1

## IN THE UNITED STATES BANKRUPTCY COURT FOR
## THE NORTHERN DISTRICT OF OKLAHOMA

RE:  GREEN COPPER HOLDINGS,    Case No.:   25-10088-T
LLC EIN # xx-xxx9708 ) CASE NO.
25-10088-T
Chapter 7

## Motion to Disqualify Trustee Due to Conflict of Interest in the Administration of the National Historic Landmark and NATIONAL HISTORIC HERITAGE OF THE AMERICAN PEOPLE and other and further relief as mandated by law

NOW COMES the undersigned interested party in the above-referenced Bankruptcy Proceeding, who, with considerable apprehension and trepidation, submits this formal notice of concern regarding the profoundly intricate and interwoven legal representations that have surfaced within these proceedings, raising serious questions regarding fairness, transparency, and the avoidance of conflicts of interest, all of which implicate fundamental ethical obligations governing fiduciary conduct.  ALL JUDICIAL EMPLOYEES, JUDGES, CLERKS and ATTORNEY are bound by the ethical, moral, and legal (INTEGRITY) issues involved in this serious filing on behalf of the undersigned and "WE THE PEOPLE" of these the UNITED STATES OF AMERICA.

In federal bankruptcy proceedings, the appointment of a special master is expressly prohibited under Rule 9031 of the Federal Rules of Bankruptcy Procedure, which states: "Rule 53 [of the Federal Rules of Civil Procedure] does not apply in cases under the [Bankruptcy] Code." https://www.bracewell.com/resources/time-has-come-special-masters-streamline-bankruptcy-cases/

However, bankruptcy courts possess inherent authority to implement measures ensuring fair and effective case management. In circumstances where an interested party harbors a justified fear of participating in proceedings via electronic communications—perhaps due to prior incarceration linked to interactions with government officials via email—specifically that of BARTLESVILLE OKLAHOMA's City Manager, MICHAEL BAILEY who claims he is not the city manager of a government but rather the CEO of Bartlesville which is operated as a business. Tthe court may consider alternative accommodations to facilitate their involvement. Such accommodations could include permitting participation through traditional paper filings, telephonic communications (though Oklahoma can and has filed felony criminal charges for persons participating in proceedings via phone), or in-person appearances (that are not economically feasible when the control person of the debtor has weaponized the legal system to prevent whistleblowers and others from cooperating with State and Federal law enforcement), thereby addressing the party's concerns while maintaining the integrity of the judicial process.https://specialmaster.law/wp-content/uploads/2017/09/benchbook.pdf

In the intricate tapestry of bankruptcy jurisprudence, the appointment of a special master is circumscribed by statutory and procedural constraints. Nonetheless, courts, vested with inherent equitable powers, may invoke alternative mechanisms to ensure that all stakeholders can engage in proceedings devoid of intimidation or prejudice. This exercise of discretion underscores the judiciary's unwavering commitment to upholding the principles of fairness and accessibility enshrined in our legal system.

Turning to the matter concerning Trustee Patrick J. Malloy, it is axiomatic that a reputation, meticulously cultivated over a lifetime, can be irrevocably tarnished by a singular lapse or the mere semblance of impropriety. Such an occurrence casts a pall over prior adjudications, inviting scrutiny and engendering suspicions of malfeasance, waste, or abuse. The gravity of this issue is amplified by widespread public discourse alluding to potential conflicts arising from Trustee Malloy's

matrimonial union with an individual who does not bear his surname—a circumstance that, in the public's perception, suggests an attempt to obfuscate their association.

The dissemination of numerous political cartoons, viewed by millions, depicting clandestine interactions between the trustee and the vice president of the Oklahoma Historical Society—a state entity heretofore uninvolved with the Price Tower—further exacerbates concerns. These interactions coincide with Trustee Malloy's stewardship over multiple bankruptcy proceedings entangled with a labyrinthine network of shell corporations, ostensibly designed to obscure the true proprietors and controlling entities of the debtor.

In corporate jurisprudence, it is imperative that an entity be endowed with adequate capitalization to fulfill its operational mandates. The formation of a New Mexico limited liability company to assume ownership of the Price Tower—a National Historic Landmark encompassing museums reportedly subsidized by federal funds, housing archives of illustrious architects Frank Lloyd Wright and Bruce Goff, as well as artifacts from Shin'enKan on loan to the Price Tower—is, at best, questionable.

A forthcoming, meticulously detailed motion will elucidate specific litigation adjudicated by the Oklahoma Supreme Court, directly addressing the proprietorship of the Shin'enKan Gate. This artifact was extricated and removed from its longstanding location after being on loan for two decades. Despite assertions by Cynthia Blanchard, broadcasted via interstate radio, that the gate was dispatched for repairs with assurances of its return to the Price Tower in Bartlesville, subsequent statements reveal she received a $50,000 deposit from the individual tasked with the purported repairs. This pecuniary transaction remains conspicuously absent from the public records of the current bankruptcy proceedings.

Complicating matters further, an accountant representing the Copper Tree entities, as well as Cynthia and Anthem Hayek Blanchard in both personal and joint capacities, has entered an appearance, asserting a claim nearing $400,000. This

same accountant is affiliated with Hera Software Development and Anthem Holdings Company—entities implicated in federal fraud litigation initiated by the United States government against Anthem Hayek Blanchard. Notably, during the period material to the Securities and Exchange Commission's fraud allegations, Cynthia D. Blanchard served as co-founder, board member, president, and purported majority shareholder of the implicated entities, which were promoted as woman-owned enterprises.

