MOTION FOR JUDICIAL NOTICE PURSUANT TO FED. R. EVID. 201 AND
REQUEST FOR RELIEF REGARDING THE "SHIN'EN KAN GATE" AND
ARTIFACTS ATTRIBUTED TO BRUCE GOFF & SHIN'EN KAN; FOR
PROTECTION OF HISTORICALLY SIGNIFICANT PROPERTY HELD IN PUBLIC
TRUST AND REPORTEDLY FUNDED IN PART THROUGH FEDERAL
PROGRAMS

# EXHIBIT

# "B"

# <u>To Follow . . .</u>

<u>IN THE UNITED STATES BANKRUPTCY COURT FOR</u>
<u>THE NORTHERN DISTRICT OF OKLAHOMA</u>

<u>RE:  GREEN COPPER HOLDINGS, LLC</u>
<u>(EIN # xx-xxx9708 ) CASE NO.</u>
<u>25-10088-T</u>
<u>Chapter 7</u>

Case No.:  25-10088-T

<u>LAWSUIT filed by CYNTHIA D. Blanchard and Green Copper Holdings vs. Frank
Lloyd Wright Building Conservancy</u>

<u>COPPER TREE, INC. VS. FRANK LLOYD WRIGHT BUILDING CONSERVANCY et al</u>

*Case
Identifier*    <u>Washington OK —
CJ-2024-00237</u>

## IN THE DISTRICT COURT IN AND FOR WASHINGTON COUNTY
## STATE OF OKLAHOMA

COPPER TREE INC., a Delaware
corporation; GREEN COPPER
HOLDINGS, LLC, a New Mexico limited
liability company, and CYNTHIA
BLANCHARD, an individual,

       Plaintiffs,

v.

FRANK LLOYD WRIGHT BUILDING
CONSERVANCY, an Illinois nonprofit
organization; PRICE TOWER ARTS
CENTER, INC., an Oklahoma nonprofit
organization,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.  CJ-2024-237
Judge Vaclaw

DEC 1 2 2024

## DEFENDANT FRANK LLOYD WRIGHT BUILDING CONSERVANCY'S ANSWER
## AND COUNTERCLAIM TO PLAINTIFFS' PETITION

For its Answer and Defenses to Plaintiffs Copper Tree Inc., ("Copper Tree") Green Copper

Holdings, LLC ("Green Copper"), and Cynthia Blanchard's (collectively "Plaintiffs") Petition,

Defendant Frank Lloyd Wright Building Conservancy (the "Conservancy" or "Defendant"),

through its counsel of record, Crowe & Dunlevy, through Malcolm E. Rosser IV, Kayci Hughes,

and Deric J. McClellan, denies each and every allegation set forth in the Petition except as

expressly admitted herein and further states as follows:

### JURISDICTION AND VENUE

1.     Admitted.

2.     Admitted.

3.     Admitted.

4.     Admitted.

81732083.6

5.      Defendants deny the allegations in Paragraph 5 of Plaintiffs' Petition. Price Tower Arts Center Inc. is still an active not-for-profit corporation, and Defendants explicitly deny any insinuation to the contrary in Paragraph 5 of Plaintiffs' Petition. Defendants further deny the remaining allegations in Paragraph 5 of Plaintiffs' Petition.

6.      Admitted.

7.      Admitted.

8.      Admitted.

## STATEMENT OF FACTS

9.      Defendant incorporates the preceding Paragraphs of this Answer as if fully set forth herein.

10.     Admitted.

11.     Admitted.

12.     Defendant admits that the Easement referenced in Paragraph 12 of Plaintiffs' Petition was recorded on April 18, 2011, with the Washington County Clerk in Book 1098, Page(s) 238-252, in favor of the Conservancy. Defendant denies Plaintiffs' insinuation that the Price Tower is no longer subject to the Easement. Defendant further denies the remaining allegations in Paragraph 12 of Plaintiffs' Petition.

13.     Defendant admits that the document referenced in Paragraph 13 of Plaintiffs' Petition speaks for itself.

81732083.6

# FIRST CAUSE OF ACTION
## DECLARATORY JUDGMENT
### (Against the Conservancy)

**I.    THE EASEMENT EXTINGUISHED BY ITS OWN TERMS.**[1]

14.    Defendant incorporates the preceding Paragraphs of this Answer as if fully set forth herein.

15.    Admitted.

16.    Admitted.

17.    Defendant admits that Plaintiffs did not sign the Easement. Defendant denies that there is any legal significance to this fact. Defendant denies the remaining allegations in Paragraph 17 of Plaintiffs' Petition.

