11410459 1.2

FILED

1

2025 APR 15 PM 3:37

## IN THE UNITED STATES BANKRUPTCY COURT FOR

## THE NORTHERN DISTRICT OF OKLAHOMA

**GREEN COPPER HOLDINGS, LLC EIN #**

**CASE NO. 25-10088-T - Chapter 7**

Case No.:  **25-10088-T**

## MOTION/NOTICE FOR JUDICIAL NOTICE OF CASE PRECEDENTS AND PRICE TOWER ARTS CENTER TAX RECORDS ESTABLISHING PRIMA FACIE EVIDENCE OF EXCESS BENEFIT TRANSACTIONS, PUBLIC BRIBERY, BREACH OF FIDUCIARY DUTY, AND FALSE STATEMENTS BY CYNTHIA BLANCHARD, INSIDERS, COUNSEL, AND TRUSTEE

**COMES NOW** the undersigned, a legally interested party and citizen of the United States, author and historian, proceeding *pro se* and invoking the constitutionally guaranteed right to petition the Government for redress of grievances under the **First Amendment to the United States Constitution**, as well as the protected right of access to the courts, including both **Article I** and **Article III federal tribunals**, as affirmed by the **Due Process Clause of the Fifth and Fourteenth Amendments**. The undersigned **appears before this Honorable Court to prevent manifest injustice** and to give formal notice of what now clearly appears arguably to be **widespread, ongoing, and federally cognizable criminal activity**, the evidence of which is now embedded within the **public record of this bankruptcy proceeding** and herein below.

The IRS Form 990 filed by **Price Tower Arts Center Inc. (PTAC)** for the tax year ending **December 31, 2023**, as retrieved from PROPUBLICA and annexed hereto as Exhibit A, for referenced and Judicial Notice, reveals that, during the same period in which Debtor control person **Cynthia D. Blanchard**—through a **New Mexico-registered shell entity**—claims to have acquired **Price Tower**, a **federally designated National Historic Landmark**, and associated museums, PTAC continued to function as a **Section 501(c)(3)** public charity under **26 U.S.C. § 170(b)(1)(A)(vi)**.

Upon information and belief, the Price Tower Arts Center, Inc. ("PTAC"), a federally tax-exempt 501(c)(3) public charity, continued to represent itself as publicly supported and federally subsidized throughout the relevant periods and across multiple fiscal years, as evidenced by IRS Form 990 filings, including the 2022 return submitted herewith and

incorporated as **Exhibit B**, retrieved directly from the Internal Revenue Service. Notably, PTAC appears to have failed to file a return for tax year 2020, as required by **26 U.S.C. § 6033(a)(1)** and **Treasury Regulation § 1.6033-2**, raising compliance concerns.

Upon review of PTAC's **2021 IRS Form 990 return**, included herein as **Exhibit C**, the individual identified as **Mark Haskell** was listed simultaneously as **Treasurer**, **officer responsible for filing**, and a person potentially qualifying as an **insider creditor** within the meaning of **26 U.S.C. § 4958(f)(1)**. Haskell continues to be listed in that same fiduciary capacity on both the 2021 and 2022 returns (Exhibits A and B), suggesting continuity of control and authority at the time of the highly questionable disposition of PTAC's most significant charitable assets.  Of grave concern is the transfer of **Price Tower**, inclusive of its attached museum archives, artifacts, and preservation-restricted materials—including priceless, one-of-a-kind relics by **Frank Lloyd Wright**, **Bruce Goff**, and other historically significant figures—to **Green Copper Holdings LLC**, a New Mexico shell entity controlled by **Cynthia Diane Blanchard**, for the nominal sum of **$10.00**, with **no documentary stamp tax paid** and a stated consideration **"under $101.00."** The transaction, by its form & substance, lacks fair market value & constitutes *de facto* **private inurement**, prohibited under **26 U.S.C. § 501(c)(3)** and implicating **excess benefit transaction** provisions under **§ 4958(c)(1)(A)**.

The subsequent and undisclosed interstate sale or shipment of museum artifacts, including objects subject to **conservation and preservation easements** imposed by both state and federal authorities, may also constitute unlawful conveyances in **violation of 18 U.S.C. § 2314** (interstate transportation of stolen property), **18 U.S.C. § 1341** (mail fraud), and/or **18 U.S.C. § 1343** (wire fraud), particularly where these objects include property **entrusted to PTAC by the "Friends of ShinenKan"** or otherwise forming part of the corpus of the **National Historic Landmark designation** of Price Tower, which carries federal oversight under **National Historic Preservation Act of 1966**, codified at **54 U.S.C. § 300101 et seq.**

The bankruptcy proceedings currently before this Honorable Court appear to be facilitating a **fraudulent laundering scheme** whereby proceeds from the unauthorized disposition of nationally significant cultural patrimony are concealed under color of judicial process, while insiders—including PTAC's former Treasurer, Executive Director, and their known affiliates—stand to personally enrich themselves through these illicit transactions. Such conduct, if proven, would constitute not only **willful violations of 26 U.S.C. § 4958**, but may

rise to the level of **federal criminal tax fraud** under **26 U.S.C. § 7206(1)** (false statements on returns) and **§ 7201** (attempt to evade or defeat tax), particularly where failure to report or reverse the **excess benefit transactions** subjects the disqualified persons to **first-tier excise taxes at 25%**, and if uncorrected, **second-tier excise taxes at 200%**, as prescribed by **26 U.S.C. § 4958(b)**.

Given the magnitude of public harm and the risk to the integrity of the federal tax-exempt system, this Court must, in the interest of justice & public trust, direct immediate notification:

- The **IRS Criminal Investigations Division (CID)**,
- The **IRS Exempt Organizations Examination Division**, and
- The **Office of the Inspector General for the Department of the Treasury**.

Furthermore, this Honorable Court should take judicial notice that the events described herein have already attracted national media attention, including Gannett Media's reporting on what they described as the **"looting, pillaging, and plundering"** of a federally recognized National Historic Landmark. Such characterizations, if substantiated, justify not only federal tax enforcement but also potential **referral to the U.S. Department of Justice, Office of Public Integrity**, for further inquiry into **public corruption, misuse of nonprofit assets**, and **interstate art crime** under **18 U.S.C. § 668** (theft of major artwork).

