

# THE BRAND LAW FIRM, P.A.

*"Protecting The Innocent"*

**Craig A. Brand, Esq.**
Tel: 305-878-1477
Tel. 877-407-BRAND
Craig@TheBrandLawFirm.com

September 15, 2023

cynthia@thepricetower.com

President Cynthia Blanchard Copper Tree, Inc
501 SE Frank Phillips Blvd. Suite 102
Bartlesville, OK  74003

> Re:    My Clients:
>           Pictoria Studios, Inc.
>           Taktik Enterprises, Inc.
>           Mystic Enterprises, Inc.

> Re:    Demand Letter for Final Payment

Dear Cynthia,

This writing has been scaled down as none of us desire adversities or escalations between ourselves, just solutions.  We are at a crossroads where the continued breaches by Copper Tree and the failings of judgements such as with Anthony Fischler, Wright Steak and Love 66 Bistro and their lack of making payments @$25,000!, wrapped up with the improper use and utilization of intellectual property being allowed by Copper Tree to be taken from Pictoria Studios by Mr. Fischler is overwhelming.  Furthermore, the continued system disruption and interferences with the Consulting Agreements belonging to Pictoria Studios and Taktik Enterprises, Inc. can no longer be accepted or tolerated. Mystic Enterprises is and has been owed monies for far too long and from appearances, everyone subsequent has been getting paid but those that have and want to help ease some of your pressures and burdens.  The bell has rung and payment is now expected.

For preservation and pre-litigation purposes, please be advised that we are concluding the drafting of a lawsuit or Arbitration Claim being circulated for verification of facts purposes. You had asked Dale Takio to reserve some additional time and that extension has also run; now by two weeks.  This lawsuit or Arbitration demand shall be filed with the American Arbitrators Association or Middle District of Florida (to be determined based upon the final decisions of the claims brought), where you will have to come to defend it.  As you are aware, Copper Tree agreed to such jurisdiction within the Consulting Agreements which reads:

*Jursidiction:*

*(a) Arbitration Rules of Engagement. The arbitration shall be conducted by a single arbitrator acting under*

Orlando Office:
11222 Oakshore Ln.
Clermont, Florida 34711
*Live Each Day With Courage*
*Always Finish What You Start*
*Know Where To Draw The Line*

Colorado Mail:
4650 Indian Creek Rd.
Loveland, Colorado 80538
*Take Pride In Your Work*
*Be Tough, But Fair*
*Do What Has To Be Done*

PHONE:  (305) 878-1477
PHONE:  (877) 407-447-BRAND
E-MAIL:  Craig@thebrandlawfirm.com
ONLINE: www.TheBrandLawFirm.com
*Ride For The Brand*
*Remember Somethings Are Not For Sale*

ExhsagDebtor 000001



# THE BRAND LAW FIRM, P.A.

*"Protecting The Innocent"*

**Craig A. Brand, Esq.**
Tel: 305-878-1477
Tel. 877-407-BRAND
Craig@TheBrandLawFirm.com

*the then current "Commercial Rules of AAA. The arbitration shall be held in either Lake County, Orange County or Miami-Dade County, Florida, or in Washington County, Oklahoma (to be based on the selection of the party initiating such arbitration) unless otherwise agreed by both parties. Each party to this Agreement will be responsible for the payment of one half (1/2) of the fees plus costs for the arbitration. In the event a dispute is submitted to arbitration, the parties will be responsible for their own legal fees unless otherwise agreed in writing by the parties. Judgement on this binding AAA arbitration shall be entered by any branch of the Miami-Dade Circuit Court with Jurisdiction on the amount at issue. The Parties further agree that any arbitrator must be one with at least 7 years of judicial experience and at least 6 years of private practice experience.*

As you are aware the numbers ($amounts) are not in dispute. Thus, for purposes of this Demand Letter, I will not be arguing liability as there are no defenses by Copper Tree to be legitimately had or raised. You signed notes, you signed contracts and those are all in material breach. The amounts owed are specifically spelled out within the Agreements, you executed, and which Dale Takio has provided to you over and over again. I will not be repeating the same. There shall be no more delays or terms in regard to these payments due. They have ballooned and payment is expected no later than Friday, September 22, 2023 by 2 pm. Additionally, each invoice, more than 5 days late, continues to incur a $25 per day late fee for all TEI and All Pictoria invoices, as you agreed and signed off on, as well as Pictoria's Note incurring an 18% per annum late fee based on simple interest calculations.

For purposes of monies owed (cash), I shall not be referring to equity positions held with Copper Tree. We would like to be bought out and would appreciate an offer for all our equity and that still left with Hera. However, for purposes of this demand, the balances owed, due and to be paid are:

Mystic Enterprises:
Hera Soft had a Note which came due and was absorbed by Copper Tree. This note was for $60,000. Hera Soft did make two payments towards this note for a total of $5,000, leaving Copper Tree with a balance owed of $55,000. This sum is due no later than September 22, 2023.

Taktik Enterprises:
A balance due and owing is $277,693.65. This This sum is due no later than September 22, 2023. All invoices due and owing have been provided to you without protest. All work has been properly performed without protest.

Settlement of Mystic and Taktik's claims by September 22, 2023:
$222,693.65 (inclusive of all respective late fees) and Mystic due the principal amount of $55,000 that TEI invoiced under the authority of Mystic and Copper for the benefit of Mystic. This discount is for settlement purposes only otherwise we can always adhere to the dollars you agreed to and signed off on within the April 7, 2023 consulting agreement amendment.

Orlando Office:
11222 Oakshore Ln.
Clermont, Florida 34711
*Live Each Day With Courage*
*Always Finish What You Start*
*Know Where To Draw The Line*

Colorado Mail:
4650 Indian Creek Rd.
Loveland, Colorado 80538
*Take Pride In Your Work*
*Be Tough, But Fair*
*Do What Has To Be Done*

PHONE: (305) 878-1477
PHONE: (877) 407-447-BRAND
E-MAIL: Craig@thebrandlawfirm.com
ONLINE: www.TheBrandLawFirm.com
*Ride For The Brand*
*Remember Somethings Are Not For Sale*



# THE BRAND LAW FIRM, P.A.
### *"Protecting The Innocent"*
**Craig A. Brand, Esq.**
Tel: 305-878-1477
Tel. 877-407-BRAND
Craig@TheBrandLawFirm.com

Pictoria Sudios Inc:

September 1, 2022 Promisory Note due of $100,000;
Equity is also due however, Pictoria Studios would prefer a cash buy out equal to the promissory note of $100,000 thereby totaling $200,000; and,
Post-Default Rate of $14,619.45.
Total due: $214,619.45 (inclusive of equity); or, $114,619.45 + an immediate stock issuance for the sum's promised as per the Anthem/Hera Agreement and then adopted as its own under the signed Copper Tree Agreement.

Should you have any questions or need me to set up a special drop box and insert invoices and promissory notes and other legal documents that should be within the possession or control of Copper Tree, please let me know. We would like to conclude these unresolved differences no later than September 22, 2023 quietly and amicably.

Please have the payment made by wire transfer as expressed herein. If not, we shall be forced to take legal recourse and protect our interests. You are on notice that this is a pre-litigation demand and I shouldn't have to tell you that you are forbidden in any way, shape or form to manipulate, maneuver, delete, tamper with, lose, destroy, etc., evidence, and any digital or hard form of document or communication which might lead to the discovery of admissible evidence, documents, emails, text messages, company information and documents from 2021 onwards.

Sincerely,

*Craig A. Brand, Esq.*

Orlando Office:
11222 Oakshore Ln.
Clermont, Florida 34711
*Live Each Day With Courage*
*Always Finish What You Start*
*Know Where To Draw The Line*

Colorado Mail:
4650 Indian Creek Rd.
Loveland, Colorado 80538
*Take Pride In Your Work*
*Be Tough, But Fair*
*Do What Has To Be Done*

PHONE: (305) 878-1477
PHONE: (877) 407-447-BRAND
E-MAIL: Craig@thebrandlawfirm.com
ONLINE: www.TheBrandLawFirm.com
*Ride For The Brand*
*Remember Somethings Are Not For Sale*

ExhsagDebtor 000003

USI INSURANCE SERVICES LLC
PO BOX 120
CLEVELAND OK 74020

USI INSURANCE SERVICES LLC
PO BOX 120
CLEVELAND OK 74020



**Workers Compensation and Employers Liability Insurance Policy**

**Information page**

**1. Policyholder information**
Price Tower Arts Center Inc
PO Box 2464
Bartlesville, OK 74005

918-336-4949

| | |
|---|---|
| **Policy number:** 03468083 22 2 | **Carrier number:** 19976 |
| **FEIN:** 73-1280004 | **Business type:** Non-profit |
| **ARD:** 07/31 | **ID number:** 350084487 |

Other workplace(s) not shown above:   **Agency**   USI Insurance Services LLC
See Extension of information page   **information:**   Steven K McConnell
                                          PO Box 120
                                          Cleveland, OK 74020

**2. Policy period**
The policy period is from 07/31/2022 to 07/31/2023 at 12:01 a.m. Central Standard Time (CST).

**3A. Workers' compensation insurance**
Includes Part One of the policy and applies to the workers' compensation law of the state of Oklahoma.

**3B. Employers' liability insurance**
Part Two of the policy applies to work in the State of Oklahoma. Limits of our liability under Part Two:
- Bodily injury by accident - $1,000,000.00 each accident
- Bodily injury by disease - $1,000,000.00 each employee
- Bodily injury by disease - $1,000,000.00 policy limit

**3C. Other states insurance**
Part Three of the policy applies to the states listed here, if any. None, except as shown in Part 3A.

**3D. This policy includes these Endorsements and Schedules** - See extension of information page.

**4. Premium**
The premium for this policy will be determined using our manuals of rules, classifications rates and rating plans. All information required below is subject to verification and change by audit.

| | |
|---|---|
| Estimated annual premium | $9,036.00 |
| Deposit premium | $0.00 |
| Report/Billing type | 6 Pay Installment |
| Minimum premium | $500.00 |

UN130 (12-17)

ExhsagDebtor 000005



**Extension of information page-** Item 4: Premium
**Policy number:** 03468083 22 2

**This is not a bill. You will receive a separate billing statement.**

| Loc # | Code # | Classification | Premium Basis Total Estimated Annual Remuneration | Rate per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|---|
| 1 | 9058 | HOTEL RESTARANT EMPLOYEES | | | |
| | | | $232,758.00 | $2.28 | $5,307.00 |

Classification code effective 07/31/2022, expiration date: 07/31/2023

| | | | | | |
|---|---|---|---|---|---|
| 1 | 9052 | HOTEL ALL OTHER EMPLOYEES & S,D | | | |
| | | | $167,912.00 | $3.00 | $5,037.00 |

Classification code effective 07/31/2022, expiration date: 07/31/2023

| | | | | | |
|---|---|---|---|---|---|
| 1 | 8810 | CLERICAL OFFICE EMPLOYEES NOC | | | |
| | | | $252,825.00 | $0.21 | $531.00 |

Classification code effective 07/31/2022, expiration date: 07/31/2023

| | |
|---|---|
| Manual premium | $10,875.00 |
| Increased limits factor 1.40% | $152.00 |
| Experience Modification of 0.84 applied, effective | $-1,764.00 |
| Premium discount | $-465.00 |
| Terrorism premium | $33.00 |
| Catastrophe premium | $65.00 |
| Expense constant | $140.00 |
| **Estimated annual premium** | **$9,036.00** |

Countersigned by: _____

UN130 (12-17)

P.O. Box 53505, Oklahoma City, OK 73152-3505 | (405) 232-7663 | (800) 347-3863 | compsourcemutual.com
Corporate Office: 1901 N. Walnut Ave., Oklahoma City, OK 73105 | Tulsa Office: 1305 S. Denver Ave.

ExhsagDebtor 000006



**Extension of information page-** Item 3D: This policy includes these endorsements and schedules
**Policy:** 03468083 22 2 Price Tower Arts Center Inc

**Schedule of endorsements**

| Endorsement | Effective date | Expiration date |
|---|---|---|
| Signature Endorsement (WC 99 03 26) | 07/31/2022 | 07/31/2023 |
| Catastrophe (Other Than Certified Acts Of Terrorism) Premium Endorsement (WC 00 04 21 E) | 07/31/2022 | 07/31/2023 |
| Notification of Change in Ownership Endorsement (WC 00 04 14 A) | 07/31/2022 | 07/31/2023 |
| Renewal Information Page - Policy (UN130 12 17) | 07/31/2022 | 07/31/2023 |
| Audit Noncompliance Charge Endorsement (WC 00 04 24) | 07/31/2022 | 07/31/2023 |
| Audit Amendatory Endorsement (WC 99 03 23) | 07/31/2022 | 07/31/2023 |
| Experience Modification Factor Revision Endorsement (WC 00 04 25) | 07/31/2022 | 07/31/2023 |
| Participating Endorsement Sliding Scale Dividend Plan (WC 99 06 29) | 07/31/2022 | 07/31/2023 |
| Oklahoma Fraud Warning Endorsement (WC 35 06 03) | 07/31/2022 | 07/31/2023 |
| Notification Of Settlement (WC 99 06 04) | 07/31/2022 | 07/31/2023 |
| Ok Employers Liability Intentional Tort Exclusion (WC 35 03 03) | 07/31/2022 | 07/31/2023 |
| Premium Discount Endorsement (WC 00 04 06) | 07/31/2022 | 07/31/2023 |
| Venue Amendatory Endorsement (WC 99 03 25) | 07/31/2022 | 07/31/2023 |
| Terrorism Risk Insurance Program Reauthorization Act Disclosure Endorsement (WC 00 04 22 C) | 07/31/2022 | 07/31/2023 |
| Final Premium Amendatory Endorsement (WC 99 03 22) | 07/31/2022 | 07/31/2023 |

UN130 (12-17)

P.O. Box 53505, Oklahoma City, OK 73152-3505 | (405) 232-7663 | (800) 347-3863 | compsourcemutual.com
Corporate Office: 1901 N. Walnut Ave., Oklahoma City, OK 73105 | Tulsa Office: 1305 S. Denver Ave.

ExhsagDebtor 000007



**Extension of information page-** Item 3D: This policy includes these endorsements and schedules
**Policy:** 03468083 22 2 Price Tower Arts Center Inc

**Schedule of endorsements**

| Endorsement | Effective date | Expiration date |
|---|---|---|
| Premium Due Date Endorsement (WC 00 04 19) | 07/31/2022 | 07/31/2023 |
| Premium Amendatory Endorsement (WC 99 03 24) | 07/31/2022 | 07/31/2023 |
| Covered Locations (WC 99 03 06) | 07/31/2022 | 07/31/2023 |
| Oklahoma Cancellation, Nonrenewal and Change Endorsement (WC 35 06 01 F) | 07/31/2022 | 07/31/2023 |
| Oklahoma Employers Liability Amended Coverage Endorsement (WC 35 03 02) | 07/31/2022 | 07/31/2023 |
| Other States Insurance Endorsement (WC 99 06 18) | 07/31/2022 | 07/31/2023 |
| Installment Fee Endorsement (WC 99 04 02) | 07/31/2022 | 07/31/2023 |

**For an explanation of endorsements, refer to your previous policy and any amendments thereto.**

UN130 (12-17)

P.O. Box 53505, Oklahoma City, OK 73152-3505 | (405) 232-7663 | (800) 347-3863 | compsourcemutual.com
Corporate Office: 1901 N. Walnut Ave., Oklahoma City, OK 73105 | Tulsa Office: 1305 S. Denver Ave.

ExhsagDebtor 000008



This page intentionally left blank.

P.O. Box 53505, Oklahoma City, OK 73152-3505 | (405) 232-7663 | (800) 347-3863 | compsourcemutual.com
Corporate Office: 1901 N. Walnut Ave., Oklahoma City, OK 73105 | Tulsa Office: 1305 S. Denver Ave.

ExhsagDebtor 000009



**Extension of information page** - Item 1: Policyholder information
**Policy number:** 03468083 22 2

**Schedule of locations**

Location:1                     510 South Dewey Ave
                               Bartlesville, OK 74003

P.O. Box 53505, Oklahoma City, OK 73152-3505 | (405) 232-7663 | (800) 347-3863 | compsourcemutual.com
Corporate Office: 1901 N. Walnut Ave., Oklahoma City, OK 73105 | Tulsa Office: 1305 S. Denver Ave.

ExhsagDebtor 000010

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**  **WC 00 04 06**

(Ed. 8-84)

## PREMIUM DISCOUNT ENDORSEMENT

The premium for this policy and the policies, if any, listed in Item 3 of the Schedule may be eligible for a discount. This endorsement shows your estimated discount in Items 1 or 2 of the Schedule. The final calculation of premium discount will be determined by our manuals and your premium basis as determined by audit. Premium subject to retrospective rating is not subject to premium discount.

Schedule

1. **State**                                    **Estimated Eligible Premium**

|  | First | Next | Next | |
|---|---|---|---|---|
|  | $5,000 | $95,000 | $400,000 | Balance |

2. Average percentage discount: _____%

3. Other policies:

4. If there are no entries in Items 1, 2 and 3 of the Schedule, see the Premium Discount Endorsement attached to your policy number:

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective  07/31/2022       Policy No  03468083 22 2         Endorsement No.
Insured    Price Tower Arts Center Inc                                    Premium

Insurance Company
CompSource Mutual Insurance Company          Countersigned by  _____

**WC 00 04 06**
(Ed. 8-84)

©1983 National Council on Compensation Insurance

ExhsagDebtor 000011

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**   WC 00 04 14 A

(Ed. 1-19)

**90-DAY REPORTING REQUIREMENT—NOTIFICATION OF CHANGE IN OWNERSHIP ENDORSEMENT**

You must report any change in ownership to us in writing within 90 days of the date of the change. Change in ownership includes sales, purchases, other transfers, mergers, consolidations, dissolutions, formations of a new entity, and other changes provided for in the applicable experience rating plan. Experience rating is mandatory for all eligible insureds. The experience rating modification factor, if any, applicable to this policy, may change if there is a change in your ownership or in that of one or more of the entities eligible to be combined with you for experience rating purposes.

Failure to report any change in ownership, regardless of whether the change is reported within 90 days of such change, may result in revision of the experience rating modification factor used to determine your premium.

This reporting requirement applies regardless of whether an experience rating modification is currently applicable to this policy.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective 07/31/2022          Policy No. 03468083 22 2              Endorsement No.
Insured Price Tower Arts Center Inc                                                              Premium

Insurance Company
CompSource Mutual Insurance Company       Countersigned by  _____

**WC 00 04 14 A**
(Ed. 1-19)

© Copyright 2017 National Council on Compensation Insurance, Inc. All Rights Reserved.

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**    **WC 00 04 19**

(Ed. 1-01)

**PREMIUM DUE DATE ENDORSEMENT**

This endorsement is used to amend:

Section D. of Part Five of the policy is replaced by this provision.

**PART FIVE
PREMIUM**

D.   **Premium** is amended to read:
    You will pay all premium when due. You will pay the premium even if part or all of a workers compensation law
    is not valid. **The due date for audit and retrospective premiums is the date of the billing.**

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective    07/31/2022          Policy No. 03468083 22 2          Endorsement No.
Insured    Price Tower Arts Center Inc                                          Premium

Insurance Company
CompSource Mutual Insurance Company          Countersigned by _____

WC 00 04 19
(Ed. 1-01)

©2000 National Council on Compensation Insurance, Inc.

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**                    WC 00 04 21 E

**(Ed. 01-2021)**

### Catastrophe (Other Than Certified Acts of Terrorism) Premium Endorsement

This endorsement is notification that your insurance carrier is charging premium to cover the losses that may occur in the event of a Catastrophe (Other Than Certified Acts of Terrorism) as that term is defined below. Your policy provides coverage for workers compensation losses caused by a Catastrophe (Other Than Certified Acts of Terrorism). This premium charge does not provide funding for Certified Acts of Terrorism contemplated under the Terrorism Risk Insurance Program Reauthorization Act Disclosure Endorsement (WC 00 04 22 C), attached to this policy.

For purposes of this endorsement, the following definitions apply:

- Catastrophe (Other Than Certified Acts of Terrorism): Any single event, resulting from an Earthquake, Noncertified Act of Terrorism, or Catastrophic Industrial Accident, which results in aggregate workers compensation losses in excess of $50 million.
- Earthquake: The shaking and vibration at the surface of the earth resulting from underground movement along a fault plane or from volcanic activity.
- Noncertified Act of Terrorism: An event that is not certified as an Act of Terrorism by the Secretary of the Treasury pursuant to the Terrorism Risk Insurance Act of 2002 (as amended) but that meets all of the following criteria:
  a. It is an act that is violent or dangerous to human life, property, or infrastructure;
  b. The act results in damage within the United States, or outside of the United States in the case of the premises of United States missions or air carriers or vessels as those terms are defined in the Terrorism Risk Insurance Act of 2002 (as amended); and
  c. It is an act that has been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.
- Catastrophic Industrial Accident: A chemical release, large explosion, or small blast that is localized in nature and affects workers in a small perimeter the size of a building.

The premium charge for the coverage your policy provides for workers compensation losses caused by a Catastrophe (Other Than Certified Acts of Terrorism) is shown in Item 4 of the Information Page or in the Schedule below.

### Schedule

| State | Rate | Premium |
|-------|------|---------|
|       |      |         |

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective   07/31/2022       Policy No   03468083 22 2         Endorsement No.
Insured                                                                     Premium
Price Tower Arts Center
Inc

Insurance Company
CompSource Mutual Insurance Company       Countersigned by  _____

**WC 00 04 21 E**
(Ed. 01-2021)

ExhsagDebtor 000014

© Copyright 2020 National Council on Compensation Insurance, Inc. All Rights Reserved.

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**                 **WC 00 04 22 C**

**(Ed. 01-2021)**

**Terrorism Risk Insurance Program Reauthorization Act Disclosure Endorsement**

This endorsement addresses the requirements of the Terrorism Risk Insurance Act of 2002 as amended and extended by the Terrorism Risk Insurance Program Reauthorization Act of 2019. It serves to notify you of certain limitations under the Act, and that your insurance carrier is charging premium for losses that may occur in the event of an Act of Terrorism.

Your policy provides coverage for workers compensation losses caused by Acts of Terrorism, including workers compensation benefit obligations dictated by state law. Coverage for such losses is still subject to all terms, definitions, exclusions, and conditions in your policy, and any applicable federal and/or state laws, rules, or regulations.

**Definitions**

The definitions provided in this endorsement are based on and have the same meaning as the definitions in the Act. If words or phrases not defined in this endorsement are defined in the Act, the definitions in the Act will apply.

"Act" means the Terrorism Risk Insurance Act of 2002, which took effect on November 26, 2002, and any amendments thereto, including any amendments resulting from the Terrorism Risk Insurance Program Reauthorization Act of 2019.

"Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States, as meeting all of the following requirements:

a. The act is an act of terrorism.
b. The act is violent or dangerous to human life, property, or infrastructure.
c. The act resulted in damage within the United States, or outside of the United States in the case of the premises of United States missions or certain air carriers or vessels.
d. The act has been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

"Insured Loss" means any loss resulting from an act of terrorism (and, except for Pennsylvania, including an act of war, in the case of workers compensation) that is covered by primary or excess property and casualty insurance issued by an insurer if the loss occurs in the United States or at the premises of United States missions or to certain air carriers or vessels.

"Insurer Deductible" means, for the period beginning on January 1, 2021, and ending on December 31, 2027, an amount equal to 20% of our direct earned premiums during the immediately preceding calendar year.

1 of 2

© Copyright 2020 National Council on Compensation Insurance, Inc. All Rights Reserved.

ExhsagDebtor 000016

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**
**(Ed. 01-2021)**                                                                    WC 00 04 22 C

**Limitation of Liability**

The Act limits our liability to you under this policy. If aggregate Insured Losses exceed $100,000,000,000 in a calendar year and if we have met our Insurer Deductible, we are not liable for the payment of any portion of the amount of Insured Losses that exceeds $100,000,000,000; and for aggregate Insured Losses up to $100,000,000,000, we will pay only a pro rata share of such Insured Losses as determined by the Secretary of the Treasury.

**Policyholder Disclosure Notice**

1. Insured Losses would be partially reimbursed by the United States Government. If the aggregate industry Insured Losses occurring in any calendar year exceed $200,000,000, the United States Government would pay 80% of our Insured Losses that exceed our Insurer Deductible.
2. Notwithstanding item 1 above, the United States Government will not make any payment under the Act for any portion of Insured Losses that exceed $100,000,000,000.
3. The premium charge for the coverage your policy provides for Insured Losses is included in the amount shown in Item 4 of the Information Page or in the Schedule below.

**Schedule**

| State | Rate | Premium |
|-------|------|---------|

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective   07/31/2022       Policy No   03468083 22 2            Endorsement No.
Insured                                                                     Premium
Price Tower Arts Center
Inc

Insurance Company
CompSource Mutual Insurance Company       Countersigned by

**WC 00 04 22 C**
(Ed. 01-2021)

2 of 2

© Copyright 2020 National Council on Compensation Insurance, Inc. All Rights Reserved.

ExhsagDebtor 000017

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**                    **WC 00 04 24**

(Ed. 1-17)

### AUDIT NONCOMPLIANCE CHARGE ENDORSEMENT

Part Five - Premium, Section G. (Audit) of the Workers Compensation and Employers LIabilty Insurance Policy is revised by adding the following :

If you do not allow us to examine and audit all of your records that relate to this policy, and/or do not provide audit information as requested, we may apply an Audit Noncompliance Charge. The method for determining the Audit Noncompliance Charge by state, where applicable, is shown in the Schedule below.

If you allow us to examine and audit all of your records after we have applied an Audit Noncompliance Charge, we will revise your premium in accordance with our manuals and Part 5 - Premium, E. (Final Premium) of this policy.

Failure to cooperate with this policy provision may result in the cancellation of your insurance coverage, as specified under the policy.

**Note:**
For coverage under state approved workers compensation assigned risk plans, failure to cooperate with this policy provision may affect your eligibility for coverage.

#### Schedule

| State(s) | Basis of Audit Noncompliance Charge | Maximum Audit Noncompliance Charge Multiplyier |
|---|---|---|
| Oklahoma | Estimated Annual Premium | 2 |

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective  07/31/2022     Policy No. 03468083 22 2          Endorsement No.
Insured Price Tower Arts Center Inc                                      Premium
Insurance Company                        Countersigned
CompSource Mutual Insurance              by
Company

_____

**WC 00 04 24**
(Ed. 1-17)

© Copyright 2015 National Council on Compensation Insurance, Inc. All Rights Reserved.

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**     **WC 00 04 25**

(Ed. 5-17)

## EXPERIENCE RATING MODIFICATION FACTOR REVISION ENDORSEMENT

This endorsement is added to Part Five—Premium of the policy.

The premium for the policy is adjusted by an experience rating modification factor. The factor shown on the Information Page may be revised and applied to the policy in accordance with our manuals and endorsements. We will issue an endorsement to show the revised factor, if different from the factor shown, when it is calculated.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective 07/31/2022          Policy No. 03468083 22 2                    Endorsement No.
Insured  Price Tower Arts Center Inc                                                   Premium

Insurance Company
CompSource Mutual Insurance Company      Countersigned by _____

**WC 00 04 25**
(Ed. 5-17)

© Copyright 2016 National Council on Compensation Insurance, Inc. All Rights Reserved.

ExhsagDebtor 000019

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**                    **WC 35 03 02**
(Ed. 1-87)

### OKLAHOMA EMPLOYERS LIABILITY AMENDED COVERAGE ENDORSEMENT

This endorsement applies only to the insurance provided by Part Two (Employers Liability Insurance) because Oklahoma is shown in Item 3.A. of the Information Page.

1. Section B. **We Will Pay** is replaced by the following:

   B. **We Will Pay**
   We will pay all sums you legally must pay as damages because of bodily injury to your employees, provided the bodily injury is covered by this Employers Liability Insurance.
   The damages we will pay, where recovery is permitted by law, include damages:
   1. for which you are liable to a third party by reason of a claim or suit against you by the third party to recover the damages claimed against such third party as a result of injury to your employee; and
   2. for care and loss of services.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective 07/31/2022          Policy No. 03468083 22 2                    Endorsement No.
Insured  Price Tower Arts Center Inc                                                  Premium

Insurance Company
CompSource Mutual Insurance Company          Countersigned by _____

**WC 35 03 02**
(Ed. 1-87)

© 1987 National Council on Compensation Insurance.

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**    **WC 35 03 03**
(Ed. 03-11)

---

### OKLAHOMA EMPLOYERS LIABILITY INTENTIONAL TORT EXCLUSION ENDORSEMENT

Part Two—Employers Liability Insurance, C—Exclusions, 5. is replaced by the following:

This insurance does not cover:

5.    bodily injury intentionally caused or aggravated by you, or bodily injury that you knew or should have known was substantially certain to occur from an act caused, committed, or aggravated by you;

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective   07/31/2022          Policy No  03468083 22 2               Endorsement No.
Insured  Price Tower Arts Center Inc                                              Premium

Insurance Company
CompSource Mutual Insurance Company          Countersigned by    _____

**WC 35 03 03**
(Ed. 03-11)

©2011 National Council on Compensation Insurance, Inc. All Rights Reserved.

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**                    **WC 35 06 01 F**

(Ed. 2-14)

## OKLAHOMA CANCELLATION, NONRENEWAL AND CHANGE ENDORSEMENT

This endorsement applies to the insurance provided by the policy because Oklahoma is shown in Item 3.A. of the Information Page.

The **Cancellation** Condition in Part Six (Conditions) of the policy is replaced by the following condition:

D.  **Cancellation**

1.  You may cancel this policy. You must mail or deliver to us not less than 30 days advance written notice stating when the cancellation is to take effect. Cancellation of coverage will be effective at 12:01 a.m. thirty (30) days after the date the cancellation notice is received by us, unless a later date is specified in the notice to us. You may cancel this policy effective less than 30 days after written notice is received by us where you have obtained other coverage or have become a self-insurer.

2.  We may cancel this policy. We will mail to you advance written notice stating when the cancellation is to take effect.

    a. At any time during the policy period, we may cancel for nonpayment of premium. If we cancel for nonpayment of premium, we will mail notice of cancellation to you and to the Workers Compensation Commission at least 10 days before the cancellation is to take effect.

    b. If we cancel this policy for a reason other than nonpayment of premium, we will mail notice of cancellation to you and to the Workers Compensation Commission at least 30 days before the cancellation is to take effect.

    c. If this policy has been in effect for more than 45 business days or is a renewal policy, we may cancel for only one or more of the following reasons:

    (1) Nonpayment of premium;

    (2) Discovery of fraud or material misrepresentation in the procurement of the insurance or with respect to any claims submitted under it;

    (3) Discovery of willful or reckless acts or omissions on the part of the named insured which increase any hazard insured against;

    (4) The occurrence of a change in the risk which substantially increases any hazard insured against after insurance coverage has been issued or renewed;

    (5) A violation of any local fire, health, safety, building, or construction regulation or ordinance with respect to any insured property or the occupancy thereof which substantially increases any hazard insured against;

    (6) A determination by the Insurance Commissioner that the continuation of the policy would place the insurer in violation of the insurance laws of this state;

    (7) Conviction of the named insured of a crime having as one of its necessary elements an act increasing any hazard insured against; or

    (8) Loss of or substantial changes in applicable reinsurance.

3.  Mailing notice of cancellation to you at your mailing address shown in Item 1 of the Information Page will be sufficient to prove notice.

4.  The policy period will end on the day and hour stated in the cancellation notice.

5.  Any of these provisions that conflict with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with the law.

Part 6 (Conditions) of the policy is amended by adding the following provisions:

F.  **Nonrenewal**

1.  If we elect not to renew this policy, we will mail or deliver written notice of nonrenewal to you at least 45 days before:

    a.  The expiration date of this policy; or

    b.  An anniversary date of this policy, if it is written for a term longer than one year or with no fixed expiration date.

2.  Any notice of nonrenewal will be mailed or delivered to you at the mailing address shown in Item 1 of the Information Page. If notice is mailed:

    a.  It will be considered to have been given to you on the day it is mailed.

    b.  Proof of mailing will be sufficient proof of notice.

© Copyright 2013 National Council on Compensation Insurance, Inc. All Rights Reserved.

ExhsagDebtor 000022

**WC 35 06 01 F**                                    WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY

(Ed. 2-14)

3. If notice of nonrenewal is not mailed or delivered at least 45 days before the expiration date or an anniversary date of this policy, coverage will remain in effect until 45 days after notice is given. Earned premium for such extended period of coverage will be calculated pro rata based on the rates applicable to the expiring policy.

4. We will not provide notice of nonrenewal if:
   a. We, or another company within the same insurance group, have offered to issue a renewal policy; or
   b. You have obtained replacement coverage or have agreed in writing to obtain replacement coverage.

5. If we have provided the required notice of nonrenewal as described above, and thereafter extend the policy for a period of 90 days or less, we will not provide an additional nonrenewal notice with respect to the period of extension.

G. **Notice of Premium or Coverage Changes Upon Renewal**
   1. If we elect to renew this policy, we will give written notice of any premium increase, change in deductible, or reduction in limits or coverage, to you, at the mailing address shown in Item 1 of the Information Page.
   2. Any such notice will be mailed or delivered to you at least 45 days before:
      a. The expiration date of this policy; or
      b. An anniversary date of this policy, if it is written for a term longer than one year or with no fixed expiration date.
   3. If notice is mailed:
      a. It will be considered to have been given to you on the day it is mailed.
      b. Proof of mailing will be sufficient proof of notice.
   4. If you accept the renewal, the premium increase or deductible, limits or coverage changes will be effective the day following the prior policy's expiration or anniversary date.
   5. If notice is not mailed or delivered at least 45 days before the expiration date or anniversary date of this policy, the premium, deductible, limits and coverage in effect prior to the changes will remain in effect until the earlier of:
      a. 45 days after notice is given; or
      b. The effective date of replacement coverage obtained by you.
   6. If you then elect not to renew, any earned premium for the resulting extended period of coverage will be calculated pro rata at the lower of the new rates or rates applicable to the expiring policy.
   7. We will not provide notice of the following:
      a. Changes in a rate or plan filed with or approved by the Insurance Commissioner or filed pursuant to the Property and Casualty Competitive Loss Cost Rating Act and applicable to an entire class of business; or
      b. Changes based upon the altered nature of extent of the risk insured; or
      c. Changes in policy forms filed with or approved by the Insurance Commissioner and applicable to an entire class of business.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective   07/31/2022          Policy No. 03468083 22 2          Endorsement No.
Insured   Price Tower Arts Center Inc                                          Premium


Insurance Company
CompSource Mutual Insurance Company          Countersigned by _____

**WC 35 06 01 F**
(Ed. 2-14)

© Copyright 2013 National Council on Compensation Insurance, Inc. All Rights Reserved.

ExhsagDebtor 000023

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**                    **WC 35 06 03**

(Ed. 12-93)

### OKLAHOMA FRAUD WARNING ENDORSEMENT

This endorsement applies only to the insurance provided by the Policy because Oklahoma is shown in Item 3.A. of the Information Page.

**WARNING:** **ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.**

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective   07/31/2022         Policy No  03468083 22 2         Endorsement No.
Insured    Price Tower Arts Center Inc                                        Premium

Insurance Company
CompSource Mutual Insurance Company          Countersigned by    _____

**WC 35 06 03**
(Ed. 12-93)

©1993 National Council on Compensation Insurance

ExhsagDebtor 000024



**Workers Compensation and Employer Liability Insurance Policy**

**Covered Location(s) Endorsement**

Policy number: 03468083 22 2
Effective date: 07/31/2022
Expiration date: 07/31/2023

This endorsement amends "General Section -- E. Locations" of your Workers' Compensation and Employers' Liability Insurance policy (form number WC 99 03 06). This policy covers:

1. All of your workplaces listed in Items 1 or 4 of the Information Page and the Schedule of Locations shown on your Extension of Information Page;
2. Any businesses listed on the Schedule of Named Insured Extension of Information Page on the policy;
3. All other workplaces in the State of Oklahoma unless you have other insurance or are self-insured for such workplaces.

As a condition of the contract of insurance, it is the responsibility of the insured to notify CompSource Mutual Insurance Company of any additions or deletions to the locations shown on your policy. Failure to notify CompSource Mutual Insurance Company of additional location(s) or additional business location(s) will constitute grounds for denial of claims arising at such location(s).

WC 99 03 06 (01-15)

ExhsagDebtor 000025



**Workers Compensation and Employers Liability Insurance Policy**

**Final Premium Amendatory Endorsement**

Policy number: 03468083 22 2
Effective date: 07/31/2022
Expiration date: 07/31/2023

The following amends the policy: Part Five, Premium

Section E is amended to read:

E. **Final Premium**

The final premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, the credit amount will be applied first to any outstanding premium. You may elect to have any balance remaining refunded to you. In the absence of a written request for a refund, the balance will be maintained as a credit on your account. The final premium will not be less than the highest minimum premium for the classifications covered by this policy.

If this policy is canceled, final premium will be determined in the following way unless our manuals provide otherwise:
1. If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the minimum premium.
2. If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force, and increased by our short-rate cancelation table and procedure. Final premium will not be less than the minimum premium.

WC 99 03 22 (02-18)

P.O. Box 53505, Oklahoma City, OK 73152-3505  |  (405) 232-7663 | (800) 347-3863 | compsourcemutual.com
Corporate Office: 1901 N. Walnut Ave., Oklahoma City, OK 73105  | Tulsa Office: 1305 S. Denver Ave.

ExhsagDebtor 000026



**Workers Compensation and Employers Liability Insurance Policy**

**Audit Amendatory Endorsement**

Policy number: 03468083 22 2
Effective date: 07/31/2022
Expiration date: 07/31/2023

The following amends the policy: Part Five, Premium

Section G is amended to read:

G. **Audit**

You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium. Insurance rate service organizations have the same rights we have under this provision. Audits cannot be contested unless we receive, within 180 days of cancellation or expiration date, a written request defining and/or documenting the reason for contesting the audit.

WC 99 03 23 (02-18)

P.O. Box 53505, Oklahoma City, OK 73152-3505  |  (405) 232-7663 | (800) 347-3863 | compsourcemutual.com
Corporate Office: 1901 N. Walnut Ave., Oklahoma City, OK 73105  | Tulsa Office: 1305 S. Denver Ave.

ExhsagDebtor 000027



**Workers Compensation and Employers Liability Insurance Policy**

**Premium Amendatory Endorsement**

Policy number: 03468083 22 2
Effective date: 07/31/2022
Expiration date: 07/31/2023

The following adds to the policy: Part Five, Premium

H.      **Deposit**

The deposit placed with CompSource Mutual Insurance Company at the inception of this policy or at any renewal thereof by policyholder is to be retained by CompSource Mutual Insurance Company until after final audit is closed after the termination of this policy. After the final audit, said deposit will be applied toward payment of any past due premium determined by the final audit. It will not be applied to any amounts due CompSource Mutual Insurance Company from the policyholder until that time**.**

WC 99 03 24 (02-18)

P.O. Box 53505, Oklahoma City, OK 73152-3505 | (405) 232-7663 | (800) 347-3863 | compsourcemutual.com
Corporate Office: 1901 N. Walnut Ave., Oklahoma City, OK 73105 | Tulsa Office: 1305 S. Denver Ave.

ExhsagDebtor 000028



**Workers Compensation and Employers Liability Insurance Policy**

**Venue Amendatory Endorsement**

Policy number: 03468083 22 2
Effective date: 07/31/2022
Expiration date: 07/31/2023

The following amends the policy: Part Six, Conditions

The following is added to the policy:

H. **Venue**

Venue for dispute of the terms, conditions or requirements, or the interpretation of the terms, conditions or requirements of this policy shall be in the District Court of Oklahoma County, Oklahoma

WC 99 03 25 (02-18)

ExhsagDebtor 000029



**Workers Compensation and Employers Liability Insurance Policy**

Policy number: 03468083 22 2
Effective date: 07/31/2022
Expiration date: 07/31/2023

The Policy Provisions with the information Page and Endorsements, if any, issued to form a part thereof complete this policy.

By

_____
Authorized Representative

WC 99 03 26 (01-15)

ExhsagDebtor 000030



**Workers Compensation and Employers Liability Insurance Policy**

**Installment Fee Endorsement**

Policy number: 03468083 22 2
Effective date: 07/31/2022
Expiration date: 07/31/2023

Endorsement Effective date: 07/31/2022

There will be a $5.00 installment fee for each and every installment bill issued for this policy. The installment fee will not apply to down payment or audit bills.

P.O. Box 53505, Oklahoma City, OK 73152-3505 | (405) 232-7663 | (800) 347-3863 | compsourcemutual.com
Corporate Office: 1901 N. Walnut Ave., Oklahoma City, OK 73105 | Tulsa Office: 1305 S. Denver Ave.

ExhsagDebtor 000031



**Workers Compensation and Employers Liability Policy**

**Notification of Settlement**

Business name: Price Tower Arts Center Inc
Policy number: 03468083 22 2

Title 85 et. al. provides:

A good faith effort shall be made on the part of any insurance carrier, CompSource Mutual Insurance Company, or group self-insured plan to notify an insured employer of the possibility of, and/or terms of, any settlement of a workers' compensation case pursuant to this section. Written comments or objections to settlements shall be filed with the Workers' Compensation Commission and periodically shared with the management of the applicable insurer. A written notice shall be made to all policyholders of their right to a good faith effort by their insurer to notify them of any proposed settlement, if the policyholder so chooses.

CompSource Mutual Insurance Company will automatically notify you, in writing, of any settlement in the Oklahoma Workers' Compensation Commission or any other court of competent jurisdiction in another state.

WC 99 06 04 (01-15)

P.O. Box 53505, Oklahoma City, OK 73152-3505 | (405) 232-7663 | (800) 347-3863 | compsourcemutual.com
Corporate Office: 1901 N. Walnut Ave., Oklahoma City, OK 73105 | Tulsa Office: 1305 S. Denver Ave.

ExhsagDebtor 000032



**Workers Compensation and Employer Liability Insurance Policy**

**Other States Insurance Endorsement**

Policy number: 03468083 22 2
Effective date: 07/31/2022
Expiration date: 07/31/2023

"Part Three-Other State Insurance" of the policy is replaced by the following:

**Part Three Other States Insurance**

    **A.**    **How this insurance applies**

      I.   We will pay promptly when due the benefits required of you by the workers compensation law of any state not listed in Item 3.A. of the Information Page if all of the following conditions are met:

          a.   The employee claiming benefits was either hired under a contract of employment made in a state listed in Item 3.A. of the Information Page or was, at the time of injury, principally employed in a state listed in Item 3.A. of the Information Page and;

          b.   The employee claiming benefits is not claiming benefits in a state where, at the time of injury, (I) you have other workers compensation insurance coverage, or (II) you were, by virtue of the nature of your operations in that state, required by that state's law to have obtained separate workers compensation insurance coverage, or (III) you are an authorized self-insurer or participant in a self-insured group plan; and

          c.   The duration of the work being performed by the employee claiming benefits in the state for which that employee is claiming benefits is temporary.

      II.   If we are not permitted to pay the benefits directly to persons entitled to them and all of the above conditions are met, we will reimburse you for the benefits required to be paid.

      III.   This insurance does not apply to fines or penalties arising out of your failure to comply with the requirements of the workers compensation law.

**Important Notice!**

**If you hire any employees outside those states listed in Item 3.A. on the Information Page or begin operations in any such state, you should do whatever may be required under that state's law, as this endorsement does not satisfy the requirements of that state's workers compensation law.**

WC 99 06 18 (02-18)

ExhsagDebtor 000033



**Workers Compensation and Employers Liability Insurance Policy**

**Participating Endorsement**
**Sliding Scale Dividend Plan**

Policy number: 03468083 22 2
Effective date: 07/31/2022
Expiration date: 07/31/2023

You may be entitled to a portion of the company's earnings in the form of a dividend to such extent and upon such conditions as shall be determined by CompSource Mutual's Board of Directors and in accordance with applicable law. To be eligible:

1.  This policy must have a term completed in the 12 months prior to the record date (as determined by CompSource Mutual's Board of Directors); and
2.  This policy must be in force as of the record date and applicable distribution date with no gap in coverage; and
3.  The policyholder must be compliant with all policy terms and conditions; and
4.  No dividend will be paid if the policy is cancelled prior to normal policy expiration.

Dividend calculations are based on premium and incurred losses, including allocated loss adjustment expenses based on the last completed term.

When calculating any dividend, we will include the premium minus any return premium or refund for the applicable policy term.

Purchasing this policy does not create any contractual right to a dividend. Dividends are not guaranteed. Approval of dividends is at the sole and absolute discretion of CompSource Mutual's Board of Directors.

WC 99 06 29 (11-1-21)

ExhsagDebtor 000034

**BROWN HARRIS STEVENS**

Established 1873

## <u>COMMISSION AGREEMENT</u>

This referral agreement made as of this 26th day of April, 2023 between Copper Tree, Inc, (Owner), having an office at 510 S. Dewey Ave. Bartlesville, OK 7400, Brown Harris Stevens Commercial Real Estate, LLC, having an office at 585 Stewart Avenue-Suite 790, Garden City, New York 11530, and William Pitt Sotheby's International Realty having an office at 26 Cherry Street, New Canaan, CT 06840 and Greengold Consulting Corporation having an office at 1635 White Dove Drive, Water Springs, Florida 32708.

Whereas, Owner is the Owner of the property located at Price Tower Arts Center, 510 Dewey Ave, Bartlesville, Oklahoma 74003.

Now therefore, in consideration of the mutual covenants and conditions hereinafter provided the parties hereto hereby agree as follows:

We specifically agree that no commission or any other compensation shall be deemed to have been earned by anyone or payable by Owner unless and until the time of closing.

This will confirm our agreement that in the event of a consummation of an asset sale, loan, Joint Venture or purchase with Owner as the party to such transaction with the other party being the direct result of an introduction by the undersigned brokers of the other party to Owner, then Owner shall pay for services rendered, a commission of 4% of the gross sales price.

The commission shall be divided between the parties and Owner shall pay each party its respective share directly in accordance with the following:

50% payable to Brown Harris Stevens Commercial Real Estate, LLC and William Pitt Sotheby's International Realty.

50% payable to Greengold Consulting Corporation.

Payment of the commissions shall be deemed earned, due and payable in full upon the closing of the transaction.

The Owner shall be deemed to have fully paid any commissions due under this agreement by paying in the manner described above and neither Brown Harris Stevens Commercial Real Estate, LLC and William Pitt Sotheby's International Realty, on the one hand, nor Greengold Consulting Corporation, on the other hand, shall have any claim against Owner for any portion beyond the 50% of the commission as described herein.

This agreement constitutes the entire agreement and supersedes all prior discussions, agreements, and negotiations, whether oral or written. No alteration, amendment, or termination of this agreement will be valid or binding unless made in writing and executed by all parties.

In Witness Whereof, the parties hereto have executed this agreement on the date first set forth above.

By:  Cynthia Blanchard          *Cynthia Blanchard*          Date:  May 26, 2023
(Owner)

Title:  CEO

By:  _____          Date:_____
Brown Harris Stevens Commercial Real Estate, LLC

Document Ref: XQOXC-2U7JY-PEMVC-PHSCJ

ExhsagDebtor 000035

# BROWN HARRIS STEVENS

Established 1873

Title: _____

By: _____          Date: _____
William Pitt Sotheby's International Realty

Title: _____

By:     *Ken Greenberg*                          Date: 2023-05-26
_____
Greengold Consulting Corporation

Title: _____

**Brown Harris Stevens Commercial Real Estate, LLC**    585 Stewart Avenue-Suite 790 Garden City, New York 11530
**Tel** 516.203.8100    **Fax** 516.203.8199    www.BHScommercial.com

Document Ref: XQOXC-2U7JY-PEMVC-PHSCJ

ExhsagDebtor 000036

Document Ref: XQOXC-2U7JY-PEMVC-PHSCJ

# Signature Certificate

Reference number: XQOXC-2U7JY-PEMVC-PHSCJ

| Signer | Timestamp | Signature |
|---|---|---|
| **Ken Greenberg**<br>Email: greengoldkg@gmail.com | | |
| Sent: | 26 May 2023 13:53:17 UTC | |
| Viewed: | 26 May 2023 13:53:43 UTC | |
| Signed: | 26 May 2023 13:54:25 UTC | |
| **Recipient Verification:** | | IP address: 68.204.3.183 |
| ✔Email verified | 26 May 2023 13:53:43 UTC | Location: Winter Springs, United States |
| **Cynthia Blanchard**<br>Email: cynthia@thepricetower.com | | |
| Sent: | 26 May 2023 13:53:17 UTC | |
| Viewed: | 26 May 2023 13:55:34 UTC | |
| Signed: | 26 May 2023 13:55:52 UTC | |
| **Recipient Verification:** | | IP address: 160.3.252.5 |
| ✔Email verified | 26 May 2023 13:55:34 UTC | Location: Bartlesville, United States |

Document completed by all parties on:
26 May 2023 13:55:52 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 40,000+ companies worldwide.



ENTERED ON A/P

Page Number: 1

## Client Statement



Overman Insurance, Div of USI
PO Box 62887
Virginia Beach, VA 23466
855-874-0004
http://www.usi.com



Copper Tree, Inc.
510 S Dewey Ave

Bartlesville, OK 74003

| | |
|---|---|
| Receivables As Of: | 05/15/2023 |
| Statement Date: | 05/15/2023 |

**Statement Total:**  $3,551.00

| Invoice Number | Transaction Eff Date | Due Date | Description | Transaction Amount | Balance Due |
|---|---|---|---|---|---|
| 4560358 | 03/31/2023 | 04/10/2023 | Policy No: LHD931608      Eff.03/31/2023-03/31/2024<br>Carrier Name: Landmark American Insurance Company<br>*New - Commercial Property<br>Total Due for This Invoice | $159,530.00 | $159,530.00 |
| 4560372 | 03/31/2023 | 04/10/2023 | Policy No: CA00004869101      Eff.03/31/2023-03/31/2024<br>Carrier Name: Admiral Insurance Company<br>*New - General Liability<br>Total Due for This Invoice | $38,606.26 | $38,606.26 |
| 4576836 | 03/31/2023 | 04/25/2023 | Policy No: LHD931608      Eff.03/31/2023-03/31/2024<br>Carrier Name: Landmark American Insurance Company<br>*New - Commercial Property<br>Total Due for This Invoice | ($155,979.00) | ($155,979.00) |
| 4576851 | 03/31/2023 | 04/25/2023 | Policy No: CA00004869101      Eff.03/31/2023-03/31/2024<br>Carrier Name: Admiral Insurance Company<br>*New - General Liability<br>Total Due for This Invoice | ($38,606.26) | ($38,606.26) |

| 0-30 Days | 31-60 Days | 61-90 Days | Over 90 Days | Statement Total: | $3,551.00 |
|---|---|---|---|---|---|
| ($194,585.26) | $198,136.26 | $0.00 | $0.00 | | |

Items appearing in the 31 days and older columns may be subject to cancellation for non payment by the insurance carrier.

---

**Statement No.**  CYB541182          **Please include a copy of the statement with your payment**

| | | | |
|---|---|---|---|
| Client Name: | Copper Tree, Inc. | Statement Total: | $3,551.00 |
| Receivables As Of: | 05/15/2023 | | |
| Statement Date: | 05/15/2023 | | |
| | | Payment Amount: | _____ |

Remit Payment To:

**Overman Insurance, Div of USI**
**PO Box 62887**
**Virginia Beach, VA 23466**
**855-874-0004**
**http://www.usi.com**

If you wish to remit payment via wire or ACH please contact
our accounts receivable team at USIAR@usi.com
Please include your client code in the subject line of the email
**Client Code: COPPETRE2**

**Statement No.**   CYB541182



*CSK02A15/001941/02/02/0/0/0/0*

ExhsagDebtor 000039

## ADMINISTRATIVE SERVICES AGREEMENT

THIS ADMINISTRATIVE SERVICES AGREEMENT (the "Agreement") is made and entered into as of the 7th day of March, 2023 (the "Effective Date"), by and between Price Tower Arts Center, Inc. an Oklahoma nonprofit corporation ("PTAC"),  Inn at Price Tower, Inc. an Oklahoma corporation ("IPT"), and Copper Tree, Inc., a Delaware corporation ("Copper Tree").

### Recitals:

WHEREAS, PTAC is selling the property known as the Price Tower located at 510 Dewey Avenue, Bartlesville, OK 74003 (the "Property") to Green Copper Holdings, LLC, a wholly owned subsidiary of Copper Tree, effective as of the Effective Date; and

WHEREAS, PTAC, IPT, and Copper Tree agree that certain of the personnel currently employed by PTAC and IPT (collectively, "Employer") to operate the Price Tower will continue for a short-term period after the Closing; and

WHEREAS, the parties have determined that it would be in their best interests, and would be more efficient, for Employer to provide the employees for Copper Tree after closing until such time as Copper Tree determines that the employees are no longer necessary or until such time as the employees become employed by Copper Tree or its designee;

NOW, THEREFORE, in consideration of the compensation to Employer by Copper Tree of the expenses reasonably incurred by Employer under this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

### Agreements:

1.      Engagement of PTAC.  Copper Tree hereby engages Employer to provide the employees set forth on Exhibit A hereto (the "Employees").

2.      Reimbursement.  Commencing on the Effective Date and for the term of this Agreement:

(a)      Copper Tree shall pay the salaries (inclusive of employer related taxes, fees and obligations for each respective pay period as outline in Section 2(b) below, herein after referred to as "Employer Fees") of the Employees per month in exchange for the services provided by Employer.  Copper Tree shall make payments of Employer Fees in advance of the due date.

(b)      "Salaries" shall be defined as the hourly wage or salaried wage rates reported to Employer by Copper Tree for each employee for each respective pay period.  For any non-exempt employee subject to overtime wages as per Federal Law, such overtime shall also be inclusive of Salaries when applicable.

(c)      Employer Fees. In addition to Salaries as calculated and reported by Copper Tree to Employer each pay period, Copper Tree on a bi-weekly basis at the end of each pay period, shall also reimburse Employer for all respective and applicable employer portions of payroll taxes

and insurance coverage due as required by either the State of Oklahoma statutory or as per Federal Law.

        (d)    Copper Tree agrees to promptly reimburse Employer all costs and expenses incurred by Employer related to the operation, maintenance, and repair of the Property during the term of this Agreement, including without limitation, costs related to the operation of the bar and restaurant located on the Property (collectively, "Operating Costs"). Employer shall deliver to Copper Tree periodic invoices detailing such Operating Costs incurred during the prior period, and such invoice shall be due and payable by Copper Tree to Employer within ten (10) days after the invoice date.

        (e)    Except for the payment of Salaries and Employer Fees, and the reimbursement of Operating Costs set forth in this Section 2, Employer shall not charge, and Copper Tree shall not pay, any fee, charge or other type of consideration, whether monetary or otherwise, in consideration of services provided hereunder.

3.    Prior to March 7, 2023 "Closing Date". Employer may at its sole discretion continue to control the time and attendance requirements of any and all employees and their respective wage or salary obligations as it sees fits up to and including the day preceding the Effective Date.

4.    Benefits and Accrued Personal Time Off (PTO). Copper Tree shall not offer any benefits to any employee under the terms of this agreement. Any additional benefits offered to any employee identified in this agreement shall be done so in writing between Copper Tree and the Employee and shall commence no earlier than the Effective Date. Copper Tree shall not assume the liability of any benefits, unpaid wages, accrued PTO or other compensation or wage related liabilities due to or for the benefit to any employee prior to the Effective Date. Any liability of any benefits, unpaid wages, accrued PTO or other compensation or wage related liabilities due to or for the benefit to any employee prior to the Effective Date, shall be the sole responsibility of Employer. Similarly, any liability of any benefits, unpaid wages, accrued PTO or other compensation or wage related liabilities due to or for the benefit to any employee on or after to the Effective Date, shall be the sole responsibility of Copper Tree.

5.    Scheduling. Copper Tree shall determine each employee's schedule as it sees fit in order to meet the needs of their business. Copper Tree shall comply with all applicable laws and other governmental requirements in connection with this Agreement. Copper Tree shall not make any promise or guarantee of shifts, hours or scheduling and all scheduling shall be performed on a case-by-case basis with each employee. If for any reason, Copper Tree determines it is necessary or prudent to remove any at-will employee entirely or permanently from scheduling consideration, they shall promptly notify Employer and Employer may opt to terminate the respective employee or retain them as they see fit and then for the continued employment and sole benefit of Employer. No additional employees shall be hired by either party for the fulfilment of this agreement and should Copper Tree desire to hire any additional employees, they must do so under direct hiring arrangements with the respective new or additional employee.

Exhsagdebtor 000041

6.     <u>ABLE License</u>. In addition to the employee related services to be provided by PTAC, IPT shall maintain their ABLE Mixed Beverage license to ensure an uninterrupted ability to sell alcohol on approved outlets and areas of the premises and for a period of time that allows Copper Tree to complete the application process to obtain a new ABLE Commission Mixed Beverage license under there ownership structure. During this period, ITP shall permit the continued use of all legally permissible sales of alcoholic beverages by and through the existing food and beverage outlets that currently reside on the premises and that are already permitted to serve alcohol as defined under the ABLE Commission Mixed Beverage license controlled and managed by ITP. Once a newly issued license is delivered to Copper Tree and its subsidiaries for use on the premises, Copper Tree shall promptly notify PTAC and ITP and make all required administrative changes in accordance with the guidelines set forth by the ABLE Commission. PTAC and ITP hereby agree to cooperate with Copper Tree to effectuate the transfer and/or issuance of a new ABLE Commission Mixed Beverage license, including but not limited to, the execution and delivery of any instrument or document necessary for such transfer and/or issuance.

7.     <u>Utilities</u>. In addition to the employee related services and the ABLE License services to be provided by Employer, PTAC shall maintain their all existing utilities account including electric, water, gas, phone and internet services to ensure an uninterrupted ability operated all improvements on the premises and areas of the premises and for a period of time that allows Copper Tree to obtain new accounts with each respective utility provider under their ownership structure. During this period of time, Copper tree shall assume responsibility for making payments directly to each respective utility service provider for each monthly statement of balance(s) due with the first month being prorated from March 7, 2023 to March 31, 2023 and then monthly on the respective due dates thereafter and until all accounts have been established by Copper Tree. Once each newly established account is enacted by Copper Tree and its subsidiaries for use on the premises, Copper Tree shall promptly notify PTAC and make all required administrative changes in accordance with the guidelines set forth by each utility provider. Any deposits refunded by any respective utility provider shall be for the sole benefit of PTAC. PTAC hereby agrees to cooperate with Copper Tree to effectuate the transfer and/or establish new utility service account for each respective utility service, including but not limited to, the execution and delivery of any instrument or document necessary for such transfer and/or issuance.

8.     <u>Indemnification</u>. Copper Tree agrees to indemnify and hold Employer, its owners, directors, members, officers, employees, and agents harmless from and against any and all losses, claims obligations, liabilities, penalties, causes of action, damages, costs and expenses (including reasonable attorney's fees and expenses) which any and all of them may hereafter be alleged to be liable for, suffer, incur, be responsible for or pay out, arising out of or resulting from Copper Tree's failure to perform its obligations under this Agreement, from Copper Tree's direction of or interaction with Employer's employees, or otherwise from the acts, omissions, or negligence of Copper Tree in connection with this Agreement. This <u>Section 7</u> shall survive the termination of this Agreement for any reason.

9.     <u>Term and Termination</u>.

    (a)     This Agreement shall remain in effect for a period of three months from the Effective Date, with the understanding that either party may terminate this Agreement at any time after the Effective Date by providing ten days written notice to the other party.

Exhsagdebtor 000042

(b)    The Agreement may be terminated, at any time, by the mutual written consent of the parties.

(c)    If either party is in breach of any of its material obligations hereunder, then the other party may give the breaching party written notice of such breach.  If such breach is not cured within ten business (10) days from the date such written notice is delivered, the notifying party shall have the right to immediately terminate this Agreement by written notice to the breaching party.

10.    Miscellaneous.

(a)    Notices.  Any notices given in this Agreement shall be given to the addresses set forth below the signatures of the parties.

(b)    Entire Agreement; Effectiveness and Amendments.  This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and shall be effective as of date first written above as to the parties who are then signatories hereto and, thereafter, as to all other parties at the time they became signatories hereto.  Neither this Agreement nor any provision hereof may be waived, modified, amended or terminated except by a writing duly executed by all parties.

(c)    Governing Law.  This Agreement shall be construed and enforced in accordance with Oklahoma law without regard to the choice of law provisions thereof.

(d)    Successors and Assigns; Restrictions on Assignment.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns.

(e)    Waivers.  The failure of any party to insist upon strict performance of any of the terms or conditions of this Agreement will not constitute a waiver of any of its rights hereunder.

(f)    Severability.  If any provision of this Agreement is held illegal, invalid, or unenforceable, such illegality, invalidity, or unenforceability will not affect any other provision hereof.  This Agreement shall, in such circumstances, be deemed modified to the extent necessary to render enforceable the provisions hereof.

(g)    Captions.  Captions are for convenience only and are not deemed to be part of this Agreement.

(h)    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[SIGNATURE PAGE FOLLOWS]

4

Exhsagdebtor 000043

IN WITNESS WHEREOF, the parties have executed this Agreement on the Effective Date.

**Price Tower Arts Center, Inc.**

By: _____
    Brad Doenges
    Chairman of the Board

Address: 100 SE Frank Phillips Blvd
          Bartlesville, OK 74003

**Copper Tree, Inc.**

By: _____
Name: Cynthia Blanchard
Title: _Authorized Signatory_

Address: 414 SE Washington, Ste 205
          Bartlesville, OK 74006

**Inn At Price Tower, Inc.**

By: _____
    Brad Doenges
    Chairman of the Board

Address: 510 SE Dewey Ave
          Bartlesville, OK 74003

Exhsagdebtor 000044

## EXHIBIT A

### Employees

| Employer | Employee Name | Department Name |
|---|---|---|
| IPT | Hill, Lindsey | Front Desk |
| IPT | Short, Christy | Front Desk |
| IPT | McClellan, Ikeyia | Front Desk |
| IPT | Hamilton, Benjamin | Front Desk |
| IPT | Sprague, Kimberly | Housekeeping |
| IPT | Clement, Candy | Housekeeping |
| IPT | Roach, Chanie | Kitchen |
| IPT | Delgado, Jesse | Kitchen |
| IPT | Arnett, Ryan | Kitchen |
| IPT | Ducre, Albert | Kitchen |
| IPT | Leavenworth, Matthew | Maintenance |
| IPT | Marcott, John | Maintenance |
| IPT | Campbell, Helen L. | Server |
| IPT | Smith, Erin | Server |
| IPT | Phelan, Chloe | Server |
| IPT | Johnson, Raven | Server |
| IPT | Bolton, Rylea | Server |
| PTAC | Connors, Francis Price | Docent |
| PTAC | Atkins, Deshane | Curator |
| PTAC | Hudson, Demarco | Operation Manager |
| PTAC | Keffer, Donna | Executive Director |

6

## ASSIGNMENT AND ASSUMPTION OF LEASES

THIS ASSIGNMENT AND ASSUMPTION OF LEASES (this "**Assignment**"), dated as of March 7, 2023 (the "**Effective Date**"), is by and between PRICE TOWER ARTS CENTER, INC., an Oklahoma nonprofit corporation ("**Assignor**"), and GREEN COPPER HOLDINGS, LLC, a New Mexico limited liability company ("**Assignee**").

WHEREAS, Assignor, as seller, and Assignee, as purchaser, have entered into that certain Contract of Sale of Real Estate (Commercial Improved) dated as of the Effective Date (the "**Purchase Agreement**"), for the purchase and sale of that certain property located at 510 SE Dewey Ave., Bartlesville, OK 74003, and as more particularly described in the Purchase Agreement (the "**Property**"); and

WHEREAS, in connection with the purchase and sale of the Property, the Purchase Agreement obligates Assignor to assign to Assignee, and Assignee to assume from Assignor, those certain lease agreements, whether oral or written, entered into between Assignor, as landlord, and the tenant parties described on **EXHIBIT A** attached hereto (the "**Leases**"), subject however to the terms and conditions set forth in this Assignment.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      <u>Assignment and Assumption.</u> Assignor hereby assigns, transfers, and sets onto Assignee, all of its right, title and interest, as landlord, in and to the Leases. Assignee hereby assumes and agrees to pay, perform, fulfill, and comply with all terms, covenants, conditions, and obligations to be paid, performed, fulfilled, or complied with by Assignor, as landlord, under the Leases arising from and after the Effective Date. Assignor agrees to be solely responsible for such landlord obligations arising prior to the Effective Date.

2.      <u>Indemnification.</u>

     (a)      Assignor hereby agrees to indemnify and to hold Assignee harmless from and against any and all loss, cost, liability, damage or expense, including without limitation, reasonable attorneys' fees, originating or relating to the period prior to the date hereof, and arising out of or with respect to the failure of Assignor to have performed any of the obligations of the landlord under the Leases which accrued prior to the Effective Date.

     (b)      Assignee hereby agrees to indemnify and to hold Assignor harmless from and against any and all loss, cost, liability, damage or expense, including, without limitation, reasonable attorneys' fees, originating or relating to the period following the date hereof and arising out of or with respect to the failure of Assignee to perform any of the obligations of the landlord under the Leases accruing on and after the Effective Date.

3.      <u>Miscellaneous Provisions.</u>

     (a)      <u>Assurances.</u> Assignor shall promptly execute and deliver to Assignee any additional instrument or other document which Assignee reasonably requests to evidence or better effect the assignment contained herein.

     (b)      <u>Binding Effect.</u> This Assignment and the obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns.

     (c)      <u>Governing Law; Enforcement Costs.</u> This Assignment shall be governed by and construed in accordance with the laws of the State of Oklahoma, without regard to conflict of law rules. In the event that any party institutes any legal suit, action, or proceeding, including arbitration, against the other party, arising out of this Assignment, the prevailing party in the suit, action, or proceeding shall be entitled to

{00440454.DOCX / 1}

receive, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action, or proceeding, including attorneys' fees, expenses, and court costs.

(d)     Amendment. No modification, waiver, amendment, discharge or change of this Assignment shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment, discharge or change is or may be sought.

(e)     Counterparts. This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original for all purposes, and all such counterparts shall together constitute but one and the same instrument.

[SIGNATURE PAGE FOLLOWS]

Exhsagdebtor 000047

IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the Effective Date.

**ASSIGNOR:**

PRICE TOWER ARTS CENTER, INC.

By: _____

Name:   Brad Doenges
Title:    Chairman of the Board

**ASSIGNEE:**

GREEN COPPER HOLDINGS, LLC

By: Copper Tree, Inc., its Manager

By: _____

Name:   Cynthia Blanchard
Title:    Authorized Signatory

Exhsagdebtor 000048

**EXHIBIT A**

<u>The Leases</u>

| Tenant Name | Space Rented |
|---|---|
| Ambler Architects | 5th and 6th Floors |
| Morgan Stanley | 112 |
| Fletcher Daniels Law | 113 |
| Bartlesville Symphony Orchestra | 143/144 |
| All Consulting | 152 |
| Engel Publishing/ B-Monthly | 402 |
| Bartlesville Art Association | Annex |
| Copper Cup | Annex |
| Alexis Hollum | 91-101 |

Exhsagdebtor 000049

**From:** **Craig Oberweger** craig@palmlawpartners.com 📎
**Subject:** Attorney Correspondence
**Date:** January 23, 2024 at 12:43 PM
**To:** paul@herasoft.com, paul@anthemvault.com



Mr. Aubert:

Please see attached correspondence from my office.

*Craig M. Oberweger*

☐
Craig M. Oberweger, Esq.
*Managing Partner*

**Palm Law Partners, P.A**.
2101 NW Corporate Blvd.
Ste 410
Boca Raton, FL 33431

Phone 800.520.2052
Fax: 561-405-3158

**DESIGNATED SERVICE EMAIL:**
craig@palmlawpartners.com
☐



☐
IRS Circular 230 Disclosure: Please note that the views expressed herein or in any attachments hereto are not intended to constitute a "reliance opinion" under applicable Treasury Regulations, and accordingly are not intended or written to be used, and may not be used or relied upon, for the purpose of (i) avoiding tax-related penalties that may be imposed by the Internal Revenue Service, or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
NOTICE: THE INFORMATION CONTAINED IN THIS TRANSMISSION IS ATTORNEY PRIVILEGED

AND CONFIDENTIAL. IT IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPY OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE COLLECT AND DELETE THE MATERIAL FROM ANY COMPUTER. THANK YOU.

☐
☐
☐
☐

| ESI hold Final.pdf | | Ins. Demand 627.pdf | |

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:39 AM 09/30/2022
FILED 11:39 AM 09/30/2022
SR 20223663565 - File Number 7122686

## CERTIFICATE OF INCORPORATION OF
## COPPER TREE, INC.

The undersigned organizer of Copper Tree, Inc. (the "Corporation"), acting pursuant to the Delaware General Corporation Law, hereby adopts the following Certificate of Incorporation of the Corporation (the "Certificate"):

### ARTICLE I
### Name

The name of the corporation is "Copper Tree, Inc."

### ARTICLE II
### Purpose

The purpose of this Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

### ARTICLE III
### Registered Office and Agent

The address of the Corporation's registered office in the State of Delaware is 16192 Coastal Highway, Lewes, County of Sussex, Delaware 19958. The name of its registered agent at such address is Harvard Business Services Inc.

### ARTICLE IV
### Capital

The total number of shares of capital stock that the Corporation shall have authority to issue is Ten Thousand (10,000) shares of common stock, each share having a par value of $0.001.

### ARTICLE V
### Duration

The Corporation is to have perpetual existence.

## ARTICLE VI
### Management and Directors

For the management of the business and for the conduct of the affairs of the Corporation, and in further definition, limitation and regulation of the powers of the Corporation, of its directors and of its stockholders or any class thereof, as the case may be, it is provided that the management of the business and the conduct of the affairs of the Corporation shall be vested in its Board of Directors. The number of directors which shall constitute the whole Board of Directors shall be fixed by the Board of Directors in the manner provided in the Bylaws, subject to any restrictions which may be set forth in this Certificate. The number of members of the Board of Directors of the Corporation is two and the name and mailing address of each such person, who is to serve as a director is as follows:

| Name | Address |
|------|---------|
| Anthem Blanchard | 501 E. Frank Phillips Blvd. Bartlesville, OK 74003 |
| Cynthia Blanchard | 501 E. Frank Phillips Blvd. Bartlesville, OK 74003 |

## ARTICLE VII
### Limitation of Personal Liability of Directors

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit. If the General Corporation Law of the State of Delaware is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law of the State of Delaware, as so amended. Any repeal or modification of this paragraph shall be prospective only, and shall not adversely affect any limitation on the personal liability of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE VIII
### Indemnification

The Corporation shall, to the fullest extent permitted by the General Corporation Law of the State of Delaware (including, without limitation, Section 145 thereof), as amended from time to time, indemnify any officer or director whom it shall have power to indemnify from and against any and all of the expense, liabilities or other losses of any nature. The indemnification provided in this Article VIII shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity, while holding such office, and shall continue as to a person who has ceased to be an officer or director and shall inure to the benefit of the heirs, executors and administrators of such a person. Any amendment, repeal or modification of the foregoing provisions of this Article VIII shall not adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal or modification.

## ARTICLE IX
### Bylaws

The Board of Directors of the Corporation is authorized from time to time in its discretion to adopt or amend or repeal the bylaws of the Corporation, except as such power may be restricted or limited by the General Corporation Law of the State of Delaware. Election of directors need not be written ballot.

## ARTICLE X
### Incorporator

The name and address of the incorporator is:

Paul Aubert
403 Corporate Woods Drive
Magnolia, Texas 77354

**IN WITNESS WHEREOF**, I have hereunto set my hand this 30th day of September, 2022.

By: _Paul Aubert_
Paul Aubert, Incorporator

**From:** **Paul Aubert** paul@herasoft.com
**Subject:** Re: NOTICE OF EMINENT LITIGATION AND EVIDENCE PRESERVATION AGAINST COPPER TREE AND BLANCHARDS + Mike Moran
**Date:** November 2, 2023 at 9:09 AM
**To:** Craig Brand  craig@thebrandlawfirm.com



OK. I'll see what we can provide and get back to you as soon as possible.

On Nov 1, 2023, at 9:15 PM, Craig Brand <craig@thebrandlawfirm.com> wrote:

Paul,

Thank you and by the looks of it, you are quickly feeling better. However, I disagree in good-faith with your assertions and forgetfulness that the debt owed to Mystic, Taktic and Pictoria, including the fraudulently induced equity far exceed the value of the intangible assets as well as all cash on hand. Intangible" to mean anything that is not material to the operations of the Company. Then you forget that we are not only large creditors but shareholders that believe we have been wronged in oh so many ways and that every transparency law, meeting and informational law, and minority shareholder law has been materially breached by your client(s). We believe your clients have personal liability due to their conduct. We also believe that the reason you and/or your clients are unwilling to provide sufficient collateral is because behind the backs of the minority equity owners you are attempting to sell them, transfer them, encumber them, cloud their title, etc.…

The 20 or so items identified by your clients, have a worth probably less than the interest owed on our debt, and that is only if they could be sold; which is doubtful. Contrary to what you might have been told, the assets are all speculative in worth, no guaranteed or fixed values, no direct appraisals, and no one knows the costs of bringing them to market let alone what, if anything, can be generated from a sale. Your client does not need furniture or fixtures, your client needs to pay off its debts and obligations. We have specifically stated that we are not seeking anything that would be material to the operations of the company or its fundamental well-being.

We will only accept cash as we do not want to be the one's fighting with your clients over which of the more than 15,000 items of assets your clients would like to utilize. Again, it's all for nothing if a judgement or bankruptcy trustee is appointed. It all comes this way then and even then we have no idea its value or if it would satisfy the debt owed. We are presently talking to lawyers in the capacity of representing us for your clients breaches, contract, and other wrongdoings. We are also presently talking to Oklahoma bankruptcy attorneys so as to weigh our options.

If you are not speaking inaccuracies, then demonstrate to us your ability to pay off our three debts and fair market value for our equity positions. Demonstrate to us, this supposed financing as equity owners. Become transparent with us instead of doing what you are doing which is playing hide the ball. Your clients conduct has all been and continues to be in bad faith and against the legal interests of the minority shareholders.

Best,

Craig

On Nov 1, 2023, at 10:01 AM, Paul Aubert <paul@herasoft.com> wrote:

Craig,

I am surprised by this.

First, I understand you sent the entire list of assets held by the Company. It is completely unclear to me how unsecured creditors who are allegedly owed a certain amount should have access to the entire corpus of personal property of a company to satisfy an amount vastly less than the value of those assets. We provided the list in good faith with our reasonable belief that the assets we are offering pursuant to these settlement discussions far exceed the total amount we have mutually agreed is the amount due for purposes of these discussions. The bad faith seems to be in unsecured creditors believing that they should be able to take possession of all of the assets of the Company. If you have anything indicating that the list of assets we provided would not be sufficient to cover the amount we are discussing, I am happy to hear those arguments and, if justified, to adjust the list of assets we are offering.

Second, any attempt to file a UCC-1 against the company by unsecured creditors without any judgment whatsoever would be immediately thrown out by the court in summary judgment. A UCC-1 may be filed against someone by anyone; however, there are strict rules in place under any UCC requiring the filing to be authorized by the debtor by having at the very least a security agreement in place.

Third, we are acting in good faith, and at this moment, you are in the same position that you have been. Obviously, not having yet secured financing, there is no way you can be repaid in cash at this moment. We are still working to secure financing by Nov. 15, and we still believe it is possible to do so, in which case you would still be repaid by the time we have been discussing. All we are really discussing here is which assets you should be able to take possession of in the event you are not repaid by such date. As unsecured creditors, we have treated you far better than required because we would like to have an amicable resolution to this.

I still have hope we can resolve this matter.

Regards,

Paul

On Oct 31, 2023, at 10:30 PM, Craig Brand <craig@thebrandlawfirm.com> wrote:

Paul,

As a direct result of the following:

From : paul@herasoft.com

To : mike@pictoriastudios.com
Date : Tue,31 Oct 2023 21:59:45 -0400
Subject : Consulting Agreement
============ Forwarded Message ============

Mike,

Cynthia asked me to touch base with you about your agreement. As you are aware, the Company is no longer in need of your services under the currently structured agreement. Therefore, we are prepared to terminate your agreement with the understanding that we would like to work with you to construct an agreement with you more in line with the needs of the Company. As you are also probably aware, we are working with Dale and Craig to settle up the Company's cash obligations to both of them (including their companies, Mystic and TakTik). We are willing to offer a similar inducement to you in which if the Company is not in a position to pay you back within the next two weeks, the Company would be willing to provide you with one of the pieces in its possession that you could take possession of (or perhaps Craig or Dale would take it on your behalf) with the purposes of selling or auctioning the piece(s) for satisfaction of your outstanding cash balance.

I will be providing you with the notice under the agreement, but I just wanted to give you a heads up and get your feedback on this proposal.

Please let me know.

Regards,

Paul
—


You are to add Mr. Moran to the list of claimants and shareholders who believe they have been wronged.  I'm sure you and your client "are aware" of the amounts owed to Mr. Moran and Pictoria Studios.

Given what had transpired today, neither Dale, Mike or myself are amenable to taking collateral in lieu of the cash due and owing.  This would include a buyout at our determined valuation, as you have failed to produce any evidence that our valuation was somehow incorrect or inflated.  Im not interested in going back n forth with your client as to what and which assets to sell off when it appears a bankruptcy trustee or a judgement will take them all.

Again, you and your client are forewarned NOT to encumber, sell, transfer, barter, cloud title to, or remove any of the company's assets given that they belong to the company we are part owners of and object to any movement thereof, but shall also be part of a UCC-1 filing as the work performed for the company directly benefited and participated in the development of the assets.  You and your client should be aware that we have both the Master Asset list for comparison purposes as well as the shortened list that I previously forwarded to you.  With three creditors that your client cannot pay and refuse to pay or in good faith provide sufficient collateral, the Oklahoma involuntary statute elements are fulfilled and a consideration of our legal and lawful rights.  Again, we do not wish to adversely engage with your client but given that you have demonstrated by actions a willful failure to engage and execute any settlement agreement as well as provide assets for sale when the company does not have capital on-hand to meet its fiscal obligations leaves us with little choices.  As you represent the Company, should you instruct the company to do anything but protect ALL ASSETS as part of litigation and evidence preservation, obviously it would be a "no no".

Looking forward to hearing from you, hoping you get well, but we shall all be doing what we have to do as your silence and then email to Mike Moran speak loudly.

Exhsagdebtor 000056

Craig

P.S., Anthem text'ed me today about my house.  If he has a different idea as to how to pay off the debt owed to me, I am willing to listen, however, please put the idea in writing.

Begin forwarded message:

**From:** Craig Brand <craig@thebrandlawfirm.com>
**Subject: Re: NOTICE OF EMINENT LITIGATION AND EVIDENCE PRESERVATION AGAINST COPPER TREE AND BLANCHARDS**
**Date:** October 31, 2023 at 1:12:05 PM CST
**To:** Paul Aubert <paul@herasoft.com>

Wow, okay, am I insulted. I sent you an itemized list of approx 17,000 items and your client sent me back approx. 20 pieces of garbage. You had me wait a month for that. Truly disturbing and in such bad-faith.

Paul, I want to discuss and come to an agreement regarding which venue to be used in the lawsuit's filing. By contract, I have the right to file in Florida and looking to see whether your client will allow you to accept service on their behalf which will include the Blanchard's personally.

Paul, please advise your clients that they are not to sell, transfer, barter, cloud title, encumber any of the assets belonging to Copper Tree or Green Copper Tree, including but not limited to the Price Tower and all of its inclusions. As litigation is now eminent you and they are on notice and are further bound with knowledge that they should preserve all potential evidence and not to tamper with, conceal, destroy, delete any potential evidence, including but not limited to all electronic data. In fact, all such electronic data, including messaging and emails, must be back up and kept safe as such information is part of evidence in potential litigation. All corporate records must be properly stored and copied.

Any attempt to tamper with potential evidence or encumber them shall be met with the full weight of the law.

Again, lets discuss the venue and forum for filing.

Thank you,

Craig

On Oct 31, 2023, at 12:43 PM, Paul Aubert <paul@herasoft.com> wrote:

Craig,

Here is a dropbox link with the assets proposed for you and Dale.

https://www.dropbox.com/scl/fo/tmggspxhq5cqnj2ll6av8/h?rlkey=fbf8ldiqvthutwzj5dgfww6kk&dl=0

Confidentiality Statement
This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.
Anthem Holdings Company and Hera Software Development, Inc. (D/B/A HeraSoft)

Confidentiality Statement
This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.
Anthem Holdings Company and Hera Software Development, Inc. (D/B/A HeraSoft)

Confidentiality Statement
This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this



system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.
Anthem Holdings Company and Hera Software Development, Inc. (D/B/A HeraSoft)

Exhsagdebtor 000058

Exhsagdebtor 000059



January 23, 2024

Certified Mail No.: 7022 2410 000 5491 4566

PAUL AUBERT, Esq.
403 Corporate Woods Dr., Suite 4
Magnolia, TX 77354

ALT/ Via email: paul@herasoft.com ; paul@anthemvault.com

**Re**: <u>**LITIGATION HOLD AND DOCUMENT AND DATA PRESERVATION**</u>
<u>**DEMAND**</u>

MYSTIC LAW, P.A., a Florida Corporation, et. al.

v.

COPPER TREE, INC., A Delaware corporation, and
PAUL D. AUBERT, ESQ., ANTHEM HOLDING CORPORATION,
A DELAWARE COMPANY, A/K/A HERASOFT
DEVELOPMENT, and Unknown Defendants 1-5

Dear Sir:

This firm represents MYSTIC LAW, P.A.

Under federal and state law, <u>each addressee</u> is obligated to retain, and refrain from altering, deleting, or destroying, any and all objects, documents, and/or data, in any form, that may be relevant to the litigation. To avoid a problem with record retention regarding the litigation, we request each addressee immediately implement a **"litigation hold"** which requires each addressee to preserve all the information and evidence that is or may be relevant to the litigation. This obligation attaches upon constructive notice of the potential for litigation. *See* e.g., *Banco Latino, S.A.C.A. v. Gomez Lopez,* 53 F. Supp. 2d 1273 (S.D. Fla. 1999) (citing *Telectron v. Overhead Door Corp.,* 116 F.R.D. 107, 126 (S.D. Fla. 1987).

This litigation hold should override any document or data destruction procedure or policy each addressee may currently have in place. This litigation hold is a continuing obligation. New documents, as they are created, must also be preserved.

Exhsagdebtor 000060

Please ensure that each addressee agents, accountants, auditors, computer systems personnel, employees and any other relevant and applicable persons, departments and/or entities are informed that a litigation hold is in place regarding all matters related, or foreseeably related, to the above referenced litigation and individuals and/or entities involved therein.

Please be certain to provide a copy of this instruction to all relevant and applicable persons/entities who/which might possibly have possession, custody and/or control of such documents and information, including, but not limited to, the person(s)/entities whose responsibilities cover the matters involved in the above-referenced litigation (as well as the discovery and preservation of such documents and information). Please take a moment to look at the list of individuals to whom this notice is addressed to see if there are other people each addressee believes should receive this notice as well. If there are additional persons that may have unique, non-cumulative, potentially relevant documents, please provide their names to us at each addressee's earliest convenience.

Each addressee should review their duties to preserve and protect electronic and non-electronic discovery. This letter details some, but by no means all, of these duties.

The Florida Rules of Civil Procedure (and the Federal Rules), and related state and federal case law, generally broadly define the term, "document," to include information in any tangible format. As a result, in addition to relevant paper and other "hard copy" documents, it is each addressee's obligation to preserve, in its original condition, any and all electronic data that may be relevant to the litigation. *Such data includes, but is not limited to*: e-mail and other electronic communications, word processing documents, spreadsheets, databases, calendars, telephone logs, text files, text messages, HTML files, notes in digital format, instant messages, SMS messages, customer lists, contact manager information, Internet usage files, and network access information that are stored in the following platforms: cloud-based storage, databases, networks, computer systems, including legacy systems (hardware and software), servers, archives, backup or disaster recovery systems, tapes, discs, drives, cartridges and other storage media, laptops, personal computers, Internet data, personal digital assistants, tablets, handheld wireless devices, mobile telephones, paging devices, and audio systems, including voicemail as well as on any social media website or application, whether locally or Internet based. This includes information that is in each addressee's possession, custody, or control, including items in the possession of third parties under each addressee's control. Any hard copies of the above-referenced information must be retained in addition to the electronic versions.

The preservation obligation also extends to any deleted data that was not overwritten at the time each addressee started considering the potential for litigation. *See Thompson v. United States Dept. of Housing and Urban Dev*., 219 F.R.D. 93, 97 (D. Md. 2003).

All information identified in this letter should be preserved covering the time frame referenced in the above, **but in no event less than the period from June 1, 2022, through the present, and ongoing** (the "Effective Date").

Each addressee has a legal obligation to follow these requirements to retain records and information about electronic data. Florida recognizes the tort of spoliation of evidence, and destruction of potentially relevant documents or data with knowledge of potential suit, even before service of process, may be subject to severe sanctions by the court, including the entry of default

judgment.  *See Banco Latino, S.A.C.A. v. Gomez Lopez,* 53 F. Supp. 2d 1273 (S.D. Fla. 1999); 18 U.S.C. § 1512(b)(2); *Telectron v. Overhead Door Corp.,* 116 F.R.D. 107, 126 (S.D. Fla. 1987).

Please ensure that each addressee retains all documents, including "electronic data compilations," as required by the law.

We consider electronic data to be a valuable and irreplaceable source of discovery and/or evidence in this matter.  The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner that they apply to other evidence.  Printouts to paper form of text from an electronic file do not preserve the totality of information, which is in the electronic file, and therefore do not suffice to fully preserve evidence.  Due to its format, electronic information is easily deleted, modified, or corrupted.

Accordingly, demand is hereby made that each addressee take every reasonable step to preserve this information until the final resolution of this matter.

This includes, but is not limited to, an obligation to:
- Discontinue all data destruction and backup tape recycling policies;
- Preserve and not dispose of relevant hardware, unless an exact replica of the file (a mirror image) is made;
- Preserve and not destroy passwords, decryption procedures (and accompanying software), network access codes, ID names, manuals, tutorials, written instructions, decompression, or reconstruction software, and/or logs;
- Maintain all other pertinent information and tools needed to access, review, view, and/or reconstruct all requested or potentially relevant electronic data.

Below is a further breakdown of the information and evidence that is subject to this litigation hold.

1.   **Electronic data to be preserved**:  The following types of electronic data should be preserved, in accordance with the steps set forth in paragraphs below:

a.   All electronic mail and information about electronic mail (including message contents, header information and logs of electronic mail system usage) sent or received by any of each addressee employees, officers, directors, or shareholders concerning the litigation from the Effective Date.

b.   All other electronic mail and information (including message contents, header information and logs of electronic mail system usage) containing information related to the litigation.

c.   All databases (including all records and fields and structural information in such databases), containing any reference to and/or information related to the Litigation that each addressee maintains or has maintained from the Effective Date.

d.   Any and all documents and other sources of information that are necessary in order to interpret all coded fields within each database referred to in the

Exhsagdebtor 000062

previous item. (A coded field contains an abbreviated entry representing other information and cannot be used or understood without a key to the transaction or meaning of the entry.)

e.  All logs of activity on computer systems, which may have been used to process or store electronic data containing information about the matters described in items a - d, *infra*.

f.  All files and file fragments created by any application program (e.g., word processing programs, calendaring programs, messaging programs, case management programs, billing programs, payroll programs, accounts payable programs, etc.) containing information about any matters pertaining to the Litigation during the Effective Date.

2.  **Hardware and Systems**. We will need a thorough understanding of the following, and therefore, request that each addressee keep an accurate record of same as of the date of each addressee's initial preservation efforts:

a.  types of computers (e.g. mainframe, workstations, laptops) used by each addressee's employees; types and versions of all operating systems (e.g., Windows, Linux, UNIX), including dates of major changes or upgrades;

b.  number/types of servers (e.g., Exchange servers) and the current locations of servers (i.e., physical locations and addresses), including the status of any previous server;

c.  employees' use of laptops to conduct business and how the laptops are connected to the network servers (e.g., remote access programs, synchronization procedures;

d.  employees' use of home computers to conduct business and how those computers are connected to the company's network (e.g., remote access, Web access);

e.  employees' use of handheld devices (e.g., Blackberries, iPads, iPhones, Droids, smartphones, tablets, and other hand-held devices) to conduct business; and

f.  any data storage locations outside of the United States.

3.  **Online data storage on servers, workstations, mainframes, desktops, laptops, micro-PCs, or other computers ("Computers"):** With regard to online storage and/or direct access storage devices attached to each addressee's computers, do not modify or delete any electronic data files existing at the time of this letter's delivery, which meet the criteria set forth in paragraph 1, infra, unless a true and correct copy of each such electronic data file has been made and steps have been taken to assure that such a copy will be preserved and accessible for purposes of this litigation. "Computers" is to be construed broadly, regardless of whether a particular computer type may have been specifically mentioned as an example of Computers.

4.      **Off-line data storage, cloud-based storage, backups and archives, diskettes, tapes, USB/flash drives, CDs, DVDs, tapes and any other removable or Internet based electronic media ("Backup Media"):**  With regard to all Backup Media used for storage, which, at the time of this letter's delivery, contained any electronic data meeting the criteria listed in paragraph 1 above: stop any activity which may result in the loss of such electronic data, including rotation, destruction, overwriting and/or erasure of such media in whole or in part.  This request is intended to cover all removable electronic media used for data storage in connection with each addressee's computer systems, regardless of whether it may have been specifically mentioned as an example of Backup Media, regardless of which Computers it may be attached to or used with, and whether containing backup and/or archive data sets and other electronic data, for all of each addressee's Computers.  We will need a thorough understanding of the following, and therefore, request that each addressee keep an accurate record of same as of the date of each addressee's initial preservation efforts:

      a.      the types of backups that each addressee perform (e.g. full backups, incremental backups);

      b.      the types of data backed up by each addressee (e.g. e-mails, word processing documents);

      c.      each addressee's backup schedule (e.g., each business day, weekly and monthly);

      d.      when the backup media, such as tapes, are recycled for reuse (and thus overwritten);

      e.      whether the backup media are individually labeled by type of data stored on the tape or by employees whose data is stored on the tape;

      f.      whether backup media are indexed and/or logged by backup software;

      g.      the type of media on which the backup data are stored, and any prior types of backup media used;

      h.      whether each addressee has restored backup tapes during the relevant period, for any purpose, including for other litigation or to retrieve data inadvertently deleted from each addressee's computer systems;

      i.      whether each addressee currently and/or in the past has used a remote, online backup service to maintain and store the tapes;

      j.      the location of any and all backup media, whether on- or off-site; and

      k.      the maintenance and location of any disaster recovery tapes.

5.      **Personal Files:**  For purposes of this litigation hold, there is no distinction between "official" company files and each addressee's "personal" files.  All potentially relevant documents each addressee wrote, compiled, or received must be preserved, including any copies each

Exhsagdebtor 000064

addressee has saved separately from any "official" or "company" file. This includes records and documents that may be stored on each addressee's employee's home computer, laptop, or other personal electronic device.

6. **Archival Data:** We will need a thorough understanding of the following, and therefore, request that each addressee keep an accurate record of same as of the date of each addressee's initial preservation efforts:

      a.    what types of data each addressee archives;

      b.    how archived media are labeled, indexed and/or logged;

      c.    the type of media on which the archived data is stored;

      d.    whether each addressee has restored archived tapes during the relevant time period; and

      e.    the location of the archived media.

7. **Replacement of Data Storage Devices:** Do not dispose of any electronic data storage devices and/or media which may be replaced due to failure and/or upgrade and/or other reasons that may contain electronic data meeting the criteria listed in paragraph 1 infra.

8. **Fixed Drives on Computers:** With regard to electronic data meeting the criteria listed in paragraph 1 above, which existed on fixed drives attached to or inside of Computers at the time of this letter's delivery, do not alter or erase such electronic data, and do not perform other procedures (such as data compression and disk de-fragmentation or optimization routines) which may impact such data, unless a true and correct copy has been made of such active files and file fragments, copies have been made of all directory listings (including hidden files) for all directories and subdirectories containing such files, and arrangements have been made to preserve copies during the pendency of this litigation.

9. **Programs and utilities**: Preserve copies of all application programs and utilities which may be used to process electronic data covered by this letter. We need to identify the brand/version of each software program currently and formerly used by each addressee, including:

      a.    e-mail programs used by the company (e.g., Microsoft Outlook); when the current e-mail system was implemented; whether any other e-mail systems were in use during the relevant period; the company's policy on employee e-mail storage (e.g., on a network server or their local drives); whether employees can access their e-mails remotely from outside the office; whether employees' e-mail folders are automatically archived on the network server; whether any "janitorial" programs are run to periodically purge old e-mails; whether any other policy limits are enforced on employees' e-mail accounts; and which personnel are responsible for administering each addressee's e-mail system;

      b.    electronic calendaring software programs;

Exhsagdebtor 000065

    c.    word processing and spreadsheet software programs;

    d.    voicemail programs and the period for which deleted and undeleted voicemail messages are retained;

    e.    internal Instant Messaging ("IM") programs and the period for which IM text messages are retained by each addressee;

    f.    financial and accounting programs;

    g.    document management programs; and

    h.    any customized software programs used by each addressee to create or maintain data.

10.    **Log of system modifications:**  Maintain an activity log to document modifications made to any electronic data processing system that may affect the system's capability to process any electronic data meeting the criteria listed in paragraph 1 infra, regardless of whether such modifications were made by employees, contractors, vendors and/or any other third parties. Include a log of access to such systems, regardless of changes having been made.

11.    **Evidence created subsequent to this letter:**  With regard to electronic data created subsequent to the date of delivery of this letter, relevant evidence should not be destroyed, and each addressee should take whatever steps are appropriate to avoid destruction of evidence.

12.    **Information for Employees:**  All data that contains the information described below for any and all employees reasonably expected to have any knowledge whatsoever regarding the litigation:

    a.    Basic employee information, including name, date of birth, Social Security number, employee identification number, race, date hired (or re-hired) and educational background;

    b.    Employment performance evaluations, reviews;

    c.    All information, including W-2s forms, relating to compensation (including salary, bonuses, merit increases, stock options or other forms of compensation);

    d.    For each position held by the employee during the time-period, the job title/position, salary level, function or description, location, division, department, subsidiary, time in position, job status, whether the employee was full-time, part-time, or temporary, and what region/territory the employee was responsible for serving;

    e.    Any disciplinary action or employment contract violations.

Exhsagdebtor 000066

13. **Keep Documents in the Ordinary Course of Business:**  Please preserve all documents in the form in which they were created and maintained in the normal course of business. Paper documents must be preserved in their present form.  For example, if a document is paper-clipped, leave the paperclip in place, or if the document includes post-it notes, leave the notes in place.  In addition, documents should not be reorganized solely in response to this litigation hold. Instead, documents should continue to be filed as each addressee normally maintains them.  If each addressee needs to handle a potentially relevant document in the ordinary course of business, each addressee may do so as long as each addressee does not alter or lose it.

Please understand that we consider the litigation creates a legal duty on each addressee's part to preserve the evidence listed above and any other evidence of which each addressee may be aware. *See Coleman (Parent) Holdings Inc. v. Morgan Stanley, Inc.,* 2005 WL 674885, at *9 (Fla. Cir. Ct. 2005) (entering a default judgment on liability against a defendant for failing to preserve evidence, including back-up tapes); *Omega Patents, LLC v. Fortin Auto Radio, Inc.,* 2006 WL 2038534 (M.D. Fla. July 19, 2006); *Quantum Comm. Corp. v. Star Broad., Inc.,* 2007 WL 445307 (S.D. Fla. Feb. 9, 2007); *Zubulake v. UBS Warburg,* 2004 WL 1620866 (S.D.N.Y. July 20, 2004) (court granted sanctions against the employer for failing to produce backup tapes containing relevant emails and for failing to produce other relevant documents in a timely manner.); *Zubulake v. UBS Warburg*, 220 F.R.D. 212 (S.D.N.Y. 2003) (determining that the employer had willfully deleted relevant emails, the court granted motion for sanctions and also ordered the employer to pay costs.  The court noted: counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched; attorneys are obligated to ensure all relevant documents are discovered, retained, and produced, and must guarantee that identified relevant documents are preserved by placing a "litigation hold" on the documents, communicating the need to preserve them, and arranging for safeguarding of relevant archival media.).

Please also understand this notice gives rise to a legal duty on each addressee's part to preserve the evidence listed above, and any other evidence which each addressee may be aware.  It includes an obligation to forward a copy of this letter to all individuals and organizations that are responsible for any of the items referenced in this letter.

Nothing contained in, or omitted from, this letter constitutes a waiver of any rights, or other legal action permissible under the law, nor does it constitute an admission of any kind.  All rights are reserved.

**PLEASE GOVERN YOURSELVES ACCORDINGLY.**

/s/ _____

Craig M. Oberweger
PALM LAW PARTNERS, P.A.
*for* **Plaintiffs**

as/CMO
cc: Client

**Taktik Enterprises, Inc & Subsidiaries**
11222 Oakshore Lane
Clermont, FL  34711
(407) 232-5951
info@taktikenterprises.com



# Statement

**TO**
President Cynthia Blanchard
Copper Tree, Inc
501 SE Frank Phillips Blvd.
Suite 102
Bartlesville, OK  74003

**STATEMENT NO.** 1054
**DATE** 10/17/2023

| DATE | ACTIVITY | AMOUNT | RECEIVED |
|------|----------|--------|----------|
| 10/01/2022 | Invoice #2108 | 5,833.34 | 5,833.34 |
| 11/01/2022 | Invoice #2109 | 5,833.33 | 5,833.33 |
| 12/01/2022 | Invoice #2112 | 5,833.33 | 5,833.33 |
| 01/01/2023 | Invoice #2115 | 5,833.33 | 5,833.33 |
| 01/01/2023 | Invoice #2117: Voided | 0.00 | 0.00 |
| 02/01/2023 | Invoice #2118 | 0.00 | 0.00 |
| 03/01/2023 | Invoice #2124 | 5,833.33 | 5,833.33 |
| 04/01/2023 | Invoice #2129 | 0.00 | 0.00 |
| 05/01/2023 | Invoice #2135 | 113,043.69 | 0.00 |
| 05/15/2023 | Invoice #2136 | 9,808.33 | 0.00 |
| 05/15/2023 | Invoice #2137 | 7,575.00 | 0.00 |
| 06/15/2023 | Invoice #2139 | 9,033.33 | 0.00 |
| 07/01/2023 | Invoice #2141 | 7,550.00 | 0.00 |
| 07/15/2023 | Invoice #2143 | 8,283.33 | 0.00 |
| 08/01/2023 | Invoice #2144 | 6,775.00 | 0.00 |
| 08/15/2023 | Invoice #2145 | 7,508.33 | 0.00 |
| 08/16/2023 | Invoice #2146 | 98,791.64 | 0.00 |
| 09/01/2023 | Invoice #2149 | 17,500.00 | 0.00 |
| 09/15/2023 | Invoice #2150: Voided - This Auto set invoice  has been voided as it was included into invoice 2146 under the default status of the account and therefore triggering all monies to be immediately due. | 0.00 | 0.00 |
| 10/01/2023 | Invoice #2151 | 16,750.00 | 0.00 |

| | | TOTAL AMOUNT | TOTAL RECEIVED |
|--|--|--------------|----------------|
| | | $331,785.31 | $29,166.66 |

Exhsagdebtor 000068

**Taktik Enterprises, Inc & Subsidiaries**

11222 Oakshore Lane

Clermont, FL  34711

(407) 232-5951

info@taktikenterprises.com



# INVOICE

| **BILL TO** | **SHIP TO** | |
|---|---|---|
| President Cynthia Blanchard | President Cynthia Blanchard | **INVOICE #** 2152 |
| Copper Tree, Inc | Copper Tree, Inc | **DATE** 11/01/2023 |
| 501 SE Frank Phillips Blvd. | 501 SE Frank Phillips Blvd. | **DUE DATE** 11/01/2023 |
| Suite 102 | Suite 102 | **TERMS** Due on receipt |
| Bartlesville, OK  74003 | Bartlesville, OK  74003 | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Advisory Consulting**<br>November 2023 Services | 1 | 16,500.00 | 16,500.00 |

| November 2023 Services | BALANCE DUE | **$16,500.00** |
|---|---|---|



**Taktik Enterprises, Inc & Subsidiaries**

11222 Oakshore Lane
Clermont, FL  34711
(407) 232-5951
info@taktikenterprises.com



# INVOICE

**BILL TO**
President Cynthia Blanchard
Copper Tree, Inc
501 SE Frank Phillips Blvd.
Suite 102
Bartlesville, OK  74003

**SHIP TO**
President Cynthia Blanchard
Copper Tree, Inc
501 SE Frank Phillips Blvd.
Suite 102
Bartlesville, OK  74003

**INVOICE #** 2150
**DATE** 09/15/2023
**DUE DATE** 09/30/2023
**TERMS** Net 15

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Promissory Note - Cash Due Converted to Note** Document Ref: KSFIU-WPWRU-VZMVX-SDRKP April 7, 2023 Updated Consulting Agreement with Simplified Promissory Note: 12 Months, 0% interest - Total Due $77,500  *Re-Deferred Cash from 2022 Services Rendered - $20,000.00 *Re-deferred Cash from Jan, Feb, March & April 2023 Service rendered - $25,000 *Balance of HeraSoft Promissory Note assumed by Copper Tree Inc - $32,500 | 0 | | 0.00T |

*VOID*

Document Ref: KSFIU-WPWRU-VZMVX-SDRKP April 7, 2023
Updated Consulting Agreement with Simplified Promissory Note: 12
Months, 0% interest - Total Due $77,500

| | |
|---|---|
| SUBTOTAL | 0.00 |
| TAX (0) | 0.00 |
| TOTAL | 0.00 |
| BALANCE DUE | **$0.00** |

**Taktik Enterprises, Inc & Subsidiaries**

11222 Oakshore Lane
Clermont, FL  34711
(407) 232-5951
info@taktikenterprises.com



# INVOICE

| **BILL TO** | **SHIP TO** | |
|---|---|---|
| President Cynthia Blanchard | President Cynthia Blanchard | **INVOICE #** 2149 |
| Copper Tree, Inc | Copper Tree, Inc | **DATE** 09/01/2023 |
| 501 SE Frank Phillips Blvd. | 501 SE Frank Phillips Blvd. | **DUE DATE** 09/01/2023 |
| Suite 102 | Suite 102 | **TERMS** Due on receipt |
| Bartlesville, OK  74003 | Bartlesville, OK  74003 | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Advisory Consulting**<br>September 2023 Services | 1 | 16,500.00 | 16,500.00 |
| **Late fee**<br>Flat fee - Applied on Sept 6, 2023 | 1 | 25.00 | 25.00T |
| **Late fee**<br>Flat fee - Applied on Sept 7, 2023 | 1 | 25.00 | 25.00T |
| **Late fee**<br>Flat fee - Applied on Sept 8, 2023 | 1 | 25.00 | 25.00T |
| **Late fee**<br>Flat fee - Applied on Sept 9, 2023 | 1 | 25.00 | 25.00T |
| **Late fee**<br>Flat fee - Applied on Sept 10, 2023 | 1 | 25.00 | 25.00T |
| **Late fee**<br>Flat fee - Applied on Sept 11, 2023 | 1 | 25.00 | 25.00T |
| **Late fee**<br>Flat fee - Applied on Sept 12, 2023 | 1 | 25.00 | 25.00T |
| **Late fee**<br>Flat fee - Applied on Sept 13, 2023 | 1 | 25.00 | 25.00T |
| **Late fee**<br>Flat fee - Applied on Sep 14, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 15, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 16, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 17, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 18, 2023 | | | 25.00 |
| **Late fee** | | | 25.00 |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| Flat fee - Applied on Sep 19, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 20, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 21, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 22, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 23, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 24, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 26, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 27, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 28, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 29, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 30, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 1, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 2, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 3, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 4, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 5, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 6, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 7, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 8, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 9, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 10, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 11, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 12, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 14, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 15, 2023 | | | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Late fee**<br>Flat fee - Applied on Oct 16, 2023 | | | 25.00 |
| **Late fee**<br>Late Fee Adjustment  October 17, 2023 | 1 | 25.00 | 25.00T |

September 2023 Services

| | |
|---|---|
| SUBTOTAL | 17,500.00 |
| TAX (0) | 0.00 |
| TOTAL | 17,500.00 |
| BALANCE DUE | **$17,500.00** |

Exhsagdebtor 000074

**Taktik Enterprises, Inc & Subsidiaries**
11222 Oakshore Lane
Clermont, FL  34711
(407) 232-5951
info@taktikenterprises.com



# INVOICE

| BILL TO | SHIP TO | | |
|---|---|---|---|
| President Cynthia Blanchard | President Cynthia Blanchard | **INVOICE #** | 2146 |
| Copper Tree, Inc | Copper Tree, Inc | **DATE** | 08/16/2023 |
| 501 SE Frank Phillips Blvd. | 501 SE Frank Phillips Blvd. | **DUE DATE** | 08/26/2023 |
| Suite 102 | Suite 102 | **TERMS** | Due on receipt |
| Bartlesville, OK  74003 | Bartlesville, OK  74003 | | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Deferred Cash Payments Due** Equity Trade Not Memorialized by Client - Monthly Deferred Cash Pending Addendum Due Upon Receipt at $11,500 per month (May, June, July and August 2023) | 4 | 11,500.00 | 46,000.00T |
| **Balance of Promissory Note Due** $77,500 Promissory note in default and full principal balance is due as per agreement. In addition to previously invoiced and unpaid monthly installments of $6458,33 per month to date for principal payments from May June, July and August 2023, remaining principal balance due on 12 month promissory note | 8 | 6,458.33 | 51,666.64T |
| **Deferred Cash Payments Due** Late Payment s paused contingent upon Copper Tree ability to settle outstanding balances as of 7/31/2023. Late fees  were paused/deferred and since outstanding balance was not able to be timely paid prior to 8/1/2023, contingent deferment of late fees are now due.  Late fess will continue to bear $25.00 per day accrual as per agreement.  These late fees are all late fess through 8/16/2023. | 325 | 25.00 | 8,125.00T |
| **Late fee** Individual Invoices Updated to Account for respective Late Fee Adjustments through August 16, 2023 | 325 | -25.00 | -8,125.00T |
| **Late fee** Flat fee - Applied on Sep 1, 2023 | | | 25.00 |
| **Late fee** Flat fee - Applied on Sep 2, 2023 | | | 25.00 |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Late fee**<br>Flat fee - Applied on Sep 3, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 4, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 5, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 6, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 7, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 8, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 9, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 10, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 11, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 12, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 13, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 14, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 15, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 16, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 17, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 18, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 19, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 20, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 21, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 22, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 23, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 24, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 26, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 27, 2023 | | | 25.00 |
| **Late fee** | | | 25.00 |

| ACTIVITY | QTY | RATE | AMOUNT |
|----------|-----|------|--------|
| Flat fee - Applied on Sep 28, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 29, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 30, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 1, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 2, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 3, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 4, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 5, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 6, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 7, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 8, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 9, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 10, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 11, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 12, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 14, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 15, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 16, 2023 | | | |
| **Late fee** | 1 | 25.00 | 25.00T |
| Late Fee Adjustment  October 17, 2023 | | | |

Please note that Copper Tree has been previously notified of default without active resolution to cure.  As per the agreements, all respective fees and balance are now due within 10 calendar days

| | |
|---|---|
| SUBTOTAL | 98,791.64 |
| TAX (0) | 0.00 |
| TOTAL | 98,791.64 |
| BALANCE DUE | **$98,791.64** |

**Taktik Enterprises, Inc & Subsidiaries**

11222 Oakshore Lane
Clermont, FL  34711
(407) 232-5951
info@taktikenterprises.com



# INVOICE

| **BILL TO** | **SHIP TO** | |
|---|---|---|
| President Cynthia Blanchard | President Cynthia Blanchard | **INVOICE #** 2145 |
| Copper Tree, Inc | Copper Tree, Inc | **DATE** 08/15/2023 |
| 501 SE Frank Phillips Blvd. | 501 SE Frank Phillips Blvd. | **DUE DATE** 08/30/2023 |
| Suite 102 | Suite 102 | **TERMS** Net 15 |
| Bartlesville, OK  74003 | Bartlesville, OK  74003 | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Promissory Note - Cash Due Converted to Note**<br>Document Ref: KSFIU-WPWRU-VZMVX-SDRKP April 7, 2023 Updated Consulting Agreement with Simplified Promissory Note: 12 Months, 0% interest - Total Due $77,500<br><br>*Re-Deferred Cash from 2022 Services Rendered - $20,000.00<br>*Re-deferred Cash from Jan, Feb, March & April 2023 Service rendered - $25,000<br>*Balance of HeraSoft Promissory Note assumed by Copper Tree Inc - $32,500 | 1 | 6,458.33 | 6,458.33T |
| **Late fee**<br>Flat fee - Applied on Sep 5, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 6, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 7, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 8, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 9, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 10, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 11, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 12, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 13, 2023 | | | 25.00 |

| ACTIVITY | QTY | RATE | AMOUNT |
|----------|-----|------|--------|
| **Late fee**<br>Flat fee - Applied on Sep 14, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 15, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 16, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 17, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 18, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 19, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 20, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 21, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 22, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 23, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 24, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 26, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 27, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 28, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 29, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 30, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 1, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 2, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 3, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 4, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 5, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 6, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 7, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 8, 2023 | | | 25.00 |
| **Late fee** | | | 25.00 |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| Flat fee - Applied on Oct 9, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 10, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 11, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 12, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 14, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 15, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 16, 2023 | | | |
| **Late fee** | 2 | 25.00 | 50.00T |
| Late Fee Adjustment  August 31 & October 17, 2023 | | | |

Document Ref: KSFIU-WPWRU-VZMVX-SDRKP April 7, 2023
Updated Consulting Agreement with Simplified Promissory Note: 12
Months, 0% interest - Total Due $77,500

| | |
|---|---|
| SUBTOTAL | 7,508.33 |
| TAX (0) | 0.00 |
| TOTAL | 7,508.33 |
| BALANCE DUE | **$7,508.33** |

**Taktik Enterprises, Inc & Subsidiaries**
11222 Oakshore Lane
Clermont, FL  34711
(407) 232-5951
info@taktikenterprises.com



# INVOICE

| **BILL TO** | **SHIP TO** | |
|---|---|---|
| President Cynthia Blanchard | President Cynthia Blanchard | **INVOICE #** 2144 |
| Copper Tree, Inc | Copper Tree, Inc | **DATE** 08/01/2023 |
| 501 SE Frank Phillips Blvd. | 501 SE Frank Phillips Blvd. | **DUE DATE** 08/01/2023 |
| Suite 102 | Suite 102 | **TERMS** Due on receipt |
| Bartlesville, OK  74003 | Bartlesville, OK  74003 | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Advisory Consulting**<br>August 2023 Services | 1 | 16,500.00 | 16,500.00 |
| **Advisory Consulting**<br>August 2023 Services - Cash Reduction in exchange for Immediate Equity Grant at $0.0100 per share par value for total of 0.23% ($11,500 cash reduction at $5,000,000 Valuation) - Shall remain as cash deferred until addendum provided by Copper and mutually executed and equity issued. | 1 | -11,500.00 | -11,500.00 |
| **Late fee**<br>Flat fee - Applied on Aug 17, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 18, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 19, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 20, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 21, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 22, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 23, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 24, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 25, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 26, 2023 | | | 25.00 |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Late fee**<br>Flat fee - Applied on Aug 27, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 28, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 29, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 30, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 31, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 1, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 2, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 3, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 4, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 5, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 6, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 7, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 8, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 9, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 10, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 11, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 12, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 13, 2023 | | | 25.00 |
| **Late fee**<br>Adjustment for Late Fees August 6 to August 16, 2023 | 11 | 25.00 | 275.00T |
| **Late fee**<br>Flat fee - Applied on Sep 14, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 15, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 16, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 17, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 18, 2023 | | | 25.00 |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Late fee**<br>Flat fee - Applied on Sep 19, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 20, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 21, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 22, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 23, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 24, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 26, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 27, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 28, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 29, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 30, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 1, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 2, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 3, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 4, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 5, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 6, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 7, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 8, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 9, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 10, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 11, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 12, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 14, 2023 | | | 25.00 |
| **Late fee** | | | 25.00 |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| Flat fee - Applied on Oct 15, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 16, 2023 | | | |
| **Late fee** | 1 | 25.00 | 25.00T |
| Late Fee Adjustment  October 17, 2023 | | | |

| | | |
|---|---|---|
| August Services 2023 Services (reduced retainer) - $11.5K monthly cash Exchange awaiting addendum from Copper Tree Inc.  Remains as cash deferred until mutually agreed and executed | SUBTOTAL | 6,775.00 |
| | TAX (0) | 0.00 |
| | TOTAL | 6,775.00 |
| | BALANCE DUE | **$6,775.00** |

**Taktik Enterprises, Inc & Subsidiaries**

11222 Oakshore Lane
Clermont, FL  34711
(407) 232-5951
info@taktikenterprises.com



# INVOICE

| **BILL TO** | **SHIP TO** | |
|---|---|---|
| President Cynthia Blanchard | President Cynthia Blanchard | **INVOICE #** 2143 |
| Copper Tree, Inc | Copper Tree, Inc | **DATE** 07/15/2023 |
| 501 SE Frank Phillips Blvd. | 501 SE Frank Phillips Blvd. | **DUE DATE** 07/30/2023 |
| Suite 102 | Suite 102 | **TERMS** Net 15 |
| Bartlesville, OK  74003 | Bartlesville, OK  74003 | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Promissory Note - Cash Due Converted to Note**<br>Document Ref: KSFIU-WPWRU-VZMVX-SDRKP April 7, 2023 Updated Consulting Agreement with Simplified Promissory Note: 12 Months, 0% interest - Total Due $77,500<br><br>*Re-Deferred Cash from 2022 Services Rendered - $20,000.00<br>*Re-deferred Cash from Jan, Feb, March & April 2023 Service rendered - $25,000<br>*Balance of HeraSoft Promissory Note assumed by Copper Tree Inc - $32,500 | 1 | 6,458.33 | 6,458.33T |
| **Late fee**<br>Flat fee - Applied on Aug 17, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 18, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 19, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 20, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 21, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 22, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 23, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 24, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 25, 2023 | | | 25.00 |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Late fee**<br>Flat fee - Applied on Aug 26, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 27, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 28, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 29, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 30, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 31, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 1, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 2, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 3, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 4, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 5, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 6, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 7, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 8, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 9, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 10, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 11, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 12, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 13, 2023 | | | 25.00 |
| **Late fee**<br>Late Fee Adjustment August 5 to August 16<br>2023 | 13 | 25.00 | 325.00T |
| **Late fee**<br>Flat fee - Applied on Sep 14, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 15, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 16, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 17, 2023 | | | 25.00 |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Late fee**<br>Flat fee - Applied on Sep 18, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 19, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 20, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 21, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 22, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 23, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 24, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 26, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 27, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 28, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 29, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 30, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 1, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 2, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 3, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 4, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 5, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 6, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 7, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 8, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 9, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 10, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 11, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 12, 2023 | | | 25.00 |
| **Late fee** | | | 25.00 |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| Flat fee - Applied on Oct 14, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 15, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 16, 2023 | | | |
| **Late fee** | 1 | 25.00 | 25.00T |
| Late Fee Adjustment  October 17, 2023 | | | |

UPDATED 9/26/2023 -Document Ref: KSFIU-WPWRU-VZMVX-SDRKP April 7, 2023 Updated Consulting Agreement with Simplified Promissory Note: 12 Months, 0% interest - Total Due $77,500

| | |
|---|---|
| SUBTOTAL | 8,283.33 |
| TAX (0) | 0.00 |
| TOTAL | 8,283.33 |
| BALANCE DUE | **$8,283.33** |

Exhsagdebtor 000088

**Taktik Enterprises, Inc & Subsidiaries**
11222 Oakshore Lane
Clermont, FL  34711
(407) 232-5951
info@taktikenterprises.com



# INVOICE

| | | |
|---|---|---|
| **BILL TO** | **SHIP TO** | |
| President Cynthia Blanchard | President Cynthia Blanchard | **INVOICE #** 2141 |
| Copper Tree, Inc | Copper Tree, Inc | **DATE** 07/01/2023 |
| 501 SE Frank Phillips Blvd. | 501 SE Frank Phillips Blvd. | **DUE DATE** 07/01/2023 |
| Suite 102 | Suite 102 | **TERMS** Due on receipt |
| Bartlesville, OK  74003 | Bartlesville, OK  74003 | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Advisory Consulting**<br>July Services | 1 | 16,500.00 | 16,500.00 |
| **Advisory Consulting**<br>July 2023 Services - Cash Reduction in exchange for Immediate Equity Grant at $0.0100 per share par value for total of 0.23% ($11,500 cash reduction at $5,000,000 Valuation) - Shall remain as cash deferred until addendum provided by Copper and mutually executed and equity issued. | 1 | -11,500.00 | -11,500.00 |
| **Late fee**<br>Flat fee - Applied on Aug 17, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 18, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 19, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 20, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 21, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 22, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 23, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 24, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 25, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 26, 2023 | | | 25.00 |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Late fee**<br>Flat fee - Applied on Aug 27, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 28, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 29, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 30, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 31, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 1, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 2, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 3, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 4, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 5, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 6, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 7, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 8, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 9, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 10, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 11, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 12, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 13, 2023 | | | 25.00 |
| **Late fee**<br>Adjsut Late Fees for  July 6 to August 16 2023 | 42 | 25.00 | 1,050.00T |
| **Late fee**<br>Flat fee - Applied on Sep 14, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 15, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 16, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 17, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 18, 2023 | | | 25.00 |
| **Late fee** | | | 25.00 |

Exhsagdebtor 000090

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| Flat fee - Applied on Sep 19, 2023 | | | |
| **Late fee**<br>Flat fee - Applied on Sep 20, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 21, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 22, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 23, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 24, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 26, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 27, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 28, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 29, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 30, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 1, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 2, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 3, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 4, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 5, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 6, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 7, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 8, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 9, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 10, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 11, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 12, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 14, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 15, 2023 | | | 25.00 |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Late fee**<br>Flat fee - Applied on Oct 16, 2023 | | | 25.00 |
| **Late fee**<br>Late Fee Adjustment  October 17, 2023 | 1 | 25.00 | 25.00T |

UPDATED 9/26/2023 -July Services 2023 Services (reduced retainer) - $11.5K monthly cash Exchange awaiting addendum from Copper Tree Inc.  Remains as cash deferred until mutually agreed and executed

| | |
|---|---|
| SUBTOTAL | 7,550.00 |
| TAX (0) | 0.00 |
| TOTAL | 7,550.00 |
| BALANCE DUE | **$7,550.00** |

**Taktik Enterprises, Inc & Subsidiaries**

11222 Oakshore Lane
Clermont, FL  34711
(407) 232-5951
info@taktikenterprises.com



# INVOICE

| **BILL TO** | **SHIP TO** | |
|---|---|---|
| President Cynthia Blanchard | President Cynthia Blanchard | **INVOICE #** 2139 |
| Copper Tree, Inc | Copper Tree, Inc | **DATE** 06/15/2023 |
| 501 SE Frank Phillips Blvd. | 501 SE Frank Phillips Blvd. | **DUE DATE** 06/30/2023 |
| Suite 102 | Suite 102 | **TERMS** Net 15 |
| Bartlesville, OK  74003 | Bartlesville, OK  74003 | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Promissory Note - Cash Due Converted to Note**<br>Document Ref: KSFIU-WPWRU-VZMVX-SDRKP April 7, 2023 Updated Consulting Agreement with Simplified Promissory Note: 12 Months, 0% interest - Total Due $77,500<br><br>*Re-Deferred Cash from 2022 Services Rendered - $20,000.00<br>*Re-deferred Cash from Jan, Feb, March & April 2023 Service rendered - $25,000<br>*Balance of HeraSoft Promissory Note assumed by Copper Tree Inc - $32,500 | 1 | 6,458.33 | 6,458.33T |
| **Late fee**<br>Flat fee - Applied on Aug 17, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 18, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 19, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 20, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 21, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 22, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 23, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 24, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 25, 2023 | | | 25.00 |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Late fee**<br>Flat fee - Applied on Aug 26, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 27, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 28, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 29, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 30, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Aug 31, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 1, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 2, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 3, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 4, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 5, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 6, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 7, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 8, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 9, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 10, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 11, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 12, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 13, 2023 | | | 25.00 |
| **Late fee**<br>Late Fee Adjustment July 6 to August 16, 2023 | 43 | 25.00 | 1,075.00T |
| **Late fee**<br>Flat fee - Applied on Sep 14, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 15, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 16, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Sep 17, 2023 | | | 25.00 |
| **Late fee** | | | 25.00 |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| Flat fee - Applied on Sep 18, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 19, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 20, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 21, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 22, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 23, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 24, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 26, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 27, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 28, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 29, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Sep 30, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 1, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 2, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 3, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 4, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 5, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 6, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 7, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 8, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 9, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 10, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 11, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 12, 2023 | | | |
| **Late fee** | | | 25.00 |
| Flat fee - Applied on Oct 14, 2023 | | | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Late fee**<br>Flat fee - Applied on Oct 15, 2023 | | | 25.00 |
| **Late fee**<br>Flat fee - Applied on Oct 16, 2023 | | | 25.00 |
| **Late fee**<br>Late Fee Adjustment  October 17, 2023 | 1 | 25.00 | 25.00T |

UPDATED 9/26/2023 -Document Ref: KSFIU-WPWRU-VZMVX-SDRKP April 7, 2023 Updated Consulting Agreement with Simplified Promissory Note: 12 Months, 0% interest - Total Due $77,500. Account is in Default Status and payment is due in full within 10 days of default.

| | |
|---|---|
| SUBTOTAL | 9,033.33 |
| TAX (0) | 0.00 |
| TOTAL | 9,033.33 |
| BALANCE DUE | **$9,033.33** |

**Taktik Enterprises, Inc & Subsidiaries**
11222 Oakshore Lane
Clermont, FL  34711
(407) 232-5951
info@taktikenterprises.com



# INVOICE

| BILL TO | SHIP TO | |
|---|---|---|
| President Cynthia Blanchard | President Cynthia Blanchard | **INVOICE #** 2137 |
| Copper Tree, Inc | Copper Tree, Inc | **DATE** 05/15/2023 |
| 501 SE Frank Phillips Blvd. | 501 SE Frank Phillips Blvd. | **DUE DATE** 06/01/2023 |
| Suite 102 | Suite 102 | **TERMS** Custom Terms |
| Bartlesville, OK  74003 | Bartlesville, OK  74003 | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Advisory Consulting**<br>June 2023 Services | 1 | 16,500.00 | 16,500.00 |
| **Advisory Consulting**<br>June 2023 Services- Voluntary Reduced Immediate Equity Grant at $0.0100 per share par value for total of 0.2300% ($11,500 cash reduction at $5,000,000 Valuation) - Shall remain as cash deferred until addendum provided by Copper and equity issued. | 1 | -11,500.00 | -11,500.00 |
| **Late fee**<br>Late Fee Adjustment June 6 to Sept 13, 2023 | 70 | 25.00 | 1,750.00T |
| **Late fee**<br>Late Fee Adjustment September 14, 2023 to September 26, 2023 | 13 | 25.00 | 325.00T |
| **Late fee**<br>Late Fee Adjustment  September 27, 2023 to October 17, 2023 | 20 | 25.00 | 500.00T |

UPDATED 9/26/2023 -June 2023 Services- Voluntary Reduced Immediate Equity Grant at $0.0100 per share par value for total of 0.2300% ($11,500 cash reduction at $5,000,000 Valuation) - Shall remain as cash deferred until addendum provided by Copper and equity issued. Notice of Default:  as per updated Agreement Account in Default Status and payment is due in full within 10 days of default

| | |
|---|---|
| SUBTOTAL | 7,575.00 |
| TAX (0) | 0.00 |
| TOTAL | 7,575.00 |
| BALANCE DUE | **$7,575.00** |

**Taktik Enterprises, Inc & Subsidiaries**
11222 Oakshore Lane
Clermont, FL  34711
(407) 232-5951
info@taktikenterprises.com



# INVOICE

| **BILL TO** | **SHIP TO** | | |
|---|---|---|---|
| President Cynthia Blanchard | President Cynthia Blanchard | **INVOICE #** | 2136 |
| Copper Tree, Inc | Copper Tree, Inc | **DATE** | 05/15/2023 |
| 501 SE Frank Phillips Blvd. | 501 SE Frank Phillips Blvd. | **DUE DATE** | 05/30/2023 |
| Suite 102 | Suite 102 | **TERMS** | Net 15 |
| Bartlesville, OK  74003 | Bartlesville, OK  74003 | | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Promissory Note - Cash Due Converted to Note**<br>Document Ref: KSFIU-WPWRU-VZMVX-SDRKP April 7, 2023 Updated Consulting Agreement with Simplified Promissory Note: 12 Months, 0% interest - Total Due $77,500<br><br>*Re-Deferred Cash from 2022 Services Rendered - $20,000.00<br>*Re-deferred Cash from Jan, Feb, March & April 2023 Service rendered - $25,000<br>*Balance of HeraSoft Promissory Note assumed by Copper Tree Inc - $32,500 | 1 | 6,458.33 | 6,458.33T |
| **Late fee**<br>Late Fee Adjustment | 101 | 25.00 | 2,525.00T |
| **Late fee**<br>Late Fee Adjustment  September 14 2023 to September 26, 2023 | 13 | 25.00 | 325.00T |
| **Late fee**<br>Late Fee Adjustment  September 27, 2023 to October 17, 2023 | 20 | 25.00 | 500.00T |

| | | |
|---|---|---|
| UPDATED 9/26/2023 -Document Ref: KSFIU-WPWRU-SDRKP April 7, 2023 Updated Consulting Agreement with Simplified Promissory Note: 12 months, 0% interest - Total Due $77,500.  Notice of default:  as per updated Agreement Account in Default Status and payment is due in full within 10 days of default. The payment due for this promissory note is in default. | SUBTOTAL | 9,808.33 |
| | TAX (0) | 0.00 |
| | TOTAL | 9,808.33 |
| | BALANCE DUE | **$9,808.33** |

**Taktik Enterprises, Inc & Subsidiaries**
11222 Oakshore Lane
Clermont, FL  34711
(407) 232-5951
info@taktikenterprises.com



# INVOICE

| BILL TO | SHIP TO | | |
|---|---|---|---|
| President Cynthia Blanchard | President Cynthia Blanchard | **INVOICE #** | 2135 |
| Copper Tree, Inc | Copper Tree, Inc | **DATE** | 05/01/2023 |
| 501 SE Frank Phillips Blvd. | 501 SE Frank Phillips Blvd. | **DUE DATE** | 05/01/2023 |
| Suite 102 | Suite 102 | **TERMS** | Due on receipt |
| Bartlesville, OK  74003 | Bartlesville, OK  74003 | | |

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **Advisory Consulting**<br>Converted under terms outlined in Document Ref: KSFIU-WPWRU-VZMVX-SDRKP as of April 7 2023<br><br>*Deferred Cash from 2022 Services Rendered - $20,000 ($20,000 converted to new12 month promissory note)<br>*Non-Deferred Past Due from 2022 - $5833.33<br>*Deferred Cash from Jan, Feb, March April 2023 Services Rendered - $25,000 ($25,000 converted to new12 month promissory note)<br>*Balance of Herasoft Promissory Notes Assumed by Copper - $32,500 ($32,500 converted to new12 month promissory note)<br>*March 2023 Expenses Past Due - $2496.18 | 1 | 103,333.33 | 103,333.33 |
| **Expense Reimbursement**<br>April 2023 FCC Presentation Trip - Airline | 1 | 578.36 | 578.36 |
| **Expense Reimbursement**<br>April 2023 FCC Presentation Trip - Parking | 1 | 57.00 | 57.00 |
| **Advisory Consulting**<br>May 2023 Services | 1 | 16,500.00 | 16,500.00 |
| **Advisory Consulting**<br>May 2023 Services- Cash Reduction in exchange for Immediate Equity Grant at $0.0100 per share par value for total of 0.23% ($11,500 cash reduction at $5,000,000 Valuation) - Shall remain as cash deferred until addendum provided by Copper and mutually executed and equity issued. | 1 | -11,500.00 | -11,500.00 |
| **Late fee**<br>Late Fee Adjustment May 6 to September 13, | 130 | 25.00 | 3,250.00T |

| ACTIVITY | QTY | RATE | AMOUNT |
|----------|-----|------|--------|
| 2023 | | | |
| **Late fee**<br>Late Fee Adjustment  September 14, 2023 to September 26, 2023 | 13 | 25.00 | 325.00T |
| **Late fee**<br>Late Fee Adjustment  September 27, 2023 to October 17, 2023 | 20 | 25.00 | 500.00T |

UPDATED 9/26/2023 -Non-Deferred Cash Due as per updated Agreement Account in Default Status and payment is due in full within 10 days of default:  April 7, 2023. April 2023 Expenses. May 2023 Services (reduced retainer) - $11.5K monthly cash Exchange awaiting addendum from Nathan & Cynthia.

| | |
|---|---|
| SUBTOTAL | 113,043.69 |
| TAX (0) | 0.00 |
| TOTAL | 113,043.69 |
| BALANCE DUE | **$113,043.69** |

| Accession # | Object ID | Object Nametype | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | AGQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.17 | 2004.17 | Sculpture | "Sixty-Six" sculpture | Indiana, Robert | Indiana, Robert | Price Tower Arts Center, museum purchase with funds by the Lynn Foundation, Mr & Mrs. C. J. Silas, Mr. George R. Kravis II, Mr. & Mrs. Glenn Cox, Mr. & Mrs. Thomas Harris, Mr. & Mrs. Joel Romines, Phillips Petroleum Company, by exchange, and others | 2003 | Sculpture, "66" Outdoor sculpture, Robert Indiana, artist, 2003. Large numbers (two sixes), green on faces and red sides, partially oxidized on some surfaces. Name/title plate is a satin silver plate, 1.4" thick with black etching, Aluminum, paint. 66 x 2.55 x 66 inches | 100,000 | 425,000 | Indiana, Robert Sculpture | Art | | Good | | Purchase | 2/20/2004 | Morgan Art Foundation, GA | South side of Price Tower, across street | Name plate for sculpture was made by First Thought ... |
| 2006.07 | 2006.07 | Painting | Painting, "Jim was Jim" | | Salle, David | Price Tower Arts Center, gift of Barbara Jackson | 1990 | | 40,000 | 40,000 | Jackson, Barbara | Art | | Good | | Gift | 5/31/2005 | Jackson, Barbara | | |
| 2006.20 | 2006.20 | Sculpture | Sculpture "Birdjectory" | Rashid, Karim | Rashid, Karim | Price Tower Arts Center, gift of Karim Rashid | 2008 | Sculpture, "Birdjectory", Karim Rashid (U.S. born 1960) designer, Insight Group, Inc., fabricator, 2006. High-density foam and metal, 46 x 300 x 36 inches | 45,000 | 45,000 | Sculpture Rashid, Karim, 1960-Art - Abstract; Birdjectic | Art | Karim Rashid | | Good | Good, stable | | | Karim Rashid, Inc. | Price Tower, 1st floor, North Gallery | |
| 2002.14 | 2002.14.2 | Rug | "Hillside" Residence Entryway Runner | Wright, Frank Lloyd Price, Joe, Harold C. Price, Carolyn Price family | Wright, Frank Lloyd | Price Tower Arts Center, gift of Carolyn E. Price | 1958 | Wool Carpet Runner, Frank Lloyd Wright designer, Edward Fields & Company, manufacturer. 1958. Large foyer carpet for "Hillside", residence of Mr. & Mrs. Harold C. Price, Jr. and their family. Four recliners cut to different lengths ... "Edward Fields" on back. 1/2 x 329-3/4 x 76-1/2 | 45,000 | 45,000 | Hillside Rug Carpet | Art | | Good | SEE DETAILED Condition Report, August 1, 2011. Good, stable. Sheen/wear at top edge with some rippling and buckling. Minor to moderate staining... One burn hole in surface. A few broken and loose threads at binding edges. | Gift | 1998 | Price, Carolyn E. | Price Tower, 2nd floor, FLLW Gallery | ... signed Jan. 5, 2010. Don and Donna Duncan both died in June 2003. Their daughters, Lynnea and Diana Duncan ... |
| 2008.01 | 2008.01.2 | Chair | High chair for William Drummond residence | Drummond, William | Drummond, William | Price Tower Arts Center, museum purchase | 1915 | Chair, Highchair for William Drummond Residence, Riverside, Illinois, William Eugene Drummond (1876-1948) designer, 1915. Prairie style. Wood frame, stained, with painted leather upholstered seat. 39 x 17 x 15-1/4 | 40,000 | | Furniture | Art | | Good | | Purchase | 1/6/2003 | Orchid, James Duncan | Price Tower, 2nd floor, FLLW Gallery | 3 Pieces from previous upholstery: Teal Leather was located in the Annex Room 111 (Mammatus Room), bottom shelf, cardboard box (10-05-2012, JPhillips) |
| 2002.03 | 2002.03.2 | Chair | Price Tower Executive Chair | Wright, Frank Lloyd Price, Jr., Harold C. | Wright, Frank Lloyd | Price Tower Arts Center, gift of Harold C. Price, Jr. | 1956 | Chair, Frank Lloyd Wright, designer, Blaustein Foundry, fabricators, Price Tower Executive Chair. 1956. Cast aluminum with Schumacher Talisin Line pattern upholstery, 34-3/4 x 29-1/2 x 29-1/2 inches | 38,000 | 38,000 | Price Tower | Art | | Good | | Gift | 03.04.02 | Price, Harold C. Jr. | Price Tower, 16th floor | Price Tower, 5th floor, Griffin apartment |
| 2001.01 | 2001.01.143 | Fireplace | Copper fireplace hood and base | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | | Copper fireplace hood and base, built-in on 17th floor. No "shoulders" that link base up to hood, no ceramic inserts in base. | 32,800 | 1,200 | | Art | | | | Gift | 5/31/2001 | Phillips Petroleum Company | 17th Fl. | |
| 2001.01 | 2001.01.147 | Fireplace | Copper fireplace hood and base | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | | Copper fireplace hood and base, built-in on 17th floor. Copper "shoulders" in place that link base up to hood, ceramic inserts still in place. | 32,800 | 1,200 | | Art | | | | Gift | 5/31/2001 | Phillips Petroleum Company | 17th Fl. | |
| 2001.01 | 2001.01.141 | Fireplace | Copper fireplace hood | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | | Copper fireplace hood from 5th floor living area. Marked "96". | 19,000 | 1,000 | | Art | | | | Gift | 5/31/2001 | Phillips Petroleum Company | Annex, Room 103 | Removed in 2006 by John H. |
| 2001.01 | 2001.01.142 | Fireplace | Copper fireplace hood, freestanding | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | | Copper fireplace hood removed from 7th floor for hotel renovation. | 19,000 | 1,000 | | Art | | | | Gift | 5/31/2001 | Phillips Petroleum Company | Annex, Room 104 | Object photographed for use in Rizzoli catalogue for Prairie Skyscraper. |
| 2001.01 | 2001.01.144 | Fireplace | Copper fireplace hood, freestanding | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | | Copper fireplace hood removed from 11th floor for hotel renovation. | 19,000 | 1,000 | | Art | | | | Gift | 5/31/2001 | Phillips Petroleum Company | Annex, Room 103 | |
| 2001.01 | 2001.01.145 | Fireplace | Copper fireplace hood, freestanding | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | | Copper fireplace hood removed from 13th floor for hotel renovation. | 19,000 | 1,000 | | Art | | | | Gift | 5/31/2001 | Phillips Petroleum Company | Annex, Room 104 | |
| 2002.03 | 2002.03.1 | Chair | Price Tower Stenographer Chair | Wright, Frank Lloyd Price, Jr., Harold C. | Wright, Frank Lloyd | Price Tower Arts Center, gift of Harold C. Price, Jr. | 1956 | Chair, Frank Lloyd Wright designer, Blaustein Foundry, furniture maker, Price Tower stenographer's chair, cast aluminum frame, with Schumacher Taliesin Line pattern upholstery, 34-3/4 x 20 x 24-3/4 inches | 18,000 | 18,000 | Price Tower | Art | | Good | See detailed condition report 11-12-2010 | Gift | 03.04.02 | Price, Harold C. Jr. | Price Tower, 16th floor | Reprinted missing by volunteer/docent Corrine Casteel, October 14, 2015. Police report filed 10-14-2015. Originally found to be a chair that had confirmed at PLLW Archives list... |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQstatus | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2006.01 | 2006.01.1 | Chair | Slipper chair, 1952, Wm. E. Martin Residence | Wright, Frank Lloyd Martin, William E. Oak Park, Illinois | Wright, Frank Lloyd | Price Tower Arts Center, museum purchase | 1952 | Chair, Slipper chair, Frank Lloyd Wright, architect | 18,000 | | Furniture Frank Lloyd Wright Martin Residence Oak Park, Illinois | Art | | Good | | Purchase | 1/6/2003 | Christie, Janna Duncan | Price Tower, 2nd floor, FLLW Gallery | |
| 2001.01 | 2001.01.149 | Frieze | Price Tower Copper Frieze | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | | Frieze, Price Tower copper panel, 1956, Frank Lloyd Wright | 16,000 | 1,000 | | Art | PPC PT | | | Gift | 5/31/2001 | Phillips Petroleum Company | Annex, Room 103 | |

| Accession # | Object ID | Object Nametype | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | AG Gross | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005.01 | 2005.01 | Book | Schumacher's Taliesin Line Sample Book | | Wright, Frank Lloyd | F. Schumacher & Company | Price Tower Arts Center, museum purchase | 1955 | | $ 4,375 | $ 4,375 | Accessories, Household (Interior decoration) Interior design Textile design Fabric Wallpaper Frank Lloyd Wright F. Schumacher & Co. | Art | | Fair | Fair, stable. Covers are moderately soiled, discolored and stained. Bottom right corner of front cover is bent. Cloth cover is torn at bottom of spine. Back cover of spine... | Purchase | 1/7/2005 | J. B. Mara Fine Arts Book Collections Storage B. | NOTE: For preservation purposes and safer handling, this book was disassembled so that covers and pages could be stored in Melinex sleeves. (Phillips, 11.06. 2008) |
| 2004.02 | 2004.02.06 | Telegram | | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Harold C. Price, Jr. | 26-Sep-52 | | $ 3,000 | | | Art | | Good | | Gift | 12/30/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | Hand written inscription in lower left corner |
| 2004.02 | 2004.02.34 | Telegram | | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Harold C. Price, Jr. | 13-Oct-53 | | $ 3,000 | | | Art | | Good | | Gift | 12/30/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.34 | Telegram | | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Harold C. Price, Jr. | 31-Dec-53 | | $ 3,000 | | | Art | | Good | | Gift | 12/30/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.34 | Telegram | | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Harold C. Price, Jr. | 19-May-54 | | $ 3,000 | | | Art | | Good | | Gift | 12/30/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.43 | Telegram | | | Wright, Olgivanna Lloyd | Price Tower Arts Center, gift of Harold C. Price, Jr. | May 22 [sic] 1955 | | $ 3,000 | | | Art | | Good | | Gift | 12/30/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.34 | Letter | | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Harold C. Price, Jr. | 13-Mar-56 | | $ 3,000 | | | Art | | Good | | Gift | 12/30/2004 | Price, Harold C. Jr. | | |
| 2004.02 | 2004.02.34 | Letter | | | Masselink, Eugene | Price Tower Arts Center, gift of Harold C. Price, Jr. | c. August 1956 ("Monday") | | $ 3,000 | | | Art | | Good | | Gift | 12/30/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | four pages |
| 2004.02 | 2004.02.02 | Letter | | | Masselink, Eugene | Price Tower Arts Center, gift of Harold C. Price, Jr. | 7-Aug-56 | | $ 3,000 | | | Art | | Good | | Gift | 12/30/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.34 | Letter | | | Masselink, Eugene | Price Tower Arts Center, gift of Harold C. Price, Jr. | 1-Oct-56 | | $ 3,000 | | | Art | | Good | | Gift | 12/30/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | four pages |
| 2004.02 | 2004.02.37 | Telegram | | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Harold C. Price, Jr. | 29-Dec-56 | | $ 3,000 | | | Art | | Good | | Gift | 12/30/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.70 | Letter | | | Wright, Olgivanna Lloyd | Price Tower Arts Center, gift of Harold C. Price, Jr. | 19-Mar-58 | | $ 3,000 | | | Art | | Good | | Gift | 12/30/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2001.01 | 2001.01.065 | Wastebasket | Price Tower wastebasket | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955/1956 | | $ 2,000 | $ 1,600 | | | Art | Fair | Fair, stable. Dirty, soiled on inside bottom, minor to moderate dents and scratches | Gift | 5/31/2001 | Phillips Petroleum Company | Annex, Room 111 (Sheridan Room) | Numbered |
| 2001.01 | 2001.01.066 | Wastebasket | Wastebasket for Price Tower chair | Wright, Frank Lloyd | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955 | | $ 2,000 | $ 1,600 | Price Tower Furniture | | Art | Fair | Fair, stable. Discoloration, scratches, abrasion and soil overall. Mineral deposits/scale on bottom. | Gift | 5/31/2001 | Phillips Petroleum Company | Annex, Room 111 (Sheridan Room) | Numbered (Note: sticker on bottom of wastebasket reads "...marked by Dr. Lawrence H. Roe, Jr. Aug. 2006" |
| 2001.01 | 2001.01.067 | Wastebasket | Price Tower wastepaper basket | Wright, Frank Lloyd Price, Harold C. | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955 | | $ 2,000 | $ 1,600 | | | Art | Fair | | Gift | 5/31/2001 | Phillips Petroleum Company | Annex, Room 111 (Sheridan Room) | Numbered |
| 2001.01 | 2001.01.068 | Wastebasket | Waste paper basket | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955 | | $ 2,000 | $ 1,600 | | | Art | Fair | Fair, stable. Discolored, scratches, abrasion and soil overall. Mineral deposits/scale and tape adhesive on bottom | Gift | 5/31/2001 | Phillips Petroleum Company | Annex, Room 111 (Sheridan Room) | Numbered |
| 2001.01 | 2001.01.069 | Waste paper basket | | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955 | | $ 2,000 | $ 1,600 | | | Art | Fair | Fair, stable. Front basket near bottom. Discoloration, scratches, abrasion and soil overall. Mineral deposits/scale and tape adhesive on bottom | Gift | 5/31/2001 | Phillips Petroleum Company | Annex, Room 111 (Sheridan Room) | |
| 2001.01 | 2001.01.090 | Waste paper basket | | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | | | $ 2,000 | $ 1,600 | | | Art | | Wastepaper basket, aluminum (FLLW) | Gift | 5/31/2001 | Phillips Petroleum Company | Annex, Room 111 (Sheridan Room) | |
| 2001.01 | 2001.01.091 | Waste paper basket | | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | | | $ 2,000 | $ 1,600 | | | Art | | Wastepaper basket, aluminum (FLLW) | Gift | 5/31/2001 | Phillips Petroleum Company | Annex, Room 111 (Sheridan Room) | |
| 2001.01 | 2001.01.124 | Waste paper basket | | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | | | $ 2,000 | $ 1,600 | | | Art | | Wastepaper basket, aluminum (FLLW) | Gift | 5/31/2001 | Phillips Petroleum Company | Annex, Room 111 (Sheridan Room) | |
| 2001.01 | 2001.01.125 | Waste paper basket | | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | | | $ 2,000 | $ 1,600 | | | Art | | Wastepaper basket, aluminum (FLLW) [note: tape on outside with LW written] (note: object not physically numbered) | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, FLLW Gallery | |
| 2001.01 | 2001.01.127 | Waste paper basket | | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | | | $ 2,000 | $ 1,600 | | | History | | Wastepaper basket, aluminum (FLLW) (custody of item unknown) | Gift | 5/31/2001 | Phillips Petroleum Company | Past Site office | |
| 2002.19 | 2002.19 | Textile | Fabric remnants - Taliesin Line No. 501 | Wright, Frank Lloyd Schindt, Henry Schimidt, Jimmie | F. Schumacher & Company | Price Tower Arts Center, gift of Hana & Jimmie Schimidt | 1955 | | $ 1,563 | $ 1,563 | | Samples - Textile and Wallcoverings | Good | Good, mostly stable. Raw edges raveling. Numerous creases from having been folded; indication of having been hemmed on some edges | Gift | 06.26.2002 | Schimidt, Hana & Jimmie | Price Tower, 2nd floor, Collections Storage A | This cloth was used to re-upholster the stenciling chairs that were exhibited in Fall (2008 or 2009?) located at the 13th floor. |
| 2008.3 | 2008.3.01 | Drawing | Colored Kachina Dancers | Masselink, Eugene | Masselink, Eugene | Price Tower Arts Center, museum purchase | c. 1940 | | $ 1,500 | $ 1,500 | | | Art | Excellent | Excellent original condition | Purchase | 7/3/2008 | | Fine Arts of the Southwest Price Tower, 2nd floor, Collections Storage A | |
| 2004.1 | 2004.10.1 | Window pane, Leaded | Leaded Windowpane - Avery Coonley House | Wright, Frank Lloyd Coonley, Avery | Wright, Frank Lloyd | Price Tower Arts Center, museum purchase with funds by the Don and Donna Durrett Memorial Fund and Phillips Petroleum Company, by exchange | c. 1907 | | $ 1,375 | $ 1,375 | Architectural elements Building component Window Stained glass | Art | Good | | Purchase | 8/18/2004 | Sotheby's, New York | Price Tower, 2nd floor, FLLW Gallery | |
| 2004.1 | 2004.10.2 | Window pane, Leaded | Leaded Windowpane - Avery Coonley House | Wright, Frank Lloyd Coonley, Avery | Wright, Frank Lloyd | Price Tower Arts Center, museum purchase with funds by the Don and Donna Durrett Memorial Fund and Phillips Petroleum Company, by exchange | c. 1907 | | $ 1,375 | $ 1,375 | Architectural elements Building component | Art | Good | | Purchase | 8/18/2004 | Sotheby's, New York | Price Tower, 2nd floor, FLLW Gallery | |
| 2004.1 | 2004.10.3 | Window pane, Leaded | Leaded Windowpane - Avery Coonley House | Wright, Frank Lloyd Coonley, Avery | Wright, Frank Lloyd | Price Tower Arts Center, museum purchase with funds by the Don and Donna Durrett Memorial Fund and Phillips Petroleum Company, by exchange | c. 1907 | | $ 1,375 | $ 1,375 | Architectural elements Building component | Art | Good | | Purchase | 8/18/2004 | Sotheby's, New York | Price Tower, 2nd floor, FLLW Gallery | |
| 2004.1 | 2004.10.4 | Window pane, Leaded | Leaded Windowpane - Avery Coonley House | Wright, Frank Lloyd Coonley, Avery | Wright, Frank Lloyd | Price Tower Arts Center, museum purchase with funds by the Don and Donna Durrett Memorial Fund and Phillips Petroleum Company, by exchange | c. 1907 | | $ 1,375 | $ 1,375 | Architectural elements Building component | Art | Good | | Purchase | 8/18/2004 | Sotheby's, New York | Price Tower, 2nd floor, FLLW Gallery | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQstatus | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.02 | 2004.02.39 | Letter | Carbon copy of June 25, 1953 letter from Harold C. Price to Frank Lloyd Wright | | Price, Harold C. | Price Tower Arts Center, gift of Harold C. Price, Jr. | 25-Jun-53 | | 1,000 | | Art | | | Good | | Gift | 12/00/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.40 | Telegram | June 8, 1954 telegram from Harold C Price to Mr Frank Lloyd Wright | | Price, Harold C. | Price Tower Arts Center, gift of Harold C. Price, Jr. | 8-Jun-54 | | 1,000 | | Art | | | Good | | Gift | 12/00/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay | |
| 2004.02 | 2004.02.42 | Telegram | October 16, 1954 telegram from Harold Price to Frank Lloyd Wright | | Price, Harold | Price Tower Arts Center, gift of Harold C. Price, Jr. | 16-Oct-54 | | 1,000 | | Art | | | Good | | Gift | 12/00/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.43 | Letter | Carbon copy of December 4, 1954 letter from Harold C. Price to Frank Lloyd Wright | | Price, Harold C. | Price Tower Arts Center, gift of Harold C. Price, Jr. | 4-Dec-54 | | 1,000 | | Art | | | Good | | Gift | 12/00/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.44 | Telegram | June 2, 1955 telegram from Harold C. Price to Mrs Olgivanna Lloyd Wright | | Price, Harold C. | Price Tower Arts Center, gift of Harold C. Price, Jr. | 2-Jun-55 | | 1,000 | | Art | | | Good | | Gift | 12/00/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.46 | Telegram | June 8, 1955, telegram from Mary Lou, Hal, Harold, Jr., Carolyn and Joe to Frank Lloyd Wright | | Price, Harold C. | Price Tower Arts Center, gift of Harold C. Price, Jr. | 8-Jun-55 | | 1,000 | | Art | | | Good | | Gift | 12/00/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.49 | Newspaper | August 12, 1955 Tulsa Daily World article "Wright His Largest Opposition To Him as All School Architect" | | | Price Tower Arts Center, gift of Harold C. Price, Jr. | 12-Aug-55 | | 1,000 | | Art | | | Good | | Gift | 12/00/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.50 | Letter | Text of April 23, 1959 broadcast of Interview of Harold Lloyd Wright by Tex and Jim McCrary | | Radio Reports | Price Tower Arts Center, gift of Harold C. Price, Jr. | 23-Apr-59 | | 1,000 | | Art | | | Good | | Gift | 12/00/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.56 | Letter | May 5, 1958 letter from K.S. "Boots" Adams, President of Phillips Petroleum, to Mr. H. C. Price, President of H C Price Company | | Adams, K. S. | Price Tower Arts Center, gift of Harold C. Price, Jr. | 5-May-58 | | 1,000 | | Art | | | Good | | Gift | 12/00/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.57 | Letter | Carbon copy of May 4, 1958 letter from Harold C. Price to K. S. "Boots" Adams, Chairman of Phillips Petroleum Company | | Price, Harold C. | Price Tower Arts Center, gift of Harold C. Price, Jr. | 4-May-58 | | 1,000 | | Art | | | Good | | Gift | 12/00/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.58 | Letter | Carbon copy of May 4, 1958 letter from Harold C. Price to Frank Lloyd Wright | | Price, Harold C. | Price Tower Arts Center, gift of Harold C. Price, Jr. | 4-May-58 | | 1,500 | | Art | | | Good | | Gift | 12/00/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.59 | Letter | Carbon copy May 14, 1958 letter from Harold C. Price to Frank Lloyd Wright | | Price, Harold C. | Price Tower Arts Center, gift of Harold C. Price, Jr. | 14-May-58 | | 1,000 | | Art | | | Good | | Gift | 12/00/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.69 | Print, Photographic | Photograph of Harold C. Price | | | Price Tower Arts Center, gift of Harold C. Price, Jr. | c 1958 | | 1,000 | | Art | | | Good | | Gift | 12/00/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.71 | Print, Photographic | Black and white photograph of Frank Lloyd Wright and Olgivanna Wright seated in golf cart | | | Price Tower Arts Center, gift of Harold C. Price, Jr. | c August 1958 | | 1,000 | | Art | | | Good | | Gift | 12/00/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | |
| 2004.02 | 2004.02.72 | Notecard | Index cards with notes for introduction on Frank Lloyd Wright for opening of Price Tower | | T Price, Harold C. | Price Tower Arts Center, gift of Harold C. Price, Jr. | Feb-56 | | 1,000 | | Art | | | Good | | Gift | 12/00/2004 | Price, Harold C. Jr. | Price Tower, 2nd floor, Collections Storage B, Bay F-4, box | six pages |
| 2004.14 | 2004.14.1 | Chair | Heritage Henredon Chair | Wright, Frank Lloyd | Wright, Frank Lloyd | Price Tower Arts Center, museum purchase with funds by Phillips Petroleum Company, by exchange, (and George W Kraus, Jr. letters only) | 1955 | | 900 | 900 | Price Tower Furniture, Henredon furniture | | | Good | | Purchase | 8/26/2004 | Altman's Henredon Auction Group | Atkinson's Henredon Auction | Re-upholstered by Mark and Cris, 2006, with reproduction Schumacher fabric |
| 2002.1 | 2002.10.1 | Sculpture | Pheonix from Shriveroom | | | Price Tower Arts Center, gift of the Friends of Shriveroom | | | 500 | 500 | Art | | | Fair | | Gift | 02.07.2002 | Crest, Bill | | |
| 2006.21 | 2006.21 | Sculpture | Frank Lloyd Wright | Huff, Robert (R. Hoffman) Wright, Frank Lloyd | Huff, R. Robert | Price Tower Arts Center, gift in honor of Blaine love by his daughters Barb, Deb, and Cindy | No date, pre 2007 | | 500 | 500 | Sculpture Wright, Frank Lloyd | | | Good | | Gift | 10/26/2006 | Smallwood, Barbara | | See copy of Huff's obituary in the accession folder |
| 2001.01 | 2001.01.106 | Plate, Dinner | Dinner plate - "HCPco" logo | | Shenango China Company | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955-1965 | | 400 | | H. C. Price Company Wright, Frank Lloyd Dinnerware Ceramics Logo Art | | | Good; stable; Minor scratches on top; Minor abrasion on bottom ridge | | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, Collections Storage A | |
| 2001.01 | 2001.01.107 | Plate, Dinner | Dinner plate - "HCPco" logo | | Shenango China Company | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955-1965 | | 400 | | H. C. Price Company Wright, Frank Lloyd Dinnerware Ceramics Logo Art | | | Good; stable | | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, Collections Storage A | |
| 2001.01 | 2001.01.108 | Plate, Dinner | Dinner plate - "HCPco" logo | | Shenango China Company | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955-1965 | | 400 | | H. C. Price Company Wright, Frank Lloyd Dinnerware Ceramics Logo Art | | | Good; stable; Very minor scratches on top; Very minor abrasion on bottom ridge | | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, Collections Storage A | |
| 2001.01 | 2001.01.109 | Plate, Dinner | Dinner plate - "HCPco" logo | | Shenango China Company | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955-1965 | | 400 | | H. C. Price Company Wright, Frank Lloyd Dinnerware Ceramics Logo Art | | | Good; stable; Moderate scratches and abrasion on top; Minor abrasion on bottom ridge | | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, Collections Storage A | |
| 2001.01 | 2001.01.110 | Plate, Dinner | Dinner plate - "HCPco" logo | | Shenango China Company | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955-1965 | | 400 | | H. C. Price Company Wright, Frank Lloyd Dinnerware Ceramics Logo Art | | | Good; stable; A few moderate scratches on top; Minor abrasion on bottom ridge | | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, Collections Storage A | |

| Accession # | Object ID | Object Nametype | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | AcQstatus | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2001.31 | 2001.31.111 | Plate, Dinner | Dinner plate - "HCPco" logo | | Wright, Frank Lloyd/assoc. | Price Tower Arts Center, gift of Phillips Petroleum Company | | Dinner Plate, "HCPco" logo plate - red logo on glossy off-white. Logo designed by Frank Lloyd Wright, architect; Shenango China, manufacturer. No date, circa 1955-1958. Maker's mark on bottom in green, "Shenango China, New Castle, PA., U.S.A., RimRol, WelRoc, (R), 7-14". Earthenware, pressed, stamped and glazed. 1 x 9 inches diameter | $ | md 5 | H. C. Price Company / Wright, Frank Lloyd / Dinnerware Ceramics Logo  Art | | | Good | Good, stable. A few minor scratches on top. Minor abrasion on bottom ridge | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, Collections Storage A | |
| 2001.31 | 2001.31.112 | Plate, Dinner | Dinner plate - "HCPco" logo | | Shenango China Company | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955-1958 | Dinner Plate, "HCPco" logo plate - red logo on glossy off-white. Logo designed by Frank Lloyd Wright, architect; Shenango China, manufacturer. No date, circa 1955-1958. Maker's mark on bottom in green, "Shenango China, New Castle, PA., U.S.A., RimRol, WelRoc, (R), 7-14". Earthenware, pressed, stamped and glazed. 1 x 9 inches diameter | $ | md 5 | H. C. Price Company / Wright, Frank Lloyd / Dinnerware Ceramics Logo  Art | | | Good | Good, stable. A few moderate scratches on top. Minor abrasion on bottom ridge | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, Collections Storage A | |
| 2001.31 | 2001.31.113 | Plate, Dinner | Dinner plate - "HCPco" logo | | Shenango China Company | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955-1958 | Dinner Plate, "HCPco" logo plate - red logo on glossy off-white. Logo designed by Frank Lloyd Wright, architect; Shenango China, manufacturer. No date, circa 1955-1958. Maker's mark on bottom in green, "Shenango China, New Castle, PA., U.S.A., RimRol, WelRoc, (R), 7-14". Earthenware, pressed, stamped and glazed. 1 x 9 inches diameter | $ | md 5 | H. C. Price Company / Wright, Frank Lloyd / Dinnerware Ceramics Logo  Art | | | Good | Good, stable. A few moderate scratches on top. Minor abrasion on bottom ridge | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, Collections Storage A | |
| 2001.31 | 2001.31.114 | Plate, Dinner | Dinner plate - "HCPco" logo | | Shenango China Company | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955-1958 | Dinner Plate, "HCPco" logo plate - red logo on glossy off-white. Logo designed by Frank Lloyd Wright, architect; Shenango China, manufacturer. No date, circa 1955-1958. Maker's mark on bottom in green, "Shenango China, New Castle, PA., U.S.A., RimRol, WelRoc, (R), 7-14". Earthenware, pressed, stamped and glazed. 1 x 9 inches diameter | $ | md 5 | H. C. Price Company / Wright, Frank Lloyd / Dinnerware Ceramics Logo  Art | | | Good | Good, stable. A few minor scratches on top. Minor abrasion on bottom ridge | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, Collections Storage A | |
| 2001.31 | 2001.31.115 | Plate, Dinner | Dinner plate - "HCPco" logo | | Shenango China Company | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955-1958 | Dinner Plate, "HCPco" logo plate - red logo on glossy off-white. Logo designed by Frank Lloyd Wright, architect; Shenango China, manufacturer. No date, circa 1955-1958. Maker's mark on bottom in green, "Shenango China, New Castle, PA., U.S.A., RimRol, WelRoc, (R), 7-14". Earthenware, pressed, stamped and glazed. 1 x 9 inches diameter | $ | md 5 | H. C. Price Company / Wright, Frank Lloyd / Dinnerware Ceramics Logo  Art | | | Good | Good, stable. Moderate scratches and abrasion on top. Moderate abrasion on bottom ridge | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, Collections Storage A | |
| 2001.31 | 2001.31.116 | Plate, Dinner | Dinner plate - "HCPco" logo | | Shenango China Company | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955-1958 | Dinner Plate, "HCPco" logo plate - red logo on glossy off-white. Logo designed by Frank Lloyd Wright, architect; Shenango China, manufacturer. No date, circa 1955-1958. Maker's mark on bottom in green, "Shenango China, New Castle, PA., U.S.A., RimRol, WelRoc, (R), 7-14". Earthenware, pressed, stamped and glazed. 1 x 9 inches diameter | $ | md 5 | H. C. Price Company / Wright, Frank Lloyd / Dinnerware Ceramics Logo  Art | | | Good | Good, stable. Minor scratches on top. Red spot on bottom at rim. Minor abrasion on bottom ridge | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, Collections Storage A | |
| 2001.31 | 2001.31.117 | Plate, Dinner | Dinner plate - "HCPco" logo | | Shenango China Company | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955-1958 | Dinner Plate, "HCPco" logo plate - red logo on glossy off-white. Logo designed by Frank Lloyd Wright, architect; Shenango China, manufacturer. No date, circa 1955-1958. Maker's mark on bottom in green, "Shenango China, New Castle, PA., U.S.A., RimRol, WelRoc, (R), 7-14". Earthenware, pressed, stamped and glazed. 1 x 9 inches diameter | $ | md 5 | H. C. Price Company / Wright, Frank Lloyd / Dinnerware Ceramics Logo  Art | | | Good | Good, stable. Very minor scratches on top. Red spot on bottom. Minor abrasion on bottom ridge | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, Collections Storage A | |
| 2001.31 | 2001.31.118 | Plate, Dinner | Dinner plate - "HCPco" logo | | Shenango China Company | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955-1958 | Dinner Plate, "HCPco" logo plate - red logo on glossy off-white. Logo designed by Frank Lloyd Wright, architect; Shenango China, manufacturer. No date, circa 1955-1958. Maker's mark on bottom in green, "Shenango China, New Castle, PA., U.S.A., RimRol, WelRoc, (R), 7-14". Earthenware, pressed, stamped and glazed. 1 x 9 inches diameter | $ | md 5 | H. C. Price Company / Wright, Frank Lloyd / Dinnerware Ceramics Logo  Art | | | Good | Good, stable. A few moderate scratches on top. Minor abrasion on bottom ridge | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, Collections Storage A | |
| 2001.31 | 2001.31.119 | Plate, Dinner | Dinner plate - "HCPco" logo | | Shenango China Company | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955-1958 | Dinner Plate, "HCPco" logo plate - red logo on glossy off-white. Logo designed by Frank Lloyd Wright, architect; Shenango China, manufacturer. No date, circa 1955-1958. Maker's mark on bottom in green, "Shenango China, New Castle, PA., U.S.A., RimRol, WelRoc, (R), 7-14". Earthenware, pressed, stamped and glazed. 1 x 9 inches diameter | $ | md 5 | H. C. Price Company / Wright, Frank Lloyd / Dinnerware Ceramics Logo  Art | | | Good | Good, stable. Top is moderately scratched and abraded on top overall. Minor abrasion on bottom ridge | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, Collections Storage A | |
| 2001.31 | 2001.31.120 | Plate, Dinner | Dinner plate - "HCPco" logo | | Shenango China Company | Price Tower Arts Center, gift of Phillips Petroleum Company | 1955-1958 | Dinner Plate, "HCPco" logo plate - red logo on glossy off-white. Logo designed by Frank Lloyd Wright, architect; Shenango China, manufacturer. No date, circa 1955-1958. Maker's mark on bottom in green, "Shenango China, New Castle, PA., U.S.A., RimRol, WelRoc, (R), 7-14". Earthenware, pressed, stamped and glazed. 1 x 9 inches diameter | $ | md 5 | H. C. Price Company / Wright, Frank Lloyd / Dinnerware Ceramics Logo  Art | | | Good | | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, Collections Storage A | |
| 2001.31 | 2001.31.470 | Sculpture | Vannes Crystal Art Deco Bowl - Sculpture - Vase | Price, Mary Lou | Vannes le Chatel, France | Price Tower Arts Center, gift of Phillips Petroleum Company | 1940s | Art Glass Sculpture or Decorative Bowl. Crystal glass bowl or vase, clear, small at the bottom extending to two large, somewhat wavy, rounded edges. Vannes le Chatel, France, manufacturer. No date, circa 1940s. Four small white felt pads on bottom. Maker's mark on bottom. Leaded glass, molded. 11-1/4 x 24-1/4 x 7-1/2 inches approximately | $ | md 3 | Sculpture Art Deco Glass Vannes le Chatel, France Art Glass Art Nouveau Contemporary Bowl Decorative  Art | | Mary Lou Price estate | Excellent | Excellent condition, stable. The small round felt pads on the bottom are somewhat soiled | Gift | 5/31/2001 | Phillips Petroleum Company | Price Tower, 2nd floor, Collections Storage A | The piece one of the objects from the Mary Lou Price estate brought to Price Tower. It had been at Mary Lou Price's Bartlesville home. It had been stored in the 17th Floor apartment kitchen, in a cabinet, for years. Ismaili produced this piece as a prototype for the Other Corporation, a manufacturer of farm equipment based in South Bend, Indiana. The design was approved for production but was ultimately canceled because of the attributes that certainly appealed to the company after World War II and included in Ismaili's concept. |
| 2004.06 | 2004.06.01 | Sculpture | Sculpture, "Other Corporation prototype" | Ismaili, Alfonso | Ismaili, Alfonso | Price Tower Arts Center, museum purchase and partial gift of Vincent Van De Venter in honor of Andrew Dant-Van De Venter | c. 1945/1950 | Sculpture, Alfonso Ismaili, sculptor/artist. Prototype for Other Corporation, ca. 1945/1950. Figure of man with arms upraised, circular design at left, with shield at center - "The Other [Corporation (?)/Aegline], cast. 6-1/4 x 3-1/4 x 4-3/4 (Data Notes) | $ | 200 3 | 200  Sculpture  Art | | | Good | | Gift | 6/2/2004 | Van De Venter, Vincent | Price Tower, 2nd floor, Collections Storage A | |
| 2004.06 | 2004.06.02 | Sculpture | Untitled Sculpture (woman's head) | Ismaili, Alfonso | Ismaili, Alfonso | Price Tower Arts Center, museum purchase and partial gift of Vincent Van De Venter in honor of Andrew Dant-Van De Venter | no date | Sculpture, Alfonso Ismaili, sculptor. Plaster sculpture of a woman's head with a hood/scarf-like hair covering, with wave detail and carved plaster with pale yellow patina. 4-1/4 x 2-3/4 x 2-1/2 | $ | 200 3 | 200  Plaster  Art | | | Good | | Gift | 6/2/2004 | Van De Venter, Vincent | Price Tower, 2nd floor, Collections Storage A | |
| 2004.06 | 2004.06.03 | Sculpture | Untitled Sculpture (woman's head) | Ismaili, Alfonso | Ismaili, Alfonso | Price Tower Arts Center, museum purchase and partial gift of Vincent Van De Venter in honor of Andrew Dant-Van De Venter | no date | Sculpture, Alfonso Ismaili, sculptor; woman's head, carved plaster with pale yellow patina. 4-3/8 x 1-5/8 x 1-15/16 | $ | 200 3 | 200  Plaster  Art | | | Good | | Gift | 6/2/2004 | Van De Venter, Vincent | Price Tower, 2nd floor, Collections Storage A | |
| 2004.06 | 2004.06.04 | Sculpture | Untitled Sculpture (bearded man's face) | Ismaili, Alfonso | Ismaili, Alfonso | Price Tower Arts Center, museum purchase and partial gift of Vincent Van De Venter in honor of Andrew Dant-Van De Venter | no date | Sculpture, Alfonso Ismaili, sculptor; bearded man's face with background, no date, light gray concrete, molded. 6-3/8 x 6-1/2 x 4-1/8 (Data Notes) | $ | 200 3 | 200  Concrete  Art | | | Good | | Gift | 6/2/2004 | Van De Venter, Vincent | Price Tower, 2nd floor, Collections Storage A | Eric O'Malley notes on this object: It appears to be a fragment or maquette for the Sagittarius plaque, Ismaili did for the Adler Planetarium, Chicago, Illinois. 2011. See accession number. |
| 2004.06 | 2004.06.05 | Sculpture | Untitled Sculpture (child's face) | Ismaili, Alfonso | Ismaili, Alfonso | Price Tower Arts Center, museum purchase and partial gift of Vincent Van De Venter in honor of Andrew Dant-Van De Venter | no date | Sculpture, Alfonso Ismaili, sculptor; child's (?) face, no date, light gray concrete, molded. 6-1/4 x 6-1/2 x 2-5/8 | $ | 200 3 | 200  Concrete  Art | | | Good | | Gift | 6/2/2004 | Van De Venter, Vincent | Price Tower, 2nd floor, Collections Storage A | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LB.2005.136 | LB.2005.136.01 | Book | An Autobiography: Frank Lloyd Wright | | Wright, Frank Lloyd | Price Tower Arts Center Library | 1977 | | $ | 250 $ | Architects -- United States -- Biography Wright, Frank Lloyd, 1867-1959 | | | | | | | | Price Tower, 2nd floor, Architecture Study Center | |
| LB.2007.138 | LB.2007.138.07 | Book | History of Modern Art: Painting, Sculpture, Architecture, Photography | | Arnason, H. Harvard | Price Tower Arts Center Library | 2004 | Book ; History of Modern Art: Painting, Sculpture, Architecture, Photography / Arnason, H. Harvard | $ | 75 $ | Art, Modern--20th century | Good | | Gift | 12/29/2007 | Dickson, Steve | Price Tower, 2nd floor, Architecture Study Center | Revised edition. Includes bibliographical references (p. [710]-711) and index. |
| LB.2007.138 | LB.2007.138.06 | Book | Art in Theory 1900-2000 | | Harrison, Charles | Price Tower Arts Center Library | 2003 | | $ | 50 $ | Art, Modern--20th century-- Philosophy | Fair | | Gift | 12/29/2007 | Dickson, Steve | Price Tower, 2nd floor, Architecture Study Center | |
| LB.2007.138 | LB.2007.138.02 | Book | History of Graphic Design: A | | Meggs, Philip B. | Price Tower Arts Center Library | 1998 | | $ | 40 $ | Graphic design (Typography)--History Book design--History | Good | | Gift | 12/29/2007 | Dickson, Steve | Price Tower, 2nd floor, Architecture Study Center | Includes bibliographical references (p. 479-490) and index. |
| LB.2007.138 | LB.2007.138.03 | Book | Art Since 1940: Strategies of Being | | Fineberg, Jonathan | Price Tower Arts Center Library | 2000 | | $ | 60 $ | Modernism (Art)--United States Postmodernism-- United States. Art, American Modernism (Art)-- Europe, Postmodernism-- Europe. Art, European. | Good | | Gift | 12/29/2007 | Dickson, Steve | Price Tower, 2nd floor, Architecture Study Center | Includes bibliographical references (p. [509]-511) and index. |
| LB.2006.001 | LB.2006.001.54 | Book | Moralism and the modal home: domestic architecture and cultural conflict in Chicago, 1873-1913 | | Wright, Gwendolyn | Museum Purchase | 1980 | | $ | 50 $ | Architecture, Domestic--Social aspects--Illinois-- Chicago. Architecture--Human factors--Illinois-- Chicago. Architecture and society--Illinois--Chicago | Standard | | Purchase | 8/21/2006 | Et Als Read & Unread Books | Price Tower, 2nd floor, Architecture Study Center | |
| LB.2007.138 | LB.2007.138.05 | Book | Architecture: Form, Space and Order | | Ching, Francis D.K. | Price Tower Arts Center Library | 1996 | | $ | 15 $ | Architecture--Composition, proportion, etc. Space (Architecture) | Good | | Gift | 12/29/2007 | Dickson, Steve | Price Tower, 2nd floor, Architecture Study Center | Includes bibliographical references and index. |
| LB.2007.138 | LB.2007.138.04 | Book | Architectural Graphics | | Ching, Francis D.K. | Price Tower Arts Center Library | 2003 | | $ | 15 $ | Architectural drawing | Poor | | Gift | 12/29/2007 | Dickson, Steve | Price Tower, 2nd floor, Architecture Study Center | Includes index. |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LB.2007.138 | LB.2007.138.12 | Book | Design of Cities | | Bacon, Edmund N. | Price Tower Arts Center Library | 1974 | | | 20 | City planning; Space (Architecture)/Harmony (Aesthetics) | | | Good | | Gift | 12/29/2007 | Dortson, Steve | Price Tower, 2nd floor, Architecture Study Center | Bibliography: p. 331-332 |
| LB.2006.001 | LB.2006.001.05 | Book | American plastic : a cultural history | | Meikle, Jeffrey L. | Museum Purchase | 1995 | | | 22 | Plastics--History; Plastics industry and trade--United States/ Design--History | Standard | | | | Purchase | 6/21/2006 | El Ata Reed & Unread Books | Price Tower, 2nd floor, Architecture Study Center | |
| LB.2007.136 | LB.2007.136.01 | Book | Modern Architecture | | Colquhoun, Alan | Price Tower Arts Center Library | 2002 | (long description) | | 30 | Architecture, Modern--20th century | | | Good | | Gift | 12/29/2007 | Dortson, Steve | Price Tower, 2nd floor, Architecture Study Center | Includes bibliographical references (p. 264-269) and index. |
| LB.2007.136 | LB.2007.136.11 | Book | Shelter Sketchbook: Timeless Building Solutions, A | | Taylor, John S. | Price Tower Arts Center Library | 1997 | | | 30 | Vernacular architecture. | | | Good | | Gift | 12/29/2007 | Dortson, Steve | Price Tower, 2nd floor, Architecture Study Center | Originally published: Commonsense architecture. New York : Norton, c1983. Includes bibliographical references (p. [190-193]) and index. |
| LB.2007.136 | LB.2007.136.14 | Book | Architecture Man in Possession of his Earth | | Wright, Frank Lloyd | Price Tower Arts Center Library | 1962 | | | 35 | 20 | | | | Poor | | Gift | 12/29/2007 | Dortson, Steve | Price Tower, 2nd floor, Architecture Study Center | "Books by Frank Lloyd Wright ... Books about Frank Lloyd Wright": p. [6] |
| 2001.01 | 2001.01.110 | Bracket | Aluminum louvel bracket | | Wright, Frank Lloyd | Price Tower Arts Center, gift of Phillips Petroleum Company | | Aluminum louvre bracket unit from 1956 original construction of Price Tower | | 15 | 15 | Art | PPC PT | | | | Gift | 5/31/2001 | Phillips Petroleum Company | Annex, Room 102 | |
| LB.2007.138 | LB.2007.138.54 | Book | Modern Architecture: A Critical History | | Frampton, Kenneth | Price Tower Arts Center Library | 1980 | | | 20 | Architecture, Modern--20th century; Architecture--Renata--Las Vegas; Symbolism in architecture | | | Good | | Gift | 12/29/2007 | Dortson, Steve | Price Tower, 2nd floor, Architecture Study Center | Includes bibliographical references (p. 345-366) and index. |
| LB.2007.138 | LB.2007.138.68 | Book | Learning from Las Vegas : the forgotten symbolism of architectural form | | Venturi, Robert | Price Tower Arts Center Library | 1977 | Regarding excess of urban sprawl Visit Spread Net, at Rice University, it's under construction, but it should be an interesting resource. Check out the traffic in the land. | | 20 | | | | Good | | Gift | 12/29/2007 | Dortson, Steve | Price Tower, 2nd floor, Architecture Study Center | Bibliography: p. [167]-184 |
| LB.2007.138 | LB.2007.138.15 | Book | Next American Metropolis: Ecology, Community, and the American Dream, The | | Calthorpe, Peter | Price Tower Arts Center Library | 1993 | | | 20 | City planning--United States; Urban ecology--United States; Metropolitan areas--United States. | | | Fair | | Gift | 12/29/2007 | Dortson, Steve | Price Tower, 2nd floor, Architecture Study Center | |
| LB.2007.138 | LB.2007.138.13 | Book | Complexity and Contradiction in Architecture | | Venturi, Robert | Price Tower Arts Center Library | 2002 | | | 20 | Architecture--Composition, proportion, etc. | | | Good | Fair, fragile. Paper cover is torn at edges, paper is brittle, minor brown at edges and spine, creased at edges, especially at front bottom right. | Gift | 12/29/2007 | Dortson, Steve | Price Tower, 2nd floor, Architecture Study Center | Includes bibliographical references |
| 2005.Library | LB.2005.814 | Book | City in History: Its Origins, its Transformations, and its Prospects, The | | Mumford, Lewis | Museum Purchase | 1961 | Booklet, Journal | | 14 | Velazquez Artist | | | Fair | | Unknown | | Various | Price Tower, Collective Storage B | |
| LB.2006.001 | LB.2006.001.03 | Book | Introduction to modern architecture, An | | Richards, J. M. (James Maude), Sir | Museum Purchase | 1961 | | | 12 | Cities and towns--History | Standard | | | | Purchase | 6/21/2006 | El Ata Reed & Unread Books | Price Tower, 2nd floor, Architecture Study Center | |
| 2004.19 | 2004.19.216 | Print | Woodblock print: "The Great Wave off Kanagawa": Hokusai | | Hokusai | Price Tower Arts Center, gift of Shirlee Kan Foundation, Inc. | | Japanese woodblock print large wave white men in long boats The great Wave site (Hokusai 1830-) [single color ink on paper print in 37.2 cm wide] | 0.00 | 0.00 | | Art | Bruce Goff Japanese Woodblock Prints | Good | | Gift | 3/4/2002 | Price, Joe--Shirlee Kan Foundation | collection room | |
| 2004.19 | 2004.19.051 | Print | two geishas and man on path outdoors | | Nampo, Mitoate | Price Tower Arts Center, gift of Shirlee Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe--Shirlee Kan Foundation | collection room | Print: 32cm-120.8c Backing: 59cm-129cPrint 20.8cm × 22.8cm |
| 2004.19 | 2004.19.052 | Print | | | Nampo, Mitoate | Price Tower Arts Center, gift of Shirlee Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe--Shirlee Kan Foundation | collection room | Height Print 13.70cm 55.5cm Backing: 55.2cm 18.5/8in Width Print 24cm 1in |
| 2004.19 | 2004.19.053 | Print | | | Nampo, Mitoate | Price Tower Arts Center, gift of Shirlee Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe--Shirlee Kan Foundation | collection room | Height Print 35.3cm 13 7/8in Backing: 50cm 22in width Print 24cm 9.5in Backing 58cm 10in |
| 2004.19 | 2004.19.054 | Print | | | Nampo, Mitoate | Price Tower Arts Center, gift of Shirlee Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe--Shirlee Kan Foundation | collection room | height Print 35.3cm 13 7/8in Backing: 55.6cm 9.8in width Print 24cm 9.5cm 5-9in Backing 22cm 1.5in |
| 2004.19 | 2004.19.055 | Print | | | Nampo, Mitoate | Price Tower Arts Center, gift of Shirlee Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe--Shirlee Kan Foundation | collection room | height Print 35.5cm 14in Backing 50cm 22in width Print 14cm 9.5in Backing 37.6cm 14 7/8 in |

| Accession # | Object ID | Object Nametype | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQstatus | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.006 | Print | | | Sho-Sui | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | HV-P-6 Print ID 29.1900 B6-5 Japanese woodblock print artist Sho-Sui Two Fish 7 Color washes of grey, blue and green ink on paper Print, 28cm 11in Backing 36.5cm 14.5in Print 24.5cm 9 3/4in Backing 35cm UMI Collections Room Top of print exposed to backing unknown, no tape showing symbol on print right and side upper right corner, original word not print by Sho-Sui 1930, Printed on backing lower right corner 29.1900 B6-5 0.00 Condition of print appears good | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe – Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.007 | Print | | | Masatoshi Nampo | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | HV-P-7 Print ID 16.1900 B6-5 Japanese woodblock print by Masatoshi Nampo Two geishas with five parasols 7 Color washes of blue, vibrant hue of red, blue purple ink on paper Print, 28cm 11in Backing 36.5cm 14.5in UMI Collections Room Print exposed to backing with tape on top left and right side unknown, no tape showing symbol on print right and side upper right corner, original word not print by Sho-Sui 1930, Printed on backing lower right corner 16.1900 B6-5 with symbols, there is a symbol located at approx 3/4 way down in upper left area 0.00 Condition appears good | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe – Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.008 | Print | | | Sho-sen | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | HV-P-8 Print ID Sho-Sun These dues with pant 7 Color washes of blue and pink vibrant hues of green ink on paper Print 28.6cm 11 1/4in Backing 35.5cm 20in width Backing 35.5cm 14in UMI Collections Room Back top of print exposed to backing unknown, symbol printed lower right corner of print, Printed on backing Sho-Sun 29.15.1900 B6-5 Condition appears good | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe – Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.009 | Print | | | Sho-sen | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | HV-P-9 Print ID 25.1900 B6-2 Japanese woodblock print by Sho-Sun Owl on branch 7 Color washes of blue, yellow, brown, vibrant hues of brown, yellow, red ink on paper Print 28cm 11in Backing 36.5cm 14.5in UMI Collections Room Back top of print exposed to backing unknown, symbol printed lower right corner of print, Printed on backing Sho-Sun 25.1900 B6-2 Condition appears good | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe – Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.010 | Print | | | Sho-sen | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | HV-P-10 Print ID 20.1900 B6-J Japanese woodblock print by Sho-Sun Eagle 7 Color washes of blue and brown, vibrant hues of brown black grey ink on paper Print, 28.6cm 11 1/4in Backing 35.5cm 20cm Print 24.5cm 9.5in Backing 35.5cm 13.5in UMI Collections Room Back top of print exposed to backing unknown, symbol printed lower right corner on location of print, symbol printed lower right corner on print, symbol printed lower right corner on print, Printed on backing Sho-Sun original print shown 8.15.03.26.1900 B6-2 0.00 No 74 cm | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe – Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.011 | Print | | | Sho-sen | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | HV-P-11 Print ID 1.1900 B6-J Print ID 35 Japanese woodblock print by Sho-Sun Bird on lotus limb with snow 7 Color washes of yellow and blue, vibrant hues of red ink on paper Print, 28cm 11in Backing 36.5cm 14.5in Print 24.7cm 9 3/4in Backing 35cm 13 5/8in 1900 Collections Room Back top of print exposed to backing unknown, symbol printed lower right corner on print, blue phone or back of print Sho-Sun symbol lower right hand corner 1.1.1900 B6-J $0.00 Condition appears good | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe – Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.012 | Print | | | Sho-sen | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | HV-P-12 Print ID 28.1900 B6-J Japanese woodblock print by Sho-Sun Two birds on flowering cherry branch 7 Color washes of yellow blue and grey, blossoms in pink and grey ink on paper Print, 28.5cm 11 1/4in Backing, 47.4cm 18 1/4in Print 24.5cm 9.5in Backing 35.5cm 14in UMI Collections Room Back top of print exposed to backing unknown, symbol printed lower right corner of print, symbol printed lower right corner on location of print, written on backing lower right corner Sho-Sun 28.1900 B6-J $15.00 No 72 | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe – Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.013 | Print | | | Sho-sen | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | HV-P-13 Print ID 30.1900 B6-J Japanese woodblock print by Sho-Sun Two roosters with three chickens 7 Color washes of pink, blue and yellow, roosters in vibrant hues of red, yellow 13cm 1/4in Backing, 35cm 13 3/4in 1900 Collections Room Back top of print exposed to backing with unknown substance, symbol printed lower right corner on print, written on back bottom of print, Sho-Sun 1930 0.2.7 written on backing print by Sho-Sun 1930 30.0" Printed lower right corner | 0.00 | 0.00 | | | Joe Price Japanese Prints | Good | | Gift | 3/4/2002 | Price, Joe – Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.014 | Print | | | Sho-sen | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | HV-P-14 Print ID 27.1900 B6-J Japanese woodblock print by Sho-Sun White herons and weeping willow 7 Color washes of grey, heron in the vibrant color throughout, vibrant hue of grey on paper Print, 28.6cm 11 1/4in Backing, 34.5cm 13 3/4in Print 25cm 10in Print 25cm 10 1/4in Backing 35.5cm UMI Collections Room Back top of print exposed to backing with unknown substance, symbol printed lower right corner on print, symbol printed lower right corner on location of print, symbol written on backing below print by Sho-Sun 1933 | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe – Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.015 | Print | | | Sho-sen | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | HV-P-15 Print ID 18.1900 B6-J Japanese woodblock print by Sho-Sun Bird on Branch 7 Color wash of rose, yellow, green, yellow, orange, vibrant color ink on paper Print, 28.6cm 11 1/4in Backing, 43cm 13 3/4in Print 25.5cm 10in Backing 35.5cm 13.5in UMI Collections Room Back of print exposed to backing with unknown substance symbol printed lower right corner on print, written on back bottom of print "Sho-Sun 1932-I, original number not belong lower left corner, written on backing lower right corner 16.1900 B6-J $0.00 | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe – Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.016 | Print | | | Sho-sen | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | HV-P-16 Print ID 40 Japanese woodblock print by Sho-Sun Man bathing under waterfall 7 Color washes of blue-green, brown, no vivid color no vibrant hue 47.5cm 19in Backing 14 Print 36.5cm 11 1/2in Print 25cm 14 1/2in Backing 35.5cm 20in Print 24.5cm 9.5in of pink print, a man shown outdoors where print has been secured to some sort of backing with a pink top, 2 mettes from tape, upper left corner of print symbols located on each corner showing where print has been secured in some sort of back on front of print top, 2 metre from tape, original number shown on outside, written on backing lower right corner 38.1900 B6-J | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe – Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.017 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | HV-P-17 Print ID NA Japanese woodblock print by UMI Sharan preaching lion 7 Vibrant blue, brown, grey brown, blue and brown on paper Print 35.6cm 14in Backing 56cm 22in UMI Collections Room Print edges are worn & yellowed, stained, no backing perhaps from humidity, water, dirt, on front of print upper right corner 2 squares with symbols printed inside, next to symbols right of prints 2 boxes with symbols printed inside, slight | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe – Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.018 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | HV-P-18 Print ID NA Japanese woodblock print by UMI Male sitting 7 Vibrant color, large amounts of color washes in appearance throughout, blue and brown 37.5cm 15in Backing 56.5cm 22 1/4in UMI Collections Room Print edge irregular on top right corner where it appears separated from other substance, blue print worn throughout, stain enlarged hole, or main color upper right appears a 1 inch enlarged hole, on main color upper light appears a small piece of tape, print appears in good condition except for stain below 1 | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe – Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |

Exhsagdebtor 000111

| Accession # | Object ID | Object Nametype | Title | PEOPLE | Creator/Artist | Credit | Date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.019 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.020 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.021 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.022 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.023 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.024 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.025 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.026 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.027 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.028 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.029 | Print | | | Hiroshige GA | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.030 | Print | | | Hiroshige GA | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.031 | Print | | | Hiroshige GA | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.032 | Print | | | Hiroshige GA | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.033 | Print | | | Hiroshige GA | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.034 | Print | | | Hiroshige GA | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.035 | Print | | | Hiroshige GA | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.036 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Bruce Goff - Japanese Woodblock Prints | | | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | | |
| 2004.19 | 2004.19.037 | Print | | | Hiroshige GA | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.038 | Print | | | Hiroshige GA | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.039 | Print | | | Hiroshige GA | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.040 | Print | | | Hiroshige GA | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.041 | Print | | | Hiroshige GA | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.042 | Print | | | Hiroshige GA | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.043 | Print | | | Hiroshige GA | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQ value | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.044 | Print | | | Hiroshige GA | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.045 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.046 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.047 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.048 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.049 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.050 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.051 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.052 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.053 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Bruce Goff - Japanese Woodblock Prints | Good | | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.054 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.055 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.056 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | [illegible description] | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | [illegible] |
| 2004.19 | 2004.19.057 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | [illegible description] | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | [illegible] |
| 2004.19 | 2004.19.058 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | [illegible description] | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | [illegible] |
| 2004.19 | 2004.19.059 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | [illegible description] | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | [illegible] |
| 2004.19 | 2004.19.060 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | [illegible description] | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | [illegible] |
| 2004.19 | 2004.19.061 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | [illegible description] | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | [illegible] |
| 2004.19 | 2004.19.062 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | [illegible description] | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | [illegible] |
| 2004.19 | 2004.19.063 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | [illegible description] | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | [illegible] |
| 2004.19 | 2004.19.064 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | [illegible description] | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | [illegible] |
| 2004.19 | 2004.19.065 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | [illegible description] | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | [illegible] |
| 2004.19 | 2004.19.066 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | [illegible description] | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | [illegible] |

Exhsagdebtor 000115

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQstatus | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.067 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14.75 in |
| 2004.19 | 2004.19.068 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14.75 in |
| 2004.19 | 2004.19.069 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14.75 in |
| 2004.19 | 2004.19.070 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14.75 in |
| 2004.19 | 2004.19.071 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14.75 in |
| 2004.19 | 2004.19.072 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14.75 in |
| 2004.19 | 2004.19.073 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14.75 in |
| 2004.19 | 2004.19.074 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14.75 in |
| 2004.19 | 2004.19.075 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14.75 in |
| 2004.19 | 2004.19.076 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14.75 in |
| 2004.19 | 2004.19.077 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 35.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14.75 in |

| Accession # | Object ID | Object Nametype | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQ/value | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.078 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 23in width Print 24cm 9.3in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.079 | Print | | | Shioto Hokige | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 23in width Print 24cm 9.3in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.080 | Print | | | Shioto Hokige | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 23in width Print 24cm 9.3in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.081 | Print | | | Ishiyual Kuniyoshi | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | Collections Room A | height Print 33.5cm 14in Backing 58cm 23in width Print 24cm 9.3in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.082 | Print | | | Ishiyual Kuniyoshi | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 23in width Print 24cm 9.3in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.083 | Print | | | Hiroshige, Ando | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 23in width Print 24cm 9.3in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.084 | Print | | | Hiroshige, Ando | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 23in width Print 24cm 9.3in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.085 | Print | | | Kuri Yoshi | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 23in width Print 24cm 9.3in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.086 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 23in width Print 24cm 9.3in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.087 | Print | | | Hiroshige, Ando | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 23in width Print 24cm 9.3in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.088 | Print | | | Hiroshige, Ando | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 58cm 23in width Print 24cm 9.3in Backing 37.6cm 14 7/8 in |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.090 | Print | | | Hiroshige, Ando | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.091 | Print | | | Kiyochika | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.092 | Print | | | Tokujiro Kobina | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.093 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.094 | Print | | | Kunisada, Utagawa | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.095 | Print | | | Sadatora | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.096 | Print | | | Kuniyoshi, Utagawa | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.097 | Print | | | Yoshi Ikea | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |
| 2004.19 | 2004.19.098 | Print | | | Shunsho Katsukawa | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 56cm 22in width Print 24cm 9.5in Backing 37.5cm 14 7/8 in |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Create/artist | credit | date | Description | Current value | ACQstatus | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.098 | Print | | | | Price Tower Arts Center, gift of Shin'enKan Foundation, Inc. | | HX-P-09 Plid 15 Japanese woodblock print by UMI. Actor in snow T'deco faded ink on paper Print cm 68.6 in H 13 Backing; cm-NA in-NA Print cm-28.6 in6.5H Backing; cm-NA in-NA UMI. Collection Room Print is faded, slightly dirty, but severely damaged, very dirty, smudged throughout. T R corner Japanese stamp. LOWER R corner 2 Japanese stamps. Top corners appear as though areas of it have been rubbed off print. This appears to be a snow scene with very obvious. Back appears very poor condition and lack of lapis tabs. Back appears very poise and dirty | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 66cm 22in width Print 24cm 6.5in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.100 | Print | | | | Price Tower Arts Center, gift of Shin'enKan Foundation, Inc. | | HX-P-101 Plid 17 Japanese woodblock print by UMI. Actor in front of chest-link screen T Faded colors ink on paper Print cm 68.6 in H 13 Backing; cm-NA in-NA Print cm-28.6 in6.5H Backing; cm-NA in-NA UMI. Collection Room Print is faded, slightly dirty, but appears in somewhat good condition. Print is slightly smudged throughout, very dirty. UMI. corner appears 5 Japanese stamps and left of these are four small holes due to chest-like screen and top left corner. Japanese stamp. Left side center appears two large holes due to insect damage. | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 66cm 22in width Print 24cm 6.5in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.101 | Print | | | | Price Tower Arts Center, gift of Shin'enKan Foundation, Inc. | | HX-P-101 Plid 17 Japanese woodblock print by UMI. Geish with sword in front of tree blossoms T Faded greens ink on paper Print cm 68.6 in H 13 Backing; cm-NA in-NA Print cm-2.5 in2.5H Backing; cm-NA in-NA UMI. Collection Room Print is somewhat faded, only slightly worn. LOWER R corner appears a small orange stain. Another orange spot left center appears to smear on an actual approx 1/2 stamp with markings on it. | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 66cm 22in width Print 24cm 6.5in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.102 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'enKan Foundation, Inc. | | HX-P-102 Plid 18 Japanese woodblock print by Hokusai From the corner of most views of famous bridges T Faded greens, yellow, blue Ink on paper Print cm 26 in-10 1/4 Backing; cm-26.1 in-10 Print; cm-58.1 in-NA Backing; cm-NA in-NA UMI. Collection Room Print is attached to mat. Print appears to have been folded in half, print is dirty, fake, and hising is apparent throughout. T LOWER and B left both corners. Japanese stamps. Entire print surface is be shattered to mat board. Mat board is dirty and on top edge appears to have detached from something it was glued with. T 2 While-H223 water Side P77HOco Co-Orientation of print and tabs is printed on center bottom of mat In center in a sticker and typed is "Hokusai 1760-1847 LOWER R corner a sticker has been partially removed | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 66cm 22in width Print 24cm 6.5in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.103 | Print | | | | Price Tower Arts Center, gift of Shin'enKan Foundation, Inc. | | HX-P-103 Plid 21 Japanese woodblock print by UMI. Geishas on boat T Vibrant colors Ink on paper Print cm 38.1 in-15 Backing; cm-NA in-NA Print; cm-25.4 in-10 Backing; cm-NA in-NA UMI. Collection Room Print is dirty, smudged but colors still appear vibrant. All edges of print appear worn, fake, and hising apparent. Japanese stamp center and bottom R appear. Entire print appears flap and bottom R corner. Very fine minute details and patterns are clearly evident. Back of print on too was smudged. Print appears not attached to anything but for mounting purposes. | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 66cm 22in width Print 24cm 6.5in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.104 | Print | | | | Price Tower Arts Center, gift of Shin'enKan Foundation, Inc. | | HX-P-104 Plid 21 Japanese woodblock print by UMI. Party boat T Faded colors Ink on paper Print; cm-25.1 in-14 Backing; cm-NA in-NA Print; cm-24.5 in-6.5H Backing; cm-NA in-NA UMI. Collection Room Print is dirty smudged, colors are faded. At the top of the print appear symbols such as a fish, old, musical instrument T Japanese stamp is at center right side. the edges of the print are all slightly worn, frayed, torn. Small hole LOWER Left corner. | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 66cm 22in width Print 24cm 6.5in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.105 | Print | | | | Price Tower Arts Center, gift of Shin'enKan Foundation, Inc. | | HX-P-105 Plid 21 Japanese woodblock print by UMI. Geisha in brown robe with three across T Vibrant reds and yellows Ink on paper Print cm-26.6 in1.6H Backing; cm-NA in-NA Print cm-NA Print cm-25.4 in-10 Backing; cm-NA in-NA UMI. Collection Room Print has very little white border on all sides. Print has strong color vibrance and very irregular holes in center throughout. Japanese stamps are scattered throughout print and lower most both R and Left corner. Patterns are detailed. LOWER R corner appears a set of five Japanese symbols. Other than the three aross this print appears in good condition. | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 66cm 22in width Print 24cm 6.5in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.106 | Print | | | | Price Tower Arts Center, gift of Shin'enKan Foundation, Inc. | | HX-P-106 Plid 21 Japanese woodblock print by UMI. Actor with Sarpont? and flowing banner T Japanese fish Faded pinks Ink on paper Print cm-26.1 in-14 Backing; cm-NA in-NA Print; cm-NA in-NA UMI. Collection Room Dirt is dark and dirty, dirty smudged throughout print. Japanese stamp center and bottom of print edge of its print appears 12in edges. Some much dirty, lighter colors are faded. Holes along right edge of print. Japanese symbols T R corner. LOWER R corner symbols 12in irregular shaped holes with 3 appears slightly damaged. | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 66cm 22in width Print 24cm 6.5in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.107 | Print | | | | Price Tower Arts Center, gift of Shin'enKan Foundation, Inc. | | HX-P-107 Plid 21 Japanese woodblock print by UMI. Actor saying face T Blue yellow, green Ink on paper Print; cm-26.1 in-14 Backing; cm-NA in-NA Print; cm-NA in-NA UMI. Collection Room This print appears three pure and torn. LOWER R right corner has what appears to be a crease in the paper approx 5 in long. T LOWER center appears another Japanese stamp. This print has very minute detail, clean look. Bold and strong graphic composition. | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 66cm 22in width Print 24cm 6.5in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.108 | Print | | | | Price Tower Arts Center, gift of Shin'enKan Foundation, Inc. | | HX-P-108 Plid 23 Japanese woodblock print by UMI. Geisha banquetting cargo T Faded muted colors Ink on paper Print; cm-26.6 in-14 1/2 Backing; cm-NA in-NA Print; cm-24.6 in-6.5 Backing; cm-NA in-NA UMI. Collection Room This border along lower front and top holes along bottom edge of print. This print appears faded throughout, smudged, fake, and worn. T R corner Japanese stamp. B left center appears a small stamp. Other corner Japanese stamps as well as T right corner. Other than small worn appears in good condition. On back of print T LOWER corner written in pencil 23.00 | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 66cm 22in width Print 24cm 6.5in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.109 | Print | | | | Price Tower Arts Center, gift of Shin'enKan Foundation, Inc. | | HX-P-109 Plid 23 Japanese woodblock print by UMI. Geisha in faded brown robe in front of small statue T Faded colors Ink on paper Print; cm-26.6 in-14 1/2 Backing; cm-NA in-NA Print; cm-NA in-NA UMI. Collection Room This border on left center appears and bottom. Print appears faded throughout, smudged, fake, and worn. Only slightly smudged throughout print. R corner. T R corner on back of print written in pencil a small hole LOWER Right corner a small LOWER Right corner appears a set of Japanese stamps and before a small hole. Edge appears clean and crisp in otherwise noted. | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 66cm 22in width Print 24cm 6.5in Backing 37.6cm 14 7/8 in |
| 2004.19 | 2004.19.110 | Print | | | | Price Tower Arts Center, gift of Shin'enKan Foundation, Inc. | | HX-P-110 Plid 23 Japanese woodblock print by UMI. Actor in yellow boots T Bright green, faded purple, blue Ink on paper Print cm-20.6 in-14 Backing; cm-NA in-NA Print; cm-24.6 in-6.5 Backing; cm-NA in-NA UMI. Collection Room Print is dirty, certain colors faded, but overall condition appears good. T LEFT corner appears a Japanese stamp. T LEFT edge appears a 3in tear. R corner appears 4 Japanese stamps and before a small hole. Edge appears clean and crisp or otherwise noted. | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 66cm 22in width Print 24cm 6.5in Backing 37.6cm 14 7/8 in |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.111 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.112 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.113 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.114 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.115 | Print | | | Hiroshige, Ando | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.116 | Print | | | Hiroshige, Ando | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.117 | Print | | | Hiroshige, Ando | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.118 | Print | | | Hiroshige, Ando | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.119 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.120 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.121 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.122 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Nametype | Title | PEOPLE | Creator/Artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.18 | 2004.18.123 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.124 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.125 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.126 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.127 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.128 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.129 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.130 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.131 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.132 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.133 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.134 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.135 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.136 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.137 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.138 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.139 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.140 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.141 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.142 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.143 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.144 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.145 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.146 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.147 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.148 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.149 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.150 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | AC/Status | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.151 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.152 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.153 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.154 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.155 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.156 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.157 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.158 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.159 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.160 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.161 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.162 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.163 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.164 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.165 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.166 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.167 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.168 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.169 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQ value | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.170 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.171 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.172 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.173 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.174 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.175 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.176 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.177 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.178 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.179 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.180 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.181 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.182 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.183 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.184 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.185 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.186 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.187 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Nametype | Title | PEOPLE | Creatertartxt | credit | date | Description | Current value | ACQ status | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Accession # | Object ID | Object Nametype | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQstatus | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.205 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | HK-P.205 Japanese woodblock print the figures - Keyaki (2 diptych) panels attached... | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 50cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.206 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | HK-P.206 Japanese woodblock print Three figures (one building) T titled ink on paper Print vm 26.6 in. | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 50cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.207 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | HK-P.207 Japanese woodblock print two figures (one building) diptych (2 panels)... | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 50cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.208 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | HK-P.208 Japanese woodblock print two people on tree in snow very little color ink on paper Print vm... | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | height Print 33.5cm 14in Backing 50cm 22in width Print 24cm 9.5in Backing 37.8cm 14 7/8 in |
| 2004.19 | 2004.19.209 | Print | | | Toyokuni II | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | HK-P.209 Japanese woodblock print two prints on diptych in one backing two women and one child by Toyokuni II... | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.210 | Print | Woodblock print - "South Wind, Clear Sky" - Hokusai | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | Japanese woodblock print Fuji in clear weather by Hokusai (1830) Mountain with blue trees at bottom Kana removed (unking) Signed ... | 0.00 | 0.00 | Art | | Bruce Goff - Japanese Woodblock Prints | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | Price Tower, 2nd floor, Collections Storage A | |
| 2004.19 | 2004.19.211 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | no p.211 Japanese woodblock print three merchants in blue and three merchants on green... | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.212 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | no p.212 Japanese woodblock print big ocean wave with little review bright color ink on paper print vm 26 in... | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.213 | Print | Woodblock print - Water mill | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | Japanese woodblock print three sailing men one man w/review and a lady whole/ly slightly faded ink on paper print vm 26.5 in 10 Print vm 37.5 in 14.75 unk... | 0.00 | 0.00 | Japanese art Woodblock print Prints, Japanese | Art | Bruce Goff - Japanese Woodblock Prints | Good | Good, stains, Slightly discolored, faded | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | Price Tower, 2nd floor, Collections Storage A | |
| 2004.19 | 2004.19.214 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | no p.214 Japanese woodblock print four review... | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.215 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | no p.215 Japanese woodblock print five standing bricks and two flying bricks... | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.216 | Print | Woodblock print - "The Great Wave off Kanagawa" - Hokusai | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | Japanese woodblock print large wave w/little men in king boats The great wave aka (Kanagawa)... | 0.00 | 0.00 | Art | | Bruce Goff - Japanese Woodblock Prints | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | | |
| 2004.19 | 2004.19.217 | Print | Woodblock print - "Kajikazawa in Kai Province" - Hokusai | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | Japanese woodblock print two men on cliff fishing A fisherman at Kajikazawa at (Province 1831) Kana removed (unking)... | 0.00 | 0.00 | Art | | Bruce Goff - Japanese Woodblock Prints | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | Price Tower, 2nd floor, Collections Storage A | |
| 2004.19 | 2004.19.218 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | no p.218 Japanese woodblock print small village w/man fighting a horse bright color ink on paper print vm... | 0.00 | 0.00 | Art | | | Good | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession# | Object ID | Object NameType | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQ status | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.16 | 2004.16.219 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Art | | Good | | Gift | 3/4/2002 | Price Tower Arts Center, gift of Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.220 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Art | | Good | | Gift | 3/4/2002 | Price Tower Arts Center, gift of Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.221 | Print | Woodblock print: "One Shinden in the Suruga Province" - Hokusai | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Art | Bruce Goff - Japanese Woodblock Prints | Good | | Gift | 3/4/2002 | Price Tower Arts Center, gift of Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.222 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Art | | Good | | Gift | 3/4/2002 | Price Tower Arts Center, gift of Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.223 | Print | Woodblock print: "Hodogaya on the Tokaido" - Hokusai | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Art | Bruce Goff - Japanese Woodblock Prints | Fair | | Gift | 3/4/2002 | Price Tower Arts Center, gift of Shin'en Kan Foundation | Price Tower, 2nd floor, Collections Storage A | |
| 2004.16 | 2004.16.224 | Print | Woodblock print: "Wheelwork bridge in Edo" - Hokusai | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Art | Bruce Goff - Japanese Woodblock Prints | Fair | | Gift | 3/4/2002 | Price Tower Arts Center, gift of Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.225 | Print | Woodblock print: "Umibori in Hitachi Province" - Hokusai | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Art | Bruce Goff - Japanese Woodblock Prints | Fair | | Gift | 3/4/2002 | Price Tower Arts Center, gift of Shin'en Kan Foundation | Price Tower, 2nd floor, Collections Storage A | |
| 2004.16 | 2004.16.226 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Art | | Fair | | Gift | 3/4/2002 | Price Tower Arts Center, gift of Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.227 | Print | Woodblock print: "Tama River in Musashi Province" - Hokusai | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Art | Bruce Goff - Japanese Woodblock Prints | Good | Good, stable. Small tear at top center | Gift | 3/4/2002 | Price Tower Arts Center, gift of Shin'en Kan Foundation | Price Tower, 2nd floor, Collections Storage A | |
| 2004.16 | 2004.16.228 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Art | | Fair | | Gift | 3/4/2002 | Price Tower Arts Center, gift of Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.229 | Print | Woodblock print: "Mishima Pass in Kai Province" - Hokusai | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Art | Bruce Goff - Japanese Woodblock Prints | Fair | | Gift | 3/4/2002 | Price Tower Arts Center, gift of Shin'en Kan Foundation | Price Tower, 2nd floor, Collections Storage A | |
| 2004.16 | 2004.16.230 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Art | | Fair | | Gift | 3/4/2002 | Price Tower Arts Center, gift of Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.231 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Art | | Fair | | Gift | 3/4/2002 | Price Tower Arts Center, gift of Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.232 | Print | Woodblock print: "Under Mannen Bridge at Fukagawa" - Hokusai | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Art | Bruce Goff - Japanese Woodblock Prints | Fair | | Gift | 3/4/2002 | Price Tower Arts Center, gift of Shin'en Kan Foundation | Price Tower, 2nd floor, Collections Storage A | |
| 2004.16 | 2004.16.233 | Print | Woodblock print: "The back of Fuji from the Minobu river" - Hokusai | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Art | Bruce Goff - Japanese Woodblock Prints | Good | Good, stable. Tear with minor loss at top left corner. Small area of adhesive stain at top right corner | Gift | 3/4/2002 | Price Tower Arts Center, gift of Shin'en Kan Foundation | Price Tower, 2nd floor, Collections Storage A | |
| 2004.16 | 2004.16.234 | Print | Woodblock print: "Ejiri in Suruga Province" - Hokusai | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Art | Bruce Goff - Japanese Woodblock Prints | Fair | | Gift | 3/4/2002 | Price Tower Arts Center, gift of Shin'en Kan Foundation | Price Tower, 2nd floor, Collections Storage A | |

| Accession # | Object ID | Object NameType | Title | PEOPLE | CreatorIartist | credit | date | Description | Current value | AGSvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resources type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.16 | 2004.16.235 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *(description text)* | 0.00 | 0.00 | | AH | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.236 | Print | Woodblock print - "Mount Fuji reflects in Lake Kawaguchi, seen from the Misaka Pass in Kai Province" - Hokusai | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *(description text)* | 0.00 | 0.00 | | AH | Bruce Goff - Japanese Woodblock Prints | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | Price Tower, 2nd floor, Collections Storage A | |
| 2004.16 | 2004.16.237 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *(description text)* | 0.00 | 0.00 | | AH | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.238 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *(description text)* | 0.00 | 0.00 | | AH | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.239 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *(description text)* | 0.00 | 0.00 | | AH | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.240 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *(description text)* | 0.00 | 0.00 | | AH | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.241 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *(description text)* | 0.00 | 0.00 | | AH | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.242 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *(description text)* | 0.00 | 0.00 | | AH | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.243 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *(description text)* | 0.00 | 0.00 | | AH | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.244 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *(description text)* | 0.00 | 0.00 | | AH | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.245 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *(description text)* | 0.00 | 0.00 | | AH | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.246 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *(description text)* | 0.00 | 0.00 | | AH | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.247 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *(description text)* | 0.00 | 0.00 | | AH | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | AC Gratus | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.248 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Fair | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.249 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Fair | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.250 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Fair | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.251 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Fair | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.252 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Fair | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.253 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Fair | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.254 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Fair | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.255 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Fair | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.256 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Fair | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.257 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Fair | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.258 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Fair | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.259 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Fair | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.260 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | Art | | | Fair | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.261 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.262 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.263 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.264 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.265 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.266 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.267 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.268 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.269 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.270 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.271 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.272 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.273 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | AC Qnvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.274 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.275 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.276 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.277 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.278 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.279 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.280 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.281 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.282 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.283 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.284 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.285 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.286 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.287 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.288 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.299 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.300 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.301 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.302 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.303 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.304 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.305 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.306 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.307 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.308 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.309 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.300 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | AO/value | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.18 | 2004.18.301 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.302 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.303 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.304 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.305 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.306 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.307 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.308 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.309 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.310 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.311 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.312 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.313 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.314 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.315 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.316 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.317 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Bruce Goff – Japanese Woodblock Prints | | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.318 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Bruce Goff – Japanese Woodblock Prints | | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.319 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | | Bruce Goff – Japanese Woodblock Prints | | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.320 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.321 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.18 | 2004.18.022 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.023 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.024 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.025 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.026 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.027 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.028 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.029 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.030 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.031 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.032 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.033 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.034 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Created/et | credit | date | Description | Current value | ACVvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.18 | 2004.18.335 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *[description illegible]* | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.336 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *[description illegible]* | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.337 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *[description illegible]* | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.338 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *[description illegible]* | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.339 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *[description illegible]* | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.340 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *[description illegible]* | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.341 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *[description illegible]* | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.342 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *[description illegible]* | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.343 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *[description illegible]* | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.344 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *[description illegible]* | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.345 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *[description illegible]* | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.346 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *[description illegible]* | 0.00 | 0.00 | | AA | Shaw Coll'n - Japanese Woodblock Prints | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.347 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | *[description illegible]* | 0.00 | 0.00 | | AA | Shaw Coll'n - Japanese Woodblock Prints | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQstatus | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.18 | 2004.18.348 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | Bruce Goff - Japanese Woodblock Prints | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.349 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | Bruce Goff - Japanese Woodblock Prints | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.350 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | Bruce Goff - Japanese Woodblock Prints | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.351 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.352 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.353 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.354 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.355 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.356 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.357 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.358 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.359 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.360 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.361 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.362 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.363 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.364 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.365 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.18 | 2004.18.366 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 5/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | AC/status | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.16 | 2004.16.367 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.368 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.369 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.370 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.371 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.372 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.373 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.374 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.375 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.376 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.377 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.378 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.379 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.380 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.381 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.382 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.383 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.384 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.385 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQstatus | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.16 | 2004.16.386 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.387 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.388 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.389 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.390 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.391 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.392 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.393 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.394 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.395 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.396 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.397 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.398 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.399 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.400 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.401 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.402 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.403 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | AA | | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | AC Grdvue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.404 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.405 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.406 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.407 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.408 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.409 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.410 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.411 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.412 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.413 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.414 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.415 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.416 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.417 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.418 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.419 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.420 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.421 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.422 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.423 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.424 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.425 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.426 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.427 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.428 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.429 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.430 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.431 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.432 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.433 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.434 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.435 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.436 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.437 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.438 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.439 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.440 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.441 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AА | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQstatus | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.442 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.443 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.444 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.445 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.446 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.447 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.448 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.449 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.450 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.451 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.452 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.453 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.454 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.455 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.456 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.457 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.458 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.459 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.460 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.461 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.462 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.463 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.464 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.465 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.466 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.467 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.468 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.469 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.470 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.471 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.472 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.473 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.474 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.475 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.476 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.477 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.478 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.479 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.480 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.481 | Print | | | Hokusai | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe / Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | AE Qvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resources type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.462 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.463 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.464 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.465 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.466 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.467 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.468 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.469 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.460 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.461 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.462 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.463 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.464 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.465 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.466 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.467 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.468 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |
| 2004.19 | 2004.19.469 | Print | | | Hokusai | Price Tower Arts Center, gift of Shirler Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | QR | 3/4/2002 | Price, Joe - Shirler Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.16 | 2004.16.500 | Print | | | Hokusai | | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.501 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.502 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.503 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.504 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.505 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.506 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.507 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.508 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.509 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.510 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.511 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.512 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.513 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.514 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.515 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.516 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.16 | 2004.16.517 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | AA | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQvalue | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.518 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.519 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.520 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.521 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.522 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.523 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.524 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.525 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.526 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.527 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.528 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.529 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.530 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.531 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.532 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.533 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.534 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | | 0.00 | 0.00 | | Art | | Fair | | GR | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |

| Accession # | Object ID | Object Name/type | Title | PEOPLE | Creator/artist | credit | date | Description | Current value | ACQ/status | Subject | Catalogue type | Collection | Condition | Condition Notes | Resource type | Received date | Resource From | Home location | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004.19 | 2004.19.D20 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | Inns 035 Japanese print wood block horizontal print of court yard title on backing "Portrait of geisha Kyko"D.00 good mull muled ink on paper print in 11.25 cm G8.5 backing in 15.00 cm 39.2 print in 14.1 cm H backing in 22.1 cm SE.2 ink collection room backing unseen top top 4 pieces of tape across top of print 5 still attached | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.D36 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | Inns 035 Japanese print wood block Horizontal tree scene with pier and excursion boat selling tower left title on backing "Title Japanese print" D.00 good mull muled ink on paper print in 11.25 cm SE.5 backing in 14.9 cm 37.0 print in 14.4 cm H backing in 22.1 cm SE.2 ink collection room backing unseen across top top 4 pieces of tape across top of print 3 attached | 0.00 | 0.00 | | Art | | Fair | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.19 | 2004.19.D37 | Print | | | | Price Tower Arts Center, gift of Shin'en Kan Foundation, Inc. | | Inns 037 Japanese print wood block Horizontal Farm scene in field title "title "Mt Fuji" D.00 good mull muled ink on paper print title on backing bottom edge 6.00 writing in lower right of print body scene good mull muled ink on paper print in 11.2 cm 28.6 backing in 15 cm 38.1 print in 14.1 cm 38.8 H backing in 22.1 cm SE.2 ink collection room backing unseen across top 4 pieces of tape across top of print 3 attached | 0.00 | 0.00 | | Japanese art Print Prints, Japanese | Art | | Fair | | Gift | 3/4/2002 | Price, Joe - Shin'en Kan Foundation | collection room | |
| 2004.2 | 2004.20.1 | Screen | Screen, wooden room divider | Price, Carolyn Wright, Frank Lloyd Price, Jr., Harold C. | Wright, Frank Lloyd | Price Tower Arts Center, gift of Carolyn S. Price | 1955 | Screen, Wooden room divider (or partition, or screen). Frank Lloyd Wright, designer. Made for the Harold Price, Jr. residence, Hillside, 1955. Five panels, ribbon mahogany veneer with brass piano hinges. 80-1/4 x 59 x 7/8 (opened flat) | 4,575.00 | 4,575.00 | | Wright, Frank Lloyd Harold Price Jr. House Hillside Furniture | Art | | Fair | | Gift | 1/7/2005 | Price, Carolyn S. | Annex, Room 102 | |
| 2004.2 | 2004.20.2 | Screen | Wooden screen room divider | Wright, Frank Lloyd Price, Carolyn Price, Jr., Harold C. | Wright, Frank Lloyd | Price Tower Arts Center, gift of Carolyn S. Price | 1955 | Screen, Wooden room divider (or partition, or screen). Frank Lloyd Wright, designer. Made for the Harold Price, Jr. residence, Hillside, 1955. Five panels, ribbon mahogany veneer with brass piano hinges. 80-1/4 x 59 x 7/8 (opened flat) | 0.00 | 0.00 | | Hillside Furniture | Art | | | | Gift | 1/7/2005 | Price, Carolyn S. | Annex, Room 102 | |
| 2004.2 | 2004.20.3 | Screen | Wooden Room Divider | | | Price Tower Arts Center, gift of Carolyn S. Price | 1955 | Screen, Wooden room divider (or partition, or screen), with ribbon mahogany veneer and metal hinges | 0.00 | 0.00 | | Art | | | | | Gift | 1/7/2005 | Price, Carolyn S. | | |
| 2004.21 | 2004.21 | Ornament, Architectural | Shin'enKan Aluminum Triangle | Goff, Bruce Price, Joe | Goff, Bruce Alonzo | Price Tower Arts Center, gift of Jim Atkinson | c. 1958 | Architectural Ornament, Triangular-shaped, decorative piece of metal from Shin'enKan, c. 1958. Brown paint applied to surface. Convex shape at center, two rectangular tiers, each with a hole, cut back. cast aluminum, painted. 10-3/4 x 12 x 1-3/4 | 0.00 | 0.00 | | Shin'enKan Goff, Bruce Architectural ornaments | Art | | | | Gift | | Atkinson, Jim | Price Tower, 2nd floor, Collections Storage A | Given to Jim Atkinson by man from Dewey, Oklahoma who wished to remain anonymous. |



**Department of the Treasury**
**Internal Revenue Service**
**Tax Exempt and Government Entities**
P.O. Box 2508
Cincinnati, OH 45201

Date:
  May 15, 2023
Employer ID number:
  92-3041459
Person to contact:
  Name: Kimya D. Hayes
  ID number: 10076
  Telephone: 877-829-5500
Accounting period ending:
  December 31
Public charity status:
  170(b)(1)(A)(vi)
Form 990 / 990-EZ / 990-N required:
  Yes
Effective date of exemption:
  March 19, 2023
Contribution deductibility:
  Yes
Addendum applies:
  No
DLN:
  26053528005583

FRIENDS OF PRICE TOWER INC
414 SE WASHINGTON BLVD
SUITE 205
BARTLESVILLE, OK 74006

Dear Applicant:

We're pleased to tell you we determined you're exempt from federal income tax under Internal Revenue Code (IRC) Section 501(c)(3). Donors can deduct contributions they make to you under IRC Section 170. You're also qualified to receive tax deductible bequests, devises, transfers or gifts under Section 2055, 2106, or 2522. This letter could help resolve questions on your exempt status. Please keep it for your records.

Organizations exempt under IRC Section 501(c)(3) are further classified as either public charities or private foundations. We determined you're a public charity under the IRC Section listed at the top of this letter.

If we indicated at the top of this letter that you're required to file Form 990/990-EZ/990-N, our records show you're required to file an annual information return (Form 990 or Form 990-EZ) or electronic notice (Form 990-N, the e-Postcard). If you don't file a required return or notice for three consecutive years, your exempt status will be automatically revoked.

If we indicated at the top of this letter that an addendum applies, the enclosed addendum is an integral part of this letter.

**Letter 947 (Rev. 2-2020)**
Catalog Number 35152P

Exhsagdebtor 000147

For important information about your responsibilities as a tax-exempt organization, go to www.irs.gov/charities. Enter "4221-PC" in the search bar to view Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities, which describes your recordkeeping, reporting, and disclosure requirements.

We sent a copy of this letter to your representative as indicated in your power of attorney.

Sincerely,

Stephen A. Martin

Stephen A. Martin
Director, Exempt Organizations
Rulings and Agreements

**Letter 947** (Rev. 2-2020)
Catalog Number 35152P

Exhsagdebtor 000148



STATE OF NEW MEXICO

**MAGGIE TOULOUSE OLIVER**

SECRETARY OF STATE

Office of the New Mexico Secretary of State
Filing Number: 0002311885
Filed On: 2/20/2023
Total Number of Pages: 1 of 3

# Limited Liability Company

## ONLINE ARTICLES OF ORGANIZATION

The undersigned, acting as organizer(s) of a Limited Liability Company pursuant to the New Mexico Limited Liability Company Act, adopt the following Articles of Organization:

**ARTICLE ONE:** The name of the Limited Liability Company is:

**Green Copper Holdings, LLC**

**ARTICLE TWO:** The period of duration is: Perpetual

**ARTICLE THREE:**
(1) The name of the initial registered agent at the address is:

| Name of Entity Appointed Registered Agent |
| --- |
| Registered Agents Inc |

(2) The New Mexico street address of the company's initial registered agent is:

| Type | Address | City | State | Zip | Country |
| --- | --- | --- | --- | --- | --- |
| Physical Address | 530-B HARKLE ROAD STE 100 | Santa Fe | NM | 87505 | USA |

**(Post Office Box is not acceptable. Provide a description of the geographical location if a street address does not exist.)**

(3) The street address of the company's principal place of business, if different from its registered agent's address is:

| Address | City | State | Zip | Country |
| --- | --- | --- | --- | --- |
| 530-B Harkle Road Suite 100 | Santa Fe | NM | 87505 | USA |

(4) The mailing address of the Limited Liability Company is:

| Address | City | State | Zip | Country |
| --- | --- | --- | --- | --- |
| 530-B Harkle Road Suite 100 | Santa Fe | NM | 87505 | USA |

**Email Address:** agent@newmexicoregisteredagent.com
**Phone:** 505-629-0009

**325 DON GASPAR, SUITE 300 | SANTA FE, NEW MEXICO  87501**
**PHONE: (505) 827-3600 or (800) 477-3632 | FAX: (505) 827-8081**
**WWW.SOS.STATE.NM.US**

Page 1 of 2

Exhsagdebtor 000149

Office of the New Mexico Secretary of State
Filing Number: 0002311885
Filed On: 2/20/2023
Total Number of Pages: 2 of 3

**ARTICLE FOUR:** (Check only if applicable):

☐ YES Management of the business and affairs of the company is vested in a manager(s).

Manager Name and address:

| **Name** | **Physical Address** | **Mailing Address** |
|---|---|---|

**ARTICLE FIVE:** (Check only if applicable):

☑ YES The Limited Liability Company is a single member Limited Liability Company.

Member Name and address:

| **Name** | **Physical Address** | **Mailing Address** |
|---|---|---|

**ARTICLE SIX:** If these Articles of Organization are not to be effective upon filing with the Secretary of State's Office, the effective date is *(if an effective date is specified here, it cannot be a date prior to the date the articles are received by the Secretary of State's Office.)*

**Effective Date**

02/20/2023

**Purpose:** The business is formed to conduct any lawful purpose.

**NAICS Code:**

**NAICS Sub Code:**

**Organizer(s) Printed Name(s):**

**(Typing the First and Last Name of the Organizer(s), is the equivalent of an electronic signature.)**

| **Organizer Name** |
|---|
| Registered Agent, Inc. |

**325 DON GASPAR, SUITE 300 | SANTA FE, NEW MEXICO  87501**
**PHONE: (505) 827-3600 or (800) 477-3632 | FAX: (505) 827-8081**
**WWW.SOS.STATE.NM.US**

Page 2 of 2

Exhsagdebtor 000150

## COMPANY AGREEMENT

### OF

### GREEN COPPER HOLDINGS, LLC

    **THIS COMPANY AGREEMENT OF GREEN COPPER HOLDINGS, LLC** (this "***Agreement***") made and entered into on the respective dates set forth below the members signatures hereto (the "***Effective Date***") constitutes the Company Agreement of GREEN COPPER HOLDINGS, LLC, a New Mexico limited liability company (the "***Company***"). This Agreement and the Certificate of Limited Liability Company and Articles of Organization of the Company shall be binding on all holders of an Interest (as defined in Section 1.5 hereof) in the Company as Members of the Company, all Transferees, successors and assignees of such Interests, and all Substituted Members and Additional Members of the Company.

### ARTICLE 1.
### FORMATION

    **1.1**     **Formation**. The Company has been organized as a New Mexico limited liability company by the filing of its Certificate of Limited Liability Company and Articles of Organization dated as of February 20, 2023 with the Office of the New Mexico Secretary of State (as amended from time to time, the "***Articles***"), pursuant to and in accordance with the Act.

    **1.2**     **Name.**   The name of the Company is "GREEN COPPER HOLDINGS, LLC" and all Company business must be conducted in that name or such other names that comply with applicable law as a Manager, with the Consent of the Members, may select from time to time, in accordance with the terms of this Agreement.

    **1.3**     **Registered Office; Registered Agent; Principal Office; Other Offices.**   The registered office of the Company required by the Act to be maintained in the State of New Mexico shall be as set forth in the Articles, or such other office (which need not be a place of business of the Company) as a Manager may designate from time to time in the manner provided by law. The registered agent of the Company in the State of New Mexico shall be the initial registered agent named in the Articles or such other person or persons as a Manager may designate from time to time in the manner provided by law. The principal office of the Company shall be the same as the Company's registered office in the State of New Mexico or such other place as a Manager may designate from time to time upon notice to the Members. The Company may have such other offices as a Manager may designate from time to time upon notice to the Members.

    **1.4**     **Perfection of Limited Liability Company.**   The Members shall do all acts and things (including publication or periodic filings of any documents) that may now or hereafter be required for the perfection and continued maintenance of Company as a limited liability company under the laws of the State of New Mexico, or which are necessary or appropriate in order to form or qualify Company under the laws of any jurisdiction in which Company is doing business, owns real property, or in which such formation or qualification is necessary in order to protect the limited liability of the Members as persons enjoying protection from debts, liabilities or other obligations of Company under the laws of the State of New Mexico or as Members under the laws of any other jurisdiction.

1.5    **Defined Terms.** Capitalized terms not otherwise defined in this Agreement have the meanings ascribed to them in this Section 1.5.

(a)    Act. The New Mexico Limited Liability Company Act, or any successor statute thereto.

(b)    Agreement. This Company Agreement as initially executed or as amended, modified or supplemented from time to time, as the context requires.

(c)    Allocation Regulations. The Treasury Regulations issued under Sections 704(b) and 752 of the Code, as the same may be modified or amended from time to time. In the event that the Allocation Regulations are revised or amended subsequent to the date of this Agreement, references herein to sections or paragraphs of the Allocation Regulations shall be deemed to be references to the applicable sections or paragraphs of the Allocation Regulations as then in effect.

(d)    Capital Account. That separate Capital Account maintained by Company for each Member; and the amount of each such Member's Capital Account, as of any given date, which shall be computed as follows:

(i)    To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of profits and the amount of any Company liabilities that are assumed by such Member or that are secured by any Company property distributed to such Member.

(ii)    To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Company property distributed to such Member pursuant to any provision of this Agreement (excluding, however, any distribution to the extent such distribution represents repayment by Company to a Member of a loan or advance or any accrued interest thereon), such Member's distributive share of losses and the amount of any liabilities of such Member assumed by Company or which are secured by any property contributed by such Member to Company.

In the event any Interest in Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

(e)    Capital Contribution. With respect to any Member, the amount of money and the Gross Asset Value of any property contributed to Company with respect to its Company interest.

(f)    Capital Proceeds. The proceeds of a Capital Transaction.

(g)    Capital Transaction. Any transaction the proceeds of which are not includable in determining Cash Flow, including, without implied limitation, Sale Proceeds and Refinancing Proceeds, but excluding loans to Company (other than a refinancing of any mortgage loans) and contributions of capital to Company by the Members.

2

(h)    <u>Cash Flow</u>.    Revenues from operations, minus all expenses (including operating expenses, payments of principal or advances from Members to the extent such loans or advances are repayable based on Cash Flow) and any reserves of revenues from operations deemed reasonably necessary by the Members, except depreciation.

(i)    <u>Code</u>.  The Internal Revenue Code of 1986, as amended, or any corresponding provisions of succeeding revenue laws.

(j)    <u>Consent of the Members</u>.  The prior written consent of the Members holding in the aggregate at least a majority of the Sharing Percentages then held by Members.

(k)    <u>Covered Person</u>.  Any Member, Manager or officer of Company and to the extent provided by resolution of the Board of Managers, any other employee or agent of Company or any of its affiliates.

(l)    <u>Fiscal Year</u>.  The fiscal year of Company shall generally mean a twelve (12) month period with a December 31 year-end (or such other date or period required under the Code).

(m)    <u>Gross Asset Value</u>.  With respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

(i)    The initial Gross Asset Value of any asset contributed by a Member to Company shall be the gross fair market value of such asset, as determined by the Members;

(ii)    The Gross Asset Values of all Company assets may, in the discretion of the Members, be adjusted to equal their respective gross fair market values, as determined by the Members, as of the following times: (a) the acquisition of an additional interest in Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by Company to a Member of more than a de minimis amount of Company property as consideration for an interest in Company if the Members reasonably determine that, with respect to adjustments are necessary or appropriate to reflect the relative economic interests of the Members in Company; and (c) the liquidation of Company within the meaning of Treasury Regulations section 1.704-l(b)(2)(ii)(g); and

(iii)    The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution.

(n)    <u>Incapacity</u>.  The following events shall constitute the Incapacity of a Member and the Member suffering such event shall be referred to as an Incapacitated Member:

(i)    The Member files a voluntary petition in bankruptcy;

(ii)    The Member is adjudged a bankrupt;

Exhsagdebtor 000153

(iii)     The Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in a bankruptcy proceeding; or

(iv)     The dissolution of the Member.

(o)     Interest. The entire legal and equitable ownership interest in Company of a Member.

(p)     Member. Any Person who has been admitted as a Member (including the initial Members) or substituted Member pursuant to the terms of this Agreement. "Members" means all such Persons. A Person shall be deemed to be admitted as a Member when he has been accepted by all of the Members of Company as a Member and Schedule A hereto has been amended to reflect such admission.

(q)     Net Operating Income. Net income before non-recurring or extraordinary gains or losses, interest expense, depreciation and amortization; provided, however, that Net Operating Income from operations sold during the applicable period is excluded.

(r)     Operating Expenses. All operating and other costs and expenses of Company determined on an accrual basis during the Fiscal Year (excluding distributions to Members).

(s)     Refinancing Proceeds. The gross proceeds available to Company from a refinancing of any mortgage loans or any other secured or unsecured indebtedness of Company.

(t)     Sale Proceeds. The gross proceeds available to Company from the sale or other disposition of all or any portion of the Project or Company's other assets, or any proceeds realized from a condemnation, insured casualty or insured title defect, but excluding proceeds from rental interruption insurance, if any. The term "Sale Proceeds" shall not include any casualty insurance proceeds received by Company if and to the extent that such proceeds are applied for repair or reconstruction.

(u)     Sharing Percentages. The percentages of interest of each Member as set forth in Schedule C attached hereto and made a part hereof

(v)     Terminating Capital Transaction. A capital transaction resulting in or involving the termination and winding up of the business of Company or any other event resulting in the "liquidation" of Company within the meaning of Section 1.704-l(b)(2)(ii)(g) of the Allocation Regulations of the Code.

(w)     Valuation Date. The last day of the month immediately preceding the date on which any notice of intent to exercise a redemption option under this Agreement is delivered.

### ARTICLE 2.
### NAME

**2.1     Name**. The name of Company is "GREEN COPPER HOLDINGS, LLC".

4

## ARTICLE 3.
## REGISTERED OFFICE: MEMBERS ADDRESSES

**3.1     Registered Office**. The registered office of the Company is GREEN COPPER HOLDINGS, LLC, 530-B Harkle Road, Suite 100, Santa Fe, New Mexico 87505, or such other place as the Members shall otherwise agree.

**3.2     Members' Addresses**. The addresses of the Members shall be those stated after their names on Schedule A attached hereto and made a part hereof. A Member may change such address by notice to Company and the other Members, which notice shall become effective upon receipt.

## ARTICLE 4.
## PURPOSES

**4.1     Purposes**. The business and purpose of Company shall be to engage in any business activities and actions which may lawfully be engaged in by limited liability companies.

## ARTICLE 5.
## MEMBERS

**5.1     Limited Liability**. No Member shall be liable to any creditor of Company whatsoever for any of the losses, debts, liabilities, damages, contracts or obligations of Company. A Member is liable only to make its agreed Capital Contributions under Article 6 hereof, and except as is provided under Article 6, no Member is required to make any further Capital Contribution or other loan of funds to Company, nor to refund any distribution rightfully received during the solvency of Company. Nevertheless, if a court of competent jurisdiction holds that a Member has received a distribution in contravention of the Act, such Member shall be liable to Company only to the extent provided in the Act.

**5.2     Limitation of Right to Withdraw; No Right to Avoid Capital Contribution by Electing to Forfeit Interest**. Each Member expressly waives any right of such Member to withdraw from Company. Subject to the provisions of Article 6 with respect to dilution of a member's Interest in Company, each Member hereby specifically and expressly waives and renounces any right which a Member of a limited liability company may have under the Act to avoid the Capital Contribution obligation of the Member by electing to forfeit such Person's entire Interest in the limited liability company.

**5.3     Substitute Members**. Subject to the provisions of Section 5.6 hereof, and except as provided in Section 5.5 hereof, no Member has the right to grant the right to become a substitute Member to an assignee of any part of his or her Interest.

**5.4     Members; Involuntary Transfers**. Upon the Incapacity of a Member, its Interest shall pass to his successors, heirs, trustee, executor or other legal representative, as the case may be; provided, however, that such transferee shall not be admitted as a Member except in accordance with Section 5.5 hereof; and provided further, that in no event shall such Member have any power or right to demand or obtain said Member's share of Company assets or the value thereof, except as provided herein.

5

**5.5      Substituted Member**. No transferee of a Member's Interest shall have the right to become a substituted Member in place of its predecessor in interest unless and until (i) the unanimous written consent of all remaining Members to such substitution shall have been obtained, which consent of the Members may, in their sole and absolute discretion, withhold; (ii) the instrument or evidence of transfer shall be in form and substance satisfactory to the remaining Members; (iii) the transferee shall have accepted, adopted and approved in writing all the terms and provisions of this Agreement and agreed to discharge all obligations accruing with respect to its Interest; (iv) an amendment to this Agreement shall have been executed; and (v) the transferee shall have paid or made provision satisfactory to Company for payment of all expenses and fees incurred in connection with its admission as a substituted Member.

**5.6      Rights of Non-Member Transferee**. Unless admitted to Company as a substituted Member, the permitted transferee of an Interest in Company shall not be admitted as a Member and shall not be entitled to any of the rights, powers or privileges of its predecessor in interest, other than the right to receive and be credited or debited with its proportionate share of profits, losses and any other items of income, profit, gain, loss and deduction (or items thereof) and distributions, and any other right specifically permitted to a transferee under the express terms of this Agreement.

## ARTICLE 6.
## CAPITAL CONTRIBUTIONS

**6.1      Capital Contributions**. As of the date hereof, each Member has made a capital contribution to Company as stated on <u>Schedule B</u>, which amount has been credited to each Member's Capital Account.

**6.2      Additional Capital Contributions**.

6.2.1      If a Manager, with the Consent of the Members, determines that Company requires additional Capital Contributions, then a Manager shall give notice to each Member of: (i) the total amount of additional Capital Contributions required, (ii) the reason the additional Capital Contribution is required, (iii) each Member's proportionate share of the total additional Capital Contribution (determined in accordance with this Section), and (iv) the date each Member's additional Capital Contribution would be due and payable, if approved by the Consent of the Members. If approved by the Consent of the Members, a Member's share of the total additional Capital Contribution shall be equal to the product obtained by multiplying the Member's Sharing Percentage and the total additional Capital Contribution required. A Member's share shall be payable in cash or by certified check or by such other means as determined by the Consent of the Members.

6.2.2      Except as provided in Section 6.2.1 hereof, no Member shall be required to contribute any additional capital to Company, and no Member shall have any personal liability for any obligation of Company.

6.2.3      If any Member (a "***Defaulting Member***") fails to pay when due all or any portion of any Capital Contribution, a Manager shall request the non-Defaulting Members to pay the unpaid amount of the Defaulting Member's Capital Contribution (the "***Unpaid Contribution***").  To the extent the Unpaid Contribution is contributed by any other Member, the Defaulting Member's

6

Sharing Percentage shall be reduced and the Sharing Percentage of each Member who makes up the Unpaid Contribution shall be increased by an amount equal to the Adjustment Percentage times the Sharing Percentages in effect at the time of notice of the required additional Capital Contributions. The "*Adjustment Percentage*" is calculated as the percentage derived by dividing (a) the aggregate amount of the additional Capital Contribution requested by a Manager by (b) the aggregate amount of all Capital Contributions including the additional Capital Contribution. This remedy is in addition to any other remedies allowed by law or this Agreement.

**6.3     No Interest on Capital Contributions**. Members shall not be paid interest on their Capital Contributions.

**6.4     Return of Capital Contributions**. Except as otherwise provided in this Agreement, no Member shall have the right to receive any return of any Capital Contribution.

**6.5     Capital Accounts**. A separate Capital Account shall be maintained for each Member.

**6.6     Loans**. Any Member may, at any time, make or cause a loan to be made to Company in any amount on those terms upon which the Company, with the Consent of the Members, and the lending Member agree.

**6.7     Amendments to Sharing Percentages; Schedule C**. Each Manager is authorized to cause the Sharing Percentages on <u>Schedule C</u> hereof to amended from time to time whenever any additional Capital Contributions are made by any of the Members in accordance with the applicable requirements of this Agreement, including, but not limited to the provisions of Section 6.2 and Article 10 hereof.

<center>

**ARTICLE 7.**
**ALLOCATIONS**

</center>

**7.1     Profits and Losses**. Profits and losses for any Fiscal Year shall be allocated among the Members according to their Sharing Percentages.

<center>

**ARTICLE 8.**
**DISTRIBUTIONS**

</center>

**8.1     Distributions Prior to Dissolution**.

**8.1.1     <u>Distribution of Cash Flow</u>**. Except for Tax Distributions made annually pursuant to Section 8.3 hereof, Cash Flow shall be distributed to the Members in accordance with their respective Sharing Percentages, but only upon the unanimous consent of all Managers; <u>provided</u>, <u>however</u>, that distributions of Cash Flow to the Members that are not in accordance with the Sharing Percentages of the Members may only be made with the Consent of the Members.

**8.1.2     <u>Distributions of Proceeds from Sale or Refinancing</u>**. Except as authorized by agreement of the unanimous consent of the Members, proceeds from sale or refinancing of Company shall be distributed in the following order of priority:

*First*, to pay any unpaid Operating Expenses;

<center>7</center>

*Second*, to discharge any outstanding debts and obligations of Company;

*Third*, to the payment of the mandatory Tax Distributions to be made pursuant to Section 8.3 hereof;

*Fourth*, to fund any working capital reserve account that may be required as determined by a Manager;

*Fifth*, to the Members in return of their Capital Contributions; and

*Sixth*, any balance remaining shall be distributed in accordance with their Sharing Percentages.

**8.2    Liquidation**.

8.2.1    Upon the liquidation and dissolution of Company, unless the business of Company is continued pursuant to the provisions hereof, a Manager shall liquidate the assets of Company and cause the business of Company to be wound up in accordance with the Act.

8.2.2    Any Capital Proceeds from a Terminating Capital Transaction remaining after payment of, or adequate provision for, the debts and obligations of Company shall be distributed to those Members with positive Capital Account balances (after taking into account all Capital Account adjustments for Company taxable year).

8.2.3    The parties intend that, as a result of the application of the allocation and distribution provisions contained in this Article 8, any Sale Proceeds from a Terminating Capital Transaction will be distributed in the same manner as Sale Proceeds are distributed under the provisions of Section 8.1.2. If Company is advised at any time by the Accountants or counsel to Company that an actual distribution of Sale Proceeds at the end of any Fiscal Year in accordance with the provisions of Section 8.2.2 would not result in each Member receiving the amount that it would have received if Section 8.1.2 rather than Section 8.2.2 applied to such distribution, a Manager is authorized and empowered to amend the provisions of this Article 8 relating to the allocation of Profits and Losses (other than the Regulatory Allocations) for such Fiscal Year (and for subsequent Fiscal Years if necessary) to cure such defect consistent with the principles set forth in the first sentence of this Section 8.2.3.

**8.3    Mandatory Tax Distribution**. To the extent permitted by law and not prohibited by any loan documents, and the availability of funds for such purposes. Company shall distribute to the Members in respect of their respective Interests, for each taxable year in which the Company is treated as a partnership for federal income tax purposes, in cash or readily marketable securities, within one hundred (100) days of the end of each tax year, an aggregate amount of not less than the aggregate amount of federal and state income taxes deemed to be imposed on the Members with respect to the income of the Company for the year (reduced to the extent of Losses of the Company allocated to each Member for previous taxable years), assuming for these purposes that all of such income is subject to federal and state income tax at the rate equal to the then highest applicable marginal tax brackets of federal and state income tax imposed on the Members (the "***Tax Distributions***").

8

## ARTICLE 9.
## MANAGEMENT

**9.1**     **Management**.

9.1.1     Consent of the Members. All Members, or their designated representatives, are entitled to vote in accordance with their Sharing Percentages.

9.1.2     Overall Management Vested in Manager. Except as expressly provided otherwise in this Agreement, management of the Company will be vested in one member, Copper Tree, Inc., a Delaware corporation (the "***Manager***"), who is a member-manager. Each Manager may act individually and without the concurrence and/or consent of the other Manager. No other Person shall have any right or authority to act for or bind the Company, except as permitted in this Agreement or as required by law. In the event that Copper Tree, Inc. resigns or is incapacitated and no longer able to perform their respective duties, a new or replacement Manager will be chosen with the Consent of the Members.

9.1.3     Powers of Member-Manager. Except as provided in Section 9.1.4 below or otherwise in this Agreement, all powers of the Company will be exercised by or under the authority of, and the business and affairs of the Company will be managed under the direction of a Manager, whether or not in the ordinary course of business. Without limiting each Manager's power or authority under this Agreement or the Act, each Manager may without obtaining consent or approval of the Members, or the other Manager, take the following actions if, as, and when he deems any such action to be necessary, appropriate or advisable, at the sole cost and expense of the Company and whether or not such actions are in the ordinary course of the Company's business:

(a)     acquire by purchase, lease, or otherwise, any movable property, corporeal or incorporeal, to be used in the ordinary course of business;

(b)     construct, operate, maintain, finance, and improve, and to own, mortgage, or lease any movable property, corporeal or incorporeal;

(c)     sell, dispose, trade, or exchange Company assets in the ordinary course of Company's business;

(d)     enter into agreements and contracts and to give receipts, releases and discharges;

(e)     purchase liability and other insurance to protect Company's properties and business;

(f)     borrow money for and on behalf of Company and, in connection therewith, execute and deliver instruments including mortgages, pledges, and other security instruments containing the usual and customary security clauses including

9

confession of judgment, the right to executory process, waiver of appraisal and the *pact de non alienando*;

(g)    execute or modify leases with respect to any part or all of the assets of Company;

(h)    prepay, in whole or in part, refinance, amend, modify, or extend any mortgages (including mortgages containing the usual and customary security clauses such as confession of judgment, the right to executory process, waiver of appraisal and the *pact de non alienando*) or deeds of trust which may affect any asset of Company and in connection therewith to execute for and on behalf of Company any extensions, renewals, or modifications of such mortgages or deeds of trust;

(i)    execute any and all other instruments and documents which may be necessary or in the opinion of a Manager desirable to carry out the intent and purpose of this Agreement, including, but not limited to, documents whose operation and effect extend beyond the term of Company;

(j)    make any and all expenditures which a Manager, in his or her sole discretion, deems necessary or appropriate in connection with the management of the affairs of Company and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, all legal, accounting, and other related expenses incurred in connection with the organization and financing and operation of Company;

(k)    enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of Company; and

(1)    invest and reinvest Company reserves in short-term instruments or money market funds.

    9.1.4   <u>Extraordinary Transactions</u>. Notwithstanding anything to the contrary in this Agreement, a Manager shall not undertake any of the following without the Consent of the Members:

(a)    any transaction, or series of related transactions, including, but not limited to, those provided for in Section 9.1.3 in which the total transaction amount exceeds Fifty Thousand and No/100 ($50,000) Dollars;

(b)    any Capital Transaction;

(c)    the admission of additional Members to Company;

(d)    Company's engaging in business in any jurisdiction which does not provide for the registration of limited liability companies; or the Company's engaging in a new line of business; and

(e)    the liquidation of Company.

<p style="text-align:center">10</p>

9.1.5   <u>Limitation on Authority of Members</u>.

(a)    No Member is an agent of Company solely by virtue of being a Member, and no Member has authority to act for Company solely by virtue of being a Member;

(b)    This Section 9.1 supersedes any authority granted to the Members pursuant to Section 1318(B) of the Act. Any Member who takes any action or binds Company in violation of this Section 9.1 shall be solely responsible for any loss and expense incurred by Company as a result of the unauthorized action and shall indemnity and hold Company harmless with respect to the loss or expense.

9.1.6   <u>Removal of a Manager</u>. A Manager may be removed at any time and from time to time and for any reason, and a new Manager may be elected, but only with the Consent of the Members.

**9.2    Meetings of and Voting by Members: Consent of the Members**.

9.2.1    A meeting of the Members may be called at any time by a Manager or with the Consent of the Members. Meetings of Members shall be held at Company's principal place of business or at any other place upon the Consent of the Members. Not less than ten (10) nor more than sixty (60) days before each meeting, the Person calling the meeting shall give written notice of the meeting to each Member entitled to vote at the meeting. The notice shall state the time, place, and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding not less than a majority of the Sharing Percentages constitutes a quorum. A Member may participate in a meeting and vote either in person or by written proxy signed by the Member, by the Member's duly authorized attorney-in-fact, by teleconference or via facsimile.

9.2.2    Except as otherwise provided in this Agreement, the vote of the Members holding in the aggregate at least a majority of the Sharing Percentages shall be required to approve any matter coming before the Members.

9.2.3    In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument signed with original or facsimile signature.

9.2.4    Except as otherwise provided in this Agreement, wherever the Act purports to require unanimous consent of the Members to approve or take any action, such consent shall mean, in all cases, the Consent of the Members.

**ARTICLE 10.**
**RESTRICTIONS ON INTEREST TRANSFER; PERMITTED TRANSFERS**

11

**10.1     Company's Options during Life of Member**. Except as expressly authorized herein, no Member may, during his or her lifetime, sell, donate or otherwise dispose of any of his Interest in Company, unless he (being hereinafter called the "***Tendering Member***") has first notified Company of his intent to do so, and, upon such notification. Company shall have the option, exercisable within thirty (30) days following the giving of such notice, to buy all or any part of such Interest in accordance with the provisions herein.

**10.2     Member's Option**. Should Company fail to exercise its option, or exercise its option as to only part of a Member's Interest, the Tendering Member shall so notify the other Members, and each such other Member shall have the option, exercisable within fifteen (15) days following the giving of such notice, to buy, pro rata (which is hereby defined as a fraction, the numerator of which is the Sharing Percentage owned of record by each such Member and the denominator of which is one hundred percent (100%)), all or any part of such Member's Interest not purchased by Company in accordance with its option.

**10.3     Third Party Purchaser**. During the sixty (60) day period next following the expiration of the last of the aforementioned options, such Interest of the Tendering Member which Company and/or the other Members have not elected to purchase pursuant hereto may be sold, donated or otherwise disposed of free and clear of the terms of this Agreement, but all such Interest which is not disposed of within said period shall again be subject to the terms of this Agreement.

**10.4     Purchase Price; Terms**. The purchase price for any Interest purchased pursuant to the options established in Sections 10.1 and/or 10.2 of this Agreement, and the terms of payment of such purchase price shall be established by the amount of the bona fide offer from a third party ("*Third Party*") to purchase a Member's Interest. In such event, the offer of a Third Party shall be made in writing, hand-delivered or, deposited in the U.S. Mail, addressed to each Member at his or her address as it appears at the time of the mailing on the registry of Company.

**10.5     Permitted Transfers**.  The following transfers shall be permitted ("***Permitted Transfers***") without compliance with the provisions of this Agreement (except as set forth in Section 5.5):

(a)     by any individual Member during such Member's lifetime or pursuant to a valid will or by intestate succession to any of such Member's immediate family, to a trust the sole beneficiaries of which are such Member or members of such Member's immediate family, or to a partnership, corporation or limited liability company all of the interests of which are at all times held by such Member or members of such Member's immediate family;

(b)     to any individual Member during such Member's lifetime by any of such Member's immediate family, by a trust the sole beneficiaries of which are such Member or members of such Member's immediate family, or by a partnership, corporation, or limited liability company all of the interests of which are at all times held by such Member or members of such Member's immediate family;

(c)     by any Member party to this Agreement or otherwise bound by the terms hereof that is a corporation, limited liability company, a partnership or trust, to its Members, members, partners, or beneficiaries or trustors, as the case may be, pursuant to a dividend or other distribution (including a distribution upon liquidation of such corporation or partnership); and

12

(d)      by any Member to the Company as a pledge of security for such Member's obligations to the Company, or any transfer to the Company pursuant to such pledge.

Any Person (including such Person's spouse, if any) so acquiring such Interests shall be deemed a "*Permitted Transferee*" for purposes of this Agreement.

## ARTICLE 11.
## DEATH OF SPOUSE AND DIVORCE

**Section 11.1      Operative Event**.  In the event of the divorce of a Member who is an individual and any spouse of such Member, or in the event of the death of a spouse of a Member, the Member whose spouse was divorced or has died shall have the right and option to acquire any and all interest in the Member's Interests in Company (the "*Spousal Interest*") from the divorced or deceased spouse's estate. If such Member fails to exercise such option to purchase the entire Spousal Interest, the divorced spouse or personal representative of the deceased spouse, as the case may be, shall offer to sell the remaining Spousal Interest to Company. If such Member and Company fail to exercise such option to purchase the entire Spousal Interest, the divorced spouse or personal representative of the deceased spouse, as the case may be, shall offer to sell the remaining Spousal Interest to the other Members, in proportion to their respective pro rata interest in Company (or in such other manner as they determine). Nothing contained in this Section 11.1(a) shall create any community property rights in any spouse of any Member and no such rights shall be inferred due to the provisions of this Section 11.1(a).

**Section 11.2      Exercise of Options**.  Company shall give written notice of its exercise, or desire not to exercise, the option granted in this Article XI to the Members within ninety (90) days following actual knowledge by Company of the occurrence of the event described in Section 11.1 giving rise to such option. In the event Company does not elect to purchase all of the Interests subject to such option, each Member (other than the Member whose Interests are subject to the option) shall have the option (but not the obligation) to purchase a portion of the remaining Interests equal to the number of such remaining Interests multiplied by a fraction, the numerator of which is the number of Interests owned by such Member and the denominator of which is the number of Interests owned by all Members electing to purchase such remaining shares. The Members shall exercise their options, if at all, by giving written notice to Company and all other Members within thirty (30) days after receipt of notice of Company's exercise of, or decision not to exercise, its option. In the event Company and the Members shall elect to purchase less than all of the Interests subject to an option under this Article XI, the owner and holder of such Interests may retain all of the Interests, subject to all transfer restrictions set forth in this Agreement.

**Section 13.3      Purchase Price**.  Unless otherwise agreed by Company, the selling Member and any purchasing Member, the purchase price for Company under this Article XIII shall be eighty percent (80%) of the then-appraised value of Company multiplied by a fraction, the numerator of which is the number of Interests to be purchased and the denominator of which is the total number of outstanding Interests in Company. Such purchase price shall be paid in cash. The closing of any purchase and sale under this Article shall take place at the office of Company (or such other location acceptable to the parties to such closing) within sixty (60) days following the exercise of the option to purchase all of the Interests subject to this Article XI by Company and/or the Members. Notice of such closing shall be given by Company to the selling Member, his or her spouse, if a party to the closing, and the other Members.

Exhsagdebtor 000163

## ARTICLE 12.
## RIGHT TO CONTINUE

**12.1    Right to Continue**. Company shall continue notwithstanding the incapacity of any of its Members.

## ARTICLE 13.
## LIQUIDATION AND TERMINATION

**13.1    Termination**. Subject to any restrictions herein or in agreements to which Company is a party, the Company shall be terminated after dissolution if Members holding Sharing Percentages at least equal to the amount required for Consent of the Members elect not to continue Company. In such event, the Members shall promptly liquidate and terminate the affairs of Company by discharging all debts and liabilities of Company.

**13.2    Liquidating Distributions**.    Upon liquidation, the assets shall be distributed as provided for in Section 8.2 above.

## ARTICLE 14.
## BOOKS AND RECORDS

**14.1    Accounting Records**. Adequate accounting records of all Company business shall be kept and these shall be open to inspection by any of the Members at all reasonable times. Company shall maintain its accounting records and shall report for income tax purposes on the method of accounting selected by the Members, except as may otherwise be required by the Code. Company shall prepare monthly internal financial reports for distribution to the Members. Within sixty (60) days after the end of each Fiscal Year and at the expense of Company, a Manager shall cause to be prepared a complete accounting of the affairs of Company, which may be audited by an independent accounting firm selected by a Manager, together with whatever appropriate information is required by each Member for the purpose of preparing such Member's income tax return for that year, which accounting and information shall be furnished to each Member.

## ARTICLE 15.
## TAX MATTERS

**Section 15.1    Partnership for Tax Purposes**.  The Members agree that it is their intention that Company shall be treated as a partnership for purposes of United States federal, state and local income tax laws, and further agree not to take any position or make any election, in a tax return or otherwise, inconsistent herewith.  In furtherance of the foregoing, Company will file as a partnership for United States federal income tax purposes.

**Section 15.2    Tax Matters Member**.  Copper Tree, Inc. is hereby designated as the "Tax Matters Member" of the Company for purposes of section 6231(a)(7) of the Internal Revenue Code and shall have the power to manage and control, on behalf of the Company, any administrative proceeding at the Company

14

level with the Internal Revenue Service relating to the determination of any item of Company income, gain, loss, deduction or credit for federal income tax purposes.  The Members shall take, and Tax Matters Member is specifically authorized and directed to take, whatever steps the Tax Matters Member deems necessary or desirable to perfect such designation, including filing any forms or documents with the Internal Revenue Service and taking such other action as may from time to time be required under Treasury Regulations.

Section 15.3    **Tax Returns**.  All matters relating to tax returns (including amended returns) filed by the Company, including tax audits and related matters and controversies, shall be determined and conducted by the Tax Matters Member after consultation with the Board of Managers.  The Tax Matters Member shall prepare and file or cause to be prepared and filed all tax returns (including amended returns) filed by the Company.  Copies of all federal income tax returns and all other material tax returns shall be provided to each of the Members at least thirty (30) days prior to filing.  As promptly as practicable, and in any event in sufficient time to permit timely preparation and filing by each Member of its respective state and Federal tax returns, the Company shall deliver to each Member a copy of each state and Federal tax return or tax report filed by Company.

Section 15.4    **Tax Elections**.  All elections for federal income tax purposes (and corresponding elections for state, local and foreign purposes) which are required or permitted to be made by Company, and all material decisions with respect to the calculation of its income or loss for tax purposes, shall be made in such manner as the Tax Matters Member shall determine in its sole discretion after consultation with the Board of Managers.

## ARTICLE XVI.
## LIABILITY AND INDEMNIFICATION

Section 16.1    **No Liability for Company Debts; Limited Liability**.

(a)    The debts, liabilities and obligations of Company, whether arising in contract, tort or otherwise, shall be solely the debts, liabilities and obligations of Company, and no Member or Manager shall be liable for any such debts, liabilities or obligations.

(b)    Except as otherwise expressly required by law, no Member, in its capacity as Member, shall have any liability to Company, any other Member or the creditors of Company in excess of the obligation of such Member to make the Capital Contributions in accordance with the provisions of this Agreement (to the extent that such Capital Contributions have not yet been made) and any other payments required to be made by such Members under the express provisions of this Agreement.

(c)    All Members expressly agree that there is no special or fiduciary (formal or informal) relationship between any of the Members prior to or after the execution of this Agreement.  A Member shall have no liability to any other Member except liability for (a) breach of this Agreement; (b) gross negligence; (c) willful misconduct; or (d) fraud.  Furthermore, liability for breach of this Agreement is limited to a cause of action for breach of contract and does not include any tort or extra-contractual claims.

Section 16.2    **Good Faith Actions; Exculpation**.

(a)    To the fullest extent permitted by applicable law, no Covered Person shall be liable to Company or any Member (or affiliate of a Member) as a result of or in connection with

Exhsagdebtor 000165

any actions or omissions with respect to the Company on the part of such Covered Person in his, her or its capacity as such based on any claim of breach of fiduciary duty to the extent that such Covered Person (i) conducted himself or itself in good faith and (ii) reasonably believed that his, her or its conduct was in the best interests of Company, regardless of the negligence or other result of such Covered Person.  In addition, no Covered Person shall be liable to Company or any Member (or affiliate of a Member) for actions taken by such Covered Person in his, her or its capacity as such which would be consistent with the duty of loyalty and care applicable to a member of the board of managers of an New Mexico limited liability company.

(b)     Whenever in this Agreement a Covered Person is permitted or required to make a decision (i) in its "sole discretion" or under a grant of similar authority or latitude, the Covered Person shall be entitled to consider only such interests and factors as he or it desires, including his, her or its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in its "good faith" or under another express standard, the Covered Person shall act under such express standard and shall not be subject to any other or different or inconsistent standard imposed by this Agreement or other applicable law.

(c)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to Company by any Manager, officer or other Person as to matters the Covered Person reasonably believes are within the professional or expert competence of such Manager, officer or other Person and who has been selected with reasonable care by or on behalf of Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, net income, net loss or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

## Section 16.3     Indemnifications.

(a)     To the fullest extent permitted by law, Company shall indemnify and hold harmless each Covered Person from and against any and all losses, claims, damages, liabilities, judgments, penalties (including excise and similar taxes), fines, settlements and reasonable expenses (including court costs and attorney's fees) actually incurred by such Covered Person in connection with any threatened, pending or completed claim, demand, action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative, any appeal in such a claim, demand, action, suit or proceeding and any inquiry or investigation that could lead to such a claim, demand, action, suit or proceeding (any such claim, demand, action, suit, proceeding, appeal, inquiry or investigation being hereinafter referred to as a "***Proceeding***"), in which such Covered Person was, is or is threatened to be made a named defendant or respondent as a result of or based upon his, her or its status as a Covered Person or any action or omission taken by him, her or it in his, her or its capacity as such, regardless of whether any of said losses, claims, damages, liabilities, judgments, penalties, fines, settlements or expenses resulted from the negligence or other fault of such Covered Person. Notwithstanding the foregoing, to the extent required by law no Covered Person shall be indemnified and held harmless unless a determination is made in accordance with paragraph (c) below that such Covered Person (i) conducted himself or itself in good faith, (ii) reasonably believed that his, her or its conduct was in the best interests of Company (in the case of conduct by a Covered Person in his, her or its official capacity) or at least not opposed to the best interests of Company (in all other cases) and (iii) in the case of a criminal Proceeding, had no reasonable cause to believe that his, her or its conduct was unlawful.  The termination of any Proceeding by judgment, order, settlement, conviction or on a plea of nolo contendere

16

or its equivalent shall not of itself be determinative that a Covered Person did not meet the requirements set forth in this paragraph (a).

(b)      Notwithstanding the provisions of paragraph (a) above, in the case of a Proceeding in which a Covered Person is found liable on the basis that personal benefit was improperly received by the Covered Person, whether or not the benefit resulted from an action taken in his, her or its official capacity, or is found liable to Company, the indemnification provided under such paragraph (i) shall be limited to reasonable expenses actually incurred by such Covered Person in connection with the Proceeding and (ii) shall not be made in respect of any Proceeding in which such Covered Person shall have been found liable for willful or intentional misconduct in the performance of his, her or its duty to the Company.  A Covered Person shall be deemed to have been found liable in respect of any claim, issue or matter only after the Covered Person shall have been so adjudged by a court of competent jurisdiction after exhaustion of all appeals therefrom.

(c)      A determination that the requirements for indemnification of a Covered Person pursuant to paragraph (a) above have been satisfied shall be made as follows:

(i)      if a quorum is obtained, by unanimous vote of the Board of Managers consisting of Managers who at the time of the vote are not named defendants or respondents in the Proceeding;

(ii)      if such a quorum cannot be obtained, by a majority vote of a committee of the Board of Managers, designated to act in the matter by a majority vote of all Managers, consisting solely of two or more Managers who at the time of the vote are not named defendants or respondents in the Proceeding;

(iii)      by special legal counsel selected by the Board of Managers or a committee of the Board of Managers by vote as set forth in subparagraph (i) or (ii) above, or if such quorum cannot be obtained and such committee cannot be established, by a majority vote of all Managers; or

(iv)      by the Members in a vote that excludes the Interests held by Managers who are named defendants or respondents in the Proceeding.

(d)      To the fullest extent permitted by law and without limiting any right granted to a Covered Person under this Section 16.3, Company shall indemnify and hold harmless each Covered Person from and against any and all reasonable expenses (including court costs and attorney's fees) incurred by such Covered Person in connection with a Proceeding in which the Covered Person was a named defendant or respondent because of his, her or its status as such, if such Covered Person has been wholly successful, on the merits or otherwise, in the defense of such Proceeding.

(e)      To the fullest extent permitted by law, Company shall pay or reimburse, in advance of the final disposition of a Proceeding and without the determination specified in paragraph (c) above, reasonable expenses (including court costs and attorney's fees) incurred by a Covered Person who was, is or is threatened to be made a named defendant or respondent in a Proceeding because of his, her or its status as a Covered Person, after Company receives a written affirmation by such Covered Person of his, her or its good faith belief that he or it has met the standard of conduct necessary for indemnification under the Act and a written undertaking by or on behalf of such Covered Person to repay the amount paid or reimbursed if it is ultimately determined that such Covered Person has not met such standard or if it is ultimately

17

determined that indemnification of the Covered Person against expenses incurred in connection with the Proceeding is prohibited under paragraph (a) above.  The written undertaking required by the preceding sentence must be an unlimited general obligation of the Covered Person but need not be secured.  It may be accepted without reference to financial ability to make repayment.

(f)     Notwithstanding any other provision contained in this Section 16.3, Company may pay or reimburse expenses incurred by a Covered Person in connection with his, her or its appearance as a witness or other participation in a Proceeding at a time when he or it is not a named defendant or respondent in such Proceeding.

(g)     Company may indemnify and advance expenses to Person who is or was serving at the request of Company as a Manager, officer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company or corporation, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise to the same extent that it may indemnify and advance expenses to Covered Persons under this Section 16.3.

(h)     Any indemnification or advancement of expenses under this Section 16.3 shall be satisfied solely out of the property and assets of the Company.  In no event may a Covered Person subject any Member to personal liability by reason of this Section 16.3.

(i)     The indemnification and advancement of expenses provided for in this Section 16.3 shall be in addition to any other rights to which a Covered Person may be entitled pursuant to any contract or agreement or any approval of the Board of Managers or Members or as a matter of law, whether with respect to an action of a Covered Person in his, her or its capacity as such or in any other capacity, and shall continue as to a Covered Person who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of a Covered Person.

(j)     To the fullest extent permitted by law, a Covered Person shall not be denied indemnification or advancement of expenses under this Section 16.3 solely on the grounds that such Covered Person had an interest in the transaction with respect to which the indemnification applies if the transaction is one otherwise permitted to be carried out by the terms of this Agreement.

(k)     Any indemnification of or advancement of expenses to a Covered Person in accordance with this Section 16.3 shall be reported in writing to the Members with or before the notice or waiver of notice of the next meeting of the Members or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the 12 month period immediately following the date of the indemnification or advancement.

(l)     Company may, but shall not be obligated to, purchase and maintain insurance or another arrangement on behalf of any Covered Person or any Person who is or was serving at the request of the Company as a Manager, officer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company or corporation, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise, against any liability asserted against him, her or it and incurred by him, her or it in such a capacity or arising out of his, her or its status as such, whether or not Company would have the power to indemnify him, her or it against that liability under this Section 16.3. If the insurance or other arrangement is with a Person that is not regularly engaged in the business of providing insurance coverage, the insurance or arrangement may provide for payment of a liability with respect to

18

which the Company would not have the power to indemnify the Person only if including coverage for the additional liability has been approved by the Members.  Without limiting the power of Company to procure or maintain any kind of insurance or other arrangement, the Company may, for the benefit of Persons indemnified by Company, (i) create a trust fund, (ii) establish any form of self-insurance, (iii) secure its indemnity obligation by grant of a security interest or other lien on the assets of Company or (iv) establish a letter of credit, guaranty, or surety arrangement.  The insurance or other arrangement may be procured, maintained, or established within Company or with any insurer or other person deemed appropriate by the Board of Managers regardless of whether all or part of the stock or other securities of the insurer or other person are owned in whole or part by Company.  In the absence of fraud, the judgment of the Board of Managers as to the terms and conditions of the insurance or other arrangement and the identity of the insurer or other Person participating in an arrangement shall be conclusive and the insurance or arrangement shall not be voidable and shall not subject the  Managers approving the insurance or arrangement to liability, on any ground, regardless of whether the  Managers participating in the approval are beneficiaries of the insurance or arrangement.

(m)     The agreements contained in this Section 16.3 shall survive any dissolution or termination of Company.

## ARTICLE 17.
## MISCELLANEOUS

**17.1     Binding Provisions**. The covenants and agreements contained in this Agreement shall be binding upon the heirs, personal representatives, successors and assigns of the respective parties to this Agreement.

**17.2     Separability of Provisions**. Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions hereof are determined to be invalid and contrary to any existing or future law, such invalidity shall not impede the operation of or affect those portions of this Agreement that are valid.

**17.3     Entire Agreement; Amendment**. This Agreement constitutes the entire understanding and agreement among the parties with respect to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements and understandings, inducements, or conditions, express or implied, oral or written, except as contained in this Agreement. This Agreement may not be amended or modified except with the unanimous consent of the Members.

**17.4     Applicable Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of New Mexico.

**17.5     Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which when taken together, constitute one and the same instrument, binding on the Members. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

Exhsagdebtor 000169

**COUNTERPART SIGNATURE PAGE TO**
**COMPANY AGREEMENT OF**
**GREEN COPPER HOLDINGS, LLC**

**IN WITNESS WHEREOF**, the Members have signed this Company Agreement, in multiple originals, as of the date first set forth hereinabove.

**MEMBERS**:

**COPPER TREE, INC.**

By: _____*Cynthia Blanchard*_____
Name:  Cynthia Blanchard
Title:  President

Date of Signature:  February 21, 2023

20

Exhsagdebtor 000170

## <u>SCHEDULE A</u>

**Members' Addresses**

The addresses of each Member are as follows:

Copper Tree, Inc.
c/o Cynthia Blanchard
414 SE Washington, Suite 205
Bartlesville, Oklahoma  74006

21

**SCHEDULE B**

**Capital Contributions as of the Effective Date**

Copper Tree, Inc.                $ 100.00

22

**SCHEDULE C**

**Member's Sharing Percentages**

Copper Tree, Inc.                    100%

Exhsagdebtor 000173

# Signature Certificate

Reference number: YZDQA-ZQYXU-JVEK3-QQJRW

| Signer | Timestamp | Signature |
|---|---|---|
| **Cynthia Blanchard**<br>Email: cynthia@thepricetower.com | | |

| | | |
|---|---|---|
| Sent: | 24 Feb 2023 21:38:40 UTC | |
| Viewed: | 24 Feb 2023 21:39:03 UTC | |
| Signed: | 24 Feb 2023 21:39:18 UTC | |

*Cynthia Blanchard*

**Recipient Verification:**

✔Email verified      24 Feb 2023 21:39:03 UTC

IP address: 152.37.150.151
Location: Bartlesville, United States

Document completed by all parties on:
24 Feb 2023 21:39:18 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 40,000+ companies worldwide.



Exhsagdebtor 000174



*From the desk of:*
*Craig M. Oberweger, Esq.*
*Direct tele: 561.859.2561*

January 23, 2024

PAUL AUBERT, Esq.
403 Corporate Woods Dr., Suite 4
Magnolia, TX 77354
ALT/Viaemail:paul@herasoft.com;
paul@anthemvault.com
Cert Mail 7022 2410 0000 5491 4573

***Re:*** COPPER TREE, INC., A Delaware corporation, and PAUL D. AUBERT, ESQ., ANTHEM HOLDING COROPORATION, A DELAWARE COMPANY, A/K/A HERASOFT DEVELOPMENT, and Unknown Defendants 1-5

**NOTICE AND DEMAND FOR INSURANCE INFORMATION PURSUANT TO FLORIDA STATUTES 627.4137**

Dear Sirs:

Please be advised that the undersigned has been retained by MYSTIC LAW, P.A and others. as counsel, to investigate and take legal action, if warranted, against COPPER TREE, INC., A Delaware corporation, and PAUL D. AUBERT, ESQ., ANTHEM HOLDING CORPORATION, A DELAWARE COMPANY, A/K/A HERASOFT DEVELOPMENT, and Unknown Defendants 1-5, for Fraud, selective and self-serving actions, and possible breaches of fiduciary duties.

Pursuant to Florida Statutes §627.4137, demand is hereby made that within thirty (30) days you forward to the undersigned a statement, under oath, of a corporate officer or your claims manager or superintendent, setting forth the following information with regard to each known policy of insurance, including excess or umbrella insurance in place covering you during the period of January 1, 2022, through the present date or which may otherwise provide liability insurance coverage for our client's claims:

a) The name of the insurer;
b) The name of each insured;
c) The limits of liability coverage;
d) A statement of any policy or coverage defense which any such insurer reasonably believes is available to such insurer at the time of filing such statement;
e) A copy of the policy;
f) Coverage documentation requested includes primary, secondary, and all umbrella and or excess coverage.

*MYSTIC et. al. v. COPPER TREE, INC, et. al.*
Notice & Insurance Demand
Page 2

In addition to the preceding, we hereby request that each of you disclose the name and coverage of each known insurer, including any excess or umbrella insurer, and forward this request for information to each and every insurer (including any excess or umbrella insurer) requesting each and every entity to supply the requested information directly to this office within thirty (30) days.

Please keep in mind that this request is being made pursuant to Florida Statute and that it shall be your responsibility to comply with the request within the thirty (30) day period. You will further have the responsibility to update the statement provided immediately upon the discovery of any fact calling for an amendment.

Should you have any questions or comments regarding this request, please feel free to contact the undersigned. Please contact this office to coordinate a mutually convenient date and time should any inspection need to take place.

**PLEASE GOVERN YOURSELVES ACCORDINGLY.**

Respectfully,

/s/

Craig M. Oberweger, Esq.
PALM LAW PARTNERS, P.A.

lb/CMO
cc: Client

2101 NW Corporate Blvd. Suite 410, Boca Raton FL 33431   Tel: 800.520.2052 Fax: 561.405.3158



March 22, 2023

Ms Sara Thompson
501 S Johnstone
Bartleville, OK  74003

RE:   510 Dewey Avenue (Price Tower)
        Bartlesville, OK  74003

For Appraisal Services Rendered            $12,500.00
              Less Retainer                    2,500.00

              BALANCE DUE      $10,000.00

Thank you for your confidence in our work.

The Gorman Group, Ltd.

Robert C. Gorman, MAI
President

**Executive Committee of the Board of Trustees of the Price Tower Arts Center**

**Acting as the Board of the Inn at Price Tower**

**Meeting Minutes of the Board of Trustees**

**March 07, 2023, at 8:30 am**

**In Person**

Trustees Present in Person: Brad Doenges, Charlie Daniels, Mark Haskell
Staff Present: None

1) Call to Order – Brad Doenges called the meeting to order at 8:45 AM; a Quorum was established.
2) The purpose of this meeting is to consider the transaction that was submitted to and approved unanimously by the Members of the Price Tower at a Special Meeting of the Members held on February 28, 2023, and approved unanimously by the Board of Trustees of the Price Tower Arts Center.
3) After some discussion, Charlie Daniels made a motion to approve the transfer of the business and assets to Copper Tree, Inc. and Green Copper Holdings, LLC, and authorizing Brad Doenges and Mark Haskell to execute and all documents useful and necessary to complete this transition. Second by Brad Doenges. All voted yes.
4) Meeting was adjourned by Brad at 8:45 am.

# JOINT VENTURE AGREEMENT

This **JOINT VENTURE AGREEMENT** ("Agreement") is made and entered into this 9 day of June , 2023 (the "Effective Date"), by and between **FISCHLER ENTERPRISES, LLC**, a Nevada limited liability company, whose address is 3773 Howard Hughes Parkway, Ste. 500S, Las Vegas, Nevada 89169 ("Fischler"), and **INN AT PRICE TOWER, INC.**, an Oklahoma corporation whose address is 510 S. Dewey Avenue, Bartlesville, OK 74003 ("IPT"). Fischler and IPT are collectively referred to as the "Participants").

## WITNESSETH:

**WHEREAS**, Green Copper Holdings, LLC, a New Mexico limited liability company ("GCH"), owns the property located at 510 S. Dewey Avenue, Bartlesville, OK 74003, known commonly as the Price Tower (the "Price Tower"), which includes a restaurant with kitchen located on the 15th and 16th floors, to be jointly operated by the Participants as a restaurant and bar tentatively named "Wright Steak," another restaurant located on the 1st floor named "Love 66 Bistro," another bar located on the 1st floor in the patio area tentatively named "Tower Bar," and any other area in the Price Tower covered by IPT's food, beverage, and liquor license(s) (the "License(s)" and the "Licensed Area"). Wright Steak, Love 66 Bistro, Tower Bar, and any other Licensed Area are collectively referred to as the "Establishments" and the facilities they occupy are collectively referred to as the "Facilities."

**WHEREAS**, GCH is a wholly-owned subsidiary of Copper Tree, Inc., a Delaware corporation ("Copper Tree"), formed as a holding corporation to hold all of the assets and operations associated with Price Tower, including CT Operations, LLC, an Oklahoma limited liability company and wholly-owned subsidiary of Copper Tree ("CTO"), formed to handle the administrative aspects of the Price Tower, and IPT, a wholly-owned subsidiary of CTO formed to operate the businesses within the Price Tower on behalf of Copper Tree.

**WHEREAS**, IPT has full right and title, as a wholly owned subsidiary of CTO and affiliate of GCH, to occupy and use the Facilities and to operate the Establishments as contemplated herein.

**WHEREAS**, the Participants seek to jointly operate the Establishments as restaurants and bars at the Facilities, as more fully described in **Exhibit A** attached hereto, with IPT providing the Facilities along with certain other items and administrative services set forth herein, and Fischler providing management and supervision of the Establishments' restaurant and bar operations along with certain other services set forth herein.

**WHEREAS**, the Participants desire to enter into this Agreement, which will be beneficial to both Participants, upon the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Participants hereto agree to the following terms and conditions:

P          N          U

## ARTICLE I
## THE JOINT VENTURE

**1.01    Scope of Joint Venture**

<u>General</u>.  The Participants hereby agree to work together to own, manage, and operate exclusively the Establishments.  Wright Steak and Love 66 Bistro shall initially operate according to the schedule set forth on **Exhibit B**, attached hereto, subject to change upon agreement of the Participants.  Each Establishment and the corresponding part of the Facilities will be able to be terminated separately if both parties agree without terminating the entire Joint Venture.

(a)    <u>Obligations of IPT</u>.  During the Term of this Agreement, IPT agrees to provide and/or pay for the following for the operation of the Establishments:

    (i)    Access, occupancy, and use of the Facilities, including but not limited too the use of the elevator at the Price Tower for patrons' use to obtain access to the Establishments equally and parking.

    (ii)    All commercial property insurance for the Facilities and commercial liability insurance for operation of the Establishments.

    (iii)    The License(s), as required by the State of Oklahoma, County of Washington, or City of Bartlesville.

    (iv)    All utilities necessary to operate the Establishments, which amount will be calculated based on the square footage of the Facilities and reimbursed monthly (as more fully set forth in Section 1.02 below).

    (v)    Administrative services, which will include: (A) acting as employer for all of the employees employed to operate the Establishments, including payroll, insurance, employer taxes and other employer expenses, which costs and expenses will be taken out of the IPT restaurants account on a consistent timeline, (B) providing a platform for point-of-service transactions at the Establishments, like Toast or another vendor suitable for such use, (C) providing separate access to such point-of-service transactions platform for Fischler, (D) providing bank account information, including bank account balances, withdrawals, payments, etc., to Fischler for the specific Establishments and their activities upon request, and (E) a facility manager/executive director (initially to be Donna Keffer) to be available for any building and facilities issues that arise during the course of daily business.

    (vi)    Marketing and advertising for the Establishments will be provided on a joint and cooperative basis between the Participants, with all costs and expenses therefor shared 50/50.

        a.    During the Term of this Agreement, IPT will provide full use of the names "Wright Steak" and "Love 66 Bistro" in connection with the corresponding Establishments, including any required DBA and trademark filings. Participants understand and agree that the name Wright Steak will be officially trademarked by the Frank Lloyd Wright Foundation but will be licensed in perpetuity without fees to IPT and sub-licensed to Wright Steak who will be the licensee of the right to use the trademark. `Love 66 Bistro will be trademarked and owned 50/50 by both participants.  If the parties decide to sell the Love 66 Bistro trademark, such sale price will be agreed upon by both

parties for a negotiated price.  These trademarks will be royalty free in perpetuity for both Wright Steak and Love 66 Bistro at Price Tower as long as the applicable Establishment is operating.  These trademarks will also be royalty free in perpetuity with respect to all merchandise created and sold through the Establishments, whether on-site or through e-commerce.  If this Agreement terminates or the parties otherwise part ways with respect to the Establishments and their business operations, either party may use the foregoing trademarks, however, both parties are entitled to a 50/50 net revenue split from any use outside of the Price tower.  The cost of trademarking the logos for Love 66 Bistro will be shared equally by both parties.

(vii)   All initial equipment repairs and continued standard maintenance of equipment and building upkeep.

(viii)  In any month that after all associated costs of doing business result in a negative cash flow for the month, IPT and Fischler are equally responsible for 50% each of this shortfall.  Reimbursement for these costs will be provided equally for both participants equally out of future net profits.

(c)  <u>Obligations of Fischler</u>.  During the Term of this Agreement, Fischler agrees to provide and/or pay for the following for the operation of the Establishments:

(i)     All initial costs necessary to launch the Establishments (except those listed above for IPT), which costs shall include among other things, all menus, tables, chairs, bar stools, linens, lighting, glasses, silverware, kitchen appliances and cookware (that are not already available in the Facilities' restaurant, kitchen and storage areas), uniforms for staff (if required), decorations, signage, staff, staff training, initial food and beverage inventory,

(ii)    Hiring, firing and managing the head chef and all kitchen and restaurant staff necessary to operate the Establishments as full-service restaurants and bars, as the case may be, including but not limited to servers, hosts, dishwashers, and daily and nightly cleaning staff;

(iii)   Regular and ongoing cleaning of the Facilities, as necessary to comply with prevailing industry standards and all applicable codes and laws;

(iv)    Providing, installing, and operating all audio/visual equipment for music, entertainment and atmosphere;

(v)     Marketing and advertising will be provided on a cooperative basis between the Participants, with all costs and expenses therefor shared 50/50, it being understood that Fischler's experience in restaurant marketing and advertising is a valuable part of this Agreement;

(vi)    All restaurant and bar design for the Establishments;

(vii)   Establishing and managing relationships with food vendors, beverage and soft drink vendors and alcohol distributors, and ordering and payment of all food, beverage and alcohol;

(viii)  Design and furnishing of food and beverage storage, including wine storage and alcoholic beverage display in the bar areas;

(ix)    Otherwise preparing the Establishments for restaurant and bar operations; and

(x)     Sole artistic design and decision-making related to the Establishments within the

constraints of the existing Conservancy Easement.

(d)   <u>Access to Records; Agents</u>.  The Participants agree to full transparency regarding all banking transactions related to the Establishments, including all credit card billing and all cash transactions related to the Establishments with monthly profit or loss reports, which is further explained in Section 1.02 herein.  Neither Participant is an employee of the other Participant, and this Agreement does not constitute a hiring by either Participant. It is expressly understood that the Participants owe each other a contractual duty of good faith and fair dealing and as otherwise described by the terms of this Agreement.

(e)   <u>Special Events</u>. Participation in any special events not covered by this Agreement (e.g., concerts, festivals, etc.) shall be agreed to by both parties and will otherwise be subject to the terms of this Agreement.

**1.02   Profit Sharing, Costs and Expenses**

(a)   <u>General</u>.  Generally, the Participants will share equally (i.e., 50/50) in all costs and expenses incurred and any Net Profit (defined below) derived from the operation of the Establishments in any given calendar month.  "Net Profit" shall mean (A) the total revenue derived from all sales of food, beverages and alcoholic beverages at the Establishments and any other merchandising or other retail sales made at the Establishments minus (B) all costs and expenses incurred to derive such revenue during the period of calculation for such total revenue, which shall include all food and beverage expenses, employee expenses, utilities (as calculated below), marketing and advertising expenses and other direct expenses of operating the Establishments.  A spreadsheet report similar in form and content to **Exhibit C**, attached hereto, shall be used for calculating and reporting Net Profit from month-to-month and as otherwise appropriate to effect this Agreement.  Exhibit C may be amended or replaced from time to time upon written agreement of the Participants, and such amended or replacement worksheet shall be attached hereto as a new Exhibit C.  IPT shall be entitled to draw down the Establishments' bank accounts, as follows: (i) for employment expenses, bi-monthly in connection with its payment of payroll for each Establishment's employees; and (ii) for utilities and insurance, once per month on the 1st of each calendar month for the payment of each Establishment's proportion of utilities.  For utilities, IPT will audit the monthly utility costs after both restaurants are up and running at full capacity to a prior months utility costs before the opening of either restaurant.  The percentage increase will be applied to the monthly operational costs of both restaurants. All other costs and expenses incurred by IPT and Fischler, which may be reimbursed under this Agreement, shall be reimbursed before distributing any Net Profit according to procedures established by the Participants from time to time. Notwithstanding the foregoing, costs and expenses expressly assigned to one Participant or the other without reimbursement shall not be eligible for reimbursement.

(b)   <u>Startup Period</u>.  Notwithstanding anything in this Agreement to the contrary, during the time period prior to opening each Establishment to the public (the "Startup Period"), each Participant shall be solely responsible for and bear all costs assigned to them under Sec-

P        N        U

tion 1.01(b) and (c), without recourse to the Joint Venture or the other Participant and without reimbursement or payment out of any Net Profit.  All costs and expenses incurred by the Participants during the Startup Period shall constitute capital investments in the Joint Venture, and neither Participant will have any right at any time to a return of such capital investments, but both Participants may recoup their startup costs from their earned net profits. Revenues during the start up period (i.e.. Bar revenue, concession are to be counted in the first months revenue.

(c)    <u>Calculation and Payment</u>.  On or before the 15th of each calendar month, IPT shall create a Net Profit report and shall provide such report to Fischler, along with the distribution of any Net Profits from the prior calendar month to the Participants based on subsection (a) above (or subsection (b) above during the Startup Period). IPT shall be responsible for all accounting and distributions of Net Profits. Each Participant is liable for their respective taxes due on the allocated tax attributes related to each of their respective profits or losses of the Establishments. In the event the Establishments are liable for any sales or other taxes, the expenses associated therewith will be deducted proportionately from each Participant's share of the Net Profits. Upon the conclusion of each fiscal quarter (January 1, April 1, July 1, and October 1), IPT shall reconcile all Net Profit calculations for such fiscal quarter and pay any shortage or recoup any overage with respect thereto. Such reconciliations shall be calculated and reported to the Participants within 30 days, or within 90 days respecting fiscal year end calculations. At both party's discretion, any shortage or overage resulting from any reconciliation may be applied to or offset against future monthly Net Profit calculations and distributions.

(d)    <u>Losses</u>.  Each Participant shall bear equally in any shortfalls sustained by the Establishments with the understanding that if the amount of revenue is not sufficient to cover all defined expenses, the loss amount will be covered equally by each Participant. In such event, except during the Startup Period, both Participants shall be entitled to recoup such payments out of their share of future Net Profits before any distribution of future Net Profits is made.

(e)    <u>Disputes</u>.  If either Participant disagrees with any calculation of the Net Profit report or has a dispute about any financial transaction the Participant is involved in, it shall notify the other Participant in writing within thirty (30) days after receipt or knowledge of such transaction setting forth with specificity the disputed amount and the nature of the dispute. If the other Participant has no challenge to this dispute, the adjustment or correction of such amount will be made and any adjusting payments to the challenging Participant will be made within five (5) business days.  If the other Participant does not concur, it must provide written notice of such disagreement within five (5) business days of the receipt of the original dispute.  Any such dispute will then be subject to the mediation provisions set forth in Section 7.11 herein. The Participants acknowledge and agree that any such dispute shall have no detrimental impact on the ongoing business relationship between the Participants, including ongoing payments pending the resolution of the dispute.

(f)    <u>Access to Records</u>.  The Participants shall work together in the best interest of this Agreement. The Participants hereto covenant and agree, each with the other, that it, respectively,

will grant access to the other at reasonable hours and under reasonable conditions to any books and records as may be required by such other Participant for such Participant to comply with or satisfy the information or documentary requirements of taxing authorities, or other governmental agencies or other reasonable business requirements, only in regard to this Agreement.

(g)  <u>Performance Award</u>. Provided Fischler complies with the terms and conditions of this Agreement, including without limitation at the time of any performance award under this Section 1.02(g), IPT shall cause Copper Tree to award equity in Copper Tree to Fischler, as follows:

  (i)   If the Establishments together generate, on average, $1,000 in daily profit over a 6-month period, then for each such consecutive 6-month period Fischler shall be entitled to receive stock equal to 0.25% of all issued and outstanding equity in Copper Tree.

  (ii)  The total amount of stock awarded by Copper Tree to Fischler shall not exceed 5% of all issued and outstanding equity in Copper Tree during the initial ten (10) year term of this Agreement.

(h)  <u>Complimentary Food & Beverage Allowance</u>. Each Participant shall be entitled to a $500 monthly allowance to purchase food and beverages at any Establishment. without incurring additional charges, costs, or expenses. Such allowance may be used by any person designated from time to time by the Participant, which persons shall initially be Anthony Fischler and Chris Berkman, with respect to Fischler, and Anthem Blanchard and Cynthia Blanchard, with respect to IPT.

Any monetary grants related to establishment properties will be split equally to the participants.

## 1.03   Confidentiality

The Participants agree to hold in strictest confidence the existence, terms and conditions of this Agreement. The Participants hereto further agree to hold in strictest confidence all data and information obtained from such other Participant, whether pertaining to financial condition, results or methods of operations, or otherwise, except such information which is or hereafter becomes published or a matter of public record by action of the Participant from which the information is obtained or is or becomes required by law to be publicly disclosed. No Participant hereto shall use any such information for any purpose except in furtherance of this Agreement.  Each Participant may provide such information to its own employees, representatives, officers, and directors on a need-to-know basis, with the understanding that any such person shall be subject to the same obligations of confidentiality as set forth herein.

## 1.04   Cooperation and Best Efforts

Subject to the terms and conditions herein provided, the Participants hereto shall use their respective best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things

Exhsagdebtor 000184

reasonably necessary, proper or advisable to satisfy the conditions of the Participants to their respective obligations hereunder to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement and to cooperate with each other in connection with the foregoing, including, without limitation:

(a)     using best efforts to obtain all necessary waivers, consents, and approvals from other parties to permits, licenses, consents, leases and other contracts;

(b)     using best efforts to obtain all necessary consents, approvals, and authorizations as are required to be obtained under any federal, state, or local law or regulation (including any applicable laws and regulations pertaining to notices to creditors or employees);

(c)     to defend all lawsuits or other legal proceedings related to this Agreement or the consummation of the transactions contemplated hereby;

(d)     to lift or rescind any injunction or restraining order or other order adversely affecting the ability of the Participants to consummate the transactions contemplated hereby; and

(e)     to affect all necessary registrations and filings and submissions of information required or requested by governmental authorities.

## 1.05    Liabilities of the Joint Venture

Except as otherwise provided herein, the liabilities arising out of this Joint Venture shall be borne by the Joint Venture and, as between the parties hereto, each of the Participants shall be severally liable for and hereby agrees to discharge 50% of all debts, obligations and other liabilities incurred or assumed in accordance with the terms of this Agreement.

## ARTICLE II□
## GOVERNANCE AND DECISION-MAKING

## 2.01    Governance and Decision-Making

The business and affairs of the Joint Venture shall be conducted and managed by the Participants in accordance with this Agreement and the laws of Oklahoma Except as expressly provided elsewhere in this Agreement, all decisions respecting the management, operation and control of the business and affairs of the Joint Venture and all determinations made in accordance with this Agreement shall be made by the affirmative vote or consent of all Participants. The Participants shall devote such time and attention as the Participants deem necessary to the conduct and management of the business and affairs of the Joint Venture.

## ARTICLE III □

## REPRESENTATIONS AND WARRANTIES

**3.01    Representations and Warranties**

Each Participant represents and warrants to the other Participant as follows:

(a)    Participant has all necessary right, power and authority and has taken all necessary actions to enter into and perform this Agreement and to grant the rights herein;

(b)    The execution and performance of this Agreement by Participant will not violate or conflict with the rights of any third party or with any service, employment, confidentiality, consulting or other agreement to which such Participant or its employees is a party or by which such Participant or its employees may be bound;

(c)    Each Participant and its employees will comply with all local, state, federal and international laws, ordinances, regulations and orders with respect to its performance pursuant to this Agreement; and

(d)    Each Participant represents and warrants that all services it provides under this Agreement will be of high quality and will be performed in a timely, workmanlike manner and with diligence and skill.

## ARTICLE IV □
## TERMINATION AND NOTICE

**4.01    Term and Termination**

(a)    <u>Term</u>.  Subject to Sections 4.01(b) and (c) below, this Agreement shall have an initial term of ten (10) years, and shall automatically renew for succeeding two-year terms if written notice to terminate is not provided within ninety (90) days of the end of the then-existing term.

(b)    <u>Automatic Termination</u>.  With respect to each Establishment, this Agreement shall automatically terminate within thirty (30) days after such Establishment suffers losses and does not post a Net Profit for four consecutive months or for nine of the last twelve calendar months, unless both Participants agree in writing to waive such termination.

(c)    <u>Unilateral Termination</u>. This Agreement may be terminated by either Participant in the event that the other Participant breaches this Agreement; provided, that, the non-breaching Participant provided written notice of such breach, and the breaching Participant fails to cure such breach within ten (10) business days following receipt of such written notice.

(d)    <u>Sale of Building</u>. If GCH elects to sell the Price Tower to a third-party purchaser (the "Price Tower Buyer"), then:

     (i)     IPT shall offer to sell its rights, titles, and interests in and under this Agreement (the "IPT Interest"), including without limitation the businesses associated with the Establishments, to the Price Tower Buyer on mutually agreeable terms and conditions.

     (ii)    If IPT does not sell the IPT Interest to the Price Tower Buyer according to clause (i) above, then IPT and Fischler shall enter into good faith negotiations with each other either (A) for IPT to sell the IPT Interest to Fischler on mutually agreeable terms and conditions or (B) for Fischler to sell its rights, titles, and interests in and under this Agreement (the "Fischler Interest"), including without limitation the businesses associated with the Establishments, to IPT on mutually agreeable terms and conditions.

     (iii)   If IPT and Fischler do not sell their respective interests to each other according to clause (ii) above, then IPT and Fischler shall offer to sell their combined interests (the IPT interest and the Fischler Interest, respectively), to the Price Tower Buyer or other third-party purchaser on mutually agreeable terms and conditions.

     (iv)   If IPT and Fischler do not sell their combined interests according to clause (iii) above, then all rights, duties, and obligations of IPT and Fischler under this Section 4.01(d) shall expire, terminate, and be without further force or effect.

Notwithstanding anything to the contrary in this Section 4.01(d), the foregoing rights, duties, and obligations are intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person, including but not limited to GCH and the Price Tower Buyer.

(e)    <u>Effect of Termination</u>.  Upon termination of this Agreement, all property owned by each Participant prior to this Agreement will be retained by such Participant, and all property acquired by a Participant for an Establishment, whether before or after the Effective Date, will be owned by the supplying Participant. Any property in the possession of the other Participant at the time this Agreement terminates shall be returned or made available to the supplying Participant in a reasonable time frame, at the supplying Participant's cost. Any payments due to either Participant pursuant to Section 1.02 above shall be paid within thirty (30) days of such termination.

## 4.02   Notices

All notices, consents, requests, instructions, approvals and other communications provided for herein shall be validly and sufficiently given, made or served, if in writing properly addressed to the other Participant hereto at the addresses set forth hereinabove (or at such other addresses as any Participant shall from time to time designate to the others in writing) and given, made or served (i) by depositing the same in the United States mail, addressed to the Participant to be notified, postage prepaid, and registered or certified with return receipt requested or (ii) by delivering the same in person to such Participant or (iii) by recognized overnight carrier with charges prepaid, addressed to the Participant to be notified or (iv) by e-mail or facsimile transmittal service. Notice given in accordance with subclause (i) above shall be effective three (3) business days after mailed

P     N     U

to the following addresses. Notice given in accordance with subclauses (ii), (iii) and (iv) above shall be effective upon receipt confirmed in writing at the address of the addressee. The following addresses and e-mail addresses shall be utilized for the above:

Notice to IPT:  510 E. Dewey Avenue
Bartlesville, OK 74003
Attention:  Cynthia Blanchard, Manager
E-mail:  cynthia@thepricetower.com

Notice to Fischler:  3773 Howard Hughes Parkway, Ste. 500S
Las Vegas, Nevada 89169
Attention:  Anthony Fischler, Manager
Email:  anthony.fischler@gmail.com

### ARTICLE V □
### INDEMNIFICATION

## 5.01    Effect of Representations and Warranties

The Participants hereto are executing and carrying out the provisions of this Agreement in reliance on the truth and accuracy of the representations, warranties, covenants and agreements contained in this Agreement. Any investigation which any Participant hereto might have made or any other representations, warranties, agreements, promises or information, written or oral, made by any other Participant hereto or by any other person shall not be deemed a waiver of any breach or inaccuracy of any representations, warranty, covenant or agreement herein contained. A represen-tation or statement made herein to the knowledge of any corporate party refers to the knowledge or belief of that corporation's members, directors, officers, and attorneys, regardless of whether the knowledge of any such person was obtained outside of the course and scope of his corporate employment or duties, and regardless of whether any such person's interests are adverse to such entity in respect of the matters to which his knowledge is attributed or may have been obtained.

## 5.02    Indemnification

Each Participant and its successors and assigns, agrees to and shall defend and protect, hold harm-less and indemnify the other Participant, its successors and assigns, and its attorneys, from and against any and all debts, liabilities, obligations, or claims of any nature, absolute or contingent, together with all expenses and legal fees, resulting from (i) any breach by the indemnifying Par-ticipant of any representation, warranty or obligation of this Agreement, (ii) any negligent action or omission by the indemnifying Participant, or (iii) any third-party action against the indemnify-ing Participant not involving this Agreement. This indemnity shall be effective from and after the Effective Date. Each Participant, its successors and assigns, shall notify the other Participant of any such liability, asserted liability, breach of warranty, untruth or inaccuracy of representation, or any claim thereof, with reasonable promptness and the other Participant or its heirs, successors

and assigns shall have, at their election, the right to compromise or defend any such matter involving any such asserted liability through counsel of their own choosing, at their expense. If any Participant undertakes to compromise or defend any such liability, it shall notify the other Participant so to be indemnified promptly in writing of their intent to do so and the entity so indemnified agrees to cooperate with any such indemnitor and its counsel in the compromising of or the defending against any such liabilities.

<div align="center">

**ARTICLE VI□**
**INTELLECTUAL PROPERTY**

</div>

## 6.01    Definitions

For purposes of this Article VI only, the following terms have the following meanings:

"Background Intellectual Property" means, with respect to either Participant, means Intellectual Property belonging to or controlled by a Participant that was made, invented, developed, created, conceived, reduced to practice, or has a filing date before the Effective Date, which is necessary to permit the Participants to perform their obligations under this Agreement.

"Developed Intellectual Property" means all Intellectual Property made, invented, developed, created, conceived, or reduced to practice either before or after the Effective Date (a) as a result of work conducted pursuant to this Agreement, or by a party in its evaluation, use, or implementation of the other party's Background Intellectual Property, in each case, including all rights in any patents or patent applications, copyrights, trade secrets, and other Intellectual Property rights relating thereto. For the avoidance of doubt, Developed Intellectual Property includes, but it is not limited to, the name, menu, plating, signature drinks, and other items developed for the Establishments.

"Intellectual Property" means, with respect to either or both Participants, (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, trade names, and corporate names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (d) all mask works and all applications, registrations, and renewals in connection therewith, (e) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (f) all computer software (including data and related documentation), (g) all other proprietary rights, and (h) all copies and tangible embodiments thereof (in whatever form or medium).

## 6.02    Cross-License of Background Intellectual Property

<div align="center">

Joint Venture Agreement
Page 11 of 16

</div>

(a)     <u>License by IPT for Fischler</u>. Subject to the terms and conditions of this Agreement, IPT, on behalf of itself and its affiliates, hereby grants to Fischler during the Term a non-exclusive, royalty-free, non-transferable and non-sublicensable license under IPT's Background Intellectual Property (i) to create and use the Developed Intellectual Property, and (ii) as reasonably necessary or useful for Fischler to perform its duties and obligations under this Agreement.

(b)     <u>License by Fischler for IPT</u>. Subject to the terms and conditions of this Agreement, Fischler, on behalf of itself and its affiliates, hereby grants to IPT during the Term a non-exclusive, royalty-free, non-transferable and non-sublicensable license under Fischler's Background Intellectual Property (i) to create and use the Developed Intellectual Property, and (ii) as reasonably necessary or useful for IPT to perform its duties and obligations under this Agreement.

**6.03    Ownership of Developed Intellectual Property; Cross-License**

(a)     <u>Ownership of Developed Intellectual Property</u>. As between the parties, each party shall (i) solely own all right, title, and interest in and to Developed Intellectual Property invented, created, or otherwise originated solely by its representatives, or any of its affiliates' representatives, and (ii) jointly own all right, title, and interest in and to Developed Intellectual Property invented, created, or otherwise originated jointly by its and the other party's representatives, or any of their respective affiliates' representatives, and in each case the inventorship, creation, and other origination of the relevant Developed Intellectual Property shall be determined by U.S. patent and other applicable intellectual property law, as the case may be.

(b)     <u>Cross-License of Developed Intellectual Property</u>. Subject to the terms and conditions of this Agreement, each Participant, on behalf of itself and its Affiliates, hereby grants to the other Participant during the Term a non-exclusive, royalty-free, non-transferable and non-sublicensable license under the Developed Intellectual Property solely owned by the first Participant, or jointly owned by both Participants, (i) to create and use the Developed Intellectual Property in accordance with this Agreement, and (ii) as reasonably necessary or useful for the other Participant to perform its duties and obligations under this Agreement.

**6.04    Option to Buy Intellectual Property**

If for any reason or circumstance IPT or a third-party purchaser buys Fischler's Interest or Fischler is no longer a Participant under this Agreement, then IPT or such third-party purchaser may offer to buy, and Fischler shall sell, its rights, titles, and interests in and to all Developed Intellectual Property. In addition to selling such Developed Intellectual Property, Fischler shall grant a fully paid up, non-exclusive, royalty-free, non-transferable and non-sublicensable license under Fischler's Background Intellectual Property as reasonably necessary or useful for the buyer to use the Developed Intellectual Property and to otherwise operate the Establishments. All terms and conditions for the sale and license contemplated by this Section 6.04 shall be reasonable un-

P          N          U

der the circumstances, consistent with the value that would be paid by a willing buyer to an unaf-filiated willing seller in a transaction not involving distress or necessity of either party, deter-mined in good faith.

## ARTICLE VII □
## MISCELLANEOUS PROVISIONS

### 7.01    Entire Agreement

This Agreement contains the entire and only agreement and understanding between the Partici-pants hereto in respect to the transactions contemplated hereby and supersedes all prior agree-ments, arrangements, and understandings relating to the subject matter hereof. No Participant shall be liable or bound to the other Participant hereto in any manner by any warranties, representations, promises or conditions in connection herewith except as specifically set forth or incorporated herein. The Participants hereto further agree that no representation was made by or on behalf of others which is not contained in this Agreement and that in entering into this Agreement none relied upon any representation not herein contained. This Agreement shall not be binding until each Participant hereto has executed the same, and a fully executed copy (which may be by way of counterparts) of this Agreement has been delivered to each of the Participants hereto.

### 7.02    Amendments, Extensions and Waiver.

This Agreement may not be changed, amended, altered, or modified except in writing executed by all the Participants hereto. The Participants hereto may, by written agreement executed subsequent hereto:

(a)    extend the time, terms or manner of effecting the performances of any obligations or other acts of the Participants hereto;

(b)    waive any inaccuracies in the warranties, representations, covenants or other undertakings contained in this Agreement; or

(c)    waive compliance with or modify any of the warranties, representations, covenants or other undertakings or obligations contained in this Agreement and waive or modify performance of any of the Participants hereto. Any agreement on the part of a Participant for any such extension, modification, amendment or waiver shall be validly and sufficiently authorized for the purpose of this Agreement if given in writing and appropriately signed and delivered to the other Participant hereto and signed by the Participant against whom enforcement thereof is sought.

### 7.03    No Continuing Waivers

The failure of any Participant at any time to require performance of any provision hereof shall in no manner affect the right thereafter to enforce the same. No waiver by any Participant of any condition, or of the breach of any term, provision, covenant, representation, or warranty contained in this Agreement in one or more instances shall not be deemed to be, or construed, as a further or continuing waiver of any such condition or breach or a waiver of any other condition or a waiver of the breach of or failure to comply with any other term, provision, covenant, representation, or warranty.

### 7.04    Rights of Others

Except as otherwise provided herein, nothing herein expressed or implied is intended, or shall be construed, to confer upon or to give any person, firm or corporation, other than the Participants hereto and their respective successors, assigns and legal representatives, any rights or remedies under or by reason of any term, provision, condition, undertaking, warranty, representation, covenant or agreement contained in this Agreement; however, it is distinctly understood, stipulated and agreed that the provisions, terms and conditions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by, the successors, assigns and legal representatives of the Participants. Should either Participant be subject to a merger, consolidation, corporate restructure or acquisition, this Agreement shall be binding upon all such successors, assigns, and acquirers.

### 7.05    Expenses

Each Participant hereto shall assume and bear all expenses, costs and fees incurred or assumed by them in connection with the preparation and execution of this Agreement whether or not the transactions herein provided for shall in fact be effectuated and each Participant hereto by its execution and delivery of this Agreement, agrees to, and shall, indemnify and hold harmless the other Participant hereto from and against any and all liabilities or claims in respect of any such expenses, costs or fees.

### 7.06    Partial Invalidity

If any term, provision, covenant, or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, voidable, void or unenforceable in any respect in any jurisdiction, the remainder of this Agreement and the validity, legality and enforceability of the other terms, provisions, covenants and restrictions thereof shall remain in full force and effect in such jurisdiction and in all other jurisdictions. The term, provision, covenant or restriction (whether, in any case, one or more) so found invalid, voidable, void or unenforceable in any jurisdiction shall in no way be affected, impaired or invalidated in any other jurisdiction and this Agreement shall thereafter be construed (solely in the invalidation jurisdiction) as though such invalid, voidable, void or unenforceable term, provision, covenant or restriction had not been included herein; provided however, that if any provision hereof is so held void, voidable, invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances.

Joint Venture Agreement
Page 14 of 16

**7.07    Counterparts**

For the convenience of the Participants, any number of counterparts of this Agreement may be executed by any one or more Participant hereto and each such executed counterpart shall be, and shall be deemed to be, an original instrument, and to have the force and effect of an original, but all of which shall constitute, and shall be deemed to constitute, in the aggregate, but one and the same instrument which shall become effective when one or more counterparts shall have been duly executed and delivered by each of the Participants hereto.

**7.08    Descriptive Headings**

The descriptive headings of the several Articles, Sections and Paragraphs of this Agreement are inserted for convenience only and shall not control or affect, enlarge or diminish, in any way or to any extent the meaning, construction or interpretation of this Agreement or of any of the provisions hereof.

**7.09    Time**

Time is of the essence of this Agreement and of the covenants and provisions hereof.

**7.10    Governing Law**

This Agreement shall be construed in accordance with and governed by the laws of the State of Oklahoma. Jurisdiction and venue for any claim arising out of this Agreement shall be made in the State of Oklahoma, County of Washington.

**7.11    Mediation**

Any dispute under this Agreement shall be required to be resolved by a mediation between the Parties hereto. Any Participant may commence a mediation proceeding by serving written notice thereof to the other Participant, by mail or otherwise, designating the issue(s) to be mediated and the specific provisions of this Agreement under which such issue(s) and dispute arose. The Parties shall select one neutral third party mediator (the "Mediator") with expertise in the area that is in dispute. The Participants covenant that they will participate in the mediation in good faith, and that they will share equally in its costs. The Mediator shall schedule sessions, as necessary, for the presentation by all Parties of their respective positions, which, at the option of the Mediator, may be heard by the Mediator jointly or in private, without any other members present. The mediation proceeding shall be held in Bartlesville, Oklahoma, or at such other place agreed to by the Partic- ipants. The Parties may submit to the Mediator, no later than ten (10) business days prior to the first scheduled session, a brief memorandum in support of their position. The Mediator shall make written recommendations for settlement in respect of the dispute within ten (10) business days of the last scheduled session. If any Participant involved is not satisfied with the recommendation for settlement, he may then commence litigation in a court of competent jurisdiction in the same county where the dispute was conducted, and Oklahoma law shall apply in any such subsequent action or proceeding.

### 7.12    Sophistication of the Participants

Each Participant hereto hereby acknowledges and agrees that it has consulted competent legal counsel in connection with the negotiation of this Agreement and that it has bargaining power equal to that of the other Participants hereto in connection with the negotiation and execution of this Agreement. Accordingly, the Participants hereto agree the rule of contract construction to the effect that an agreement shall be construed against the draftsman shall have no application in the construction or interpretation of this Agreement.

### 7.13    Signatures

Signatures by facsimile and electronic mail are binding in one or more parts and all such counter-parts will be treated as original by all Participants hereto.

P      N      U

Exhsagdebtor 000194

**IN WITNESS WHEREOF**, the Participants hereto have caused this Agreement to be duly executed in their names and on behalf of their entities as of the Effective Date.

**FISCHLER ENTERPRISE LLC**

By:_____

    Anthony Fischler, Manager

**INN AT PRICE TOWER, INC.**
By:  CT OPERATIONS, LLC
as sole shareholder of Inn at Price Tower, Inc.

By:_____

    Cynthia Blanchard, Manager

EXHIBIT A□
to□
Joint Venture Agreement

## **FACILITIES**

[See Attached.]

Exhsagdebtor 000196

EXHIBIT B☐
to☐
Joint Venture Agreement

## **HOURS OF OPERATION**

|            | **Open** | **Close** |
|------------|----------|-----------|
|            | TBA      | TBA       |
| Monday     |          |           |
|            | TBA      | TBA       |
| Tuesday    | TBA      | TBA       |
| Wednesday  | TBA      | TBA       |
|            | TBA      | TBA       |
| Thursday   |          |           |
|            | TBA      | TBA       |
| Friday     | TBA      | TBA       |
|            | TBA      | TBA       |
| Saturday   |          |           |
|            | TBA      | TBA       |
| Sunday     | TBA      | TBA       |

P        N        U

Exhsagdebtor 000197

EXHIBIT C☐
to☐
Joint Venture Agreement

## WORKSHEET FOR NET PROFIT CALCULATIONS

# IPT Costs:

Insurance:

30% of monthly costs
Of property, 30% of liability, workman's compensation costs with a quarterly reconciliation of actual incurred costs

Utilities:

30% of monthly utility costs including electric and gas.  10% water

Admin Costs:

A percentage of monthly costs of accounting department and other admin personnel directly attributable to the restaurants

Marketing:

50% of marketing team costs related directly to establishment marketing

Restaurant Management Costs:

50% of monthly restaurant management systems costs including fees for hardware, software and payment processing

# Fischler Costs:

Employee Costs:

100% Employee Costs including attributable worker's comp costs directly related to establishment employees only as defined in this agreement.

P   N   U

Exhsagdebtor 000198

Restaurant Supplies:

50% of monthly costs including cleaning supplies, paper products, etc. attributed to  establishment as defined in this agreement.

Decorations:

100% of decoration and added furniture costs

Marketing:

50% of marketing costs related to establishment as defined in this agreement.

Training:

100% of training costs

Food, Beverage and Liquor Costs:

100% of food, beverage, and liquor costs

P        N       U

Exhsagdebtor 000199

Exhsagdebtor 000200

# Signature Certificate

Reference number: QGUYN-LDPDB-ENESY-5VVWG

| Signer | Timestamp | Signature |
|--------|-----------|-----------|

**Cynthia Blanchard**
Email: cynthia@thepricetower.com

| | | |
|--------|-----------|-----------|
| Sent: | 09 Jun 2023 14:13:42 UTC | |
| Viewed: | 09 Jun 2023 14:20:40 UTC | |
| Signed: | 09 Jun 2023 14:21:48 UTC | |

**Recipient Verification:**

✔ Email verified    09 Jun 2023 14:20:40 UTC

*Cynthia Blanchard*

IP address: 160.3.252.5
Location: Bartlesville, United States

---

**Anthony Fischler**
Email: anthony.fischler@gmail.com

| | | |
|--------|-----------|-----------|
| Sent: | 09 Jun 2023 14:13:42 UTC | |
| Viewed: | 11 Jun 2023 06:34:09 UTC | |
| Signed: | 11 Jun 2023 06:34:35 UTC | |

**Recipient Verification:**

✔ Email verified    11 Jun 2023 06:34:09 UTC

*Anthony Fischler*

IP address: 172.116.58.202
Location: Santa Monica, United States

---

Document completed by all parties on:
11 Jun 2023 06:34:35 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 40,000+ companies worldwide.



**Dale Takio - Taktik Enterprises**

| | |
|---|---|
| **From:** | Ken Greenberg <greengoldkg@gmail.com> |
| **Sent:** | Wednesday, August 16, 2023 12:22 PM |
| **To:** | P C |
| **Subject:** | Fwd: June 2023 Copper Tree Consolidated Financials |
| **Attachments:** | June 2023 Copper Tree Consolidated Financials.pdf |

Patrick...

Attached is your last request for a financial statement for Copper Tree (Price Tower) which is the June 30th statement. Of course, Copper did not take over the building until into March of this year and some of this reflects acquisition costs and clean out of nonpay tenants and the repositioning of the 2 restaurants which are now just starting to reopen (one of them last evening).

This is a great iconic asset that will be a solid win!

Please confirm receipt of this email..

Ken Greenberg
786-586-6351

---------- Forwarded message ---------
From: **Cynthia Blanchard**
Date: Wed, Aug 16, 2023 at 12:12 PM
Subject: Fwd: June 2023 Copper Tree Consolidated Financials
To: Ken Greenberg <greengoldkg@gmail.com>



## PRICE TOWER ARTS CENTER
FRANK LLOYD WRIGHT ARCHITECT
510 South Dewey Ave /// Bartlesville, OK 74003

O > 918.336.1000   C > 918.409.7006 ///  **pricetower.org**

Exhsagdebtor 000202



## Consolidated – Copper Tree Inc.

## Profit and Loss

### June 2023

|  | Total |
|---|---|
| **Income** | |
| **40000 Sales** | |
| 40100 Hotel Room Revenue | ▌ |
| 40200 Banquet Room Revenue | ▌ |
| 40300 Rental Income | ▌ |
| Total 40000 Sales | $ ▌ |
| **Total Income** | $ ▌ |
| **Cost of Goods Sold** | |
| 50000 Cost of goods sold | |
| 50500 Food - COGS | ▌ |
| 50600 Liquor - COGS | ▌ |
| 50700 Sales Taxes - COGS | ▌ |
| 50705 OK Liquor Tax | ▌ |
| 50715 OK Lodging Tax | ▌ |
| Total 50700 Sales Taxes - COGS | $ ▌ |
| Total 50000 Cost of goods sold | $ ▌ |
| **Total Cost of Goods Sold** | $ ▌ |
| **Gross Profit** | $ ▌ |
| **Expenses** | |
| 61000 Advertising & marketing | ▌ |
| 61100 Business licenses | ▌ |
| 61150 Commissions & fees | ▌ |
| 62100 General business expenses | |

510 Dewey Ave, Bartlesville, OK 74003



Exhsagdebtor 000203



| | | |
|---|---|---|
| 62110 Bank fees & service charges | | ▆ |
| Total 62100 General business expenses | $ | ▆ |
| 62200 Insurance | $ | ▆ |
| 62300 Legal & accounting services | | |
| 62310 Accounting fees | | ▆ |
| 62320 Legal Fees | | ▆ |
| Total 62300 Legal & accounting services | $ | ▆ |
| 62400 Office expenses | | |
| 62420 Office supplies | | ▆ |
| 62430 Printing & photocopying | | ▆ |
| 62460 Software & apps | | ▆ |
| Total 62400 Office expenses | $ | ▆ |
| 62600 Utilities | | |
| 62620 Electricity | | ▆ |
| 62660 Water & sewer | | ▆ |
| Total 62600 Utilities | $ | ▆ |
| 62990 Contract labor | | ▆ |
| 63000 Payroll expenses | | |
| 63400 Salaries & wages | | |
| 63440 IPT - Payroll Reimbursement | | ▆ |
| 63460 PTAC - Payroll Reimbursement | | ▆ |
| Total 63400 Salaries & wages | $ | ▆ |
| Total 63000 Payroll expenses | $ | ▆ |
| 64200 Repairs & maintenance | | ▆ |
| 64300 Supplies | | |
| 64310 Supplies & materials | | ▆ |
| Total 64300 Supplies | $ | ▆ |
| 64500 Taxes paid | | ▆ |
| Total Expenses | $ | ▆ |
| Net Operating Income | -$ | ▆ |
| Net Income | -$ | ▆ |

510 Dewey Ave, Bartlesville, OK 74003





Thursday, Jul 27, 2023 10:10:36 PM GMT-7 - Accrual Basis

510 Dewey Ave, Bartlesville, OK 74003



Exhsagdebtor 000205

**dtakio@thepricetower.com**

| | |
|---|---|
| **From:** | Cynthia Blanchard <cynthia@thepricetower.com> |
| **Sent:** | Tuesday, May 30, 2023 4:05 PM |
| **To:** | mike@coppertree.org; dale@thepricetower.com |
| **Subject:** | Fwd: FW: [External] RE: [External] RE: [External] RE: [External] Tower Breakdown |

-------- Forwarded Message --------
**Subject:** FW: [External] RE: [External] RE: [External] RE: [External] Tower Breakdown
 **Date:** Thu, 18 May 2023 04:46:59 +0000
 **From:** Hugh Robert <hugh@smr-law.com>
  **To:** Cynthia Blanchard <cynthia@thepricetower.com>
  **CC:** Sharon Halowell <sharon@smr-law.com>, Jared Nelson <jared@smr-law.com>

Cynthia- please see analysis below.  I don't know that I will be able to discuss before I leave on Friday but wanted to get this to you ASAP.  This will help provide guidance to us as we develop the portion of the building that is FPT and the remainder being the for profit enterprise.  I had asked about leasing the entirety by FPT but that would likley cause nonprofit compliance issues as she eludes to in the bottom of her email.

**From:** Moore, Heather Elizabeth <heather.moore@faegredrinker.com>
**Date:** Tuesday, May 16, 2023 at 8:56 AM
**To:** Hugh Robert <hugh@smr-law.com>
**Cc:** Michael Anderson <michael@smr-law.com>, Pimentel-Gannon, Jacqueline M. <jacqueline.pimentel-gannon@faegredrinker.com>
**Subject:** [External] RE: [External] RE: [External] RE: [External] Tower Breakdown

> **Caution:** This is an external email. Please take care when clicking links or opening attachments.

Exhsagdebtor 000206



Exhsagdebtor 000207

**Heather Elizabeth Moore**

Counsel

*Admitted to Practice in Indiana, Oklahoma, and Tennessee*
heather.moore@faegredrinker.com

Connect: vCard

+1 317 237 1062 direct

———

**Faegre Drinker Biddle & Reath** LLP
300 N. Meridian Street, Suite 2500
Indianapolis, Indiana 46204, USA

This message and any attachments are for the sole use of the intended recipient(s) and may contain confidential and/or privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message and any attachments.

3

Exhsagdebtor 000208

**From:** **Paul Aubert** paul@mussalilaw.com 
**Subject:** Letter RE Stockholder Access to books and records
**Date:** September 25, 2023 at 3:28 PM
**To:** Craig Brand craig@thebrandlawfirm.com

Craig,

Attached please find the attached letter addressing your e-mail request for Copper Tree, Inc. books and records. Also, I received your voice mail on Saturday and am prepared to discuss the proposed letter you sent to the Company regarding alleged outstanding amounts due.

Regards,

Paul



## LOAN SERVICING AGREEMENT

This Loan Servicing Agreement (this "Agreement") dated as of March 7, 2023 between Mark Haskell, an individual residing in Oklahoma ("Borrower"), and Green Copper Holdings, LLC, a New Mexico limited liability company ("GCH").

**WHEREAS**, Servicer is buyer the real property known as the Price Tower located at 510 Dewey Avenue, Bartlesville, OK 74003, herein after "Premises" pursuant to the Commercial Improved Purchase Contract dated March 7, 2023 (the "Contract") with Price Tower Art Center, Inc, herein after "PTAC"; and

**WHEREAS**, pursuant to the Contract, GCH will agree to the ongoing loan payments of the debt as provided herein upon Closing (as defined in the Contract) of the Contract.

**WHEREAS**, Truity Credit Union ("Truity") has originated a new loan to Borrower in the principal amount of FIVE HUNDRED NINETY-ONE THOUSAND NINE AND 18/100 DOLLARS ($591,009.18) (the "New Loan") prior to Closing on the Contract, and the proceeds from the New Loan have been used solely for the immediate payment in full for the indebtedness owed by PTAC to Arvest Bank.

**WHEREAS**, the primary loan documents for the New Loan is attached to this Agreement as Exhibit A (the "Loan Documents").

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1.    Upon the Closing of the Contract, Servicer does hereby agree to make all payments before delinquency owed by Borrower to Truity in connection with the New Loan. Servicer shall directly pay Truity for all such amounts in accordance with the Loan Documents. Servicer may opt to prepay or advance pay any amount of each respective loan without penalty and at its discretion at any time.

2.    Servicer shall use its best efforts to promptly secure the anticipated secondary phase debt or equity financial model(s) funding being sought for finalization in order to effect the full renovations and operational enhancements required to support the Servicer's proforma models and anticipated debt structures.

3.    Servicer shall pay in full the outstanding principal balance and accrued interest owed by Borrower under the New Loan, if not already paid in full, on or before the earlier to occur of: (a) 60 days following all secondary funding being received by the Servicer; or (b) December 31, 2023.  Upon payment in full of all owed principal and interest for the New Loan, the Borrower shall promptly be removed from any and all obligations to the Servicer.

4.    All parties acknowledge that no loan identified herein shall be considered assumed by the GCH unless otherwise done so under a separate agreement between Servicer and Truity. However, if the GCH opts to refinance, pay off or otherwise assume the terms of any loan identified herein at a later date, it shall only be done with the condition that Borrower and all named obligors on the New Loan be released of liability in connection with the New Loan, and said parties shall not be obligors or have any liability

Exhsagdebtor 000210

associated with any new financing between GCH and the applicable lender with respect to the subsequent loan.

5.     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their successors and assigns.  In addition, the parties hereto agree that this Agreement is also for the benefit of the Borrower.

6.     Should the New Loan by Truity to Borrower as refenced herein be declared in default by Truity or should payments be delinquent pursuant to the Loan Documents, then Borrower shall have the right to require that GCH immediately cause the account to be current whether by transfer of or, demand that GCH immediately commence with the sale of GCH owned assets, and with respective proceeds to be used for the sole purpose of curing any said default declared by Truity.  If GCH fails to generate proceeds from the sale of any assets to cure any such default, then the Borrower shall have the immediate right to file a lien against the Premises as a first priority mortgage lien holder and be entitled to all legal rights associated with such lien.

7.     Should GCH ever consider selling any portion of the Premises or otherwise assign any equity position in the Premises to another party prior to the New Loan being paid in full, GCH shall not do so unless the entire balance of the New Loan outlined in Exhibit A is been paid in full upon the effective date of said sale, assignment or transfer of the Premises; provided, however, that Borrower and GCH may otherwise agree in writing pursuant to a separate agreement with newly formed terms that expressly supersede the terms and conditions set forth in this Agreement.

8.     GCH further covenants and agrees for themselves, their successors and assigns, jointly and severally, absolutely and unconditionally, to at all times indemnify, defend, hold and save Borrower harmless from and against any and all actions or causes of actions, claims, demands, liabilities, losses, damages or expenses of whatsoever kind and nature, including without limitation attorneys' fees, which Borrower shall or may at any time sustain or incur arising from GCH's failure to pay or perform any of its obligations under this Agreement.

9.     No amendment, supplement, modification, waiver or termination of this Agreement shall be binding unless executed in writing by all parties hereto, or in the case of a waiver, by the party for whom such benefit was intended.  A waiver of any of the provisions of this Agreement shall not constitute and shall not be deemed a waiver of any other provision of this Agreement, whether or not similar, nor shall such waiver constitute a continuing waiver unless otherwise expressly provided in writing.

10.     **THE PARTIES HERETO AGREE THAT THIS AGREEMENT, AND THE RESPECTIVE RIGHTS, DUTIES AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF OKLAHOMA, WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAW THEREUNDER.**

11.     This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts together shall constitute one and the same instrument. Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all of the parties hereto.

Exhsagdebtor 000211

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by their respective duly authorized officers on the date first above written.

**Mark Haskell**

By: _____

Name: Mark Haskell

Title: Individual

**Green Copper Holdings, LLC**

By: Copper Tree, Inc., its Manager

By: _____

Name: Cynthia Blanchard

Title: _Authorized Signatory_____

Exhsagdebtor 000212

**Exhibit A**

**Truity Credit Loan Agreement**

[ATTACHED]

Exhsagdebtor 000213

## DISBURSEMENT REQUEST AND AUTHORIZATION

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $591,009.18 | 03-06-2023 | 03-20-2028 | 1837539.01 | 1 / 2 | 1837539 | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Mark Haskell
115 1/2 SE Frank Phillips
Bartlesville, OK 74003

**Lender:** Truity Federal Credit Union
Bartlesville Main
501 S. Johnstone
Bartlesville, OK 74003

---

**LOAN TYPE.** This is a Fixed Rate (7.550%) Nondisclosable Loan to an Individual for $591,009.18 due on March 20, 2028.

**PRIMARY PURPOSE OF LOAN.** The primary purpose of this loan is for:

☐ Personal, Family, or Household Purposes or Personal Investment.

☒ Business (Including Real Estate Investment).

**SPECIFIC PURPOSE.** The specific purpose of this loan is: refinance of downtown building to payoff arvest debt.

**REAL ESTATE DOCUMENTS.** If any party to this transaction is granting a security interest in any real property to Lender and Borrower is not also a party to the real estate document or documents (the "Real Estate Documents") granting such security interest, Borrower agrees to perform and comply with the Real Estate Documents just as if Borrower has signed as a direct and original party to the Real Estate Documents. This means Borrower agrees to all the representations and warranties made in the Real Estate Documents. In addition, Borrower agrees to perform and comply strictly with all the terms, obligations and covenants to be performed by either Borrower or any Grantor or Trustor, or both, as those words are defined in the Real Estate Documents. Lender need not tell Borrower about any action or inaction Lender takes in connection with the Real Estate Documents. Borrower assumes the responsibility for being and keeping informed about the property. Borrower also waives any defenses that may arise because of any action or inaction of Lender, including without limitation any failure of Lender to realize upon the property, or any delay by Lender in realizing upon the property.

**DISBURSEMENT INSTRUCTIONS.** Borrower understands that no loan proceeds will be disbursed until all of Lender's conditions for making the loan have been satisfied. Please disburse the loan proceeds of $591,009.18 as follows:

|  |  |
|---|---|
| **Other Disbursements:** | $588,492.18 |
| $43,705.74 Arvest Bank  Loan#2153684 | |
| $7,462.62 Arvest Bank Loan #2174353 | |
| $36,512.13 Arvest Bank Loan #21887272 | |
| $119,444.81 Arvest Bank Loan #2410917 | |
| $283,620.76 Arvest Bank Loan #2463804 | |
| $97,748.12 Arvest Bank Loan #2479259 | |
| **Other Charges Financed:** | $492.00 |
| $46.00  Recording Fee | |
| $5.00  Mortgage Certification Fee | |
| $11.00  Flood Certification | |
| $12.00  Credit Report | |
| $400.00  Title Report/Search | |
| $18.00  Mortgage Release Fee | |
| **Total Financed Prepaid Finance Charges:** | $2,025.00 |
| $2,000.00  Loan Documentation Fee | |
| $25.00  Membership Fee | |
| **Note Principal:** | $591,009.18 |

**FINANCIAL CONDITION.** BY SIGNING THIS AUTHORIZATION, BORROWER REPRESENTS AND WARRANTS TO LENDER THAT THE INFORMATION PROVIDED ABOVE IS TRUE AND CORRECT AND THAT THERE HAS BEEN NO MATERIAL ADVERSE CHANGE IN BORROWER'S FINANCIAL CONDITION AS DISCLOSED IN BORROWER'S MOST RECENT FINANCIAL STATEMENT TO LENDER. THIS AUTHORIZATION IS DATED MARCH 6, 2023.

**BORROWER:**

X _Mark Haskell_
Mark Haskell

LaserPro, Ver. 30.1.0.034  Copr. Finastra USA Corporation 1997, 2023.  All Rights Reserved.  OK  L:\CFI\LPL\G20.FC  TR-5027  PR-5

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $591,009.18 | 03-06-2023 | 03-20-2028 | 1837539.01 | 1 / 2 | 1837539 | *** | gh |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Mark Haskell
115 1/2 SE Frank Phillips
Bartlesville, OK 74003

**Lender:** Truity Federal Credit Union
Bartlesville Main
501 S. Johnstone
Bartlesville, OK 74003

**Principal Amount: $591,009.18** **Date of Note: March 6, 2023**

**PROMISE TO PAY.** Mark Haskell ("Borrower") promises to pay to Truity Federal Credit Union ("Lender"), or order, in lawful money of the United States of America, the principal amount of Five Hundred Ninety-one Thousand Nine & 18/100 Dollars ($591,009.18), together with interest on the unpaid principal balance from March 6, 2023, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 7.550%, until paid in full. The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.

**PAYMENT.** Borrower will pay this loan in 59 regular payments of $4,834.47 each and one irregular last payment estimated at $521,202.45. Borrower's first payment is due April 20, 2023, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on March 20, 2028, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to any late charges; then to any accrued unpaid interest; and then to principal. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Truity Federal Credit Union, 501 S. Johnstone Bartlesville, OK 74003.**

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged $25.00.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to 18.000%. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The death of Borrower or the dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and

# PROMISSORY NOTE
## (Continued)

Page 2

completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including without limitation all attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Oklahoma without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Oklahoma.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Washington County, State of Oklahoma.

**STATUTORY LIEN.** Borrower agrees that all loan advances under this Note are secured by all shares and deposits in all joint and individual accounts Borrower has with Lender now and in the future. Borrower authorizes Lender, to the extent permitted by applicable law, to apply the balance in these accounts to pay any amounts due under this Note when Borrower is in default under this Note. Shares and deposits in an Individual Retirement Account and any other account that would lose special tax treatment under state or federal law if given as security are not subject to the security interest Borrower has given in Borrower's shares and deposits.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein: a Mortgage dated March 6, 2023, to Lender on real property located in Washington County, State of Oklahoma.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE.**

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

x _Mark Haskell_ (signature)
**Mark Haskell**

LENDER:

**TRUITY FEDERAL CREDIT UNION**

x _Darah Harris_ (signature)
Darah Harris, Senior Commercial Lending Officer

LaserPro, Ver. 20.1.0.034  Copr. Finastra USA Corporation 1997, 2023.  All Rights Reserved.  - OK  L:\CFI\LPL\D20.FC  TR-1027  PR-5

Exhsagdebtor 000216

# MILES LAW, PLLC

Eric Miles, Esq. Florida Bar No. 0105391

551 Copperdale Ave. Winter Garden, FL. 34787 | ██████ | ██████████

**McFarlin Building, LLC**
John Snyder and Macy Snyder-Amatucci
11 E 5TH ST STE 500
Tulsa, OK 74103
Mr. John Snyder
Email: ██████████████
Ms. Macy Snyder-Amatucci
Email: ████████████

**LEVINSON, SMITH & HUFFMAN, P.C.**
John M. Thetford, OBA #12892
Evan M. McLemore, OBA #30417
Grant B. Thetford, OBA #33624
1743 East 71st Street
Tulsa, Oklahoma 74136-5108
████████ -Tel.
████████ - Fax
███████████████

g.thetford@levinsonlawtulsa.com

**Jess M. Kane**, OBA# 22418
**Stephanie J. Clifton**, OBA #35083
P.O. Box 1066
Bartlesville, Oklahoma 7 4005
████████ -Tel.
███████████

Date: January 9, 2025

RE: **NOTICE OF FORTHCOMING LITIGATION AND INTEREST IN PROPERTY/EVIDENCE OF AND CONCERNING THE PRICE TOWER**

Dear Mr. Snyder and Ms. Snyder-Amatucci,

I have included your attorneys' of record predicated upon the Court filing of November 12, 2024 Case No. CV-2024-158 IN THE DISTRICT COURT AND FOR WASHINGTON COUNTY STATE OF OKLAHOMA between The McFarlin Building, LLC (Plaintiff) v. Copper Tree Inc. and Green Copper Holdings, LLC. Our clients are related to and mentioned within this Court Action but are not currently a party to the action. Because our clients are not a party to this action, we are not receiving the latest updates to this action and if you are no longer represented by these attorneys, we sincerely apologize for copying them on this letter, which is also why we are also sending this letter of Notice to you personally. Please be advised that our firm represents several minority shareholders and creditors (Michael Moran individually, Pictoria Studios, Inc., Taktik Enterprises, Inc. and Dale Takio individually) against Copper Tree, Inc. the parent or holding company that owns and potentially "controls" the Price Tower located in Bartlesville, OK. This control, including the company's cap table, is currently under dispute and is central

1

# MILES LAW, PLLC

to our forthcoming litigation.

It has come to our attention that McFarlin Building, LLC, or one of its affiliates, may have an interest in purchasing, transferring, clouding title to, or encumbering the Price Tower or related assets owned by Copper Tree, Inc. If you or your company are involved in such actions, please be aware that my clients have material equity claims against Copper Tree, Inc., its holdings, and its representatives, including Cynthia Blanchard in addition to owed payments and delinquent charges in an amount over $500,000.00 dollars.

Preservation notices have already been served on Copper Tree, Inc., informing the company and its representatives of their duty to preserve evidence. This notice also applies to any potential purchasers or encumbrancers of the Price Tower or related assets. My clients will pursue all lawful means to recover any such assets and damages, should any transactions or encumbrances occur in violation of these legal claims.

We advise you to consult with your attorney regarding this notice and any future actions you may take concerning the Price Tower. Should McFarlin Building, LLC have an existing or potential interest in the Price Tower or its associated assets, we welcome the opportunity to discuss this further. Our clients have informed us that they are interested in negotiations to settle this amicably between all parties prior to filing additional claims, liens or injunctions concerning this issue. Please be aware you are now formally on notice that claims and interests in the Price Tower arise and stem from Copper Tree, Inc.

Sincerely,

Eric Miles, Esq.

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 001 | | Exterior, North elevation, to right of main entry door, embedded into concrete planter. | Frank Lloyd Wright "signature" tile. Minor damage due to vandalism, covered in tempered glass in 2001. | N/A |
| 002 | | Exterior, on three quadrants (Northwest, Northeast, and Southeast), on all floors. | Patinated embossed copper horizontal window louvers with aluminum hardware. Fair to good condition due to exposure to natural elements. | 5215.053 5215.147 5215.240 |

Exhsagdebtor 000219

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|---|---|---|---|---|
| 003 | | Exterior, on one quadrant (Southwest), on all floors. | Patinated embossed copper vertical copper louvers with aluminum hardware. Fair to good condition due to exposure to natural elements. | 5215.054 5215.147 |
| 004 | | Exterior, North elevation, above main entry. | Patinated embossed copper tile with patina. Fair to good condition due to exposure to natural elements. | 5215.054 5215.145 5215.153 5215.228 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 005 | | Exterior, South elevation. | Patinated embossed copper trim. Fair to good condition due to exposure to natural elements. | 5215.145 |
| 006 | | Exterior, Northwest and Southwest elevations. | See above. | 5215.145 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 007 | | Exterior, North elevation. | See above. | 5215.145 5215.003 |
| 008 | | Exterior, North elevation. | Patinated embossed copper window frame. Good condition. Glass is peach colored. | 5215.001 5215.048 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|---|---|---|---|---|
| 009 | | Exterior, Southwest elevation on all bedroom loft floors: 4, 6, 8, 10, 12, 14, 16, and 18. | Patinated embossed copper balconies. Fair to good condition due to exposure to natural elements. | 5215.003 |
| 010 | | Exterior, South elevation, | See above. | 5215.003 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 011 | | Exterior, North, South and West elevations. | Hexagonal patinated copper lighting fixture with shade. One fixture with original "faceted" shade (shown), two with flat acrylic replacement. | 5215.149 |
| 012 | | Exterior, under eaves, all elevations. | Typical patinated copper lighting fixture with shade. Several shades have been replaced with flat glass or molded acrylic. | 5215.113 5215.148 |

Exhsagdebtor 000224

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 013 | | Interior, typical wall treatment throughout building. | Modern color to match historic Martin Senour brand paint color specified by Wright (control sample to be taken from within Lobby text panel). Specified currently as Devoe's latex paint #3302 "California Buff" color in eggshell finish. Last painted in 2002. | N/A |
| 014 | | Interior, typical wall treatment in main gallery space. | Modern color to coordinate with historic Martin Senour brand paint color specified by Wright. Specified currently as Pittsburgh Paints #515-2 "Navajo White" color in satin/eggshell finish. Used on all exhibition walls and historic interiors. | N/A |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 015 | | Exterior, North, South, East, and West elevations on all floors. | Typical peach colored glass window with aluminum window frames. This glass will need to be custom run in the future. Since 2009, breakage has been replaced with glass tinted on site. | 5215.001 |
| 016 | | Exterior, North and South elevations. | Typical peach colored glass entrance doors with aluminum door frames. Good condition. | 5215.001 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 017 | | Exterior, North, South, East, and West elevations on all floors. | Typical peach colored glass windows with aluminum window frames. This glass will need to be custom run in the future. Since 2009, breakage has been replaced with glass tinted on site. | 5215.001 |
| 018 | | Exterior, North and South elevations. | Steel reinforced patinated embossed copper carport supports. Good condition. | 5215.118 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 019 | | Exterior, North and South elevations. | Reinforced concrete carport structures with patinated copper supports. Good condition. | 5215.123 |
| 020 | | Exterior, East elevation. | Reinforced concrete exterior staircase. Good condition. | 5215.057<br>5215.052<br>5215.051 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 021 | | Exterior, East elevation, all floors. | Reinforced concrete exterior staircase with formed aluminum handrails. Good condition. | 5215.057 5215.052 5215.051 |
| 022 | | Exterior, North, South, East, and West elevations. | Pigmented concrete sidewalks and entryway floors. Repaired numerous times since 1956. Control sample of "Cherokee Red" color to be taken in field area featuring scored parallelograms. | 5215.229 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 023 | | Interior, 17th Floor apartment. | Patinated embossed copper tiles, Philippine mahogany shutters, and view of HVAC grill along bottom of slanted ceiling. Shutters were replaced in 2006 restoration and pieced together from several remnants removed from other floors over the building's history. | 5215.007 |
| 024 | | Interior, ceiling of lobby entrance and 19th floor. | Triangular patinated copper light fixtures (no shades) and aluminum triangular ventilation grilles. Good condition. | 5215.113 5215.156 5215.167 |

Exhsagdebtor 000230

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 025 | | Interior, ceiling of first and second floor public spaces. | Triangular copper "eyeball" style light fixtures (no shade). Most in good condition and all in working order. | 5215.113 5215.156 |
| 026 | | Interior, first and second floor public spaces. | Triangular patinated copper light fixture with glass shade. Good condition. | 5215.113 5215.156 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|---|---|---|---|---|
| 027 | | Interior, typical aluminum door frame for offices. | Typical interior door frame with peach colored glass. These doors were replaced on floors with hotel rooms in 2003. Original doors now located in museum collection storage. | N/A |
| 028 | | Interior, typical floor treatment. | "Cherokee Red" color pigmented concrete floor. Generally good condition. Wax removed in 2006 and build-up on floors (as well as damage form high heeled shoes) is apparent. Several hotel rooms have red colored painted floors, as was the condition of the building in 2001. Public floors and historic interior floors were stripped of this finish in 2006. | N/A |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 029 | | Interior, typical floor ornament. | Cast bronze floor medallion design comprised of initials of H. C. Price Company (HCP Co). 18 exist in building (except 2nd floor) and mark center point of the tower floorplan. Routinely polished and central square feature painted "Cherokee Red" color. Good condition. | 5215.117 5215.162 |
| 030 | | Interior, ceiling of elevator lobbies on floors 3 through 18. | Square ceiling light fixtures with shades. Positioned above floor medallions. Shades and fixtures in good working order. | 5215.149 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|---|---|---|---|---|
| 031 | | Interior, typical staircase detail. | Reinforced parallelogram-shaped concrete interior staircases with formed aluminum handrail and aluminum vertical rod staircase screens. Typical staircase detail in public areas and apartments. Good condition. Stair treads in painted finish as received in 2001. | 5215.057 5215.121 |
| 032 | | Interior, first floor. | Reinforced concrete interior staircase with formed aluminum handrails. Handrail extended in 2001 as a safety measure (seam apparent). Stair treads in painted finish as received in 2001. | 5215.057 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 033 | | Interior, 18th floor elevator lobby. | Philippine mahogany wall paneling with perforated board frieze. Good condition. | 5215.116 |
| 034 | | Interior, 17th floor kitchen. | Typical kitchen environment for apartments in Southeast quadrant. Two complete kitchens remain in building (floors 9 and 17). Original appliances and enamel painted cabinets. Good condition, though appliance are not in working order. | 5215.111 5215.060 |

Exhsagdebtor 000235

**PRICE TOWER ARTS CENTER**
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 035 | | Interior, 17th floor kitchen. | See above. | 5215.111 5215.060 |
| 036 | | Interior, 17th floor kitchen. | Rubbish chute to basement. Good condition. Chute no longer in service. | 5215.111 5215.060 |

Exhsagdebtor 000236

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 037 | | Interior, 9th floor kitchen. | Typical kitchen environment for apartments in Southeast quadrant. Two complete kitchens remain in building (floors 9 and 17). Original appliances and enamel painted cabinets. Good condition, though appliance are not in working order. | 5215.111 5215.060 |
| 038 | | Interior, West elevation. Rubbish bin 9th floor | Rubbish chute to basement. Good condition. Chute no longer in service. | 5215.111 5215.060 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 039 | | Interior, typical elevator cabin and exterior doors. | Historic elevator cabin (3 in working order, one in museum collection). Paint color: Zachary Paints #Z0035 semigloss oil-based enamel in "Cherokee Red" matched to original paint. | 5215.108 |
| 040 | | Interior, typical elevator cabin. | See above. Elevator upgraded over time to meet building code and safety standards. | 5215.108 |

Exhsagdebtor 000238

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 041 | | Interior, 9th floor apartment powder room. | Good condition. | N/A |
| 042 | | Interior, typical apartment powder room. | Good condition. Powder room on 17th floor altered and returned to original appearance in 2006 with the exception of countertop which was fabricated in painted wood (laminate molding process cost prohibitive). Good condition. | 5215.107 5215.106 |

**PRICE TOWER ARTS CENTER**
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 043 | | Interior, typical apartment bathroom. | Original ceramic tiles and chrome fixtures. Good condition. | 5215.107 5215.106 |
| 044 | | Interior, typical apartment bathroom. | Original ceramic tiles and chrome fixtures. Good condition. | 5215.107 5215.106 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 045 | | Interior, typical apartment bathroom. | Original ceramic tiles and chrome fixtures. Bathroom on 18th floor altered and returned to original appearance in 2006 with the exception of countertop which was fabricated in painted wood (laminate molding process cost prohibitive).  Good condition. | 5215.107 5215.106 |
| 046 | | Interior, typical apartment bathroom | Original ceramic tiles and chrome fixtures. Toilet seat and lid are not historic. Good condition. | 5215.107 5215.106 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|---|---|---|---|---|
| 047 | | Interior, basement. | Original boiler units (two). Good working order.  Maintained and inspected with regular frequency. | N/A |
| 048 | | Interior, Lobby, West elevation. Painted text mural of Walt Whitman quote. | Painted text mural of Walt Whitman quote. Original gold leaf text applied to painted wall surface. Illuminated "T" is original to design, though gold painted border was added in 2001 to help maintain boundaries when repainting wall surface. Wall surface area within boundary is to be considered standard for building wall and ceiling paint color. | N/A |

Exhsagdebtor 000242

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 049 | | Interior, Lobby. | Mobile directory board. Accessioned museum collection item. Plexiglas signage retrofitted into existing frame in 2006. Casters in good working order. Good condition overall with minimal wear. | 5215.175 |
| 050 | | Interior, Lobby, East elevation. | Built- in wood banquette seating  with loose cushions. Seat and back cushions restored in 2006 using replicated fabric based on original color and pattern (Wright's "Taliesin Line" for Schumacher, Pattern 501, Color 734624 Turquoise) | N/A |

**PRICE TOWER ARTS CENTER**
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 051 | | Interior, Loggia, East elevation. | See above. | N/A |
| 052 | | Interior, First Floor, "Taliesin Room," East elevation. | "Willows and Reflections" copper and cloisonne mural designed by John Dekoven Hill and fabricated by Pauli Lame, above built-in Philippine mahogany banquette seating with loose cushions. Part of the 1977 redesign by Taliesin Associated Architects. Original drawings or mural part of museum collection. Companion coffee table in museum collection. Good overall condition with minor discoloration. | N/A |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 053 | | Interior, First Floor, "Taliesin Room," East elevation. | Triangular lighting diffusers, copper and cloisonne mural with built-in seating.  Part of the 1977 redesign by Taliesin Associated Architects. Good condition. Louvers are removable to ease in bulb replacement. | N/A |
| 054 | | Interior, typical furniture trim, Floors 1, 18, and 19. | Embossed copper "bean sprout" design trim placed on most original wood furniture. First floor trim added to furniture as part of 1977 redesign of by Taliesin Associated Architects. 18th and 19th floor furniture trim is original to 1956 interiors. Affixed with nails to Philippine mahogany wood objects. Overall good condition with minor discoloration and dents due to wear. Natural patina. | 5215.173 |

Exhsagdebtor 000245

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 055 | | Interior, First floor, "Taliesin Room," East elevation. | Built-in wood cabinets and reception desk. Part of the 1977 redesign by Taliesin Associated Architects. Philippine mahogany. Cabinets in good condition. Reception desk in fair to good condition due to daily use. | N/A |
| 056 | | Interior, museum gallery. | Large elongated pentagon-shaped ceiling skylight. Good condition. Plexiglas panels in good condition, unsure if original or replacements. Skylight covered to protect museum exhibits and lit by spotlights within skylight coffer. | 5215.158 5215.093 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 057 | | Interior, museum gallery, East elevation. | Typical Philippine mahogany partition wall specified for building. Good condition with minor wear and discoloration apparent. | 5215.124 |
| 058 | | Interior, First floor, "Taliesin Room," North and South elevations. | Copper mesh window treatments. Part of the 1977 redesign by Taliesin Associated Architects. Good condition. | N/A |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 059 | | Interior, throughout. | Typical floor grate. Some may have been replicated over time due to wear. Good condition. | N/A |
| 060 | | Interior, Office, Southeast quadrant. | Philippine mahogany wooden partition wall system with aluminum framing. Good condition. Only office interior with original partition walls. | 5215.059 |

# PRICE TOWER ARTS CENTER

Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 061 | | Interior, Office, Southeast quadrant. | See above. | N/A |
| 062 | | Interior, apartment, 17th floor. | Detail of painted wall mural showing signature block; inscribed "To Hal / The Blue Moon / Frank Lloyd Wright / Feb 56" in gold paint. Fair condition due to light exposure. | N/A |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 063 | | Interior, apartment, 17th floor, East elevation. | Painted wall mural with gold leaf. Thoroughly conserved in 2004 to original condition. Adjacent red wall repainted in 2006 based on historic color. Wood shelf and painted blue mirror elements restored in 2006. | 5215.176 |
| 064 | | Interior, apartment, 17th floor, East elevation. | Patinated embossed copper fireplace with ceramic heating element. Good condition. Unit no longer in working order. Minor discoloration and damage due to use. | 5215.169 5215.177 5215.213 5215.214 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 065 | | Interior, 18th floor lobby, West elevation. | Decorative perforated Philippine mahogany wood border. Good condition. Affixed to painted wall (red color not as specified by Wright, who notes "dark gray" on drawings). | 5215.116 |
| 066 | | Interior, apartment, 18th floor. | Triangular linen closet constructed of Philippine mahogany. Good condition. | N/A |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 067 | | Interior, 9th floor, Southeast quadrant. | Patinated embossed copper fireplace. Good condition. Ceramic heating unit removed. | N/A |
| 068 | | Interior, 18th floor, West elevation. | Wooden shutters bedroom loft. Good condition. | 5215.007 |

# PRICE TOWER ARTS CENTER

Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 069 | | Interior,  19th floor, North elevation. | Built-in Philippine mahogany cabinets, desk, wood and ceiling panels, and shelving. Original filing cabinets. Good condition. Wood conservation completed 2005 and 2006. | 5215.139 5215.059 |
| 070 | | Interior, 19th floor office. | Built-in Philippine  mahogany wood built-in shelving, daybed, cabinets, and desk. Wood conserved in 2005 and 2006. | 5215.139 5215.140 5215.008 |

**PRICE TOWER ARTS CENTER**
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 071 | | Interior, 19th floor office, South elevation. | Stained embossed copper wood burning fireplace. Converted to accommodate gas starter (date unknown). Good condition. | 5215.140 5215.144 |
| 072 | | Interior, 19th floor office, South elevation. | Fireplace grille. Good condition. | 5215.140 |

**PRICE TOWER ARTS CENTER**
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 073 | | Interior, 19th floor, South elevation. | Fireplace chainmail screen detail. Good condition. | 5215.140 |
| 074 | | Interior, 19th floor, South elevation. | Stained embossed copper fireplace trim. Pattern similar to embossed copper furniture trim. Good condition. | 5215.140 |

# PRICE TOWER ARTS CENTER

Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 075 | | Interior, 19th Floor. | Embossed copper ceiling light fixture with aluminum suspension rod (embellished with aluminum hexagon forms) and glass shades. The only pendant fixture in the building. Good condition. | N/A |
| 076 | | Interior, 10th floor, West elevation. | Wood shutters in bedroom loft. Good condition. | 5215.007 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 077 | | Interior, 19th floor, East elevation. | Mural designed and installed by Eugene Masselink. Paint, colored glass, and gold leaf on silver mirror wall panels. Trimmed in embossed copper trim. Good condition with two pieces missing. | 5215.143 |
| 078 | | Interior, 19th floor, East elevation. | 1956 globe manufactured by Replogle and attached to built-in Philippine mahogany cabinet with embossed copper arms. Globe in poor condition especially due to water and light damage, cabinet in good condition and conserve din 2005. | 5215.143 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 079 | | Interior, typical hotel room, 7th, 8th, 9th, 10th, 12th, and 13th floors in Northeast, Southeast, and Northwest quadrants. | Hotel rooms converted from typical office interiors. Minor alterations to interior space, most notably in the insertion of shower stall into existing toilet room and addition of radiant heat flooring in bathroom. Good condition. | 5215.058 |
| 080 | | Interior, typical hotel room, 7th, 8th, 9th, 10th, 12th, and 13th floors in Northeast, Southeast, and Northwest quadrants. | See above. | 5215.058 |

Exhsagdebtor 000258

# PRICE TOWER ARTS CENTER

Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 081 | | Interior, typical hotel room, 8th, 12th, and 14th floors in Southwest quadrant. | Hotel rooms converted from typical apartment interiors. Minor alterations to interior space, most notably in the removal of historic kitchens, fireplaces, and built-in furniture. Good condition. | 5215.058 |
| 082 | | Interior, typical hotel room, 8th, 12th, and 14th floors in Southwest quadrant. | See above. | 5215.058 |

# PRICE TOWER ARTS CENTER

Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 083 | | Interior, typical hotel room, 8th, 12th, and 14th floors in Southwest quadrant. | See above. | 5215.058 |
| 084 | | Interior, typical office, Northwest quadrant. | Historic lighting fixtures and toilet rooms. Good condition. | 5215.058 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 085 | | Interior, typical office, Northwest quadrant. | See above. | 5215.058 |
| 086 | | Interior, typical office, Northeast quadrant. | See above. | 5215.131 5215.132 5215.133 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 087 | | Interior, typical office, Northeast quadrant. | See above. | 5215.131<br>5215.132<br>5215.133 |
| 088 | | Interior, typical office, Southwest quadrant. | Former apartment interior converted by later tenant. Little historic features remain except for lighting fixtures and bathroom and powder room finishes and fixtures. | 5215.126 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 089 | | Interior, typical office, Southwest quadrant. | See above. | 5215.126 |
| 090 | | Interior, typical office, Southwest quadrant. | See above. | 5215.126 |

# PRICE TOWER ARTS CENTER
Bartlesville, Oklahoma

**PHOTOGRAPHIC SURVEY**
March 2011

| ID | Photo | Location | Notes | Drawing |
|----|-------|----------|-------|---------|
| 091 | | Interior, typical office, Southwest quadrant. | See above. | 5215.126 |

Exhsagdebtor 000264

Policy Number: MCP0172192

 # NOTICE TO OUR BROKERS AND AGENTS
# OF OUR CLAIM NOTIFICATION PROCEDURE

As part of our continuing effort to provide you with the best service available, ALL CLAIMS, OCCURRENCES, INCIDENTS and LAWSUITS under this policy are to be reported immediately to:

**Mt. Hawley Insurance Company**

**Email (preferred):  New.Claim@rlicorp.com**

**Fax:  (866) 692-6796**

**Phone:  (800) 444-0406**

**Street Address:  9025 N. Lindbergh Drive, Peoria, IL  61615**

**Mailing Address:  P.O. Box 3961, Peoria, IL 61612-3961**

When reporting the incident, be prepared to supply a report of claim or the following information:

1. Policy Number
2. Contact Person information (name, address, phone, etc.)
3. Nature of incident
4. Date of incident

When reporting multiple incidents, please send each loss notice separately.

RIL 2131 (08/12)

**M:H**™

# IMPORTANT NOTICE TO POLICYHOLDERS

## TERRORISM RISK INSURANCE ACT, AS AMENDED

Under the Terrorism Risk Insurance Act, as amended (the "**Act**"), we must make coverage for "**certified acts of terrorism**" available in the policies we offer. We notified you at the time of offer and purchase of the policy to which this Notice is attached that this coverage was available and we gave you the right to reject our offer of such terrorism coverage. If you elected to purchase the coverage, the premium charged for such coverage is shown on the Declarations page of the policy. If you elected to reject the coverage we have not charged your policy for terrorism coverage and have attached a terrorism exclusion to your policy.

PLEASE NOTE: IF YOU REJECTED THE OFFER OF FEDERAL TERRORISM INSURANCE COVERAGE, THAT REJECTION DOES NOT APPLY TO THE LIMITED EXTENT THAT RELEVANT STATE LAW REQUIRES COVERAGE FOR FIRE LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM UNDER THE ACT.

When coverage is provided by this policy for losses resulting from "**certified acts of terrorism**," such losses may be partially reimbursed by the United States Government under a formula established by Federal Law. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under this formula, the United States Government generally pays 80% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company. The premium for this coverage does not include any charges for the portion of loss covered by the Federal Government under the act.

You should also know that the Act contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

Specific coverage terms for terrorism, including limitations and exclusions, are more fully described in endorsements attached to the policy. Your policy may contain an exclusion for losses that are not eligible for federal reinsurance under the Act.

Definitions:

"**Certified acts of terrorism**," as defined in Section 102(1) of the Act, means an act that is certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Insured

Exhsagdebtor 000266

Policy Number:  MCP0172192



**Mt. Hawley Insurance Company**
Peoria, Illinois 61615

# NOTICE TO POLICYHOLDERS

## REGARDING THE UNITED STATES TREASURY DEPARTMENT – OFFICE OF FOREIGN ASSETS CONTROL (OFAC)

This Policyholder Notice does not provide coverage nor can it be construed to replace any provisions of your policy. Please read your policy carefully to determine your rights, duties, and what is and what is not covered by your policy. This Notice should only be used to provide information concerning the possible impact of your insurance coverage as it relates to directives issued by OFAC.

**PLEASE READ THIS NOTICE CAREFULLY.**

OFAC administers and enforces economic and trade sanctions and places restrictions on certain transactions. OFAC acts pursuant to Executive Orders of the President of the United States and specific legislation. OFAC has identified and named numerous foreign agents, front organizations, terrorists, terrorist organizations, and narcotics traffickers, among others, as "Specially Designated Nationals and Blocked Persons." The complete list can be found on the United States Treasury website – http://www.treas.gov/ofac.

Various trade or economic sanctions and other laws or regulations prohibit us from providing insurance in certain circumstances. In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance contract is considered a blocked or frozen contract and will be considered null and void. When an insurance policy is considered to be a blocked or frozen contract, all provisions of this insurance will be immediately subject to OFAC, and neither payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments may also apply.

Insured

Exhsagdebtor 000267

Policy Number:  MCP0172192

**Mt. Hawley Insurance Company**
9025 N. Lindbergh Drive
Peoria, Illinois 61615

## ATTENTION POLICYHOLDER

## <u>KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS</u>

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false, incomplete, or misleading information, or conceals information concerning any material fact thereto, commits a fraudulent insurance act, which is a crime punishable by incarceration, and shall also be subject to civil penalties.

Insured

Exhsagdebtor 000268

Policy Number: MCP0172192                                    Mt. Hawley Insurance Company

# IMPORTANT NOTICE TO POLICYHOLDER

## POLICYHOLDER'S RESPONSIBILITY TO PROPERLY ASSESS AND REPORT PROPERTY VALUATION

This Policyholder Notice does not provide coverage nor can it be construed to replace any provisions of your policy. Please read your policy carefully to determine your rights, duties, and what is and what is not covered by your policy. This Notice only provides information concerning your responsibility to properly assess and report property valuation amount(s).

PLEASE READ THIS NOTICE CAREFULLY.

The coverage provided under this policy is based on the valuation amount(s) you report to us for the scheduled property(ies) under the policy. While valuation of the property(ies) may be discussed with us, the ultimate responsibility to provide proper valuation(s) lies with the insured. Valuation could have a material impact on the outcome of a claim(s) involving a loss(es) to the scheduled property(ies) under your policy.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

RIL 2156 (06/22)



## Mt. Hawley Insurance Company

9025 N. Lindbergh Drive
Peoria, Illinois 61615
309-692-1000

## Commercial Property Policy Declarations Page

**Policy No.** MCP0172192

| Named Insured and Mailing Address: | Agent/Broker and Mailing Address: |
|---|---|
| Price Tower Arts Center Inc<br>PO Box 2464<br>Bartlesville, OK 74005 | Risk Placement Srvs. Inc<br>5100 N Classen Blvd<br>Suite 105<br>Oklahoma City, OK  73118 |

**Policy Period:**  From 08/01/2022  to 08/01/2023   at 12:01 A.M. Standard Time at your mailing address shown above.

### DESCRIPTION OF PREMISES

Covered Locations Listed Below :

510 S. Dewey Ave, Bartlesville, OK  74003
500 S. Dewey Ave, Bartlesville, OK  74003

### CAUSES OF LOSS:  Special excluding Earthquake and Flood

### LIMITS OF INSURANCE

**Total coverage (limit) applicable  Limit** $5,000,000          **, part of** $5,000,000

The above limit applies to the following and is subject to any sublimits stated elsewhere in the policy:

| | |
|---|---|
| Accounts Receivable | Premium         : $100,000.00 |
| Building | Catastrophe Analysis Fee : $250.00 |
| Business Personal Property | Carrier Inspection Fee : $400.00 |
| Debris Removal | Policy Fee       : $350.00 |
| Electronic Data Processing | OK Surplus Lines Tax :  $6,045.00 |
| Fine Arts | Total Charges      : $107,045.00 |
| Fire Department Service Charges | |
| Fire Protection Equipment Recharge | |
| Newly Acquired Property | |
| Sewer Backup and Drains | |
| Valuable Papers and Records | |
| Business Income (and Extra Expense) | Monthly Limit of Indemnity 1/12 |
| Extended Period of Indemnity | |

**Per Occurrence Loss Limit**

At no time will we pay more than $5,000,000          for a loss due to a single occurrence or event.

### DEDUCTIBLE(S):  Refer to CPR 2218, Declarations - Deductible Addendum

**This contract is not subject to the protection of the Oklahoma Guaranty
Association in the event of liquidation or receivership of the surplus lines insurer.**

NV  8/24/2022

FRPR 100 (02/02)
RPSTUL/SC/2022.09.01

Insured

To Report a Loss
• Dial toll-free #1 (844)777-8323 or visit our
• Website: https://my.rpsins.com/claimsfnol
• Contact Insurer directly (see policy section)

Exhsagdebtor 000270



**Mt. Hawley Insurance Company**

9025 N. Lindbergh Drive
Peoria, Illinois 61615
309-692-1000

## Commercial Property Policy Declarations Page

**Policy No.** MCP0172192

**FORMS MADE A PART OF THIS POLICY AT TIME OF ISSUE:**  See CPR 2150, Applicable Forms & Endorsements

| | |
|---|---|
| **PCA Fees** | $ 250 |
| **Inspection Fees** | $ 400 |
| **Total Premium** | $ 100,000 |
| **Amount Payable At Inception** | $ 100,650 |

Authorized Signature

NV  8/24/2022

FRPR 100 (02/02)

Insured

Page 2 of 2

Exhsagdebtor 000271

Policy Number: MCP0172192         Mt. Hawley Insurance Company

# DECLARATIONS - SUB-LIMIT ADDENDUM

The total Limit of Liability as shown in the Declarations is subject to the following sub-limit(s). The sub-limit(s) shown is a limit or amount per occurrence, except for Earthquake and Flood where an annual aggregate applies. The sub-limit(s) shown are included in and do not increase the Limit of Liability shown in the Declarations. We will not, in any case, exceed this sub-limit(s) in one disaster, casualty or event, no matter how many locations are involved.

| Coverage Part or Item: | Sub-Limit |
|---|---|
| Fire Department Service Charges | $5,000 |

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000272

Policy Number:  MCP0172192                                    Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DECLARATIONS - DEDUCTIBLE ADDENDUM

The following deductible wording is in addition to all other deductible wording found elsewhere in this policy. All other deductible wording found in and made a part of this policy also applies. Each claim for loss or damage will be adjusted separately.

**PERIL DEDUCTIBLE(S)**

$25,000 Per Occurrence for All Covered Perils, except:
2.00% of the Total Insurable Values Per Location (including time element if applicable) at the time of loss or damage subject to a minimum of $100,000 Per Occurrence for Windstorm or Hail

Total Insurable Values is defined as the full value of covered property, including time element if applicable, subject to the valuation terms and conditions of the policy. Total Insurable Values are calculated at the time of loss or damage.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000273

Policy Number:  MCP0172192                                                                    Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SCHEDULED LOCATIONS ENDORSEMENT

| Location Number | Coverage Type | Declared* Values | Valuation** | Description and Location of Property Covered |
|---|---|---|---|---|
| 00001 - 001 | Building | $13,207,300 | FRC | Built: 1956, Fire Resistive<br>510 S. Dewey Ave<br>Bartlesville, OK  74003<br>Office, Hotel, Restaurant |
| 00001 - 001 | Business Income (and Extra Expense) | $300,000 | ALS | Built: 1956, Fire Resistive<br>510 S. Dewey Ave<br>Bartlesville, OK  74003<br>Office, Hotel, Restaurant |
| 00001 - 001 | Business Personal Property | $768,900 | FRC | Built: 1956, Fire Resistive<br>510 S. Dewey Ave<br>Bartlesville, OK  74003<br>Office, Hotel, Restaurant |
| 00002 - 001 | Building | $1,781,690 | RCV | Built: 1956, Joisted Masonry<br>500 S. Dewey Ave<br>Bartlesville, OK  74003<br>Art Gallery |
| 00002 - 001 | Business Personal Property | $54,921 | RCV | Built: 1956, Joisted Masonry<br>500 S. Dewey Ave<br>Bartlesville, OK  74003<br>Art Gallery |

\*      For Limit of Insurance please see Declarations page of this policy.
\*\*     Indicate: ACV (Actual Cash Value), ALS (Actual Loss Sustained), FRC (Functional Replacement Cost), RCV (Replacement Cost Value), SP (Selling Price) or SV (Stated Value).

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000274

Policy Number:  MCP0172192                                                    Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# APPLICABLE FORMS & ENDORSEMENTS

FORMS AND ENDORSEMENTS LISTED BELOW APPLY TO AND ARE MADE PART OF THIS POLICY AT TIME OF ISSUE.

| | |
|---|---|
| CPR-2147(02/04) | Declarations - SubLimit Addendum |
| CPR-2218(11/04) | Declarations - Deductible Addendum |
| CPR-2194(10/01) | Scheduled Locations Endorsement |
| CP-0010(06/07) | Building and Personal Property Coverage Form |
| CP-0030(06/07) | Business Income (and Extra Expense) Coverage Form |
| CP-1030(06/07) | Causes Of Loss - Special Form |
| CP-0415(10/00) | Debris Removal Additional Insurance |
| CP-0438(06/07) | Functional Building Valuation |
| CPR-2152F(02/04) | Electronic Data Processing Endorsement |
| CPR-2170(03/02) | Valuable Papers and Records |
| CPR-2177(03/02) | Accounts Receivable |
| CPR-2216(01/20) | Fine Arts Endorsement |
| CPR-2224(03/03) | Sewer Back Up Endorsement |
| CPR-2254(07/04) | Extended Period of Indemnity Endorsement |
| CPR-2268(11/20) | Protective Safeguard Endorsement |
| CPR-2273(04/12) | Minimum Earned Premium Endorsement |
| CPR-2276(04/12) | Non-Payment Of Premium |
| CPR-2281(12/14) | Nuclear, Biological, Chemical, or Radioactive Exclusion |
| CPR-2282(02/15) | Exclusion Of Cosmetic Damage To Roof Surfacing |
| CPR-2283(05/19) | Actual Cash Value For Roof Surfacing |
| CPR-2284(04/15) | Fire Protection Equipment Recharge Endorsement |
| CPR-2315(07/20) | Newly Acquired Property Endorsement |
| CP-1032(08/08) | Water Exclusion Endorsement |
| CPR-2117(08/15) | Definition of Occurrence |
| CPR-2230(03/08) | Terrorism Exclusion |
| CPR-2261(09/04) | Fire Department Service Charge Endorsement |
| CPR-2269(06/09) | Asbestos Exclusion |
| CPR-2295(04/20) | Windstorm Or Hail Loss Reporting Limitation Addendum |
| CPR-2308(12/18) | Pre-Existing Damage Exclusion |
| CPR-2310(04/20) | Appraisal |
| CPR-2311(04/20) | Legal Action Conditions Endorsement |
| CPR-2313(04/22) | Cyber And Computer Related Loss Exclusion |

Insured

Exhsagdebtor 000275

**APPLICABLE FORMS & ENDORSEMENTS**
**(cont'd)**

| | |
|---|---|
| CPR-2314(07/20) | Communicable Disease Exclusion |
| CPR-2316(08/20) | Total Pollution Exclusion |
| CPR-2318(08/21) | Actual Cash Value (ACV) Definition |
| CPR-2320(04/21) | Amended Limitations |
| CPR-2321(01/22) | Common Policy Conditions |
| CPR-2324(04/22) | Commercial Property Conditions |
| CPR-2326(07/22) | Fully Earned Premium For Actual Total Loss Or Constructive Total Loss |
| IL-0174(07/05) | Oklahoma Changes - Appraisal |
| IL-0236(09/07) | Oklahoma Changes - Cancellation And Nonrenewal |
| RIL-2156(06/22) | Policyholder's Responsibility To Properly Assess And Report Property Valuation |
| RIL-099(04/20) | Service Of Suit |
| ILF-0001COK(07/16) | Oklahoma Signature Page |

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

CPR 2150 (10/01)                                                                 Page  2 of 2

Insured

Exhsagdebtor 000276

Policy Number: MCP0172192 Mt. Hawley Insurance Company

# BUILDING AND PERSONAL
# PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **H. Definitions**.

**A. Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**1. Covered Property**

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A. 1.**, and limited in **A. 2. Property Not Covered**, if a Limit of Insurance is shown in the Declarations for that type of property.

**a. Building**, meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery and

**(b)** Equipment;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

**(a)** Fire-extinguishing equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(5)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the building or structure;

**(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property – Separation Of Coverage form:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy but do not own; and

**(b)** You acquired or made at your expense but cannot legally remove;

© ISO Properties, Inc., 2007
Insured

Exhsagdebtor 000277

**(7)** Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property Of Others.

**c. Personal Property Of Others** that is:

**(1)** In your care, custody or control; and

**(2)** Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**2. Property Not Covered**

Covered Property does not include:

**a.** Accounts, bills, currency, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

**b.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

**c.** Automobiles held for sale;

**d.** Bridges, roadways, walks, patios or other paved surfaces;

**e.** Contraband, or property in the course of illegal transportation or trade;

**f.** The cost of excavations, grading, backfilling or filling;

**g.** Foundations of buildings, structures, machinery or boilers if their foundations are below:

**(1)** The lowest basement floor; or

**(2)** The surface of the ground, if there is no basement;

**h.** Land (including land on which the property is located), water, growing crops or lawns;

**i.** Personal property while airborne or waterborne;

**j.** Bulkheads, pilings, piers, wharves or docks;

**k.** Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

**l.** Retaining walls that are not part of a building;

**m.** Underground pipes, flues or drains;

**n.** Electronic data, except as provided under the Additional Coverage, Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data. This paragraph, **n.**, does not apply to your "stock" of prepackaged software;

**o.** The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data;

**p.** Vehicles or self-propelled machines (including aircraft or watercraft) that:

**(1)** Are licensed for use on public roads; or

**(2)** Are operated principally away from the described premises.

This paragraph does not apply to:

**(a)** Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

**(b)** Vehicles or self-propelled machines, other than autos, you hold for sale;

© ISO Properties, Inc., 2007
Insured

Exhsagdebtor 000278

**(c)** Rowboats or canoes out of water at the described premises; or

**(d)** Trailers, but only to the extent provided for in the Coverage Extension for Non-owned Detached Trailers;

**q.** The following property while outside of buildings:

**(1)** Grain, hay, straw or other crops;

**(2)** Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, trees, shrubs or plants (other than "stock" of trees, shrubs or plants), all except as provided in the Coverage Extensions.

**3. Covered Causes Of Loss**

See applicable Causes Of Loss Form as shown in the Declarations.

**4. Additional Coverages**

**a. Debris Removal**

**(1)** Subject to Paragraphs **(3)** and **(4)**, we will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

**(2)** Debris Removal does not apply to costs to:

**(a)** Extract "pollutants" from land or water; or

**(b)** Remove, restore or replace polluted land or water.

**(3)** Subject to the exceptions in Paragraph **(4)**, the following provisions apply:

**(a)** The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

**(b)** Subject to **(a)** above, the amount we will pay for debris removal expense is limited to 25% of the sum of the

deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

**(4)** We will pay up to an additional $10,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

**(a)** The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

**(b)** The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if **(4)** **(a)** and/or **(4)** **(b)** apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $10,000.

**(5) Examples**

The following examples assume that there is no Coinsurance penalty.

**EXAMPLE #1**

| | |
|---|---|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 50,000 |
| Amount of Loss Payable: | $ 49,500 |
| | ($50,000 – $500) |
| Debris Removal Expense: | $ 10,000 |
| Debris Removal Expense Payable: | $ 10,000 |

($10,000 is 20% of $50,000.)

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the

© ISO Properties, Inc., 2007
Insured

Exhsagdebtor 000279

loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3)**.

**EXAMPLE #2**

| | |
|---|---|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $    500 |
| Amount of Loss: | $ 80,000 |
| Amount of Loss Payable: | $ 79,500 |
| | ($80,000 – $500) |
| Debris Removal Expense: | $ 30,000 |

Debris Removal Expense Payable

| | |
|---|---|
| Basic Amount: | $ 10,500 |
| Additional Amount: | $ 10,000 |

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4)**, because the debris removal expense ($30,000) exceeds 25% of the loss payable plus the deductible ($30,000 is 37.5% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $30,000 = $109,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $10,000; the maximum payable under Paragraph **(4)**. Thus the total payable for debris removal expense in this example is $20,500; $9,500 of the debris removal expense is not covered.

**b.  Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)**  While it is being moved or while temporarily stored at another location; and

**(2)**  Required by local ordinance. No Deductible applies to this Additional Coverage.

**c.  Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000, unless a higher limit is shown in the Declarations, for your liability for fire department service charges:

**(1)**  Assumed by contract or agreement prior to loss; or

**(2)**  Required by local ordinance.

No Deductible applies to this Additional Coverage.

**d.  Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

**e.  Increased Cost Of Construction**

**(1)**  This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

**(2)**  In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in **e. (3)** through **e. (9)** of this Additional Coverage.

Exhsagdebtor 000280

**(3)** The ordinance or law referred to in **e. (2)** of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises, and is in force at the time of loss.

**(4)** Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

**(a)** You were required to comply with before the loss, even when the building was undamaged; and

**(b)** You failed to comply with.

**(5)** Under this Additional Coverage, we will not pay for:

**(a)** The enforcement of any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

**(b)** Any costs associated with the enforcement of an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**(6)** The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of: $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

**(7)** With respect to this Additional Coverage:

**(a)** We will not pay for the Increased Cost of Construction:

**(i)** Until the property is actually repaired or replaced, at the same or another premises; and

**(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

**(b)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e. (6)** of this Additional Coverage, is the increased cost of construction at the same premises.

**(c)** If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e. (6)** of this Additional Coverage, is the increased cost of construction at the new premises.

**(8)** This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion, to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

**(9)** The costs addressed in the Loss Payment and Valuation Conditions, and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of an ordinance or law. The amount payable under this Additional Coverage, as stated in **e. (6)** of this Additional Coverage, is not subject to such limitation.

**f.   Electronic Data**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, Electronic Data.

© ISO Properties, Inc., 2007
Insured

Exhsagdebtor 000281

**(2)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

**(3)** The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, Electronic Data, subject to the following:

**(a)** If the Causes Of Loss – Special Form applies, coverage under this Additional Coverage, Electronic Data, is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

**(b)** If the Causes Of Loss – Broad Form applies, coverage under this Additional Coverage, Electronic Data, includes Collapse as set forth in that form.

**(c)** If the Causes Of Loss Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Electronic Data.

**(d)** The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

**(4)** The most we will pay under this Additional Coverage, Electronic Data, is $2,500 for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**5. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more, or a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a. Newly Acquired Or Constructed Property**

**(1) Buildings**

If this policy covers Building, you may extend that insurance to apply to:

**(a)** Your new buildings while being built on the described premises; and

**(b)** Buildings you acquire at locations, other than the described premises, intended for:

**(i)** Similar use as the building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2) Your Business Personal Property**

**(a)** If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

**(i)** Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions;

© ISO Properties, Inc., 2007
Insured

Exhsagdebtor 000282

**(ii)** Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations; or

**(iii)** Business personal property that you newly acquire, located at the described premises.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

**(b)** This Extension does not apply to:

**(i)** Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

**(ii)** Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

**(3) Period Of Coverage**

With respect to insurance on or at each newly acquired or constructed property, coverage will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b. Personal Effects And Property Of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

**(1)** Personal effects owned by you, your officers, your partners or members, your managers or your employees. This Extension does not apply to loss or damage by theft.

**(2)** Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers And Records (Other Than Electronic Data)**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Extension does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered, Electronic Data.

**(2)** If the Causes Of Loss – Special Form applies, coverage under this Extension is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

**(3)** If the Causes Of Loss – Broad Form applies, coverage under this Extension includes Collapse as set forth in that form.

**(4)** Under this Extension, the most we will pay to replace or restore the lost information is $2,500 at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist), and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and therefore coverage of such costs is not additional insurance.

**d. Property Off-premises**

**(1)** You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described premises, if it is:

Exhsagdebtor 000283

(a) Temporarily at a location you do not own, lease or operate;

(b) In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

(c) At any fair, trade show or exhibition.

(2) This Extension does not apply to property:

(a) In or on a vehicle; or

(b) In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.

(3) The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than "stock" of trees, shrubs or plants), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

(1) Fire;

(2) Lightning;

(3) Explosion;

(4) Riot or Civil Commotion; or

(5) Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

**f. Non-owned Detached Trailers**

(1) You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

(a) The trailer is used in your business;

(b) The trailer is in your care, custody or control at the premises described in the Declarations; and

(c) You have a contractual responsibility to pay for loss or damage to the trailer.

(2) We will not pay for any loss or damage that occurs:

(a) While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

(b) During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

(3) The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

(4) This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. Exclusions And Limitations**

See applicable Causes Of Loss Form as shown in the Declarations.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to a building, is $2,500 per sign in any one occurrence.

The amounts of insurance stated in the following Additional Coverages apply in accordance with the terms of such coverages and are separate from the Limit(s) of Insurance shown in the Declarations for any other coverage:

**1.** Fire Department Service Charge;

Exhsagdebtor 000284

2. Pollutant Clean-up And Removal;

3. Increased Cost Of Construction; and

4. Electronic Data.

Payments under the Preservation Of Property Additional Coverage will not increase the applicable Limit of Insurance.

**D. Deductible**

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss, and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

**EXAMPLE #1**

(This example assumes there is no Coinsurance penalty.)

| | |
|---|---|
| Deductible: | $    250 |
| Limit of Insurance – Building #1: | $ 60,000 |
| Limit of Insurance – Building #2: | $ 80,000 |
| Loss to Building #1: | $ 60,100 |
| Loss to Building #2: | $ 90,000 |

The amount of loss to Building #1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Building #1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Building #1:

$60,100
−   250
$59,850    Loss Payable – Building #1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Building #2. Loss payable for Building #2 is the Limit of Insurance of $80,000.

Total amount of loss payable:

$59,850 + $80,000 = $139,850

**EXAMPLE #2**

(This example, too, assumes there is no Coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example #1.

| | |
|---|---|
| Loss to Building #1:<br>(Exceeds Limit of Insurance plus Deductible) | $ 70,000 |
| Loss to Building #2:<br>(Exceeds Limit of Insurance plus Deductible) | $ 90,000 |
| Loss Payable – Building #1:<br>(Limit of Insurance) | $ 60,000 |
| Loss Payable – Building #2:<br>(Limit of Insurance) | $ 80,000 |
| Total amount of loss payable: | $140,000 |

**E. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

1. **Abandonment**

There can be no abandonment of any property to us.

2. **Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

3. **Duties In The Event Of Loss Or Damage**

a. You must see that the following are done in the event of loss or damage to Covered Property:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claime.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

4. **Loss Payment**

a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

b. The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

c. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

d. We will not pay you more than your financial interest in the Covered Property.

e. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

Exhsagdebtor 000286

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

**(1)** We have reached agreement with you on the amount of loss; or

**(2)** An appraisal award has been made.

**h.** A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and Coinsurance Conditions and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**6. Vacancy**

**a. Description Of Terms**

**(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1) (a)** and **(1) (b)** below:

**(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building

means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

**(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

**(i)** Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

**(ii)** Used by the building owner to conduct customary operations.

**(2)** Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

**(1)** We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

**(a)** Vandalism;

**(b)** Sprinkler leakage, unless you have protected the system against freezing;

**(c)** Building glass breakage;

**(d)** Water damage;

**(e)** Theft; or

**(f)** Attempted theft.

**(2)** With respect to Covered Causes of Loss other than those listed in **b. (1) (a)** through **b. (1) (f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

Exhsagdebtor 000287

**a.** At actual cash value as of the time of loss or damage, except as provided in **b., c., d.** and **e.** below.

**b.** If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

However, the following property will be valued at the actual cash value even when attached to the building:

**(1)** Awnings or floor coverings;

**(2)** Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

**(3)** Outdoor equipment or furniture.

**c.** "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

**d.** Glass at the cost of replacement with safety-glazing material if required by law.

**e.** Tenants' Improvements and Betterments at:

**(1)** Actual cash value of the lost or damaged property if you make repairs promptly.

**(2)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

**(a)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

**(b)** Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(3)** Nothing if others pay for repairs or replacement.

**F. Additional Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

**(2)** Divide the Limit of Insurance of the property by the figure determined in Step **(1)**;

**(3)** Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step **(2)**; and

**(4)** Subtract the deductible from the figure determined in Step **(3)**.

We will pay the amount determined in Step **(4)** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**EXAMPLE #1 (UNDERINSURANCE)**

| When: | | |
|---|---|---|
| | The value of the property is: | $250,000 |
| | The Coinsurance percentage for it is: | 80% |
| | The Limit of Insurance for it is: | $100,000 |
| | The Deductible is: | $     250 |
| | The amount of loss is: | $  40,000 |

Step **(1)**: $250,000 x 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step **(2)**: $100,000 ÷ $200,000 = .50

Exhsagdebtor 000288

**Step (3):**   $40,000 x .50 = $20,000

**Step (4):**   $20,000 – $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

### EXAMPLE #2 (ADEQUATE INSURANCE)

| When: | | |
|---|---|---|
| | The value of the property is: | $250,000 |
| | The Coinsurance percentage for it is: | 80% |
| | The Limit of Insurance for it is: | $200,000 |
| | The Deductible is: | $    250 |
| | The amount of loss is: | $  40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

### EXAMPLE #3

| When: | | |
|---|---|---|
| | The value of the property is: | |
| | Building at Location #1: | $ 75,000 |
| | Building at Location #2: | $100,000 |
| | Personal Property at Location #2: | $ 75,000 |
| | | $250,000 |
| | The Coinsurance percentage for it is: | 90% |
| | The Limit of Insurance for Buildings and Personal Property at Locations #1 and #2 is: | $180,000 |
| | The Deductible is: | $   1,000 |
| | The amount of loss is: | |
| | Building at Location #2: | $ 30,000 |
| | Personal Property at Location #2: | $ 20,000 |
| | | $ 50,000 |

**Step (1):**   $250,000 x 90% = $225,000
(the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

**Step (2):**   $180,000 ÷ $225,000 = .80

**Step (3):**   $50,000 x .80 = $40,000

**Step (4):**   $40,000 – $1,000 = $39,000

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2.  Mortgageholders**

**a.**  The term mortgageholder includes trustee.

**b.**  We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.**  The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

**d.**  If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

**(1)**  Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)**  Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)**  Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

**e.**  If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)**  The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

Exhsagdebtor 000289

**(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

**(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**G. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

**1. Agreed Value**

**a.** The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

**b.** If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

**c.** The terms of this Optional Coverage apply only to loss or damage that occurs:

**(1)** On or after the effective date of this Optional Coverage; and

**(2)** Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

**2. Inflation Guard**

**a.** The Limit of Insurance for property to which this Optional Coverage applied will automatically increase by the annual percentage shown in the Declarations.

**b.** The amount of increase will be:

**(1)** The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

**(2)** The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

**(3)** The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**EXAMPLE**

| | | |
|---|---|---|
| If: | The applicable Limit of Insurance is: | $100,000 |
| | The annual percentage increase is: | 8% |
| | The number of days since the beginning of the policy year (or last policy change) is: | 146 |
| | The amount of increase is: $100,000 x .08 x 146 ÷ 365 = | $ 3,200 |

**3. Replacement Cost**

**a.** Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

**b.** This Optional Coverage does not apply to:

**(1)** Personal property of others;

**(2)** Contents of a residence;

**(3)** Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

Exhsagdebtor 000290

**(4)** "Stock", unless the Including "Stock" option is shown in the Declarations.

Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

**c.** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

**d.** We will not pay on a replacement cost basis for any loss or damage:

**(1)** Until the lost or damaged property is actually repaired or replaced; and

**(2)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

With respect to tenants' improvements and betterments, the following also apply:

**(3)** If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth in the Valuation Loss Condition of this Coverage Form; and

**(4)** We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

**e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

**(1)** The Limit of Insurance applicable to the lost or damaged property;

**(2)** The cost to replace the lost or damaged property with other property:

**(a)** Of comparable material and quality; and

**(b)** Used for the same purpose; or

**(3)** The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

**f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**4. Extension Of Replacement Cost To Personal Property Of Others**

**a.** If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph **3.b.(1)** of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.

**b.** With respect to replacement cost on the personal property of others, the following limitation applies:

If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance.

**H. Definitions**

**1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**2.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**3.** "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

© ISO Properties, Inc., 2007
Insured

Exhsagdebtor 000291

Policy Number: MCP0172192                                    Mt. Hawley Insurance Company

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.**, Definitions.

**A. Coverage**

**1. Business Income**

Business Income means the:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

**b.** Continuing normal operating expenses incurred, including payroll.

For manufacturing risks, Net Income includes the net sales value of production.

Coverage is provided as described and limited below for one or more of the following options for which a Limit of Insurance is shown in the Declarations:

**(1)** Business Income Including "Rental Value".

**(2)** Business Income Other Than "Rental Value".

**(3)** "Rental Value".

If option **(1)** above is selected, the term Business Income will include "Rental Value". If option **(3)** above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

**(a)** The portion of the building which you rent, lease or occupy; and

**(b)** Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

**2. Extra Expense**

**a.** Extra Expense Coverage is provided at the premises described in the Declarations only if the Declarations show that Business Income Coverage applies at that premises.

**b.** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

**(1)** Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement

CP 00 30 06 07                     © ISO Properties, Inc., 2007                     Page 1 of 10
                                          Insured

Exhsagdebtor 000292

premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

**(2)** Minimize the "suspension" of business if you cannot continue "operations".

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

**3. Covered Causes Of Loss, Exclusions And Limitations**

See applicable Causes Of Loss Form as shown in the Declarations.

**4. Additional Limitation – Interruption Of Computer Operations**

**a.** Coverage for Business Income does not apply when a "suspension" of "operations" is caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage – Interruption Of Computer Operations.

**b.** Coverage for Extra Expense does not apply when action is taken to avoid or minimize a "suspension" of "operations" caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage – Interruption Of Computer Operations.

**c.** Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**5. Additional Coverages**

**a. Civil Authority**

In this Additional Coverage – Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

**(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

**(1)** Four consecutive weeks after the date of that action; or

**(2)** When your Civil Authority Coverage for Business Income ends;

whichever is later.

© ISO Properties, Inc., 2007
Insured

Exhsagdebtor 000293

**b. Alterations And New Buildings**

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

**(1)** New buildings or structures, whether complete or under construction;

**(2)** Alterations or additions to existing buildings or structures; and

**(3)** Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

    **(a)** Used in the construction, alterations or additions; or

    **(b)** Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations", the "period of restoration" for Business Income Coverage will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

**c. Extended Business Income**

**(1) Business Income Other Than "Rental Value"**

If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

**(a)** Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

**(b)** Ends on the earlier of:

    **(i)** The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

    **(ii)** 30 consecutive days after the date determined in **(1)(a)** above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**(2) "Rental Value"**

If the necessary "suspension" of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

**(a)** Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

**(b)** Ends on the earlier of:

    **(i)** The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

    **(ii)** 30 consecutive days after the date determined in **(2)(a)** above.

However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

 © ISO Properties, Inc., 2007

Insured

Exhsagdebtor 000294

d. **Interruption Of Computer Operations**

(1) Under this Additional Coverage, electronic data has the meaning described under Additional Limitation – Interruption Of Computer Operations.

(2) Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a "suspension" of "operations" caused by an interruption in computer operations due to destruction or corruption of electronic data due to a Covered Cause of Loss.

(3) With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

(a) If the Causes Of Loss – Special Form applies, coverage under this Additional Coverage – Interruption Of Computer Operations is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

(b) If the Causes Of Loss – Broad Form applies, coverage under this Additional Coverage – Interruption Of Computer Operations includes Collapse as set forth in that form.

(c) If the Causes Of Loss Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage – Interruption Of Computer Operations.

(d) The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for an interruption related to manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, maintain, repair or replace that system.

(4) The most we will pay under this Additional Coverage – Interruption of Computer Operations is $2,500 for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

(5) This Additional Coverage – Interruption in Computer Operations does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in **(4)** above has not been exhausted.

6. **Coverage Extension**

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**NEWLY ACQUIRED LOCATIONS**

a. You may extend your Business Income and Extra Expense Coverages to apply to property at any location you acquire other than fairs or exhibitions.

b. The most we will pay under this Extension, for the sum of Business Income loss and Extra Expense incurred, is $100,000 at each location.

c. Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

(1) This policy expires;

(2) 30 days expire after you acquire or begin to construct the property; or

(3) You report values to us.

Exhsagdebtor 000295

We will charge you additional premium for values reported from the date you acquire the property.

The Additional Condition, Coinsurance, does not apply to this Extension.

**B. Limits Of Insurance**

The most we will pay for loss in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

Payments under the following coverages will not increase the applicable Limit of Insurance:

**1.** Alterations And New Buildings;

**2.** Civil Authority;

**3.** Extra Expense; or

**4.** Extended Business Income.

The amounts of insurance stated in the Interruption Of Computer Operations Additional Coverage and the Newly Acquired Locations Coverage Extension apply in accordance with the terms of those coverages and are separate from the Limit(s) of Insurance shown in the Declarations for any other coverage.

**C. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Appraisal**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**2. Duties In The Event Of Loss**

**a.** You must see that the following are done in the event of loss:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when, and where the direct physical loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(6)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(7)** Cooperate with us in the investigation or settlement of the claim.

**(8)** If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

 © ISO Properties, Inc., 2007

Insured

Exhsagdebtor 000296

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**3. Loss Determination**

**a.** The amount of Business Income loss will be determined based on:

**(1)** The Net Income of the business before the direct physical loss or damage occurred;

**(2)** The likely Net Income of the business if no physical loss or damage occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

**(3)** The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

**(4)** Other relevant sources of information, including:

**(a)** Your financial records and accounting procedures;

**(b)** Bills, invoices and other vouchers; and

**(c)** Deeds, liens or contracts.

**b.** The amount of Extra Expense will be determined based on:

**(1)** All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

**(a)** The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

**(b)** Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

**(2)** Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

**c. Resumption Of Operations**

We will reduce the amount of your:

**(1)** Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

**(2)** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**d.** If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**4. Loss Payment**

We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

**a.** We have reached agreement with you on the amount of loss; or

**b.** An appraisal award has been made.

**D. Additional Condition**

**COINSURANCE**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any Business Income loss if the Limit of Insurance for Business Income is less than:

Exhsagdebtor 000297

**1.** The Coinsurance percentage shown for Business Income in the Declarations; times

**2.** The sum of:

    **a.** The Net Income (Net Profit or Loss before income taxes), and

    **b.** Operating expenses, including payroll expenses,

that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

Instead, we will determine the most we will pay using the following steps:

Step **(1):** Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

Step **(2):** Divide the Limit of Insurance for the described premises by the figure determined in Step **(1)**; and

Step **(3):** Multiply the total amount of loss by the figure determined in Step **(2)**.

We will pay the amount determined in Step **(3)** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

    **(1)** Prepaid freight – outgoing;

    **(2)** Returns and allowances;

    **(3)** Discounts;

    **(4)** Bad debts;

    **(5)** Collection expenses;

    **(6)** Cost of raw stock and factory supplies consumed (including transportation charges);

    **(7)** Cost of merchandise sold (including transportation charges);

    **(8)** Cost of other supplies consumed (including transportation charges);

    **(9)** Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

    **(10)** Power, heat and refrigeration expenses that do not continue under contract (if Form **CP 15 11** is attached);

    **(11)** All ordinary payroll expenses or the amount of payroll expense excluded (if Form **CP 15 10** is attached); and

    **(12)** Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion – not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**EXAMPLE #1 (UNDERINSURANCE)**

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been: $400,000

    The Coinsurance percentage is: 50%

    The Limit of Insurance is: $150,000

    The amount of loss is: $ 80,000

Step **(1):** $400,000 x 50% = $200,000
(the minimum amount of insurance to meet your Coinsurance requirements)

Step **(2):** $150,000 ÷ $200,000 = .75

Step **(3):** $80,000 x .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

**EXAMPLE #2 (ADEQUATE INSURANCE)**

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been: $400,000

© ISO Properties, Inc., 2007
Insured

Exhsagdebtor 000298

| | |
|---|---|
| The Coinsurance percentage is: | 50% |
| The Limit of Insurance is: | $200,000 |
| The amount of loss is: | $ 80,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of Insurance in this example is adequate and no penalty applies. We will pay no more than $80,000 (amount of loss).

This condition does not apply to Extra Expense Coverage.

**E. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

**1. Maximum Period Of Indemnity**

a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

b. The most we will pay for the total of Business Income loss and Extra Expense is the lesser of:

(1) The amount of loss sustained and expenses incurred during the 120 days immediately following the beginning of the "period of restoration"; or

(2) The Limit of Insurance shown in the Declarations.

**2. Monthly Limit Of Indemnity**

a. The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

b. The most we will pay for loss of Business Income in each period of 30 consecutive days after the beginning of the "period of restoration" is:

(1) The Limit of Insurance, multiplied by

(2) The fraction shown in the Declarations for this Optional Coverage.

**EXAMPLE**

When: The Limit of Insurance is:     $120,000

The fraction shown in the Declarations for this Optional Coverage is:     1/4

The most we will pay for loss in each period of 30 consecutive days is:     $ 30,000
($120,000 x 1/4 = $30,000)

If, in this example, the actual amount of loss is:

| | |
|---|---|
| Days 1–30: | $ 40,000 |
| Days 31–60: | $ 20,000 |
| Days 61–90: | $ 30,000 |
| | $ 90,000 |

We will pay:

| | |
|---|---|
| Days 1–30: | $ 30,000 |
| Days 31–60: | $ 20,000 |
| Days 61–90: | $ 30,000 |
| | $ 80,000 |

The remaining $10,000 is not covered.

**3. Business Income Agreed Value**

a. To activate this Optional Coverage:

(1) A Business Income Report/Work Sheet must be submitted to us and must show financial data for your "operations":

(a) During the 12 months prior to the date of the Work Sheet; and

(b) Estimated for the 12 months immediately following the inception of this Optional Coverage.

(2) The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown in the Declarations. The Agreed Value should be at least equal to:

(a) The Coinsurance percentage shown in the Declarations; multiplied by

(b) The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.

 © ISO Properties, Inc., 2007

Insured

**b.** The Additional Condition, Coinsurance, is suspended until:

   **(1)** 12 months after the effective date of this Optional Coverage; or

   **(2)** The expiration date of this policy; whichever occurs first.

**c.** We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:

   **(1)** Within 12 months of the effective date of this Optional Coverage; or

   **(2)** When you request a change in your Business Income Limit of Insurance.

**d.** If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

   **(1)** The Business Income Limit of Insurance; divided by

   **(2)** The Agreed Value.

**EXAMPLE**

When:  The Limit of Insurance is:         $100,000

       The Agreed Value is:              $200,000

       The amount of loss is:           $ 80,000

Step **(1)**:   $100,000 ÷ $200,000 = .50

Step **(2)**:   50 x $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

   **4. Extended Period Of Indemnity**

   Under Paragraph **A.5.c.**, **Extended Business Income**, the number 30 in Subparagraphs **(1)(b)** and **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.

**F. Definitions**

   **1.** "Finished stock" means stock you have manufactured.

"Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

"Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

**2.** "Operations" means:

   **a.** Your business activities occurring at the described premises; and

   **b.** The tenantability of the described premises, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

**3.** "Period of restoration" means the period of time that:

   **a.** Begins:

   **(1)** 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

   **(2)** Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

   caused by or resulting from any Covered Cause of Loss at the described premises; and

   **b.** Ends on the earlier of:

   **(1)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

   **(2)** The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

   **(1)** Regulates the construction, use or repair, or requires the tearing down, of any property; or

   **(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

Exhsagdebtor 000300

The expiration date of this policy will not cut short the "period of restoration".

**4.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**5.** "Rental Value" means Business Income that consists of:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the described premises which is occupied by you; and

**b.** Continuing normal operating expenses incurred in connection with that premises, including:

**(1)** Payroll; and

**(2)** The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

**6.** "Suspension" means:

**a.** The slowdown or cessation of your business activities; or

**b.** That a part or all of the described premises is rendered untenantable, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

Exhsagdebtor 000301

Policy Number: MCP0172192                                      Mt. Hawley Insurance Company

# CAUSES OF LOSS – SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **G.**, Definitions.

**A. Covered Causes Of Loss**

When Special is shown in the Declarations, Covered Causes of Loss means Risks Of Direct Physical Loss unless the loss is:

**1.** Excluded in Section **B.**, Exclusions; or

**2.** Limited in Section **C.**, Limitations;

that follow.

**B. Exclusions**

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

    **a. Ordinance Or Law**

    The enforcement of any ordinance or law:

    **(1)** Regulating the construction, use or repair of any property; or

    **(2)** Requiring the tearing down of any property, including the cost of removing its debris.

    This exclusion, Ordinance Or Law, applies whether the loss results from:

        **(a)** An ordinance or law that is enforced even if the property has not been damaged; or

        **(b)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

    **b. Earth Movement**

    **(1)** Earthquake, including any earth sinking, rising or shifting related to such event;

**(2)** Landslide, including any earth sinking, rising or shifting related to such event;

**(3)** Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

**(4)** Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

**(5)** Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

**(a)** Airborne volcanic blast or airborne shock waves;

**(b)** Ash, dust or particulate matter; or

**(c)** Lava flow.

All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

Volcanic Action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

CP 10 30 06 07                          © ISO Properties, Inc., 2007                          Page 1 of 10

Exhsagdebtor 000302

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

**(1)** Originates away from the described premises; or

**(2)** Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

**f. War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

**(1)** Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows from a sewer, drain or sump; or

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings.

But if Water, as described in **g.(1)** through **g.(4)** above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**h. "Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

**(1)** When "fungus", wet or dry rot or bacteria results from fire or lightning; or

© ISO Properties, Inc., 2007
Insured

Exhsagdebtor 000303

**(2)** To the extent that coverage is provided in the Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(a)** Electrical current, including arcing;

**(b)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(c)** Pulse of electromagnetic energy; or

**(d)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

**d.** **(1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

Exhsagdebtor 000304

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**h.** Dishonest or criminal act by you, any of your partners, members, officers, managers, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)** Acting alone or in collusion with others; or

**(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

**i.** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**j.** Rain, snow, ice or sleet to personal property in the open.

**k.** Collapse, including any of the following conditions of property or any part of the property:

**(1)** An abrupt falling down or caving in;

**(2)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

**(3)** Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to **(1)** or **(2)** above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, **k.**, does not apply:

**(a)** To the extent that coverage is provided under the Additional Coverage – Collapse; or

**(b)** To collapse caused by one or more of the following:

**(i)** The "specified causes of loss";

**(ii)** Breakage of building glass;

**(iii)** Weight of rain that collects on a roof; or

**(iv)** Weight of people or personal property.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion, **l.**, does not apply to damage to glass caused by chemicals applied to the glass.

**m.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

© ISO Properties, Inc., 2007
Insured

Exhsagdebtor 000305

of part or all of any property on or off the described premises.

**4. Special Exclusions**

The following provisions apply only to the specified Coverage Forms.

**a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

We will not pay for:

**(1)** Any loss caused by or resulting from:

**(a)** Damage or destruction of "finished stock"; or

**(b)** The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

**(2)** Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

**(3)** Any increase of loss caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

**(4)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

**(5)** Any other consequential loss.

**b. Leasehold Interest Coverage Form**

**(1)** Paragraph **B.1.a.**, Ordinance Or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

**(a)** Your cancelling the lease;

**(b)** The suspension, lapse or cancellation of any license; or

**(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following exclusions do not apply to insurance under this Coverage Form:

**(a)** Paragraph **B.1.a.**, Ordinance Or Law;

**(b)** Paragraph **B.1.c.**, Governmental Action;

**(c)** Paragraph **B.1.d.**, Nuclear Hazard;

**(d)** Paragraph **B.1.e.**, Utility Services; and

**(e)** Paragraph **B.1.f.**, War And Military Action.

**(2)** The following additional exclusions apply to insurance under this Coverage Form:

**(a) Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

Exhsagdebtor 000306

**(i)** Your assumption of liability was executed prior to the accident; and

**(ii)** The building is Covered Property under this Coverage Form.

**(b) Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**5. Additional Exclusion**

The following provisions apply only to the specified property.

**LOSS OR DAMAGE TO PRODUCTS**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**C. Limitations**

The following limitations apply to all policy forms and endorsements, unless otherwise stated.

**1.** We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

**a.** Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**b.** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

**c.** The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

**(1)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

**(2)** The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

**d.** Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

However, this limitation does not apply to:

**(1)** Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

**(2)** Business Income Coverage or Extra Expense Coverage.

**e.** Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

**f.** Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

**2.** We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

**a.** Animals, and then only if they are killed or their destruction is made necessary.

**b.** Fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

**(1)** Glass; or

Exhsagdebtor 000307

**(2)** Containers of property held for sale.

**c.** Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

However, this limitation does not apply:

**(1)** If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

**(2)** To Business Income Coverage or to Extra Expense Coverage.

**3.** The special limit shown for each category, **a.** through **d.**, is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are:

**a.** $2,500 for furs, fur garments and garments trimmed with fur.

**b.** $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

**c.** $2,500 for patterns, dies, molds and forms.

**d.** $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

This limitation, **C.3.**, does not apply to Business Income Coverage or to Extra Expense Coverage.

**4.** We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire-extinguishing equipment if the damage:

**a.** Results in discharge of any substance from an automatic fire protection system; or

**b.** Is directly caused by freezing.

However, this limitation does not apply to Business Income Coverage or to Extra Expense Coverage.

**D. Additional Coverage – Collapse**

The coverage provided under this Additional Coverage – Collapse applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**.

**1.** For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

**2.** We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

**a.** Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

**b.** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

**c.** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

**d.** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

**(1)** A cause of loss listed in **2.a.** or **2.b.**;

**(2)** One or more of the "specified causes of loss";

**(3)** Breakage of building glass;

**(4)** Weight of people or personal property; or

**(5)** Weight of rain that collects on a roof.

Exhsagdebtor 000308

3. This **Additional Coverage – Collapse** does **not** apply to:

   **a.** A building or any part of a building that is in danger of falling down or caving in;

   **b.** A part of a building that is standing, even if it has separated from another part of the building; or

   **c.** A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

4. With respect to the following property:

   **a.** Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

   **b.** Awnings, gutters and downspouts;

   **c.** Yard fixtures;

   **d.** Outdoor swimming pools;

   **e.** Fences;

   **f.** Piers, wharves and docks;

   **g.** Beach or diving platforms or appurtenances;

   **h.** Retaining walls; and

   **i.** Walks, roadways and other paved surfaces;

   if an abrupt collapse is caused by a cause of loss listed in **2.a.** through **2.d.**, we will pay for loss or damage to that property only if:

   **(1)** Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

   **(2)** The property is Covered Property under this Coverage Form.

5. If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

   **a.** The collapse of personal property was caused by a cause of loss listed in **2.a.** through **2.d.**;

   **b.** The personal property which collapses is inside a building; and

   **c.** The property which collapses is not of a kind listed in **4.**, regardless of whether that kind of property is considered to be personal property or real property.

   The coverage stated in this Paragraph **5.** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

6. This Additional Coverage – Collapse does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

7. This Additional Coverage – Collapse will not increase the Limits of Insurance provided in this Coverage Part.

8. The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in **D.1.** through **D.7.**.

**E. Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria**

1. The coverage described in **E.2.** and **E.6.** only applies when the "fungus", wet or dry rot or bacteria is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

   **a.** A "specified cause of loss" other than fire or lightning; or

   **b.** Flood, if the Flood Coverage Endorsement applies to the affected premises.

2. We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

   **a.** Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

   **b.** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

© ISO Properties, Inc., 2007
Insured

Exhsagdebtor 000309

**c.** The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

**3.** The coverage described under **E.2.** of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continues to be present or active, or recurs, in a later policy period.

**4.** The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

**5.** The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph **F.2.** (Water Damage, Other Liquids, Powder Or Molten Material Damage) of this Causes Of Loss Form or under the Additional Coverage – Collapse.

**6.** The following, **6.a.** or **6.b.**, applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage Form.

**a.** If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet

or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

**b.** If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

**F. Additional Coverage Extensions**

**1. Property In Transit**

This Extension applies only to your personal property to which this form applies.

**a.** You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

**b.** Loss or damage must be caused by or result from one of the following causes of loss:

**(1)** Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

**(2)** Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the roadbed.

**(3)** Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

**c.** The most we will pay for loss or damage under this Extension is $5,000.

This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

Exhsagdebtor 000310

**2. Water Damage, Other Liquids, Powder Or Molten Material Damage**

If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. This Coverage Extension does not increase the Limit of Insurance.

**3. Glass**

**a.** We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

**b.** We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

This Coverage Extension, **F.3.**, does not increase the Limit of Insurance.

**G. Definitions**

**1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**2.** "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

**a.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

**(1)** The cost of filling sinkholes; or

**(2)** Sinking or collapse of land into man-made underground cavities.

**b.** Falling objects does not include loss or damage to:

**(1)** Personal property in the open; or

**(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

**c.** Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam.

Exhsagdebtor 000311

Policy Number: MCP0172192                                    Mt. Hawley Insurance Company

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

**1.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**2.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

    **a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

    **b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

**4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

**1.** We have the right to:

    **a.** Make inspections and surveys at any time;

    **b.** Give you reports on the conditions we find; and

    **c.** Recommend changes.

**2.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public and we do not warrant that:

    **a.** Conditions are safe or healthful;

    **b.** The insured property complies with laws, regulations, codes or standards; or

    **c.** The insured property is free from pre-existing conditions that may impact coverage in the event of a loss.

Any property inspection undertaken by us or on our behalf related to the underwriting process in connection with issuance of any policy is for our information only and does not in any way negate or impair our ability to apply and enforce any and all applicable exclusions, limitations, conditions, or other terms of this policy. It is agreed that neither such property inspection nor any property inspection report can be used by any insured for any reason after a loss.

**3.** Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**4.** Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

Exhsagdebtor 000312

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

You may not transfer your rights and duties under this policy, before or after a loss, without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Exhsagdebtor 000313

Policy Number: MCP0172192                                      Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DEBRIS REMOVAL ADDITIONAL INSURANCE

This endorsement modifies insurance provided under the following:

BUILDERS' RISK COVERAGE FORM
BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY
TOBACCO SALES WAREHOUSES COVERAGE FORM

**SCHEDULE\***

| Prem.<br>No. | Bldg.<br>No. | Debris Removal<br>Amount | Additional<br>Premium |
|---|---|---|---|
| All | All | $20,000 | Included |

*Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

The additional amount of $10,000 for debris removal in the **Debris Removal** Additional Coverages section is replaced by the higher amount shown in the Schedule.

CP 04 15 10 00              Copyright, Insurance Services Office, Inc., 1999              Page 1 of 1
Insured

Exhsagdebtor 000314

Policy Number: MCP0172192         Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FUNCTIONAL BUILDING VALUATION

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM

**SCHEDULE**

| Premise Number | Building Number | Limit of Insurance |
|---|---|---|
| 00001 | 001 | See CPR-2162 |
|  |  |  |
|  |  |  |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** The Limit of Insurance shown in the above Schedule is the only limit of insurance applicable to the building described in the above Schedule.

**B.** The **Coinsurance** Additional Condition does not apply to the building described in the above Schedule.

**C.** With respect to the building described in the above Schedule, the following replaces Items **a.** and **b.** of the **Valuation** Loss Condition:

  **1.** If you contract for repair or replacement of the loss or damage to restore the building shown in the above Schedule for the same occupancy and use, within 180 days of the damage unless we and you otherwise agree, we will pay the smallest of the following, **a.**, **b.**, **c.**, or **d.**:

    **a.** The Limit of Insurance shown in the above Schedule as applicable to the damaged building;

    **b.** In the event of a total loss, the cost to replace the damaged building on the same site (or on a different site if relocation is required by an ordinance or law as described in Paragraph **E.2.a.** below), with a less costly building that is functionally equivalent to the damaged building.

    **c.** In the event of partial loss:

      **(1)** The cost to repair or replace the damaged portion of the building with less costly material, if available, in the architectural style that existed before the loss or damage occurred; and

      **(2)** The amount you actually spend to demolish and clear the site of undamaged parts of the building as described in Paragraph **E.2.b.** below.

    **d.** The amount you actually spend:

      **(1)** That is necessary to repair or replace the lost or damaged building with less costly material if available; and

      **(2)** To demolish and clear the site of undamaged parts of the building as described in Paragraph **E.2.b.** below.

  **2.** If you do not make a claim under Paragraph **1.** above, we will pay the smallest of the following, **a.**, **b.** or **c.**:

    **a.** The Limit of Insurance shown in the above Schedule as applicable to the damaged building;

    **b.** The "market value" of the damaged building, exclusive of the land value, at the time of loss; or

Exhsagdebtor 000315

   c.  The amount it would cost to repair or replace the damaged building on the same site, with less costly material in the architectural style that existed before the damage occurred, less allowance for physical deterioration and depreciation.

**D. Other Insurance**

   **1.**  You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Functional Building Valuation insurance. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Functional Building Valuation insurance bears to the Limits of Insurance of all insurance covering on the same basis.

   **2.**  If there is other insurance covering the same loss or damage, other than that described in **1.** above, our insurance is excess. But we will not pay more than the applicable Limit of Insurance.

**E. Ordinance Or Law Coverage**

   **1. Application Of Coverage**

     The Ordinance Or Law Coverage provided under this endorsement applies to the building described in the above Schedule only if both **E.1.a.** and **E.1.b.** are satisfied and are then subject to the qualifications set forth in **E.1.c.**

     **a.**  The ordinance or law:

        **(1)**  Regulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and

        **(2)**  Is in force at the time of loss.

     But Ordinance Or Law Coverage under this endorsement applies only in response to the minimum requirements of the ordinance or law. Losses and costs incurred in complying with recommended actions or standards that exceed actual requirements are not covered under this endorsement.

     **b. (1)**  The building sustains direct physical damage that is covered under this policy and such damage results in enforcement of the ordinance or law; or

        **(2)**  The building sustains both direct physical damage that is covered under this policy and direct physical damage that is not covered under this policy, and the building damage in its entirety results in enforcement of the ordinance or law.

        **(3)**  But if the building sustains direct physical damage that is not covered under this policy, and such damage is the subject of the ordinance or law, then there is no Ordinance Or Law Coverage under this endorsement even if the building has also sustained covered direct physical damage.

     **c.**  In the situation described in **E.1.b.(2)** above, we will not pay the full amount of loss otherwise payable under the terms of Coverages **A**, **B** and/or **C** of this endorsement. Instead, we will pay a proportion of such loss; meaning the proportion that the covered direct physical damage bears to the total direct physical damage.

     (Section **G.** of this endorsement provides an example of this procedure.)

     However, if the covered direct physical damage alone would have resulted in enforcement of the ordinance or law, then we will pay the full amount of loss otherwise payable under the terms of Coverages **A**, **B** and/or **C** of this endorsement.

   **2. Description Of Coverage**

     The following coverage(s) apply to the building described in the above Schedule, subject to Paragraph **C.** and all other provisions of this endorsement.

     This is not additional insurance; losses covered under Coverages **A**, **B** and **C** are included within the Limit of Insurance shown in the above Schedule as applicable to the building.

     **a. Coverage A – Coverage For Loss To The Undamaged Portion Of The Building**

        With respect to the building that has sustained covered direct physical damage, we will pay under Coverage **A** for the loss in value of the undamaged portion of the building as a consequence of enforcement of any ordinance or law that requires the demolition of undamaged parts of the same building.

Exhsagdebtor 000316

**b. Coverage B – Demolition Cost Coverage**

With respect to the building that has sustained covered direct physical damage, we will pay the cost to demolish and clear the site of undamaged parts of the same building, as a consequence of enforcement of an ordinance or law that requires demolition of such undamaged property.

**c. Coverage C – Cost To Reconstruct In Compliance With An Ordinance Or Law**

With respect to the building that has sustained covered direct physical damage, the cost to repair, reconstruct or remodel the damaged and/or undamaged portions of the building (whether or not demolition is required) will include costs that are a consequence of enforcement of the minimum requirements of the ordinance or law. If the building is repaired or rebuilt, it must be intended for similar occupancy as the current building, unless otherwise required by zoning or land use ordinance or law.

However, we will not pay for the cost to reconstruct in compliance with an ordinance or law if the building is not repaired or replaced.

**3.** We will not pay under this endorsement for:

**a.** Enforcement of any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

**b.** The costs associated with the enforcement of any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**4.** Under this endorsement we will not pay for loss due to any ordinance or law that:

**a.** You were required to comply with before the loss, even if the building was undamaged; and

**b.** You failed to comply with.

**F.** The following definition is added:

"Market value", as used in this endorsement, means the price which the property might be expected to realize if offered for sale in a fair market.

**G.** Example of Proportionate Loss Payment For Ordinance or Law Coverage Losses (procedure as set forth in Section **E.1.c.** of this endorsement)

Assume:

- Wind is a Covered Cause Of Loss; Flood is an excluded Cause of Loss

- The building sustains a partial loss

- Total direct physical damage to building: $100,000

- Portion of direct physical damage that is covered (caused by wind): $30,000

- Portion of direct physical damage that is not covered (caused by flood): $70,000

- The cost to repair the building includes $60,000 attributable to enforcement of an ordinance (Coverage **C**)

Step **1**:

Determine the proportion that the covered direct physical damage bears to the total direct physical damage.

$30,000 ÷ $100,000 = .30

Step **2**:

Apply that proportion to the Ordinance or Law loss.

$60,000 x .30 = $18,000

In this example, the most we will pay under this endorsement for the Coverage **C** loss is $18,000, subject to the applicable Limit of Insurance and any other applicable provisions.

**NOTE:** The same procedure applies to losses under Coverages **A** and **B** of this endorsement.

© ISO Properties, Inc., 2007
Insured

Policy Number:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FUNCTIONAL PERSONAL PROPERTY VALUATION OTHER THAN STOCK

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONCOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM

**SCHEDULE***

| Prem. No. | Bldg. No. | Description of Personal Property | Limit of Insurance |
|---|---|---|---|
| 00001 | 001 | | See CPR-2162 |

**A.** The limit of insurance shown in the above Schedule is the only limit of insurance applicable to the item(s) of personal property in the above Schedule.

**B.** The COINSURANCE Additional Condition and VALUATION Loss Condition do not apply to the item(s) of personal property described in the above Schedule.

**C.** The following VALUATION Loss Condition applies to the item(s) of personal property listed in the above Schedule:

**1.** If you contract for repair or replacement of the loss or damage to restore the item(s) of personal property shown in the above Schedule for the same use, within 180 days of the loss or damage unless we and you otherwise agree, we will pay the smallest of the following:

**a.** The Limit of Insurance shown in the above Schedule as applicable to the lost or damaged item(s) of personal property;

**b.** The cost to replace, on the same site, the lost or damaged item(s) of personal property with the most closely equivalent property available; or

**c.** The amount you actually spend that is necessary to repair or replace the lost or damaged item(s) of personal property.

**2.** If you do not make a claim under paragraph **1.,** we will pay the smallest of the following:

**a.** The Limit of Insurance shown in the above Schedule as applicable to the lost or damaged item(s) of personal property;

**b.** The "market value" of the lost or damaged item(s) of personal property at the time of loss; or

**c.** The amount it would cost to repair or replace that part of the item(s) of personal property that is lost or damaged with material of like kind and quality less allowance for physical deterioration and depreciation.

**D.** The following DEFINITION is added:

**"Market Value,"** as used in this endorsement, means the price which the property might be expected to realize if offered for sale in a fair market.

\* Information required to complete this Schedule, if not shown in this endorsement, will be shown in the Declarations.

Exhsagdebtor 000318

Policy Number:  MCP0172192                                          Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ELECTRONIC DATA PROCESSING ENDORSEMENT

**1.  LIMITS OF INSURANCE**

Coverage is only provided under this endorsement for items **A.** through **D.** below when a dollar amount is shown beside the coverage part. We will not pay more than the Limits of Insurance specified below in respect to any one occurrence, and in no event will we pay more than the Limits of Insurance of the policy to which this endorsement is attached.

| | | |
|---|---|---|
| **A.** | **Hardware:** | $ 25,000 |
| **B.** | **Software:** | $ Included in Above |
| **C.** | **Extra Expense:** | $ Not Covered |
| **D.** | **Business Interruption:** | $ Not Covered |

**2.  SPECIFIC HARDWARE OR SOFTWARE TO BE EXCLUDED**

**3.  PROPERTY COVERED**

We will pay for direct physical loss of or damage to covered property caused by a Covered Cause of Loss at the premises described in the Schedule. Covered property, as used in this endorsement, means the type of property described in this section if a Limit of Insurance is shown above for that type of property.

**A.  Hardware**, meaning a network of electronic machine components including microprocessors (firmware) capable of accepting instructions and information, processing the information according to the instructions, and producing desired results; computer networks; and peripheral data processing equipment. Such equipment may be owned by you or leased, rented or under your control. Hardware does not include communication systems or protection and control systems.

**B.  Software**, meaning electronic data processing, recording or storage software such as films, tapes, cards, discs, drums or cells, and data and programming records used for electronic data processing or electronically controlled equipment, stored on media.

**C.  Extra Expense**

**1.**  We will pay the actual and necessary extra expenses you incur during the "period of restoration":

**a.**  To continue your "normal" electronic data processing operations that are interrupted due to direct physical loss or damage caused by a Covered Cause of Loss to covered property owned, leased, rented or under your control; while at the described premises;

**b.**  To repair, replace, or restore any covered hardware or software, but only to the extent that they reduce the loss otherwise payable under this coverage part.

**2.**  We will not pay under this Extra Expense coverage for:

**a.**  More than the actual loss sustained or the amount shown in item **1. LIMITS OF INSURANCE, C. Extra Expense**, whichever is less; or

**b.**  Loss of profits or earnings resulting from a decrease or reduction of business.

CPR 2152F (02/04)                                                              Page 1 of 3

Exhsagdebtor 000319

   **D. Business Interruption**

     **1.** We will pay for the actual loss of "business income" you incur due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss or damage as a result of a Covered Cause of Loss to covered property at the described premises, including personal property in the open (or in a vehicle) within 100 feet of the described premises.

     **2.** We will only pay for loss of "business income" that occurs within 12 consecutive months after the date of direct physical loss or damage.

**4. PROPERTY NOT COVERED**

   **A.** Accounts, bills, money, currency, notes, securities, or other evidences of debt, securities, valuable papers, records, abstracts, deeds, manuscripts, program documentation or other documents except those that are in software form, and then only in that form;

   **B.** Property rented or leased to others while away from your premises;

   **C.** Your stock in trade; and/or

   **D.** Any machinery or equipment, other than hardware, whether or not controlled by a data processing system.

**5. EXCLUSIONS**

   **A.** Actual work upon the property covered.

   **B.** Error or omission in machine programming or instructions to machine.

   **C.** Errors, omissions or deficiencies in design, specifications, materials or workmanship.

   **D.** Loss from processing operations.

**6. VALUATION**

   **A.** The value of covered property will be based on the actual cash value at the time of the loss (with a deduction for depreciation). We will not pay more than what it will cost to repair, rebuild or replace the property with other property of like kind and quality. We will also not pay more than the amount shown under item **1. LIMITS OF INSURANCE**.

   **B.** In determining the amount of loss when extra expense coverage is provided, the following also apply:

     **1.** The salvage value of any property bought for temporary use will be deducted from the amount of loss extra expense; and

     **2.** We will not pay for any increase in loss due to your failure to use reasonable efforts to resume all or part of your business. This includes making use of other locations and property to reduce the loss.

**7. RESUMPTION OF OPERATIONS**

As soon as practicable after any loss, you must resume complete or partial business "operations" of the covered property and, as much as practicable, reduce or dispense with the additional charges and expenses that are being incurred.

Insured

Exhsagdebtor 000320

8. **DEFINITIONS**

   **A.**  "Normal" means the conditions that would have existed had no loss occurred.

   **B.**  "Business income" means:

      **1.**  Net Income (net profit or loss before income taxes) that would have been earned or incurred; and

      **2.**  Continuing "normal" operating expenses incurred, including payroll.

   **C.**  "Operations" means your business activities occurring at the described premises.

   **D.**  "Period of restoration" means the period of time that:

      **1.**  Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

      **2.**  Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality, or the date when business is resumed at a new permanent location.

     "Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

      **(a)**  Regulates the construction, use or repair, or requires the tearing down of any property; or

      **(b)**  Requires any Insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of pollutants.

     The expiration date of this policy will not cut short the "period of restoration."

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Exhsagdebtor 000321

Policy Number: MCP0172192                                    Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# VALUABLE PAPERS AND RECORDS

We will pay for direct physical loss of or damage to "Valuable Papers and Records," as defined below and subject to the following provisions:

**1.  COVERED PROPERTY**

This extension of coverage applies to "Valuable Papers and Records" while on the "Premises" located at the following locations (except as provided for in paragraph **2.**) and is subject to the limit indicated below:

**A.**  All "Valuable Papers and Records" not specified in **B.** below:

| LOCATION: | LIMIT OF LIABILITY: |
|---|---|
| All | $ 25,000 |

**B.**  Specified Articles:

| DESCRIPTION OF ARTICLES: | LIMIT OF LIABILITY: |
|---|---|
| N/A | $ N/A |

**2.  DEFINITIONS**

"Valuable Papers and Records" means written, printed or inscribed documents, manuscripts or records, including books, maps, films, drawings, abstracts, deeds or mortgages. "Valuable Papers and Records" does not mean "money" or "securities," converted data, programs or instructions used in your data processing operations, including the materials on which the data is recorded.

"Premises" means the interior of that portion of the building at the location(s) designated above that you occupy for your business.

"Money" means currency, coins, bullion and bank notes whether or not in current use, as well as travelers checks, registered checks and money orders held for sale to the public.

"Securities" means all negotiable and non-negotiable instruments or contracts representing either money or other property and includes revenue and other stamps in current use, tokens and tickets. "Securities" also means evidences of debt issued in connection with credit or charge cards, which cards are not of your own issue. "Securities" does not include money.

**3.  EXCLUSIONS**

The following exclusions apply to coverage provided by this endorsement and are in addition to exclusions contained elsewhere in this policy:

**A.**  This endorsement does not insure against physical loss of or damage to:

**1.**  Property not specifically declared, described and valued in paragraph **1.B.** of this endorsement if such property cannot be replaced with other of like kind and quality or restored to usable conditions;

Insured

Exhsagdebtor 000322

    **2.**   Property held as samples or for sale or for delivery after sale; or

    **3.**   Data processing equipment and media. Media means magnetic tapes, disk packs, diskettes, paper tapes, cards, and other material on which data is stored. It includes data stored on the media.

  **B.**  This endorsement does not insure against loss resulting from:

    **1.**   Errors or omissions in processing or copying;

    **2.**   Unauthorized instructions to transfer property to any person or to any place;

    **3.**   Voluntary parting with any property by the insured or any associate, proprietor, partner, director, trustee, officer, employee or agent of any insured if induced to do so by any fraudulent scheme, trick, device or false pretense.

**4.   LIMIT OF INSURANCE**

  We will not pay more than:

  **A.**  The amount scheduled under paragraph **1.B.** of this endorsement; or

  **B.**  The least of the following if not scheduled under paragraph **1.B.** of this endorsement:

    **1.**   The cost to research (to the extent necessary) and replace the "Valuable Papers and Records"; or

    **2.**   The cost to repair or restore the "Valuable Papers or Records"; or

    **3.**   The applicable limit stated in this endorsement.

However, we will not, in any case, pay more than the Per Occurrence Loss Limit shown in the Declarations in one disaster, casualty, or event, no matter how many locations are involved.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000323

Policy Number:  MCP0172192                                    Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ACCOUNTS RECEIVABLE

We will pay for direct physical loss of or damage to Accounts Receivable, as defined below and subject to the following provisions:

**1. COVERAGE**

**A.** We will pay:

    **1.** All sums due from your customers that you are unable to collect thereof as the direct result of loss of or damage to records of accounts receivable;

    **2.** Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

    **3.** Collection expenses in excess of your normal collection expenses that are made necessary by the loss or damage;

    **4.** Other reasonable expenses that you incur to re-establish your records of accounts receivable;

    That result from direct physical loss of or damage to your records of accounts receivable.

**B.** This extension of coverage applies to records of accounts receivable while on the "premises" at the following locations and is subject to Limit of Insurance indicated below:

| LOCATION | LIMIT OF INSURANCE |
|---|---|
| All | $  25,000 |
| N/A | $  N/A |

**2. PERILS NOT COVERED**

We will not pay for loss or damage:

**A.** Caused directly or indirectly by bookkeeping, accounting or billing errors or omissions;

**B.** That requires any audit of records or an inventory computation to prove its factual existence;

**C.** Due to alteration, falsification, manipulation, concealment, destruction or disposal of records of accounts receivable done to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property, but only to the extent to such wrongful giving, taking, obtaining or withholding;

**D.** Unauthorized instructions to transfer property to any person or to any place;

**E.** Due to an error or omission in programming; or

**F.** Caused by providing improper data entry instructions.

**3. DEFINITION**

"Premises" means the interior of that portion of the building at the location(s) designated above that you occupy for your business.

CPR 2177 (03/02)                                                                                    Page 1 of 2

Insured

Exhsagdebtor 000324

**4. DETERMINATION OF RECEIVABLES**

    **A.** If you cannot accurately establish the amount of accounts receivable outstanding as of the time of loss or damage, the following method will be used:

        **1.** Determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the loss or damage occurs; and

        **2.** Adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

    **B.** The following will be deducted from the total amount of accounts receivable, however that amount is established:

        **1.** The amount of the accounts for which there is no loss or damage;

        **2.** The amount of the accounts that you are able to re-establish or collect;

        **3.** An amount to allow for probable bad debts that you are normally unable to collect; and

        **4.** All unearned interest and service charges.

    However, we will not, in any case, pay more than the Per Occurrence Loss Limit shown in the Declarations in one disaster, casualty, or event, no matter how many locations are involved.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000325

Policy Number: MCP0172192                                    Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FINE ARTS ENDORSEMENT

**1. COVERED PROPERTY**

Covered property is extended to include direct physical loss of or damage to "Fine Arts" while at a covered "premises" described in the Declarations for the perils covered under this policy.

**2. LIMIT OF INSURANCE**

**A. Unscheduled "Fine Arts,"** not specified in **B.** below:

This section provides coverage to Unscheduled "Fine Arts" situated at covered "premises" subject to a total maximum Limit or Sub-Limit of Insurance included or endorsed onto this policy. However, in no event will we pay more than $10,000 for any single Unscheduled "Fine Arts" item, or $10,000 per occurrence.

**B. Scheduled "Fine Arts":**

This section provides coverage for specifically scheduled "Fine Arts" identified with a detailed description of the item, its covered "premises" location and declared "Stated Value" as shown within the latest schedule on file provided.

**3. VALUATION**

In the event of loss, the value of covered "Fine Arts" will be determined as of the time of loss.

The value of covered "Fine Arts" will be the least of the following amounts:

As respects section **2. Limit of Insurance**, item **A. Unscheduled "Fine Arts":**

**a.** The actual cash value at the time of loss;

**b.** The cost of reasonably restoring the property to its condition immediately before loss; or

**c.** The cost of replacing the property with substantially identical property.

**d.** The lowest figure you put on the property in your inventories, stock books, stock papers or lists existing as of the time of loss or damage.

As respects section **2. Limit of Insurance**, item **B. Scheduled "Fine Arts":**

**a.** The cost of reasonably restoring that property to its condition immediately before loss;

**b.** The cost of replacing the property with substantially identical property; or

**c.** The "Stated Value" of the item listed within the schedule of "Fine Arts" attached to this policy provided that:

    **1.** The "Fine Arts" are authentic; and

    **2.** The "Stated Value" was determined by:

        **a.** An independent appraiser compliant with Uniform Standards of Professional Appraisal Practice (USPAP) & such appraiser had expert knowledge of the "Fine Arts" appraised; or

CPR 2216 (01/20)                                                              Page 1 of 2

Insured

Exhsagdebtor 000326

    **b.**  Invoice or Bill of Sale issued by the artist, art gallery, or art auction that identifies the individual "Fine Arts" item; including date & price sold, name of artist, dimensions, media & title. Documentation should state if the item is framed; including the framed dimensions.

However, if any scheduled "Fine Arts" item does not meet the above conditions **1.** & **2.** the value of such scheduled "Fine Arts" will not be at "Stated Value." In such instances actual cash value at the time of loss will be used.

**4.**  **DEFINITIONS**

"**Fine Arts**" means paintings, etchings, drawings, pictures, tapestries, rare or art glass, art glass windows, stained glass windows, valuable rugs, statuary, sculptures, "antique" furniture, porcelains, and similar property of rarity, historical value, or artistic merit.

"**Premises**" means the interior of that portion of the building you occupy at the location(s) designated in or endorsed onto this policy.

"**Antique**" means an object having value because its craftsmanship is in the style or fashion of former times and because of its considerable age.

"**Stated Value**" means the declared value of the scheduled "Fine Arts" property.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Exhsagdebtor 000327

Policy Number:   MCP0172192                                    Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SEWER BACK UP ENDORSEMENT

The most we pay for loss caused by water that backs up through a sewer or drain is $ 10,000 _____ per occurrence. This Limit of Insurance is a part of, and not in addition to, the Per Occurrence Loss Limit shown in the Declarations. $ See CPR-2218 _____ will be deducted from each loss.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

CPR 2224 (03/03)                                                                              Page 1 of 1

Insured

Exhsagdebtor 000328

Policy Number: MCP0172192                                          Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXTENDED PERIOD OF INDEMNITY ENDORSEMENT

When made a part of this policy, this endorsement changes the definition of Covered Property to include coverage for Extended Period of Indemnity and becomes a part of the Business Income endorsement(s) made a part of this policy.

If the necessary "suspension" of your "operations" produces a Business Income or "Rental Value" loss payable under this policy, we will pay for the actual loss of Business Income or "Rental Value" you incur during the period that:

**1.** Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed or tenantability is restored; and

**2.** Ends on the earlier of:

    **(a)** The date you could restore your "operations" or tenant occupancy, with reasonable speed, to the level which would generate the business income or "Rental Value" amount that would have existed if no direct physical loss or damage had occurred; or

    **(b)** __60__ consecutive days after the date determined in **1.** above.

However, Extended Period of Indemnity does not apply to loss of Business Income or "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the covered peril in the area where the described premises are located.

Loss of Business Income or "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from a covered peril.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000329

Policy Number: MCP0172192 <span style="float:right">Mt. Hawley Insurance Company</span>

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PROTECTIVE SAFEGUARD ENDORSEMENT

As a condition of this insurance, you agree that the Protective Safeguard Devices set forth in the Schedule below shall be maintained in complete working order by you at all times during the Policy Period and the Protective Safeguard Services set forth in the Schedule below shall be maintained at all times during the Policy Period. In the event of a claim, you must demonstrate full compliance with the Protective Safeguard requirements set forth in this endorsement, including providing contracts, invoices, photos, or other relevant documentation. We will not pay for loss or damage if:

1. Any Protective Safeguard Device listed in the Schedule below is not in complete working order and fully operational at the time of loss or damage; and

2. Any Protective Safeguard Service listed in the Schedule below is not in effect and in full compliance with the requirements set forth in this endorsement; and

3. Any Protective Safeguard Device or Service listed in the Schedule below is not in compliance with all applicable local, state, and federal requirements at the time of loss or damage.

**Schedule**

| Protective Device or Service | Location |
|---|---|
| BR-1 | All |
| CC-1 Apply to any suites/units with Commercial Cooking Operations | All |
| CC-1A Apply to any suites/units with Commercial Cooking Operations | All |
| P-2 | All |
| SP-1 Apply to any vacant/unoccupied portions of any building | All |
| UT-1 Apply to any vacant/unoccupied portions of any building | All |

**"P-1" Automatic Fire Protection System Device**, means an automatic fire extinguishing system protecting each entire building or structure at each Location shown in the Schedule above, including but not limited to all sprinkler heads, discharge nozzles, ducts, pipes, valves, fittings, tanks, hydrants, standpipes, outlets, pumps and fire protection mains.

**"P-1A" Automatic Fire Protection System Service**, means that you must have a written contract signed by both parties prior to any loss or damage with a licensed fire inspection independent contractor to inspect and test your Automatic Fire Protection System(s) at least once every 12 months. Failure to provide documentation showing that each Automatic Fire Protection System Device at a scheduled Location has passed inspection within the 18 months immediately prior to any loss or damage voids coverage. This requirement is in addition to any testing or inspection required by applicable local, state, or federal requirements.

CPR 2268 (11/20) <span style="float:right">Page 1 of 3</span>

Exhsagdebtor 000330

**"P-2" Automatic Fire Alarm Device**, means a fire alarm protecting each entire building or structure at each Location shown in the Schedule above, which sends a signal that is received by a central station or a public or private fire alarm station.

**"P-3" Security Service**, means at least one watchperson provides regularly scheduled monitoring at each Location shown in the Schedule above and maintains contemporaneous logbook records of such regularly scheduled monitoring during all non-regularly scheduled work hours and whenever the premises are unoccupied.

**"P-4" Fire Protection Service**, means you have a written contract signed by both parties, prior to any loss or damage, with a privately owned fire department providing fire protection service to each Location shown in the Schedule above.

**"BR-1" Central Station Automatic Burglar Alarm Device**, means an automatic burglar alarm system protecting the entire building or structure at each Location shown in the Schedule above, including but not limited to protection of "openings and entryways", and that sends a signal that is received by a central station or a police station. "Openings and entryways" includes but is not limited to gates, doors, windows, hatchways and any other openings or means of possible ingress or egress.

**"BR-2" Automatic Burglar Alarm Device**, means a Burglar alarm system protecting the entire building or structure at each Location shown in the Schedule above, including but not limited to protection of "openings and entryways", and that has a loud sounding alarm or siren on the outside of the building or structure. "Openings and entryways" includes but is not limited to gates, doors, windows, hatchways and any other openings or means of possible ingress or egress.

**"CC-1" Cooking Equipment Safeguard Device**, means an automatic fire suppression system approved by Underwriters Laboratories (U.L.) protecting all cooking equipment, hoods, grease filters, and related duct areas at each Location shown in the Schedule above.

**"CC-1A" Cooking Equipment Safeguard Service**, means you must have a written contract signed by both parties,  prior to any loss or damage, with an independent contractor for the express purpose of cleaning and degreasing all hoods, grease filters, and duct systems connected to all cooking units at the Locations shown in the Schedule above at least once every 6 months. You must provide documentation of this Service being completed within 6 months immediately prior to any claimed loss or damage. Failure to provide documentation showing that all Cooking Equipment at each scheduled Location has undergone the required cleaning and degreasing within the 6 months immediately prior to any loss or damage voids coverage. This requirement is in addition to any testing or inspection required by applicable local, state, or federal requirements.

**"FE-1" Fire Extinguishers Device**, means fully functional fire extinguishers are located throughout each building or structure at each Location shown in the Schedule above and in full compliance with all local, state, and federal requirements.

**"FMS-1" Flammable Materials Storage**, means all flammable materials, including but not limited to gases, liquids, or solvents are stored in full compliance with all local, state, and federal requirements throughout each building or structure at each Location shown in the Schedule above and within Underwriters Laboratories (U.L.) or National Fire Protection Association (NFPA) approved cabinets, cages, or other storage devices.

**"FP-1" Fenced Premises Device**, means a continuous and uninterrupted fence that completely surrounds the building(s) or structure(s) at each Location shown in the Schedule above.  All fence gates must be locked during all non-regularly scheduled work hours and whenever the premises are unoccupied.

**"P-9"** The protective device or service set forth in the above Schedule.

**"SP-1" Secured Premises Device**, means all "openings and entryways" for each entire building or structure at each Location shown in the Schedule above, are securely locked at all times to prevent unauthorized entry. "Openings and entryways" includes but is not limited to gates, doors, windows, hatchways and any other openings or means of possible ingress or egress.

Insured

Exhsagdebtor 000331

**"SD-1" Smoke Detector Device**, means fully functional smoke detectors are located throughout each building or structure at each Location shown in the Schedule above and in full compliance with all local, state, and federal requirements.

**"UT-1" Utility Service**, means all utility services necessary to prevent freezing of any and all pipes and drains are connected and fully operational at each building or structure at each Location shown in the Schedule above.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000332

Policy Number:   MCP0172192

Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ASBESTOS EXCLUSION

It is agreed that this policy does not insure against loss or damage arising from asbestos material, including but not limited to costs or expenses incurred by the Insured as a result of any of the following:

**(1)** asbestos material removal, containment, or other abatement;

**(2)** demolition or increased cost of construction, repair, debris removal, or loss of use necessitated by the enforcement of any law or ordinance regulating asbestos material; and/or

**(3)** any governmental direction or request declaring that such asbestos material present in or part of or utilized on any undamaged portion of the insured's property can no longer be used for the purpose for which it was intended or installed and must be removed or modified;

Nor does any coverage provided by this policy apply to payment for the investigation or defense of any loss, damage or any cost, loss of use expense, fine or penalty or for any expense or claim or suit related to any of the above.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000333

Policy Number:   MCP0172192                                    Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WATER EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion in Paragraph **B.** replaces the **Water** Exclusion in this Coverage Part or Policy.

**B. Water**

   **1.** Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

   **2.** Mudslide or mudflow;

   **3.** Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

   **4.** Water under the ground surface pressing on, or flowing or seeping through:

      **a.** Foundations, walls, floors or paved surfaces;

      **b.** Basements, whether paved or not; or

      **c.** Doors, windows or other openings; or

   **5.** Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **1., 3.** or **4.**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **1.** through **5.**, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **1.** through **5.**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

Exhsagdebtor 000334

Policy Number:  MCP0172192                                      Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DEFINITION OF OCCURRENCE

Occurrence means the total loss or damage caused by a distinct, single incidence of a peril or combination of perils insured against, except:

**A.** For a single atmospheric disturbance including tornado, cyclone, hurricane, windstorm, hail, tropical storm or cyclone, typhoon, hail and winter storm/freeze, an occurrence is limited to the total of all losses, damage, or expenses sustained or commencing during a continuous 144 hour period;

**B.** For riot, riot attending a strike and civil commotion an occurrence is limited to the total of all losses, damage or expenses sustained or commencing during a continuous 96 hour period.

In reference to items **A.** and **B.** above, you may decide when the applicable continuous number of hour period begins.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000335

Policy Number: MCP0172192                                          Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TERRORISM EXCLUSION

1. We will not pay for loss, damage, cost or expense caused directly or indirectly by "terrorism" including "certified acts of terrorism," as defined in the Terrorism Risk Insurance Act, as amended, unless specifically provided by endorsement to this policy or any action taken to control, prevent, or suppress terrorism. Such loss, damage, cost or expense is excluded regardless of any other cause or event that contributes concurrently or in any sequence to this loss.

2. The following definition is added and applies under this endorsement wherever the term "terrorism" is used.

   "Terrorism" means activities against persons, organizations or property of any nature:

   **A.** That involve the following or preparation for the following:

   1. Use or threat of force or violence; or

   2. Commission or threat of a dangerous act; or

   3. Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

   **B.** When one or both of the following applies:

   1. The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

   2. It appears that the intent is to intimidate or coerce a government, or to further polictical, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

3. Fire Exception

   The following provision applies only where relevant state law requires coverage for fire losses resulting from acts of terrorism, and where a premium for such has been paid.

   If an act of terrorism results in fire, we will pay for the loss or damage caused by that fire. This exception for fire applies only to direct loss or damage by fire to covered property. This exception does not apply to coverage for business income, extra expense, or fire legal liability.

4. Neither the terms of this endorsement nor the terms of any other terrorism endorsement attached to this policy provide coverage for any loss that would otherwise be excluded by this policy under:

   **A.** Exclusions that address war, military action, or nuclear hazard; or

   **B.** Any other exclusion.

5. The absence of any other terrorism endorsement does not imply coverage for any loss that would otherwise be excluded by this policy under:

   **A.** Exclusions that address war, military action, or nuclear hazard; or

   **B.** Any other exclusion.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Policy Number:   MCP0172192                                    Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FIRE DEPARTMENT SERVICE CHARGES ENDORSEMENT

When made a part of this policy, this endorsement replaces any Fire Department Service Charge wording that may appear elsewhere in this policy.

**A.**  When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay your fire department service charges that are:

   **1.**  Assumed by contract or agreement prior to loss; or

   **2.**  Required by local ordinance.

**B.**  The most we will pay for this coverage under this endorsement in any one loss is the amount specifically stated in the Declarations. This Limit of Insurance is part of, and not in addition to, the Per Occurrence Loss Limit shown in the Declarations.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000337

Policy Number:  MCP0172192                                      Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# MINIMUM EARNED PREMIUM ENDORSEMENT

This endorsement changes Cancellation conditions elsewhere in the policy as follows:

This policy is subject to a minimum earned premium of 35% of the annual policy premium or $35,000, whichever is greater.

When you request that the policy be cancelled, the total earned premium will be the calculated premium for the term of the policy or the minimum earned premium as calculated above, whichever is greater.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000338

Policy Number: MCP0172192                                               Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NON-PAYMENT OF PREMIUM

Your failure to make a timely payment of any premium due either at inception of this policy or for any subsequent endorsement will be considered a request by you to us to cancel the policy.

If we cancel for non-payment of premium, the minimum earned premium, as determined by the Minimum Earned Premium Endorsement included in this policy, will be immediately due and payable.

At our discretion, we may consider reinstating coverage if you pay us the full amount of premium due prior to the effective date of cancellation.

However, payment of overdue premium by you will not guarantee the reinstatement of coverage. Should we decide not to reinstate coverage, any unearned premium will be refunded accordingly.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000339

Policy Number: MCP0172192        Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR, BIOLOGICAL, CHEMICAL OR RADIOACTIVE EXCLUSION

We will not pay for loss, damage, cost, or expense directly or indirectly from:

**1)** The use or threatened use of nuclear, biological, chemical, radioactive substances or the like, however caused.

**2)** The accidental discharge of nuclear, biological, chemical, radioactive substances or the like, however caused.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Exhsagdebtor 000340

Policy Number: MCP0172192             Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF COSMETIC DAMAGE TO ROOF SURFACING

**A.** The following applies with respect to loss or damage by wind and/or hail to any building and/or structure covered under this policy unless otherwise indicated below:

We will not pay for cosmetic damage to roof surfacing caused by wind and/or hail.

For the purpose of this endorsement:

**1.** Cosmetic damage means that the wind and/or hail caused marring, pitting or other superficial damage that altered the appearance of the roof surfacing, but such damage does not prevent the roof from continuing to function as a barrier to entrance of the elements to the same extent as it did before the cosmetic damage occurred.

**2.** Roof surfacing refers to the shingles, tiles, cladding, metal or synthetic sheeting or similar materials covering the roof and includes all materials used in securing the roof surface and all materials applied to or under the roof surface for moisture protection, as well as roof flashing.

Exceptions to the above are as follows:

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Exhsagdebtor 000341

Policy Number: MCP0172192          Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ACTUAL CASH VALUE FOR ROOF SURFACING

The following applies with respect to loss or damage by wind and/or hail to a building or structure as indicated below:

**A.** Replacement Cost coverage (if otherwise applicable to such property) does not apply to roof surfacing. Instead, we will determine the value of roof surfacing at actual cash value as of the time of loss or damage.

**B.** For the purpose of this endorsement, roof surfacing refers to the shingles, tiles, cladding, metal or synthetic sheeting or similar materials covering the roof and includes all materials used in securing the roof surface and all materials applied to or under the roof surface for moisture protection, as well as roof flashing.

Buildings or structures to which this endorsement applies:

All Locations

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000342

Policy Number: MCP0172192                                    Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FIRE PROTECTION EQUIPMENT RECHARGE ENDORSEMENT

We will pay up to $5,000 for expenses incurred to recharge fire suppression systems or extinguishers when such systems or extinguishers are discharged to fight a hostile fire on the covered premises or if discharged due to another covered cause of loss. No deductible applies to this coverage.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000343

Policy Number: MCP0172192                                    Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WINDSTORM OR HAIL LOSS REPORTING LIMITATION ADDENDUM

Regardless of anything to the contrary in the policy to which this endorsement is attached, the following limitations apply in reference to reporting of claims under this policy:

With respect to loss or damage caused by windstorm or hail, including any named storm, you must give us prompt notice of the loss or damage and include a description of the property involved, and as soon as possible give us a description of how, when and where the loss or damage occurred.  In no event may a claim be filed with us later than one year after the date of the loss or damage that is the subject of the claim.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

CPR 2295 (04/20)                                                    Page 1 of 1

Insured

Exhsagdebtor 000344

Policy Number: MCP0172192                                          Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PRE-EXISTING DAMAGE EXCLUSION

We do not cover any loss or damage directly or indirectly caused by, resulting from or contributed to by any pre-existing building damage at the time of loss insured under this policy.

The above exclusion shall automatically be removed upon:

    **a.**  The completion of all building repairs; and

    **b.**  Written evidence, signed by a licensed general contractor, stating that such building repairs have been completed.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000345

Policy Number: MCP0172192                                    Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# APPRAISAL

This endorsement replaces the Appraisal Condition in the coverage form.

**Appraisal**

If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree on an umpire, either may request that selection be made by a judge of a federal court having jurisdiction. The appraisers will state separately the amount of loss, including an itemized determination of (1) the actual cash value for each damaged item included in the claim, and (2) the replacement cost value, if applicable under the policy, for each damaged item included in the claim. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding, and the decision must be itemized as specified in (1) and (2) above. Each party will:

**a.**   Pay its chosen appraiser; and

**b.**   Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

Under no circumstance is appraisal allowed under this policy to determine causation or the existence or non-existence of coverage. Appraisal is also not allowed where coverage for the claimed loss has been denied in its entirety. You cannot invoke appraisal after suit has been filed.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000346

Policy Number: MCP0172192                                    Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LEGAL ACTION CONDITIONS ENDORSEMENT

This endorsement adds the following to LEGAL ACTION AGAINST US elsewhere in the policy:

All matters arising hereunder including questions related to the validity, interpretation, performance and enforcement of this Policy shall be determined in accordance with the law and practice of the State of New York (notwithstanding New York's conflicts of law rules).

It is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, any Named Insured, any additional insured, and any beneficiary hereunder shall submit to the jurisdiction of a court of competent jurisdiction in the State of New York, and shall comply with all the requirements necessary to give such court jurisdiction. Any litigation commenced by any Named Insured, any additional insured, or any beneficiary hereunder against the Company shall be initiated in New York. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's right to remove an action to a United States District Court.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000347

Policy Number:  MCP0172192          Mt. Hawley Insurance Company

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED. PLEASE READ IT CAREFULLY.**

# CYBER AND COMPUTER RELATED LOSS EXCLUSION

**A.** We will not pay for any loss, damage, expense, or threat, whether direct or indirect, to "computer data and related equipment" arising out of:

    **1.** "Computer virus" or "computer hacking";

    **2.** Any electrical disturbance including electromagnetic pulse, solar flare, magnetic damage, disturbance of electronic recordings, or erasure of electronic recordings;

    **3.** Failure, malfunction, or inadequacy of:

        **a.** Such "computer data and related equipment" whether belonging to you or to others; or

        **b.** Any products, and any services, data, or functions that directly or indirectly use or rely on, in any manner, such "computer data and related equipment" due to the inability to correctly recognize, process, distinguish, interpret, or accept one or more dates or times.

**B.** We will not pay for any loss, damage, expense, or threat, whether direct or indirect, caused by the transfer or delivery of Covered Property to a person or place away from a Covered Location on the basis of unauthorized or fraudulent instructions, including but not limited to instructions transmitted by a computer, whether or not owned by you, or via any telecommunications transmission method.

**C.** We will not pay for any actual or alleged loss of goods, money, or securities resulting from "Social Engineering"; or

**D.** We will not pay for any loss, damage, expense, or threat arising from any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement, or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in this endorsement.

Such loss, damage, expense, or threat described in paragraphs **A** through **D** of this endorsement is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss, damage, expense, or threat.

However, if direct physical loss of or damage to Covered Property not otherwise excluded by this Policy results, then subject to all of the Policy terms and conditions, we will only pay for the resulting direct physical loss or damage.

**E.  DEFINITIONS**

    **1.** "Computer virus" means the introduction of an electronic data processing code or other programming that:

        **a.** Results in the deletion, destruction, generation, access, or modification of data;

        **b.** Alters, contaminates, corrupts, degrades, or destroys the integrity, quality, or performance of data;

        **c.** Damages, destroys, or causes malfunction, inadequacy, degradation, or corruption of any hardware or processing, recording, or storage media used with hardware;

        **d.** Results in the denial of access to or denial of services from your computers, your computer network, or web site;

        **e.** Acts as malware, including but not limited to, ransomware, spyware, worms, Trojan Horses, or any other harmful code or similar instruction designed to damage, destroy, disrupt, or gain access to "computer data and related equipment".

Insured

Exhsagdebtor 000348

2. "Computer hacking" means any intrusion into "computer data and related equipment" that can or does:

   a. Result in the deletion, destruction, generation, access, or modification of data;

   b. Alter, contaminate, corrupt, degrade, or destroy the integrity, quality, or performance of data;

   c. Result in the scanning or copying of data;

   d. Cause damage, destruction, inadequacy, malfunction, degradation, or corruption of any hardware or processing, recording, or storage media used with hardware; or

   e. Result in the denial of access to or denial of services from your computer, your computer network, or web site.

3. "Computer data and related equipment" includes the following items:

   a. Computer hardware, including microprocessors;

   b. Computer software;

   c. Computer operating systems, data, applications, code, or related software;

   d. Computer networks, including but not limited to network facilities, cloud network, internet, intranet, and virtual private networks (VPN);

   e. Microprocessors (computer chips) not part of any computer system;

   f. Any other electronic equipment, communications system, or electronic device or components; or

   g. Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in items **a.** through **f.** above. This includes any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement, or supervision provided or done by you or for you to determine, rectify or test for, any potential problems with items listed in **a.** through **f.** above.

4. "Social Engineering" means the reliance upon any deceptive, dishonest, fraudulent, or unauthorized representation or instruction which induces you, your employee, your contractor, or anyone else acting on your behalf or with your express or implied permission, to voluntarily part with title to or possession of any property.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Policy Number: MCP0172192          Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMMUNICABLE DISEASE EXCLUSION

**A.** We will not pay for loss, damage, cost or expense of any nature, directly or indirectly caused by, contributed to by, resulting from, arising out of, or in connection with a Communicable Disease or the fear or threat (whether actual or perceived) of a Communicable Disease regardless of any other cause or event that contributes concurrently or in any sequence thereto. This exclusion applies whether or not the loss event results in a pandemic or affects a substantial area.

**B.** As used herein, a Communicable Disease means any disease which can be transmitted by means of any substance or agent from any organism to another organism where:

    **1.** The substance or agent includes, but is not limited to, a virus, bacterium, parasite or other organism or any variation thereof, whether deemed living or not; and

    **2.** The method of transmission, whether direct or indirect, includes but is not limited to, airborne transmission, bodily fluid transmission, transmission from, to or through any surface or object, solid, liquid or gas or between organisms; and

    **3.** The disease, substance or agent can cause or threaten damage to human health or human welfare or can cause or threaten damage to, deterioration of, loss of value of, marketability of or loss of use of property.

**C.** This exclusion applies to all property coverage under all forms and endorsements that comprise this policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense, action of civil authority, contingent business income, business income and/or extra expense from dependent properties, ingress and egress, or utility services.

**D** With respect to any loss or damage subject to this exclusion, the application of such exclusion supersedes the application of any exclusion relating to "pollutants".

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

CPR 2314 (07/20)          Page 1 of 1

Insured

Exhsagdebtor 000350

Policy Number: MCP0172192                                    Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEWLY ACQUIRED PROPERTY ENDORSEMENT

This endorsement supersedes any other coverage that refers to Building and Personal Property coverage for newly acquired property.

"We" extend Covered Property to include real and personal property of the type insured under the policy that is rented, leased, purchased, or acquired by the Insured after the inception date of this policy and is located within the Coverage Territory.

Coverage under this endorsement ceases at the earliest of the following dates:

1.  60   days from the date of rental, lease, purchase or acquisition of such property; or

2.  When such newly acquired property is bound by the Company; or

3.  When the Company notifies the Insured that it will not bind the coverage for such property; or

4.  When this Policy expires or is cancelled.

The most we will pay for loss or damage under this endorsement from a Covered Cause of Loss is $100,000         .
This does not increase the Limit of Insurance as stated in the Declarations and applies to all newly acquired property for any one occurrence.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000351

Policy Number: MCP0172192                                          Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION

This endorsement supersedes any existing terms, conditions, limitations, exclusions, coverages, additional coverages and definitions regarding "pollutants" within any property coverage forms or related endorsements within this policy.

We will not pay for loss, damage, cost, or expense caused, in whole or in part, directly or indirectly by, resulting from, contributing to, or made worse by, or arising out of or in connection with, the following:

    **A.**  The actual, alleged, or threatened exposure to, or discharge, dispersal, release, or escape of, "pollutants";

    **B.**  Testing for, monitoring, cleaning up, treating, removing, extracting, detoxifying, or neutralizing "pollutants" or in any way responding to or assessing the existence, concentration, or effects of "pollutants";

    **C.**  The enforcement of, or compliance with, any ordinance, law, or governmental direction resulting from or arising out of the actual, alleged or threatened exposure to, or discharge, dispersal, release, or escape of, "pollutants".

Such loss, damage, cost, or expense is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. This exclusion applies regardless of the size or scope of the exposure to, or discharge, dispersal, release, or escape of, "pollutants".

"Pollutants" means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned, or reclaimed. "Pollutants" includes any naturally occurring or manmade substances which can cause or threaten damage to human health or human welfare, or causes or threatens damage to, or deterioration, loss of value, marketability or loss of use of, any property. Such substances include, but are not limited to bacteria, virus, nanoparticles, electromagnetic radiation, or other hazardous substances. Hazardous substances include, but are not limited to, those listed in the Federal Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, Toxic Substances Control Act or as designated by the U.S. Environmental Protection Agency.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000352

Policy Number: MCP0172192                                    Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ACTUAL CASH VALUE (ACV) DEFINITION

It is agreed that the definition of "Actual Cash Value" wherever used in this policy is as follows:

"Actual Cash Value" (sometimes referred to in this policy as ACV) means the value of the lost or damaged property or part of the property at the time of loss, calculated as the estimated cost to repair or replace such property, less a deduction to account for pre-loss depreciation. For this calculation, all components of this estimated cost are subject to depreciation, including but not limited to:

1.  Materials, including any tax;

2.  Labor, including any tax;

3.  Overhead and profit, if applicable;

4.  Fees and permits; and

5.  Debris removal.

The deduction for depreciation may include, but is not limited to, such considerations as:

1.  Age;

2.  Condition;

3.  Reduction in useful life;

4.  Obsolescence; and

5.  Any pre-loss damage including wear, tear, or deterioration.

The amount of any depreciation is not limited to a maximum percentage deduction.

The "Actual Cash Value" of any lost or damaged property may be significantly less than its Replacement Cost.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Insured

Exhsagdebtor 000353

Policy Number:  MCP0172192                                                    Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDED LIMITATIONS

This endorsement modifies insurance provided under the following:

CAUSES OF LOSS – SPECIAL FORM

The following replaces **C. Limitations 1.c.** in this Coverage Part or Policy.

    **c.**  The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

        **(1)**  The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure; or

        **(2)**  The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters. However, we will not pay for any loss or damage, caused in whole or in part, directly or indirectly by, resulting from, contributed to or made worse by, or in connection with, any of the following causes of loss, regardless of any other cause or event that contributes concurrently or in any sequence to the loss: wet or dry rot; wear and tear; rust; corrosion; decay; deterioration; hidden or latent defect; settling; cracking; shrinking or expansion; or faulty, inadequate or defective planning, design, specifications, workmanship, repair, construction, materials, or maintenance.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

CPR 2320 (04/21)                                                                                  Page 1 of 1

Exhsagdebtor 000354

Policy Number: MCP0172192

Mt. Hawley Insurance Company

# COMMERCIAL PROPERTY CONDITIONS

This Policy is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

**A. CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Policy is void and there is no coverage for any claim in any case of fraud by you as it relates to this Coverage at any time. It is also void if you or any other insured, at any time, conceals or misrepresents a material fact concerning this Policy, the Covered Property, or your interest in the Covered Property.

There is no coverage for any claim under this Policy if, at any time and regardless of intent, you or any other insured or any representative acting on your or any insured's behalf provide incorrect, false, inaccurate, or incomplete information in connection with any claim under this Policy.

There is no coverage for any claim under this Policy if, at any time and regardless of intent, you do not promptly, and prior to a loss, provide us notice in writing of a material change in any risk insured under this Policy which is relevant to the loss.

**B. CONTROL OF PROPERTY**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Policy at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**C. INSURANCE UNDER TWO OR MORE COVERAGES**

If two or more of this Policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**D. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Policy unless:

1. There has been full compliance with all of the terms of this Policy; and

2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

**E. LIBERALIZATION**

If we adopt any revision that would broaden the coverage under this Policy without additional premium within 45 days prior to or during the Policy Period, the broadened coverage will immediately apply to this Policy.

**F. NO BENEFIT TO BAILEE**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**G. OTHER INSURANCE**

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Policy. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Policy bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in **1.** above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**H. POLICY PERIOD, COVERAGE TERRITORY**

Under this Policy:

1. We cover loss or damage commencing:

   **a.** During the Policy Period shown in the Declarations; and

   **b.** Within the coverage territory.

2. The coverage territory is:

Exhsagdebtor 000355

**a.** The United States of America (including its territories and possessions);

**b.** Puerto Rico; and

**c.** Canada.

**I.** **TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this Policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

**1.** Prior to a loss to your Covered Property or Covered Income.

**2.** After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

**a.** Someone insured by this insurance;

**b.** A business firm:

**(1)** Owned or controlled by you; or

**(2)** That owns or controls you; or

**c.** Your tenant.

This will not restrict your insurance.

Exhsagdebtor 000356

Policy Number: MCP0172192                                              Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FULLY EARNED PREMIUM FOR ACTUAL TOTAL LOSS
# OR CONSTRUCTIVE TOTAL LOSS

**A.** It is hereby understood and agreed that in the event of a covered "Actual Total Loss" or "Constructive Total Loss" of any item of property insured during the policy period, the premium attributed to all values at that building or structure shall be considered fully earned at the time of the loss. No return premium will be owed in the event the policy is cancelled or the values at that building or structure are removed from the policy by endorsement.

**B.** For the purpose of this endorsement only, the following definitions apply:

"Constructive Total Loss" means Covered Property that is damaged and is treated as a total loss because the cost of repairing the damaged Covered Property equals or exceeds the value of the Covered Property, the Actual Cash Value of the Covered Property, or the applicable Limit of Insurance, whichever is the lesser amount.

"Actual Total Loss" means a loss that occurs when the Covered Property is totally destroyed or damaged in such a way that it can be neither recovered nor repaired for further use.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Policy Number: MCP0172192                                            Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OKLAHOMA CHANGES – APPRAISAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART

**A.** Except as provided in **B.** below, the **Appraisal** Condition is replaced by the following:

**APPRAISAL**

If we and you disagree on the value of the property or the amount of loss, either party may make written demand for an appraisal of the loss. In this event, only the party which demanded the appraisal will be bound by the results of that appraisal.

Each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days after the written demand for an appraisal has been made. The two appraisers will select an umpire. If they cannot agree upon an umpire within 15 days, then, at the request of either you or us, and after notice of hearing to the nonrequesting party by certified mail, selection of the umpire will be made by a judge of a district court in the county where the loss ("loss") occurred. The appraisers will state separately the value of the property and amount of loss ("loss"). If the appraisers submit a written report of agreement to us, the amounts agreed upon will be the value of the property and the amount of loss ("loss") and will be binding on the party which demanded the appraisal. If the appraisers fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding on the party which demanded the appraisal. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**B.** The **Appraisal** Condition in the:

**1.** Business Income Coverage Form (And Extra Expense) **CP 00 30**;

**2.** Business Income Coverage Form (Without Extra Expense) **CP 00 32**; and

**3.** Capital Assets Program Coverage Form (Output Policy), **OP 00 01**, Paragraph **A.7.** Business Income And Extra Expense

is replaced by the following:

**APPRAISAL**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either party may make written demand for an appraisal of the loss. In this event, only the party which demanded the appraisal will be bound by the results of that appraisal.

Each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days after the written demand for an appraisal has been made. The two appraisers will select an umpire. If they cannot agree upon an umpire within 15 days, then, at the request of either you or us, and after notice of hearing to the nonrequesting party by certified mail, selection of the umpire will be made by a judge of a district court in the county where the loss occurred. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If the appraisers submit a written report of agreement to us, the amounts agreed upon will be the value of the property and the amount of loss and will be binding on the party which demanded the appraisal. If the appraisers fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding on the party which demanded the appraisal. Each party will:

**(1)** Pay its chosen appraiser; and

**(2)** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

IL 01 74 07 05                          © ISO Properties, Inc., 2004                          Page 1 of 1
                                                Insured

Policy Number:  MCP0172192                                      Mt. Hawley Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OKLAHOMA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **2.** of the **Cancellation** Common Policy Condition is replaced by the following:

    **2.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

        **a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

        **b.** 30 days before the effective date of cancellation if we cancel for any other reason.

    After coverage has been in effect for more than 45 business days or after the effective date of a renewal of this policy, no notice of cancellation will be issued by us unless it is based on at least one of the following reasons:

        **(1)** Nonpayment of premium;

        **(2)** Discovery of fraud or material misrepresentation in the procurement of the insurance or with respect to any claims submitted under it;

        **(3)** Discovery of willful or reckless acts or omissions by you that increase any hazard insured against;

        **(4)** The occurrence of a change in the risk that substantially increases any hazard insured against after insurance coverage has been issued or renewed;

        **(5)** A violation of any local fire, health, safety, building, or construction regulation or ordinance with respect to any covered property or its occupancy that substantially increases any hazard insured against;

        **(6)** A determination by the Insurance Commissioner that the continuation of the policy would place us in violation of the insurance laws of this state;

        **(7)** Your conviction of a crime having as one of its necessary elements an act increasing any hazard insured against; or

        **(8)** Loss of or substantial changes in applicable reinsurance.

**B.** The following are added to the Common Policy Conditions and supersede any provisions to the contrary:

    **1. Nonrenewal**

        **a.** If we elect not to renew this policy, we will mail or deliver written notice of nonrenewal to the first Named Insured at least 45 days before:

IL 02 36 09 07                          © ISO Properties, Inc., 2006                          Page 1 of 2
Insured

Exhsagdebtor 000359

**(1)** The expiration date of this policy; or

**(2)** An anniversary date of this policy, if it is written for a term longer than one year or with no fixed expiration date.

**b.** Any notice of nonrenewal will be mailed or delivered to the first Named Insured at the last mailing address known to us.

**c.** If notice is mailed:

**(1)** It will be considered to have been given to the first Named Insured on the day it is mailed.

**(2)** Proof of mailing will be sufficient proof of notice.

**d.** If notice of nonrenewal is **not** mailed or delivered at least 45 days before the expiration date or an anniversary date of this policy, coverage will remain in effect until 45 days after notice is given. Earned premium for such extended period of coverage will be calculated pro rata based on the rates applicable to the expiring policy.

**e.** We will **not** provide notice of nonrenewal if:

**(1)** We, or another company within the same insurance group, have offered to issue a renewal policy; or

**(2)** You have obtained replacement coverage or have agreed in writing to obtain replacement coverage.

**f.** If we have provided the required notice of nonrenewal as described in **B.1.a.** above, and thereafter extend the policy for a period of 90 days or less, we will **not** provide an additional nonrenewal notice with respect to the period of extension.

**2. Premium Or Coverage Changes At Renewal**

**a.** If we elect to renew this policy, we will give written notice of any premium increase, change in deductible, or reduction in limits or coverage, to the first Named Insured, at the last mailing address known to us.

**b.** Any such notice will be mailed or delivered to the first Named Insured at least 45 days before:

**(1)** The expiration date of this policy; or

**(2)** An anniversary date of this policy, if it is written for a term longer than one year or with no fixed expiration date.

**c.** If notice is mailed:

**(1)** It will be considered to have been given to the first Named Insured on the day it is mailed.

**(2)** Proof of mailing will be sufficient proof of notice.

**d.** If the first Named Insured accepts the renewal, the premium increase or coverage changes will be effective the day following the prior policy's expiration or anniversary date.

**e.** If notice is **not** mailed or delivered at least 45 days before the expiration date or anniversary date of this policy, the premium, deductible, limits and coverage in effect prior to the changes will remain in effect until:

**(1)** 45 days after notice is given; or

**(2)** The effective date of replacement coverage obtained by the insured;

whichever occurs first.

If the first Named Insured then elects **not** to renew, any earned premium for the resulting extended period of coverage will be calculated pro rata at the lower of the new rates or rates applicable to the expiring policy.

**f.** We will **not** provide notice of the following:

**(1)** Changes in a rate or plan filed pursuant to the Property and Casualty Competitive Loss Cost Rating Act applicable to an entire class of business;

**(2)** Changes which are based upon the altered nature or extent of the risk insured; or

**(3)** Changes in policy forms filed with or approved by the Insurance Commissioner and applicable to an entire class of business.

© ISO Properties, Inc., 2006
Insured

Policy Number: MCP0172192

## Mt. Hawley Insurance Company
Peoria, Illinois 61615

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SERVICE OF SUIT ENDORSEMENT

It is agreed that service of process in any suit against the Company may be made upon the Superintendent, Commissioner, or Director of Insurance or other person specified for that purpose in the statute or his successor or successors in office as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of any Named Insured or any additional insured or any beneficiary hereunder arising out of this contract of insurance.

The Company hereby designates Craig W. Kliethermes, President,

**Mt. Hawley Insurance Company**

9025 N. Lindbergh Drive, Peoria, Illinois 61615 as the person to whom the said Superintendent, Commissioner, or Director of Insurance is authorized to mail such process or a true copy thereof, in compliance with the applicable statutes governing said service of process in the state or jurisdiction.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.**

Exhsagdebtor 000361

Policy Number: MCP0172192                                           Mt. Hawley Insurance Company

# SIGNATURE PAGE

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

The use of this endorsement supersedes any signatures on any other policy forms, endorsements or declarations where those forms contain an earlier edition date.

Corporate Secretary                              President & COO

ILF 0001C OK (07/16)

Insured

**Price Tower
Bartlesville OK**

## Valuation Analysis



# The Gorman Group, Ltd

**1200 West 175th Street
East Hazel Crest, Illinois 60429
www.gormangrp.com**

# TABLE OF CONTENTS

**Summary**................................................................................2
    Property Identification...............................................2
    Client/Intended User(s)............................................2
    Existing Use..............................................................2
    Opinion of Public Interest Value.............................2
    Date of Valuation .....................................................2

**Compliance Items**..............................................................4
    Intended Use..............................................................4
    Documentation Type ...............................................4
    Type of Opinion.........................................................4
    Interest Valued ........................................................4

**Property** ............................................................................5
    Property Description ................................................7

**Valuation Analysis**.........................................................26

**Regulatory Items** ...........................................................30
    Assumptions and Limiting Conditions ......................31
    Certificate of Appraisal...........................................36

**ADDENDA**

Architect's Notes

Rehabilitation Budget

Rehabilitation Plan

Qualifications of Appraiser

# SUMMARY

| | |
|---|---|
| **REAL ESTATE**: | Price Tower |
| | 510 Dewey Avenue |
| | Bartlesville, OK  74003 |
| | Washington County |
| **PIN No:** | All of Block 47 Original Bartlesville |
| **Client(s**): | Ms. Sara Thompson |
| | Commercial Lending Consultant |
| | Truity Credit Union |
| | 501 S Johnston |
| | Bartlesville, OK  74003 |
| **Existing Use**: | Mixed Use |
| **Lot Size**: | 300 feet by 300 feet |
| **Building Size**: | Tower  49,812± square feet |
| | Annex  10,523 square feet |
| **Public Interest Value**: | **$40,000,000.00** |
| **Date of Valuation**: | March 7, 2023 |
| **Date of Inspection**: | March 7, 2023 |
| **Date of Report**: | March 20, 2023 |

**Note**:  This report assumes the proposed renovations have been completed as shown in the architect's notes and budget as attached in the addenda.

## Compliance Items

*The Gorman Group, Ltd*
*Commercial Real Estate Consultants*

## Compliance Items

**Client/Intended User(s)**:     The report is prepared for the exclusive use of the client.

**Intended Use**:     To generate civic support for costs of maintaining/restoring Price Tower
**AND**
To assist in renegotiation of the operational structure of Price Tower.

**Documentation Type**:     Appraisal Report

**Type of Opinion**:     ***Public Interest Value*** – Historically, public interest value has been used as a general term covering a family of value concepts that relate the highest and best use of a property with noneconomic uses. (Other terms for similar concepts include natural value, intrinsic value, aesthetic value, scenic value and preservation value. The analysis of public interest value tends to be driven social, political and public policy goals rather than economic principles.[1]

**Interest Valued**:     Fee Simple Title and subject to the assumptions and limiting conditions contained herein

---

[1] Appraisal Institute, the Appraisal of Real Estate, 14th ed. (Chicago, Appraisal Institute, 2013), 64

Exhsagdebtor 000367

## Property

*The Gorman Group, Ltd*
*Commercial Real Estate Consultants*

# Property

The subject of this report, Price Tower, is located in Bartlesville Oklahoma. Bartlesville is about 40 miles north of Tulsa.



From Wikipedia:

Bartlesville is a city mostly in Washington County in the U.S. state of Oklahoma. The population was 37,290 at the 2020 census.[4] Bartlesville is 47 miles (76 km) north of Tulsa and 18 miles (29 km) south of the Kansas border. It is the county seat of Washington County.[5] The Caney River runs through Bartlesville.

Bartlesville is the primary city of the Bartlesville Micropolitan area, which consists of Washington County and had a population of 51,843 in 2018. A small portion of the city is in Osage County. The city is also part of the Tulsa Combined Statistical Area, with a population of 1,151,172 in 2015.

Bartlesville is notable as the longtime home of Phillips Petroleum Company. Frank Phillips founded Phillips Petroleum in Bartlesville in 1905 when the area was still an Indian Territory. The company merged with Conoco as ConocoPhillips and later split into the two independent companies, Phillips 66 and ConocoPhillips. Both

companies have retained some operations in Bartlesville, but they have moved their corporate headquarters to Houston.

The following history of Price Tower is from the Price Tower Organization:

The Price Tower is a spectacular building of copper and concrete and stands in the downtown area of Bartlesville, Oklahoma. The tower was built for Harold C. Price as a corporate headquarters for his pipeline construction company. Mr. Price had originally thought of a rather modest rectangular building a few stories high, however Frank Lloyd Wright convinced him that it would be more economic and efficient to build up rather than out.

Subsequent floors of the building not required by the Price Company could be rented out and accrue revenue to support the building throughout its lifespan.

Price Tower is one of ten Frank Lloyd Wright structures to be nominated by the United States to be included on the World Heritage List along with structures such as the Statue of Liberty and the Eiffel Tower.

The unique form of the Price Tower was originally designed by Wright for downtown New York City in 1929, as one of a cluster of apartment towers, but was nonetheless unrealized due to the effects of the Great Depression upon real estate prices and building material costs. Wright was delighted to have the opportunity to build his tower on the plains of Oklahoma, and he nicknamed the building "The Tree that Escaped the Crowded Forest" because it had escaped the crowded "forests" of Manhattan skyscrapers and was now able "to cast its own shadow upon its own piece of land." At the time of its construction, from 1953 to 1956, the Price Tower was the tallest building in Bartlesville and on the corner of Dewey Avenue and Sixth Street at the southern edge of the downtown area.

The nickname also reflected the structural design of the tower. Frank Lloyd Wright was an "organic" architect and often chose themes and ideas from nature. The "trunk" of the Price Tower is made of four elevator shafts and their structural walls. The trunk extends deep underground like a "tap root" and provides the strong support for the upper floors, whose tapering cantilevered concrete floor slabs are like "branches." The outer walls do not support the building, allowing for large expanses of window glass. The exterior of the Price Tower is clad in copper panels and sun louvers, the

"leaves" of the tree, whose color was aided by chemical applications rather than due to the effects of nature upon the material. The building also tapers upward like a tree with the top three floors progressively becoming narrower and the penthouse floor only a single suite of rooms.

Wright also wished to visually connect the inside of a building with the landscape outside by using similar materials on both the interior and exterior, such as the copper panels, concrete, and aluminum trim. Large windows drew the eye outside toward the view of the Oklahoma prairie, with Wright preferring not to have draperies or artwork on the walls to distract one's eye from experiencing the beauty.

Frank Lloyd Wright was interested in the ways in which a society worked and felt that architecture could both transform and improve the landscape while helping create a more functional society. He believed that mankind should build "up" rather than "out" so that in a skyscraper one could both work and live, but also have everything you need in the same building. Rather than having these businesses, stores, and offices along one street, he favored a "vertical street" where they are stacked into a tall building—his definition of a "skyscraper"— that would release land for parks, gardens, and the general enjoyment of the town's citizens.

Price Tower was designed as four quadrants based on the geometry of a 30-60-90° double parallelogram module—one quadrant for double-height apartments and three quadrants for private offices. Initially, there were eight apartments in the building, with Bruce Goff living and working in the Price Tower for nearly nine years. The first and second floors of the Price Tower were designed for retail and housed a women's dress shop, a beauty salon, and the offices of the Public Service Company of Oklahoma. On the floors above there were a variety of professional offices with the Price Company occupying the top seven floors of the tower including a sixteenth-floor commissary where free lunches were prepared and served to their employees. The seventeenth and eighteenth floors housed the Price Company corporate apartment and the company's conference room. The nineteenth floor penthouse was the office suite for H.C. Price and his assistant.

The Price Tower commission also allowed Wright to design objects within the building. He designed built-in furniture, free standing furniture, fixtures, textiles and decorative artwork. Many of the

designs were produced locally to his specifications. The cast aluminum chairs were manufactured by Blue Stem Foundry, Dewey, Oklahoma, with the built-in and freestanding wood furniture built on site.

The draperies and upholstery fabrics were designed by Wright as part of his "Taliesin" line of wallpapers and fabrics, and were manufactured by the F. Schumacher Company, New York City, in 1955. The tower's murals were also designed by Wright, with the corporate apartment's mural being the only one he inscribed and signed.

The floors and ceilings of the building are made of reinforced concrete. Frank Lloyd Wright liked to build with concrete—it could be molded, colored with pigments, and was durable and easy to maintain. The floors of the Price Tower are dyed "Cherokee Red," which was believed to be his favorite color, and used on many of his designs. The powdered pigment was added to the concrete while it was still wet and after pouring, the floors were scored with the geometric double parallelogram module.

In February 1956, the Price Tower was opened for the public to tour. Curious onlookers and reporters came from great distances to view the fascinating and unusual looking building in a small town on the Oklahoma plains. Since then, visitors have continued to be intrigued and amazed by its beauty and architectural form, and so the Price Tower is particularly recognized by a variety of honors:

> 1960 The Price Tower was listed as one of Wright's most significant works by the American Institute of Architects.

> 1974 The Price Tower was listed on the National Register of Historic Places.

> 1983 The Price Tower was honored with the American Institute of Architects' Twenty-five Year Award for continued use of a building in the purpose for which it had been designed.

> 2007 The Price Tower became a National Historic Landmark – the twentieth designation in Oklahoma to receive this prestigious honor.

In 1979, the lobby of the Price Tower was remodeled by Taliesin Associated Architects, Scottsdale, Arizona, as Frank Lloyd Wright's firm was known following his death. The redecoration included new

freestanding furniture, built-in reception desk and banquette sofa, and a beautiful twenty-five-foot long cloisonné (enamel on copper) mural entitled Willows and Reflections designed by John DeKoven Hill (1920-1996) of Taliesin Associated Architects and fabricated by Arizona artist Pauli Lame (b. 1924). The room was completed with the hanging of copper metal draperies to complement the copper on the exterior of the building.

The Price Company enjoyed the time they owned and occupied the Price Tower and the Price family continued to operate the company and work in the tower until 1981, when the company relocated to Dallas, Texas. The Phillips Petroleum Company then owned the building for a number of years using it for office space, and off-site storage. In 1987, the Landmarks Preservation Council of Bartlesville began conducting tours of the Price Tower, continuing to do so until 1998. In 1990, the Bartlesville Museum and Sculpture Garden began presenting exhibitions in the tower. Their first exhibition, "The Tree That Escaped the Crowded Forest, Frank Lloyd Wright and the Price Tower," was a fitting tribute to the Price Tower's role in the community.

In 1998, The Bartlesville Museum and Sculpture Garden became the Price Tower Arts Center and Phillips Petroleum began to refurbish the tower, making it compliant with current building codes and removing alterations that had been made to the interior spaces. Once completed, Phillips Petroleum then donated the building to the Price Tower Arts Center, who is the current owner of the Price Tower and its city block.

In 2003, Inn at Price Tower, a nineteen-room hotel and Copper Bar + Restaurant opened, providing overnight guests the option to fully experience Wright's design. The Price Tower Arts Center galleries now occupy the two-story space once held by the Public Service Company of Oklahoma and the dress shop and beauty salon. In October 2006, the top three floors of the building were reopened following a three-month restoration to their original 1956 appearance, including replacement of furnishings and replication of original draperies and upholstery fabrics. Tours are conducted daily to these floors or by special appointment.

With properties like the subject, a direct market analysis is impossible; there are no other buildings even remotely similar to it. This is compounded by the fact it was designed and built by Frank Lloyd Wright.

## Property

The owner wanted Wright to build an office building for his company and Wright suggested the "high rise" concept because the tenants would then contribute to the building operation and maintenance.  It was not designed to be an investment type of property wherein the property owner would be receiving a positive return on his investment.  It was designed to "offset" the costs of a high class, high quality corporate office building.

Today, the property is operated as a museum with a boutique hotel operated to offset operating/maintenance costs. An income analysis is not appropriate for this valuation analysis.

The subject of this report falls under the definition of special-use property:

> A property with a unique physical design, special construction materials, or a layout that particularly adapts its utility to the use for which it was built; also called a special design property[2]

The characteristics that mark properties as special purpose can also be listed as follows:
- They were constructed for a specialized use
- They exhibit a specialized design
- They are difficult or expensive to convert to another use
- They have limited utility for alternative uses; in other words, they have high functional obsolescence when considered for alternative use
- There are few, if any, market transactions involving similar properties

The Appraisal of Real Estate notes the particular appropriateness of the cost approach for the valuation of special use properties. [3]

The subject has all the noted characteristics of a special-purpose property and, perhaps most significantly, since they are one-of-a-kind, there are no sales of truly comparable properties that can be used to estimate their value.

For special-purpose, one-of-a-kind historic icons, a calculation of undepreciated reproduction cost—rather than replacement cost—is the goal. The D*ictionary of Real Estate Appraisal*, sixth edition, defines *reproduction cost* as "the estimated cost to construct, at current prices as

---

[2] *The Dictionary of Real Estate Appraisal*, 6th ed., s.v. "special purpose property"
[3] For example, see *The Appraisal of Real Estate* 14th ed., 45, 566 and 567

of the effective date of the appraisal, an *exact duplicate or replica* of the building being appraised, *using the same materials, construction standards, design, layout and quality of workmanship* and embodying all the deficiencies, superadequacies and obsolescence of the subject building."(emphasis added)

In contrast, *replacement cost* is defined as "the estimated cost to construct, at current prices as of a specific date, *a substitute* for a building or other improvements, *using modern materials and current standards, design, and layout.*" (emphasis added). The most important differences between the two types of construction costs are in the elements emphasized—reproduction attempts to provide an exact duplicate, while replacement does not.

Property

Bartlesville Data



## Property

### General Description

**Site Size**: 300 feet by 300 feet

**Parking Spaces:** There is on-site parking in rear for 120± cars.

**Curbs/Sidewalks**: Concrete

**Easements** Typical utility easements

**Zoning**: C-4 central Commercial. The building appears to conform.

**Principal Building** The subject is a 19-story mixed use building containing office space, museum space and space for a restaurant (now closed). It was constructed from 1954-56.

**Number of Stories:** 19

**Building Size:** Approximately 49,812 square feet

**Overall Condition:** After renovation – excellent.  As is - good for age

**Basement:** Partial

**HVAC:** Variable Refrigerant Flow system

**Exterior Walls:** Glass, copper and steel

**Roof:** Flat

**Windows:** Fixed pane and hopper

**Foundation:** Concrete

## Property

**Tower**

**General**:

This is a 1-story building containing an art display area, offices, hotel rooms and museum office area.

The hotel section of the building contains 19 rooms, some of which are duplexed.

At one time there was a restaurant/bar in the building, but it closed during the pandemic.



**Condition**:                        Very good for its age

## Property

### Annex Building

This is a mixed use building that is estimated to have been constructed in the 1940's. It is of masonry construction and utilized for storage for the tower itself. It has a large area where artists work and an office area which is rented out. It contains about 10,500 square feet.



## Property



## Property





Property



Arts Center Level 1



Arts Center Level 2

Property



Typical Office Space



Typical Office Space

## Property



Typical Hotel Room



Lower Level of Duplexed Hotel Suite

Property



Copper Bar/Restaurant





Kitchen Areas

Property



Price Conference – Museum Area



Price Office – Museum Area

## Property



Price Tower Annex



Annex Storage Area

Exhsagdebtor 000387

## Property



Annex Artist Work Area



Annex Rented Area

*The Gorman Group, Ltd.*
*Commercial Real Estate Consultants*
Price Tower.docx  © 2023  Page 25

## Valuation Analysis

*The Gorman Group, Ltd*
*Commercial Real Estate Consultants*

Exhsagdebtor 000389

Valuation Analysis

**THE VALUE ANALYSIS**

The public use value of historic properties such as the subject cannot be ascertained by conventional techniques like comparing it to similar buildings that have been recently sold or by analyzing its income to figure the rate of return a prospective purchaser might receive.  These techniques are not appropriate because a, there are NO similar buildings and b, public use buildings typically do not produce a positive cash flow.

The methodology of estimating the reproduction cost of a building for public use is generally accepted to be the index method.  Reproduction cost in real estate refers to the total costs of an exact duplicate of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship and embodying all the deficiencies, superadequacies, and obsolescence of the subject building.

Generally speaking, the value of the underlying land is estimated first. This is not done by utilizing a multiplier but is done utilizing actual land sales.

| Sale | Location | | Price | Date | Size | $/SF |
|------|----------|--|-------|------|------|------|
| 1 | Apx  2311 SE Adams | Bartlesville | $ 1,115,462.00 | Sep-21 | 48,352 | $ 23.07 |
| 2 | SWC Adam & Madiso | Bartlesville | $ 250,000.00 | Sep-20 | 47,916 | $ 5.22 |
| 3 | 501 SE Wadhington | Bartlesville | $ 907,000.00 | Mar-20 | 34,000 | $ 26.68 |
| 4 | 1300 SE Wasjongton | Bartlesville | $ 500,000.00 | Feb-18 | 54886 | $ 9.11 |
| 5 | 1407 SE Washington | Bartlesville | $ 595,000.00 | 5/1/2019 | 54,360 | $ 10.95 |
| 6 | 526 S Wuapaw | Bartlesville | $ 81,500.00 | Dec-21 | 14000 | $ 5.82 |

After giving consideration to each sale as to the date of sale, location, condition and utility, I have concluded that the underlying land has a market value of $900,000.00.

**$900,000.00**
**NINE HUNDRED THOUSAND DOLLARS**

Price Tower was reportedly constructed for between $2.1 million and $2.4 million between 1952 and 1956. I am utilizing a mid-point figure of $2,250,000.00. The 10,000 square foot annex had been constructed earlier.  It is not part of the original tower, but is part of the complex and will be treated accordingly.

## Valuation Analysis

In estimating the reproduction cost we utilize the original cost and a multiplier for inflation. The first thing noticed is that the conventional Consumer Price Index tends to list to a lower than actual cost multiplier. As the chart below suggests, construction wages and costs typically run higher than the Consumer Price Index.



Using a basic *consumer price index multiplier*, the reproduction cost comes to $25,241,591.00 say, 25,250,000.00 but as can be seen by the chart below, *construction cost* inflation is significantly higher the consumer cost index and suggests a reproduction cost of $38,604,300.00...say $38,600,000.00 or about $775.00 per square foot.



**Series 1 is the more commonly noted Consumer Price Index**
**Series 2 is the Construction Cost Index**

## Valuation Analysis

There is a second building on the site as previously noted; the annex. The annex is valued more conventionally using a replacement cost methodology.

Replacement Cost is the estimated cost to construct, at current prices as of a specific date, a substitute for a building or other improvements, using modern materials and current standards, design, and layout.

The depreciated replacement cost of the Annex is estimated to be $950,000.00.

### Summary of Reproduction and Replacement Costs

RERODUCTION COST - TOWER

    49,812 SF @ $ 775.00          $  38,604,300.00

REPLACEMENT COST – ANNEX  - Depreciated Cost

    10,500 SF             $      945,000.00

ESTIMATED MARKET VALUE OF THE SITE     $    900,000.00

ESTIMATED VALUE                  $  40,449,300.00

**Rounded to**

### FORTY MILLION DOLLARS
### ($40,000,000.00)

## Regulatory Items

*The Gorman Group, Ltd*
*Commercial Real Estate Consultants*

## Regulatory Items

**Assumptions and Limiting Conditions**

- It is assumed that the construction and use of the appraised property, if improved, complies with all public authorities having jurisdiction, including but not limited to the National Environmental Protection Act and any other applicable federal, state, municipal, and local environmental impact or energy laws or regulations.

- The Americans with Disabilities Act (ADA) became effective January 26, 1992.  We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA.  It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act.  If so, this fact could have a negative effect upon the value of the property.  Since we have no direct evidence relating to this issue, we did not consider possible non-compliance with the requirements of ADA in estimating the value of the property.

- It is assumed that the title to this property is good and marketable.  No title search has been made, nor have we attempted to determine ownership of the property.  The value opinion is given without regard to any questions of title, boundaries or encroachments.  It is assumed that all assessments are paid.  We assume the property to be free and clear of liens and encumbrances except as noted.

- The legal description, if included herein, should be verified by legal counsel before being relied upon or used in any conveyance or other document.

- We are not familiar with any engineering studies made to determine the bearing capacity of the land.  Improvements in the area appear to be structurally sound.  It is therefore assumed that soil and subsoil conditions are stable unless specifically outlined in this report.

- Any exhibits in the report are intended to assist the reader in visualizing the property and its surroundings.  The drawings are

## Regulatory Items

not intended as surveys and no responsibility is assumed for their cartographic accuracy.  Drawings are not intended to be exact in size, scale or detail.

- Areas and dimensions of the property may or may not have been physically measured.  If data is furnished by the principal or from plot plans or surveys furnished by the principal, or from public records, we assume it to be reasonably accurate.  In the absence of current surveys, land and/or building areas may be based upon representations made by the owner's agents, the client, public records, or via scaling from aerial photographs.  No attempt has been made to render an opinion or determine the status of easements that may exist.  No responsibility is assumed for discrepancies which may become evident from a licensed survey of the property.

- Our value opinion involves only the real estate and all normal building equipment if any improvements are involved.  No consideration was given to personal property, (or special equipment), unless stated.

- It is assumed that the property is subject to lawful, competent and informed ownership and management unless noted.

- Information in this report concerning market data was obtained from buyers, sellers, brokers, attorneys, trade publications or public records.  To the extent possible, this information was examined for accuracy and is believed to be reliable.  Dimensions, areas or data obtained from others is believed correct; however, no guarantee is made in that the appraiser did not personally measure same.

- Any information, in whatever form, furnished by others is believed to be reliable; however, no responsibility is assumed for accuracy.

- The physical condition of any improvements described herein was based on visual inspection only.  Electrical, heating, cooling, plumbing, sewer and/or septic system, mechanical equipment and water supply were not specifically tested, but were assumed to be in good working order and adequate, unless otherwise specified.  No liability is assumed for the soundness of structural members, since no engineering tests were made of same.  The roof(s) of structures described herein are assumed to be in good repair unless otherwise noted.  The existence of potentially hazardous

## Regulatory Items

material used in the construction or maintenance of the building, such as urea formaldehyde foam insulation and/or asbestos insulation, which may or may not be present on the property, has not been considered.  In addition, no deposits of toxic wastes, unless specifically mentioned herein, have been considered.  The appraiser is not qualified to detect such substances and suggests the client seek an expert opinion, if desired.

- It is specifically noted that the appraiser(s) have not conducted tests to determine the presence of, or absence of Radon.  We are not qualified to detect the presence of Radon gas, which requires special tests and therefore must suggest that if the buyer is suspect as to the presence of Radon or any other potentially hazardous substances, he or she should take steps to have proper testing done by qualified firms who have the equipment and expertise to determine the presence of this substance in the property.

- If the client has any concern regarding the structural, mechanical or protective components of the improvements described herein, or the adequacy or quality of sewer, water, or other utilities, it is suggested that independent contractors or experts in these disciplines be retained by said client, before relying upon this appraisal.

- Separate allocations between land and improvements, if applicable, represent our judgment only under the existing utilization of the property.  A re-evaluation should be made if the improvements are removed or substantially altered, and the land utilized for another purpose.

- All information and comments concerning the location, neighborhood trends, construction quality and costs, loss in value from whatever cause, condition, rents, or any other data for the property appraised herein, represent the estimates and opinions of the appraiser formed after an examination and study of the property.

- Any valuation analysis of an income stream has been predicated upon financing conditions as specified herein, which we have reason to believe are currently available for this property.  Financing terms and conditions other than those indicated may alter the final value conclusions.

## Regulatory Items

- Expenses shown in the Income Approach, if used, are estimates only, and are based on past operating history if available, and are stabilized as generally typical over a reasonable time period.  If we were not provided any income or expense information, we have estimated them based upon our experience in the market.

- The appraiser is not required to give testimony or appear in court because of having made this appraisal, with reference to the property in question, unless arrangements have been made previously thereto.  If the appraiser(s) is subpoenaed pursuant to court order, the client will be required to compensate said appraiser(s) for his time at his regular hourly rates, plus expenses.

- All opinions, as to values stated, are presented as the appraiser's considered opinion based on the information set forth in the report and his experience.  We assume no responsibility for changes in market conditions or for the inability of the client or any other party to achieve their desired results based upon the appraised value.  Further, some of the assumptions made can be subject to variation depending upon evolving events.  We realize some assumptions may never occur and unanticipated events or circumstances may occur.  Therefore, actual results achieved during the projection period may vary from those in our report.

- Appraisals made subject to satisfactory completion of construction, repairs, alterations, remodeling or rehabilitation, are contingent upon completion of such work in a timely manner using good quality materials and workmanship and in substantial conformity to plans or descriptions or attachments made hereto.

- It is agreed that the liability of the appraiser/consultant to the client is limited to the amount of the fee paid as liquidated damages.  The appraiser/consultant responsibility/liability is limited to the client, and use of this appraisal by any other party is prohibited. Further, there is no accountability, obligation, or liability to any third party.

- A signatory of this appraisal is a State Licensed (Certified) appraiser.  State and Federal Privacy Laws control the use and distribution of each appraisal report to protect any confidential information that might be contained therein.  Therefore, except as herein provided, the party for whom this appraisal report was prepared may not distribute copies of this appraisal report.  Nor

## Regulatory Items

shall selected portions of this appraisal report be given to third parties without prior written consent of the signatories of this appraisal report.

- Neither all nor any part of this appraisal report shall be disseminated without the prior written consent of the signatories of this appraisal report.

- Acceptance of and payment for the report constitutes acceptance of all the provisions contained herein.

## Regulatory Items

**CERTIFICATE OF APPRAISAL**

I certify that, to the best of my knowledge and belief:

1. This appraisal report has been prepared for the exclusive benefit of the client.  It may not be used or relied upon by any other party.  Any party who uses or relies upon any information in this report, without the preparer's written consent, does so at his own risk.

2. The statements of fact contained in this report are true and correct.

3. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions.

4. I have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved.

5. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

7. The appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

8. My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of:

    USPAP        Uniform Standards of Professional Appraisal Practice, and
    SPP-AI        Code of Professional Ethics and the Standards of Professional Practice of
    the Appraisal Institute; and, except as noted in the Scope of Appraisal

9. The use of this report is subject to the requirements of the Appraisal Institute relating to its review by duly authorized representatives.

10. Robert C. Gorman has made a personal inspection of the property that is the subject of this report.

*The Gorman Group, Ltd.*
*Commercial Real Estate Consultants*
Price Tower.docx  © 2023  Page 36

Exhsagdebtor 000399

## Regulatory Items

11. No one provided significant professional assistance to the person(s) signing this report.

12. I do not authorize the out-of-context quoting from or partial reprinting of this appraisal report.  Further, neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser nor the name of the firm with which he is connected, nor any reference to the Appraisal Institute) shall be reproduced, published, or disseminated to the public through advertising media, public relations media, news media, or another public means of communication, without the prior written consent of the appraiser signing this report.

13. The Appraisal Institute conducts a continuing education program for its designated members.  As of the date of this report, Robert Gorman has completed the requirements of the continuing education program of the Appraisal Institute.

14. I have performed no other services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

The Gorman Group Ltd., an Illinois Corporation

by:_____

Robert C. Gorman, MAI
President
Illinois Certified General Appraiser
License Number 553.000002
Expires September 30, 2023

Oklahoma Temporary Practice Permit
Number OK 23-030

## Addenda

Architect's Notes
Rehabilitation Budget
Rehabilitation Plan
Qualifications of Appraiser

**Building Systems Immediate Plan**

1   This is what we must do in the first 6 months to be ready for the dog days of summer and to prepare for winter 2023.

**Building Systems – Rehabilitation Plan**

2   This is the bulks of the work to make the building systems reliable for the next 20 years

3   It will take place in 2023-24 to be ready for the summer of 2024.

**Elevator Rehabilitation**

4   This assumes a total modernization of the elevator equipment and controls. There are a lot of options here, but this is worst case.

5   If we signed up today, we would ride in the first of the three elevators in January 2024. The other two would follow in the summer and fall of 2024.

**Interior Work**

6   This work needs to happen as the HVAC upgrades are happening.

7   The window upgrades will help the HVAC systems do their jobs.

8   The door repairs and a maintenance item that can happen over time.

9   The plaster and painting will need to be done as we tear up the ceilings to install the HVAC.

**Exterior Rehabilitations**

1   Copper Repair will be ongoing.

2   Roof repairs is a worst case scenario and should be done in 2023

**Hospitality Upgrades**

1   This is the fun stuff!

2   New furniture and fixtures for a boutique hotel

3   Restaurant/Gallery/Gift Shop renovations

4   Copper Renovations – 15-16th floors

5   FFE – Furniture, Fixtures and Equipment – this pertains to things that are not nailed down, but needed in the restaurant. I don't typically include POS, china, silver or computers in this budget line. But it does include booths, chairs, tables, art décor, lighting etc.

**Design Fees**

1   Ambler Architects fees to design and manage the construction projects.

**Owner's Representative**

2   My fees, which we discussed being out of a different budget

**Conservation Management Plan**

3    This is the Management Plan that has been started, but not finished. It will be done by the Chicago architect that the FLLW folks gush over and will be required to get back in the good graces of UNESCO.

**Contingency**

4    This is a significant amount of money, but I'll be we use it all.

Exhsagdebtor 000403

Price Tower Rehabilitation Budget
15-Nov-22

| | | | 1 story | 2 story | | VRF Units | Glass Doors | Windows Office | Suite |
|---|---|---|---|---|---|---|---|---|---|
| 1st Floor | 7,052 | | 0 | 0.0 | | | 5 | | |
| 2nd Floor | 6,854 | | 0 | 0.0 | | | 2 | | |
| 3rd Floor | 2,280 | | 0 | 0.0 | | 4 | 4 | 3 | 1 |
| 4th Floor | 2,300 | | 0 | 0.0 | | 4 | 4 | 3 | |
| 5th Floor | 2,280 | | 0 | 0.0 | | 4 | 5 | 3 | 1 |
| 6th Floor | 2,300 | | 0 | 0.0 | | 4 | 5 | 3 | |
| 7th Floor | 2,280 | | 3 | 1.0 | | 4 | 1 | 3 | 1 |
| 8th Floor | 2,300 | | 3 | 0.0 | | 4 | 1 | 3 | |
| 9th Floor | 2,280 | Storage and Apt | | 1.0 | (2) | 4 | 1 | 3 | 1 |
| 10th Floor | 2,300 | | 3 | 1.0 | | 4 | 1 | 3 | |
| 11th Floor | 2,280 | | | 0.0 | | 4 | 1 | 3 | 1 |
| 12th Floor | 2,300 | | 3 | 1.0 | | 4 | 1 | 3 | |
| 13th Floor | 2,280 | | 3 | 0.0 | | 4 | 1 | 3 | 1 |
| 14th Floor | 2,300 | Glenn Security | | | (3) | 4 | 3 | 3 | |
| 15th Floor | 2,280 | Copper | | | | 4 | 2 | 3 | 1 |
| 16th Floor | 2,300 | Copper | | | | 2 | 3 | 3 | |
| 17th Floor | 1,326 | Corporate Apt. | | | | 2 | 3 | 3 | 1 |
| 18th Floor | 1,300 | Corporate Apt. | | | | 2 | 3 | 2 | |
| 19th Floor | 1,220 | Mr. Price's Office | | | | | 3 | 3 | |
| | 49,812 sf | | 15 | 4 | | 58 | 49 | 50 | 8 |

Price Tower Rehabilitation
15-Nov-22

| Building Systems - Immediate Plan | | | | |
|---|---|---|---|---|
| HVAC Systems | | | 210,000 | |
| Electrical | | | 25,000 | |
| Plumbing | | | 55,000 | |
| Fire Protection | | | | |
| | | | | 290,000 |

| Building Systems - Rehabilitation Plan | | | | |
|---|---|---|---|---|
| HVAC | | | 3,500,000 | |
| Electrical | | | 250,000 | |
| Plumbing | | | 80,000 | |
| Fire Protection | | | 600,000 | |
| | | | | 4,430,000 |

| Elevator Rehabilitation | | | | |
|---|---|---|---|---|
| | | | | 1,500,000 |

| Interior Work | | | | |
|---|---|---|---|---|
| Seal Single Story Windows | 50 | 1,200 | 60,000 | |
| Seal Two Story Windows | 8 | 2,200 | 17,600 | |
| Window Tint | | | 50,000 | |
| Repair Doors | 49 | 1,500 | 73,500 | |
| Plaster Repair | | | 100,000 | |
| Painting | | | 150,000 | |
| | | | | 451,100 |

| Exterior Rehabilitations | | | | |
|---|---|---|---|---|
| Copper Repair etc | | | | 350,000 |
| Roofing | | | | 200,000 |

| Hospitality Upgrades | | | | |
|---|---|---|---|---|
| Hotel Rooms | 19 | 15,000 | 285,000 | |
| Recommission 2 hotel rooms | 2 | 25,000 | 50,000 | |
| Restaurant/Gallery/Gift Shop | 5,458 | 100 | 545,800 | |
| Copper | 2,300 | 100 | 230,000 | |
| FFE | | | 500,000 | |
| | | | | 1,610,800 |

| Subtotal | | | | 8,831,900 |
|---|---|---|---|---|

| Design Fees | 4% | | | 353,276 |
|---|---|---|---|---|
| Owner's Representative | | | | 0 |
| Complete the Conservation Management Plan | | | | 100,000 |
| Contingency | 8% | | | 706,552 |
| | | | | $9,991,728 |

Exhsagdebtor 000405



# *The Gorman Group, Ltd.*
*Real Estate Research and Analysis*

Robert C Gorman, MAI
Amanda E Wilson, MAI
Robert J Anton, Jr., MAI
Kimberly A Redelman CGA
Brian M Masterson, SRA, CGA

1200 W. 175th Street
E. Hazel Crest, IL 60429
(708) 799-4200
rcgorman@gormangrp.com
www.gormangrp.com

## Professional Qualifications
## Robert C. Gorman, MAI

### National

Appraisal Foundation, State Regulatory Advisory Board, 10-year past member

### State of Illinois

State of Illinois Real Estate Appraiser Licensing Board, Former Chairman, Multiple Terms
Certified General Appraiser # 2
Registered Real Estate Broker, State of Illinois

### Other States

**Indiana –** Registered Real Estate Appraiser/Broker, Certified General Appraiser # CG 69201470
**Wisconsin -** Certified General Appraiser and Licensed Appraiser # 281
**Michigan -** State Certified General Appraiser # 1201003260
**Florida** – State Certified General Appraiser # RZ 263

### Appraisal Institute

Member- MAI 6966
Legislative Committee (local), Chairman 1986 - 1995
Local Chapter, Director - 1991-1993
Government Relations (national) 1990 - 1994
Legislative Task Force (national) 1986 - 1990

### Royal Institution of Chartered Surveyors
Member- MRICS 1294941

### Associations/Organizations

National Golf Foundation
Illinois Association of Certified Real Estate Appraisers, Director
Illinois Association of Real Estate Educators, Founding Member
Illinois Association of Realtors, Chairman
Indiana Association of Realtors

### Professional Education

Robert Gorman has met all of the continuing education requirements for the states in which he is
licensed.

### Classifications of Real Estate Appraised (Partial List)

| | |
|---|---|
| Golf Courses | Partial Interests |
| Car Washes (contemporary) | Restaurants |
| Office Buildings | Commercial Buildings |
| Manufacturing Facilities | Medical Centers |

| | |
|---|---|
| Warehouses | Office Condominiums |
| Mobile Home Parks | Subdivisions |
| Industrial Condominiums | Shopping Centers |
| Easements | Historic Properties |
| Adult Congregate Living Facilities | Service Stations |
| Vacant Land | Financial Institutions |

**Special or Interesting Projects**

| | |
|---|---|
| Airport Lands – Solar Array, ME | Airport FBO, NM |
| Roaring Fork Golf Course, CO | Wastewater Treatment Facility, SD |
| Hazardous Waste Treatment Facilities - Siting Study | "Sin Strip" - Calumet City, IL |
| Lake Calumet Airport - Neighborhood Analysis | Frankfort Airport, IL |
| Crescent Dune - Michigan City, IN | Ringling Hotel, Sarasota, FL (historic) |
| Globally Rare Land, MI | 50,000 SF Restaurant, IL |
| Ronald Reagan's Childhood Home, IL | Wright/Dunbar Museum, Dayton, OH |
| Car Museum, LaPorte, IN | Potomac Airport, Berkley Springs |
| Car Washes, Coon Rapids, WI |   (included an island), WV |
| Private Airport, Hinckley, MN | Olympia Fields County Club, IL |

**Clients** (Partial List)

| | |
|---|---|
| U.S. Army Corps of Engineers | State of Illinois – Central Management |
| U. S. Dept. of Interior | Federal Deposit Insurance Corp. (FDIC) |
| U.S. National Park Service | Small Business Administration (SBA) |
| U.S. Dept. of Commerce | Office of Special Trustee for American |
| State of Illinois – General Assembly |   Indians/Department of Interior |
| Southern Illinois Airport Authority | Resolution Trust Corporation (RTC) |
| Amtrak | University of San Francisco |
| The Nature Conservancy | Calumet River Basin Authority |
| Izaak Walton League | Shirley Heinze Foundation |
| Habitat for Humanity | Homewood-Flossmoor Park District |
| | |
| Forest County Potawatomi Community | South Shore Hospital |
| Northern Illinois Gas Company | State Farm Insurance |
| NIPSCO | Humana |
| U. S. Silica | Acme Steel Company |
| Times-Mirror Corporation | Kane, McKenna & Associates |
| Safety–Kleen Corporation | Hollywood Casino |
| SPSS, Inc. | Heller Financial |
| Patrick Engineering | Ingalls Hospital |
| | |
| City of Gary | City of Aurora |
| Village of Tinley Park | Village of Oak Lawn |
| Village of Frankfort | Village of Homewood |
| Village of Libertyville | Village of Richton Park |
| Village of Dolton | Village of Riverdale |
| Village of Oak Park | Village of Midlothian |
| City of Calumet City | City of Blue Island |
| Village of Glenwood | City of Harvey |
| Village of Berwyn | Village of Homewood |
| City of Benton Harbor, MI | City of Elgin |

*The Gorman Group, Ltd*
*Commercial Real Estate Consultants*

| | |
|---|---|
| City of Oak Forest | Village of Matteson |
| Thornton Township | Prairie State College |
| School District 154, Thornton | School District 149, Calumet City |
| School District 122, Oak Lawn | South Suburban College |
| School District 140, Tinley Park | School District 33C, Homer Twn, IL |
| CUSD 220, Oregon IL | School District 161, Frankfort, IL |
| School District 157 C, Frankfort, IL | School District 151, South Holland |
| School District 92, Lockport, IL | |

| | |
|---|---|
| Royal Bank of Scotland | Citicorp |
| Northern Trust | The Private Bank |
| Charter One | National City Bank |
| Bank of America | First Midwest Bank |
| BankFinancial | Harris Bank |
| First Financial Bank | Centier Bank |
| Pinnacle Bank | First Bank of Manhattan |
| CNB Bank & Trust | First Trust Bank |
| First Personal Bank | First Community Bank & Trust |
| Centrue Bank | Merchants & Manufacturers Bank |
| LincolnWay Community Bank | LaSalle State Bank |
| Marquette Bank | |
| First Bank of Manhattan | |

Other clients include Attorneys, Developers and Corporations

## Books

Fundamentals of Real Estate Appraisal, Technical Editor

## Instructor (former)

| | |
|---|---|
| Real Estate Appraisal | Real Estate Contracts and Conveyances |
| Real Estate Sales and Brokerage | Basic Real Estate Transactions |
| Advanced Principles of Real Estate | |

## Expert Witness

Circuit Court of Cook County, Chancery Division
U.S. District Court, Northern District of Indiana
U.S. District Court for the Northern District of Illinois, Eastern Division
U.S. Bankruptcy Court Northern Illinois District of Illinois, Eastern Division

The Appraisal Institute conducts a voluntary program of continuing education of its designated
members. Robert C. Gorman has completed the continuing education program.

More information about Robert C. Gorman can be found on the corporate website
www.GormanGrp.com

*The Gorman Group, Ltd*
*Commercial Real Estate Consultants*

_011-003083   04/18/2011  2:35 pm
Book   1098     Page(s) 0238-0252
Fee:    $ 41.00     Doc:     $ 0.00
Marjorie Parrish - Washington County
State of Oklahoma

## PRESERVATION AND CONSERVATION EASEMENT

This Preservation and Conservation Easement is effective as of the _____6th_____ day of _____April_____ 2011, by and between Price Tower Arts Center, Inc., an Oklahoma nonprofit organization, of 510 South Dewey Avenue, Bartlesville, Oklahoma 74003 ("Grantor"), and The Frank Lloyd Wright Building Conservancy, an Illinois not-for-profit corporation, of 53 West Jackson Boulevard, Suite 1120, Chicago, Illinois 60604.

### WITNESSETH:

WHEREAS, the Grantee is organized as an Illinois not-for-profit corporation and is a qualifying recipient of qualified conservation contributions under the Internal Revenue Code (the "Code");

WHEREAS, the Grantor is organized as an Oklahoma not-for-profit corporation and is a tax exempt corporation under the Code;

WHEREAS, the Grantor owns certain real property consisting of one parcel (the "Site") and including one main structure commonly known as the Price Tower (the "Building") located at 510 Dewey Avenue, Bartlesville, Oklahoma 74003 (all sometimes collectively referred to as the "Premises"), the legal description for which is attached as Exhibit A, and which was designated a National Historic Landmark on March 29, 2007.

WHEREAS, the architect of the Building was Frank Lloyd Wright;

WHEREAS, the Grantor and Grantee recognize the historical, cultural, and aesthetic value of the Premises and have the common purpose of conserving and preserving the Premises, and related original architectural and design elements;

WHEREAS, Frank Lloyd Wright designed total environments, including architecture, furniture and decorative glass, windows and arts, so that the removal or sale of these elements diminishes the artistic and historic value of such environments;

WHEREAS, the grant of a preservation and conservation easement will assist in preserving and maintaining the Premises;

WHEREAS, Grantor desires to grant to Grantee, and Grantee desires to accept, a preservation and conservation easement on the Premises, pursuant to the following terms and conditions;

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, receipt of which is hereby acknowledged, Grantor hereby irrevocably grants and conveys unto the Grantee a preservation and conservation easement in gross in perpetuity (the "Easement") in and to the Premises as follows:

The Easement shall be of the nature and character hereinafter expressed, and shall constitute a binding servitude, to run in perpetuity upon said Premises, and to that end, Grantor covenants on behalf of itself, its successors and assigns, with Grantee, its successors, and assigns, that each of the following covenants and stipulations, will contribute to the public purpose and will aid significantly in the preservation of the Premises, and will help maintain and assure the present and future historic integrity of the Premises.

1.  **Description of the Premises.** To more fully establish the Grantor's obligations and undertakings with reference to the Premises and in order to document the external and internal appearance and condition of the Building as of the date of this Easement, Grantor will compile a set of photographs depicting the exterior and interior surfaces of the Building and the surrounding property, text describing the Building and copies of the original architectural plans of the Building. This compilation shall be identified as the Price Tower Compilation

and attached hereto as Exhibit B. It is stipulated that the external and internal appearance and condition of the Building as shown in the Price Tower Compilation is the external and internal appearance and condition of the Building as of the date of this Easement. Grantor intends to preserve and maintain the exterior and certain historic interior features of the Premises to conform substantially to the Price Tower Compilation, and in a manner consistent with the 1995 edition (or more recent) U.S. Secretary of the Interior's Standards for the Treatment and Restoration of Historic Properties, (the "Standards").  If the Price Tower Compilation or the Standards are destroyed, lost or abandoned, the Grantor and Grantee shall agree upon reasonable alternative standards for application hereunder including, but not limited to, state or local standards for review of work affecting historically or architecturally significant structures.  As used herein: "Facades" shall mean the exterior facades and elevations (including structural and decorative architectural elements and windows comprising part of such facades and elevations) and walkways and related landscaping approaching various entrances to the Building, as reflected in the Price Tower Compilation.

2.  **Grantor's Permanent Covenants**. Grantor covenants and agrees, for itself, its successors and assigns, to do and to refrain from doing (as the case may be) upon the Premises, the following:

   a.  Grantor shall not demolish or remove any material portion of the Facades or the exterior of the Building except as provided herein.

   b.  Without the prior consent of the Grantee, Grantor shall not:

      i)  Increase or decrease the height of any Facade or the Building;

      ii)  Adversely affect the structural soundness of any Facade or the Building;

      iii)  Make or permit any material changes in the appearance or construction of any Facade or the exterior of the Building, except ordinary repairs or maintenance pursuant to Paragraph 2 (c) or reconstruction or restoration pursuant to Paragraph 2 (d); or

      iv)  Grantor shall not erect or place buildings or structures on the Premises, except for temporary structures for the maintenance or rehabilitation thereof, or for promotional, educational or social events.

   c.  Grantor shall at all times maintain the Premises in good condition and repair and maintain the structural soundness and safety of the Building and Site. Subject to the casualty provisions of Paragraphs 4 and 5, this obligation to maintain shall require replacement, rebuilding, repair, and reconstruction whenever necessary to have the external nature of the Building at all times appear to be the same as depicted in the Price Tower Compilation.

   d.  Grantor shall complete any reconstruction or restoration of the Facades or exterior of the Building pursuant to plans and specifications ("Plans") prepared by Grantor's architect. The Plans shall be based upon the Price Tower Compilation and the Standards. The Plans and any material alteration to them must be approved by the Grantee in advance. Grantor shall provide Grantee such Plans or alterations and Grantee shall advise Grantor whether it approves same within 30 days of receipt; if Grantee fails to so advise Grantor within such 30 days, Grantee shall be deemed to have given approval.  The standard for approval will be the fidelity of the Plans to the Price Tower Compilation and the Standards. The approval of the Plans, or any alteration, by Grantee shall not be unreasonably delayed or withheld. Grantor shall undertake any reconstruction or restoration work in accordance with the Plans, and shall permit periodic review of work by the Grantee to ensure work conforms to the approved Plans.  If, during the course of work Grantee determines that any work does not conform to the Plans, Grantee may so advise Grantor and Grantor shall give due consideration to Grantees advice Within thirty (30) days following completion of the work, Grantor shall provide the Grantee a full and complete set of the Plans, which

2

shall be deposited and retained as part of the Price Tower Compilation.

e.    Grantor shall not accumulate unsightly or offensive materials on the Premises.

f.    Grantor shall not subdivide, sell or develop parts of the Premises separately.

g.    Grantor may repair, remodel, restore, alter and change any part of the interior of the Building so long as the Facades are not materially affected and so long as the interior artworks and architectural features listed on a list of Protected Historic Features, which is attached as Exhibit C, are not altered or changed. Grantor reserves the right to amend and update Exhibit C from time to time, and shall promptly deliver a dated copy of any amended or updated Exhibit C to Grantee. Grantor shall provide Grantee drawings reflecting remodeling, alterations and changes within 30 days after completion of same.

3.   **Public Access**. Grantor shall continue to make the Premises accessible to the public consistent with the purposes of this Easement.

4.   **Casualty Damage.** If the Facades are damaged by casualty, and if Grantors determine that restoration is feasible, then Grantors shall restore the Facades to the extent that they can reasonably be restored consistent with the Price Tower Compilation and the Standards, and shall consult with Grantee in connection with the restoration.

5.   **Review After Casualty Loss.** If after the Building suffers a casualty Loss, in the opinion of the Grantee and Grantor, restoration/reconstruction would not serve the purpose and intent of the Easement, the Grantor shall continue to comply with the provisions of the Easement dealing with the extinguishment of the Easement, as well as the provisions dealing with Grantor's obligations with regard to the alteration, demolition, removal or razing of the Premises, Building or Site.

6.   **Grantee's Covenants**. The Grantee hereby warrants and covenants that:

a.    Grantee is and will remain a Qualified Organization for purposes of Sections 501 (c)(3), 170(h) and related provisions of the Code. If the Internal Revenue Service successfully challenges Grantee's status as a Qualified Organization, Grantee shall promptly select two or more Qualified Organizations to one of which Grantor agrees to transfer all rights and obligations under this Easement.

b.    If Grantee at any time in the future becomes the owner of the Premises, Grantee for itself, its successors, and assigns, covenants and agrees, in the event of a subsequent conveyance of the same to another, to specifically continue the applicability of this Easement.

c.    Grantee may, with the prior consent of Grantor, convey, assign, or transfer this Easement to a Qualified Organization as defined in Paragraph 6 (a) above.

d.    Grantee shall exercise reasonable judgment and care in performing its obligations and exercising its rights under the terms of the Easement, and shall consider economic and business factors affecting Grantor.

7.   **Inspection**. Grantee or Grantee's agent shall be permitted at all reasonable times to inspect the Premises, including the Facades, the Building and Site. Grantee shall be permitted to enter and inspect the interior of the Building to ensure maintenance of structural soundness and safety; inspection of the interior will not, in the absence of evidence of deterioration, take place more often than once annually, and may involve reasonable testing of interior structural condition. Inspection of the interior will be made at a time mutually agreed upon by Grantor, and Grantor shall not unreasonably withhold its consent in determining a date and time for such

3

inspection. Grantee may, during such inspections, take photographs, make drawings or other representations documenting the significant historical, cultural, or architectural character and features of the Premises, provided such activities do not materially adversely interfere with Grantor's use of the Premises.

8. **Grantee's Remedies.** Grantee has the following legal remedies to correct any violation of any covenant, stipulation, or restriction herein, in addition to any remedies now or hereinafter provided by law or in equity:

    a. Legal relief available to Grantee shall include ex parte, temporary, preliminary, and/or permanent injunction, including prohibitory and/or mandatory injunctive relief, and to require the restoration of the Premises, Building, Site or Facades to the condition and appearance required under this instrument.

    b. Grantee's exercise of any remedy hereunder shall not have the effect of waiving or limiting any other remedy, and the failure to exercise any remedy shall not have the effect of waiving or limiting the use of any other remedy or the use of such remedy at any other time.

9. **Notice from Government Authorities.** Within ten (10) days of receipt by Grantor, Grantor shall deliver to Grantee copies of any notice received by Grantor from any government authority setting forth any violation of any law or regulation or building or occupancy code or permit. Upon request by Grantee, Grantor shall promptly furnish Grantee evidence of Grantor's compliance with such notice, demand, letter, or bill.

10. **Notice of Proposed Sale.** Grantor shall promptly notify Grantee in writing of any proposed sale of the Premises and provide the opportunity for Grantee to explain the terms of the Easement to potential new owners prior to sale closing.

11. **Runs with the Land.** The obligation imposed by this Easement shall be effective in perpetuity and shall be deemed to run as a binding servitude with the Premises except as provided in Paragraph 20. This Easement shall be binding upon Grantor and Grantee, their respective successors in interest, and all persons hereafter claiming under or through Grantor and Grantee, and the words "Grantor" and "Grantee" when used herein shall include all such persons. Notwithstanding anything herein to the contrary, no person shall have any obligation pursuant to this instrument following the termination of such person's right, title and interest in and to the Premises. The restrictions, stipulations, and covenants contained herein shall be inserted by Grantor, verbatim or by express reference, in any subsequent deed or other legal instrument by which Grantor divest themselves of either the fee simple title to or any lesser estate in the Premises or any part thereof.

12. **Recording.** Grantor shall cause this Easement to be recorded in the official records of the recorder of deeds for the county in which the Premises are located within ten (10) days of the execution of this Easement.

13. **Existing Liens.** Except for those matters shown in Exhibit D hereto, Grantor warrants to Grantee that no perfected lien or encumbrance exists on the Premises as of the date hereof. Grantor shall immediately cause to be satisfied, subordinated or released any perfected lien that may hereafter come to exist against the Premises, which would have priority over any of the rights, title, or interest hereunder of Grantee.

14. **Indemnification.** The Grantor hereby agrees to pay, protect, indemnify, hold harmless, and defend at its own cost and expense, the Grantee, its agents, directors, and employees, or independent contractors from and against any and all claims, liabilities, expenses, costs, damages, losses, and expenditures (including reasonable attorneys' fees and disbursements hereafter incurred) arising out of or in any way relating to the administration, performed in good faith, of this Easement, including, but not limited to, the granting or denial of consents hereunder, the reporting on or advising as to any condition on the Premises, and the execution of work on the Premises. In the event that the Grantor is required to indemnify the Grantee pursuant to the terms of this Easement, the amount of such indemnity, until discharged, shall constitute a lien on the Premises.

15. **Taxes and Charges.** Grantor shall pay immediately, when first due and owing, all general taxes, special

Exhsagdebtor 000412

taxes, special assessments, water charges, sewer service charges, and other charges which may become a lien on the Premises.

16.  **Insurance.** Grantor shall keep the Premises insured by an insurance company rated "A" or better by Best's for the full replacement value against loss from the perils commonly insured under standard fire and extended coverage policies and comprehensive general liability insurance against claims for personal injury, death, and property damage of a type and in such amounts as would normally be carried on a property such as the Premises. Such insurance shall name Grantee as an additional insured and shall provide for at least thirty (30) days' notice to Grantee before cancellation and that the act or omission of one insured shall not invalidate the policy as to any other insured party. Furthermore, Grantor shall deliver to Grantee fully executed copies of such insurance policies, or certificates of insurance, evidencing the aforesaid insurance coverage at the commencement of this grant and copies of new or renewed policies at least ten (10) days prior to the expiration of such policy. Grantee shall have the right to provide insurance at Grantor's cost and expense, should Grantor fail to obtain it. In the event Grantee obtains such insurance, the cost of such insurance shall be a lien on the Premises until repaid by Grantor.

17.  **Liens.** Any lien on the Premises created pursuant to any Paragraph of this Easement may be confirmed by judgment and foreclosed by Grantee in the same manner as a mechanic's lien.

18.  **Written Notice.** Any notice, approval or consent provided for hereunder shall be in writing and shall be mailed postage prepaid by registered, or by certified mail with return receipt requested, or by hand delivery, or by telefacsimile transmission to the following addresses: (a) if to Grantor: 510 South Dewey Avenue, Bartlesville, Oklahoma 74003; and if to Grantee: The Frank Lloyd Wright Building Conservancy, 53 West Jackson Boulevard, Suite 1120, Chicago, IL 60604 (fax) 312-663-5505; or to any subsequent address as notified. Each party may change its address set forth herein by a notice to such effect to the other party. Any notice, consent, approval, agreement, or amendment permitted or required of Grantee under the Easement may be given by the Executive Director, President, or by any duly authorized representative of the Grantee.

19.  **Evidence of Compliance**. Upon request by Grantee, Grantor shall promptly furnish Grantee with reasonable evidence of Grantor's compliance with any obligation of Grantor contained herein.

20.  **Extinguishment.** Notwithstanding anything herein to the contrary, Grantor and Grantee recognize that an unexpected change in the conditions surrounding the Premises may make impossible the continued ownership or use of the Premises for preservation and conservation purposes and necessitate extinguishment of this Easement. Such a change in condition includes, but is not limited to, partial or total destruction of the Building or the Facades resulting from a casualty of such magnitude that Grantor decides in its sole judgment, and after due consideration of this Easement, to demolish the Building in whole or in part, not to reconstruct the Building. In the event of any cessation of operations or dissolution of either party, or termination of Grantee's not-for-profit status as a Section 501(c) (3) organization, this Easement shall continue in favor of any successor or assignee designated by such party provided that such successor or assignee is an entity qualified as a Section 501 (c) (3) organization dedicated to preservation of historic structures.

21.  **Interpretation and Enforcement.** The following provisions shall govern the effectiveness interpretation, and duration of this Easement:

    a.  Any rule of strict construction designed to limit the breadth of restriction on alienation shall not apply in the construction or interpretation of this instrument, and this instrument shall be interpreted broadly to effect its preservation and conservation purposes.

    b.  This instrument shall extend to and be binding upon the parties and all persons hereafter claiming under or through them. Anything contained herein to the contrary notwithstanding, a person shall have no

Exhsagdebtor 000413

obligation pursuant to this instrument where such person shall cease to have any interest (present, partial, contingent, collateral, or future) in the premises by reason of a bona fide transfer for full value. Any right, title, or interest herein granted to Grantee also shall be deemed granted to each successor and assign of Grantee and each such following successor and assign thereof, and the word "Grantee" shall include all such successors and assigns.

c.   This instrument is made pursuant to the laws of the State of Oklahoma. The invalidity or lack of enforceability of any provision of this instrument shall not affect the validity or enforceability of any other provision of this instrument or any ancillary or supplementary agreement relating to the subject matter hereof.

d.   This instrument reflects the entire agreement of Grantor and Grantee. Any prior or simultaneous correspondence, understandings, agreements, and representations which conflict with or purport to cover the same provisions as stated in this instrument are null and void upon execution hereof, unless set out in this instrument.

e.   Each party represents and acknowledges that it has relied exclusively upon its own independent tax and/or legal advisors in evaluating the tax and/or legal considerations arising from or relating to this Easement.

BK 1098 PG 0243

EXECUTED BY:

GRANTOR:
Price Tower Arts Center, Inc.

By: _____ _Timothy Boruff_
Its Executive Director

GRANTEE:
The Frank Lloyd Wright Building Conservancy

By: _____
Its Executive Director

STATE OF OKLAHOMA          )
                          ) ss
COUNTY OF _Washington_     )

On this _9_ day of _March_ 20_11_, before me, the undersigned, a Notary Public in and for said County, in said State, personally appeared, _Timothy Boruff_ to me personally known, who, being by me duly sworn, did say that he is the authorized representative of said corporation; that no seal has been procured by the said corporation; that said instrument was signed on behalf of said corporation by authority of its Board of Directors; and that the said, _____ as such officer, acknowledged the execution of said instrument to be the voluntary act and deed of said corporation, by it and by them voluntarily executed.

_Joanna Peters_ _____
Notary Public, _09002733_ Co., _WA_
My Commission Expires: _3-25-2013_

6

Notary Public
State of Oklahoma
JOANNA PETERS
WASHINGTON COUNTY
COMMISSION #09002733
Comm. Exp. 03-25-2013

Exhsagdebtor 000414

STATE OF ILLINOIS   )
                    ) ss
COUNTY OF COOK      )

On this 6th day of April 2011, before me, the undersigned, a Notary Public in and for said County, in said State, personally appeared Janet L Halstead, to me personally known, who, being by me duly sworn, did say that he is the authorized representative of said corporation; that no seal has been procured by the said corporation; that said instrument was signed on behalf of said corporation by authority of its Board of Directors; and that the said, as such officer, acknowledged the execution of said instrument to be the voluntary act and deed of said corporation, by it and by them voluntarily executed.


_____
Notary Public in and for Cook County, Illinois
My Commission Expires:

```
OFFICIAL SEAL
STACI M MOHAN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:04/20/12
```

**Prepared by and when recorded return to:**
The Frank Lloyd Wright Building Conservancy
53 W. Jackson, Suite 1120
Chicago, IL 60604

X:\wp51\FLW\Advocacy\Price\Easment FINAL 11.15.10.doc

7

Exhibit A

# DEED

**KNOW ALL MEN BY THESE PRESENTS:**

THAT PHILLIPS PETROLEUM COMPANY, Grantor, in consideration of the sum of Ten and No/100 Dollars ($10.00), and other valuable consideration, in hand paid, the receipt of which is hereby acknowledged, does hereby quitclaim to PRICE TOWER ARTS CENTER, INC. all of Grantor's right, title, and interest in and to the personal property located in and designed by Frank Lloyd Wright for the Price Tower and the real property situate in the County of Washington, State of Oklahoma to wit:

**Block Forty-seven (47) of the Original Town, Now City of Bartlesville, Oklahoma**

510 SE Dewey, Bartlesville, OK 74003

to have and to hold it to Grantee and Grantee's successors, and assigns forever. Neither Grantor nor Grantor's successors, or assigns will have, claim, or demand any right or title to the Property or any part of it.

GRANTOR DOES NOT WARRANT EITHER EXPRESSLY OR IMPLIEDLY, THE CONDITION OR FITNESS OF THE PROPERTY CONVEYED HEREUNDER, ANY SUCH WARRANTY BEING HEREBY EXPRESSLY NEGATIVED. GRANTEE BY ACCEPTANCE HEREOF ACKNOWLEDGES THAT GRANTEE HAS MADE A COMPLETE INSPECTION OF THE PROPERTY AND ANY IMPROVEMENTS AND/OR EQUIPMENT LOCATED THEREON AND IS IN ALL RESPECTS SATISFIED THEREWITH AND ACCEPTS THE SAME "AS IS".

SAVE and EXCEPT, and there is hereby reserved unto Grantor, its successors and assigns all of the oil, gas and other minerals in and under and that may be produced from the above described property.

GRANTEE SHALL RELEASE, INDEMNIFY, DEFEND AND HOLD GRANTOR, ITS PARENT, SUBSIDIARIES, AFFILIATES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS (THE "INDEMNIFIED PARTIES"), HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, CAUSES OF ACTION, JUDGMENTS, COSTS AND EXPENSES (INCLUDING WITHOUT LIMITATION CLEANUP COSTS, COURT COSTS AND ATTORNEYS'

Exhibit A

FEES), GOVERNMENTAL ORDERS, PENALTIES, FINES, DAMAGES, LOSSES AND LIABILITIES, OF WHATEVER NATURE OR KIND, ARISING OUT OF, IN CONNECTION WITH, OR RESULTING FROM THE PRESENCE OF ANY PETROLEUM PRODUCTS, HYDROCARBONS, OR CONTAMINANTS (INCLUDING WITHOUT LIMITATION HAZARDOUS OR TOXIC SUBSTANCES) IN, ON OR UNDER THE PROPERTY REGARDLESS WHETHER THE SAME OCCURRED PRIOR TO OR AFTER THE DATE OF THIS DEED, AND REGARDLESS WHETHER THE SAME WAS CAUSED BY OR CONTRIBUTED TO, IN WHOLE OR IN PART, BY THE ACTIVE OR PASSIVE NEGLIGENCE OF THE INDEMNIFIED PARTIES.

TO HAVE AND TO HOLD said described premises unto the said Grantee, its successors and assigns forever, effective March 30, 2001.

WITNESSES

*Jimmie Peker*

*Elizabeth Bolling*

PHILLIPS PETROLEUM COMPANY

By *George F Patterson*
**Attorney-in-Fact**

Doc # 2001002080
Bk 947
Pg 1718-1719
DATE 04/02/01 15:30:30
Filing Fee $10.00
Documentary Tax $0.00
State of Oklahoma
County of WASHINGTON
WASHINGTON County Clerk
M. PARRISH, WASHINGTON

THE STATE OF TEXAS          §

COUNTY OF HARRIS            §

Before me, the undersigned, a Notary Public in and for said County and State, on this 27th day of March 2001, personally appeared George F. Patterson, the duly constituted Attorney-in-Fact for PHILLIPS PETROLEUM COMPANY, to me known to be the identical person who executed the within and foregoing instrument and acknowledged to me that he executed the same as his free and voluntary act and deed, and as the free and voluntary act and deed of said corporation for the uses and purposes therein set forth.

GIVEN under my hand and seal the day and year last above written.

*Kathy Proske*
**Notary Public**

My Commission Expires:



KATHY PROSKE
MY COMMISSION EXPIRES
June 17, 2001

*Bona fide gift*
*No documentary tax*
*stamps.*

Exhsagdebtor 000417

# OTC 988
Revised 11-2002

## OKLAHOMA APPLICATION FOR AD VALOREM TAX EXEMPTION CHARITABLE

**Tax Year** 2004

To: _Todd Mathes_ _____ County Assessor

_Washington_ _____ County, Oklahoma

## AFFIDAVIT

I, the undersigned, am personally acquainted with the use of the property hereinafter described, to wit:

(Mailing Address and Legal Description) _510 SE Dewey, Bartlesville, OK 74003_

_#8783 Lots 1-3 Block 47 incl. value of 10' vac. alley_

This property was purchased by _Price Tower Arts Center_

Date filed _3/27/2001_ Book _947_ Page _1718 - 1719_ County _Washington_

**To qualify, the above described property must comply with one of the following statutory requirements...**

- All property of any charitable institution organized or chartered under the laws of this state as a nonprofit or charitable institution, provided the net income from such property is used exclusively within this state for charitable purposes and no part of such income inures to the benefit of any private stockholder, including property which is not leased or rented to any person other than a governmental body, a charitable institution or a member of the general public who is authorized to be a tenant in property owned by a charitable institution under Section 501(c)(3) of the Internal Revenue Code, and which additionally satisfies the income standards set forth in Internal Revenue Service Revenue Procedure 96-32 if the property provides residential rental accommodations regardless of whether services or meal are provided, **or**
- All property used exclusively and directly for charitable purposes within the state, provided the charity using said property does not pay any rent or remuneration to the owner thereof unless the owner is a charitable institution described in Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C., Section 501(c)(3), or a veterans' organization described in Section 501(c)(19) of the Internal Revenue Code, 26 U.S.C., Section 501(c)(19).

- A charitable institution requesting an exemption pursuant to the provisions of paragraph 8 of Section 2887 of Title 68 of the Oklahoma Statutes shall be required to file an application with supporting documentation to satisfy both income and occupancy requirements of IRS Rev. Proc. 96-32. This application shall be required initially and each year thereafter, with the county assessor of the county in which the property is located. *(68 O.S. 2000 Supp. § 2887.1)*

- A continuum of care retirement community providing housing for the aged, licensed under Oklahoma law, owned by a nonprofit entity recognized by the Internal Revenue Service as a Section 501 (c) (3) tax-exempt entity and located in a county with a population of more than five hundred thousand (500,000) according to the latest Federal Decennial Census; *(68 O.S. 2001 § 2887 paragraph 8)*

- If the property provides residential rental accommodations or is subject to occupancy requirements, the owner shall submit a report to the county assessor regarding the occupancy rate for the preceding eleven months no later than December 15. A copy of the report must accompany this form.

I, _Laura V. Riley_ _____, being first duly sworn upon oath, under the penalties of perjury, do hereby depose and say that I am _Director of Finance_ _____ of _Price Tower Arts Center_ _____, that as such I am acquainted with the books, accounts and affairs of said institution and know the above statements to be true, correct and complete, and that all information requested herein has been fully and completely given and I understand this is an annual affidavit that must be filed with the county assessor each year by March 15.

Please attach a certified copy of the transfer document.

**Is this property a housing program that is financed by a public trust?**

☐ Yes    ☒ No

If "yes" Section 178.6 Title 60 prohibits public trusts from financing housing or housing programs involving properties exempt from ad valorem taxation pursuant to Section 2887 of Title 68. Ref: Attorney General Opinion 01-56.

▶ _____

Applicant (or Agent) _____ Date

BK 1098 PG 0247

Exhsagdebtor000418

**EXHIBIT B**

EXHIBIT B is not recorded herewith. It contains a bound set of photographs depicting the exterior and interior surfaces of the building and the surrounding property, text describing the building, and copies of the original architectural plans. Two complete copies of Exhibit B exist, signed and dated by a representative of each party to this Easement, and one copy is stored in the offices of each party. In the event of any conflict between the two copies, the copy in the offices of the Grantee shall prevail.

PRICE TOWER ARTS CENTER
FRANK LLOYD WRIGHT ARCHITECT

510 S Dewey Avenue
Bartlesville, OK  74003
T 918 336 4949
F 918 336 7117
www.pricetower.org

Page 1 of 3

# EXHIBIT C
## Easement Addendum – Protected Historic Features

### Class A
Those objects and areas deemed "irreplaceable" and of the utmost value. If object is removed, it shall be categorized as Class D.
### Class B
Those objects deemed "valuable" but which may necessitate replacement over time due to damage or breakage. If object is removed, it shall be categorized as Class D.
### Class C
Those items deemed "historic" but which may necessitate replacement due to mechanical upgrades or safety concerns. If object is removed, it shall be categorized as Class D.
### Class D
Those objects and items (moveable or fixed) currently installed or removed from the historic building over time that shall be accessioned into the collections of Price Tower Arts Center. This body of objects shall change over time due to museum accession and collecting policies, and as new items are discovered or removed from use. A current list of accessioned Price Tower historical objects shall be provided with each easement review.

*General Building Exterior*
> **A** Patinated embossed copper louvers, including their aluminum hardware
> **A** Patinated embossed copper decorative tiles
> **A** Patinated embossed copper trimmings and details, including hardware
> **A** Patinated copper balcony constructions (bedroom level of apartment)
> **A** Patinated embossed copper planter boxes
> **A** Triangular and hexagonal patinated copper lighting fixtures and shades
> **A** Aluminum window and door frames
> **A** Reinforced concrete carport structures and their patinated copper supports
> **A** Reinforced concrete exterior staircase and its formed aluminum handrail
> **A** Frank Lloyd Wright "signature" tile
> **B** Peach-colored glass window and door panes
> **C** Pigmented concrete sidewalks and entryways

*General Building Interior*
> **A** Patinated embossed copper decorative tiles (SW quadrant bedroom loft parapets)
> **A** Triangular lighting fixtures and shades (historic only)
> **A** Triangular ventilation grilles
> **A** Aluminum window and door frames (historic only)
> **A** Pigmented concrete floors
> **A** Bronze logo medallions (located on all floors but 2)
> **A** Square light fixtures and shades over bronze logo medallions (all floors but 2)
> **A** Reinforced concrete interior staircases and their formed aluminum handrail
> **A** Aluminum staircase screens (vertical rods used on interiors staircases)

Exhsagdebtor 000420

PRICE TOWER ARTS CENTER
FRANK LLOYD WRIGHT ARCHITECT
510 S Dewey Avenue
Bartlesville, OK  74003
T 918 336 4949
F 918 336 7117
www.pricetower.org

Page 2 of 3

**A** Wooden doors (historic only)

**A** Laminate countertops (historic kitchens and bathrooms on floors 9 and 17 only)

**A** Painted steel cabinets (historic kitchens on floors 9 and 17 only)

**A** Appliances and rubbish chute cover (historic kitchens on floors 9 and 17 only)

**A** Built-in wood furniture, shelving, cabinetry, and wall paneling including any metal trim or hardware (historic only)

**A** Bathroom and powder room mirrors and sconce lighting (historic only)

**A** Ceramic tiles (historic bathrooms only)

**B** Paint color, walls in public areas and historic interiors

**B** Paint color, walls in public areas and historic interiors

**B** Peach-colored glass window and door panes (historic only)

**C** Elevator cabs (one currently in collections, three in current use)

**C** Boiler system (pair, in current use)

**C** Sinks, toilets, and bath fixtures and hardware (historic only)

*First Floor Lobby and Loggia*

All items listed under "General Building Interior" above

**A** Painted text mural (Whitman Quote)

**A** Lobby and loggia built-in wood banquette seating

**D** Building directory board

*First Floor "Taliesin Room"*

All items listed under "General Building Interior" above

**A** *Willows and Reflections* copper and cloisonné mural, with accompanying hexagonal wood table with cloisonné and copper insert and trio of triangular wood pull-up tables

**A** Built-in wood furniture, banquette, cabinetry, and wall paneling

**A** Triangular lighting diffusers

**D** Copper mesh window treatments

*First Floor Gallery*

All items listed under "General Building Interior" above

*Second Floor Gallery and Lobby Mezzanine*

All items listed under "General Building Interior" above

**B** Wooden partition wall system

*Third Floor*

All items listed under "General Building Interior" above

**B** Wooden partition wall system in SE quadrant office

*Fourth Floor*

All items listed under "General Building Interior" above

*Fifth Floor*

All items listed under "General Building Interior" above

*Sixth Floor*

All items listed under "General Building Interior" above

*Seventh Floor*

All items listed under "General Building Interior" above

*Eighth Floor*

Exhsagdebtor 000421

PRICE TOWER ARTS CENTER
FRANK LLOYD WRIGHT ARCHITECT
510 S Dewey Avenue
Bartlesville, OK 74003
T 918 336 4949
F 918 336 7117
www.pricetower.org

Page 3 of 3

All items listed under "General Building Interior" above
*Ninth Floor*
    All items listed under "General Building Interior" above
    **B** Patinated embossed copper fireplace hood
*Tenth Floor*
    All items listed under "General Building Interior" above
*Eleventh Floor*
    All items listed under "General Building Interior" above
*Twelfth Floor*
    All items listed under "General Building Interior" above
*Thirteenth Floor*
    All items listed under "General Building Interior" above
*Fourteenth Floor*
    All items listed under "General Building Interior" above
*Fifteenth Floor*
    All items listed under "General Building Interior" above
*Sixteenth Floor*
    All items listed under "General Building Interior" above
*Seventeenth Floor*
    All items listed under "General Building Interior" above
    **A** Patinated embossed copper fireplace and ceramic heating element
    **A** Painted mural with inscription block
*Eighteenth Floor*
    All items listed under "General Building Interior" above
    **A** Decorative perforated wood border (lobby)
    **A** Triangular linen closet
    **B** Wooden shutters (bedroom loft, floors 10 and 18 only)
*Nineteenth Floor*
    All items listed under "General Building Interior" above
    **A** Stained embossed copper fireplace, grille, and screen
    **A** Stained embossed copper pendant light fixture
    **A** Painted glass mural
    **B** Period globe and mounting hardware
*Museum Collection Items*
    **D** Itemized annual listing of collection holdings from all categories

BK 10098 PG 0251

PRICE TOWER ARTS CENTER ▪
FRANK LLOYD WRIGHT ARCHITECT

510 Dewey Avenue
Bartlesville, OK 74003
T 918 336 4949
F 918 336 7117
www.pricetower.org

Page 1 of 1

**EXHIBIT D**
**Easement Addendum – Existing Liens**

There are no existing liens on this property.

BK I098PG0252

Exhsagdebtor 000423

**Price Tower Arts Center**

**Meeting Minutes of the Board of Trustees**

**July 13, 2023, at 3:00 pm**

**In Person**

Trustees Present in Person: Brad Doenges, Sheryl Kaufman, Sandy Kent, Mark Haskell
Trustee Absent: Scott Holz, Charlie Daniels, Daniel Adams, Scott Sabine (moved to Houston)

Staff Present: Donna Keffer

1) Call to Order – Brad Doenges called the meeting to order at 3:06 PM; a Quorum was established.
2) Approval of the minutes from February 21, 2023, meeting. Sheryl Kaufman made a motion to approve the minutes as submitted. Sandy Kent seconded. All approved.
3) Executive Director's Report
   A. February 2023 Financials were distributed as part of the meeting pre-reading. Mark has reviewed in detail and sent a list of changes/suggestions to Donna and Linda Jones to verify and forward to SAMB as appropriate. These suggestions are shown in an attachment to the meeting minutes.
   B. **ERC Application** by SAMB

   Below is the breakdown of ERC refunds claimed as part of the recent application by SAMB. Total potential ERC refunds are **$197,450.69 plus interest**.

   Inn at Price Tower – Total $161,044.84
   - Q2 2020 - $3,242.20
   - Q4 2020 - $59,717.54
   - Q1 2021 - $52,083.59
   - Q2 2021 - $46,001.52
   Price Tower Arts Center – Total $36,405.85
   - Q2 2020 - $7,208.34
   - Q4 2020 - $14,222.26
   - Q1 2021 - $14,975.25

   The returns for the ERC were mailed on May 18th. The turnaround time for refund checks is roughly six months based on our observations. Donna and Mark will work with SAMB to monitor the progress.

   C. **D&O Insurance** – due to the change of ownership the Directors & Officers policy is currently in run-off status, which allows for reporting of claims arising from incidents that occurred prior to the sale. This run-off period will expire when the policy naturally expires on 7/31/23. You do have the option to extend the future claims reporting period by extending the run-off period as follows:
   i) One year – 150% of the annual premium = $2,549.00
   ii) Two years – 200% of the annual premium = $3,398.00
   iii) Three years – 215% of the annual premium = $3,653.00
   After a brief discussion, it was decided to renew this insurance for two years. Donna will notify the insurance company and then pay the premium before the end of July.
   D. **EIDL** – It has very recently come to our attention that the Price Tower Arts Center secured an EIDL loan from the SBA in June of 2020. The funds of $149,900 were dispersed by the SBA on June 11, 2020 and the funds cleared our account at Arvest on June 15, 2020. Payments were initially set to commence after 12 months, and this was later extended to 30 months. During this

**Price Tower Arts Center**

**Meeting Minutes of the Board of Trustees**

**July 13, 2023, at 3:00 pm**

**In Person**

time, we had a change of Executive Director twice, and knowledge or documentation of this commitment was not passed to the new Executive Director. We recently received an invoice for 6 months of past due payments. Once we became aware of this about a week ago, we mailed a check in the amount of $3,846 to the SBA. It was subsequently determined we needed to pay off the full amount of the loan to clear a UCC lien placed on the Price Tower by the SBA. On Monday, July 10, Mark called the SBA to initiate a payoff transaction for $158,461.19. It cleared our Arvest account overnight on July 11. Mark loaned PTAC $163,000 to cover this final payment in addition to $4,000 to cover the initial payment. The surplus funds will be used to cover a few other PTAC expenses. This will be repaid once the ERC funds are received later this year. Donna and Mark will continue to monitor until the UCC lien is lifted.

E. **990's** – the 990 for 2022 is nearing completion. SAMB filed for an extension and will have this completed and ready for review and approval before the deadline in the next few months. There will be a partial year 990 prepared once we have completed all transactions for PTAC and are ready to shut down the entity.

F. **Write off the original loan from PTAC to IPT**
   i) Mark met with Debbie Mueggenborg on April 25th, and she said her initial concerns are now resolved.
      (1) She was initially worried about creating a taxable gain for IPT with forgiveness of the loan. She said we have a cumulative Net Operating Loss for IPT that is larger than the gain that will be generated. So, there will not be a taxable gain in total to worry about for IPT.
      (2) She was also worried about the capital gain created by the sale of the Price Tower. She said the loss created by the forgiveness of the Receivable from IPT will more than offset the gain, so there will not be a taxable gain there either.
      (3) She said we are good to proceed as discussed and write off the loan.
      (4) A motion to write-off the original loan from PTAC to IPT was made by Sheryl. Seconded by Sandy. Mark will prepare the request for Brad to sign. Charlie can also sign as Secretary if necessary.

G. **Remaining expenses and sources of revenue**
   i) Sources of revenue
      (1) ERC - $198,000 plus interest
      (2) Refund of PSO deposit - $20,000
   ii) Remaining expenses
      (1) Linda Jones - $11,000 loan
      (2) D&O Insurance - $3,398
      (3) SAMB – 990 preparations
      (4) PTO – if funds are available - ~$13,500 pre-tax.
      (5) Will likely be other expenses associated with shutting down the PTAC entity.
      (6) Mark
         (a) $163,000 – loan for EIDL payment in full
         (b) $4,000 – loan for initial EIDL payment
         (c) $1,560 – loan to cover final legal fees
         (d) ~$58,000 – various loans to cover expenses in final weeks of operation before sale was finalized.

**Price Tower Arts Center**

**Meeting Minutes of the Board of Trustees**

**July 13, 2023, at 3:00 pm**

**In Person**

H.  **Executive Committee to handle any remaining activities for PTAC** – Sandy made a motion to give the Executive Committee authority to wrap-up and shut down the PTAC non-profit. Sheryl seconded the motion. All approved. It was also noted that the full board will be kept informed as actions are taken.

I.  **Update on Current Operations**

(1)  Use of PTAC until end of July by Blanchard's – the Blanchard's needed time to get their non-profit approved and set up. This has happened and they have set up the required bank accounts at Truity CU. They recently processed Payroll through the Truity account, so will be ready to stop using the PTAC account by the end of July as planned.

(2)  IPT was transferred to the Blanchard's for continued use since the liquor license was associated with this organization.

(3)  The Blanchard's applied for some incentives through the BDA for both restaurants. The City Council recently approved these incentives for the downstairs Love 66 Bistro ($35,000) and the Wright Steakhouse ($50,000). Love 66 Bistro could have a soft opening as early as next week. It will likely be September before the Wright Steakhouse is ready to open.

(4)  An initial meeting of the Friends of Price Tower board was held. There will be a follow up meeting with the Tulsa attorney recommended by the OK Center for Non-Profits to make sure we understand the nuances of raising funds with the various structures for the new organizations.

4)  The meeting was adjourned by Brad at 3:49pm.

**From:** **Paul Aubert** paul@herasoft.com 📎

**Subject:** Re: Mystic, et.al. v. Copper Tree/Blanchard.....SETTLEMENT NEGOTIATIONS. SETTLEMNET DISCUSSIONS. PRIVLEDGED AND CONFIDENTIAL COMMUNICATIONS. NOT TO BE DISSEMINATED. Paul,

**Date:** October 16, 2023 at 4:27 PM

**To:** Craig Brand  craig@thebrandlawfirm.com

PA

Craig,

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

I hope that my responses addressed your questions appropriately, and that this helps move this process along to a conclusion amenable to all of the parties.

Regards,

Paul

> **Copper Tree Mystic Release and Settlement for Brand.docx** 📥

On Oct 16, 2023, at 12:28 PM, Craig Brand <craig@thebrandlawfirm.com> wrote:

Paul,

Sorry for making you work for free, but want to ask you the following:

████████████████████████████████████████████████████████████

Craig□

On Oct 12, 2023, at 12:26 PM, Craig Brand <craig@thebrandlawfirm.com> wrote:

Paul, which way are we going??

Craig□

On Oct 12, 2023, at 6:43 AM, Craig Brand <craig@thebrandlawfirm.com> wrote:

Morning Paul,

████████████████████████████████████████████████████████████

Craig
FBN: 896111
Tel. 305-878-1477

On Oct 10, 2023, at 4:33 PM, The Brand Law Firm, P.A. <Craig@thebrandlawfirm.com> wrote:

Paul,

myself. [This acceptance is not an admission of the full or complete debt due to us, just that we will agree in lieu of reaching a



Thank you,

Craig

On Oct 10, 2023, at 3:04 PM, Paul Aubert <paul@herasoft.com> wrote:

Regards,

Paul Aubert
713-516-2670

On Oct 10, 2023, at 12:43 PM, The Brand Law Firm, P.A. <Craig@thebrandlawfirm.com> wrote:

On Oct 10, 2023, at 6:37 AM, The Brand Law Firm, P.A. <craig@thebrandlawfirm.com> wrote:



Craig

On Oct 9, 2023, at 9:06 PM, Paul Aubert <paul@herasoft.com> wrote:



Exhsagdebtor 000431

Exhsagdebtor 000432

**From:** **Paul Aubert** paul@herasoft.com
**Subject:** Re: Need an answer. Settlement Discussions. Privileged and confidential
**Date:** September 28, 2023 at 8:43 AM
**To:** Craig Brand  craig@thebrandlawfirm.com
**Cc:** Paul Aubert  paul@anthemvault.com





*UNANIMOUS WRITTEN CONSENT OF*
*THE BOARD OF DIRECTORS OF*
*COPPER TREE, INC.*

March 7, 2023

The undersigned being all of the members of the board of directors of Copper Tree, Inc., a Delaware corporation ("Company"), do hereby execute these resolutions pursuant to the Company's Certificate of Incorporation and pursuant to Delaware General Corporation Law.

## PRICE TOWER ACQUISITION

**WHEREAS**, the Company is the direct parent of Green Copper Holdings, LLC, a New Mexico limited liability company ("Green Copper"); and

**WHEREAS**, Green Copper is in the process of the acquisition of the real property located at 510 Dewey Avenue, Bartlesville, OK, known as the Price Tower (all of the real property and improvements referred to herein as the "Price Tower") from Price Tower Arts Center Inc. ("PTAC") through the Oklahoma Uniform Contract of Sale of Real Estate Commercial Improved (the "Purchase Contract") with PTAC; and

**WHEREAS**, the Board believes it in the best interests of the Company to have Green Copper execute the Purchase Contract of even date herewith to authorize the acquisition of the Price Tower by Green Copper, and also to authorize the Company and Green Copper to authorize the execution and delivery of the related agreements included as Exhibits to the Purchase Contract, and any other related agreements and instruments related thereto (collectively, the "Transaction Documents").

**NOW, THEREFORE, BE IT**

**RESOLVED**, that the transactions contemplated by the Transaction Documents are hereby approved, and the execution and delivery of the Purchase Contract by Green Copper and any related agreements and instruments be, and they hereby are, approved, ratified and confirmed, and the actions and obligations; and be it further

**RESOLVED**, that Anthem Blanchard, Cynthia Blanchard, and any other officers of the Company (the "Authorized Signatories") be, and each of them hereby is, authorized and directed in the name and on behalf of the Company and Green Copper to execute and deliver the Purchase Contract and all related documents and instruments related thereto by either the Company or Green Copper, as the case may be; and be it further

**RESOLVED**, that the Authorized Signatories be and hereby is, authorized, empowered and directed for and on behalf of the Company and Green Copper and in their name to execute, deliver and cause the performance of all such further documents and to take all such further actions as such officer may in his discretion deem necessary, appropriate or advisable in order to carry out and perform the intent of the foregoing resolutions, the execution and delivery of such documents, and the taking of any such action to conclusively evidence the authorization thereof

by the Company; and be it further

**RESOLVED**, that any and all actions heretofore or hereafter taken by any such officer or officers within the intent of the foregoing resolutions are hereby ratified, affirmed and approved as the acts and deeds of the Company and Green Copper; and be it further

**RESOLVED**, that this Consent may be executed by facsimile, and, upon such execution, shall have the same force and effect as an original.

The undersigned hereby represent the entire board of directors of the Company.

_____
Anthem Blanchard , Board Director

_____
Cynthia Blanchard , CEO & Chairman of the Board

Exhsagdebtor 000435