Although Mrs. Blanchard is not presently named as a defendant in the aforementioned case, it is within the knowledge of the undersigned and numerous others that both the undersigned and hundreds of concerned parties are being systematically obstructed—through the strategic exploitation of legal mechanisms by the Blanchards and their alleged co-conspirator, Chad M. Koehn—from communicating with the Securities and Exchange Commission. This obstruction effectively deprives the SEC of critical information necessary to safeguard the investing public and maintain the integrity of financial markets against fraud and manipulation.

The actions perpetrated by the Blanchards and Mr. Koehn are in direct contravention of multiple federal statutes, including, but not limited to, willful obstruction of justice and violations of SEC Rule 21F-17(a), which prohibits any action impeding an individual from communicating directly with the Commission about possible securities law violations. Such conduct not only undermines the foundational principles of transparency and accountability but also poses a significant threat to the efficacy of regulatory enforcement mechanisms designed to protect the public interest.

In the grand tapestry of jurisprudential discourse, one occasionally stumbles upon narratives so replete with intricate entanglements that they evoke both bemusement and scholarly intrigue. Consider, if you will, the curious case wherein Mr. Patrick J. Malloy, Esq., in his capacity as trustee over a series of bankruptcy proceedings, finds himself ensnared in a web of potential conflicts of interest that would make

even the most seasoned ethicist's head spin faster than a law student's during finals week.

At the heart of this legal labyrinth lies Mr. Malloy's matrimonial alliance to one Ms. Karen Keith, whose esteemed position as vice-president of the Oklahoma Historical Society adds a layer of complexity thicker than a treatise on the Rule Against Perpetuities. This esteemed Society, hitherto exhibiting a conspicuous lack of interest in the National Historic Landmark and its associated museums, suddenly manifests a keen enthusiasm coinciding suspiciously with Mr. Malloy's trusteeship—a coincidence that, to the discerning observer, seems as serendipitous as finding a needle in a haystack on the first try.

Further compounding this quagmire is the expedited time frame orchestrated by Mr. Malloy for objections to the ostensibly biased bidding procedures. This maneuver effectively places former and possibly current board members and executive directors of the public non-profit Price Tower Arts Center Inc. in a precarious position, akin to walking a legal tightrope without a safety net. These individuals, by virtue of their roles, have perpetuated the inclusion of the Price Tower and its museum assets on financial statements and federal filings to the Internal Revenue Service, thereby potentially exposing themselves to liabilities that could range from civil infractions to criminal indictments faster than one can say "excess benefit transaction."

The plot thickens when one scrutinizes the transfer of the National Historic Landmark and its invaluable contents to a New Mexico Limited Liability Company—a jurisdiction renowned for its confidentiality provisions that could make even the most secretive organizations envious. This strategic relocation, ostensibly masterminded by one Ms. Cynthia D. Blanchard, raises more red flags than a matador's wardrobe, particularly given the opaque nature of the LLC's ownership and control structures.

Enter Mr. William Bradley "Brad" Doenges, whose execution of a Quit Claim deed effectively transferred an asset appraised at over $40 million for the princely sum of

ten dollars—a transaction that, on its face, appears as fiscally prudent as purchasing a yacht for the price of a cup of coffee. This conveyance, meticulously documented in Filing Number 56, Exhibit A, and further elucidated in Document 55, Exhibit B, not only raises eyebrows but also questions regarding potential evasion of Oklahoma state taxes and the overarching legality of the transfer.

The ramifications of these actions are far-reaching, potentially ensnaring a multitude of individuals in a legal morass that could rival the complexity of a Shakespearean tragedy. The alleged misappropriation of a National Historic Landmark, along with its treasured artifacts, represents not merely a breach of fiduciary duty but an affront to the collective cultural heritage of the American populace—a transgression that demands rigorous scrutiny and, where appropriate, the full measure of legal accountability.

In summation, the confluence of matrimonial affiliations, expedited legal procedures, and the surreptitious transfer of nationally significant assets coalesces into a scenario that is as legally perplexing as it is culturally disconcerting. It serves as a poignant reminder that, in the realm of legal ethics and fiduciary responsibility, the appearance of impropriety can be as damning as the impropriety itself, warranting a level of diligence and transparency that, regrettably, appears to be as absent in this case as a unanimous Supreme Court decision.

While Karen Keith does not publicly share the surname of Patrick J. Malloy, multiple independent and publicly available sources confirm that Patrick J. Malloy is, in fact, legally married to Karen Keith. This undisclosed spousal relationship is of particular significance given that Karen Keith presently serves as the Vice-President of the Oklahoma Historical Society, the very entity that has now, for the first time, exhibited an interest in the preservation and disposition of Price Tower, a National Historic Landmark, within the purview of this highly consequential bankruptcy matter.

The failure to disclose such a direct, material relationship raises substantial concerns under the canons of professional ethics, the fiduciary obligations of

trustees, and the overarching duty to avoid even the appearance of impropriety or self-dealing in matters of public trust. As the Bankruptcy Trustee, Patrick J. Malloy is subject to uncompromising ethical obligations to ensure that the administration of this estate is conducted with absolute impartiality, procedural integrity, and an unwavering commitment to a fair and open bidding process.