18.    Defendant admits that the Easement contains a clause in Section 20 providing for the possibility of its extinguishment.

19.    Defendant denies the allegations in Paragraph 19 of Plaintiffs' Petition.

20.    Defendant admits, on information and belief, that Plaintiffs are not Internal Revenue Code Section 501(c)(3) organizations. Defendant denies that there is any legal significance to this fact and points out that Defendant itself is an Internal Revenue Code Section 501(c)(3) organization. Defendant denies the remaining allegations in Paragraph 20 of Plaintiffs' Petition.

21.    Defendant denies the allegations in Paragraph 21 of Plaintiffs' Petition.

**II.    THE EASEMENT DOES NOT APPLY TO PERSONAL PROPERTY.**

22.    Defendant denies the allegations in Paragraph 22 of Plaintiffs' Petition.

---

[1] Defendant's inclusion of Plaintiff's headings and subheadings is merely used for organizational purposes. The inclusion of such headings and subheadings should not be read as an admission of their truth or validity, and Defendant expressly denies everything located in the headings and subheadings of Plaintiffs' Petition.

3

81732083.6

23.     Defendant admits that the Easement does not contain the terms "security interest," "security agreement," or "personal property," but denies that there is any legal significance to this fact.

24.     Defendant denies the allegation in Paragraph 24 of Plaintiffs' Petition. The Easement pertains to property of historical value as identified and defined by the Easement and exhibits thereto. *See* Preservation and Conservation Easement, attached as **Exhibit A-1** to the Affidavit of Barbara Gordon contained in **Exhibit A** ("Gordon Affidavit"). Section 2(g) of the Easement refers to an "Exhibit C," which is attached to the Easement. Exhibit C contains a list of "Protected Historic Features." *Id.*. § 2(g). The list of "Protected Historic Features" includes a category labeled "Museum Collection Items," and underneath that label is the description "Itemized annual listing of collection holdings from all categories" ("Inventory Lists"). Thus, the Easement incorporates by reference "Exhibit C," and Exhibit C incorporates by reference the Inventory Lists. *Id.*, Ex. C. The Easement prevents the owner of the building from altering or changing the interior artworks and architectural features of the building without prior consent of the Grantee (the Conservancy). *See id.* § 2(g). And, the Easement applies to the "designed total environments, including architecture, furniture and decorative glass, windows and arts, so that the removal of these elements diminishes the artistic and historical value of such environments." *See id.*, Recitals.

25.     Defendant denies the allegations in Paragraph 25 of Plaintiffs' Petition. The Easement runs with the land as "a binding servitude with the Premises," and is binding on the Grantor and their successors in interest," as articulated in Section 11 of the Easement. The Easement "constitute[s] a binding servitude, to run in perpetuity upon [the] Premises" as specified in the Recitations of the Easement.

4

81732083.6

26.      Defendant denies the allegations in Paragraph 26 of Plaintiffs' Petition. Oklahoma

has enacted the Uniform Conservation Easement Act ("Act"). 60 O.S. § 49.1-8. Under the Act, a

conservation easement is defined as "a nonpossessory interest of a holder in real property

imposing limitations or affirmative obligations the purpose of which include, but are not limited

to, retaining or protecting natural, scenic, or open-space values of real property, assuring its

availability for agricultural , forest, recreational, or open-space use, protecting natural resources,

maintaining or enhancing air or water quality, **or preserving the historical, architectural,**

**archaeological, or cultural aspects of real property**[.]" *Id.* § 49.2(1) (emphasis added).

Accordingly, easements created pursuant to the Act can place limitations and affirmative

obligations on the alienation of property if protection of that property is required to "preserve the

historical, architectural, archaeological, or cultural aspects of real property." *Id.* Moreover,

regardless of its title, the Easement contains specific, express restrictions on what can be done

with the property in the Price Tower. *See,* **Ex. A-1**, Recitals ("Frank Lloyd Wright designed total

environments, including architecture, furniture and decorative glass, windows and arts, so that

the removal of these elements diminishes the artistic and historical value of such environment.").