**Wherefore, movant respectfully urges this Court and all appropriate authorities** to scrutinize, investigate, and if appropriate, prosecute those responsible for the systematic dismantling, misappropriation, and monetization of federally protected cultural property under the guise of bankruptcy and nonprofit privilege.   Specifically, PTAC's return reflects receipt of over **$1.66 million in public and governmental support** during the applicable five-year test period, and an additional **$238,201 in public funding during the year of claimed divestiture**, of the National Historic Landmark and alleged federally funded museums, while simultaneously purporting to have conveyed the Price Tower real property and all museum holdings—including **architectural relics of Frank Lloyd Wright and Bruce Goff**, **ShinenKan criminal arson-recovered artifacts**, and **federally protected archives and educational materials**—for a mere **$10.00**, without court-supervised deaccession or adherence to federal or state nonprofit asset transfer protocols, including those at issue with transfer to a NEW MEXICO legal entity.

Moreover, PTAC's tax filing states affirmatively under **Line 16a** of Schedule A: *"The organization qualifies as a publicly supported organization,"* thereby binding the organization to heightened legal responsibilities under **Treas. Reg. § 1.170A-9(f), § <u>1.509(a)-3, and §</u> <u>53.4958-4(c), including prohibitions against private inurement, excess benefit</u> <u>transactions,</u>** and unauthorized **divestment of charitable assets** without full and fair consideration and appropriate oversight.  These are classic examples of excess benefit transactions and self-dealing, outlawed under IRS Code **§ 4958 and addressed in:**

- ○ *United Cancer Council v. Commissioner, 165 F.3d 1173 (7th Cir. 1999),*
- ○ *Estate of Atkinson v. Commissioner, 115 T.C. 26 (2000)*

Simultaneously, and equally troubling, PTAC appears to continue to list the Price Tower property on its depreciation schedule as a capital asset, despite the alleged conveyance to the Debtor—a contradiction which potentially implicates criminal liability under **26 U.S.C. § 7206(1)** (false statements on tax returns) and civil & criminal penalties under **26 U.S.C. § 6662** for substantial misstatements involving charitable assets.  Thereby raising serious questions of good faith, abuse of process, and potential conflict with public policy under *In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004).

In light of Price Tower's designation as a **National Historic Landmark** under the **National Historic Preservation Act of 1966 (NHPA), as codified at 54 U.S.C. § 300101 et seq.,** its structural, cultural, and artistic components are protected under **Section 106 (54 U.S.C. § 306108)**, which mandates review of any undertaking involving federally funded or <u>previously</u> <u>federally funded</u> historic properties. PTAC's own public representations, including those made to federal grant agencies and donors, confirm it has received past and ongoing **National Endowment for the Arts (NEA)** and other federal support, making it subject to **Section 106 compliance procedures**, as administered by the **Advisory Council on Historic Preservation (ACHP)** and **National Park Service.  Irreparable Harm:**  Once the Tower and its contents are transferred and/or demolished, the damage is irreversible. The sale of the museum, disappearance of archives, <u>trafficking of priceless artifacts</u>, and <u>concealment of</u> <u>these facts from the public</u> constitute irreparable harm to the American people, for which the undersigned is a part of *"WE THE PEOPLE"* and to generations of scholars, architects, and historians.   The First Amendment to the Constitution of the United States, which guarantees the fundamental right <u>*"to petition the Government for a redress of grievances."*</u> As a member

of the sovereign body politic referred to in the Constitution's Preamble as "We the People," the undersigned asserts standing under both constitutional and statutory authority to seek protection of the public trust, the integrity of judicial proceedings, and the <u>inviolable rights of the citizenry</u>. In the exercise of this constitutionally protected civic duty—and under the shield of federal whistleblower protections.

Any attempted transfer or liquidation of federally designated historic property outside of this statutory framework arguably not only renders the transaction ***ultra vires*** and **voidable** but may further subject all participating parties—including fiduciaries, transferees, and their agents—to civil penalties and criminal liability under **18 U.S.C. § 641 (theft of public property)**, **18 U.S.C. § 668 (theft of major artwork)**, and **18 U.S.C. § 1956 (money laundering)** where cryptocurrency has been used to obscure financial proceeds from the unauthorized sale of protected cultural materials and/or comingling of assets and accounts for expenses and operations has been made to other legal entities.

This matter further implicates the <u>enduring constitutional doctrine of the **public trust**</u>, recognized in federal jurisprudence as a principle that obligates both public and quasi-public actors to hold certain resources—particularly those of cultural, environmental, and historic significance—in trust for the benefit of the citizenry at large. **See, e.g., *Illinois Central R.R. Co. v. Illinois*, 146 U.S. 387 (1892); *National Audubon Society v. Superior Court*, 33 Cal.3d 419 (1983)**. Under this doctrine, assets entrusted to PTAC for the public benefit—including its real estate, museum holdings, and educational mission—could not lawfully be alienated for private gain, least of all under circumstances involving deception, fraud, and structural concealment; as is evidenced by the sale of all culturally protected assets for just $10.00 & no taxes paid.  <u>Taken together, the record reflects a prima facie</u> case of **constructive fraud**, **excess benefit enrichment**, **breach of fiduciary duty**, and **coordinated misuse of the bankruptcy process** to launder misappropriated charitable assets through judicial proceedings—all in direct contravention of federal preservation law, IRS nonprofit governance regulations, and constitutional guarantees that protect the American public's shared historical and cultural patrimony.  <u>Accordingly, the undersigned respectfully urges the Court</u> to take **judicial notice** of these grave legal violations and to refer this matter without delay to the **U.S. Attorney pursuant to 18 U.S.C. § 3057(a)**; to notify the **Internal Revenue Service – Exempt Organizations Division and Criminal Investigations Division**,

the **National Park Service, US Attorney General, Federal Bureau of Investigation** and **Advisory Council on Historic Preservation**; and to consider the imposition of **constructive trusts**, issuance of **Rule 2004 subpoenas, & Rule 2002 detainment of control person** and **injunctive relief** to prevent further destruction of protected property held in trust for the **American People, future generations depend on the competent Federal Courts under Articles I, II, III of the US Constitution to protect future Americans yet unborn**.