The existence of an undisclosed marital relationship between the Bankruptcy Trustee and a high-ranking official of an entity that now seeks involvement in the preservation of the very property at issue calls into question:

1. Whether full and candid disclosures have been made to this Court and to all interested parties regarding the nature and extent of any discussions, advocacy, or involvement by the Oklahoma Historical Society in the bankruptcy process.
2. Whether the integrity of the bidding process has been, or may yet be, compromised by any influence, direct or indirect, exerted by the Trustee's spouse or any entity with which she is affiliated.
3. Whether the Bankruptcy Trustee's fiduciary obligations are imperiled by competing personal, professional, or institutional interests, which may operate to the detriment of a fair and neutral adjudication of the disposition of the debtor's assets.
4. Whether all ethical obligations of disclosure, recusal, and avoidance of conflicts of interest have been faithfully observed, particularly in light of the stringent ethical duties imposed upon bankruptcy trustees under the Bankruptcy Code, the U.S. Trustee Program, and applicable state bar regulations.

These concerns are not merely academic but bear directly on the fundamental legitimacy of these proceedings and the public's confidence in their openness, fairness, and adherence to ethical best practices.

Accordingly, the undersigned respectfully submits that this Court should inquire into these matters to ensure the full, transparent, and impartial administration of this bankruptcy estate, in strict accordance with the highest standards of legal ethics, fiduciary duty, and public trust.

In the hallowed halls of bankruptcy jurisprudence, where the scales of justice endeavor to balance the interests of myriad stakeholders, the trustee's assertion of disinterestedness, as articulated in paragraph (2) of Document 8—"Malloy is not a creditor of this estate and does not hold or represent an interest that is adverse to the interests of this estate"—warrants a meticulous examination under the lens of fiduciary duty and the avoidance of conflicts of interest.

While it is ostensibly accurate that neither Mr. Malloy nor his esteemed firm are cataloged as creditors within the present proceedings, and conceding that the Oklahoma Historical Society's mission ostensibly aligns with the preservation of National Historic Landmarks, it is, however, a matter of public record that the Society exhibited a conspicuous absence of engagement with this particular Landmark prior to Mr. Malloy's tenure as trustee in these unprecedented dual bankruptcy cases.

The crux of the matter lies not solely in the presence or absence of an adverse interest per se but extends to the nuanced realm of perceived impartiality and the trustee's role in orchestrating the succession of stewardship over assets of profound cultural and historical significance. The public, both within the territorial confines of Oklahoma and across the national spectrum, harbors a vested interest in the disposition of the National Historic Landmark, inclusive of its museum collections, artworks, and archival materials.

This collective concern is further exacerbated by allegations of prior misappropriation and unauthorized dispersion of artifacts—acts tantamount to cultural pillage and plunder—thereby amplifying the imperative for transparent and ethically unassailable administration of the estate. Such allegations have permeated mainstream media, with reputable publications, subject to rigorous legal scrutiny,

reporting on the purported mismanagement and illicit activities associated with the Landmark's assets.

In light of these considerations, it becomes incumbent upon the trustee to not only eschew actual conflicts of interest but also to diligently avoid any semblance of partiality or impropriety that could undermine public confidence in the equitable administration of this estate. The integrity of the bankruptcy process hinges upon such unwavering commitment to fiduciary duty and the transparent stewardship of assets entrusted to the trustee's care for the benefit of not only the creditors but on behalf of the AMERICAN PEOPLE as a whole.  "WE THE PEOPLE" of these the UNITED STATES OF AMERICA, must be taken into account regarding these irreplaceable and invaluable cultural assets of National Historic Heritage to all the people's of these the UNITED STATES OF AMERICA!

> "Karen Keith Vice President - Elected - State At-Large, Tulsa - Term expiring 2026  Karen Keith served four terms as Tulsa County Commissioner for District 2. Some of the projects she is most proud of include efforts to rebuild the Tulsa/West Tulsa Levee system. The project is currently entering the pre-engineering and design phase. After years of planning and broad support for the project, Gilcrease Expressway was opened to drivers in fall of 2022. Lastly, the design and location of a new building for the Oklahoma State University Extension is also underway, and Keith is excited to see this project come to fruition."

https://www.okhistory.org/about/kkeith

"Keith and her husband, Patrick Malloy, a Tulsa attorney, are fortunate to share their lives with Gulnara Taragachova, a foreign exchange student from Baku, Azerbaijan. Gulnara attended one year of high school in Tulsa, followed by Tulsa Community College. There she was named a Distinguished Alumni honoree and then graduated OSU-Tulsa with a degree in international business. Gulnara now lives in the Netherlands with her daughter Samaya and works for Shawcor."

In the tapestry of legal entanglements, one cannot help but raise a quizzical brow at the curious case of Ms. Cynthia D. Blanchard. At all times material to the federal fraud prosecution spearheaded by the Securities and Exchange Commission's Denver Office [NOT the CHICAGO office that Patrick Malloy has purposefully sent communications in order to DENY the Federal Government meaningful notice of these proceedings] Ms. Blanchard—acting as the control person of the purported debtor—served on the Board of Directors, as <u>President</u>, co-founder, and, by her own admission, majority shareholder of entities such as Anthem Holdings Company and HeraSoft (Hera Software Development). These entities are central to the government's case against Mr. Anthem Hayek Blanchard and the aforementioned corporate bodies. The SEC's allegations paint a portrait of a company engaged in a $5 million securities fraud, with Mr. Blanchard at the helm.