27.      Defendant admits that certain property in the Price Tower is not land, but denies

that there is any legal relevance to this fact. The Frank Lloyd Wright-designed property in the

Price Tower is part of the overall Price Tower property.

28.      Defendant denies the allegations in Paragraph 28 of Plaintiffs' Petition.

29.      Defendant denies the allegations in Paragraph 29 of Plaintiffs' Petition.

**III.   THE EASEMENT DOES NOT CREATE A SECURITY INTEREST AGAINST PLAINTIFFS IN THE CONSERVANCY'S FAVOR.**

30.      Defendants deny the allegations in Paragraph 30 of Plaintiffs' Petition.

31.      Admitted.

5

81732083.6

32.     Defendants deny the allegations in Paragraph 32 of Plaintiffs' Petition. Upon information and belief, Ms. Blanchard purported to claim ownership of numerous parts of the Price Tower property, contained in the UCC Filing, when she sold them to third parties or pledged them as collateral to third parties. Moreover, on information and belief, Ms. Blanchard caused numerous parts of the Price Tower property to be moved from the Price Tower to her personal residence, from which she sold those items to third parties.

33.     Defendant admits that Blanchard did not sign any document labeled as a security agreement. Defendant denies the remaining allegations in Paragraph 33 of Plaintiffs' Petition.

34.     Defendant admits that Blanchard did not sign any document labeled as a security agreement. Defendant denies the remaining allegations in Paragraph 34 of Plaintiffs' Petition.

35.     Defendant admits that Green Copper did not sign any document labeled as a security agreement. Defendant denies the remaining allegations in Paragraph 35 of Plaintiffs' Petition.

36.     Defendant admits that Green Copper did not sign any document labeled as a security agreement. Defendant denies the remaining allegations in Paragraph 36 of Plaintiffs' Petition.

37.     Defendant admits that Copper Tree did not sign any document labeled as a security agreement. Defendant denies the remaining allegations in Paragraph 37 of Plaintiffs' Petition.

38.     Defendant admits that Copper Tree did not sign any document labeled as a security agreement. Defendant denies the remaining allegations in Paragraph 38 of Plaintiffs' Petition.

81732083.6

39.    Defendant admits that the attachment to the UCC Filing referenced in Paragraph 39 of Plaintiffs' Petition speaks for itself. Defendant denies the remaining allegations in Paragraph 39 of Plaintiffs' Petition.

40.    Defendant admits that the Easement speaks for itself. Defendant denies the remaining allegations in Paragraph 40 of Plaintiffs' Petition.

41.    Defendant admits that the 2024 Inventory is not signed by Plaintiffs. Defendant denies the remaining allegations in Paragraph 41 of Plaintiffs' Petition.

42.    Defendant denies the allegations in Paragraph 42 of Plaintiffs' Petition. The Easement makes reference to property that is part of the Price Tower described in the 2024 Inventory via Section 2(g), which refers to an "Exhibit C." Exhibit C, which is attached to the Easement and fully incorporated therein, contains a list of categories of "Protected Historic Features" which encompass the 2024 Inventory. **Ex. A-1**, § 2(g)

43.    Defendant denies the allegations in Paragraph 43 of Plaintiffs' Petition. The Easement prevents the owner of the building from altering or changing the interior artworks and architectural features of the building without the grantee (the Conservancy)'s prior consent. **Ex. A-1**, § 2(g). Section 2(g) of the Easement refers to an "Exhibit C," which is attached to the Easement. Exhibit C contains a list of "Protected Historic Features." *Id*. The list of "Protected Historic Features" includes a category labeled "Museum Collection Items," and underneath that label is the description "Itemized annual listing of collection holdings from all categories" ("Inventory Lists"). Thus, the Easement incorporates by reference "Exhibit C," and Exhibit C incorporates by reference the Inventory List. *Id*. Defendant denies the remaining allegations in Paragraph 43 of Plaintiffs' Petition.

44.    Defendant denies the allegations in Paragraph 44 of Plaintiffs' Petition.

7

81732083.6

45.     Defendant admits the allegations in Paragraph 45 of Plaintiffs' Petition. Defendant denies that there is any legal significance to this fact as Plaintiffs' approval of any inventory lists is not necessary for the enforceability and validity of the Easement. Moreover, Plaintiffs were presented with an inventory list from 2022 following the purchase by Plaintiffs of the Price Tower.