One week prior to the filing of the dual Chapter 11 bankruptcy cases for **Copper Tree Inc. (a** Delaware corporation) and **Green Copper Holdings LLC** (a New Mexico entity), attorney **Scott R. Helton**, doing business as **Helton Law Firm, PLLC**, obtained a **secured first-position mortgage in the amount of $250,000** against **Price Tower**, a National Historic Landmark. At the time of this transaction, **Scott Helton was actively serving as legal counsel** for all involved debtor entities and for **Cynthia Diane Blanchard personally**, in at least two separate lawsuits: (1) a suit by **McFarlin Building**, and (2) a case in which **Blanchard and Copper Tree sued the Frank Lloyd Wright Building Conservancy**, who then filed counterclaims against both Blanchard and Copper Tree. **While still serving as counsel of record**, Helton secured for himself a **first-position mortgage** on a major asset of the debtor entities, in the precise amount of **$250,000**, just days before those same entities sought federal bankruptcy protection.

Despite this insider transaction, **no proper disclosure was made in the bankruptcy schedules**. In **Part 2, Line 2.1** of both voluntary petitions, **Cynthia D. Blanchard**, who certified she owns more than **90% of both debtor entities**, falsely stated that she **did not know the value of the secured mortgage**—a knowingly false statement, as she had signed the mortgage herself only a week prior. Moreover, she checked "**No**" in response to the required disclosure **"Is the creditor an insider or related party?"**, when in fact Helton met all criteria of an insider under both statutory and non-statutory interpretations.

## Attorney Scott R. Helton – Plausible Ethical and Legal Violations

The conduct of Attorney Scott R. Helton constitutes multiple and egregious violations of the **ABA Model Rules of Professional Conduct**, including: ☑ **Rule 1.7 – Conflict of Interest: Current Clients** Helton simultaneously represented both debtors & their majority equity holder when acquiring direct adverse financial interest. ☑ **Rule 1.8(a) – Business Transactions with Clients** Helton entered into a secured financial transaction with his clients (obtaining a mortgage) without: Full

written disclosure of terms; Advising clients in writing of the desirability of seeking independent legal counsel; Obtaining informed, written consent from all clients involved. ☑ **Rule 1.9 – Duties to Former Clients** Even if Helton claimed to have withdrawn before the filing, he remained bound by duties of loyalty and confidentiality, which were violated through his self-interested conduct. ☑ **Rule 1.2(d) – Assisting Fraud** Helton it appears knowingly participated in or failed to prevent submission of false or misleading information in the bankruptcy schedules. ☑ **Rule 3.3 – Candor Toward the Tribunal** Helton had a duty to ensure accurate and honest disclosures to the court. Failing to correct misstatements regarding his insider status or the value of the secured debt violated this duty. ☑ **Rule 4.3 – Dealing with Unrepresented Persons** If Helton communicated directly with the debtors' majority shareholder on a matter where interests diverged without ensuring clarity of his role, this rule may also apply. ☑ **Rule 8.4(c) – Conduct Involving Dishonesty, Fraud, Deceit, or Misrepresentation** Knowingly securing a mortgage while still representing the debtors and their principal, failing to disclose that conflict, and benefitting from a first-position lien under false pretenses constitutes professional misconduct. ☑ **Rule 8.4(d) – Conduct Prejudicial to the Administration of Justice** His actions undermined the bankruptcy process, harmed creditor confidence, & concealed material conflicts.

## Attorney Ron Brown – Potential Ethical Violations

**Attorney Ron Brown**, of **Ron Brown PC**, who advised Cynthia D. Blanchard in the preparation and filing of the bankruptcy petitions, also bears ethical responsibility. As a bankruptcy attorney, Brown had a **duty to verify the accuracy of the filings** and to **advise his client of disclosure obligations**, particularly the obligation to identify **insiders** and to accurately list **secured debt, especially 1st position mortgages**:  Ron Brown's potential violations include:

- **Rule 1.1 – Competence** (failure to identify and disclose a critical insider transaction);
- **Rule 1.2(d)** (assisting a client in filing misleading bankruptcy schedules);
- **Rule 3.3 – Candor Toward the Tribunal** (allowing or failing to correct misstatements);
- **Rule 5.1 – Responsibilities of a Supervisory Attorney**;
- **Rule 8.4(c) and (d)** (involving misrepresentation & integrity prejudice of judicial process).

## Cynthia D. Blanchard – Potential Violations of Federal Bankruptcy Law

Falsely denying knowledge of a $250,000 mortgage Cynthia Blanchard personally executed on behalf of the debtor one week prior to filing bankruptcy; Denying that the creditor was an insider, despite simultaneous legal representation by Helton; Filing false or misleading schedules under penalty of perjury, may constitute **intentional violations** of both civil and

criminal bankruptcy statutes, including: **11 U.S.C. § 521(a)(1)**, Failure to disclose all financial relationships & liabilities; **11 U.S.C. § 548**; Fraudulent transfers to insiders prior to bankruptcy; **18 U.S.C. § 152** –Bankruptcy fraud - knowingly making a false declaration.

**Conclusion:**  Combined actions of **Scott Helton**, **Ron Brown**, & **Cynthia Blanchard** represent arguably serious breaches of ethical and legal obligations, including:  Insider self-dealing; Suppression of critical disclosures; Fraud upon the Bankruptcy Court. These acts merit immediate review by the **Office of the United States Trustee**, and the General Counsel in Washington DC, the **presiding Bankruptcy Court**, and the **State Bar disciplinary authorities**. Remedies may include:

- **Avoidance of the secured mortgage under §§ 547 or 548**;
- **Sanctions and disgorgement of legal fees** under §§ 327, 329, and 330;
- **Disqualification of attorneys** involved;
- **Bar complaints and professional discipline**, up to and including disbarment;
- **Referral for criminal investigation** where appropriate.

Moreover, **Cynthia Blanchard's purported contention that the *"ad valorem taxes"* are in dispute is wholly without merit and legally indefensible**, particularly given the material fact that **title to Price Tower—a nationally recognized historic skyscraper—was transferred from a federally subsidized public non-profit entity to a private, for-profit shell corporation for nominal consideration of merely ten dollars ($10.00)**. Such a transfer constitutes a clear change in character of ownership triggering **loss of exempt status under relevant state and municipal tax laws**, rendering **all assessed property taxes valid, due, and owing as a matter of law**.

Compounding this tax delinquency is the existence of an **egregiously disproportionate valuation** assigned to Price Tower relative to **comparable commercial assets** located within the same taxing jurisdiction—most notably those held by **ConocoPhillips (COP)**, a publicly traded multinational corporation listed on the **New York Stock Exchange (NYSE)**. This **valuation disparity not only evidences an arbitrary and capricious application of local tax assessments in violation of the Equal Protection Clause**, but also poses significant material risk to **COP shareholders**, who may reasonably perceive such disparate treatment as an indirect fiduciary breach by local taxing authorities, thereby giving rise to potential **shareholder derivative actions** or **securities-based litigation**.