Adding a dash of international intrigue, HeraSoft has purportedly made grandiose claims of contractual engagements with <u>the government of the Netherlands</u>, asserting a role in managing the entirety of the nation's gold imports and exports. This narrative twist introduces an <u>unexpected connection to Ms. Gulnara Taragachova</u>, whose residence in the Netherlands and professional ties to "SHAWCOR" invite further scrutiny. While the extent of Ms. Taragachova's involvement with the Blanchards' ventures remains shrouded in mystery, the confluence of these relationships and international dealings certainly adds layers to an already complex legal mosaic.

The ongoing highly publicized global controversy surrounding the transfer of Price Tower, a National Historic Landmark officially designated by the Secretary of the Interior, has been extensively documented in news media. However, despite the sheer volume of investigative reports detailing the questionable conveyance of this culturally and historically significant property, not a single report has referenced the Oklahoma Historical Society (OHS) taking any discernible interest in its preservation—until the appointment of Patrick J. Malloy as the bankruptcy trustee overseeing the extraordinarily rare and highly irregular double-bankruptcy

proceedings. These proceedings appear to be the direct consequence of a calculated asset-stripping scheme, involving the deliberate dismantling of a museum reportedly funded through federal appropriations and numerous third-party public grants.

It is both alarming and legally disconcerting that the Oklahoma Historical Society's sudden interest in Price Tower's preservation efforts materialized only after Patrick J. Malloy's appointment as the trustee overseeing the bankruptcy estate. The situation becomes even more egregious upon recognizing that Patrick J. Malloy's spouse, Karen Keith, currently holds the position of Vice-President of the Oklahoma Historical Society. Furthermore, Karen Keith is identified as the State At-Large Representative for Tulsa, with a term extending through 2026, raising severe and deeply troubling conflicts of interest in relation to her husband's fiduciary obligations as bankruptcy trustee.

More disturbingly, Karen Keith's tenure as a Tulsa County Commissioner overlapped with the renovation and redevelopment of the Mayo Hotel, a historic property linked to John Snyder and/or the McFarlin Building. Given these interwoven financial, political, and personal entanglements, it is difficult, if not impossible, to envision a scenario in which Patrick J. Malloy can be expected to conduct a fair and impartial bidding process for Price Tower's assets. The situation is further exacerbated by the existence of highly questionable affidavits purportedly filed by Patrick J. Malloy himself, raising serious concerns regarding procedural integrity, trustee neutrality, and the potential for undue influence in the administration of this historic bankruptcy estate.

This matter warrants immediate judicial scrutiny, as the convergence of conflicts of interest, alleged fiduciary breaches, and deeply entrenched institutional relationships poses grave risks to the legitimacy of the bankruptcy proceedings, the preservation of a National Historic Landmark, and the public's right to a fair, transparent, and legally compliant resolution.



fox23.com

Video: Oklahoma Historical Society concerned about
Bartlesville's Price Tower after winter weather

The Oklahoma Historical Society said they're concerned about Frank Lloyd Wright's
Price Tower in Bartlesville, one of Oklahoma's national...

Hai 3 semanas

Patrick Malloy, with full cognizance and deliberate intent, effectuated service of
process upon the Securities and Exchange Commission (SEC) office situated in
Chicago, Illinois, despite possessing unequivocal knowledge that the individual
exercising dominion and control over both debtor entities was the principal actor in
all material times pertinent to the ongoing federal fraud litigation currently pending
before the United States District Court for the District of Kansas. Said litigation is
directed against control person CYNTHIA D. BLANCHARD's spouse, Anthem Hayek
Blanchard, and the corporate entity Anthem Holdings Company, under prosecution
by the Securities and Exchange Commission's Denver, Colorado, regional office
within the jurisdictional boundaries of the Tenth Circuit.

The deliberate act of Patrick Malloy in transmitting such service of process to a
geographically and jurisdictionally inappropriate SEC office constitutes a calculated
effort to obfuscate, impede, and ultimately deprive the Securities and Exchange
Commission, acting under the auspices of the United States Federal Government, of
material and pertinent information regarding the disposition of real property. This
property, by operation of law and in accordance with creditor claims asserted
through legal entities implicated in the aforementioned proceedings, falls under the
purview of the ongoing federal enforcement action in the United States District Court
for the District of Kansas.

By willfully and knowingly effecting service upon an SEC office that neither
possesses jurisdiction nor maintains prosecutorial authority within the governing
regime of the Tenth Circuit—rather than submitting such documentation to the

prosecuting regional office in Denver, Colorado—Patrick Malloy has demonstrated an egregious and manifest intent to subvert the federal government's intervention in this matter. MALLOY's actions constitute a direct contravention of procedural mandates and the statutory obligations incumbent upon officers of the court, **thereby evidencing clear and demonstrable malice against the citizenry.**

For the judicial notice of this Honorable Court, which falls under the jurisdictional purview of the Tenth Circuit, it is duly tendered that the Tenth Circuit, with its principal administrative headquarters located in Denver, Colorado, encompasses the states of Colorado, Kansas, New Mexico, Oklahoma, Utah, and Wyoming. Accordingly, the Securities and Exchange Commission's Denver office is the sole and proper regional authority vested with prosecutorial jurisdiction over enforcement actions within this circuit.