46.     Defendant denies the allegations in Paragraph 46 of Plaintiffs' Petition.

47.     Defendant denies the allegations in Paragraph 47 of Plaintiffs' Petition.

48.     Defendant denies the allegations in Paragraph 48 of Plaintiffs' Petition.

49.     Defendant admits that the Court has jurisdiction to adjudicate the controversy existing between Plaintiffs and Defendant.

**SECOND CAUSE OF ACTION**
**INJUNCTION**
**(Against the Conservancy)**

50.     Defendant incorporates the preceding Paragraphs of this Answer as if fully set forth herein.

51.     Defendant admits that the statute referenced in Paragraph 51 of Plaintiffs' Petition speaks for itself. Defendant denies the remaining allegations in Paragraph 51 of Plaintiffs' Petition.

52.     Defendant denies the allegations in Paragraph 52 of Plaintiffs' Petition.

53.     Defendant denies the allegations in Paragraph 53 of Plaintiffs' Petition.

54.     Defendant denies the allegations in Paragraph 54 of Plaintiffs' Petition.

55.     Defendant denies the allegations in Paragraph 55 of Plaintiffs' Petition.

56.     Defendant denies the allegations in Paragraph 56 of Plaintiffs' Petition.

81732083.6

### THIRD CAUSE OF ACTION
### <u>TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE</u>
#### (Against the Conservancy)

57.      Defendant incorporates the preceding Paragraphs of this Answer as if fully set forth herein.

58.      Defendant does not have sufficient information or knowledge to specifically admit or deny the allegations in Paragraph 58 of Plaintiffs' Petition, and therefore denies such allegations.

59.      Defendant denies the allegations in Paragraph 59 of Plaintiffs' Petition.

60.      Defendant denies the allegations in Paragraph 60 of Plaintiffs' Petition.

61.      Defendant denies the allegations in Paragraph 61 of Plaintiffs' Petition.

62.      Defendant denies the allegations in Paragraph 62 of Plaintiffs' Petition.

63.      Defendant denies the allegations in Paragraph 63 of Plaintiffs' Petition.

### FOURTH CAUSE OF ACTION
### <u>QUIET TITLE</u>
#### (Against all Defendants)

64.      Defendant incorporates the preceding Paragraphs of this Answer as if fully set forth herein.

65.      Defendant denies the allegations in Paragraph 65 of Plaintiffs' Petition.

66.      Defendant denies the allegations in Paragraph 66 of Plaintiffs' Petition.

With respect to Plaintiffs' prayer for relief, Defendant denies that Plaintiffs are entitled to any relief.

### <u>AFFIRMATIVE DEFENSES</u>

Pursuant to Oklahoma Rule of Civil Procedure 12 O.S. § 2012(B), Defendant asserts the following affirmative defenses. These legal defenses are offered based on the facts known at this

9

81732083.6

time. As discovery is still ongoing, Defendant specifically reserves the right to assert allegations, any and all other claims, legal defenses and arguments which may be applicable.

1.    Plaintiffs fail to state a claim pursuant to which relief can be granted.

2.    Plaintiffs' claims are barred, in whole or in part, based on the Plaintiff's failure to mitigate its damages.

3.    Plaintiffs' claims are barred, in whole or in part, based on estoppel.

4.    Plaintiffs' claims are barred, in whole or in part, by Plaintiff's unclean hands.

5.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

6.    Defendant acted in good faith at all times.

## DEFENDANT'S COUNTERCLAIM

### I.    PARTIES, JURISDICTION, AND VENUE

Defendant Frank Lloyd Wright Building Conservancy (the "Conservancy" or "Defendant"), through its counsel of record, Crowe & Dunlevy, through Malcolm E. Rosser IV, Kayci Hughes, and Deric J. McClellan, files this Counterclaim against Plaintiffs Copper Tree Inc., ("Copper Tree") Green Copper Holdings, LLC ("Green Copper"), and Cynthia Blanchard (collectively "Counter-Defendants") and states and alleges as follows:

1.    Defendant incorporates its responses, including denials and admissions, to the allegations contained in Paragraphs 1-8 of Plaintiffs' Petition regarding identification of the parties, jurisdiction, and venue.