Furthermore, the **municipality's apparent preferential treatment** of the Blanchard-controlled entity—through underassessment or non-enforcement of property taxes—has the potential to materially distort **municipal bond risk assessments** and impair the **bond rating of the City of Bartlesville**, thereby adversely affecting both existing bondholders and the broader capital markets. The **systemic inequities in the** *ad valorem taxation* **scheme**, as presently administered, threaten to undermine public confidence in both **local governance** and the **regulatory frameworks governing publicly traded corporations**, implicating issues of **fiscal mismanagement, discriminatory taxation, and potential violations of 42 U.S.C. § 1983** for unequal treatment under color of law.

**Disturbingly at Part 11 of the Voluntary petition:** Cynthia Blanchard lists two entities as renting space and paying for storage by stating that Ambler Architects, who appear as insiders given numerous reports by GANNETT Media and prior involvement with PTAC by principles both Donna Keffer and Scott Ambler: "this company is renting space at Price Tower to hold it's personal belongings" AND Blanchard also states:  BUFFALO ROAM:  "this company pays to store its personal property at Price Tower"; yet the US Federal Government's form is explicit when it states:  **"Do not list leased or rented property."**

The factual matrix herein presents a deeply troubling confluence of **interrelated personnel**, **shared financial oversight**, and **potentially fraudulent corporate practices** that, taken together, may amount to a **pattern of deceptive conduct**, material misrepresentation, and systemic abuse of the federal bankruptcy system and securities regulations.  At all times material to the federal enforcement action currently being prosecuted by the **United States Securities and Exchange Commission (SEC)** against **Anthem Hayek Blanchard** and **Anthem Holdings Company**, the debtor's control person, **Cynthia Diane Blanchard**, was and remains the **co-founder**, **majority shareholder**, and **presiding officer** (President) of both **Anthem Holdings Company** and its principal subsidiary, **Hera Software Development, Inc.** According to the SEC's formal complaint, the entities in question disseminated **materially false and misleading representations** regarding the existence of **United States Federal Government cybersecurity contracts**, as well as contractual relationships with **U.S. State and foreign governmental entities**—contracts which the SEC has categorically alleged to be fictitious. The fraudulent claims formed the basis of **artificial revenue projections** and **misstatements of corporate valuation**, thereby underpinning potential violations of **Section**

**10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5)**.

Of even greater concern within the present bankruptcy proceedings is the central role of one **Renee Nichols**, who is identified by **Cynthia Blanchard** under penalty of perjury in the bankruptcy petition at **Line 26a(1)** and **Line 26b(1)** as the **sole accountant, bookkeeper, and auditor** of record for **Green Copper Holdings LLC** and its parent entity **Copper Tree Inc.** within the two-year period preceding the petition date. Nichols is further reported to be the financial custodian and accountant of record for numerous other entities under Blanchard family control, including but not limited to: **Anthem Gold Inc.**, **Hera Software Development Inc.**, **Anthem Holdings Company**, **Anthem Vault Inc.**, and entities affiliated with the **HERC crypto token**.  The disclosure that Nichols simultaneously functioned as the **bookkeeper, accountant, and purported auditor of her own financial work product**—a fact admitted by the debtor's principal under oath—raises **prima facie violations** of established standards of financial independence & professional accounting ethics, including violations of **Generally Accepted Auditing Standards (GAAS)**, **IRS Circular 230**, & potentially **26 U.S.C. § 7206(1)** (false statements made under penalties of perjury). This alone would constitute grounds for further inquiry by both the **IRS Office of Professional Responsibility** and the **U.S. Trustee Program** under **28 U.S.C. § 586(a)(3)(F)**.

Exacerbating the opacity of these financial disclosures is the fact that, in response to the mandatory query under **Schedule A/B, Line 27**, which requires identification of all persons in possession of the debtor's books and records at the time of filing, **Cynthia Blanchard listed herself personally** and designated the physical address of a known **UPS Store commercial mail-receiving agency (CMRA)** as sole repository of debtor's financial books & records. Such an assertion defies regulatory expectations under **Federal Rule of Bankruptcy Procedure 1007** & may signal intent to obstruct or frustrate oversight.

Contradictions arise at **Line 28**, where Cynthia Blanchard identifies herself as the **only officer of Green Copper Holdings LLC**, while simultaneously claiming to **own 0% of the entity**, asserting instead that the debtor is **wholly owned by Copper Tree Inc.** This assertion is irreconcilable with sworn testimony reportedly given during the **341 meeting of creditors**, where Blanchard affirmatively stated she **owned & controlled over 90%** of the debtor entity. Such inconsistencies suggest deliberate effort to obscure beneficial ownership & control,

which may implicate **28 U.S.C. § 1746** (false declarations under oath - perjury), **18 U.S.C. § 152(3)** (concealment of assets or false statements in bankruptcy), and **26 U.S.C. § 4958(c)(1)** if excess benefit transactions occurred between PTAC & Blanchard affiliates. <u>Additionally, multiple creditors have voiced</u>—albeit informally and often anonymously; grave concerns regarding **threats of retaliation**, **confusion over legal ownership**, and **the uniform control exercised by Cynthia Blanchard and Anthem Hayek Blanchard** across a complex web of corporate vehicles. The entities involved have, at various times, referred to **Anthem Hayek Blanchard** as the "**suite advisor**," "**co-owner**," or even the **legal owner** of Price Tower itself. These conflicting representations further erode the transparency required under the bankruptcy code and may implicate doctrines of **substantive consolidation**, **piercing the corporate veil**, or **constructive fraud** under **11 U.S.C. § 548(a)(1)(B)**, particularly given Price Tower was acquired for a grossly inadequate sum of **$10.00** contemporaneous public promise to inject "**millions of dollars**" into the property. <u>Equally critical is the potential breach of federal conservation and preservation easements associated with Price Tower</u>, a **National Historic Landmark** subject to stringent protections under the **National Historic Preservation Act (54 U.S.C. § 300101 et seq.)** and potentially recorded easements under **26 U.S.C. § 170(h)**. By publicly claiming a fiduciary commitment to safeguard historic relics, artwork, and exhibits donated or entrusted by third parties (e.g., the Friends of ShinenKan), and subsequently divesting, removing, or obscuring the status of such culturally significant artifacts, Cynthia Blanchard may have subjected herself—and those acting in concert with her—to civil and criminal liability under **18 U.S.C. § 641**; & **18 U.S.C. § 1001**, and relevant provisions of the **Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970** where federal funding was used. Given the cumulative weight of these disclosures, contradictions, and conflicts, it is not only appropriate but imperative that this Honorable Court consider **referral to the Internal Revenue Service**, **U.S. Trustee Program**, **FBI Art Crime Team**, and the **SEC Office of the Whistleblower**, to investigate the **interlocking roles, material misstatements, potential financial self-dealing**, and **systemic abuse of corporate formalities**.