The preponderance of incontrovertible evidence presented herein establishes that Patrick Malloy has, through willful misrepresentation and procedural misconduct, intentionally diverted critical filings to an SEC office devoid of jurisdictional competency. Such actions constitute a transparent and knowing attempt to feign compliance with procedural obligations under the jurisdiction of the Tenth Circuit while simultaneously subverting the due process rights of the United States Federal Government.

Further, it is prima facie evident that Patrick Malloy, in full knowledge of the SEC office tasked with the prosecution of this matter, has deliberately elected to transmit service to an SEC office wholly without jurisdictional authority. In doing so, he has knowingly and willfully engaged in conduct that not only contravenes due process but also materially deprives the United States Federal Government of substantial and requisite notice in these proceedings. Such conduct, committed with full awareness of its consequences, constitutes an egregious breach of procedural integrity, warranting the strongest possible judicial scrutiny and remedial intervention.

14

**Case Precedents Supporting the Legal Averments:**

1. **Liberal Construction of Pro Se Filings:**

   o *Haines v. Kerner*, 404 U.S. 519 (1972): The Supreme Court held that pro se pleadings are to be held to "less stringent standards than formal pleadings drafted by lawyers."

   o *Erickson v. Pardus*, 551 U.S. 89 (2007): Reaffirmed that a pro se complaint, however inartfully pleaded, must be liberally construed and held to less stringent standards than formal pleadings drafted by attorneys. https://casetext.com/case/kalmar-v-branning

   o *Estelle v. Gamble*, 429 U.S. 97 (1976): Emphasized that pro se documents are to be liberally construed.

   o *Kalmar v. Branning*, No. 2:21-cv-543-JLB-MRM (M.D. Fla. 2021): Noted that "A document filed pro se is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." https://casetext.com/case/kalmar-v-branning

2. **Enforcement of SEC Rule 21F-17(a):**

   o *In the Matter of Activision Blizzard, Inc.*, File No. 3-21294 (Feb. 3, 2023): The SEC charged Activision Blizzard for including language in separation agreements that violated Rule 21F-17(a) by requiring employees to notify the company of any requests from an administrative agency in connection with a report or complaint. https://katzbanks.com/employment-law-blog/sec-enforcement-action-for

-rule-21f-17a-violations/

- *In the Matter of Guggenheim Securities, LLC*, File No. 3-20370 (June 23, 2021): The SEC found that Guggenheim's compliance manual and training materials improperly prohibited employees from initiating contact with any regulator without prior approval, violating Rule 21F-17(a).
  https://www.sec.gov/enforcement-litigation/whistleblower-program/whistleblower-protections

- *SEC v. Collector's Coffee, Inc., et al.*, No. 19-cv-04355 (S.D.N.Y. Nov. 4, 2019): The SEC charged violations of Rule 21F-17(a) where defendants conditioned the return of investor funds on agreements prohibiting reporting potential securities law violations to law enforcement, including the SEC.
  https://www.sec.gov/enforcement-litigation/whistleblower-program/whistleblower-protections

The Bankruptcy Code, under 11 U.S.C. § 324(a), provides that a court may remove a trustee for cause after notice and a hearing. While the Code does not explicitly define "cause," courts have interpreted it to include situations where a trustee's personal relationships or interests could interfere with their impartial administration of the estate. For instance, the Handbook for Chapter 7 Trustees outlines scenarios that may constitute conflicts of interest or lack of disinterestedness, such as when the trustee has represented the debtor or a creditor in other matters, or when the trustee has a personal or business relationship with a party in interest.

In the matter at hand, the removal of a bankruptcy trustee due to alleged conflicts of interest is <u>governed by 11 U.S.C. § 324(a)</u>, which permits the court to remove a trustee "for cause" after notice and a hearing. The term "cause" is not explicitly defined within the Bankruptcy Code, necessitating a case-by-case analysis. In *In re*

*Tres-Ark, Inc.*, the court emphasized the gravity of such removal, noting that it is a serious action not undertaken lightly and that the burden of proof lies with the party seeking removal, typically requiring a preponderance of the evidence. www2.txwb.uscourts.gov

A trustee's duty to remain disinterested and avoid conflicts of interest is **paramount.** The Bankruptcy Code mandates that trustees must not hold interests materially adverse to the estate or its stakeholders. A conflict of interest can constitute sufficient cause for removal. Furthermore, 28 C.F.R. § 58.6 outlines grounds for trustee suspension or removal, including conflicts of interest or lack of disinterestedness. https://www2.txwb.uscourts.gov/opinions/opdf/09-12589-cag_Tres-ark%2C%20Inc._2012-11-21%2023%3B05%3B14.pdf

In the current case, the trustee's marital relationship to an elected official, **who has shown interest in the National Historic Landmark** central to these proceedings, raises questions about the trustee's disinterestedness and potential conflicts of interest. The public perception of impropriety, especially when combined with actions that may favor certain parties over the interests of the estate or the public, can undermine confidence in the fair administration of justice. As noted in *In re CNC Payroll, Inc.*, a trustee's actions that appear to preordain outcomes benefiting their own interests can be grounds for concern and removal.

https://casetext.com/case/in-re-cnc-payroll-inc

**Case Precedents Supporting the Legal Averments:**

1. **In re BH & P Inc., 949 F.2d 1300 (3d Cir. 1991):** This case underscores the imperative for bankruptcy trustees to maintain disinterestedness and avoid conflicts of interest. The Third Circuit upheld the removal of a trustee who simultaneously represented related entities, highlighting that even the appearance of a conflict can compromise the integrity of the bankruptcy

process.