### II.    BACKGROUND

#### A.    Frank Lloyd Wright and the Price Tower

2.    Frank Lloyd Wright is arguably the most famous American architect in history. Eight of his buildings were inscribed onto the United Nations Educational, Scientific and

81732083.6

Cultural Organization's ("UNESCO") World Heritage List in 2019 for their "outstanding universal value." *See* Affidavit of Barbara Gordon, attached hereto as **Exhibit A**.

3.    Born in 1867, and living until 1959, Frank Lloyd Wright revolutionized his field with his organic architecture philosophy that sought to promote harmony between human habitation and the natural world. *Id.* ¶ 4.

4.    Mr. Wright designed more than 1,000 structures during his seventy-year career, and the American Institute of Architects has labeled him "the greatest American architect of all time." *Id.* ¶ 5.

5.    One of Mr. Wright's most famous works was the Price Tower, a spectacular building of copper and concrete that stands nineteen stories tall in downtown Bartlesville, Oklahoma. *Id.* ¶ 6.

6.    Harold C. Price commissioned the Price Tower for use as a corporate headquarters for his pipeline and construction company. Construction on the Price Tower was completed in 1956. Designed on a quadrant plan, three quadrants were designated for offices while the remaining quadrant was for two-story apartments. The H.C. Price Company occupied a majority of the tower floors for its own use, but individual offices and the apartments were rented to tenants. *Id.* ¶ 7.

7.    Originally designed for downtown New York City, but ultimately unrealized due to the Great Depression, Mr. Wright was delighted to have the opportunity to build his tower on the plains of Oklahoma. He nicknamed the building "The Tree that Escaped the Crowded Forest" because it had escaped the crowded "forests" of Manhattan skyscrapers and was now able "to cast its own shadow upon its own piece of land." *Id.* ¶ 8.

11

81732083.6

8.    The nickname also reflected the tree-like structural design of the tower and the incorporation of Mr. Wright's famous organic architecture. *Id.* ¶ 9.

9.    The "trunk" of the Price Tower comprises the structural walls of the building's four elevator shafts. The trunk extends deep underground like a "tap root" and provides the strong support for the upper floors, whose tapering and cantilevered concrete floor slab are like branches. The outer walls do not support the building, allowing for large expanses of window glass. The exterior of the Price Tower is clad in embossed and patinated copper panels and sun louvers, meant to represent leaves of the tree. And the building tapers upward like a tree with the top three floors progressively becoming narrower. *Id.*

10.    The Price Tower commission also allowed Mr. Wright to design objects within the building. He designed built-in furniture, free standing furniture, fixtures, textiles, and decorative artwork, all intended and designed to be part of the Price Tower property. *See* M. Costantino, THE LIFE AND WORKS OF FRANK LLOYD WRIGHT, an excerpt of which is attached hereto as **Exhibit I**, at 131 ("All of the furnishings were custom designed for the building including those for the apartments and for Price's 19th floor office. Like the tower itself, the furniture and the decorative motifs are based on a diamond module of 30-degree and 60-degree triangles."). Many of those designs were produced locally to his specifications and are considered "one of a kind." **Ex. A**, ¶ 11..

B.    **The Price Tower Through the Years**

11.    The Price Tower was added to the National Register of Historic Places in 1974. *Id.* ¶ 12.

12.    The H.C. Price Company owned and occupied the Price Tower until 1981 when the company relocated to Dallas, Texas. After that, the Phillips Petroleum Company owned and operated the building, using it for office space and off-site storage. *Id.* ¶ 13.

81732083.6

13.    The Price Tower won the American Institute of Architects' prestigious Twenty-Five Year Award in 1983, recognizing architectural design of enduring significance. *Id.* ¶ 14.

14.    In 1990, Phillips Petroleum Company made space available in the Price Tower for the Bartlesville Museum, and it opened with its first exhibition: "The Tree that Escaped the Crowded Forest, Frank Lloyd Wright and the Price Tower." *Id.* ¶ 15.

15.    In 1998, the Bartlesville Museum is reorganized as the Price Tower Arts Center. In 2000, Phillips Petroleum began to refurbish the tower, making it compliant with current building codes and removing alterations that had been made to the interior spaces. *Id.* ¶ 16.

16.    In 2001, once the renovation was complete, Phillips Petroleum donated the building to the Price Tower Arts Center. *Id.* ¶ 17.