<u>Cynthia Blanchard did execute a signature after which she read the following:  **"WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571. I have examined the information in this Statement of Financial Affairs and any**</u>

11410459.1.12

*attachments and have a reasonable belief that the information is true and correct, I declare under penalty of perjury that the foregoing is true and correct." SEE Doc1 page 36*

Note for this Honorable Court and subsequent filings under Administrative Procedures Act, that the statement made by Trustee, Patrick J. Malloy III is inconsistent with known information from the United Nations UNESCO organisation, wherein Malloy incorrectly attests to the court a false statement: "*since 2007 has been included on the United Nations Environment, Scientific and Cultural Organization ("UNESCO") list of World Heritage Sites.*", see document number 9, at number 3. The statement made by Malloy is contradicted by the UN itself, & the history of the property, this attestment by Malloy materially prejudices a multitude of parties including the UN & U.S.A. itself, as this statement is factually incorrect, the structure was nominated as part of a larger list of Frank Lloyd Wright properties THREE separate times and ultimately NOT included in the approved application! **Malloy's statement is factually incorrect!** IMPORTANT for the Court to Note regarding Price Tower, Frank Lloyd Wright, Bruce Goff and ShinenKan:

1. The Price Tower was added to the National Register of Historic Places (NRHP) in 1974 [*The Daily Oklahoman*. October 7, 1974]
2. The ShinenKan Gate was attached to the land & arguably the building in 2002, with the ShinenKan relics from the criminal arson entrusted to the museum for the benefit of the public, scholars, authors and historians, and those future generations of Americans yet unborn. "In 2002 the Friends of Shin'enKan created a memorial to Goff, and the "Gate for Shin'enKan" is a permanent exhibit outside the Price Tower..." *Bartlesville Examiner July 14th, 2014.* "Before it was engulfed in flames one winter night in 1996, Shin'enKan was a renowned historical landmark and tourism destination." "In 1985, Price donated Shin'enKan to the University of Oklahoma College of Architecture as a memorial to Bruce Goff, who died in 1982 at the age of 78."
3. Further nominated for a National Historic Landmark designation in 2006.
4. ShinenKan Gate was arguably mounted as part of a memorial to Bruce Goff & part of Price Tower nomination as National Historic Landmark.
5. On **March 29, 2007**, the United States Department of the Interior designated the building as a National Historic Landmark;
6. 2008, the U.S. National Park Service submitted the Price Tower, along with nine other Frank Lloyd Wright properties,to a tentative list for World Heritage status. The Price Tower and ten other Wright buildings were renominated to the list in 2011. Ten buildings including the Price Tower were again nominated to the World Heritage List in 2015.

7. UNESCO ultimately added eight properties to the World Heritage List in July 2019 under the title *"The 20th-Century Architecture of Frank Lloyd Wright"*; <u>the Price Tower was not one of them.</u>

At <u>**Paragraph 4 of Document No. 9, Trustee Malloy**</u> makes a FALSE, affirmative representation to this Honorable Court that is **materially inaccurate and legally erroneous**. Specifically, Trustee Malloy asserts that **"The Price Tower is unencumbered."** This assertion is demonstrably false and constitutes a misrepresentation of a material fact, as the **Price Tower is, in fact, encumbered by a first-position mortgage in the principal amount of $250,000**, previously discussed herein and recorded in favor of **Scott R. Helton and the Helton Law Firm, PLLC**. A **first-position mortgage lien**, <u>by its very nature, constitutes a primary encumbrance</u> upon real property, as defined under both state property law and prevailing **bankruptcy jurisprudence**. To assert otherwise—namely, that the Price Tower is "unencumbered" in the face of a recorded mortgage interest—is to advance a **falsehood upon the tribunal**, <u>in contravention of the duty of candor owed to the Court</u> under **Fed. R. Bankr. P. 9011(b)(3)** and **Model Rule of Professional Conduct 3.3(a)(1)**, which prohibits attorneys and fiduciaries from knowingly making false statements of material fact. Trustee Malloy's failure to recognize and disclose the existence of this mortgage; particularly given its public record status and legal priority—raises serious concerns regarding the **diligence and accuracy of the Trustee's investigation**, as required under **11 U.S.C. § 704(a)(4)**, which imposes upon the Chapter 7 Trustee an affirmative duty to investigate the financial affairs of the debtor and to provide full, fair, and complete disclosures to the Court. Accordingly, the Trustee's statement that the Price Tower is unencumbered is not merely **factually incorrect**, but also **legally untenable** and potentially prejudicial to creditors and the integrity of these proceedings. Such a misstatement warrants immediate correction on the record and may subject the Trustee to further scrutiny under applicable fiduciary standards and judicial oversight.

On the 12th day of March, 2025, within Part I, Section 2.1, Debtor Control Person Cynthia Blanchard persistently asserts, subject to penalties prescribed for perjury, a purported ignorance of the existence and specific details of a certain mortgage instrument personally executed by her in the amount of $250,000. Moreover, Blanchard continues to erroneously and misleadingly represent before this Honorable Court that Scott Helton does not meet the statutory or judicially recognized definition of an "insider," contrary to clear provisions