2. **In re AFI Holding, Inc., 530 F.3d 832 (9th Cir. 2008):** The Ninth Circuit affirmed the removal of a Chapter 7 trustee due to a material conflict of interest, emphasizing that a trustee's impartiality is paramount and that any significant conflict warrants removal to preserve the bankruptcy system's integrity. https://caselaw.findlaw.com/court/us-9th-circuit/1032888.html

3. **In re Tres-Ark, Inc., No. 09-12589-CAG (Bankr. W.D. Tex. Nov. 21, 2012):** This case acknowledges the gravity of removing a trustee under Section 324 of the Bankruptcy Code, noting that such removal is a serious action not undertaken lightly. It emphasizes that the burden of proof lies with the party seeking removal, typically requiring a preponderance of the evidence.

WHEREFORE, it is hereby petitioned that this Honorable Court issue an order effectuating the following relief:

1. **Recognize Pro Se Leniency:** Acknowledge the pro se status of the filer and construe the submitted documents liberally, in accordance with established precedents, to ensure that substantive rights are not forfeited due to procedural technicalities.

2. **Immediate Removal of the Trustee: An order removing the current trustee from their position in this case due to the evident conflict of interest arising from their spousal relationship with an interested party, which compromises the trustee's disinterestedness and fiduciary obligations. WITH REFERRAL TO US DOJ and LAW ENFORCEMENT FOR INVESTIGATION INTO ALL ACTS PERFORMED BY THE TRUSTEE TO DATE INCLUDING ALL EX PARTE COMMUNICATIONS! Remove the Appointed Bankruptcy Trustee: Pursuant to 11 U.S.C. § 324(a), remove the current trustee due to evident conflicts of interest arising from**

**matrimonial ties to an elected official with vested interests in the proceedings, which compromise the trustee's disinterestedness and impartiality.**

3. <u>**Appointment of a Successor Trustee:**</u> **The designation of a new, impartial trustee to ensure the unbiased and faithful administration of the bankruptcy estate, free from conflicts of interest or appearances of impropriety.**

4. <u>**Address Impediments to SEC Communication:**</u> Declare any contractual provisions or actions that impede the undersigned's ability to communicate directly with the Securities and Exchange Commission (SEC) regarding potential securities law violations as unenforceable, pursuant to SEC Rule 21F-17(a), the ongoing extrajudicial and direct harassment being perpetrated by CYNTHIA DIANE BLANCHARD in concert with her husband ANTHEM HAYEK BLANCHARD that are tantamount to **OBSTRUCTION of JUSTICE** as they work in conspiracy with their alleged co-conspirator CHAD M. KOEHN in Kansas, who has previously threatened the lives of Article III Judges and Magistrates in addition to his acts of misogyny and racial bias to an African American Female Judge Magistrate Birzer sitting for the US District of Kansas a Judge he personally sought the recusal of and eventually succeeded in recusing via what the Federal Judge categorized as a contrite recusal by "knee capping" the Federal Magistrate!

5. **Mandate Proper Notification to the Securities and Exchange Commission (SEC):** Direct the newly appointed trustee to ensure that all pertinent filings and notices related to these proceedings are duly served

upon the <u>appropriate prosecutorial office of the SEC</u>, **specifically the Denver, Colorado office**, which is actively engaged in the prosecution of matters concerning the control persons of the purported debtor.

6. **Reset Procedural Timelines:** Order the recalibration of all relevant procedural deadlines and timelines to ensure that all interested parties, including pro se creditors and members of the public, are afforded adequate notice and opportunity to participate meaningfully in these proceedings.

7. **Admonish Participating Attorneys Regarding Ethical Obligations:** Formally remind all attorneys participating in these proceedings of their ethical and legal obligations under the Rules of Professional Conduct, particularly Rule 8.3 concerning the reporting of professional misconduct. Emphasize the imperative of adherence to these ethical standards to maintain the integrity of the legal profession and the judicial process.

8. **Address Recent Presidential Memorandum:** Acknowledge and consider the implications of the recent Presidential Memorandum titled "Preventing Abuses of the Legal System and the Federal Court," which underscores the necessity for attorneys to uphold the highest standards of ethical conduct and the importance of preventing frivolous or vexatious litigation.

9. **Enjoin Restrictive Agreements:** Issue an injunction preventing the enforcement of any agreements or policies that violate SEC Rule 21F-17(a) by restricting the undersigned's right to report potential securities law

violations to the SEC or other regulatory authorities.

https://www.sec.gov/enforcement-litigation/whistleblower-program/whistleblow
er-protections

10. **Grant Further Relief:** Provide such other and further relief as the Court
deems just and proper to protect the undersigned's rights and ensure
compliance with applicable laws and regulations.