17.    While the Price Tower has been open for public tours since its completion in 1956, the Price Tower Arts Center turned the building into a major public attraction, opening a hotel, a bar and restaurant, and a museum in 2002-2003. And in 2006, the Price Tower Arts Center renovated the top three floors to their original 1956 appearance, and added an Architecture Study Center on its second floor to provide public access to its archive holdings. *Id.* ¶ 18.

18.    The Price Tower Arts Center owned and operated the building from 2001 until March 2023. *Id.* ¶ 19.

19.    In March 2023, the Price Tower Arts Center transferred the Price Tower via quitclaim deed to Defendant Green Copper Holdings, LLC. Green Copper Holdings LLC is a wholly owned subsidiary of Copper Tree, Inc. On information and belief, Defendant Cynthia Blanchard is the CEO of Copper Tree, Inc. *Id.* ¶ 20.

81732083.6

20.    Defendant Blanchard, through Green Copper, purchased the Price Tower for $10 and acquired its debt. Blanchard told a local news reporter that she would embark on a $10 million restoration of the Price Tower. *Id.* ¶ 21.

### C.    The Conservation Easement

21.    In 2003, the Conservancy, a Chicago-based nonprofit dedicated to protecting and promoting the legacy of Mr. Wright and his works, took on the initiative of having ten Wright-designed buildings included on the list of the United Nations Educational, Scientific and Cultural Organization's ("UNESCO") list of World Heritage Sites. An application making the Price Tower a National Historic Landmark was approved by the National Park Service and the U.S. Department of the Interior, with its designation confirmed on March 29, 2007. *Id.* ¶ 22.

22.    In preparation for the Price Tower's possible inclusion on the World Heritage List, the Price Tower Arts Center granted a conservation easement to the Conservancy. *Id.* ¶ 23.

23.    The Easement is dated April 6, 2011, and was recorded on April 18, 2011, at Book 1098, Pages 238-254 in the records of the County Clerk of Washington County, Oklahoma as Document Number 2011-003083 (the "Easement"). *See* ¶ 24, Preservation and Conservation Easement attached hereto as **Exhibit A-1**.

24.    The Easement is governed by the Oklahoma Uniform Conservation Easement Act ("Act"). 60 O.S. § 49.1-8. *See* Letter from Charles Daniels to Department of Interior, dated April 6, 2012, attached hereto as **Exhibit B**. The Act, among other things, provides that "[a] conservation easement is valid even though … [t]he benefit does not touch or concern real property." 60 O.S. § 49.5(6). Moreover, a conservation easement is defined as "a nonpossessory interest of a holder in real property imposing limitations or affirmative obligations the purpose of which include, but are not limited to, retaining or protecting natural, scenic, or open-space values

14

81732083.6

of real property, assuring its availability for agricultural, forest, recreational, or open-space use, protecting natural resources, maintaining or enhancing air or water quality, **or preserving the historical, architectural, archaeological, or cultural aspects of real property**[.]" *Id.* § 49.2(1) (emphasis added). Accordingly, easements created pursuant to the Act can place limitations and affirmative obligations on the alienation of property if protection of that property is required to "preserve the historical, architectural, archaeological, or cultural aspects of real property." *Id.*

25.    Conservation easements like the one at issue here are common for historical properties, as they often provide the only means to protect and preserve a historical property for future generations. *See generally* **Exhibit A-1**.

26.    Moreover, the Act defines a "Holder" of a conservation easement as: (1) a "governmental body," or (2) "a charitable corporation, charitable association, or charitable trust." Id. § 49.2(2)(b). Accordingly, under Oklahoma law, the grantee of a conservation easement must be either a governmental body or some type of charitable organization.

27.    The Easement is all encompassing and "[t]he obligation imposed by the Easement shall be effective in perpetuity and shall be deemed to run as a binding servitude with the Premises." *Id.* § 11. The Easement is "binding upon Grantor and Grantee, their respective successors in interest, and all persons hereafter claiming under or through Grantor and Grantee, and the words 'Grantor' and 'Grantee' when used [in the Easement] shall include all such persons." *Id.*

28.    The Easement, among other things (1) prevents the owner of the building from demolishing or removing any material portion of the facades or the exterior of the building; (2) requires the owner to maintain the premises in good condition and repair and maintain the structural soundness and safety of the building; (3) requires the owner of the building to

15

81732083.6

complete any necessary restorations of the building; (4) prevents the owner of the building from accumulating unsightly or offensive materials on the premises; and (5) prevents the owner of the building from subdividing, selling, or developing parts of the premises separately. *Id., § 2(a)-(f).*

29.     The Easement also requires the Grantor to indemnify and hold harmless the Grantee against all losses, claims, and expenditures incurred by the Grantee relating to the administration of the Easement. *Id.* § 14.