delineated in relevant federal bankruptcy statutes and jurisprudential interpretations. **Further compounding the foregoing inaccuracies**, Blanchard disputes the quantum and the enforceability of outstanding "ad valorem taxes" due and payable on the subject real property, maintaining an implausible ignorance of the tax obligations. Such repeated claims by Blanchard constitute prima facie evidence of gross negligence in record-keeping practices and a demonstrable incapacity or unwillingness to secure essential billing documentation directly from the pertinent county authorities.  Moreover, within the revised creditor listing, Blanchard explicitly identifies, in Part 2, Section 3.6, an individual named Donna Keffer, currently serving as Executive Director of the publicly chartered nonprofit organization responsible for the gratuitous conveyance of substantial assets—valued in the multi millions—for the nominal sum of ten dollars ($10.00). The classification of Keffer simultaneously as both creditor, asserting an ostensibly disputed and unspecified business obligation, and as executive director of the nonprofit entity, unequivocally epitomizes an "excess benefit transaction," as defined under applicable federal statutes, potentially triggering an excise penalty of up to 200% unless timely rescission occurs, thus reducing liability to a more modest penalty of 25%. Additionally, such an overt conflict necessitates the examination of potential mandatory criminal referrals under prevailing federal statutory frameworks and established jurisprudence. Furthermore, Blanchard's disclosures in Part 2, Section 3.9, introduce an individual identified as Mark Haskell, designated Treasurer of the same public nonprofit entity—Price Tower Arts Center Inc.—responsible for the aforementioned gratuitous conveyance of nationally recognized historic landmark assets for a nominal amount of ten dollars ($10.00). In stark contrast to the transactional consideration documented explicitly within the Quit Claim Deed and corroborated through Judicial Notice Document 55, Blanchard now categorizes Haskell as a creditor entitled to the sum of $576,087.77. This extraordinary discrepancy unequivocally establishes an excessive and improper benefit to Haskell, constituting a manifest "excess benefit transaction," subject to statutory clawback provisions and the imposition of an excise tax penalty potentially reaching 200%. Such transactions inherently demand rigorous judicial scrutiny & referral for mandatory criminal prosecutorial evaluation, as stipulated by controlling federal standards.  The assertion that a debtor entity, an LLC domiciled in New Mexico, could legitimately accrue substantial debts subsequent to the documented acquisition of a National Historic Landmark, explicitly cited in state-certified public records via Quit Claim Deed consideration of merely ten dollars ($10.00), is inherently absurd, contrived, and devoid of any credible legal or factual justification. Moreover, the transparently irregular arrangement

whereby the nonprofit organization's Treasurer stands poised to extract excessive financial gain exceeding half a million dollars through the instrumentalization of an Article I Bankruptcy Court as an intermediary facilitator is indicative of a potentially criminal scheme, <u>warranting immediate investigatory action</u>, financial restitution through judicially mandated clawback remedies, & application of severe federal excise taxation penalties with obligatory prosecutorial referrals consistent with prevailing federal statutes, regulations, & authorities.

## **LEGAL CASE PRECEDENTS:**

**Fraudulent Conveyance and Constructive Fraud:**  *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003): This case underscores the fiduciary duty of the federal government to maintain and preserve property held in trust.

**Excess Benefit Transactions under IRC § 4958:**

*Fumo v. Commissioner*, T.C. Memo 2019-1 (U.S. Tax Court 2019): The Tax Court found that substantial expenditures by a nonprofit organization for the personal benefit of a disqualified person constituted excess benefit transactions, IRC § 4958.

**National Historic Preservation Act (NHPA) Compliance:**

*San Carlos Apache Tribe v. United States*, 272 F. Supp. 2d 860 (D. Ariz. 2003): The court held that federal agencies must comply with NHPA § 106 by considering the impact of their actions on historic properties engaging the required consultation process.

**Public Trust Doctrine: *Illinois Central Railroad Co. v. Illinois*, 146 U.S. 387 (1892):** This <u>seminal case</u> established certain resources are held in trust for public use duty by transferring such resources to private entities when it interferes with public interest.

**Fraudulent Transfers Involving Nonprofits:** *In re World Vision Entertainment, Inc.*, 275 B.R. 641 (Bankr. M.D. Fla. 2002): The court examined the applicability of fraudulent transfer laws to charitable contributions, noting that transfers to charities can be VOIDED.

**Intermediate Sanctions and Nonprofit Governance:**

*Caracci v. Commissioner*, 456 F.3d 444 (5th Cir. 2006): The Fifth Circuit addressed the imposition of intermediate sanctions under IRC § 4958, emphasizing the importance of **<u>fair market value assessments</u>** in transactions involving disqualified persons and nonprofit organizations. https://en.wikipedia.org/wiki/Intermediate_sanctions

**United States v. Fumo**, 655 F.3d 288 (3d Cir. 2011): This case illustrates the legal consequences of a public official engaging in fraudulent activities involving a nonprofit, highlighting the application of federal fraud statutes in the context of nonprofit.

**United States v. Warford and Williams**, No. 4:25-cr-00123 (E.D. Mo. 2025):
Diarra Williams and Nicolas Warford were indicted for defrauding Missouri's At-Risk
Afterschool and Summer Food Service Programs by falsely claiming to have served over 2.2
million meals to low-income children, resulting in the misappropriation of over $7 million.
Demonstrates federal fraud and money laundering statutes prosecuting exploits nonprofits.
**United States v. Alrai**, No. 1:24-cr-00145 (D.N.H. 2024): Imran Alrai, a former employee of
United Way,convicted of embezzling $6.7 million from the nonprofit through a secretly owned
IT company. Highlights legal repercussions of self-dealing and fraud.
**United States v. Morgan**, No. 1:24-cr-00234 (E.D.N.Y. 2024): Dominique Morgan, former
executive director of The Okra Project, was indicted for allegedly diverting nearly $100,000
from a bail fund intended for jailed transgender individuals to personal expenses.
**Sta-Home Health Agency, Inc. v. Commissioner**,TC 2002-39 (USTaxCourt 2002):
*U*pheld the IRS's imposition of <u>intermediate sanctions</u> on a nonprofit organization for engaging
in <u>excess benefit transactions</u> with disqualified persons, emphasizing the <u>need for fair market
value assessments</u>. Reinforces the importance of adhering to IRS regulations. **Caracci v.
Commissioner**, 456 F.3d 444 (5th Cir. 2006): Fifth Circuit addressed the imposition of
intermediate sanctions under IRC § 4958, focusing on the valuation of assets transferred
between related nonprofit and for-profit entities and the determination of excess benefit
transactions. Highlights the necessity for<u> accurate valuations and adherence to fair market
value standards in transactions</u> to avoid excise taxes and penalties. **Erlanger v. New
Sombrero Phosphate Co. (1878) 3 App Cas 1218** <u>constituting self-dealing</u>.