A document filed pro se is "to be liberally construed," Estelle, 429 U.S. "pro se …
however inartfully pleaded, must be held to less stringent standards than formal
pleadings drafted by lawyers," ibid. Cf. Fed. Rule Civ. Proc. 8(f) ("All pleadings shall
be so construed as to do substantial justice"). "filings generously and with the
leniency due pro se litigants", see Erickson v. Pardus, U.S. 127 S.Ct. L.Ed.2d
(2007); Andrews v. Heaton, 483 F.3d (10th Cir.2007).

RESPECTFULLY SUBMITTED,

Michael Eric Nelson
Care of the United States Secretary of State for foreign location re-routing.
702.932.3434

Email only to be used after pre-notification as to email address sending documents from in order
to have the address authorized to receive said notices: michaelericnelson @ilcoud.com *

CERTIFICATE OF SERVICE & DECLARATION OF RESTRICTED DISCLOSURE

IN THE MATTER OF JUDICIAL NOTICE AND PROCEDURAL ASSERTION OF RESTRICTIVE NON-DISSEMINATION MANDATES

WHEREAS, in strict adherence to the prevailing corpus of procedural jurisprudence, statutory imperatives, and doctrinal maxims enshrining the sacrosanct principles of procedural due process and equitable notice, the undersigned, acting in an abundance of caution and in full cognizance of binding jurisdictional predicates, hereby certifies that effectuate service of the foregoing instrument has been executed in conformity with the prevailing mandates of statutory law, codified procedural governance, and applicable adjudicatory directives.

NOTWITHSTANDING, in recognition of extrajudicial anomalies, convoluted procedural exigencies, and the demonstrable tactical exploitation of statutory architecture heretofore executed with artifice and calculated intent, it is hereby formally, unequivocally, and incontrovertibly noticed that the subject filing—individually, severally, and in the aggregate—shall not, under any conceivable construction, legal fiction, interpretative lens, or attenuated inference, be conveyed, transmitted, promulgated, or otherwise disseminated in any form, manner, or medium—whether directly, derivatively, incidentally, or by operation of constructive notice—to the individual personage of Chad Mitchell Koehn, aka Chad Koehn, C. Mitch Koehn, Chad M. Koehn, Chad Mitchell K., Chad Mitch K, Chad Koehn Mitchell, Chad Mitchel Koehn or any other derivative he may use nor to any juridical entity, corporate enterprise, organizational consortium, trust arrangement, professional association, individual, attorney, consort, person, associate, employee or extrinsic affiliate with whom Chad M. Koehn maintains, has maintained, or is reasonably deduced to have maintained any contractual nexus, fiduciary entanglement, agency affiliation, governance role, or informal economic coalescence.

Said prophylactic restriction is predicated upon the putative existence of an adjudicatory directive, the precise linguistic contours and jurisdictional breadth of which remain presently indeterminate, but which is purported to have been issued sub silentio.

WHEREFORE, the undersigned, in full cognizance of the gravity and jurisdictional implications of the foregoing assertions, reserves all procedural, statutory, and constitutional prerogatives available under prevailing federal jurisprudence, including but not limited to the absolute right to seek adjudicatory redress for any and all infractions, violations, or legally cognizable transgressions arising from the conduct herein delineated.  To include without limitation emergency appeal to the Bankruptcy Appealette Board, the emergency notification to the 10th Circuit Court of Appeals and emergency service of UNITED STATES SUPREME COURT RULE 22 Application upon Justice Neil Gorsuch, of the same UNITED STATES SUPREME COURT.

<u>Formal Entry of Appearance and Notice to All Parties</u>

Let it be hereby formally noticed, advised, and acknowledged by all recipients of this legal notification that the undersigned makes this entry of appearance as an interested party pursuant to the applicable rules, regulations, statutory provisions, and procedural mandates governing these proceedings. Said appearance is made without divulging, conceding, or directly affirming any prior, existing, or underlying relationship, connection, or affiliation with CHAD M. KOEHN in any legal, financial, contractual, or extrajudicial capacity.

It is further acknowledged and asserted that CHAD M. KOEHN and UNITED CAPITAL MANAGEMENT OF KANSAS INC.—the latter having been previously recognized by the State of Kansas under the stylized corporate designation "UNITEDCAPITALMANAGEMENTOFKANSASINC."—have entered into a contractual agreement with the undersigned. Said agreement explicitly prohibits the undersigned from engaging in communications, disclosures, or reporting with the

Securities and Exchange Commission (SEC) regarding any matters pertaining to potential securities fraud, regulatory violations, financial malfeasance, corporate misconduct, or other violations of federal securities laws allegedly perpetrated by CHAD M. KOEHN and/or UNITED CAPITAL MANAGEMENT OF KANSAS INC.

The aforementioned prohibition stands in direct contravention of Securities and Exchange Commission Rule 21F-17(a), which expressly forbids any contractual or extrajudicial restriction that impairs, obstructs, or precludes an individual's right to directly communicate with the SEC regarding potential violations of the Securities Exchange Act of 1934, the Dodd-Frank Wall Street Reform and Consumer Protection Act, or any other applicable securities regulations.