30.     The Easement further states that the Grantor shall promptly notify Grantee in writing of any proposed sale of the Price Tower and provide Grantee the opportunity to explain the terms of the Easement to potential new owners prior to sale closing. *Id.* § 10.

31.     Additionally, the Easement provides that the "Grantor shall keep the Premises insured by an insurance company rated "A" or better by Best's for the full replacement value against loss from the perils commonly insured under standard fire and extended coverage policies and comprehensive general liability insurance against claims for personal injury, death, and property damage of a type and in such amounts as would normally be carried on a property such as the Premises." *Id.* § 16.

32.     Due to the Act's requirement that the "Holder" of a conservation easement be either a governmental body or a charitable organization, the Easement further states that if Grantee's (*i.e.*, the Conservancy) "not-for-profit status as a Section 501(c)(3) organization" is terminated, then the "Easement shall continue **in favor of any successor or assignee designated by such party** provided that such successor or assignee is an entity qualified as a Section 501(c)(3) organization dedicated to preservation of historic structures." *Id.* § 20 (emphasis added). Thus, the Easement addresses the legal status of those whom it favors and the Grantee of the Easement is required to be a charitable organization. If the Conservancy were to ever lose its

16

81732083.6

501(c)(3) status or dissolve, any successor grantee would be required to be a 501(c)(3)

organization. This provision ensures compliance with the Act. Notably, however, Section 20 of

the Easement does not concern the **Grantor's** status as a charitable organization.

33.      Additionally, the Easement prevents the owner of the building from altering or

changing the interior artworks and architectural features of the building without the Grantee (the

Conservancy's) prior consent. *Id.* § 2(g). Being designed and intended to be part of Price Tower,

these interior artworks and architectural features are part of the Price Tower property and

important to maintaining the historical, architectural, archaeological, and cultural significance

and integrity of Price Tower.

34.      Section 2(g) of the Easement refers to an "Exhibit C," which is attached to the

Easement. Exhibit C contains a list of "Protected Historic Features." *Id.*

35.      The list of "Protected Historic Features" includes a category labeled "Museum

Collection Items," and underneath that label is the description "Itemized annual listing of

collection holdings from all categories" ("Inventory Lists"). *Id.*, Ex. C. Thus, the Easement

incorporates by reference "Exhibit C," and Exhibit C incorporates by reference the Inventory

Lists. *Id.*

36.      Accordingly, the Conservancy received an inventory of the collection when the

Easement was granted to it in 2011. The Price Tower Arts Center creates inventories of the

collection and provides updated lists of collection holdings to the Conservancy.

37.      During an easement monitoring visit in May 2022, the Conservancy's

Preservation Programs Manager John H. Waters, a member of the American Institute of

Architects ("AIA"), worked with the Price Tower Arts Center's staff to create a photo

documented list of 3-dimensional objects that were available for documentation in the inventory

17

81732083.6

collection. On June 17, 2022, the Conservancy sent the Price Tower Arts Center an updated

Inventory List titled "Price Tower – Schedule of 3-dimensional items addressed by easement"

(the "June 17, 2022 Inventory List") attached to the Gordon Affidavit as **Exhibit A-2**.

38.     The June 17, 2022 Inventory List was in effect when the Price Tower was

conveyed to Green Copper Holdings, LLC, on March 7, 2023. *See* Quitclaim Deed Conveying

Price Tower to Green Copper Holdings, LLC, attached to the Gordon Affidavit as **Exhibit A-3**.

39.     Green Copper Holdings, LLC was aware of the Easement when it acquired the

Price Tower. **Ex. A**, ¶ 36.

40.     On March 9. 2023. two days after Green Copper acquired the Price Tower. the

Conservancy's Executive Director Barbara Gordon and Mr. Waters had an introductory Zoom

call with Counter-Defendant Blanchard to explain the Easement and the Conservancy's role in

administering it. Ms. Blanchard acknowledged the existence of the Easement and expressed

explicit understanding for how the Easement functions, including its effect on her ownership of

the Price tower.