**York Buildings Co. v. MacKenzie (1795) 3 ER 432:**
**Moore and Co. v. T-A-L-L, Inc., 792 P.2d 794 (Colo. 1990)**

***Murad v. Al-Saraj [2005] EWCA Civ 959***: *F*iduciary failed to disclose personal profits in a
joint venture, leading to a breach of duty claim; fiduciaries must account for undisclosed
profits, emphasizing the obligation of transparency. Reinforces the necessity for <u>fiduciaries to
disclose any personal gains derived</u> from their position **Full Disclosure:** Ensuring
Transparent Disclosure of Material Facts and Conflicts of Interest ***Aberdeen Railway Co v
Blaikie Bros (1854) 1 Paterson 394***: This case established that fiduciaries must avoid
situations where personal interests conflict with their duties. The court held that a director's
personal interest in a contract with the company rendered the contract voidable, emphasizing
the necessity for transparency and avoidance of conflicts.

*Boardman v Phipps [1966] UKHL 2* https://en.wikipedia.org/wiki/Boardman_v_Phipps
*Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173 (Del. 1986)*

**Fair Market Value Transactions: Conducting Arm's Length Transactions Reflecting True Market Value**  *Smith v. Van Gorkom, 488 A.2d 858 (Del. 1985)*: The Delaware Supreme Court found that directors breached their duty of care by approving a merger without adequate information, resulting in a sale below fair market value. This case underscores the importance of **informed decision-making to ensure transactions reflect true market value**. https://en.wikipedia.org/wiki/Smith_v._Van_Gorkom

**Avoidance of Self-Dealing:** Preventing Transactions Where Personal Interests Conflict with Organizational Duties  *Keech v Sandford (1726) Sel Cas Ch 61*: Foundational case established the strict duty of loyalty, holding that fiduciaries must avoid conflict of interest.

**Hobby Lobby Smuggling Scandal and Museum of the Bible (2017):**   Hobby Lobby, a for-profit corporation, purchased thousands of ancient artifacts, including cuneiform tablets, later found to have been illegally smuggled. U.S. government filed a civil action against Hobby Lobby for the illicit importation of artifacts. Hobby Lobby agreed to forfeit the artifacts & pay a $3 million fine.  **highlighted the importance of due diligence**

**Adherence to Fiduciary Duties: Upholding Duties of Care, Loyalty, and Obedience**
**Duty of Loyalty**: Fiduciaries are required to act in the best interests of the organization, avoiding conflicts of interest and self-dealing. This duty is fundamental in ensuring that personal interests do not interfere with organizational responsibilities.  **Duty of Care**: Board members must perform their responsibilities with the same care that an ordinarily prudent person would use under similar circumstances, ensuring informed & reasonable decisions. **Duty of Obedience**: Directors must ensure the organization adheres to its central purposes as stated in its governing documents, complying with all applicable laws and regulations.

**Prayer for Relief** - *WHEREFORE, Movant respectfully petitions this Honorable Court to:*

1. ***Grant Leave to Intervene***: *Pursuant to Federal Rule of Civil Procedure 24, permit Movant to intervene in the instant proceedings to protect vested interests and* ***uphold the integrity of the judicial process.***

2. ***Issue an Immediate Stay****: Enjoin any further sale, transfer, or destruction of Price Tower and its associated museum contents pending comprehensive independent reviews by the Internal Revenue Service, National Park Service, U.S. Attorney General, U.S. Interim Trustee and General Counsel's Office, the Federal Bureau of Investigation, and other relevant federal authorities, in light of the substantial prima facie evidence of malfeasance present in the court record.*

3. ***Order a Forensic Audit and Comprehensive Inventory****: Mandate a thorough <u>forensic examination of the trustee's actions</u> and compile a complete inventory of all architectural, artistic, and archival materials, including, but not limited to, a detailed account of all items transacted via cryptocurrency (e.g., Bitcoin) or wire transfers, testified by Control Person Cynthia D. Blanchard during 341 meeting.*

4. ***Refer the Matter for Criminal Investigation****: In accordance with 18 U.S.C. § 3057(a), refer this case to the Interim Acting U.S. Trustee & General Counsel, the IRS Exempt Organizations Division & Criminal Investigations Division, the Department of Justice Criminal Division, and the National Park Service/Advisory Council on Historic Preservation for further investigation & potential prosecution.*

5. ***Recognize Constitutional Violations****: Acknowledge that the current trajectory of the Court infringes upon the constitutional rights of Movant and the American public, particularly the rights to security in our collective cultural heritage and patrimony, which are held in public trust for current and future generations.*

6. ***Grant Further Relief as Deemed Just and Proper****: Provide such additional relief as justice and the preservation of public trust may require.*

**This Article I US Federal Court has certain obligations inherent for the protection of the American People.**  Article I courts, also known as legislative courts, are established by Congress under its Article I powers of the U.S. Constitution. Unlike Article III courts, which are part of the judicial branch, Article I courts are created to handle specific areas of law and have judges who do not enjoy the same protections as Article III judges.

<u>The primary obligations of Article I courts to the American public include without limitation:</u>

1. **Adjudication of Public Rights**: Article I courts primarily handle cases involving public rights, which are matters arising between the government and individuals. This includes

areas such as military justice, tax disputes, and benefits claims. By efficiently resolving these cases, Article I courts help maintain the rule of law and ensure that governmental actions comply with legal standards.

2. **Specialized Expertise**: Article I courts are designed to focus on specific legal areas, allowing judges to develop expertise and provide informed decisions in complex fields. **This specialization benefits the public by promoting consistency and accuracy in rulings within these domains.**

3. **Accessibility and Efficiency**: By handling specialized cases, Article I courts alleviate the caseload of Article III courts, contributing to a more efficient judicial system. This division allows for more timely resolutions of disputes, benefiting individuals and entities <u>seeking justice</u>.

4. **Due Process**: Despite differences in structure and protections compared to Article III courts, <u>**Article I courts are still bound to uphold the constitutional rights of individuals, including the right to due process**</u>. They must ensure **fair procedures and impartial adjudication** in the cases they oversee.

Article I courts **serve the American public** by providing specialized, efficient, and **fair adjudication** in specific areas of law, thereby supporting the broader judicial system and **upholding individuals' rights for JUSTICE and LIBERTY for all.** The Supreme Court has held that Article I courts can <u>**adjudicate cases involving "public rights",**</u> cases that arise between a private actor and the government. <u>The public rights theory can be traced back to the Court's 1855</u> ruling in *Murray's Lessee v. Hoboken Land & Improvement Co.* The lamentable and egregious desecration of Price Tower—a National Historic Landmark and the sole extant skyscraper conceived by the eminent architect Frank Lloyd Wright—demands immediate and unwavering attention from this Honorable Court. The evidentiary record irrefutably demonstrates that the edifice has suffered profound and irreparable harm, encompassing the illicit alienation and dismemberment of its integral components. This includes the unauthorized divestiture of singular artifacts and architectural elements of unparalleled significance within Wright's corpus, such as bespoke furnishings and decorative features meticulously designed for this iconic structure.
https://savewright.org/endangered-price-tower-in-bartlesville-oklahoma/

The clandestine expropriation of myriad artifacts, museum exhibits, and culturally invaluable artworks from Price Tower not only eviscerates the cultural patrimony of the United States but

also besmirches the esteemed reputation of international institutions entrusted with the safeguarding of global heritage. The purported conveyance of this architectural marvel for the nominal sum of ten dollars to Green Copper Holdings LLC—a New Mexico-based shell entity under the ostensible stewardship of Cynthia D. Blanchard—constitutes a flagrant violation of the public trust and an affront to the principles of heritage conservation.