Accordingly, the undersigned places this formal notice on the record to underscore the existence of a legally questionable and potentially unenforceable restriction imposed by CHAD M. KOEHN and UNITED CAPITAL MANAGEMENT OF KANSAS INC., which stands in conflict with federal law, public policy, and SEC-mandated whistleblower protections.

<u>Formal Legal Notice and Comprehensive Disclaimer of Communication with Any Affiliated Party of Chad M. Koehn, including towit Mike Moran, Dale Takio and/or Craig Alan Brand and/or Cynthia D. Blanchard</u>

In recognition of and with a heightened awareness of the extraordinary and egregiously unlawful deprivation of liberty previously suffered by the undersigned—wherein the undersigned endured an unjustified, protracted, and perilously hazardous period of incarceration within a high-risk correctional facility situated in Newark, New Jersey—the undersigned, exercising an abundance of caution, heightened diligence, and unequivocal legal prudence, hereby submits and formally asserts the following legal declaration, disclaimer, and notice to all entities, individuals, and persons in receipt of this filing or otherwise privy to its content:

1. The undersigned explicitly and categorically repudiates, disclaims, and negates any suggestion, implication, or inference that the undersigned has engaged in, is engaging in, or shall in any future capacity engage in direct, indirect, incidental, or implied communication, transmission, discourse, correspondence, interaction, or any form of contact—whether **oral, written, electronic, digital, personal, constructive, substantive, ancillary, or otherwise—with any individual, corporation, entity, association, governmental subdivision, limited liability company, trust, partnership, fiduciary, agent, officer, employee, contractor, affiliate, subsidiary, parent entity, or legal representative that is, was, or may in any capacity be affiliated, connected, associated, or otherwise related to Chad M. Koehn, either personally, professionally, financially, legally, or extrajudicially.

2. The electronic submission and filing of the instant legal notice, document, or other court-related material has been conducted exclusively via the PACER (Public Access to Court Electronic Records) system, an official United States Federal Judiciary platform designated for the lawful and regulated submission of filings before the United States Federal Bankruptcy Court.

3. Any and all notifications, advisories, procedural transmissions, or legal correspondences that are the result of, incidental to, or arising from the electronic submission of the instant filing within the PACER system shall be deemed to constitute notifications effectuated solely and exclusively by the United States Federal Bankruptcy Court itself, pursuant to the Federal Rules of Bankruptcy Procedure, the Local Rules of the United States Bankruptcy Court, and any relevant federal statutory provisions governing electronic service of process, notifications to creditors, and legal notice procedures in bankruptcy matters.

4. The undersigned disavows, disclaims, and negates any and all assertion, implication, or supposition that the undersigned has initiated, solicited, facilitated, attempted, or otherwise engaged in any form of direct or indirect interaction, discussion, or communication—whether voluntary, involuntary,

constructive, or otherwise—with any entity or individual falling within the orbit of Chad M. Koehn's personal, professional, corporate, financial, fiduciary, or legal sphere of influence, involvement, or association.  The undersigned is prohibited under coercion and threat of legal armageddon against the undersigned's elderly mother if the SEC or any other Federal regulatory authority or law enforcement entity is provided information regarding the large scale alleged ponzi scheme and/or money laundering activities involving CHAD M. KOEHN and his alleged co-conspirators and therefore this statement of interested party status pursuant with the rights under the Bankruptcy Code is explicitly filed without authorization to be given in any way to a member of the Federal Law Enforcement Community, the SEC, CFTC, IRS, FTC, FinCEN or other regulatory authority having obligations of regulatory oversight over Chad M. Koehn and/or his co-conspirators.

5. Insofar as any individual, legal entity, judicial officer, administrative body, creditor, claimant, or party in interest receives notice of the instant filing, its contents, or any procedural advisement emanating from its submission, such notice shall be deemed to have been made by and through the formal ministerial functions of the United States Federal Bankruptcy Court itself, not by the undersigned personally, indirectly, incidentally, or by any other construct or legal fiction that would purport to impute communication to the undersigned.

6. The undersigned reserves all rights, privileges, defenses, and immunities afforded under the United States Constitution, federal statutory law, common law doctrines, bankruptcy code provisions, judicial precedents, procedural safeguards, and equitable principles to preclude, reject, negate, and oppose any and all mischaracterizations, erroneous inferences, wrongful interpretations, malicious distortions, or unfounded presumptions that would suggest, insinuate, or falsely ascribe any communicative act, participatory engagement, or intentional interaction by the undersigned with Chad M.

Koehn or any affiliated entity, organization, or person.

Accordingly, all creditors, claimants, parties in interest, government agencies, regulatory bodies, and legal representatives are hereby formally placed on notice of the aforementioned assertions, reservations, disclaimers, and protections governing the legal position and conduct of the undersigned with respect to the instant matter and any peripheral proceedings related thereto.

When filed to the US Federal Court this filing will be automatically sent to the parties of record pursuant with the Federal Court's automatic notification systems, therefore service so rendered pursuant with applicable law notwithstanding the aforementioned foregoing disclaimer.



Michael Eric Nelson
Care of the United States Secretary of State for foreign location re-routing.
702.932.3434

Email only to be used after pre-notification as to email address sending documents from in order to have the address authorized to receive said notices:  michaelericnelson @ilcoud.com *