41.     Waters sent a follow-up email to Ms. Blanchard on March 13, 2023, that included

the June 17, 2022 Inventory List. *See* Email Exchange Between John Waters and Cynthia

Blanchard, dated March 13, 2023, attached to the Gordon Affidavit as **Exhibit A-4**.

**D.      Cynthia Blanchard's Unauthorized Sale of Museum Collection Items on the
         June 17, 2022 Inventory List**

42.     On April 26, 2024, the Conservancy became aware (via a news article) that Ms.

Blanchard had sold certain items from the Price Tower collection. While none of the items

reported sold appeared to be included in the June 17, 2022 Inventory List, the Conservancy was

concerned that Ms. Blanchard might try to sell items that did fall within the purview of the

Easement. **Ex. A**, ¶ 38.

18

81732083.6

43.     Accordingly, on April 26, 2024, Gordon emailed Ms. Blanchard as follows:

"Cynthia,

It has come to our attention through the national news networks and yesterday's article, that you are selling off pieces of the Price Tower collection. While what we have read about does not appear to be in our easement purview, I implore you to protect the expansive archive related to Bruce Goff that needs to remain with the building.

I would like to remind you of the specific items in the collection (attached) that are under the protection of our legal easement.  These items are under no circumstances to be separated from the Tower and sold.

We have also heard that you are in the process of selling the Price Tower to another party.  Given the easement that we hold on the Price Tower and the collection as listed in the attached, it will be important for us to have a meeting with the new buyer as soon as possible to explain our relationship and the terms of the easement.

Would you please facilitate that early next week?"

*See* Email between Barbara Gordon and Cynthia Blanchard, dated April 26, 2024, attached to the

Gordon Affidavit as **Exhibit A-5**.

44.     After Ms. Gordon sent the above email, Ms. Blanchard expressed her belief that

the Easement did not apply to Counter-Defendants during a Zoom meeting to discuss the matter

on May 3, 2024 with Conservancy representatives Ms. Gordon, Mr. Waters, and Ron Duplack,

attorney and co-chair of the Conservancy's Legal/Easement Committee. Ms. Blanchard has

subsequently repeated this in media interviews. **Ex. A**, ¶ 40.

45.     Shortly after this, the Conservancy became aware that certain parts of the Price

Tower property protected by the Easement were in fact sold to a third-party dealer that has

subsequently put the items on sale itself. *Id.* ¶ 41.

46.     For example, one of the parts of the Price Tower property Counter-Defendants

sold in contravention of the Easement was a red upholstered hexagonal armchair that Frank

19

81732083.6

Lloyd Wright specifically designed to be part of the building. Another other item was a one-of-a-kind directory board, believed to be unique in Wright's body of work that Mr. Wright designed also and was originally in the lobby of the Price Tower to identify the tenants on the various floors within the building. A picture of each item is attached to the Gordon Affidavit as **Exhibit A-6** and **Exhibit A-7**.

47.    The Conservancy also learned, through multiple sources, that Ms. Blanchard intends to sell the Price Tower and may attempt to further subdivide it in contravention of Section 2(f) of the Easement, including by selling additional parts of the Price Tower property that are covered by the Easement. **Ex. A**, ¶ 43.

48.    In July of 2024, Price Tower staff provided an updated Inventory List of the collection to the Conservancy. The list noted items that had been sold or given as collateral to others for loans, and included additional items there were not available for photo documentation during John Waters' May 2022 visit. The updated Inventory List is dated July 30, 2024 ("July 30, 2024 Inventory List"), and is attached to the Gordon Affidavit as **Exhibit A-8**.

49.    The Conservancy provided the July 30, 2024 Inventory List to Counter-Defendants on August 12, 2024. **Ex. A**, ¶ 45.

**E.    The Conservancy's Attempt to Settle this Case Outside of Court**

50.    Due to the facts recounted above, the Conservancy prepared a Petition and Motion for Temporary Restraining Order to file in this Court to prevent Counter-Defendants from selling any more parts of the Price Tower property on the July 30, 2024 Inventory List and to further request the Court to have Counter-Defendants comply with the provisions of the Easement.