The undersigned, acting in propria persona and devoid of formal accreditation as an attorney-at-law, accountant, or any analogous professional designation within the legal or accounting fraternities, hereby asserts standing pursuant to the pertinent criteria established under Article I and Article III of the United States Constitution. Specifically, the undersigned attests to being an individual of majority age, endowed with the faculties requisite for literacy and comprehension, notwithstanding the occasional typographical or scrivener's error. This declaration is tendered in the capacity of a concerned citizen and whistleblower, endeavoring to avert manifest injustice that may impinge upon the interests of the American populace, encompassing past, present, and future generations.  Enthusiasts and connoisseurs of Frank Lloyd Wright's architectural legacy universally advocate for the meticulous preservation and stewardship of structures such as the edifice known as "Price Tower." This advocacy extends beyond the mere physical integrity of the building to encompass the safeguarding of associated museum artifacts and artistic works that collectively constitute integral components of Wright's oeuvre. Moreover, this preservationist interest encompasses the creations of his protégé, Bruce Goff, notably including relics from the esteemed Shin'enKan property. These artifacts, salvaged with painstaking diligence from the aftermath of the criminal arson that befell Shin'enKan, have been entrusted to the public domain, thereby serving as invaluable assets within the Price Tower museum collections and reinforcing its designation as a National Historic Landmark.   The Supreme Court has held that Article I courts can adjudicate cases involving "public rights" —cases that arise between a private actor and the government. The public rights theory can be traced back to the *Court's 1855 ruling in Murray's Lessee v. Hoboken Land & Improvement Co.*  A document filed pro se is **"to be liberally construed,"** Estelle, 429 U.S. "pro se … however inartfully pleaded, <u>must be held to less stringent standards than formal pleadings drafted by lawyers,"</u> ibid. Cf. Fed. Rule Civ. Proc. 8(f) ("All pleadings shall be so construed as to do substantial justice"). "filings generously and with the ***leniency due pro se litigants***", see *Erickson v. Pardus, U.S. 127 S.Ct. L.Ed.2d (2007); Andrews v. Heaton, 483 F.3d (10th Cir.2007).*

**Respectfully submitted;**  April 2025



Michael Eric Nelson

Care of the United States Secretary of State for foreign location re-routing

US Phone Number: 702-932-3434 US based phone number for contact regarding these historic
bankruptcy cases and notice regarding any communication via email prior to email
communication being instituted.

Email only to be used after pre-authorization as to email address sending documents and/or
notices in order to have the address authorized to receive said notices

michaelericnelson @icloud.com

**Author / Historian**

## CERTIFICATE OF SERVICE & RESTRICTED DISCLOSURE

## IN THE MATTER OF JUDICIAL NOTICE AND PROCEDURAL ASSERTION OF RESTRICTIVE NON-DISSEMINATION MANDATES

WHEREAS, in strict adherence to the prevailing corpus of procedural jurisprudence, statutory imperatives, and doctrinal maxims enshrining the sacrosanct principles of procedural due process and equitable notice, the undersigned, acting in an abundance of caution and in full cognizance of binding jurisdictional predicates, hereby certifies that effectuate service of the foregoing instrument has been executed in conformity with the prevailing mandates of statutory law, codified procedural governance, and applicable adjudicatory directives.

NOTWITHSTANDING, in recognition of extrajudicial anomalies, convoluted procedural exigencies, and the demonstrable tactical exploitation of statutory architecture heretofore executed with artifice and calculated intent, it is hereby formally, unequivocally, and incontrovertibly noticed that the subject filing—individually, severally, and in the aggregate—shall not, under any conceivable construction, legal fiction, interpretative lens, or attenuated inference, be conveyed, transmitted, promulgated, or otherwise disseminated in any form, manner, or medium—whether directly, derivatively, incidentally, or by operation of constructive notice—to the individual alleged co conspirator of the debtor control person CYNTHIA D. BLANCHARD and her consort ANTHEM HAYEK BLANCHARD by personage of **Chad Mitchell Koehn**, aka Chad Koehn, C. Mitch Koehn,

Chad M. Koehn, Chad Mitchell K., Chad Mitch K, Chad Koehn Mitchell, Chad Mitchel Koehn or any other derivative he may use nor to any juridical entity, corporate enterprise, organizational consortium, trust arrangement, professional association, individual, attorney, consort, person, associate, employee or extrinsic affiliate with whom Chad M. Koehn maintains, has maintained, or is reasonably deduced to have maintained any contractual nexus, fiduciary entanglement, agency affiliation, governance role, or informal economic coalescence.

Said prophylactic restriction is predicated upon the putative existence of an adjudicatory directive, the precise linguistic contours and jurisdictional breadth of which remain presently indeterminate, but which is purported to have been issued **sub silentio.**

Accordingly, all **creditors, claimants, parties in interest, government agencies, regulatory bodies, and legal representatives** are hereby formally placed on notice of the aforementioned assertions, reservations, disclaimers, and protections governing the legal position and conduct of the **undersigned** with respect to the instant matter and any peripheral proceedings related thereto.

When filed to the US Federal Court this filing will be automatically sent to the parties of record pursuant with the Federal Court's automatic notification systems, therefore service so rendered pursuant with applicable law notwithstanding the aforementioned foregoing disclaimer.

**Respectfully submitted;**  April 2025

Michael Eric Nelson

Care of the United States Secretary of State for foreign location re-routing

US Phone Number:  702-932-3434 US based phone number for contact regarding these historic bankruptcy cases and notice regarding any communication via email prior to email communication being instituted.

Email only to be used after pre-authorization as to email address sending documents and/or notices in order to have the address authorized to receive said notices

michaelericnelson @icloud.com