# EXCHANGE AGREEMENT
## PLUS EQUITY STOCK SWAP
### ("Agreement")

**THIS EXCHANGE AGREEMENT, PLUS EQUITY STOCK SWAP** (herein after referred to as the "*Agreement*") is made and entered into effective as of the _____ day of October, 2022, for lawful and duly noted legal consideration by and between Mystic Law, P.A., a Florida professional association ("*Mystic*"), and Anthem Holdings Company, a Delaware corporation ("*AHC*"), and for certain purposes set forth herein, Copper Tree, Inc., a Delaware corporation ("*Copper Tree*") and further states as follows:

**WHEREAS**, Mystic and AHC entered into that certain Consulting Agreement effective as of March 1, 2021 (as amended, the "*Consulting Agreement*") herein attached hereto as Exhibit "A" and incorporated by reference; and,

**WHEREAS,** the Consulting Agreement is a material component of this Agreement as it is the intent of the Parties to modify this Consulting Agreement in accordance to the conditions and contingencies set forth herein; and,

**WHEREAS**, upon the successful completion of the contingencies herein as it relates to the Contingency Agreement, this Agreement shall replace, modify and/or void said Contingency Agreement, whereas this Agreement shall control; and,

**WHEREAS**, Mystic has received in the aggregate amount of 600,000 shares of the common, non-dilutable stock in AHC as partial payment of its services provided in the Consulting Agreement, with 300,000 shares (the "*Brand Shares*") being granted to the Mystic designee, Craig Brand and Adriana Soto JTWROS, and 300,000 shares (the "*Takio Shares*") being granted to the Mystic designee, Dale Douglas Takio and Katalin Nagy-Takio JTWROS; and

**WHEREAS**, pursuant to said Consulting Agreement, AHC continues to owe Mystic US$160,000 which comes due February 28, 2023.  It is the intent, should conditions precedent first be successfully met, that this Agreement shall exchange this amount of money due to Mystic as further consideration for the Copper Tree, Inc., equity to be discussed herein; and,

**WHEREAS**, upon the effectiveness of this Agreement and the conditions precedent warranted to trigger an equity swap, (discussed herein below), some of the Brand Shares and some of the Takio

Document Ref: CMBTK-7HZUS-HYXUS-N2UWB

Shares shall be converted to the set forth equity in Copper Tree Inc., and voided in the scope set forth herein, as to AHC; and,

**WHEREAS**, should any stock swap be effectuated and should the "Closing Date" (as defined below), occur, the newly issued shares in Copper Tree shall be to: Mystic, Takio, Brand, Moran and/or their assigns or appointees; and,

**WHEREAS**, $60,000 in payments due under the Consulting Agreement were settled pursuant to that certain **Promissory Note** (the "*Note*")(attached hereto as Exhibit "B" and incorporated herein by reference), between Mystic and AHC dated September 1, 2022 in the principal amount of $60,000 and is separate and aside from the remainder due thereunder said Consulting Agreement; and

**WHEREAS**, the Parties want to express that the payments pursuant to the Promissory Note shall not be effected by the execution of this Agreement despite other payments and monies owed by AHC to Mystic being modified or attempted at modification, conditions met, pursuant to this Agreement; and,

**WHEREAS**, this Agreement shall also contract for certain employment and additional compensation for work in relation to Copper Tree Inc.  This Agreement while mentioning and setting forth various employment terms, shall not usurp or take the place of a subsequent agreement/contract related directly to said employment and additional compensation.   However, if these intended forthcoming contracts are not drafted and executed upon, this Agreement shall control; and,

**WHEREAS**, Copper Tree Inc., has been created with the material help and leadership of Dale Takio (set forth in the Consulting Agreement), and Michael Moran (set forth in the Consulting Agreement  and who shall be set forth herein below due to his involvement with Copper Tree Inc and the compensation to be derived).  Copper Tree, Inc., has been established to be the holding company for the purchase, hold and operations of the Price Tower Arts Center, Inc. and Inn at Price Tower, Inc. and all of its holdings and assets, located in Bartlesville, Oklahoma.   All funding and ownership of the Price Tower Association shall be held by Copper Tree Inc and if not then by a fully owned subsidiary, for which Mystic, Takio and Moran and/or their assigns shall be non-diluted, equity partners/shareholders; and,

**WHEREFORE**, for good and valuable consideration, the receipt, sufficiency, and adequacy of which are hereby acknowledged by each party hereto, and in further consideration of the mutual promises and benefits flowing between the parties hereto, the parties hereby agree as follows:

6

1.        All WHEREAS Clauses, including the Exhibits mentioned therein, stated above, are herein incorporated herein as part of this Agreement.

1.        <u>Establishment and Purpose of Copper Tree Inc</u>.  Copper Tree Inc., (Copper Tree) was incorporated and established by Mrs. Cynthia Blanchard, a resident of Bartlesville, Oklahoma.  Copper Tree shall be operated from Bartlesville, Ok., and shall share an incorporation with the States of Delaware and Oklahoma.  The express purpose of Copper Tree is to own, operate, manage and control the Price Tower Association and its assets.  Copper Tree has permission to use and utilize wholly owned subsidiaries to further its purpose(s), however, as any contemplated equity exchange is occurring with the use of Copper Tree Inc., as the equity vehicle, Copper Tree must remain and be the umbrella, holding or parent company at all times from which Mystic, Takio and Moran or their assigns or transferees shall hold their equity interests.

1.        <u>Material First Condition Precedent</u>.  Prior to any equity swap, prior to any retirement of stated debt(s) owed and to be paid, prior to any change in Exhibit A and/or B, hereto, Copper Tree Inc., must receive funding in an amount sufficient to acquire the Price Tower Association and its assets.  This acquisition can be found in the presentation set forth by Dale Takio and Mike Moran on behalf of Copper Tree, and incorporated herein as Exhibit "C".  The amount necessary to acquire those assets, the proposal set forth within Exhibit "C" has yet to be determined and as such cannot be specifically set forth herein.  The acquisition cost, however, is approximated at or about Fifteen Million ($15,000,000/) Dollars.  The leading bank candidate to date is Truity Bank followed by Arvest Bank, each out of Bartlesville, Oklahoma.    The loan must go to the benefit of and under the name of Copper Tree, Inc. or its real estate subsidiary with equal to or greater than 95% ownership, or any other wholly owned subsidiary of Copper Tree, Inc..  This mortgage or loan is to be personally signed by the Cynthia Blanchard and her husband, Anthem Blanchard ("Blanchard's), as guarantors.  The loan proceeds shall be used for the acquisition, management and operation of Exhibit "C".

1.        <u>Material Condition Precedent as a Sub-Part of The First Condition Precedent (#3, supra)</u>.  As a material sub-part of the above, #3, supra, Copper Tree, Inc, must close on the acquisition outlined in Exhibit "C", hereto or to the extent agreed to with the lender.  This funding and closing must occur prior to March 1, 2023 (herein after referred to as "Closing Date") in order for the stock swap to continue forward and for the $160,000 of debt set forth within the Consulting Agreement (Exhibit "A") to be entirely waived.  If closed after February 28, 2023, the stock swap shall still continue forward and must be transacted within 30 days of

Document Ref: CMBTK-7HZUS-HYXUS-N2UWB

receipt of funds outline in #3 supra, however, the full financial waiver shall not occur and the terms of payment shall continue as set forth below in #6, *Closing Date Not Effectuated*. The actual date in which Copper Tree receives deposited funds described in #3, shall be the Actual Closing Date (herein after referred to as "Actual Closing Date").

1.      Actual Closing Date Effectuated Upon the successful Closing Date effectuated, the work to be performed following the successful Actual Closing Date is the triggering of the: (1) stock swaps; (2) debt waiver(s) or reassignment; (3) new, additional equity provided, (4) satisfaction of Notes, and (5) Voidance of Exhibits "A" & "B". These triggered events require new documentation and the parties agree that such new documentation must be completed and executed within 30 days from the Closing Date. Whichever party is or causes any delay in either the drafting or execution, said Party shall be in material breach of contract and such breach will stop any and all events happening from occurring except for the stock swap which shall be deemed a certainty and immediate upon the Closing Date. AHC shall not be released of any debts still owing and payments due unless and until these additional contracts, *supra*, are executed.

1.      Closing Date Not Effectuated. In the event that the Closing Date does not timely or properly occur prior to March 1, 2023, the following events shall be triggered:

a.   Exhibits "A" and "B" shall remain in full force and effect.
b.   The $160,000 due and owing from AHC to Mystic shall be deemed due and to be paid. However, the Parties agree that AHC shall be able to obtain the following terms:
   a.   $5,000 per month; with first payment to be made on or before April 1, 2023.
   b.   For 32 consecutive months or until funding has been received by Copper Tree as noted to satisfy the conditions set forth in #3, supra, whichever occurs first;
      l.   If Copper Tree is funded as noted in #3, supra, on the first day following the receipt of funds by Copper Tree, any remaining balance of the debt due under Exhibit A, shall be deemed satisfied and considered paid in full.
   c.   Payment deposited to Mystic or its biller Taktik Enterprises, Inc. on the 1st of every month and if the 1st falls on a weekend or US banking holiday, then the very next banking business day.
c.   The $2,500 per month as per the Promissory Note by and between AHC and Mystic, for which Mystic is the holder, shall continue until the $60,000 debt thereunder is paid in full and if Copper Tree gets actually funded, it shall immediately pay off the balance owed.

Document Ref: CMBTK-7HZUS-HYXUS-N2UWB

1.        <u>Actual Closing Date Effectuated and Stock Swap Triggered</u>. Upon the Actual Closing Date being Successful, as it relates to a stock swap, the following shall occur:

   a.  Mystic by and through the following non-party holds 600,000 non-dilutable shares in AHC.  Of this 600,000 shares, three hundred thousand (300,000) are held by: Craig Brand and Adriana Soto JTWROS.  It is agreed that Craig Brand and Adriana Soto JTWROS shall tender back to AHC 200,000 shares, (leaving 100,000 non-dilutable shares still in AHC), for which AHC shall retire those 200,000 shares.  In exchange, Copper Tree Inc., shall issue to Craig Brand and Adriana Soto JTWROS or assign(s), the amount of two and one-half percent (2.5%) interest in the outstanding non-dilutive share interests of Copper Tree Inc.  The shares shall be voting class and it is represented that only one type of share class has been issued by and for Copper Tree Inc.  The par value of these shares are $0.01/ for which there shall be no charge to Craig Brand and Adriana Soto JTWROS or assign(s).

   b.  Mystic by and through the following non-party holds 600,000 non-dilutable shares in AHC.  Of this 600,000 shares, three hundred thousand (300,000) are held by: Dale Douglas Takio and Katalin Nagy-Takio JTWROS.  It is agreed that Dale Douglas Takio and Katalin Nagy-Takio JTWROS shall tender back to AHC 200,000 shares, (leaving 100,000 non-dilutable shares still in AHC), for which AHC shall retire those 200,000 shares.  In exchange, Copper Tree Inc., shall issue to Dale Douglas Takio and Katalin Nagy-Takio JTWROS or assign(s), the amount of two and one-half percent (2.5%) interest in the outstanding non-dilutive share interests of Copper Tree Inc.  The shares shall be voting class and it is represented that only one type of share class has been issued by and for Copper Tree Inc.  The par value of these shares are $0.01/ for which there shall be no charge to Dale Douglas Takio and Katalin Nagy-Takio JTWROS or assign(s).

   c.   The shares in Copper Tree Inc., shall be the highest class, with voting rights and it is represented that only one type of share class has been issued by and for Copper Tree Inc.  The par value of these shares are $0.01/ for which there shall be no charge to Craig Brand and Adriana Soto JTWROS or assign(s), nor to Dale Douglas Takio and Katalin Nagy-Takio JTWROS or assign(s).

1.        <u>Actual Closing Date Effectuated and Voidance of $160,000 Debt or Remaining Balance if Applicable</u>.  Upon the successful Actual Closing Date, the Parties agree that in addition to the stock swap, Mystic shall waive the entire remaining balance, that is not otherwise in arrears, of the $160,000 debt obligation as monies due from Consulting work and void that AHC obligation.

1.        <u>Employment and Compensation in Copper Tree Inc., for Dale Takio and Michael</u>

6

<u>(Mike) Moran</u>.

a.  Dale Takio:

a.  This clause only activates in the event of an Actual Closing Date.
b.  On the first date of the month following the Actual, Dale Takio (Takio), by and through Taktik Enterprises, Inc., a Florida Corporation, shall be appointed as Managing Director of Copper Tree Inc.
c.  Takio shall report to the Copper Tree Board of Directors and Mrs. Blanchard, CEO.
d.  Dale Takio (Takio), by and through Taktik Enterprises, Inc., shall be given an unconditional twelve month employment term and in the event of discharge (for any reason) prior to said 12 months, Takio shall be notified in writing with no less than 45 days notice and upon effective notice of termination date, all outstanding compensation shall be immediately due.  Likewise, Dale Takio (Takio), by and through Taktik Enterprises, Inc., shall have the same right to terminate at any time and for any reason with the same 45 days notice.
e.  Salary shall be $17,500/ per month, payable by electronic transfer by the 5th day of each consecutive month.
f.  Takio shall, classified as an additional  salary receive Quarterly additional salary payments based upon gross revenue every three months.  These additional salary payments shall be based off of gross profits defined as Revenue less total expenses for operations before taxes, plus the amount required to service the line of credit. These additional sums shall then be calculated at a rate of 2.5% of quarterly gross profits.
g.  Reimbursement for applicable approved costs business and/or travel expenses.
h.  Extra 1% of Copper Tree Inc's equity (same class and par value, supra), Issued to Dale Douglas Takio & Katalin Nagy-Takio JTWROS upon first 12 month anniversary.

ii.   Michael (Mike) Moran:

a.  This clause only activates in the event of an Actual Closing Date.
b.  On the first date of the month following the Actual Closing Date, Mike, by and through Pictoria Studios USA, Inc. a Florida Corporation, shall be appointed as VP Marketing, of Copper Tree Inc.
c.  Mike shall report to the Copper Tree Board of Directors, Dale Takio, and Mrs. Blanchard, CEO.
    a.  Mike Moran, by and through Pictoria Studios USA, Inc, shall be given an unconditional twelve month employment term and in the event of discharge (for any reason) prior to said 12 months, Mike shall be notified in writing with no less than 45 days notice and upon

Document Ref: CMBTK-7HZUS-HYXUS-N2UWB

effective notice of termination date, all outstanding compensation shall be immediately due. Likewise, Mike Moran, by and through Pictoria Studios USA, shall have the same right to terminate at any time and for any reason with the same 45 days notice.

a. Salary shall be $13,500/ per month, payable by electronic transfer by the 5th day of each consecutive month.

b. Mike shall receive his equity in the name of: Michael J. Moran & Erinne Moran JTWROS  or assign(s) shall receive as part of his consideration an additional 1.25% of non-dilutable Copper Tree Inc, voting stock.  These stock issuances shall have a par value of US$0.01/. In exchange for receipt of this quantity of Copper Tree, Inc non-dilutable, voting class stock, Mike shall forgo, tender back to AHC the amount of 100,000 shares of equity out of his approximate 162,000 shares of which AHC shall retire.

    a. Mike Moran shall, classified as an additional  salary, receive Quarterly additional salary payments based upon gross revenue every three months.   These additional salary payments shall be based off of gross profits defined as Revenue less total expenses for operations before taxes, plus the amount required to service the line of credit. These additional sums shall then be calculated at a rate of 1.25% of quarterly gross profits.

c. Reimbursement for applicable approved costs business and/or travel expenses.

d. Extra 0.5% of Copper Tree Inc's equity (same class and par value, supra), Issued to Michael J. Moran & Erinne Moran JTWROS  or assign(s) upon first 12 month anniversary.

       9.   <u>Mutual Release; Indemnity</u>.  Upon final payment under this Agreement, each party does hereby unconditionally release, acquit, discharge, and agree to hold the other party, and each of its agents, officers, directors, shareholders, employees, legal representatives, affiliated companies, successors, and assigns (collectively referred to in this Agreement as the "***Indemnitees***") harmless from and against any and all actions, claims, suits, rights, liabilities, or demands of any kind or nature (each such action, claim, suit, right, liability, or demand being hereinafter individually referred to as a "Claim" and collectively referred to as "Claims") that each has against the other under the Consulting Agreement; provided, however, that the releases shall not apply to any claims under this Agreement nor shall this apply to the Note until such time as the Note is fully satisfied.

   10.   <u>Confidentiality/Non-Disclosure</u>.  In the course and performance of this Agreement, the Parties may be exposed to, and will be required to, use certain "Confidential Information" (as hereinafter defined) belonging to each of the parties to this Agreement.   The Parties mutually agree that neither will use such Confidential Information other than for purposes

addressed in this agreement. In no event shall either party use the confidential information of the other party to circumvent or cause harm to the other party.

(a)    <u>Definition</u>.  "Confidential Information" means any proprietary information, technical data, trade secrets or know-how, including, but not limited to, customers, customer lists, contact lists, software, developments, marketing, marketing strategies, advertising strategies, video production or any digital media, proprietary methods, business plans, data reports, methods of doing business, finances or other business information disclosed by one Party to the other, or developed by the Parties hereto, either directly or indirectly, in writing, orally or otherwise.

(b)    <u>Confidential Information</u>.  The Parties each hereby agree not to disclose any Confidential Information and further agree to review and in good-faith execute a more formal description of the Confidential Information as it becomes known as a result of the performance hereunder or mark any information, data or document as Confidential as they come to light during the performance of this relationship. The confidential information shall be treated as confidential and proprietary for five years from the effective date of this Agreement.  Notwithstanding the above, either Party may present this information to their respective attorneys, accountants, Team, associates, partners, officers and/or board members.  In the event third parties are in need of information deemed or reasonably believed to be of Confidential value, before any third party may come into possession or "know", both Parties hereto must first agree to the dissemination and if agreed upon, the third party must first be bound to a Confidentiality and Non-Circumvent Agreement.  In the event of litigation hereunder, all Confidential information must be filed Confidentially without public dissemination.  In the event any party gets served, through the legal process, for information which is or should be reasonable construed as Confidential, the Party served shall first alert the other Party of the service, provide a copy of the service, and allow the other Party to contest the service and request through the legal process prior to any dissemination.  The Parties may share Confidential Information and proprietary information with their retained experts and professionals.

(c)    <u>Return of Materials</u>.  Upon the termination of this Agreement, each Party will deliver to the other all of the Confidential Information of the other Party that it may have in its possession or control, together with all copies and abstracts thereof.

1.    <u>Venue.</u> Notwithstanding the foregoing The Parties may apply to any state court in either Orange County or Miami-Dade County, Florida or in Montgomery County, Texas or Washington County, Oklahoma for a temporary restraining order, preliminary injunction,

6

or other interim or conservatory relief, as necessary, without breach of this arbitration agreement and without abridgment of the powers of the arbitrator. Such "interim relief" must be in furtherance of this mandatory Arbitration dispute resolution.

1.        <u>INDEMNIFICATION</u>. The Parties each agree to indemnify and hold each other harmless from any damage, liability or cost (including reasonable attorney's fees and costs of defense) to the extent caused by the other's negligent acts, errors or omissions in the performance of services or from its software programs and protocols. Indemnity is conditioned upon the indemnified party (i) providing prompt notice to the indemnifying party of any potential claim, (ii) tendering control of the defense and/or settlement of such claim to the indemnifying party, and (iii) reasonably cooperating with the indemnifying party in the defense and/or settlement of such claim.

13.        <u>Nondisparagement</u>.  Each party hereby covenants and agrees at all times hereafter not to make or cause to be made any statements that disparage, are inimical to or damage the business reputation of the other party or any of its officers, directors, employees, affiliated companies, agents or representatives.

14.        <u>Further Assurances</u>.  At any time and from time to time after the date of this Agreement, upon request of any party hereto and without the payment of any further consideration, another party hereto shall duly execute, acknowledge and deliver all such further assignments, conveyances and other instruments of transfer and other documents, and will take such other action, consistent with the terms of this Agreement, as reasonably may be requested for the purposes of effecting the transactions contemplated hereby.

15.        <u>Modification</u>.  No modification, termination, or attempted waiver of this Agreement, or any provision thereof, shall be valid unless executed by both Parties to this Agreement.

16.        <u>Assignment</u>.  Neither this Agreement nor any right hereunder, nor any interest herein, may be assigned or transferred by either Party, unless to a related entity, a subsidiary entity, or a purchasing or controlling entity, without the express written consent of the other Party.

17.        <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the internal laws (and not the laws of conflicts) of the State of Florida or the State of Texas, based on the selection of the party initiating a dispute.

6

18.    <u>Entire Agreement</u>.  This Agreement is the entire agreement of the Parties and supersedes any prior agreements between them, whether written or oral, with respect to the subject matter hereof.

19.    <u>Attorney's Fees</u>. In any arbitration or court action court action which is brought by one of the Parties to enforce or interpret the provisions of this Agreement, the Prevailing Party shall be entitled to a reasonable award of Attorney fees and costs.

20.    <u>Relationships</u>. No joint venture, partnership, agency, or other relationship, which would impose liability upon one party for the act or failure to act of the other, shall be created or implied hereby or here from. Except as is expressly set forth herein, each party shall bear full and sole responsibility for its own expenses, liabilities, costs of operation, and the like. Neither party has or shall have the power to bind the other party or to assume or to create any obligation or responsibility, express or implied, on behalf or in the name of the other party.  No Party may act as the agent of the other and no Party hereto shall be deemed an employee of the other.  This does not apply to the select parties employment or work relations with Copper Tree as the positions granted/assigned shall entitle them to make executive decisions with executive signing powers.

21.    <u>Severability/Waiver</u>. If the application of any provision or provisions of this Agreement to any particular facts or circumstances shall be held to be invalid or unenforceable by any court of competent jurisdiction, then the validity and enforceability of such provision or provisions as applied to any other particular facts or circumstances and the validity of other provisions of this Agreement shall not in any way be affected or impaired thereby. The waiver of any one default shall not waive subsequent defaults. Any and all ambiguity shall not be construed against the drafting party as each party agrees they have had amble ability to participate in this Agreements drafting.  In the event of any legal changing due to ambiguity, confusion, scrivener's error, or statute, the "Blue Pencil" laws shall apply.

22.    <u>Counterparts; Delivery of Signatures</u>.   This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which taken together shall be deemed to constitute one and the same instrument.  This Agreement may be executed by any party by delivery of a facsimile or pdf signature, which signature shall have the same force as an original signature.  Any party which delivers a facsimile or pdf signature shall promptly thereafter deliver an originally executed signature to the other party; provided, however, that the failure to deliver an original signature page shall not affect the validity of any signature delivered by facsimile or pdf.

6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date last indicated below.

**ANTHEM HOLDINGS COMPANY**

*Anthem Blanchard*

By:＿＿＿＿＿＿＿＿＿＿＿
    Anthem Blanchard, CEO

501 E. Frank Phillips Blvd.

Bartlesville, OK 74003

Attn:  Anthem Blanchard/Paul Aubert

**MYSTIC LAW, P.A.**

*Craig Brand*

By:＿＿＿＿＿＿＿＿＿＿＿
    Craig Brand, President

4650 Indian Creek Road

Loveland, CO 80538

Attn:  Craig Brand/Dale Takio

For purposes of certain terms herein:

**COPPER TREE, INC.**

*Cynthia Blanchard*

By:＿＿＿＿＿＿＿＿＿＿＿
    Cynthia Blanchard, CEO

501 E. Frank Phillips Blvd.

Bartlesville, OK 74003

Attn:  Anthem Blanchard/Paul Aubert

**BRAND**

*Craig Brand*

＿＿＿＿＿＿＿＿＿＿＿
    Craig Brand

4650 Indian Creek Road

Loveland, CO 80538

Attn:  Craig Brand

PICTORIA STUIDOS, Inc

*Michael T. Moran*

3517 Watercrest Place

Orlando, FL 32819

Attn: Mike Moran

6

*Michael J. Moran*

_____
Michael J. Moran, President


TAKTIK ENTERPRISES, Inc               11222 Oakshore Lane

                                      Clermont, FL 34711

*Dale Takio, CEO*                     Attn: Dale Takio

_____
Dale Takio, CEO

6

000448

# Exhibit "A"

Document Ref: CMBTK-7HZUS-HYXUS-N2UWB

000449

DocuSign Envelope ID: 9E58452C-4E89-4F73-B096-3E85DAE3C926

## CONSULTING AGREEMENT
## AGREEMENT

THIS CONSULTING AGREEMENT ("Agreement") is made effective as of this 1st day of March, 2021, by and between **Mystic Law, P.A.**, located at 4650 Indian Creek Road, Loveland, Colorado 80538, and/or Mystic's or its shareholder's assigns, affiliates, related entities, and/or related third parties (herein after from time to time referred to as "Mystic" and/or "Consultant"); and **Anthem Holdings Company**, a Delaware corporation ("AHC"), **Hera Software Development, Inc.**, a Delaware corporation ("HeraSoft" and together with "AHC"), located at 550 Club Drive, Suite 445, Montgomery, TX 77316, (herein after referred to from time to time as "HeraSoft" and/or "Client"). Together, Mystic and HeraSoft agrees to the terms and conditions set forth herein, on the date stated above, for good and valuable legal consideration, the receipt and sufficiency of which shall go uncontested. Client and Mystic collectively shall be known as "Parties" or individually as a "Party", who further state:

## RECITALS

**WHEREAS**: Mystic is a law-firm, headquartered and maintaining a State bar license in the State of Florida with offices in the State of Colorado. (See resume, attached hereto). Mystic has a wide variety of expertise, knowledge, venture and roll-out business experience, with special skills in the areas of litigation, white collar, business law, State and Federal. Mystic and its team have been successful in corporate development, business development, capital raises, international arenas of law, advertising and marketing, and intellectual property. Mystic works with industry leaders and top tier CPA's, venture capitalists, business developers and social media experts, helping identify areas of concern or question on behalf of its clients. Mystic intends on utilizing its experiences and contacts for and on behalf of HeraSoft.

**WHEREAS**: AHC and HeraSoft are Delaware "C" corporations, with offices in the States of Texas and Oklahoma. HeraSoft has been created with the express purpose of developing, operating, raising funds in support of, and rolling-out a Ransomware and fraudulence-proof distributed, decentralized cloud software platform. This platform is designed to negate, minimize, hedge against cyber-attacks against its clientele. HeraSoft created, owns and utilizes a software program called "Hercules". Hercules distributed cloud software is represented by Client as being: (1) incorruptible, (2) Unchangeable, (3) Trackable, (4) Un-hackable, and (5) Ransomware Proof.

**WHEREAS**: Hercules, by design, holds itself out as offering its clients solutions- rolled up into one single, decentralized cloud platform, i.e., (1) Security within the network, and (2) Security from cyber-attacks adversely affecting the network, (3) a fraudulent-proofing feature — Incorruptible Track and Trace, and (4) Built on the blockchain, the chain of all actions occurring on the Hercules cloud which can be trusted (no backdating, no editing), thus ensuring accountability, transparency, and non-corruptibility within the client's system, the client's data, the client's internal system including inventory, property records, internal records, employee records, log in times, instances of HR recognition(s), digital finger-printing, corporate and business documents and digitized data, legal, fiscal, accounting, protocol assurances, auditing, vertical line authentication, and shareholder confidence. Hercules system goes beyond just protecting the corporations or governments it seeks to represent but software enabled systems to protect those certain individuals within these corporations or governments with personal "track n search" capabilities.

**WHEREAS**: Hercules lays claim to intricate programing, allowing it to maintain the following structured features:

* Served by multiple servers at once = Zero failure (impossible to take down);
* No central place for data storage = Ransomware proof data;
* No central place for data served = Ransomware proof applications;
* Zero downtime = No system lock out failure;
* Affordable storage = Best cloud pricing available;
* Blockchain technology = Incorruptible/unchangeable/trackable/un-hackable.

 

1

6

000451

DocuSign Envelope ID: 9E58452C-4E89-4F73-B09B-3E85DAE3C926

CONSULTING & SOFT-CONSULTING-&-COMPENSATION
AGREEMENT

**WHEREAS:** Client desires and Mystic accepts the effort to work collectively in order to better promote and bring to market Client's development. (See, Scope Of Work, as defined herein below). The intent is to allow HeraSoft to focus on the subject product(s) while Mystic identifies and helps engage those to better market, advertise, roll-out, present, identify compliance issues, correct compliance issues, correct perceived mis-statements or public acknowledgments which can be taken wrong, identify points within legal agreements, engage in speaking forums, engage in business and client development and where needed, travel.

**THEREFORE**, in consideration of the recitals and mutual promises contained herein from which the Parties have no objection and agree to the legal sufficiency and consideration set forth herein, the parties further agree as follows:

1. WHEREAS Clauses. All WHEREAS clauses, are incorporated herein and made part of this Agreement.

2. <u>Scope Of Services</u>. Client has developed an exceptional software product, as promoted by its officers, directors and shareholders. Client would like the ability to concentrate on its product and the further development of its product(s), while leaving the areas of: (1) marketing, (2) advertising, (3) social media promotion, (4) talking points, (5) legalities of what cannot be said or represented, (6) legalities of funding, (7) issues or questions regarding international conduct, (7) proper expensing and fiscal distribution, (8) business development and promotion, (9) risk/revenue models – to the concern of Mystic. Mystic shall begin its services by providing a comprehensive analysis of Client and Clients business while discussing possible, real time solutions or implementation of solution driven methods for any areas of concern. Mystic's services are to identify and provide within its normal course of work. Should additional expertise, over-sight, outside or third party services need to be obtained and retained, these expenses shall be timely borne and owed by Client. This Agreement is not meant to shift costs and expenses from Client to Mystic. Mystic is amenable to locating and retaining any and all third parties and expertise, on behalf of and for Client, however, the costs are that of Client. Should Client expect or identify issues beyond Mystic's Team, Mystic shall identify this shortage and work with Client as to any agreement to bring new or additional talent on-board, in some manner or another, so that Client's expectations are fulfilled. The scope of work for the Mystic Team Services to be provided to Client is specifically set forth in the proposal, quote, or acknowledgment submitted to Client. If Client requests a change in the scope of the Services to be provided, Mystic reserves the right to revise delivery schedules and make an equitable adjustment to the price. Client acknowledges and agrees that Mystic is providing the Services only and is not providing or participating in the provision of any HeraSoft product(s). Mystic will not be obligated to provide any services which are (a) outside of the scope defined in the applicable documentation; (b) outside its area of expertise; or (c) in violation of any applicable laws, codes or regulations.

All proposals, quotations or acknowledgments issued by Mystic are an offer to sell its Services pursuant to these terms and conditions. No waiver or modification of these terms and conditions shall be binding on Mystic unless authorized in writing by both parties.

3. CUSTOMER OBLIGATIONS. Client shall make available in a timely manner at no charge to Mystic any and all business information, including product information and data, financial, subject matter, competition, pitfalls and pluses, industry matters and issues, internal documents, presentations, negative facts or negative possibilities, always the truth. This information shall be deemed Proprietary and Confidential, unless publicly known. It is acknowledged and understood that Mystic can only be as good as the tools by which Client provides.

4. LIMITATION OF LIABILITY. Mystic's liability for a claim of any kind arising out of the Services provided or undertaken by the Mystic Team, pursuant to this Agreement shall in no case exceed the price already paid by Client. In no event shall Mystic be liable for any special, indirect, incidental or consequential damages, including loss of profits or business interruption or loss of use of Client's product or business, however caused, arising from the Services provided pursuant to this Agreement.

Mystic accepts such services under the terms and conditions discussed herein above and below.

5. <u>Term & Termination</u>. This Agreement shall commence on the Effective Date and shall continue in full force and effect for no less than twelve (12) consecutive months unless terminated earlier due to material default of obligations agreed upon by the Parties, or as described in the Default section specifically addressed below.

Page | 2    

6

6

Document Ref: CMBTK-7HZUS-HYXUS-N2UWB

000453

DocuSign Envelope ID: 9E58452C-4E89-4F73-B09B-3E85DAE3C926

SOFT-CONSULTING-&-COMPENSATION
AGREEMENT

This Agreement shall automatically renew unless either Party gives the other Party at least 90 days of formal, written and received Notice of this Agreements termination. The burden of receipt is placed upon the Notice Server/Provider. Mystic shall agree to termination without cause providing that Client provides Notice of Termination along with cleared funds amounting to three month's worth of compensation, plus any owed expenses.   CLIENT UNDERSTANDS AND MUST TAKE INTO ACCOUNT THAT IN THE EVENT MYSTIC IS TERMINATED, CLIENT LOSES ANY THIRD-PARTY CONTRACTS OR BENEFITS ENURED WHICH ARE CONTRACTED UNDERNEATH MYSTIC FOR PURPOSES OF CLIENT. Mystic agrees to work with Client in transferring any such contracts or making other arrangements amicable to the Parties. Any company equity provided prior to said Notice of Termination remains with Mystic. If terminated, Mystic's only legal obligations to Client shall be limited to that of an arm's length, equity holder.

6.  Compensation. Mystic shall be compensated for its services as follows:

   a.  $40,000 per consecutive month, deemed fees due and owing, which compensates Mystic and its team.  This amount does not cover costs, expenses, those outside of the Mystic "Team", or third party(s) and their expenses, nor contracted expenses on behalf and for Client. Mystic is responsible for payments to its Team members;

   b.  A Cost Retainer of $10,000 per month which shall be immediately replenished in the event exhausted.  This cost retainer shall be applicable to the Mystic Team's expenses and not applied to third party or Client's costs, expenses or fees. Mystic shall report to Client, its expenses at the end of each month by way of spread sheet.  Any expenses outside of the normal course of business must be first agreed to by Client.

   c.  Equity As Part of Compensation to Mystic:

      i.  Upon signing hereto, Mystic shall receive a bonus of 100,000 Common Voting Shares or if existing, Series A Preferred, Voting Shares, either of which shall be non-dilutable and fully earned with no provision for any sale hold, as earned shares.  These shares shall be issued at a cost basis of $0.71 per share, the last price at which the shares of common stock were sold, and shall be considered for tax purposes as a distribution not fee to the extent permitted by applicable law.

      ii.  After 90 days, from the signing hereof, Client shall immediately provide and assign, [noted with the company's transfer agent or acting Secretary should said Secretary be responsible for the Company's books and records], an additional 120,000 shares of Common Stock at a cost basis of the last price at which the shares were sold or if existing, Series A Preferred, Voting Shares, either of which shall be non-dilutable and fully earned with no provision for any sale hold, as earned shares.

      iii.  After 180 days, from the signing hereof, Client shall immediately provide and assign, [noted with the company's transfer agent or acting Secretary should said Secretary be responsible for the Company's books and records], an additional 120,000 shares of Common Stock or, if existing, Series A Preferred, Voting Shares, at a cost basis of the last price at which the shares were sold, either of which shall be non-dilutable and fully earned with no provision for any sale hold, as earned shares.

      iv.  After 270 days, from the signing hereof, Client shall immediately provide and assign, [noted with the company's transfer agent or acting Secretary should said Secretary be responsible for the Company's books and records], an additional 120,000 shares of Common Stock or, if existing, Series A Preferred, Voting Shares, at a cost basis of the last price at which the shares were sold, either of which shall be non-dilutable and fully earned with no provision for any sale hold, as earned shares.

      v.  After 360 days, from the signing hereof, Client shall immediately provide and assign, [noted with the company's transfer agent or acting Secretary should said Secretary be responsible for the Company's books and records], an additional 140,000 shares of Common Stock or, if existing, Series A Preferred, Voting Shares, at a cost basis of the last price at which the shares were sold, either of which shall be non-dilutable and fully earned with no provision for any sale hold, as earned shares.

      vi.  Client agrees that in the event Mystic wishes to accelerate all above stated shares, [6(c)(i-v), supra, Mystic may do so at the agreed rate of $0.71 par value, the last price at which the shares of common stock were sold, and shall be considered for tax purposes as a distribution not fee to the extent permitted by applicable law.

Page | 3



Document Ref: CMBTK-7HZUS-HYXUS-N2UWB

000454

6

DocuSign Envelope ID: 9E58452C-4E89-4F73-B09B-3E85DA53C926

CONSULTING & MYSTIC SOFT-CONSULTING-&-COMPENSATION
AGREEMENT

Performance-based Vesting: Mystic shall receive an option to purchase 2,500,000 shares of AHC's common stock with an exercise price of $0.71 per share, with the shares to vest in 500,000 share increments for each $5,000,000 increment in total revenue or $2,500,000 increment in total investment income, each directly sourced by Mystic and actually received by the Client; provided that, such revenue or investment income, as the case may be, must be received by the Client by the first anniversary of the date of this Agreement. To the extent that any shares under this provision remain unvested by such first anniversary, they will terminate upon such date. In the alternative, Mystic may elect to receive shares with the same vesting schedule, with the understanding that Mystic will be responsible for its own taxes.

7.   Royalties As Part of Compensation. The Parties do hereby agree that Mystic shall receive an on-going and perpetual 2.5% gross fee for any and all business introduced to Client and which Client collects upon. This provision shall survive any termination of this Agreement or renewal. Client shall pay, in clear funds, Mystic within 5 business days of collecting any and all fees paid to Client from the introduced third party.

8.   Audit. Client hereby agrees that at least once per year, Mystic is entitled to and shall be provided with an audited accounting of any and all monies due and/or paid to Mystic, at Client's expense, as part of its annual audit obligations. Should Mystic desire more than one audit per year, Client shall make all materials needed and necessary to Mystic's auditor, however, the cost of Mystic's auditor shall be borne by Mystic. All audit reporting shall remain Confidential under the terms set forth governing Confidentiality herein below.

9.   Future Successful Fundraising.

A.   In the event that Client issues a new series raise, while Mystic is providing the Consulting services, Mystic shall be entitled to a buy in up to $500,000 worth of Client's newly issued shares at the originally agreed valuation of $0.71 per share of Client's Common Voting Shares or if existing, Series A Preferred, Voting Shares, either of which shall be non-dilutable and fully earned with no provision for any sale hold, as earned shares. Mystic and/or assigns shall be responsible for their own tax payments and said distribution of shares shall be deemed a distribution not fees to the extent permitted by applicable law.

10.   Facilities. The place of work shall be at Mystic's discretion, except as otherwise required by the nature of the work. Client shall be responsible for costs and expenses Mystic's Team incurs associated with travel and travel related items.

11.   Reporting and Reimbursement. In order for Mystic to apply the Cost Retainer set forth in Section 6b hereof, Mystic shall obtain prior written approval for all expenses, except for those expenses incurred within the normal course and scope of the relations. At the end of each month, Mystic shall account to Client for its prior month use of the Cost Retainer. The monthly invoice shall itemize all expenses according to their respective expense report procedures and be paid to the other through the cost retainer. In the event that said cost retainer is insufficient, Client shall pay the balance within 7 business days from the date of invoice and replenish the Cost Retainer Account.

12.   Due Diligence Upon The Other. Each Party hereto agrees that they have already conducted sufficient due diligence upon the other, have verified the other, have met and liked the other to the point where they each feel comfortable entering into this Agreement. Each Party represents that they have conducted their independent due diligence free from the influences of the other and have not relied upon anything but their own respective investigation and diligence whereby going into this relationship with their eyes wide open.

13.   Confidentiality/Non-Disclosure. In the course and performance of this Agreement, the Parties may be exposed to, and will be required to, use certain "Confidential Information" (as hereinafter defined) belonging to each of the parties to this Agreement. The Parties mutually agree that neither will use such Confidential Information other than for purposes addressed in this agreement. In no event shall either party use the confidential information of the other party to circumvent or cause harm to the other party.

(a)   Definition. "Confidential Information" means any proprietary information, technical data, trade secrets or know-how, including, but not limited to, customers, customer lists, contact lists, software, developments,

Page | 4      

6

000456

Document Ref: CMBTK-7HZUS-HYXUS-N2UWB

000457

DocuSign Envelope ID: 9E58452C-4E89-4F73-B09B-3E85DAE3C926

SOFT-CONSULTING-&-COMPENSATION
AGREEMENT

marketing, marketing strategies, advertising strategies, video production or any digital media, proprietary methods, business plans, data reports, methods of doing business, finances or other business information disclosed by one Party to the other, or developed by the Mystic Team for the benefit of HeraSoft, either directly or indirectly, in writing, orally or otherwise.

(b)   Confidential Information.  The Parties each hereby agree not to disclose any Confidential Information and further agree to review and in good-faith execute a more formal description of the Confidential Information as it becomes known as a result of the performance hereunder or mark any information, data or document as Confidential as they come to light during the performance of this relationship. The confidential information shall be treated as confidential and proprietary for five years from the effective date of this Agreement. Notwithstanding the above, either Party may present this information to their respective attorneys, accountants, Team, associates, partners, officers and/or board members.  In the event third parties are in need of information deemed or reasonably believed to be of Confidential value, before any third party may come into possession or "know", both Parties hereto must first agree to the dissemination and if agreed upon, the third party must first be bound to a Confidentiality and Non-Circumvent Agreement.  In the event of litigation hereunder, all Confidential information must be filed Confidentially without public dissemination.  In the event any party gets served, through the legal process, for information which is or should be reasonable construed as Confidential, the Party served shall first alert the other Party of the service, provide a copy of the service, and allow the other Party to contest the service and request through the legal process prior to any dissemination.

(c)   Return of Materials.  Upon the termination of this Agreement, each Party will deliver to the other all of the Confidential Information of the other Party that it may have in its possession or control, together with all copies and abstracts thereof.

14.   Venue. Notwithstanding the foregoing The Parties may apply to any state court in either Orange County or Miami-Dade County, Florida or in Montgomery County, Texas for a temporary restraining order, preliminary injunction or other interim or conservatory relief, as necessary, without breach of this arbitration agreement and without abridgment of the powers of the arbitrator. Such "interim relief" must be in furtherance of this mandatory Arbitration dispute resolution.

15.   INDEMNIFICATION. Client agrees to indemnify and hold Mystic harmless from any damage, liability or cost (including reasonable attorney's fees and costs of defense) to the extent caused by Client's negligent acts, errors or omissions in the performance of services or from its software programs and protocols. Indemnity is conditioned upon the indemnified party (i) providing prompt notice to the indemnifying party of any potential claim, (ii) tendering control of the defense and/or settlement of such claim to the indemnifying party, and (iii) reasonably cooperating with the indemnifying party in the defense and/or settlement of such claim.

16.   WARRANTY. Mystic warrants that the Services will be performed in a good and workmanlike manner in accordance with prevailing standards and practices applicable to the law firm and consulting operations. Mystic expressly disclaims any and all other warranties, express or implied, including the implied warranties of merchantability and fitness for a particular purpose.

17.   RELIANCE. Client understands that Services governed by this agreement are for their sole use and benefit and agrees not to authorize any third party to rely on the Services without the prior written consent of Mystic. Mystic acknowledges that Client may wish to allow others to rely on the services performed and agrees to extend reliance to others subject to execution of an appropriate agreement and collection of additional fees. Client acknowledges that the terms and conditions offered to others in connection with such reliance may differ from those agreed herein.

18.   ARBITRATION. Any controversy or claim arising out of, or related to, the interpretation, validity, construction, performance, breach or termination of this Agreement, such dispute or controversy shall be settled by arbitration in accordance with the proceedings under the American Arbitration Association ("AAA") rules and such arbitration will be the exclusive dispute resolution method. The decision and award determined by such arbitrator shall be final, conclusive and binding upon both parties.

(a)   Arbitration Rules of Engagement.  The arbitration shall be conducted by a single arbitrator acting under the then current "Commercial Rules of AAA. The arbitration shall be held in either Orange County or

Page | 5      AB      CB

6

000458

DocuSign Envelope ID: 9E58452C-4E89-4F73-B09B-3E85DAE3C926

SOFT-CONSULTING-&-COMPENSATION AGREEMENT

Miami-Dade County, Florida, or in Montgomery County, Texas (to be based on the selection of the party initiating such arbitration) unless otherwise agreed by both parties. Each party to this Agreement will be responsible for the payment of one half (1/2) of the fees plus costs for the arbitration. In the event a dispute is submitted to arbitration, the parties will be responsible for their own legal fees unless otherwise agreed in writing by the parties. Judgement on this binding AAA arbitration shall be entered by any branch of the Miami-Dade Circuit Court with Jurisdiction on the amount at issue. The Parties further agree that any arbitrator must be one with at least 7 years of judicial experience and at least 6 years of private practice experience.

(b)    Consent to Personal and Subject Matter Jurisdiction.  The arbitrator(s) shall apply either Florida or Texas law (based on the selection of the party initiating such arbitration).  **The Parties each and respectively hereby consent to the personal and/or subject matter jurisdiction of the state or Federal courts located in either Orange County or Miami-Dade County, Florida** or in Montgomery County, Texas **for any action or proceeding arising from or relating to this Agreement or relating to any arbitration in which the parties are participants.**

(c)    Acknowledgment.   BOTH PARTIES HAVE READ AND UNDERSTAND SECTION 18, Arbitration, WHICH BINDS EACH PARTY HERETO TO ARBITRATION.   BOTH PARTIES UNDERSTAND AND ACKNOWLEDGE THAT BY SIGNING THIS AGREEMENT, THEY BOTH AGREE TO SUBMIT ANY CLAIMS ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT, OR THE INTERPRETATION, VALIDITY, CONSTRUCTION, PERFORMANCE, BREACH OR TERMINATION THEREOF, TO BINDING ARBITRATION, EXCEPT AS PROVIDED IN SECTION 18, AND THAT THIS ARBITRATION CLAUSE CONSTITUTES A WAIVER OF ALL RIGHTS OF BOTH PARTIES TO A JURY TRIAL AND RELATES TO THE RESOLUTION OF ALL DISPUTES RELATING TO ALL ASPECTS OF THE RELATIONSHIP BETWEEN THE PARTIES.

19.  Modification.  No modification, termination, or attempted waiver of this Agreement, or any provision thereof, shall be valid unless executed by both Parties to this Agreement.

20.  Assignment.  Neither this Agreement nor any right hereunder, nor any interest herein, may be assigned or transferred by either Party, unless to a related entity, a subsidiary entity, or a purchasing or controlling entity, without the express written consent of the other Party.

1.   21.  Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws (and not the laws of conflicts) of the State of Florida or the State of Texas, based on the selection of the party initiating a dispute.

22.  Entire Agreement.  This Agreement is the entire agreement of the Parties and supersedes any prior agreements between them, whether written or oral, with respect to the subject matter hereof.

23.  Attorney's Fees. In any arbitration or court action which is brought by one of the Parties to enforce or interpret the provisions of this Agreement, the Prevailing Party shall be entitled to a reasonable award of Attorney fees and costs.

24.  Relationships. No joint venture, partnership, agency, or other relationship, which would impose liability upon one party for the act or failure to act of the other, shall be created or implied hereby or here from. Except as is expressly set forth herein, each party shall bear full and sole responsibility for its own expenses, liabilities, costs of operation, and the like. Neither party has or shall have the power to bind the other party or to assume or to create any obligation or responsibility, express or implied, on behalf or in the name of the other party. No Party may act as the agent of the other and no Party hereto shall be deemed an employee of the other.

25.  Severability/Waiver. If the application of any provision or provisions of this Agreement to any particular facts or circumstances shall be held to be invalid or unenforceable by any court of competent jurisdiction, then the validity and enforceability of such provision or provisions as applied to any other particular facts or circumstances and the validity of other provisions of this Agreement shall not in any way be affected or impaired thereby. The waiver of any one default shall not waive subsequent defaults. Any and all ambiguity shall not be construed against the drafting party as each party agrees they have had ample ability to participate in this

Page | 6    AB   CB

000459

6

Document Ref: CMBTK-7HZUS-HYXUS-N2UWB

000460

DocuSign Envelope ID: 9E58452C-4E89-4F73-809E-3E85DAE3C926

CONSULTANT-AND-THE-SOFT-CONSULTING-&-COMPENSATION
AGREEMENT

Agreements drafting.  In the event of any legal changing due to ambiguity, confusion, scrivener's error, or statute, the "Blue Pencil" laws shall apply.

26.  Notices.  Any notice to be given pursuant to this Agreement shall be in writing and shall be deemed to have been given three business days after delivered in person to a Party, if an individual, or to an officer, general partner, or an agent for the service of process for the entity; or by email with proof of email delivery, and effective one business day after said email is served.

27. Safe Harbor Notice

Mystic's services may provide "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, such as statements relating to financial results and plans for future development activities and are thus prospective. Forward-looking statements include all statements that are not statements of historical fact regarding intent, belief or current expectations of the company, its directors or its officers. Client and Client's investors are cautioned that any such forward-looking statements are not guarantees of future performance and involve risks and uncertainties, many of which are beyond Mystic's and/or the client's ability to control. Actual results may differ materially from those projected in the forward-looking statements. Among the factors that could cause actual results to differ materially from those indicated in the forward-looking statements are risks and uncertainties associated with the client's business and finances in general, including the ability to continue and manage its growth, competition, global economic conditions and other factors discussed in detail in the Company's periodic filings or public statements.  Among the important factors that could cause the Client's actual results, performance or achievements to materially differ from those in the forward-looking statements are, among others, the competitive nature of the markets, technological developments, government regulations, changes in economical conditions or political events. In preparing its services, Mystic has relied upon and assumed, and Client understands and acknowledges Mystic's reliance, without independent verification, the accuracy and completeness of all information available from public and Client's internal sources or which was provided to it or otherwise reviewed by it. The information contained in Mystic's services has been taken from sources deemed to be reliable. Mystic does not represent that such information is accurate or complete and it should not be relied on as such.   **Mystic undertakes no obligation to update any forward-looking statements.**

28.  Miscellaneous. The section headings in this Agreement are solely for convenience and shall not be considered in its interpretation. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. The exhibits referred to herein and annexed hereto are hereby incorporated into and made a part of this Agreement.

29. Parol Evidence. The Parties agree that NO PAROL evidence shall be admissible and that the only representations made are stated in writing herein.  Further understandings must be in writing.

Authorized Signatures

**THIS AGREEMENT**, its terms and conditions are understood and agreed to between the parties on date first written above.  Client has read this agreement and accepted its terms.  Client further understands that prior to the signing of this agreement, Client may ask any questions, have any concerns satisfied, and even go to or take this agreement to another lawyer for review and explanation. Mystic has allowed Client's to partake in the creation or change of this agreement's terms and conditions or edit any prepared items "at will".

FOR: ("MYSTIC")                                FOR: ANTHEM HOLDINGS COMPANY and  HERASOFT

BY: _Craig Brand_                              BY: _Anthem Blanchard_

Name & Title    Craig Brand                    Name & Title    Anthem Blanchard   CEO

            President

Page | 7

Document Ref: CMBTK-7HZUS-HYXUS-N2UWB

000461

# EXHIBIT "B"

6

000462

DocuSign Envelope ID: 3E0721C7-9F0A-4ACE-9E78-CF2D7BB30D69

## FIRST AMENDMENT TO CONSULTING AGREEMENT DATED MARCH 1, 2021

This First Amendment (the "**Amendment**") to the Consulting Agreement dated March 1, 2021, is made and entered into as of March 2, 2022 by and between Anthem Holdings Company, a Delaware corporation ("**AHC**"), and Hera Software Development, Inc., herein after referred to as "Hera",  (together with AHC and Hera, shall be referred to as the "**Company**") located at 504 E. Silas, Bartlesville, OK 74003; and, Mystic Law, P.A., located at 4650 Indian Creek Road, Loveland, Colorado 80538 ("**Consultant**").  Collectively, "Company" and/or "Consultant" shall be referred to as the "Parties".

### RECITALS:

**WHEREAS**, the Parties entered into that certain Consulting Agreement dated effective as of March 1, 2021 (the "**Consulting Agreement**"), pursuant to which Consultant agreed to provide certain services for the Company and Company agreed to accept the same; and

**WHEREAS**, the Company would like to further engage Consultant as set forth herein and therefore would like to amend the Consulting Agreement to reflect such engagement;

**WHEREAS**, if not stated herein or spoken to, the remainder of the terms set forth in the original Consulting Agreement shall apply and control as this document is meant as an Addendum thereto and extension of the Parties Agreement.

**NOW, THEREFORE**, in consideration of the premises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     "WHEREAS" CLAUSES:  All WHEREAS clauses cited in the Recital section, herein above, shall be deemed terms and conditions as part of this Addendum or Amendment.

2.     Amendment of Consulting Agreement.   The Consulting Agreement is hereby amended in the following respects:

(a)     Section (6a) of the Consulting Agreement is hereby amended by replacing "$40,000" with "$20,000", whereby the discrepancy or $20,000 monthly deficiency shall be treated as an interest free, deferred, recurring preferred debt, with shall not become part of any Company bankruptcy, effective November 1, 2021, and by adding the following at the end of the first sentence:

"; provided, however, that upon the earlier of (1) the closing by the Company or any of the Company's heirs, subsidiary(s), related entity(s), assign(s), or added entity(s)- of any financing of at least $3,000,000/, or, (2) the end of a calendar month in which the Company has had at least $1,000,000/ in total revenue for three consecutive calendar months, or, (3) only in the event neither (2)(1) or (2)(2), *supra* occur, then (3) by February 28, 2023, that the original, monthly consulting fee amount of $40,000/ be re-set and



000463

6

Document Ref: CMBTK-7HZUS-HYXUS-N2UWB

DocuSign Envelope ID: 3E0721C7-9FDA-4ACE-9E78-CF2D7BB30D69

applicable beginning March 1, 2023. Additionally, as agreed to, upon the occurrence of the aforementioned [2(1), (2), or (3)], Consultant shall receive the total amount of the deferred debt (see, 2(a), above) in one lump sum. Said payment is due no later than seven (7) business days from the occurrence of section [2(1), (2), or (3)], *supra*.

(b)    "Section 6 of the Consulting Agreement is hereby amended by adding the following after section 6 (c):

"(d) Initial Deferred Payments Between November 1, 2021 – February 28, 2022 Shall Be Treated Differently From An Accounting and Payable Perspective:   Between November 1, 2021 and February 28, 2022 Consultant has been taking a $20,000 per month deferral for a total of $80,000. This $80,000 is monies/debt that predates this Amendment and thus shall be handled differently than the deferments/debt accruing subsequent to the signing of this Amendment. In relation to the Pre-Amendment debt, *supra*, Company shall make best effort to retire said debt, which shall be treated by Company as a preferred debt, within 120 days from this Amendment or shall retire said debt upon the occurrence of section 2 (1),2(2) or 2(3), above, whichever comes first.

"(d) Payments:   All payments made under this agreement to the Consultant from March 1, 2022 thereafter, shall be paid to the firm Taktik Enterprises, Inc" upon assignment from Mystic Law, P.A.

(c)    Section 2, of the Consulting Agreement is hereby amended by adding at the end of the second sentence:

"(10) As a significant focus of scope of work, Consultant shall also act as a strategic advisor to the Company for matters pertaining to and assisting with The Price Tower Project up to the potential acquisitions of The Price Tower building or complex, Bartlesville, OK., and underlying businesses and revenue derived at or in association with the location or its assets. However upon any such purchase or transfer of The Price Tower to any entity owned or controlled or financed by the Company or its officers, directors or shareholders, Consultant shall have first right of refusal to engage in executive and operational oversight and administration of such resulting ventures, continuing, planned, and/or in relations with the purchase, transfer, and continuing operations or management of The Price Tower and shall be entitled to reasonably prevailing rates and wages for such additional role(s) and ongoing participation or involvement. This further consulting business, effective subsequently to any acquisition or transfer of the Price Tower, discussed *supra*, shall be defined at such time under an additional agreement of terms and additional compensation in mutual amicability with new ownership or controlling party and at such time may include or require this agreement to also be amended, renegotiated and shall then also be agreed to by all parties"

3.    Stock and Par Value. As to any and all stock in Company given to Consultants, individually or corporately, past, present and future, it is agreed that the par value shall be $0.01.



2

Document Ref: CMBTK-7HZUS-HYXUS-N2UWB

000465

DocuSign Envelope ID: 3E0721C7-9F0A-4ACE-9E78-CF2D7BB30D69

4.   No Further Amendments: Conflicting Terms.  Except as expressly provided herein, the Consulting Agreement shall be left intact and collectively these Agreements shall become a valid, binding and enforceable Agreement.

5.   Reference to Consulting Agreement.  Each reference in the Consulting Agreement to "this Agreement," "hereunder," or words of like or similar import shall mean and be a reference to the Consulting Agreement dated March 1, 2021, as modified and amended by this Amendment dated March 2, 2022.

6.   Successors and Assigns.  This Amendment shall be binding upon and, to the extent expressly permitted by the provisions of the Consulting Agreement, shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, related parties, successors, successors in interest, and/or assigns.

7.   Counterparts.  This Amendment may be executed in two or more counterparts, and with counterpart signature pages, each of which shall be an original, but all of which together shall constitute one and the same Agreement, binding on all of the parties hereto notwithstanding that all such parties have not signed the same counterpart.  Counterpart signature pages to this Amendment transmitted by facsimile transmission, by email in .pdf or similar form, Docusign, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing an original signature.

[Remainder of Page Intentionally Left Blank]



3

000466

6

000467

DocuSign Envelope ID: 3ED721C7-9F0A-4ACE-9E76-CF2D7BB30D69

IN WITNESS WHEREOF, the undersigned have caused this Amendment to be executed as of the date first above written.

**ANTHEM HOLDINGS COMPANY**

By: _____    3/23/2022

Anthem Blanchard, Chief Executive Officer

**MYSTIC LAW, P.A.**

_____    3/23/2022

Craig Brand, President

6

000468

# EXHIBIT "C"

Document Ref: CMBTK-7HZUS-HYXUS-N2UWB



Document Ref: CMBTK-7HZUS-HYXUS-N2UWB



6

# Signature Certificate

Reference number: CMBTK-7HZUS-HYXUS-N2UWB

| Signer | Timestamp | Signature |
|---|---|---|

**Anthem Blanchard**
Email: anthem@herasoft.com

| | | |
|---|---|---|
| Sent: | 17 Oct 2022 16:06:52 UTC | |
| Viewed: | 17 Oct 2022 16:17:27 UTC | *Anthem Blanchard* |
| Signed: | 17 Oct 2022 16:17:58 UTC | |

**Recipient Verification:**
✔ Email verified          17 Oct 2022 16:17:27 UTC          IP address: 172.58.56.235

**Cynthia Blanchard**
Email: cynthia@herasoft.com

| | | |
|---|---|---|
| Sent: | 17 Oct 2022 16:06:52 UTC | |
| Viewed: | 17 Oct 2022 16:17:25 UTC | *Cynthia Blanchard* |
| Signed: | 17 Oct 2022 16:17:59 UTC | |

**Recipient Verification:**
✔ Email verified          17 Oct 2022 16:17:25 UTC          IP address: 107.77.207.113

**Dale Takio**
Email: dtakio@taktikenterprises.com

| | | |
|---|---|---|
| Sent: | 17 Oct 2022 16:06:52 UTC | |
| Viewed: | 17 Oct 2022 16:15:32 UTC | *Dale Takio, CEO* |
| Signed: | 17 Oct 2022 16:26:37 UTC | |

**Recipient Verification:**
✔ Email verified          17 Oct 2022 16:15:32 UTC          IP address: 72.239.155.173
                                                            Location: Clermont, United States

**Michael J. Moran**
Email: mike@pictoriastudios.com

| | | |
|---|---|---|
| Sent: | 17 Oct 2022 16:06:52 UTC | |
| Viewed: | 17 Oct 2022 16:20:28 UTC | *Michael J. Moran* |
| Signed: | 17 Oct 2022 16:27:13 UTC | |

**Recipient Verification:**
✔ Email verified          17 Oct 2022 16:20:28 UTC          IP address: 193.36.224.12
                                                            Location: Miami, United States

Document completed by all parties on:
18 Oct 2022 14:07:27 UTC

Page 1 of 2



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 30,000+ companies worldwide.



000472

# Signature Certificate

Reference number: CMBTK-7HZUS-HYXUS-N2UWB

| Signer | Timestamp | Signature |
|--------|-----------|-----------|

**Craig Brand**
Email: craig@thebrandlawfirm.com

| | | |
|--------|-----------|-----------|
| Sent: | 17 Oct 2022 16:06:52 UTC | |
| Viewed: | 18 Oct 2022 13:30:05 UTC | |
| Signed: | 18 Oct 2022 14:07:27 UTC | |

*Craig Braud*

**Recipient Verification:**

✔ Email verified          18 Oct 2022 13:30:05 UTC

IP address: 186.64.208.140
Location: Perez Zeledon, Costa Rica

Document completed by all parties on:
18 Oct 2022 14:07:27 UTC

Page 2 of 2



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 30,000+ companies worldwide.



# AMENDMENT TO CONSULTING AGREEMENT

**THIS AMENDMENT TO CONSULTING AGREEMENT** (herein after referred to as the ("***Amendment***") is made and entered into effective as of the January 1, 2023, for lawful and duly noted legal consideration by and between Copper Tree, Inc., a Delaware corporation ("**Company**") and Taktik Enterprises, Inc., a Florida corporation ("***Consultant***") further states as follows:

Whereas, an agreement titled "Consulting Agreement" with Document reference number GPBWX-BJVRT-RKB5G-RPLCR (Exhibit A) was executed on October 13, 2022 shall be referred to in this Amendment as the "Consulting Agreement";

Whereas, an agreement titled "Exchange Agreement Plus Equity Stock Swap" and with Document reference number CMBTK-7HZUS-HYXUS-N2UWB (Exhibit B) was executed on October 18, 2022 shall be referred to in this Amendment as the "Exchange Agreement";

Whereas the Company and the Consultant desire to make amendments and revisions to the Consulting Agreement that was also entered as Exhibit A in the Exchange Agreement;

Whereas, all remaining parts and subparts of the Consulting Agreement and the Exchange Agreement shall remain unchanged and in full effect;

Whereas, both parties continue to agree that no other changes shall take effect with any agreements unless otherwise done so in writing and agreed to by all named parties:

*Now, Therefore,* in consideration of the mutual covenants and conditions herein contained, the receipt and sufficiency of which are acknowledged, the parties hereto agree as follows:

1. Revision to "Additional Cash Fees." Section of the Consulting Agreement:
   a. The following clause restated in section 1.a.i. below, shall be completely stricken from the Consulting Agreement and from Exhibit A of the Exchange Agreement
      i. Additional Cash Fees. After completion of the primary services ending on December 31, 2022 and recommencing January 1, 2023 then on a month to month basis the Consultant shall continue to provide the services set forth above as secondary services, and shall be paid $12,500 per month, with the understanding that such amount may be reduced by $2500 per month for as long as the Company is making payments under its separate agreement with Mystic Law, P.C. Also, until receipt of the bank commitment, the amount due above shall accrue and not become payable until such time as the Company receives such bank commitment. Employee shall also be entitled to receive $12,500 per month in deferred cash upon the availability of funds from the Company's receipt of its commitment from Truity Bank or any other bank that commits to fund the project. In the event such bank commitment is not received, this deferred payment shall not accrue nor become payable at any time.
      ii. The stricken section as outline in 1.a.i. herein, shall be replaced with the entirety of section 2 and its corresponding subsections herein and upon execution of this Amendment:

2. Additional Cash Fees Revised.
   a. After completion of the primary services ending on December 31, 2022 and recommencing January 1, 2023 then on a month to month basis the Consultant shall continue to provide the services set forth above as secondary services, and shall be paid **$5,000** per month as a **non-deferred** cash payment.
      i. Each non-deferred payment due shall be paid on the following schedule and terms: Each monthly $5000.00 non-deferred payment outlined in section 1.(b.) shall be paid on a net 90 basis from the first day of each month. (*For example, January 1, 2023 $5000.00 non-*

*deferred payment for commencement of secondary services shall be due on or before April 1, 2023 and so on for each month in which secondary services are continued.*)

    ii.  All payments may be made by check, ACH bank transfer or by major credit card, however, Company understands that for any credit card payments made by the Company to the Consultant, if payments are timely processed within 5 days of each due date, no fees shall be applied to payments made by credit card, however, if payments are made after 5 days following each monthly invoice due date, a 2.5% credit card processing fee shall be applied.

  b.  Additionally, for each month commencing on January 1, 2023 and for as long as the secondary services continue, Consultant shall also be entitled to receive $12,500 per month in **deferred** cash upon the availability of funds from the Company's receipt of its commitment from Truity Bank or any other bank or entity that commits to fund the project. In the event such bank or entity commitment is not received, this $12,500 per month in deferred payment(s) shall not accrue nor become payable at any time.

  c.  In addition to the reduced non-deferred monthly cash payments outlined in 1.(b.), Consultant shall also be entitled to receive additional Equity Fees equal 0.250% of the total outstanding equity in the company for each month that secondary services have commenced as per the terms of the entire "Agreement" and to be issued within 30 days of the first day of each month in which secondary services have commenced and issuable as follows:

    i.  An amount equal to 0.125% of the total outstanding equity in the Company to be issued to Dale Douglas Takio and Katalin Nagy-Takio JTWROS and which shall be issued at such time at a price of $0.01 per share of Copper Tree non-dilutive share interests; and

    ii.  An amount equal to 0.125% of the total outstanding equity in the Company to be issued to Michael J. Moran and Erinne Moran JTWROS and which shall be issued at such time at a price of $0.01 per share of Copper Tree non-dilutive share interests.

  d.  As previously referenced and relating to payments due to Mystic Law, P.A. (P.C.) herein and previously in the Consulting Agreement and in Exhibit A of the Exchange Agreement, The Company understands that Anthem Holdings Company and Hera Software Company currently has past due balances totaling $7500.00 and specific to invoice number 2110 dated November 1, 2022, invoice number 2113 dated December 1, 2023 and invoice number 2116 dated January 1, 2023 and is in default and continues to be liable for all remaining payments due under the Promissory Note and other terms set forth in the above mentioned Agreements. As such, Company understands and agrees that **<u>no</u>** credits or reductions in fees relating to any monies due to Mystic Law, P.A. (P.C.) shall be eligible or applied to non-deferred cash payments due for any secondary services or other services to be provided by the Consultant to the Company from January 1, 2023 onwards and Anthem Holdings Company and Hera Software Company shall continue to owe the balances set forth under all other valid agreements in place.

    i.  Upon a Closing Date being effectuated as defined in the Exchange Agreement, Company shall become a guarantor of all past and future monies due from Anthem Holdings Company or Hera Software Company to Mystic Law, P.A. or the Consultant in the event that payments are not timely made and;

    ii.  The Company shall immediately pay any past due amounts within 5 days of the Closing Date as defined in the Exchange Agreement, and continue to make payments within 5 days of each ongoing due date for any and all monies owed to Mystic Law, P.A. or the Consultant should payments not be made on or before each schedule due date(s) by Anthem Holdings Company or Hera Software Company

3.  <u>Remainder of Agreements</u>.  All parties hereby agree that no other changes to agreements with Document Reference CMBTK-7HZUS-HYXUS-N2UWB or Document reference CMBTK-

000475

7HZUS-HYXUS-N2UWB shall be made or affected by this Amendment and all other terms and conditions shall remain in full effect.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date last indicated below.

**COPPER TREE, INC.**                       501 E. Frank Phillips Blvd.
                                            Bartlesville, OK 74003
                                            Attn: Cynthia Blanchard/Paul Aubert

*Cynthia Blanchard*                         Jan 5, 2023
By: Cynthia Blanchard (Jan 5, 2023 11:43 CST)
Cynthia Blanchard, CEO

TAKTIK ENTERPRISES, Inc                     11222 Oakshore Lane
                                            Clermont, FL 34711
                                            Attn: Dale Takio

*Dale D. Takio, CEO*
By: Dale D. Takio, CEO (Jan 5, 2023 13:00 EST)    Jan 5, 2023

Dale Takio, CEO

000476

# EXHIBIT A

## (GPBWX-BJVRT-RKB5G-RPLCR)

000477

CONFIDENTIAL

## Consulting Agreement

This CONSULTING AGREEMENT is dated effective as of October 11, 2022, by and between COFFEE TREE, INC., a Delaware corporation (the "Company"), with principal offices in Bartlesville, OK and Taleth Enterprises, Inc. ("Consultant") with offices located in Florida.

*[Page contains additional body text that is illegible due to scan quality.]*

---

CONFIDENTIAL

*[Page contains body text that is illegible due to scan quality.]*

000478



000479



# EXHIBIT B

# (CMBTK-7HZUS-HYXUS-N2UWB)

000480

000481



Exhibit "A"

000483



EXHIBIT "B"



EXHIBIT "C"



000485



# Amendment to Consulting Agreement Dated October 13v.12.28.2022_FINAL

Final Audit Report                                                                 2023-01-05

| | |
|---|---|
| Created: | 2023-01-04 |
| By: | Dale Takio (dtakio@mail.valenciacollege.edu) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAHXG9BdmalzciHZy_S46xHk6zE7DSjh0j |

## "Amendment to Consulting Agreement Dated October 13v.12.28 .2022_FINAL" History

📄 Document created by Dale Takio (dtakio@mail.valenciacollege.edu)
2023-01-04 - 8:37:02 PM GMT- IP address: 72.239.155.173

📧 Document emailed to cynthia@thepricetower.com for signature
2023-01-04 - 8:39:09 PM GMT

📧 Email sent to Dale Takio (dtakio@mail.valenciacollege.edu) bounced and could not be delivered
2023-01-04 - 8:39:20 PM GMT

📄 Email viewed by cynthia@thepricetower.com
2023-01-05 - 5:43:00 PM GMT- IP address: 152.37.150.151

✍️ Signer cynthia@thepricetower.com entered name at signing as Cynthia Blanchard
2023-01-05 - 5:43:47 PM GMT- IP address: 152.37.150.151

✍️ Document e-signed by Cynthia Blanchard (cynthia@thepricetower.com)
Signature Date: 2023-01-05 - 5:43:49 PM GMT - Time Source: server- IP address: 152.37.150.151

📧 Document emailed to dtakio@taktikenterprises.com for signature
2023-01-05 - 5:43:51 PM GMT

📧 Email sent to Dale Takio (dtakio@mail.valenciacollege.edu) bounced and could not be delivered
2023-01-05 - 5:44:00 PM GMT

📄 Email viewed by dtakio@taktikenterprises.com
2023-01-05 - 5:58:15 PM GMT- IP address: 72.239.155.173

✍️ Signer dtakio@taktikenterprises.com entered name at signing as Dale D. Takio, CEO
2023-01-05 - 5:59:59 PM GMT- IP address: 72.239.155.173

 **Adobe Acrobat Sign**

000487

Document e-signed by Dale D. Takio, CEO (dtakio@taktikenterprises.com)
Signature Date: 2023-01-05 - 6:00:01 PM GMT - Time Source: server- IP address: 72.239.155.173

Agreement completed.
2023-01-05 - 6:00:01 PM GMT

**Adobe Acrobat Sign**

000488

## CONSULTING AGREEMENT

This document will confirm the mutual understanding and serve as an agreement between JDS VENTURES Ltd (Consultant) and Copper Tree, Inc., a Delaware corporation (the "Company"), regarding a potential investment, merger or joint venture into the Company through the services and / or introduction by Consultant.

1. **ENGAGEMENT:**  The Company hereby engages JDS VENTURES and Dominick Arcamone, and they both herebyaccept the engagement to render strategic consulting services to the Company in connection with the Company's efforts to obtain Financing and Marketing assistance.

2. **SERVICES:**  The Company's objective is to raise additional capital to expand the marketing of the Company's services and for working capital purposes. JDS VENTURES Ltd will provide assistance in the preparation, review and implementation of the Company's capital funding programs if requested.

- Work with the Company to develop an overall strategic and capital development plan for the Company.
- Assist in corporate capital development by the Company, including the identification, qualification and negotiation with available capital financing sources..

3. **DEFINITIONS:**  For the purpose of this agreement, "Consideration" shall be calculated and payable in U.S. Dollars and shall mean the value of all cash paid or delivered by an investing party because of JDS VENTURES Ltd involvement. and or introduction.

4. **COMPENSATION:** In consideration of the services pursuant to this Agreement, JDS VENTURES Ltd. shall be entitled to receive and the Company agrees to pay, or cause to be paid, to JDS VENTURES Ltd the following compensation:

 (A)  COMPANY shall pay the CONSULTANT a fee of FOUR PERCENT (4%) of the gross dollars raised. Payment shall commence on the first day of each month.

 The CONSULTANT will not be entitled to any compensation on any transaction obtained directly by the COMPANY.

 (B). (Intentionally left blank)

 (C)  Payment of Compensation:   COMPANY agrees to pay CONSULTANT on the first of each month and no later than the 10th. Of each month.

1

000489

(D), CONSULTANT'S EXPENSES: COMPANY agrees to pay, in addition to the fee for CONSULTANT'S services, material and printing costs of documentation created for the COMPANY and all travel expenses of CONSULTANT incurred by CONSULTANT in performing services pursuant to this agreement, including but not limited to transportation costs (airlines and automobile), meals and lodging.  The COMPANY prior to use shall approve such expenses.

5. **CONFIDENTIALITY:**  Except as contemplated by the terms hereof or as required by applicable law, JDS VENTURES Ltd shall keep confidential all material, non-public information provided to him by the Company and shall not disclose such information to any third party, other than such of JDS VENTURES Ltd employees, contractors and advised as
      determines to have a need to know.

6. Except as provided by applicable law, any information provided by JDS VENTURES Ltd or the Company under this Agreement shall not be disclosed publicly or made available to third parties without the written approval of JDS VENTURES Ltd or the Company.

7. **MUTUAL COVENANTS:**  JDS VENTURES Ltd. and the Company each agree that they will undertake the activities contemplated by this Agreement in compliance with all applicable laws and regulations, including without limitation, all applicable securities laws.

8. **APPLICABLE LAW:**  The Laws of the State of Oklahoma shall govern the validity and interpretation of this Agreement.

9. **EFFECT AND SURVIVAL:**  The benefits of this Agreement shall insure to the respective successors and assigns of the parties hereto and their respective representatives.  The obligations and liabilities assumed or undertaken in this Agreement by the parties hereto shall be binding upon their respective successors and assigns.  This Agreement shall become fully effective upon execution by all parties below.

10. **COUNTERPARTS, DELIVERY BY FACSIMILE:**  For the convenience of the parties, the parties may execute any number of counterparts of this Agreement hereto.  Each such counterpart shall be deemed to be an original instrument but all such counterparts taken together shall constitute one and the same Agreement.  This Agreement may be delivered following execution by Facsimile transmission with executed originals to be delivered thereafter

2

by next day mail or express delivery service.  This Agreement may not be modified or amended except in writing signed by the parties hereto.

**11 NO THIRD PARTY FEES:**  Neither party neither is nor will be responsible for any Finder Fees, Commissions or any other such costs related to this transaction beyond the terms set forth in this Agreement.

**12.  COSTS:**  The Company upon receiving, reviewing and accepting the Underwriting Terms and Conditions from the proposed Underwriter, shall bear all costs associated with the Underwriting Commitment as defined in the Underwriting Letter of Engagement.  These costs and fees shall not affect the payment of Success Fees to JDS VENTURES Ltd.

**13.  NOTICES:**  Any notice hereunder shall be in writing and delivery thereof shall be complete if delivered in person, by facsimile, U.S. mail or delivery/courier service, return receipt requested, charges prepaid to the following addresses:

14. DISCLAIMER:  Let it be known here with, that JDS VENTURES Ltd _ is not, nor has it held itself out to be, a licensed Broker under any State or Federal Statutes. (e.g.: Real Estate Broker, Broker Dealer, or Business Dealer).

**TO COMPANY:**   **Copper Tree, inc and Green Copper Holdings,LLC ( wholly Owned subsidiary for Copper Tree,inc)**
**510 DeweyAve #3560**
**Bartlesville,Ok 74003**

**TO:  CONSULTANT:  JDS VENTURES Ltd**
14 Arch Lane
Hicksville, NY 11801

If the foregoing correctly sets forth the understanding and agreement between JDS VENTURES Ltd and the Company, please sign and return a copy of this

000491

Agreement to JDS VENTURES Ltd , whereupon this document shall constitute a Binding Agreement between the parties as of the date written below.

**CONFIRMED AND AGREED:**

**Copper Tree,inc,**

*Cynthia Blanchard*

**Cynthia Blanchard, CEO Copper Tree,Inc.**

**Green Copper Holdings,LLC**

*Cynthia Blanchard*

**Cynthia Blanchard, Managing Partner, Green Copper Holdings, LLC**

 2023-04-14

**DATE**

Consultant:

JDS VENTURES Ltd

*Dominick Arcamone*

Dominick Arcamone, President

DATE

4

000492

000493

# Signature Certificate

Reference number: E46DB-FYHTX-BEHQT-B8HHE

| Signer | Timestamp | Signature |
|---|---|---|

**Cynthia Blanchard**
Email: cynthia@thepricetower.com

| | | |
|---|---|---|
| Sent: | 14 Apr 2023 19:27:24 UTC | |
| Viewed: | 14 Apr 2023 19:54:35 UTC | |
| Signed: | 14 Apr 2023 19:59:40 UTC | |

**Recipient Verification:**
✔ Email verified          14 Apr 2023 19:54:35 UTC          IP address: 107.77.196.115

**Dominick Arcamone**
Email: dominick.jdsventures@gmail.com

| | | |
|---|---|---|
| Sent: | 14 Apr 2023 19:27:24 UTC | |
| Viewed: | 14 Apr 2023 20:20:20 UTC | |
| Signed: | 14 Apr 2023 20:39:16 UTC | |

**Recipient Verification:**
✔ Email verified          14 Apr 2023 20:20:20 UTC          IP address: 47.18.216.65
                                                            Location: Hicksville, United States

Document completed by all parties on:
14 Apr 2023 20:39:16 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 40,000+ companies worldwide.



**BYLAWS**

**OF**

**COPPER TREE, INC.**

a Delaware corporation

Effective September 30, 2022

## Table of Contents

**Page**

**ARTICLE I  OFFICES** ...................................................................................................1

SECTION 1.1.   REGISTERED OFFICE ...............................................................1
SECTION 1.2.   OTHER OFFICES .....................................................................1

**ARTICLE II  MEETINGS OF STOCKHOLDERS**.......................................................1

SECTION 2.1.   PLACE OF MEETINGS ..............................................................1
SECTION 2.2.   ANNUAL MEETINGS ................................................................1
SECTION 2.3.   SPECIAL MEETINGS .................................................................1
SECTION 2.4.   NOTICE ..................................................................................2
SECTION 2.5.   ADJOURNMENTS......................................................................2
SECTION 2.6.   QUORUM ................................................................................2
SECTION 2.7.   VOTING .................................................................................2
SECTION 2.8.   PROXIES .................................................................................2
SECTION 2.9.   CONSENT OF STOCKHOLDERS IN LIEU OF MEETING.................3
SECTION 2.10. LIST OF STOCKHOLDERS ENTITLED TO VOTE ..........................4
SECTION 2.11. RECORD DATE.........................................................................5
SECTION 2.12. STOCK LEDGER .......................................................................5
SECTION 2.13. CONDUCT OF MEETINGS.........................................................5

**ARTICLE III  DIRECTORS**......................................................................................6

SECTION 3.1.   NUMBER AND ELECTION OF DIRECTORS ................................6
SECTION 3.2.   VACANCIES .............................................................................6
SECTION 3.3.   DUTIES AND POWERS .............................................................6
SECTION 3.4.   MEETINGS ..............................................................................6
SECTION 3.5.   ORGANIZATION ......................................................................6
SECTION 3.6.   RESIGNATIONS AND REMOVALS OF DIRECTORS......................7
SECTION 3.7.   QUORUM ................................................................................7
SECTION 3.8.   ACTIONS OF THE BOARD OF DIRECTORS BY WRITTEN CONSENT ......7
SECTION 3.9.   MEETINGS BY MEANS OF CONFERENCE TELEPHONE................7
SECTION 3.10. COMMITTEES ..........................................................................7
SECTION 3.11. COMPENSATION.......................................................................8
SECTION 3.12. INTERESTED DIRECTORS .........................................................8

**ARTICLE IV  OFFICERS**.........................................................................................8

SECTION 4.1.   GENERAL ...............................................................................8
SECTION 4.2.   ELECTION; AUTHORITY AND DUTIES ......................................9
SECTION 4.3.   VOTING SECURITIES OWNED BY THE CORPORATION ...............9
SECTION 4.4.   CHAIRMAN OF THE BOARD OF DIRECTORS.............................9
SECTION 4.5.   PRESIDENT .............................................................................9
SECTION 4.6.   VICE PRESIDENTS...................................................................10

i

SECTION 4.7.   SECRETARY ........................................................................................10
SECTION 4.8.   TREASURER ........................................................................................10
SECTION 4.9.   ASSISTANT SECRETARIES ...................................................................11
SECTION 4.10. ASSISTANT TREASURERS ....................................................................11
SECTION 4.11. OTHER OFFICERS ...............................................................................11

**ARTICLE V   STOCK** ...............................................................................................**11**

SECTION 5.1.   FORM OF CERTIFICATES .....................................................................11
SECTION 5.2.   LOST CERTIFICATES ...........................................................................11
SECTION 5.3.   TRANSFERS .........................................................................................12
SECTION 5.4.   DIVIDEND RECORD DATE ....................................................................12
SECTION 5.5.   RECORD OWNERS ................................................................................12
SECTION 5.6.   TRANSFER AND REGISTRY AGENTS .....................................................12

**ARTICLE VI   NOTICES** ..........................................................................................**12**

SECTION 6.1.   NOTICES .............................................................................................12
SECTION 6.2.   WAIVERS OF NOTICE ..........................................................................13

**ARTICLE VII   GENERAL PROVISIONS** .................................................................**13**

SECTION 7.1.   DIVIDENDS ..........................................................................................13
SECTION 7.2.   DISBURSEMENTS .................................................................................14
SECTION 7.3.   FISCAL YEAR .......................................................................................14
SECTION 7.4.   CORPORATE SEAL ...............................................................................14

**ARTICLE VIII   INDEMNIFICATION** .......................................................................**14**

SECTION 8.1.   RIGHT TO INDEMNIFICATION ..............................................................14
SECTION 8.2.   RIGHT TO ADVANCEMENT OF EXPENSES ............................................14
SECTION 8.3.   RIGHT OF INDEMNITEE TO BRING SUIT ..............................................15
SECTION 8.4.   NON-EXCLUSIVITY OF RIGHTS ...........................................................15
SECTION 8.5.   INSURANCE ..........................................................................................15
SECTION 8.6.   INDEMNIFICATION OF OTHER PERSONS ..............................................15
SECTION 8.7.   AMENDMENTS ......................................................................................16
SECTION 8.8.   CERTAIN DEFINITIONS .........................................................................16
SECTION 8.9.   CONTRACT RIGHTS ..............................................................................16
SECTION 8.10. SEVERABILITY .....................................................................................16

**ARTICLE IX   AMENDMENTS** ..................................................................................**16**

SECTION 9.1.   AMENDMENTS ......................................................................................16
SECTION 9.2.   ENTIRE BOARD OF DIRECTORS ............................................................17

ii

# BYLAWS
## OF
## COPPER TREE, INC.

(hereinafter called the "*Corporation*")

## ARTICLE I
### OFFICES

Section 1.1. Registered Office. The registered office of the Corporation in the State of Delaware is 16192 Coastal Highway, Lewes, Delaware 19958. The name of the registered agent of the Corporation in the State of Delaware at such address is Harvard Business Services Inc.

Section 1.2. Other Offices. The Corporation may also have offices at such other places, both within and without the State of Delaware, as the Board of Directors may from time to time determine.

## ARTICLE II
### MEETINGS OF STOCKHOLDERS

Section 2.1. Place of Meetings. Meetings of the stockholders for the election of directors or for any other purpose shall be held at such time and place, either within or without the State of Delaware, as shall be designated from time to time by the Board of Directors. The Board of Directors may, in its sole discretion, determine that a meeting of the stockholders shall not be held at any place, but may instead be held solely by means of remote communication in the manner authorized by the General Corporation Law of the State of Delaware (the "*DGCL*").

Section 2.2. Annual Meetings. The Annual Meeting of Stockholders for the election of directors shall be held on such date and at such time as shall be designated from time to time by the Board of Directors. Any other proper business may be transacted at the Annual Meeting of Stockholders.

Section 2.3.  Special Meetings.  Unless otherwise required by law or by the certificate  of incorporation of the Corporation, as amended and restated from time to time (the "*Certificate of Incorporation*"), Special Meetings of Stockholders, for any purpose or purposes, may be called by either (i) the Chairman, if there be one, (ii) the President, (iii) any Vice President, if there be one, (iv) the Secretary, or (v) any Assistant Secretary, if there be one, and shall be called by any such officer at the request in writing of (A) the Board of Directors, (B) a committee of the Board of Directors that has been duly designated by the Board of Directors and whose powers and authority include the power to call such meetings, or (C) stockholders owning a majority of the capital stock of the Corporation issued and outstanding and entitled to vote. Such request shall state the purpose or purposes of the proposed meeting. At a Special Meeting of Stockholders, only such business shall be conducted as shall be specified in the notice of meeting (or any supplement thereto).

1

Section 2.4. <u>Notice</u>. Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, and, in the case of a Special Meeting, the purpose or purposes for which the meeting is called. Unless otherwise required by law, written notice of any meeting shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to notice of and to vote at such meeting.

Section 2.5. <u>Adjournments</u>. Any meeting of the stockholders may be adjourned from time to time to reconvene at the same or some other place, and notice need not be given of any such adjourned meeting if the time and place, if any, thereof and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, notice of the adjourned meeting in accordance with the requirements of <u>Section 2.4</u> hereof shall be given to each stockholder of record entitled to notice of and to vote at the meeting.

Section 2.6. <u>Quorum</u>. Unless otherwise required by applicable law or the Certificate of Incorporation, the holders of a majority of the Corporation's capital stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business. A quorum, once established, shall not be broken by the withdrawal of enough votes to leave less than a quorum. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, in the manner provided in <u>Section 2.5</u> hereof, until a quorum shall be present or represented.

Section 2.7. <u>Voting</u>. Unless otherwise required by law, the Certificate of Incorporation or these Bylaws, any question brought before any meeting of the stockholders, other than the election of directors, shall be decided by the vote of the holders of a majority of the total number of votes of the Corporation's capital stock represented and entitled to vote thereat, voting as a single class. Unless otherwise provided in the Certificate of Incorporation, and subject to <u>Section 5.5</u> of **ARTICLE V** hereof, each stockholder represented at a meeting of the stockholders shall be entitled to cast one (1) vote for each share of the capital stock entitled to vote on each matter thereat held by such stockholder. Such votes may be cast in person or by proxy as provided in <u>Section 2.8</u> hereof. The Board of Directors, in its discretion, or the officer of the Corporation presiding at a meeting of the stockholders, in such officer's discretion, may require that any votes cast at such meeting shall be cast by written ballot.

Section 2.8. <u>Proxies</u>. Each stockholder entitled to vote at a meeting of the stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder as proxy, but no such proxy shall be voted upon after three years from its date, unless such proxy provides for a longer period. Without limiting the manner in which a stockholder may authorize another person or persons to act for

2

such stockholder as proxy, the following shall constitute a valid means by which a stockholder may grant such authority:

(i)       A stockholder may execute a writing authorizing another person or persons to act for such stockholder as proxy. Execution may be accomplished by the stockholder or such stockholder's authorized officer, director, employee or agent signing such writing or causing such person's signature to be affixed to such writing by any reasonable means, including, but not limited to, by facsimile signature.

(ii)       A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of a telegram, cablegram or other means of electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such telegram, cablegram or other means of electronic transmission must either set forth or be submitted with information from which it can be determined that the telegram, cablegram or other electronic transmission was authorized by the stockholder. If it is determined that such telegrams, cablegrams or other electronic transmissions are valid, the inspectors or, if there are  no inspectors, such other persons making that determination shall specify the information on which they relied.

Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission authorizing another person or persons to act as proxy for a stockholder may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used; provided, however, that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.9.   Consent of Stockholders in Lieu of Meeting.   Unless otherwise provided  in the Certificate of Incorporation, any action required or permitted to be taken at any Annual or Special Meeting of Stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which  all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of the stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. Every written consent shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered in the manner required by this Section 2.9 to the Corporation, written consents signed by a sufficient number of holders to take action are delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of the stockholders are recorded. A telegram, cablegram or other electronic transmission consenting to an action to be taken and

3

transmitted by a stockholder or proxyholder, or by a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of this Section 2.9, provided that any such telegram, cablegram or other electronic transmission sets forth or is delivered with information from which the Corporation can determine (i) that the telegram, cablegram or other electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder or proxyholder, and (ii) the date on which such stockholder or proxyholder or authorized person or persons transmitted such telegram, cablegram or electronic transmission. The date on which such telegram, cablegram or electronic transmission is transmitted shall be deemed to be the date on which such consent was signed. No consent given by telegram, cablegram or other electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and until such paper form shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of the stockholders are recorded. Delivery made to the Corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested. Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of holders to take the action were delivered to the Corporation as provided above in this Section 2.9.

Section 2.10. List of Stockholders Entitled to Vote. The officer of the Corporation who has charge of the stock ledger of the Corporation shall prepare and make, at least ten (10) days before every meeting of the stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation. In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.

Document Ref: C5J8A-PN5ZR-AOBEL-RU9BA

Section 2.11.  Record Date.

(i)      In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of the stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of the stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of the stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

(ii)      In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by applicable law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of the stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by applicable law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

Section 2.12. Stock Ledger. The stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the stock ledger, the list required by Section 2.10 of this **ARTICLE II** or the books of the Corporation, or to vote in person or by proxy at any meeting of the stockholders.

Section 2.13. Conduct of Meetings.  The Board of Directors of the Corporation may adopt by resolution such rules and regulations for the conduct of any meeting of the stockholders as it shall deem appropriate. Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the chairman of any meeting of the stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chairman of the meeting, may include, without limitation, the following:  (i) th

5

establishment of an agenda or order of business for the meeting; (ii) the determination of when the polls shall open and close for any given matter to be voted on at the meeting; (iii) rules and procedures for maintaining order at the meeting and the safety of those present;  (iv) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation,  their duly authorized and constituted proxies or such other persons as the chairman of  the meeting shall determine; (v) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (vi) limitations on the time allotted to questions or comments by participants.

## ARTICLE III
### DIRECTORS

Section 3.1. <u>Number and Election of Directors</u>.  The Board of Directors shall consist of not less than one (1) nor more than nine (9) members, the exact number of which shall initially be two (2). The number of authorized directors thereafter shall be fixed from time to time by the Board of Directors. Except as provided in <u>Sections 2.9</u> and <u>3.2</u>, directors shall be elected by a plurality of the votes cast at each Annual Meeting of Stockholders and each director so elected shall hold office until the next Annual Meeting of Stockholders and until such director's successor is duly elected and qualified, or until such director's earlier death, resignation or removal.  Directors need not be stockholders.

Section 3.2. <u>Vacancies</u>.  Unless otherwise required by law or the Certificate of Incorporation, vacancies arising through death, resignation, removal, an increase in the number of directors or otherwise may be filled only by a majority of the directors then in office, though less than a quorum, or by a sole remaining director, and the directors so chosen shall hold office until the next Annual Meeting of Stockholders and until their successors are duly elected and qualified, or until their earlier death, resignation or removal.

Section 3.3. <u>Duties and Powers</u>. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or these Bylaws required to be exercised or done by the  stockholders.

Section 3.4. <u>Meetings</u>. The Board of Directors may hold meetings, both regular and special, either within or without the State of Delaware. Regular meetings of the Board of Directors may be held without notice at such time and at such place as may from time to time be determined by the Board of Directors. Special meetings of the Board of Directors may be called by the Chairman, if there be one, the President, or by any director. Notice thereof stating the place, date and hour of the meeting shall be given to each director either by mail not less than forty-eight (48) hours before the date of the meeting, by telephone, telegram or electronic means on twenty-four (24) hours' notice, or on such shorter notice as the person or persons calling such meeting may deem necessary or appropriate in the circumstances.

Section 3.5. <u>Organization</u>.  At each meeting of the Board of Directors, the Chairman of the Board of Directors, or, in his or her absence, a director chosen by a majority of the directors present, shall act as chairman of the Board of Directors.  The Secretary of the Corporation shall

6

act as secretary at each meeting of the Board of Directors. In case the Secretary shall be absent from any meeting of the Board of Directors, an Assistant Secretary shall perform the duties of secretary at such meeting; and in the absence from any such meeting of the Secretary and all the Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.

Section 3.6. <u>Resignations and Removals of Directors</u>. Any director of the Corporation may resign at any time by giving notice in writing or by electronic transmission to the Chairman of the Board of Directors, if there be one, the President or the Secretary of the Corporation. Such resignation shall take effect at the time therein specified or, if no time is specified, immediately; and, unless otherwise specified in such notice, the acceptance of such resignation shall not be necessary to make it effective. Except as otherwise required by applicable law and subject to the rights, if any, of the holders of shares of preferred stock then outstanding, any director or the entire Board of Directors may be removed from office at any time by the affirmative vote of the holders of at least a majority in voting power of the issued and outstanding capital stock of the Corporation entitled to vote in the election of directors.

Section 3.7. <u>Quorum</u>. Except as otherwise required by law or the Certificate of Incorporation, at all meetings of the Board of Directors, a majority of the entire Board of Directors shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors. If a quorum shall not be present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting of the time and place of the adjourned meeting, until a quorum shall be present.

Section 3.8. <u>Actions of the Board of Directors by Written Consent</u>. Unless otherwise provided in the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all the members of the Board of Directors or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board of Directors or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 3.9. <u>Meetings by Means of Conference Telephone</u>. Unless otherwise provided in the Certificate of Incorporation or these Bylaws, members of the Board of Directors of the Corporation, or any committee thereof, may participate in a meeting of the Board of Directors or such committee by means of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this <u>Section 3.9</u> shall constitute presence in person at such meeting.

Section 3.10. <u>Committees</u>. The Board of Directors may designate one or more committees, and each committee will consist of one or more of the directors of the Corporation. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of any such committee.  In the absence or disqualification of a member of a committee, and in the absence  of

7

000504

a designation by the Board of Directors of an alternate member to replace the absent or disqualified member, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any absent or disqualified member. Any committee, to the extent permitted by law and provided in the resolution establishing such committee, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it. Each committee shall keep regular minutes and report to the Board of Directors when required.

Section 3.11. <u>Compensation</u>. The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary for service as director, payable in cash or securities. Subject to the same limitations set forth above, no such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Subject to the same limitations set forth above, members of special or standing committees may be allowed like compensation for service as committee members.

Section 3.12. <u>Interested Directors</u>. No contract or transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any other corporation, partnership, association or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the Board of Directors or committee thereof which authorizes the contract or transaction, or solely because any such director's or officer's vote is counted for such purpose if: (i) the material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Directors or the committee, and the Board of Directors or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or (ii) the material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders; or (iii) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified by the Board of Directors, a committee thereof or the stockholders. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or of a committee that authorizes the contract or transaction.

**ARTICLE IV**
<u>OFFICERS</u>

Section 4.1. <u>General</u>. The officers of the Corporation shall be chosen by the Board of Directors and shall be a President and a Secretary. The Board of Directors, in its discretion, also may choose a Chairman of the Board of Directors (who must be a director), a Treasurer, one or more Vice Presidents, Assistant Secretaries, and Assistant Treasurers and other officers. Any number of offices may be held by the same person, unless otherwise prohibited by law, the

8

Certificate of Incorporation or these Bylaws.   The officers of the Corporation need not be stockholders of the Corporation nor need such officers be directors of the Corporation.

Section 4.2. Election; Authority and Duties. The Board of Directors, at its first meeting held after each Annual Meeting of Stockholders (or action by written consent of stockholders in lieu of the Annual Meeting of Stockholders), shall elect the officers of the Corporation who shall hold their offices for such terms and shall exercise such powers and perform such duties in the management of the Corporation as may be provided in these Bylaws or, to the extent not so provided, by resolution of the Board of Directors and each officer of the Corporation shall hold office until such officer's successor is elected and qualified, or until such officer's earlier death, resignation or removal. Any officer elected by the Board of Directors may be removed at any time by the Board of Directors. Any vacancy occurring in any office of the Corporation shall be filled by the Board of Directors. The salaries of all officers of the Corporation shall be fixed by the Board of Directors.

Section 4.3. Voting Securities Owned by the Corporation. Powers of attorney, proxies, waivers of notice of meeting, consents and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the President or any Vice President or any other officer authorized to do so by the Board of Directors and any such officer may, in the name of and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation in which the Corporation may own securities and at any such meeting shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed if present. The Board of Directors may, by resolution, from time to time confer like powers upon any other person or persons.

Section 4.4. Chairman of the Board of Directors. The Chairman of the Board of Directors, if there be one, shall preside at all meetings of the stockholders and of the Board of Directors. During the absence or disability of the President, the Chairman of the Board of Directors shall exercise all the powers and discharge all the duties of the President.  The Chairman of the Board of Directors shall also perform such other duties and may exercise such other powers as may from time to time be assigned by these Bylaws or by the Board of Directors.

Section 4.5. President. The President shall, subject to the control of the Board of Directors and, if there be one, the Chairman of the Board of Directors, have general supervision of the business of the Corporation and shall see that all orders and resolutions of the Board of Directors are carried into effect. The President shall execute all bonds, mortgages, contracts and other instruments of the Corporation requiring a seal, under the seal of the Corporation, except where required or permitted by law to be otherwise signed and executed and except that the other officers of the Corporation may sign and execute documents when so authorized by these Bylaws, the Board of Directors or the President. In the absence or disability of the Chairman of the Board of Directors, or if there be none, the President shall preside at all meetings of the stockholders and, provided the President is also a director, the Board of Directors. If there be no Chairman of the Board of Directors, or if the Board of Directors shall otherwise designate, the President shall be the chief executive officer of the Corporation.   The President shall also

9

perform such other duties and may exercise such other powers as may from time to time be assigned to such officer by these Bylaws or by the Board of Directors.

Section 4.6. <u>Vice Presidents</u>. At the request of the President or in the President's absence or in the event of the President's inability or refusal to act (and if there be no Chairman of the Board of Directors), the Vice President Officer if so designated by the Board of Directors, or the Vice Presidents if there are more than one (in the order designated by the Board of Directors), shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President. Each Vice President shall perform such other duties and have such other powers as the Board of Directors from time to time may prescribe.  If there be no Chairman of the Board of Directors and no Vice President, the Board of Directors shall designate the officer of the Corporation who, in the absence of the President or in the event of the inability or refusal of the President to act, shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President.

Section 4.7. <u>Secretary</u>. The Secretary shall attend all meetings of the Board of Directors and all meetings of the stockholders and record all the proceedings thereat in a book or books to be kept for that purpose; the Secretary shall also perform like duties for committees of the Board of Directors when required. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors, the Chairman of the Board of Directors or the President, under whose supervision the Secretary shall be. If the Secretary shall be unable or shall refuse to cause to be given notice of a meeting of the stockholders or a special meeting of the Board of Directors, and if there be no Assistant Secretary, then either the Board of Directors or the President may choose another officer to cause such notice to be given. The Secretary shall have custody of the seal of the Corporation and the Secretary or any Assistant Secretary, if there be one, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by the signature of the Secretary or by the signature of any such Assistant Secretary. The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest to the affixing by such officer's signature. The Secretary shall see that all books, reports, statements, certificates and other documents and records required by law to be kept or filed are properly kept or filed, as the case may be.

Section 4.8. <u>Treasurer</u>. The Treasurer if so designated by the Board of Directors shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the President and the Board of Directors, at its regular meetings, or when the Board of Directors so requires, an account of all transactions as Treasurer and of the financial condition of the Corporation. If required by the Board of Directors, the Treasurer shall give the Corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of the office of the Treasurer and for the restoration to the Corporation, in case of the Treasurer's death,

10

resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in the Treasurer's possession or under the Treasurer's control belonging to the Corporation.

Section 4.9. <u>Assistant Secretaries</u>.  Assistant Corporate Secretaries, if there be any,  shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors, the President, any Vice President, if there be one, or the Secretary, and in the absence of the Secretary or in the event of the Secretary's inability or refusal to act, shall perform the duties of the Secretary, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Secretary.

Section 4.10. <u>Assistant Treasurers</u>. Assistant Treasurers, if there be any, shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors, the President, any Vice President, if there be one, or the Treasurer, and in the absence of the Treasurer or in the event of the Treasurer's inability or refusal to act, shall perform the duties of the Treasurer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Treasurer. If required by the Board of Directors, an Assistant Treasurer shall give the Corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of the office of Assistant Treasurer and for the restoration to the Corporation, in case of the Assistant Treasurer's death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in the Assistant Treasurer's possession or under the Assistant Treasurer's control belonging to the Corporation.

Section 4.11. <u>Other Officers</u>. Such other officers as the Board of Directors may choose shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors. The Board of Directors may delegate to any other officer of the Corporation the power to choose such other officers and to prescribe their respective duties and powers.

## ARTICLE V
### STOCK

Section 5.1. <u>Form of Certificates</u>. Every holder of stock in the Corporation shall be entitled to have a certificate signed by, or in the name of the Corporation (i) by the Chairman of the Board of Directors, or the President or a Vice President, and (ii) by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary of the Corporation, certifying the number of shares owned by such stockholder in the Corporation.

Section 5.2. <u>Lost Certificates</u>.   The Board of Directors may direct a new certificate to be issued in place of any certificate theretofore issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed. When authorizing such issue of a new certificate, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate, or such owner's legal representative, to advertise the same in such manner as the Board of Directors shall require and/or to give the Corporation a bond in such sum as it may direct as indemnity against any

11

claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate or the issuance of such new certificate.

Section 5.3. <u>Transfers</u>. Stock of the Corporation shall be transferable in the manner prescribed by applicable law and in these Bylaws. Transfers of stock shall be made on the books of the Corporation only by the person named in the certificate or by such person's attorney lawfully constituted in writing and upon the surrender of the certificate therefor, properly endorsed for transfer and payment of all necessary transfer taxes; provided, however, that such surrender and endorsement or payment of taxes shall not be required in any case in which the officers of the Corporation shall determine to waive such requirement. Every certificate exchanged, returned or surrendered to the Corporation shall be marked "Cancelled," with the date of cancellation, by the Secretary or Assistant Secretary of the Corporation or the transfer agent thereof. No transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing from and to whom transferred.

Section 5.4. <u>Dividend Record Date</u>. In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 5.5. <u>Record Owners</u>. The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise required by law. The Corporation may establish a recognition procedure by which the beneficial owner of shares that are registered in the name of a nominee is recognized by the Corporation as the stockholder. The extent of this recognition may be determined in the recognition procedure.

Section 5.6. <u>Transfer and Registry Agents</u>. The Corporation may from time to time maintain one or more transfer offices or agencies and registry offices or agencies at such place or places as may be determined from time to time by the Board of Directors.

## ARTICLE VI
<u>NOTICES</u>

Section 6.1. <u>Notices</u>. Whenever written notice is required by law, the Certificate of Incorporation or these Bylaws, to be given to any director, member of a committee or stockholder, such notice may be given by mail, addressed to such director, member of a committee or stockholder, at such person's address as it appears on the records of the

Document Ref: C5J8A-PN5ZR-AOBEL-RU9BA

Corporation, with postage thereon prepaid, and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail. Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under applicable law, the Certificate of Incorporation or these Bylaws shall be effective if given by a form of electronic transmission if consented to by the stockholder to whom the notice is given. Any such consent shall be revocable by the stockholder by written notice to the Corporation. Any such consent shall be deemed to be revoked if (i) the Corporation is unable to deliver by electronic transmission two (2) consecutive notices by the Corporation in accordance with such consent, and (ii) such inability becomes known to the Secretary or Assistant Secretary of the Corporation or to the transfer agent, or other person responsible for the giving of notice; provided, however, that the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action. Notice given by electronic transmission, as described above, shall be deemed given: (i) if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice; (ii) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; (iii) if by a posting on an electronic network, together with separate notice to the stockholder of such specific posting, upon the later of (A) such posting and (B) the giving of such separate notice; and (iv) if by any other form of electronic transmission, when directed to the stockholder. Notice to directors or committee members may be given personally or by telegram, telex, cable or by means of electronic transmission.

Section 6.2.   Waivers of Notice.   Whenever any notice is required by applicable law, the Certificate of Incorporation or these Bylaws, to be given to any director, member of a committee or stockholder, a waiver thereof in writing, signed by the person or persons entitled to notice, or a waiver by electronic transmission by the person or persons entitled to notice, whether before or after the time stated therein, shall be deemed equivalent thereto. Attendance of a person at a meeting, present in person or represented by proxy, shall constitute a waiver of notice of such meeting, except where the person attends the meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Annual or Special Meeting of Stockholders or any regular or special meeting of the directors or members of a committee of directors need be specified in any written waiver of notice unless so required by law, the Certificate of Incorporation or these Bylaws.

## ARTICLE VII
## GENERAL PROVISIONS

Section 7.1. Dividends.  Dividends upon the capital stock of the Corporation, subject to the requirements of the DGCL and the provisions of the Certificate of Incorporation, if any, may be declared by the Board of Directors at any regular or special meeting of the Board of Directors (or any action by written consent in lieu thereof in accordance with Section 3.8 hereof), and may be paid in cash, in property, or in shares of the Corporation's capital stock. Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the Board of Directors from time to time, in its absolute discretion, deems proper as a reserve or reserves to meet contingencies, or for purchasing any of the shares of capital stock, warrants, rights, options, bonds, debentures, notes, scrip or other securities or evidences of indebtedness of the Corporation, or for equalizing dividends, or for repairing or

13

maintaining any property of the Corporation, or for any proper purpose, and the Board of Directors may modify or abolish any such reserve.

Section 7.2. <u>Disbursements</u>. All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

Section 7.3. <u>Fiscal Year</u>. The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

Section 7.4.   <u>Corporate Seal</u>.   The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware." The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

## ARTICLE VIII
### INDEMNIFICATION

Section 8.1. <u>Right to Indemnification</u>. Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "***proceeding***"), by reason of the fact that he or she is or was a director or officer of the Corporation or, while a director or officer of the Corporation is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter a "***Covered Person***"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent, or in any other capacity while serving as a director, officer, employee or agent, shall be indemnified and held harmless by the Corporation to the fullest extent authorized or permitted by applicable law, as the same exists or may hereafter be amended, against all expense, liability and loss (including, without limitation, attorneys' fees, judgments, fines, excise taxes assessed on the Covered Person with respect to an employee benefit plan, and penalties and amounts paid in settlement) reasonably incurred or suffered by such Covered Person in connection with such proceeding; provided, however, that, except as provided in <u>Section 8.3</u> with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify a Covered Person in connection with a proceeding (or part thereof) initiated by such Covered Person only if such proceeding (or part thereof) was authorized by the Board of Directors.

Section 8.2. <u>Right to Advancement of Expenses</u>. In addition to the right to indemnification conferred in <u>Section 8.1</u>, a Covered Person shall also have the right to be paid by the Corporation the expenses (including, without limitation, attorneys' fees) incurred in defending, testifying, or otherwise participating in any such proceeding in advance of its final disposition (hereinafter an "***advancement of expenses***"); provided, however, that, if the DGCL requires, an advancement of expenses incurred by a Covered Person in his or her capacity as a director or officer of the Corporation (and not in any other capacity in which service was or is rendered by such Covered Person, including, without limitation, service to an employee benefit plan)  shall  be made only upon  delivery to  the  Corporation of  an  undertaking (hereinafter  an

14

"*undertaking*"), by or on behalf of such Covered Person, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "*final adjudication*") that such Covered Person is not entitled to be indemnified for such expenses under this **ARTICLE VIII** or otherwise.

Section 8.3. Right of Indemnitee to Bring Suit.  If a claim  under  Section 8.1  or Section 8.2 is not paid in full by the Corporation within sixty (60) days after a written claim therefor has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be twenty (20) days, the Covered Person may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Covered Person shall also be entitled to be paid the expense of prosecuting or defending such suit. In (a) any suit brought by the Covered Person to enforce a right to indemnification hereunder (but not in a suit brought by a Covered Person to enforce a right to an advancement of expenses) it shall be a defense that, and (b) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the Covered Person has not met any applicable standard for indemnification set forth in the DGCL. Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such suit that indemnification of the Covered Person is proper in the circumstances because the Covered Person has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including a determination by its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) that the Covered Person has not met such applicable standard of conduct, shall create a presumption that the Covered Person has not met the applicable standard of conduct or, in the case of such a suit brought by the Covered Person, shall be a defense to such suit. In any suit brought by the Covered Person to enforce a right to indemnification or to an advancement of expenses hereunder, or by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Covered Person is not entitled to be indemnified, or  to  such  advancement  of  expenses,  under this  **ARTICLE VIII** or otherwise shall be on the Corporation.

Section 8.4. Non-Exclusivity of Rights. The rights provided to Covered Persons pursuant to this **ARTICLE VIII** shall not be exclusive of any other right which any Covered Person may have or hereafter acquire under applicable law, the Certificate of Incorporation, these Bylaws, an agreement, a vote of stockholders or disinterested directors, or otherwise.

Section 8.5. Insurance. The Corporation may maintain insurance, at its expense, to protect itself and/or any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against  such expense, liability or loss under the DGCL.

Section 8.6.  Indemnification of Other Persons.  This **ARTICLE VIII** shall not limit  the right of the Corporation to the extent and in the manner authorized or permitted by law to

15

indemnify and to advance expenses to persons other than Covered Persons. Without limiting the foregoing, the Corporation may, to the extent authorized from time to time by the Board of Directors, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation and to any other person who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee  plan, to the fullest extent of the provisions of this **ARTICLE VIII** with respect to the indemnification and advancement of expenses of Covered Persons under this **ARTICLE VIII**.

Section 8.7. Amendments. Any repeal or amendment of this **ARTICLE VIII** by the Board of Directors or the stockholders of the Corporation or by changes in applicable law, or the adoption of any other provision of these Bylaws inconsistent with this **ARTICLE VIII**, will, to the extent permitted by applicable law, be prospective only (except to the extent such amendment or change in applicable law permits the Corporation to provide broader indemnification rights to Covered Persons on a retroactive basis than permitted prior thereto), and will not in any way diminish or adversely affect any right or protection existing hereunder in respect of any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

Section 8.8.  Certain Definitions.   For purposes of this **ARTICLE VIII**, (a) references to "other enterprise" shall include any employee benefit plan; (b) references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; (c) references to "serving at the request of the Corporation" shall include any service that imposes duties on, or involves services by, a person with respect to any employee benefit plan, its participants, or beneficiaries; and (d) a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to  the best interest of the Corporation" for purposes of Section 145 of the DGCL.

Section 8.9. Contract Rights. The rights provided to Covered Persons pursuant to this **ARTICLE VIII** shall be contract rights and such rights shall continue as to a Covered Person who has ceased to be a director, officer, agent or employee and shall inure to the benefit of the Covered Person's heirs, executors and administrators.

Section 8.10. Severability. If any provision or provisions of this **ARTICLE VIII** shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of this **ARTICLE VIII** shall not in any way be affected or impaired thereby; and (b) to the fullest extent possible, the provisions of this **ARTICLE VIII** (including, without limitation, each such portion of this **ARTICLE VIII** containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

## ARTICLE IX
AMENDMENTS

Section 9.1. Amendments. These Bylaws may be altered, amended or repealed, in whole or in part, or new Bylaws may be adopted by the stockholders or by the Board of

16

Directors; provided, however, that notice of such alteration, amendment, repeal or adoption of new Bylaws be contained in the notice of such meeting of the stockholders or Board of Directors, as the case may be. All such amendments must be approved by either the holders of a majority of the outstanding capital stock entitled to vote thereon or by a majority of the entire Board of Directors then in office.

Section 9.2. <u>Entire Board of Directors</u>. As used in this **ARTICLE IX** and in these Bylaws generally, the term "entire Board of Directors" means the total number of directors which the Corporation would have if there were no vacancies.

As adopted by Unanimous Written Consent as of the Date first written above:

By:‎*Cynthia Blanchard*

Cynthia Blanchard, President

17

000514

9026163v.2

18

Document Ref: C5J8A-PN5ZR-AOBEL-RU9BA

000515

# Signature Certificate

Reference number: C5J8A-PN5ZR-AOBEL-RU9BA

| Signer | Timestamp | Signature |
|---|---|---|
| **Cynthia Blanchard**<br>Email: cynthia@thepricetower.com | | |

| Sent: | 02 Mar 2023 22:35:11 UTC |
|---|---|
| Viewed: | 02 Mar 2023 22:42:33 UTC |
| Signed: | 02 Mar 2023 22:43:01 UTC |

Signature: *Cynthia Blanchard*

**Recipient Verification:**

✔Email verified          02 Mar 2023 22:42:33 UTC

IP address: 152.37.150.151
Location: Bartlesville, United States

Document completed by all parties on:
02 Mar 2023 22:43:01 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 40,000+ companies worldwide.



000516

## CONFIDENTIAL

### Consulting Agreement

This **CONSULTING AGREEMENT** is dated effective as of October 13, 2022, by and between **COPPER TREE, INC.**, a Delaware corporation (the "Company"), with principal offices in Bartlesville, OK and Taktik Enterprises, Inc. ("Consultant"), with offices located in Florida.

*Whereas*, the Company desires to retain the Consultant to perform certain advisory services for the Company and its affiliates, as further outlined on Exhibit A;

*Whereas*, the Company and its affiliates are engaged, among other things, in the development and marketing of services associated with the building known as the Price Tower located in Bartlesville, Oklahoma (collectively, the "Business").

*Now, Therefore,* in consideration of the mutual covenants and conditions herein contained, the receipt and sufficiency of which are acknowledged, the parties hereto agree as follows:

1.      Consultant's Services. The Company retains the Consultant, and the Consultant hereby agrees to use Consultant's best efforts to diligently perform for the Company, certain consulting and advisory services described in more detail on Exhibit A (collectively, the "Services"), upon the terms and conditions set forth in this Agreement. Such Services shall include the roles, tasks, responsibilities and duties outlined on Exhibit A. The Consultant acknowledges that the performance of the Services does not represent a conflict of interest with any other organization by which the Consultant is employed or for which the Consultant performs services.

2.      Compensation and Expenses. For the performance of the Services to be rendered to the Company during the term of this Agreement, the Company shall pay the Consultant the fees set forth on Exhibit A attached hereto. The Company shall also reimburse Consultant's reasonable out-of-pocket expenses on a monthly basis; provided, that, all expenses must be approved in writing by the Company in advance in order to obtain such reimbursement.

3.      Term. The first term of this Agreement and the Consultant's Services hereunder shall commence as of the date of this Agreement and run through December 31, 2022 and then proceed on a month to month basis thereafter until effectively terminated or until the last day of the month in which the Company's receipt of its commitment from Truity Bank or any other bank that commits to fund the project. From January 1, 2023, this agreement shall then continue on a month to month basis until either party provides written notice of termination 10 business days prior to such termination or until cancelled by subsequent execution of an  agreement of no less than one year between the Company and Taktik Enterprises, Inc and Pictoria Studios USA, Inc respectively and separately to take effect on the first day of the month immediately following the Company's receipt of its commitment from Truity Bank or any other bank that commits to fund the project.  These subsequent agreement shall be based upon the outline Memorandum of Understanding at time of this agreement.  Upon notice of termination, the Consultant shall use best efforts to assure a smooth transition of Services prior to the effective date of termination.

4.      Independent Contractor Status. The Consultant's relationship to the Company will be that of an independent contractor and not an employee. Neither this Agreement nor the Services to be rendered hereunder shall for any purpose whatsoever or in any way or manner create any employer-employee relationship between the parties. The Consultant shall have sole and exclusive responsibility for the payment of all federal, state and local income taxes, and for all employment, health and disability insurance, workers' compensation, disability benefits, or unemployment insurance, or for withholding or paying Social Security or employment-related taxes, and such payments shall be the sole responsibility of Consultant with respect to any compensation provided by the Company hereunder. Subject to Exhibit A

**CONFIDENTIAL**

and the Consultant's obligations to the Company to perform the Services in <u>Exhibit A</u>, the Consultant shall control the manner, means and methods by which Consultant conducts Consultant's activities under this Agreement.

     5.    <u>Obligation of Confidentiality</u>.  (A) The term "<u>Proprietary Information</u>" shall mean all knowledge and information which the Consultant has created (in whole or in part in collaboration with others, including employees and independent contractors of the Company, if any are engaged on behalf of the Company's work), acquired or may acquire as a result of, or related to, Consultant's relationship with the Company (including any information which may have been obtained prior to the date of this Agreement in connection with this Agreement) concerning the Company's business, research and development activities relating to the commercialization of products; business development, sales and marketing plans; business and operational strategy; product designs, technical data, prototypes and technical and scientific specifications; systems, processes, laboratory notebooks, formulae and scientific data relating to the identification and use of methodologies developed by the Company for the research, design, development and commercialization of technologies being developed by the Company; copyrightable works; operations, proprietary technologies (whether of the Company or its customers); systems, processes, manufacturing know-how and show-how; trade secrets and confidential business information relating to the Business; and projects, studies, tests, tests results, plans and proposals. Notwithstanding the foregoing sentence, this Proprietary Information does <u>*not*</u> include (i) information which is or becomes publicly available (except as may be disclosed in a threatened breach or actual violation of this Agreement); or (ii) information received from a third party outside the Company that was disclosed without a breach of any confidentiality obligation.

     (B)    <u>Nondisclosure Obligation; Nondisclosure</u>. The Consultant agrees that Consultant will not at any time, either during or five (5) years after the term or any termination of this Agreement, without the prior written consent of the Company, divulge or disclose to anyone outside the Company, or appropriate for Consultant's own use or the use of any third party, any such Proprietary Information, and will not during Consultant's engagement by the Company hereunder, or five (5) years thereafter, disclose or use or attempt to use any such Proprietary Information for Consultant's own benefit, or the benefit of any third party, or in any manner which may injure or cause injury to the Company; provided, that, Consultant will not divulge, disclose, appropriate for Consultant's own use or use of a third party or use or attempt to use any Proprietary Information that is a trade secret under applicable law for as long as such Proprietary Information remains a trade secret under such applicable law.

     6.    <u>Intellectual Property</u>.  (A) The Consultant agrees to assist the Company in any reasonable manner to obtain and enforce for the Company's benefit any patents, copyrights and other property rights in any and all countries, with respect to any Intellectual Property (defined below), and the Consultant agrees to execute, when requested, patent, copyright or similar applications and assignments to the Company and any other lawful documents deemed necessary by the Company to carry out the purposes of this Agreement with respect thereto.  In the event that the Company is unable for any reason to secure the Consultant's signature to any document required to apply for or execute any patent, copyright or other applications with respect to any Intellectual Property (including improvements, renewals, extensions, continuations, divisions or continuations in part thereof), after a written demand is made therefor upon the Consultant (which shall refer to the provisions of this paragraph), the Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Consultant's agents and attorneys-in-fact to act for and on Consultant's behalf and instead of Consultant, to execute and file any such application and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights, mask works or other rights thereon with the same legal force and effect as if executed by the Consultant.

Document Ref: GPBWX-BJVRT-RKB5G-RPLCR

(B)   "<u>Intellectual Property</u>" includes any and all new or useful art, discovery, improvement, technical development, or invention, whether or not patentable and all related know-how, designs, trademarks, formulae, processes, manufacturing techniques, trade secrets, ideas, artworks, software or other copyrightable or patentable work, that the Consultant, solely or jointly with others, makes, conceives or reduces to practice that result from the Consultant's services for the Company under this Agreement.  All right, title and interest of every kind and nature whatsoever in and to the Intellectual Property made, discussed, developed, secured, obtained or learned by the Consultant during the term of this Agreement, or the 30-day period immediately following termination of this Agreement, are hereby assigned to the Company, and shall be the sole and exclusive property of the Company for any purposes or uses whatsoever, and shall be disclosed promptly by the Consultant to the Company. All copyrightable material shall constitute works for hire.

7.     ARBITRATION. Any controversy or claim arising out of, or related to, the interpretation, validity, construction, performance, breach or termination of this Agreement, such dispute or controversy shall be settled
by arbitration in accordance with the proceedings under the American Arbitration Association ("AAA") rules and such arbitration will be the exclusive dispute resolution method. The decision and award determined by such arbitrator shall be final, conclusive and binding upon both parties.

(a) Arbitration Rules of Engagment. The arbitration shall be conducted by a single arbitrator acting under the then current "Commercial Rules of AAA. The arbitration shall be held in either Orange County or Miami-Dade County, Florida, or in Washington County, Oklahoma (to be based on the selection of the party initiating such arbitration) unless otherwise agreed by both parties. Each party to this Agreement will be responsible for the payment of one half (1/2) of the fees plus costs for the arbitration. In the event a dispute is submitted to arbitration, the parties will be responsible for their own legal fees unless otherwise agreed in writing by the parties. Judgement on this binding AAA arbitration shall be entered by any branch of the Miami-Dade Circuit Court with Jurisdiction on the amount at issue. The Parties further agree that any arbitrator must be one with at least 7 years of judicial experience and at least 6 years of private practice experience.

(b) Consent to Personal and Subject Matter Jurisdiction. The arbitrator(s) shall apply either Florida or Oklahoma law (based on the selection of the party initiating such arbitration). **The Parties each and respectively hereby consent to the personal and/or subject matter jurisdiction of the state or Federal courts located in either Orange County or Miami-Dade County, Florida** or in Washington County, Oklahoma **for any action or proceeding arising from or relating to this Agreement or relating to any arbitration in which the parties are participants**.

(c) Acknowledgment. BOTH PARTIES HAVE READ AND UNDERSTAND SECTION 18, Arbitration, WHICH BINDS EACH PARTY HERETO TO ARBITRATION. BOTH PARTIES UNDERSTAND AND ACKNOWLEDGE THAT BY SIGNING THIS AGREEMENT, THEY BOTH AGREE TO SUBMIT ANY CLAIMS ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT, OR THE INTERPRETATION, VALIDITY, CONSTRUCTION, PERFORMANCE, BREACH OR TERMINATION THEREOF, TO BINDING ARBITRATION, EXCEPT AS PROVIDED IN SECTION 18, AND THAT THIS ARBITRATION CLAUSE CONSTITUTES A WAIVER OF ALL RIGHTS OF BOTH PARTIES TO A JURY TRIAL AND RELATES TO THE RESOLUTION OF ALL DISPUTES RELATING TO ALL ASPECTS OF THE RELATIONSHIP BETWEEN THE PARTIES.

8.     <u>General</u>. This Agreement constitutes the entire Agreement between the parties relative to the subject matter hereof, and supersedes all proposals or agreements, written or oral, and all other communications between the parties relating to the subject matter of this Agreement. **IN WITNESS**

Document Ref: GPBWX-BJVRT-RKB5G-RPLCR

000519

**CONFIDENTIAL**

**WHEREOF,** the parties have executed this Consulting Agreement as of the day and year first above written.

**TAKTIK ENTERPRISES, INC.**                    **COPPER TREE, INC.**

*Dale Takio, CEO Taktik Enterprises, Inc.*                    *Cynthia Blanchard*

By:_____        By:_____
       Dale Takio, President                                    Cynthia Blanchard, CEO

000520

**CONFIDENTIAL**

**EXHIBIT A**
**Services and Compensation**

**Services:**

The Consultant is responsible for being available and providing the Services outlined below. The Consultant agrees to devote the time and attention to the Company required to perform the Services.

**Primary Services:**

- The Consultant will perform the following functions as a primary matter:

  1. Analysis and review of all due diligence information, documents and accounting provided by the current board of Price Tower;

  2. Revised pro forma financials commensurate with realities of due diligence findings;

  3. Detailed business plan for each revenue center/business unit to align with due diligence findings, review and revised pro forma needs;

  4. Operational improvement strategy and plan based on due diligence findings and realities

  5. December 1, 2022 deliverable of updated presentation and creation of 90-120 second sizzle reel video for presentation to the loan board of Truity or any other applicable bank;

  6. Detailed marketing outline for each respective revenue center/business unit;

  7. December 1st to December 31st – Additional refinements as needed based on directives or feedback post Truity presentation; and

  8. Any additional presentations needed for the current Power Tower board or for Truity or other banks, as needed.
  9. This period shall end on December 31, 2022.

- The Consultant will perform the following functions as a secondary matter:

  1. Finalization of reorganization, staff retention and/or replacement and organizational chart updating for new Price Tower team to be in place prior to official closing and take-over;
  2. Operational review and revamping as needed within each revenue center/business unit;
  3. Strategic planning and staging for all final approved tactical implementation of business plans for each revenue center/business unit to commence promptly upon expected official closing with the current Price Tower board and Truity (or any other financial institution involved) funding;
  4. If applicable, oversee any transitional operations for any respective revenue centers/business units to remain operational during any respective transition periods; and
  5. Begin executing upon development buildout of all revised or new marketing plans to be implemented upon official takeover.
  6. This period shall commence on January 1, 2023 and continue on a month to month basis as outlined in and subject to paragraph 3

- Such other services as the Company may request from time to time.

**CONFIDENTIAL**

**Fees:**

Cash Fees.  The Company shall pay to Consultant a cash fee of $35,000.00 (the "Initial Cash Fee"), payable in accordance with the Company's normal salary payment schedule over the course of six months starting with October 1, 2022 for services performed through December 31, 2022.  In addition, as a deferred portion of Initial Cash Fees, Employee shall be entitled to receive $40,000.00 in cash upon the availability of funds from the Company's receipt of its commitment from Truity Bank or any other bank that commits to fund the project.  In the event such bank commitment is not received, this deferred portion of the Initial Cash Fees payment shall not accrue nor become payable at any time.

Reimbursement.  Subject to Section 7, the Company shall reimburse Consultant for all reasonable, ordinary, and necessary business expenses incurred in the performance of Consultant's duties hereunder in accordance with and subject to the terms and conditions of the Company's then prevailing standard expense policy, a copy of which has been provided to Consultant.  As a condition precedent to obtaining such reimbursement, Consultant shall provide to the Company any and all statements, bills or receipts evidencing the expenses for which Consultant seeks reimbursement, and such other related information or materials as the Company may from time to time reasonably require.

Equity Fees.  Consultant will be entitled to a total amount in equity in the Company of 0.375% of the total outstanding equity, issuable as follows upon execution of this agreement:
1.  An amount equal to 0.25% of the total outstanding equity in the Company to be issued to Dale Douglas Takio and Katalin Nagy-Takio JTWROS and which shall be issued at such time at a price of $0.01 per share of Copper Tree non-dilutive share interests; and
2.  An amount equal to 0.125% of the total outstanding equity in the Company to be issued to Michael J. Moran and Erinne Moran JTWROS and which shall be issued at such time at a price of $0.01 per share of Copper Tree non-dilutive share interests.

Additional Cash Fees.  After completion of the primary services ending on December 31, 2022 and recommencing January 1, 2023 then on a month to month basis the Consultant shall continue to provide the services set forth above as secondary services, and shall be paid $12,500 per month, with the understanding that such amount may be reduced by $2500 per month for as long as the Company is making payments under its separate agreement with Mystic Law, P.C.  Also, until receipt of the bank commitment, the amount due above shall accrue and not become payable until such time as the Company receives such bank commitment. Employee shall also be entitled to receive $12,500 per month in deferred cash upon the availability of funds from the Company's receipt of its commitment from Truity Bank or any other bank that commits to fund the project.  In the event such bank commitment is not received, this deferred payment shall not accrue nor become payable at any time.

**Primary Company Contact:**

The primary contact from the Company shall be Anthem & Cynthia Blanchard.  E-mail communications and agreement shall be deemed sufficient for all invoicing purposes described herein.

Document Ref: GPBWX-BJVRT-RKB5G-RPLCR

000522

# Signature Certificate

Reference number: GPBWX-BJVRT-RKB5G-RPLCR

| Signer | Timestamp | Signature |
|---|---|---|

**Cynthia Blanchard**
Email: cynthia@herasoft.com

| | | |
|---|---|---|
| Sent: | 13 Oct 2022 21:16:40 UTC | |
| Viewed: | 13 Oct 2022 21:42:18 UTC | |
| Signed: | 13 Oct 2022 21:42:39 UTC | |

**Recipient Verification:**
✔Email verified    13 Oct 2022 21:42:18 UTC

IP address: 152.37.150.151
Location: Bartlesville, United States

*Cynthia Blanchard*

---

**Dale Takio**
Email: dtakio@taktikenterprises.com

| | | |
|---|---|---|
| Sent: | 13 Oct 2022 21:16:40 UTC | |
| Viewed: | 13 Oct 2022 22:05:58 UTC | |
| Signed: | 13 Oct 2022 22:08:14 UTC | |

**Recipient Verification:**
✔Email verified    13 Oct 2022 22:05:58 UTC

IP address: 72.239.155.173
Location: Clermont, United States

*Dale Takio, CEO Taktik Enterprises, Inc.*

Document completed by all parties on:
13 Oct 2022 22:08:14 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 30,000+ companies worldwide.



**OFFICER'S CERTIFICATE**
**COPPER TREE, INC.**

This certificate is given by the undersigned officer of Copper Tree, Inc. (the "Company").

The undersigned officer hereby certifies that following is the current capitalization structure of the Company:

| Name of Owner* | Percentage of Outstanding Ownership Interests |
|---|---|
| Anthem and Cynthia Blanchard (held personally or by designees) | 89.075% |
| Dale Douglas Takio and Katalin Nagy-Takio JTWROS | 3.175% (1% contigent reserve at 1 year mark when applicable) |
| Michael J. Morin and Erinne Moran JTWROS | 1.75%. (1% contigent reserve at 1 year mark when applicable) |
| Craig Brand and Adriana Soto JTRWOS | 2.5% |
| Helm Ventures (or its designees) | 2.0% |
| Paul Aubert | 0.5% |
| Renee Nichols | 0.5% |
| Josh Gunter | 0.5% |
| TOTAL | 100.0% |

*An additional 20% is hereby reserved for issuance for a potential convertible note holder.

IN WITNESS WHEREOF, the undersigned President has executed and delivered this certificate this __9__ day of March, 2023.

000524

By: *Cynthia Blanchard*
_____
Name:  Cynthia Blanchard
Title:  CEO

000525

Document Ref: FAWTJ-VWRJS-9WI7U-WSKLE

000526

# Signature Certificate

Reference number: FAWTJ-VWRJS-9WI7U-WSKLE

| Signer | Timestamp | Signature |
|---|---|---|

**Cynthia Blanchard**
Email: cynthia@thepricetower.com

| | |
|---|---|
| Sent: | 09 Mar 2023 21:58:16 UTC |
| Viewed: | 09 Mar 2023 21:58:49 UTC |
| Signed: | 09 Mar 2023 22:00:35 UTC |

*Cynthia Blanchard*

**Recipient Verification:**

✔ Email verified      09 Mar 2023 21:58:49 UTC

IP address: 152.37.150.151
Location: Bartlesville, United States

Document completed by all parties on:
09 Mar 2023 22:00:35 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 40,000+ companies worldwide.



**GREEN COPPER HOLDINGS, LLC**
**(A New Mexico limited liability company)**
**(the "*Company*")**

**UNANIMOUS WRITTEN CONSENT OF MEMBERS AND MANAGERS**
**IN LIEU OF ORGANIZATIONAL MEETING**

**March 3rd, 2023**

The undersigned, being all of the members and managers of Green Copper Holdings, LLC, a New Mexico limited liability company (the "*Company*"), hereby waives any and all requirements for calling, giving notice of and holding an organizational meeting of the Members and Managers of the Company and, in lieu of such organizational meeting, consents to the adoption of the following resolutions:

**WHEREAS**, the Company was formed in 2023 with Cynthia Blanchard as the sole manager and with Copper Tree, Inc., a Delaware corporation, as the sole owner, with a bank account with a nominal amount and the Internal Revenue Service Employer Identification Number. (the "*EIN*"); and

**WHEREAS**, Paul D. Aubert ("*Originator*") desires for the Company to become a wholly owned subsidiary of *Copper Tree, Inc.*, a Delaware corporation (the "*Member*"); that all of the acts of the incorporator of the Company be, and they hereby are, approved, ratified and confirmed.

**NOW, THEREFORE**, the Company, the Originator and the Member hereby agree to the following:

**I.    Certificate of Formation**

RESOLVED, that the Certificate of Organization of the Company as filed in the Office of the Secretary of State of the State of New Mexico on February 20, 2023, a copy of which is attached hereto as Exhibit A, is hereby accepted and approved, and the Secretary of the Company is directed to place the Certificate of Organization in the corporate record book of the Company.

**II.    Incorporator**

RESOLVED, that all of the acts of the incorporator of the Company be, and they hereby are, approved, ratified and confirmed.

**III.    Company Agreement**

RESOLVED, that the proposed Company Agreement (the "*Company Agreement*") of the Company for the regulation of the affairs of the Company, a copy of which is attached hereto as Exhibit B, be, and it hereby is, approved, and the Secretary is directed to execute and deliver the Company Agreement and to place it in the record book of the Company.

### IV.     Officers

RESOLVED, that the following persons hereby are nominated and elected to the offices of the Company set forth opposite their names, to serve in such capacities until their respective resignation or removal in the manner authorized by the Operating Agreement of the Company or until their respective successors have been duly elected and qualified:

| **Name** | **Office** |
| --- | --- |
| Cynthia Blanchard | President and Treasurer |
| Paul Aubert | Secretary |
| Josh Gunter | Assistant Secretary |

### Issuance of Initial Membership Units

RESOLVED, that the issuance to the following members of the membership interests of the Company (the "***Interests***"), set forth opposite his name set forth below, is hereby accepted, for the capital contributions as described in the Company Agreement:

| Name | Number of Membership Interests | Percentage of Membership Interests |
| --- | --- | --- |
| Copper Tree, Inc. | 100 | 100.00% |

RESOLVED, that such Interests are hereby duly authorized, issued and outstanding membership interests, fully paid and nonassessable.

### V.     Interest Certificates; Book And Records

RESOLVED, that the form of Interest certificate representing the Company's membership interests, attached to this Consent as Exhibit C, is approved and adopted as the form of certificate to evidence ownership of Interests of the Company, and the Secretary is directed to procure such certificates, records, books and other items as may be necessary for the conduct of the business and affairs of the Company.

### VI.     Company Seal

RESOLVED, that the President of the Corporation be, and he hereby is, authorized to adopt a corporate seal of the Company, an impression of which may appear in the margin of this Consent, and located in such city and state of the Company's business address.

### VII.     Authorization to Qualify in Other States

RESOLVED, that for the purpose of authorizing the Company to do business in any state, territory or dependency of the United States or of any foreign country in which it is necessary or expedient for the Company to transact business, the proper officers of the Company are hereby

Document Ref: XJWSO-6H2QD-OPYK9-GNNRJ

authorized and empowered to substitute all necessary agents or attorneys for service of process, to designate and change the location of all necessary statutory offices and, under the corporate seal if necessary, to make and file all necessary certificates, reports, powers of attorney and other instruments as may be required by the laws of such state, territory, dependency or country to authorize the Company to transact business therein, and whenever it is expedient for the Company to cease doing business therein and withdraw therefrom, to revoke any appointment of agent or attorney for service of process and to file such certificates, reports, revocation of appointment or surrender of the Company to do business in any such state, territory, dependency or country.

## VIII.    *Fiscal Year*

RESOLVED, that the fiscal year of the Company shall be the calendar year ending December 31.

## IX.    *Payment of Organizational Expenses*

RESOLVED, that the proper officers of the Company be, and each of them acting alone hereby is, authorized to pay all fees and expenses incident to, and necessary for, the organization of the Company.

## X.    *Banking Resolutions*

RESOLVED, that the proper officers of the Company be, and each of them acting alone hereby is, authorized to facilitate the opening of a depository for corporate funds at a banking institution, and to designate the persons authorized to deal in and with the account and matters relating to it.

RESOLVED FURTHER, that the Member of the Company hereby approve and adopt any and all additional resolutions required by any such financial institution to facilitate the establishment of such accounts.

## XI.    *Licenses and Permits*

RESOLVED, that any officer of the Corporation is hereby authorized and directed to take such action and to execute and deliver such documents as may be necessary to obtain such licenses and tax permits as may be required for the transaction of the business of the Corporation by any federal, state, county, or municipal governmental statute, ordinance or regulation, and to take such action necessary or appropriate to qualify the Corporation to transact its business in compliance with the laws and regulations of any appropriate federal, state, or municipal governmental authority.

## XII.    *Authority*

RESOLVED FURTHER, that the proper officers of the Company are, and each of them acting alone hereby is, authorized to (a) sign, execute, certify to, verify, acknowledge, deliver, accept, file and record any and all such instruments and documents, and (b) take, or cause to be taken, any and all such action in the name of and on behalf of the Company or otherwise (as in any such officer's judgment shall be necessary, desirable or appropriate) in order to effect the purposes of the foregoing resolutions.

3

000530

RESOLVED FURTHER, that all acts and things heretofore done for and on behalf of and in the name of the Company by its member and officers be, and the same hereby are, ratified and affirmed in each, all and every respect.

IN WITNESS WHEREOF, the undersigned has executed this Consent effective as of the day first written above.

**[Remainder of Page Intentionally Left Blank]**
**[Signature Page Follows]**

4

Document Ref: XJWSO-6H2QD-OPYK9-GNNRJ

000531

MEMBER:

**COPPER TREE, INC.,** a Delaware corporation

By: _____ *Cynthia Blauchard* _____

Name:        Cynthia Blanchard
Title:        President

MANAGER:

_____ *Cynthia Blauchard* _____

Name:        Cynthia Blanchard

5

Document Ref: XJWSO-6H2QD-OPYK9-GNNRJ

# EXHIBIT A

## NEW MEXICO CERTIFICATE OF FORMATION

**(see attached)**

Document Ref: XJWSO-6H2QD-OPYK9-GNNRJ

**EXHIBIT B**

**COMPANY AGREEMENT**

**(see attached)**

7

Document Ref: XJWSO-6H2QD-OPYK9-GNNRJ

**EXHIBIT C**

**FORM OF MEMBERSHIP INTEREST CERTIFICATE**

**(see attached)**

Document Ref: XJWSO-6H2QD-OPYK9-GNNRJ

000535

# Signature Certificate

Reference number: XJWSO-6H2QD-OPYK9-GNNRJ

| Signer | Timestamp | Signature |
|---|---|---|
| **Cynthia Blanchard**<br>Email: cynthia@thepricetower.com | | |

| Sent: | 22 May 2023 18:53:38 UTC |
| Viewed: | 22 May 2023 18:54:17 UTC |
| Signed: | 22 May 2023 18:54:52 UTC |

**Recipient Verification:**

✔ Email verified                   22 May 2023 18:54:17 UTC

IP address: 162.208.44.97
Location: Bartlesville, United States

Document completed by all parties on:
22 May 2023 18:54:52 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 40,000+ companies worldwide.



<u>**Consulting Agreement**</u>

This CONSULTING AGREEMENT is effective as of March 7, 2023, by and between COPPER TREE, INC., a Delaware corporation (the "Copper Tree") and its wholly owned subsidiary, GREEN COPPER HOLIDING, LLC, a New Mexico limited liability company (the "Subsidiary") and its affiliates, (collectively, the "Company"), with principal offices in Bartlesville, OK and Pictoria Studios, Inc. ("Pictoria"), with offices located in Florida located in Florida, collectively (collectively, the "Consultant").

*Whereas*, the Company desires to retain the Consultant to perform certain advisory and operational services for the Company and its affiliates and appoint the Consultant, with Michael Moran serving as Vice President Marketing and Guest Experiences of the Company, as further outlined on <u>Exhibits A</u>; and,

*Whereas*, the Company and its affiliates are engage in, among other things, in the development, operations, and marketing planning, implementation and oversight of services associated with the building and premises known as the Price Tower located in Bartlesville, Oklahoma in addition to all other lawful business conducted by the Company, its subsidiaries and affiliates hereinafter, (collectively, the "<u>Business</u>"); and,

*Whereas*, the Consultant has already provided services of significant value to the Company and the Business and is owed various compensation, fees, payments, equity and expense reimbursements for services rendered and that continued to be rending for the real benefit to the Business and for promissory notes due herein after, ("Compensation Owed"), as further outlined in <u>Exhibit B</u> and,

*Whereas*, previous Agreements are a material component of this Agreement as it is the intent of the Parties to modify this Consulting Agreement in accordance to the conditions and contingencies set forth herein; and,

*Whereas*, Pictoria and its principal, Michael Moran, performed services for Copper Tree Inc.pursuant to the Consulting Agreement between Consultant and the Company effective as of October 13, 2022  amended on January 5, 2023(as amended, the "Original Agreement.; and

*Whereas*, Copper Tree, Inc.,was formed for, among other things,  the acquisition and operation of the Price Tower Arts Center, Inc. and Inn at Price Tower, Inc. and all of its holdings and assets (collectively, the "Premises", located in Bartlesville, Oklahoma; and

*Whereas*, pursuant to the Original Agreement, the Consultant has earned and received three and seven-eighths percent (1.8750%) interest in the outstanding limited non-dilutive share interests (such limited non-dilutive provisions described in Exhibit A hereto) of Copper Tree Inc., and

*Whereas*, under the Agreement, the Consultant shall continue to be eligible for one-quarter of one percent (0.1250%) additional partial compensation in the form of common, limited non-diluttive stock in Copper (the "***Consultant Shares***") and allocated at an amount equal to one-eighth of one percent (0.125%) of the total outstanding equity in the Company to be issued to Dale Douglas Takio and Katalin Nagy-Takio JTWROS (the "***Takio Eligible Shares***") and which shall be issued at such time at a price of $0.01 per share of Copper Tree limited non-dilutive share interests, and

*Whereas*, an extra one percent (1.0000% ) of Copper Tree Inc's equity (same class and par value, supra), Issued to Michael J. Moran and Erinne Moran JTWROS upon first 12 month anniversary from the date the Premises were acquired which was on March 7, 2023 and which shall be issued at such time at a price of $0.01 per share of Copper Tree limited non-dilutive share interests, and

**WHEREFORE**, for good and valuable consideration, the receipt, sufficiency, and adequacy of which are hereby acknowledged by each party hereto, and in further consideration of the mutual promises and benefits flowing between the parties hereto, the parties hereby agree as follows:

1.        All WHEREAS Clauses, including the Exhibits mentioned therein, stated above, are herein incorporated herein as part of this Agreement.

2.        <u>Establishment and Purpose of Copper Tree Inc.</u> The express purpose of Copper Tree is to own, operate, manage and control the Price Tower, its premises, assets and acquire and develop additional properties and assets. Copper Tree

000537

Inc. will remain the ultimate parent company at all times for the ownership of the Premises acquired by Copper Tree from which Moran their assigns or transferees shall hold their equity interests; provided, that, in the event Copper Tree determines that another entity should ultimately hold the Premises, it will cause any new entity to provide Consultant with its then-current outstanding equity in Copper Tree in the same proportion in the new entity

       3.    <u>Consultant's Services</u>. The Company retains the Consultant, and the Consultant hereby agrees to use Consultant's best efforts to diligently perform for the Company, certain consulting and advisory services described in more detail on Exhibit A (collectively, the "Services"), upon the terms and conditions set forth in this Agreement. Such Services shall include the roles, tasks, responsibilities and duties outlined on Exhibit A. The Consultant acknowledges that the performance of the Services does not represent a conflict of interest with any other organization by which the Consultant is employed or for which the Consultant performs services.

       4.    <u>Compensation and Expenses</u>. For the performance of the Services to be rendered to the Company during the term of this Agreement, the Company shall pay the Consultant the fees set forth on Exhibit A attached hereto. The Company shall also reimburse Consultant's reasonable out-of-pocket expenses on a monthly basis; provided, that, all expenses must be approved in writing by the Company in advance in order to obtain such reimbursement.

       5.    <u>Term</u>. The term of this Agreement and the Consultant's Services hereunder shall commence as of March 7, 2023 and shall continue for a period of one (1) year and shall automatically renew annually unless properly terminated by either party as set forth herein.  Should the Company wish not to renew this agreement, they must notify the Consultant no later than December 31st each calendar year prior to each auto renew date which shall be March 7th each calendar year.  Upon any notice of termination, the Consultant shall use best efforts to assure a smooth transition of Services prior to the effective date of termination.  Should the Company wish to terminate this agreement at any time for any reason, they must first provide written notice and shall pay all monies due up to the date of termination within ten (10) days of said termination date.

       6.    <u>Independent Contractor Status</u>. The Consultant's relationship to the Company will be that of an independent contractor and not an employee. Neither this Agreement nor the Services to be rendered hereunder shall for any purpose whatsoever or in any way or manner create any employer-employee relationship between the parties. The Consultant shall have sole and exclusive responsibility for the payment of all federal, state and local income taxes, and for all employment, health and disability insurance, workers' compensation, disability benefits, or unemployment insurance, or for withholding or paying Social Security or employment-related taxes, and such payments shall be the sole responsibility of Consultant with respect to any compensation provided by the Company hereunder. Subject to Exhibit A and the Consultant's obligations to the Company to perform the Services in Exhibit A, the Consultant shall control the manner, means and methods by which Consultant conducts Consultant's activities under this Agreement.

       7.    <u>Nondisparagement</u>.  Each party hereby covenants and agrees at all times hereafter not to make or cause to be made any statements that disparage, are inimical to or damage the business reputation of the other party or any of its officers, directors, employees, affiliated companies, agents or representatives.

       8.    <u>Further Assurances</u>.  At any time and from time to time after the date of this Agreement, upon request of any party hereto and without the payment of any further consideration, another party hereto shall duly execute, acknowledge and deliver all such further assignments, conveyances and other instruments of transfer and other documents, and will take such other action, consistent with the terms of this Agreement, as reasonably may be requested for the purposes of effecting the transactions contemplated hereby.

       9.    <u>Entire Agreement</u>.  This Agreement contains the entire agreement of the parties hereto relating to the subject matter hereof and supersedes all prior agreements and understandings between the parties with respect to the subject matter hereof, and there are no written or oral terms or representations made by either party other than those made herein.  No amendment or modification of this Agreement shall be valid or binding unless made in writing and duly executed by each of the parties hereto.

       10.    <u>Further Assurances</u>. At any time and from time to time after the date of this Agreement, upon request of any party hereto and without the payment of any further consideration, another party hereto shall duly execute, acknowledge and deliver all such further assignments, conveyances and other instruments of transfer and other documents, and will take such other action, consistent with the terms of this Agreement, as reasonably may be requested for the purposes of effecting the transactions contemplated hereby.

Document Ref: EKMDA-VPFHQ-4TTXY-FAFHG

11.      Indemnification. The Parties each agree to indemnify and hold each other harmless from any damage, liability or cost (including reasonable attorney's fees and costs of defense) to the extent caused by the other's negligent acts, errors or omissions in the performance of services. Indemnity is conditioned upon the indemnified party (i) providing prompt notice to the indemnifying party of any potential claim, (ii) tendering control of the defense and/or settlement of such claim to the indemnifying party, and (iii) reasonably cooperating with the indemnifying party in the defense and/or settlement of such claim.

12.      Notices.  All notices which may or are required to be given pursuant to this Agreement shall be (i) either delivered in person or sent via certified mail, return receipt requested, or by email, and (ii) addressed to the party to whom sent or given at the address set forth on the signature page hereof or to such other address as any party hereto may have given to the other party hereto in such manner.  If delivered, such notice shall be deemed given when received; if mailed, such notice shall be deemed made or given five days after such notice has been mailed as provided above, and if emailed, shall be to the email addresses set forth on the signature page hereof.

13.      Modification. No modification, termination, or attempted waiver of this Agreement, or any provision thereof, shall be valid unless executed by both Parties to this Agreement.

14.      Assignment. Neither this Agreement nor any right hereunder, nor any interest herein, may be assigned or transferred by either Party, unless to a related entity, a subsidiary entity, or a purchasing or controlling entity, without the express written consent of the other Party.

15.      Severability of Provisions.  Every portion of this Agreement is intended to be severable.  Whenever possible, each such provision shall be interpreted in such manner as to be valid and enforceable under applicable law.  In the event any of the provisions of this Agreement should ever be deemed to exceed the time, scope, or geographic limitations permitted by applicable law, then such provisions shall be reformed to the maximum time, scope, and geographic limitations permitted by such law so as to be enforceable.  Further, if any provision of this Agreement shall be prohibited by or invalid under applicable law and not subject to such reformation, such provision shall be deemed severed here from and shall be unenforceable to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

16.      Default:  For any payments due that are late thirty (30) days more from the respective due date, shall be considered in default.  Upon any event of default, the Consultant shall notify the Company in writing and the Company shall have five (5) calendar days from the date of notice of default to cure the default.  If any event or default has still not been cured, the Consultant shall have the right to immediately demand of payment in full for all fees due for the entire remaining term of this agreement.  Upon such demand the Company shall have ten (10) calendar days to make payment in full for all demand monies due.

17.      Termination by Consultant. This agreement may be terminated by the Consultant at any time with Cause (as defined herein) or without Cause. In such termination event without Cause, Consultant shall only be due fees or other compensation due up to the effect date of termination without Cause and, the Consultant shall not be entitled to additional fees or compensation thereafter unless stated in writing and agreed to by both parties otherwise.   In the event of termination with Cause or resulting from default by the Company, the Consultant shall be entitled to all compensation due, as outlined in Exhibit A, up to, but not beyond the effective date of the next Term renewal date set forth.

18.      Termination by Company. This agreement may be terminated by the Company at any time with Cause (as defined herein) or without Cause. In the event of termination due without Cause or due to default by the Consultant, the Company shall provide notice as required herein and the Consultant shall be entitled to all compensation due, as outlined in Exhibit A, up to, but not beyond the effective date of the next Term renewal date set forth.   In such termination event with Cause, Consultant shall only be due fees or other compensation due up to the effective date of termination with Cause, and, the Consultant shall not be entitled to additional fees or compensation after the effective date of termination unless stated herein or otherwise agreed to in writing by both parties.

19.      Cause. Cause shall be defined as a bona fide event that has been fully adjudicated through Dispute Resolution guidelines set forth herein or otherwise negotiated and agreed to in writing otherwise by both parties.   All other events shall be considered without cause and shall be subject to no less than a forty-five days (45) days' written notice of cancellation or termination of this agreement, with all outstanding and earned fees due to be paid in full within fifteen (15) days from the effective date of termination.

20.

21.     Severability/Waiver. If the application of any provision or provisions of this Agreement to any particular facts or circumstances shall be held to be invalid or unenforceable by any court of competent jurisdiction, then the validity and enforceability of such provision or provisions as applied to any other particular facts or circumstances and the validity of other provisions of this Agreement shall not in any way be affected or impaired thereby. The waiver of any one default shall not waive subsequent defaults. Any and all ambiguity shall not be construed against the drafting party as each party agrees they have had amble ability to participate in this Agreements drafting. In the event of any legal changing due to ambiguity, confusion, scrivener's error, or statute, the "Blue Pencil" laws shall apply.

22.     Counterparts; Delivery of Signatures.  This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which taken together shall be deemed to constitute one and the same instrument.  This Agreement may be executed by any party by delivery of a facsimile or pdf signature, which signature shall have the same force as an original signature.  Any party which delivers a facsimile or pdf signature shall promptly thereafter deliver an originally executed signature to the other party; provided, however, that the failure to deliver an original signature page shall not affect the validity of any signature delivered by facsimile or pdf.

23.     Confidential Agreement.  Each party represents and warrants to and agrees with the other party that it will keep the terms of this Agreement completely confidential among themselves, their attorney, their tax advisor, and their agents and representatives, and that it will not disclose to any other person any of such terms or any other information relating to this Agreement. Each party shall assure that its attorney, tax advisor, and agents and representatives maintain the same confidentiality, except as required by law or government requirements.  Whenever used in this Agreement the term "person" shall mean and include any individual, partnership, association, corporation, trust, unincorporated organization, or any other business entity or enterprise.

24.     Confidentiality/Non-Disclosure. In the course and performance of this Agreement, the Parties may be exposed to, and will be required to, use certain "Confidential Information" (as hereinafter defined) belonging to each of the parties to this Agreement. The Parties mutually agree that neither will use such Confidential Information other than for purposes addressed in this agreement. In no event shall either party use the confidential information of the other party to circumvent or cause harm to the other party.


(a)     Definition. "Confidential Information" means any proprietary information, technical data, trade secrets or know-how, including, but not limited to, customers, customer lists, contact lists, software, developments, marketing, marketing strategies, advertising strategies, video production or any digital media, proprietary methods, business plans, data reports, methods of doing business, finances or other business information disclosed by one Party to the other, or developed by the Parties hereto, either directly or indirectly, in writing, orally or otherwise.

(b)     Confidential Information. The Parties each hereby agree not to disclose any Confidential Information and further agree to review and in good-faith execute a more formal description of the Confidential Information as it becomes known as a result of the performance hereunder or mark any information, data or document as Confidential as they come to light during the performance of this relationship. The confidential information shall be treated as confidential and proprietary for five years from the effective date of this Agreement. Notwithstanding the above, either Party may present this information to their respective attorneys, accountants, Team, associates, partners, officers and/or board members. In the event third parties are in need of information deemed or reasonably believed to be of Confidential value, before any third party may come into possession or "know", both Parties hereto must first agree to the dissemination and if agreed upon, the third party must first be bound to a Confidentiality and Non-Circumvent Agreement. In the event of litigation hereunder, all Confidential information must be filed Confidentially without public dissemination. In the event any party gets served, through the legal process, for information which is or should be reasonable construed as Confidential, the Party served shall first alert the other Party of the service, provide a copy of the service, and allow the other Party to contest the service and request through the legal process prior to any dissemination. The Parties may share Confidential Information and proprietary information with their retained experts and professionals.

(c)     Return of Materials. Upon the termination of this Agreement, each Party will deliver to the other all of the Confidential Information of the other Party that it may have in its possession or control, together with all copies and abstracts thereof.

Document Ref: EKMDA-VPFHQ-4TTXY-FAFHG

000540

21.     <u>ARBITRATION</u>. Any controversy or claim arising out of, or related to, the interpretation, validity, construction, performance, breach or termination of this Agreement, such dispute or controversy shall be settled by arbitration in accordance with the proceedings under the American Arbitration Association ("AAA") rules and such arbitration will be the exclusive dispute resolution method. The decision and award determined by such arbitrator shall be final, conclusive and binding upon both parties.

(a) <u>Arbitration Rules of Engagement</u>. The arbitration shall be conducted by a single arbitrator acting under the then current "Commercial Rules of AAA. The arbitration shall be held in either Lake County, Orange County or Miami-Dade County, Florida, or in Washington County, Oklahoma (to be based on the selection of the party initiating such arbitration) unless otherwise agreed by both parties. Each party to this Agreement will be responsible for the payment of one half (1/2) of the fees plus costs for the arbitration. In the event a dispute is submitted to arbitration, the parties will be responsible for their own legal fees unless otherwise agreed in writing by the parties. Judgement on this binding AAA arbitration shall be entered by any branch of the Miami-Dade Circuit Court with Jurisdiction on the amount at issue. The Parties further agree that any arbitrator must be one with at least 7 years of judicial experience and at least 6 years of private practice experience.

(b) <u>Consent to Personal and Subject Matter Jurisdiction</u>. The arbitrator(s) shall apply either Florida or Oklahoma law (based on the selection of the party initiating such arbitration). The Parties each and respectively hereby consent to the personal and/or subject matter jurisdiction of the state or Federal courts located in either Orange County or Miami-Dade County, Florida or in Washington County, Oklahoma for any action or proceeding arising from or relating to this Agreement or relating to any arbitration in which the parties are participants.

(c) <u>Acknowledgment</u>. BOTH PARTIES HAVE READ AND UNDERSTAND SECTION 21, Arbitration, WHICH BINDS EACH PARTY HERETO TO ARBITRATION. BOTH PARTIES UNDERSTAND AND ACKNOWLEDGE THAT BY SIGNING THIS AGREEMENT, THEY BOTH AGREE TO SUBMIT ANY CLAIMS ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT, OR THE INTERPRETATION, VALIDITY, CONSTRUCTION, PERFORMANCE, BREACH OR TERMINATION THEREOF, TO BINDING ARBITRATION, EXCEPT AS PROVIDED IN SECTION 18, AND THAT THIS ARBITRATION CLAUSE CONSTITUTES A WAIVER OF ALL RIGHTS OF BOTH PARTIES TO A JURY TRIAL AND RELATES TO THE RESOLUTION OF ALL DISPUTES RELATING TO ALL ASPECTS OF THE RELATIONSHIP BETWEEN THE PARTIES.

22.     <u>General</u>. This Agreement constitutes the entire Agreement between the parties relative to the subject matter hereof, and supersedes all proposals or agreements, written or oral, and all other communications between the parties relating to the subject matter of this Agreement.

**IN WITNESS WHEREOF,** the parties have executed this Consulting Agreement as of the day and year first above written.


**PICTORIA STUDIOS, INC.**

By:_____*Michael Moran*_____
Michael Moran, President


For all Notices if sent by email:

mike@pictoriastudios.com


**COPPER TREE, INC. & GREEN COPPER HOLDING, LLC**

By:_____*Cynthia Blanchard*_____
Cynthia Blanchard, CEO & Managing Member


For all Notices if sent by email:
cynthia@thepricetower.com

000541

Document Ref: EKMDA-VPFHQ-4TTXY-FAFHG

**EXHIBIT A**
**Services and Compensation**

**Services:**
The Consultant is responsible for being available and providing the Services outlined below. The Consultant agrees to devote the time and attention to the Company required to perform the Services.

**Primary Services:**
The Consultant, through its designee Michael Moran ("Moran"), shall serve as the Vice President Marketing and Guest Experiences for Copper Tree, Inc and its Subsidiaries and aside from equity grants issued to Moran, all other compensation and fees shall be paid directly to the Consultant and at no time shall Moran individually be considered an employee of the Company.  During the entire term of this agreement, the Consultant and Moran shall report directly to Dale Takio, Managing Director and Executive Vice President of Copper Tree, Inc. and a dotted line reporting Cynthia Blanchard, CEO.  These Primary Services shall include, but not limited to the following:

1.  Provide managing oversight, guidance and leadership over all employees, contractors, affiliates and vendors as they relate to Sales, Marketing and Guest Services;

2.  Oversee all aspects of all digital marketing, digital media and digital assets owner or controlled by Copper Tree;

3.   Oversee the development and creation of sales and marketing financials commensurate with realities of ongoing due diligence and operational findings;

4.  Oversee the development and creation of revised detailed marketing plans for each revenue center/business unit to align with due diligence operational findings, review and revise pro forma needs;

5.  Oversee all sales, marketing and customer experience improvement strategies, plans and implementation models based on due diligence and operational findings and realities;

6.  Oversee all a detailed marketing outlines for each respective revenue center/business unit and guide the oversight for all sales and marketing efforts;

7.  Provide review, strategies and tactical planning for all sales, marketing and guest experience related projects, engagements and acquisitions determined to be of interest or benefit to Copper Tree.

The Consultant will perform the following functions as a secondary matter:

1.  Finalization of staff retention and/or replacement and organizational chart that pertains to sales, marketing or customer service and updating for new Price Tower team to be in place throughout all phases from acquisition until this agreement has completed;

2.  Provide sales, marketing and guest experience related review and revamping as needed within each revenue center/business unit;

3.  Strategic planning and staging for all final approved tactical implementation of sales and marketing plans for each revenue center/business unit to commence promptly upon the acquisition of the Price Tower Premises and through to both bridge funding, and all subsequent funding stages and activities;

4.  If applicable, oversee any transitional sales or marketing efforts for any respective revenue centers/business units to remain operational during any respective transition or remodeling periods; and

5.  If applicable, oversee any transitional sales or marketing efforts for any respective revenue centers/business units to cease operations or be operational reduced during any respective transition or remodeling periods; and

6.  Begin planning, implementing and executing upon development buildout of all revised or new marketing plans to be implemented upon official takeover and acquisition of the Premises.

7.  Provide such other services as the Company may request from time to time.

**Cash Fees:** The Company shall pay to Consultant a cash fee of **$13,000.00 per month**.  All Cash Fees for each current month of service shall be due not later than last day of each month in which services are to be provided.

1.        This Cash Fee structure shall commence on May 1, 2023 for services rendered from May 1, 2023 onwards.

2.        Due Date: Payments for Cash Fees shall be due no later than the last day each month unless that day falls on a Saturday or Sunday or on Federal Holiday and in such instances, shall be due on the next business day.

3.        All other fees and compensation due for service provided through April 30, 2023 and outlined in Exhibit B shall be due in accordance with the schedules and details outlined in Exhibit B.

4.        Late Payments:  Company shall have a five-calendar penalty free grace period from the last day of each calendar month.   For payments made after five days from the last day of each calendar month, shall incur a $25.00 service fee for each day following the five (5) day grace period until and including the date in which payment has been made.  In the event of any Default as per section 16., all Late Payment fees shall continue to accrue until any defaulting event has been cured.

Reimbursement. Subject to Section 4, the Company shall reimburse Consultant for all reasonable, ordinary, and necessary business expenses incurred in the performance of Consultant's duties hereunder in accordance with and subject to the terms and conditions of the Company's then prevailing standard expense policy, a copy of which has been provided to Consultant. As a condition precedent to obtaining such reimbursement, Consultant shall provide to the Company any and all statements, bills or receipts evidencing the expenses for which Consultant seeks reimbursement, and such other related information or materials as the Company may from time to time reasonably require.

Equity Fees.  Consultant has earned or shall be entitled to the following Equity Fees:

1.        As described in the WHEREAS clauses above and pursuant to the Original Agreement, one and seven-eighths percent (1.8750%) interest in the outstanding non-dilutive share interests of Copper Tree Inc. as partial payment of its services provided and for other real value as per previous agreements between the Consultant and the Company, and with the entire 1.8750%of all shares issued and outstanding in Copper Tree, Inc. (the "***Moran Shares***") having already been granted and issued to Michael J. Moran and Erinne Moran JTWROS as of April 1, 2023 and the par value of these shares are $0.01/ for which there was no charge to Michael J. Moran and Erinne Moran JTWROS or assign(s), and;

2.        On March 7, 2024 upon the one year anniversary of this Agreement, the Consultant shall be granted and issued an additional Equity Fee currently being held in reserve for issuance by the Company and in the amount one percent (1.0000% ) of Copper Tree Inc's equity (same class and par value, supra), Issued to Michael J. Moran and Erinne Moran JTWROS and shall be issued at such time at a price of $0.01 per share of Copper Tree limited non-dilutive share interests.

3.        The shares in Copper Tree Inc., shall be the highest class and shall have no restrictions and with voting rights, and it is represented that only one type of share class has been issued by and for Copper Tree Inc. provided, however, that in the event the Company receives new funding from an investor that requires preferences over the outstanding equity of the Company, Consultant agrees and acknowledges that the equity granted hereunder may be subordinate to any such new money investor.  The Company has no intent to issue any equity other than common stock unless required by any such new money investor. The par value of these shares are $0.01/ for which there shall be no charge to Michael J. Moran and Erinne Moran JTWROS or assign(s). All shares received by Consultant received pursuant to the Original Agreement and this Agreement shall have a limited non-dilutive aspect in the following regard:  Consultant shall receive additional equity to maintain its current ownership interest for (1) any equity issued by Company for compensation to directors, officers, employees or consultants and not for receipt of new funding and (2) the issuance of equity to investors for up to an aggregate of $5 million in new funding at a valuation lower than $20 million. All Equity Fees in this section are further detailed in Exhibit B for inclusion in the Company Cap Table.

Payments Methods:  All Cash Fee and Additional Cash Fee payments may be made by ACH payment or by major credit card via a secure payment link to be provided by the Consultant with each invoice issued.  No service fees shall be incurred for ACH payments, however if the Company opts to pay any invoice by major credit card, a two and one-half (2.5%) percent fee shall be incurred and automatically added to the next invoice issued to the Company.

**Primary Company Contact:**
The primary contact from the Company shall be Cynthia Blanchard. E-mail communications to cynthia@thepricetower.com or other emails controlled or directed by Cynthia Blanchard shall be deemed sufficient for all invoicing purposes described herein.

Document Ref: EKMDA-VPFHQ-4TTXY-FAFHG

**EXHIBIT B**
**Schedule of Fees Due, Deferred Fees, Equity Issued and Equity Due from Reserves**

Schedule of Equity Issued and Equity Due From Reserves

| Michael J. Moran and Erinne Moran JTWROS | | | |
|---|---|---|---|
| Description | Earned Scheduled Rate | Total Issued | Issued Par Value per Share of |
| Phase 1 Equity Grant Clause | 0.125% | 0.125% | $ 0.0100 |
| Phase 2 Cash Fee Reductions for Services Rendered in January, February, March and April, 2023.  Issued on the First day of Each Month at a rate of 0.125% per month | 0.125% | 0.500% | $ 0.0100 |
| Stock Swap and Apportioned Promissory Note Forgiven in Exchange for Copper Tree Equity | 0.125% | 1.250% | $ 0.0100 |
| **Total Immediate Grants Earned/Swapped** | | **1.875%** | **$ 0.0100** |
| Description | Earned Scheduled Rate | Total To Be Issued | To Be Issued at a Par Value per Share of |
| RESERVED EQUITY - Mike's Equity Bonus at 1 year - Triggers on March 6, 2024 | **1.000%** | **1.000%** | **$ 0.0100** |

Schedule of Cash Fees Due to Taktik Enterprise, Inc for Benefit to Pictoria Studios, Inc..

Fees for Services Rendered: For all fees due for the benefit of Pictoria Studios, Inc for services rendered prior to May 1, 2023 under previous agreements are to be paid to Taktik Enterprises, Inc in accordance with previous terms and agreements and Taktik Enterprises, Inc. shall be responsible for fees then due to Pictoria Studios, Inc. during all periods prior to May 1, 2023.

Document Ref: EKMDA-VPFHQ-4TTXY-FAFHG

000545

# Signature Certificate

Reference number: EKMDA-VPFHQ-4TTXY-FAFHG

| Signer | Timestamp | Signature |
|--------|-----------|-----------|

**Cynthia Blanchard**
Email: cynthia@thepricetower.com

| | | |
|---|---|---|
| Sent: | 06 Apr 2023 23:28:44 UTC | |
| Viewed: | 07 Apr 2023 00:09:17 UTC | |
| Signed: | 07 Apr 2023 00:09:43 UTC | |

**Recipient Verification:**
✔ Email verified    07 Apr 2023 00:09:17 UTC

IP address: 160.3.252.5
Location: Bartlesville, United States

---

**Michael Moran**
Email: mike@pictoriastudios.com

| | | |
|---|---|---|
| Sent: | 06 Apr 2023 23:28:44 UTC | |
| Viewed: | 06 Apr 2023 23:54:16 UTC | |
| Signed: | 07 Apr 2023 13:58:16 UTC | |

**Recipient Verification:**
✔ Email verified    06 Apr 2023 23:54:16 UTC

IP address: 97.100.1.34
Location: Orlando, United States

---

Document completed by all parties on:
07 Apr 2023 13:58:16 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 40,000+ companies worldwide.



GURR JOHNS

est 1914

FAIR MARKET VALUE APPRAISAL - ISSUED APRIL 25, 2023

Appraisal Report no. 29498

Value Date: April 11, 2023

CHICAGO

PALM BEACH

LOS ANGELES

LONDON

NEW YORK

000547

# GURR JOHNS
est 1914

## APPRAISAL CERTIFICATION

On April 11, 2023, at the request of Nathan Aldinger for Charbe Management, Fiona Lamb, an appraiser of tangibles of the kind and character set down upon the annexed schedule who has been in the appraisal business for over 3 years, and Rachel Rosan, an appraiser of tangibles of the kind and character set down upon the annexed schedule who has been in the appraisal business for over 24 years, appraised from images and listings the Fair Market Value of the tangible personal property belonging to Charbe Management located at Price Tower, 510 Dewey Avenue, Bartlesville, Oklahoma.

A schedule of such property is hereto annexed.  The appraisers have relied upon the client for any vital information including, but not limited to, provenance, condition, ownership, title, etc.  The values given are for the same or comparable items.  Acceptance of this report by the client constitutes acceptance that the information included is correct and reliable and that no vital information has been withheld. The client agrees to indemnify and hold Gurr Johns, Inc. harmless from and against any and all claims, actions, damages, losses, liabilities and expenses relating to this appraisal. The appraisers have assumed that all works are authentic.  The Fair Market Value is as of April 11, 2023.

The Fair Market Value is defined as the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts (see Appraisal Terminology and Definitions at the end of this report for complete definition).  The statements of fact contained in this report are true and correct. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are the appraisers' personal, impartial, and unbiased professional analyses, opinions, and conclusions. The appraisers have performed no services, as appraisers or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding agreement to perform this assignment.  This appraisal represents their informed opinion but is not a warranty as to authenticity.  This appraisal is based on the comparative market data approach. Comparables are attached and are maintained in the office work files if needed. Engagement in this assignment was not contingent upon developing or reporting predetermined results. Compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.  The appraisers have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.  The appraisers have no bias with respect to the property that is the subject of this report or to the parties involved in this assignment.  No one provided significant personal property appraisal assistance to the appraisers signing this certification.

The analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP), 2020 - 2023.

Appraisal Report no. 29498
Value Date: April 11, 2023

Page 1 of 37

000548

# GURR JOHNS
est 1914

The Fair Market Value is THREE HUNDRED FIFTY THOUSAND and 00/100 DOLLARS ($350,000.00).

_Fiona Lamb_
Fiona Lamb, Appraiser

_Rachel A. Rosan_
Rachel Rosan, Appraiser

Appraisal Report no. 29498
Value Date: April 11, 2023

# GURRJOHNS
est.1914

## SCOPE OF WORK

**Problem to Solve:** The appraisers were asked to appraise from images and listings tangible personal property located at Price Tower, 510 Dewey Avenue, Bartlesville, Oklahoma and prepare a Fair Market Value appraisal for financial planning purposes. The assignment is to produce an Appraisal Report following the guidelines of the Uniform Standards of Professional Appraisal Practice (USPAP), 2020 - 2023. This appraisal will be sent to the client. This appraisal is not valid for any other purpose.

**Category of Items Examined:** Fine art.

**Client:** Nathan Aldinger for Charbe Management.

**Use of Appraisal:** Fair Market Value for financial planning purposes.

**User(s) of Appraisal:** This Appraisal Report can be used and relied upon by the client or their designated representatives. Any other user is considered an unintended user.

**Valuation Date of Appraisal:** The value expressed in this Appraisal Report is effective as of April 11, 2023.

**Ownership Interest/Art Loss Register:** The question of title was not an issue. As such, the appraisers did not perform any Art Loss Register inquiries.

**Authenticity:** Although the appraisers do not authenticate works of art, the appraisers had no reason to doubt the authenticity of the works.

**General Assignment Conditions:** This appraisal is based on information supplied for the appraisers by the client, and through research. The appraisers were given adequate time to research the items.

# GURR JOHNS
est.1914

**Specific Assignment Conditions (Assumptions):** The appraisers assume the mediums to be as reported. A scientific analysis of the chemical compounds of the materials was not conducted, as this was not an issue relating to valuation.

**Specific Assignment Conditions (Extraordinary Assumptions):** The appraisers assume information provided by the client to be correct. The appraisers assume some, if not all, authorship to be authentic. The appraisers assume these works were previously traded in an appropriate market without any unusual market stimuli affecting their sale or transaction. The appraisers assume that the owner retains full title to the works.

**Specific Assignment Conditions (Limiting Conditions):** The appraisers are not conservators and as such did not prepare condition reports. The appraisers applied a general condition comment to some objects. "Condition" refers to what is considered generally acceptable, with ordinary wear and tear for its type, unless otherwise noted. Items may have limited condition comments. COVID-19 was declared a pandemic by the World Health Organization as of March 11, 2020, and a national state of emergency is in place. Substantial turmoil has occurred in financial markets and due to the ongoing situation, it is not possible at this time to quantify its long-term or short-term effects on the subject property. The value opinion contained in this appraisal is based on findings of an analysis of market data available to the appraisers at the time of the assignment.

**Examination and Method of Examination:** As noted above, this appraisal is based on information supplied for the appraisers by the client, and through research.

**Method of Research:** Research was conducted at the offices of Gurr Johns, Inc., with access to the Gurr Johns reference library and to online databases, including, but not limited to, Artnet, Askart, and 1stdibs. Additional research was conducted on the Internet using standard search engines such as Google. Appropriate galleries and auction houses were contacted for information when necessary.

**Comparables:** Comparables are attached and are maintained in the office work files if needed.

**Confidentiality:** Specific comparable retail sales history is confidential according to the Gramm, Leach, Bliley Act* and cannot be disclosed without the client's permission. The appraisers will not disclose confidential information or assignment results to anyone other than: the client; persons specifically authorized by the client; state appraiser regulatory agencies; third parties as may be authorized by due process of law; or a duly authorized professional peer review committee except when such disclosure to a committee would violate

000551

# GURR JOHNS
est 1914

applicable law or regulation. Appraisal assignment information will be kept by Gurr Johns, Inc. for a minimum of five (5) years after the date of issue or two (2) years after final disposition of any judicial proceedings involving the appraisers, whichever period expires last.

*The Gramm, Leach, Bliley Act, passed in 1999 and fully effective in July, 2001, addressed overall financial industry reforms as well as emerging consumer privacy and security issues. Officially called the "Financial Modernization Act of 1999," it affects the technology and information system policies used by anyone engaged in providing financial services either directly or indirectly to consumers. Appraisers are specifically named as institutions required to follow the stipulations of the law.

**Approach to Value:** The appraisers named in the certification of this document employed the "market comparison" approach to arrive at the appraised Fair Market Value. The "income" approach, which is typically used for intangible property, was not applicable to this appraisal assignment because the subject property is all tangible personal property. The "cost" approach is used to estimate the cost of replacing the subject property or replicating the subject property if a replacement is not found. Since this was not part of the intended use for this appraisal assignment, the cost approach is not applicable to produce credible assignment results.

**Market Examined:** The "market comparison" approach analyzes recent sales of comparable articles at appropriate major international and regional fine art auctions, private and public sales, shows and exhibitions, as well as prevailing prices at retail shops and galleries where the article may normally be traded. Adjustments are then made for each article, which consider age, condition, rarity, artistic merit, technical workmanship, current trends and availability of an article as compared to such recent sales.

Gurr Johns Inc.
155 East 56th Street, 6th Floor
New York, NY 10022

Tax ID: 13-3407505

Appraisal Report no. 29498
Value Date: April 11, 2023

Fair Market Value

Fair Market Value:     $350,000

1.   **ROBERT INDIANA (American, b. 1928 - d. 2018)**

Sixty-Six, 2003
Unique
Polychrome aluminum on base
96" high x 200" wide x 48" deep

CONDITION
Assumed to be in good condition overall.

PROVENANCE
Commissioned in 2003

The appraiser assumes this work will be included in the artist's
forthcoming catalogue raisonne.

To submit:

RI Catalogue Raisonne LLC
(646) 489 1388
info@robertindiana.com

Client Reference: 2004.17



**BARTLESVILLE, OKLAHOMA**

Appraisal Report no. 29498
Value Date: April 11, 2023

Page 6 of 37

000553

Appraisal Report no. 29498
Value Date: April 11, 2023

Additional Image

1.

Additional Image

1.





BARTLESVILLE, OKLAHOMA

1. **Comparable:**

ROBERT INDIANA (American, b. 1928 - d. 2018)
Seven, 1980 - 2001
Edition 5/6
Signed, dated and numbered
Painted aluminum
78 1/3" high x 74" wide x 38" deep
Artcurial, Monaco Sculptures, July 20, 2022, Lot 808
Estimate: 250,000 - 350,000 EUR ($255,362 - $357,507)
Bought in

This comparable is smaller than the subject work, from an edition of 6, and features a single-digit composition. The work failed to sell at auction in July 2022 with a presale auction estimate of approximately $250,000 - $350,000. Lack of interest at this price level indicates a more appropriate estimate of $150,000 - $200,000 and the appraiser believes this work would have likely sold at that level ($175,000). As such, and taking into consideration all of the above, the appraiser believes the subject work to have a higher value.



BARTLESVILLE, OKLAHOMA

Appraisal Report no. 29498
Value Date: April 11, 2023

1.   **Comparable:**

ROBERT INDIANA (American, b. 1928 - d. 2018)
Six, 1980, cast 2001
Edition 6/6, plus 2 APs
Polychrome aluminium on steel plinth
78" high x 74" wide x 38" deep
Kunsthaus Lempertz, Auction 1155 - Modern and
Contemporary Art - Evening Sale, June 19, 2020, Lot 50
Estimate: 200,000 - 230,000 EUR ($223,738 - $257,299)
Sold for: 237,500 EUR ($265,689) (including buyer's premium)

The subject work is unique, larger in scale, features a two-digit
composition, and is associated with the lore of Route 66,
deeming it more desirable in the secondary market in
comparison to this work. Therefore, the subject work is valued
higher.



**BARTLESVILLE, OKLAHOMA**

000556

1.    **Comparable:**

ROBERT INDIANA (American, b. 1928 - d. 2018)
Eight, 1980, cast 2003
Edition 5/6, plus 2 APs
Stamped, dated and numbered
Polychrome aluminium on aluminium base
78" high x 74" wide x 38" deep
Sotheby's Hong Kong, Contemporary Art Evening Sale, October
6, 2019, Lot 1141
Estimate: 3,000,000 - 5,000,000 HKD ($382,667 - $637,779)
Bought in

This comparable is smaller than the subject work, from an
edition of 6, and features a single-digit composition. The work
failed to sell at auction in October 2019 with a pre-sale auction
estimate of $382,667 - $637,779. Lack of interest at this price
level indicates a more appropriate estimate of $150,000 -
$200,000 and the appraiser believes this work would have likely
sold at that level ($175,000). As such, and taking into
consideration all of the above, the appraiser believes the subject
work to have a higher value.



**BARTLESVILLE, OKLAHOMA**

Appraisal Report no. 29498
Value Date: April 11, 2023

Fair Market Value:        $350,000

Grand Total

Grand Total is the aggregate sum of all values applied to items listed in this appraisal.

Appraisal Report no. 29498
Value Date: April 11, 2023

# GURR[J]OHNS
est.1914

## Market Overview

Although the end of 2021 marked a step back in the fight against Covid-19 due to the Omicron variant, early 2022 sales as well as the recently released 2021 market numbers show that the global art market has adapted to the new reality shaped by the pandemic, and continues to be robust. Another set of challenges to the possible rebound of the art market in 2021-22 was the impact of the Fifth Anti-Money Laundering Directive on auction houses and dealers in Europe, along with the change in administration in the United States. Overall, Covid presented opportunities for restructuring, re-organization and innovation for galleries and auction houses alike, which, alongside the emergence of NFTs in the market in 2021, has brought about a true "cultural digital renaissance."[1] The investment in technology by collectors, dealers, auction houses and cultural institutions will forever change the landscape of how the public interacts with, and transacts with, art. Overall, there was significantly more online buying in 2021 than ever before, from new buyers as well as existing buyers who were buying online for the first time. Both political and pandemic-related challenges did not seem to shake the ever-growing art market.

While the 2020 value in the art market fell 22% to $50.1 billion overall from the same period of time in 2019, 2021 saw enormous growth. Not just from the Covid-19 pandemic pull-back, but from the 2018 peak. Sotheby's achieved a total of $7.3 billion in sales in 2021, its highest total ever, up from $5 billion in 2020. This figure is up 26% from the comparable time frame in 2019 and up 71% from the comparable time frame in 2020. This figure is partially boosted by two major private collections, MGM and Macklowe. Christie's annual sales for 2021 totaled $7.1 billion for 2021, its third highest ever and a record for private sales which accounted for $1.7 billion and $150 million from the sales of NFTs. Christie's 2020 total was $4.4 billion. Phillip's also recorded its highest ever yearly totals in 2021 with $1.2 billion, the highest in company history. "Auction sales of fine art have totaled $6.5 billion in 2021[2], surpassing the previous peak in 2018. The figure was up 21.7% from 2019 and 74% from 2020, when art markets were interrupted by the Covid-19 pandemic." [3] US collectors saw the most growth in percentage terms year-over-year in 2021, closely followed by Europe in second place and Asia in third.

A driving force behind the current buoyancy of the high-end auction market is an influx of new buyers, particularly millennials. This relatively new collector group had the highest level of spending across all categories in the year 2021. 35% of Christie's buyers were new to the business this year, and 32% of those new buyers were millennials.[4] The rapid innovation forced upon the world by Covid-19 created booming tech and crypto markets which were extremely profitable for many young collectors, many of whom are from Asia. "Their motivations, tastes and behaviors are now driving the market for young artists, and can be linked to social media activity, FOMO hype, investment and speculation - but also an inherent interest in being involved

1 McAndrew, Clare. "Resilience in the Dealer Sector: A Mid-Year Review 2021", Art Basel & UBS, Sept. 2021, p. 115.
2 Block, Fang. "Global Art Auction Sales Hit a Record $6.5 Billion in 2021", Barron's, 15 Dec. 2021, https://www.barrons.com/articles/global-art-auction-sales-hit-a-record-6-5-billion-in-2021-01639600005
3 Dewar, Lindsay. "The Art Market 2021: A Year in Review", ArtTactic, Dec. 2021, p. 1.
4 Brady, Anna. "Christie's 2021 Sales Total 7.5bn", The Art Newspaper, 20 Dec. 2021, https://www.theartnewspaper.com/2021/12/20/christies-expects-2021-sales-to-total-dollar71bn

000559

# GURR JOHNS

est.1914

with a generation of artists that are representative and relevant to the time and society of today."[5]

2021 saw the intersection of art and technology in a completely new sector - the NFT. In March of 2021, Christie's made history by selling the work of Beeple, a non-fungible token for $69 million. The emergence of the NFT market, not only for "fine art" but also for collectibles, brings about a plethora of opportunities and a platform for non-hierarchical or established artists to create unique works of art. Even with the unknown challenges this new market brings – blockchain and legal issues surrounding issues of authenticity, ownership, copyright, and artist resale rights – this new market sector is booming. In addition to bringing a new set of collectors to the art market, the emergence of NFTs has created a renewed interest in digital, film and video works by established collectors.[6] A larger and more diverse market has been created which will hopefully engage with and sustain a multi-ethnic and diverse group of artists across all platforms and media.

In addition to the emergence of new categories of collecting, there has also been a sharp increase in the work of women and artists of color. Young emerging female artists such as Shara Hughes, Emily Mae Smith, Jade Fadojutimi and Flora Yukhnovich were some of the most in-demand lots at auction in 2021 and early 2022. Hammer prices flew past presale estimates in fevered bidding from collectors worldwide. Mid-career women artists such as Mickalene Thomas and Amy Sherald continued their market success in 2021 and long-established women artists such as Lee Krasner, Joan Mitchell, Yayoi Kusama and Alice Neel saw sharp increases in prices achieved both at auction and in the private sector. While still a relatively small percentage of the overall art market as compared to male counterparts, this sector of the market continues to grow exponentially.

19 living artists set new auction records over $1 million in 2021, the majority of which were BIPOC and people of color. BIPOC and people of color saw record-breaking prices in a market where they were previously underrepresented. This trend coincides with a rise in "flipping" (when a collector purchases a work and, soon thereafter, sells the work for an exponentially higher value). Works by Salman Toor, Kerry James Marshall, Titus Kaphar, Amoako Boafo and Rashid Johnson (among others) exemplify this market shift.

According to the 2021 ArtTactic report, the strongest sales growth was for Young Contemporary artists (artists under 45), which generated a record $395 million in sales, up from $131 million in 2020 and $195 million in 2019. "Established contemporary artists (born between 1930 and 1976) have also seen strong growth in both average prices and sales, reaching a new market peak in 2021. Total sales ended up at $1.85 billion, up 76.4% from 2020." Post-War art saw a modest increase in auction sales in 2021. The market for Modern masters such as Picasso, Rothko and Giacometti were particularly bolstered this year by two important private collections sold at auction; the MGM collection and the Macklowe collection. $1.2 billion in sales were achieved in 2021, a large number especially after seeing declining sales in this category since 2018. The top three artists in the Impressionist category continue to be Monet, Van Gogh and Cezanne and sales in this category were up 13.2% in 2021 with a total of $963 million (up from $278 million in

---

[5] Dewar, Lindsay. "The Art Market 2021: A Year in Review". ArtTactic, Dec. 2021, p. 3.

[6] McAndrew, Clare. "Resilience in the Dealer Sector: A Mid-Year Review 2021". Art Basel & UBS, Sept. 2021, p. 113.

000560

GURR JOHNS
est.1914

2020). The old master auction market has remained relatively steady since 2018, with $279 million in sales in 2021. This number is up 32.1% from 2020 and 16.4% from 2019.[7]

_____

[7] Dewar, Lindsay. "The Art Market 2021: A Year in Review". ArtTactic, Dec. 2021, p. 5.

Appraisal Report no. 29498
Value Date: April 11, 2023

000561

*Decorative Arts*

The ongoing decline in the traditional antique furniture market has continued unabated over the past two decades with some market leaders noting prices for this material have dropped by as much as 80% from their heyday in decades past.[1]

As tastes evolve, younger generations of collectors continue to migrate away from objects that previous generations collected.[2] The value of high-end antique furniture has plummeted in the past decade, while the market for 20th century design has grown.[3] Despite these larger shifts in collecting trends, there is still a desire for museum-quality pieces at the top end of the market.[4]

The major auction houses have contracted their decorative arts departments and now conduct highly curated multi-departmental sales with offerings dovetailed and marketed around a single-owner collection of a known tastemaker, as seen with the Collection of the late Karl Lagerfeld offered at Sotheby's in successive sales at the end of 2021 and continuing into the spring of 2022.[5]

In the July 2020 Design sale at Sotheby's, a ceramic vase produced in 1900 by the Grueby Faience Company set an auction record for a work produced by the firm, selling for $431,250, approximately fifty times its high presale estimate.[6] The sale also totalled $12.2 million for works by design duo François-Xavier and Claude Lalanne.[7]

Further growth in this market was evidenced by the Sotheby's Paris sale of works by and from the personal collection of French surrealist designers/ sculptors Claude and François-Xavier Lalanne in late October of 2019. The market absorbed some 274 lots achieving a 100% sell through rate and a

---

[1] Tim McKeough, "How Low Will Market For Antiques Actually Go," New York Times, March 3, 2018, Accessed June 16, 2020, https://www.nytimes.com/2018/03/03/style/how-low-will-market-for-antiques-actually-go.html.
[2] Elizabeth Holmes, "Disrupting the Dishes," New York Times, May 5, 2018, Accessed February 8, 2019, https://www.nytimes.com/2018/05/05/style/disrupting-the-dishes.html.
[3] Thomas Seal, "The recline and fall of antique furniture," Financial Times, March 11, 2016, Accessed February 8, 2019, https://www.ft.com/content/15c569ca-d1a8-11e5-831d-09f7778e7377.
[4] Tim McKeough, "How Low Will Market For Antiques Actually Go," New York Times, March 3, 2018, Accessed February 8, 2019, https://www.nytimes.com/2018/03/03/style/how-low-will-market-for-antiques-actually-go.html?smid=fb-share&llpi=nrn%3AI%3Apage%3Ad_flagship3_feed%3Bhbyl.cls.
[5] Angelica Villa, "Karl Lagerfeld's Personal Effects Rouse Bidders at Paris Sotheby's Sale," Artnet News, December, 17, 2021, Accessed March 30, 2022, https://www.artnews.com/artnews/market/karl-lagerfeld-auction-paris-sothebys1234613926/ .
[6] Taylor Dafoe, "This Ordinary-Looking Vase Just Sold for Nearly 50 Times Its High Estimate After a 45-Minute Bidding War at Sotheby's," Artnet, July 31, 2020, Accessed August 5, 2020, https://news.artnet.com/market/sothebys-vase-1898939?utm_content=from_artnetnews&utm_source=Sailthru&utm_medium=email&utm_campaig%E2%80%A6
[7] Taylor Dafoe, "This Ordinary-Looking Vase Just Sold for Nearly 50 Times Its High Estimate After a 45-Minute Bidding War at Sotheby's," Artnet, July 31, 2020, Accessed August 5, 2020, https://news.artnet.com/market/sothebys-vase-1898939?utm_content=from_artnetnews&utm_source=Sailthru&utm_medium=email&utm_campaig%E2%80%A6

GURR JOHNS
est.1914

Appraisal Report no. 29498
Value Date: April 11, 2023

# GURR JOHNS
est.1914

final result of $101,470,223 (four times the pre-sale high estimate) setting world records for some models.[8] A key factor in the growth of the design market apart from the traditional furniture market is that blue chip design masterworks by Les Lalannes, Alberto Giacometti, Marc Newson, Jean Prouve etc. defy strict categorization where design blurs with contemporary sculpture.[9] A key example of this blending was exhibited in Sotheby's New York December 8, 2021 single owner sale PROUVÉ x BASQUIAT: Art and Design from the Collection of Peter M. Brant and Stephanie Seymour. The offering of 73 lots was a mixture of iconic Contemporary artists (Haring, Schnabel, Basquiat etc.) selling seamlessly alongside 20th century design masters (Royere, Newson, Prouve etc.) resulting in a 100% sell through rate and achieving $27,724,038 ($8M over the high estimate.)[10]

---

[8] "Lalanne-mania in Paris: Sotheby's Lalanne Auction breaks records," *Art Daily*, Accessed June 16, 2020, https://artdaily.com/news/117877/Lalanne-mania-in-Paris-Sotheby-s-Lalanne-Auction-breaks-records#.Xc_ku9VK6fl.

[9] Ylean MunDelsalle, "Christie's On The Enduring Appeal of French Design Duo Les Lalanne," *Forbes*, Accessed 3/30/22, https://www.forbes.com/sites/yjeanmundelsalle/2022/01/02/christies-on-the-enduring-appeal-of-french-design-duo-les-lalanne/?sh=6e6572633b3e

[10] Sotheby's New York: PROUVÉ x BASQUIAT: Art and Design from the Collection of Peter M. Brant and Stephanie Seymour, results, Accessed 3/30/22, https://www.sothebys.com/en/buy/auction/2021/prouve-basquiat-art-and-design-from-the-collection-of-peter-m-brant-and-stephanie-seymour?locale=en&SlotFilter=AllLots

000563

# GURR JOHNS
est.1914

## Fiona Lamb, M.A., ISA

### Work Experience

**2022 - Present**  **GURR JOHNS INTERNATIONAL**, New York, NY
*Junior Appraiser of Fine Art, June 2022*
- Evaluates general contents with a focus in fine art for Fair Market and Retail Replacement USPAP compliant appraisal reports.
- Assists Deputy Chairman and team of fine and decorative art appraisers with research for estate tax, donation, and insurance appraisals and with on-site cataloguing.

**2021 - 2022**  **GURR JOHNS INTERNATIONAL**, New York, NY
*Research Associate, January - June 2022*
*Administrator, Appraisals and Operations, June - December 2021*
*Intern, Fine Art Appraisals, January - June 2021*

**2019 - 2020**  **ANNIE WHARTON ART CONSULTING**, Los Angeles, CA
*Research Associate and Curatorial Assistant*
- Lead researcher and co-curator of group exhibitions, composed press releases, wrote and edited artist biographies, fact sheets, and didactics for exhibitions and prospective collectors.

**2016 - 2017**  **BOWERS MUSEUM**, Santa Ana, CA
*Research Associate*
- Served as lead research coordinator while reporting to Curator of Permanent and Special Collections and Museum President.
- Maintained and developed the institution's registration, cataloguing, and digital database of a permanent collection of over 91,000 cultural objects and fine art. Researched and recorded archival materials, while handling and photographing over 100 acquisitions.
- Managed intern program in respective projects and professional development.

Appraisal Report no. 29498
Value Date: April 11, 2023

000564

# GURR JOHNS
est.1914

2013 - 2014    **BOWERS MUSEUM,** Santa Ana, CA
*Intern, Curatorial and Collections Management*

2012 - 2013    **SONOMA VALLEY MUSEUM OF ART,** Sonoma, CA
*Intern, Education and Public Programs*

2012 - 2012    **MISSION OF SAN JUAN CAPISTRANO,** San Juan Capistrano, CA
*Intern, Permanent Collections, May - August 2012*

- Catalogued, logged condition reports, and researched objects in the Permanent Collection, including fine art and personal effects from the 17th through 20th century.

**Education**
**Sotheby's Institute of Art and Claremont Graduate University,** Los Angeles, CA
Master of Arts in Art Business, 2020

**California State University, Fullerton,** Fullerton, CA
Bachelor of Arts with Honors in Art History, 2012

**Memberships and Associations**
International Society of Appraisers, 2021

**Certifications**
Uniform Standards of Professional Appraisal Practice (USPAP) (Compliant through April 2024)



**GURR JOHNS** est 1914

# Rachel Adler Rosan, A.A.A.

## Work Experience

**2022 - Present**
**GURR JOHNS INTERNATIONAL**, New York
*Senior Director of Fine Art; Advisory & Appraisals*

**2015 - 2022**
**PHILLIPS**, New York
*Senior Specialist and Head of Appraisals, 20th Century & Contemporary Art*

**2010 - 2015**
**GURR JOHNS INTERNATIONAL**, New York
*Appraiser*
Provide expertise for Post War and Contemporary Art appraisals, including Charitable donation, Retail Replacement (Insurance), Estate tax, Fair Market Value and damage/restoration appraisals; visited clients to catalogue works

**2005 - 2016**
**ROSAN ART ADVISORY, LLC**, New York
*President and Founder*
Provide consultation to clients for purchasing and selling investment grade Contemporary art through private dealers, galleries and auction; provide insurance, loan, and IRS estate appraisals for private clients; and as a consultant for Gurr Johns, Inc.; assist clients with conservation, art transport, framing and installation

**1997 - 2005**
**SOTHEBY'S INTERNATIONAL**, New York
*Assistant Vice President, Specialist, Contemporary Art*
In charge of Contemporary Art Evening sale catalogue, bi-annual auction comprised of approximately 60 works of art; research and write scholarly catalogue entries and coordinate marketing and design elements for Contemporary Art Evening Sale catalogues; additional tasks include working closely with pertinent art institutions, museums and galleries, writing condition reports for Evening Sale property, coordinating expert restoration and conservation analyses; evaluate, appraise and estimate contemporary works of art for sale at auction; prepare donation, fair market value and insurance appraisals for corporate clients, private clients, dealers and museums; develop sale strategies, conduct market research and coordinate design elements for high-end competitive business-getting proposals, client management and business development for

Appraisal Report no. 29498
Value Date: April 11, 2023

000566

# GURRJOHNS
est.1914

consignment, purchasing and private treaty sales; lecture at several museums about Contemporary art market; exhibition Management - coordinate installation of pre-sale exhibitions; hire outside art handlers; work with artist's studios, liaise with inter-company personnel and union staff and assist clients during exhibition; experience as Senior Cataloguer/Specialist (January 1999-January 2003) in charge of the Contemporary Art Day sale; Achieved firstever sale to reach the $10 million mark; experience as Department Administrator (August 1997-December 1999); organized all inter-company transportation of property, as well as movement to and from clients, artist foundations and restorers; worked closely with clients regarding pre- and postsale logistics, contracts, and accounting, inquires; organized all inter-company transportation of property, as well as movement to and from clients, artist foundations and restorer

## Education and Training

B.A., Art History, University of Texas, Austin, Texas, 1997
American Institute for Foreign Study, Richmond College, Florence Campus, 1996

## Memberships, Conferences and Associations

Uniform Standards of Professional Appraisal Practice - compliant through January 2024
Certified Member of Appraisers Association of America
Member of ArtTable
American Friends of the Israel Museum
Acquisitions Committee and National Board member

Appraisal Report no. 29498
Value Date: April 11, 2023

# GURR JOHNS
est.1914

# APPRAISAL TERMINOLOGY AND DEFINITIONS

ACTUAL CASH VALUE (ACV): This term refers to Market Value and is generally synonymous with payment restricted to cash. Some insurance policies also define ACV as the replacement cost minus any depreciation.

ADMINISTRATOR: This is someone appointed by the court if the decedent died without a will. if no executor is named in the will or if the person named cannot or will not serve.

AFFIDAVIT: An affidavit is a statement used in an appraisal which explains what was done in the appraisal. An affidavit is frequently called the appraiser's certification.

ALTERNATE VALUATION DATE: A term most frequently identified with estate appraisals. At present it is the date six months to the day after the date of death on which the fiduciaries of the estate can chose, legally, to have the estate valued rather than the date of death. In this manner, the IRS allows the estate the choice of a date which may be more advantageous in the event that the market or price for the objects in question has changed significantly, usually declining in value materially, from the date of death to the date six months after the death. if the alternate date of death is chosen, then all items in the estate must be value on that alternate date, not just the personal property.

ANTIQUE: As defined by the United States Customs Department, any object that is 100 years old or older is an antique. But the term is broadly interpreted with its definition varying from product to product and year to year. Generally speaking, the following are the most accepted definitions: 1.) An item collected or desirable due to its rarity, condition, utility or some other unique feature that is older than 100 years. Motor vehicles, in contrast, are considered antiques in the US if they are older than 25 years and some electronic gadgets of more recent vintage may be considered antiques; 2.) Ancient art such as sculptures, gems, medals, seals collected from Greek and Roman civilizations.

APPOSITE VALUE: This is a value that is fitting, suitable and appropriate for an object.

APPRAISAL: As defined by the Appraisal Standards Board (ASB) in the Uniform Standards of Professional Appraisal Practice (USPAP) is "the act or process of developing an opinion of value." According to the ASB, value can "be numerically expressed as a specific amount, as a range of numbers, or as a relationship (e.g., not more than, not less than) to a previous value opinion or numerical benchmark (e.g., assessed value, collateral value)." It should be noted that USPAP states that calling an appraisal something else such as "valuation" or "valuation estimate" does not remove it from being considered as an appraisal if an opinion of value is given. The document contains a valuation executed for a specific purpose and follows specified guidelines.

THE APPRAISAL FOUNDATION: This is an independent organization established in 1987 by the US government with members from various appraisal organizations. The Foundation now receives federal funds and is empowered by Congress to establish standards for all aspects of the appraisal profession.

APPRAISAL METHODOLOGY: This is the procedures and rules for executing properly prepared appraisal reports.

APPRAISAL REPORT: This is the actual document in which the opinion of value is stated. Appraisal reports can be written, which is always preferable, or oral. Both, according to USPAP, are subject to specific development and reporting requirements.

# GURR JOHNS

est.1914

**APPRAISER:** This is the individual who values the items and prepares the appraisal document.

**APPRECIATION IN VALUE:** This is an increase in value over time.

**ARBITRATION:** This is a way to settle a dispute. Arbitration is a proceeding in which a dispute is submitted to one or more impartial parties for a binding determination made by the arbitrator. Arbitration is usually quicker, simpler and cheaper than litigation but the perceived disadvantage is that there is no appeal. With a few narrow exceptions, like fraud, there is no way to appeal an arbitrator's decision.

**ART ADVISORY PANEL:** The IRS Art Advisory Panel is composed of several generic groups of professionals: IRS staff appraisers, museum directors and curators, art and antiques dealers, and auction house employees. The full panel generally meets twice a year, while the IRS staff appraisers work full time reviewing appraisals that are submitted to the IRS and preparing those appraisals deemed appropriate for submission to the whole panel. The IRS appraisers are full time government employees while the other members of the panel serve two year terms. Generally speaking, the Panel reviews objects valued individually above $50,000. However, the Panel has been known to review as well objects valued considerably under that amount.

**ASSEMBLED, ASSOCIATED OR MARRIED PIECES:** This term is used to describe a piece of furniture or other piece of decorative arts which has been composed of parts from various pieces of furniture or woods from the same or other periods, e.g., a dressing table or lowboy with a chest added to the top to make it into a tall chest or highboy; a refectory table with a 17th century base and an 18th century top from another table. This is beyond a mere restoration and is almost an attempt at deception unless the marriage is clearly identified as such when sold.

**ASSUMPTIONS AND LIMITING CONDITIONS:** According to USPAP, the appraiser is required to identify and explain the circumstances and appropriateness of any assumptions, extraordinary assumptions, hypothetical and limiting condition that have been used in an appraisal assignment. These terms or concepts are generally linked together in most appraisals. They refer to the assignment conditions and how, if varied, they might alter the appraisal results. An ASSUMPTION is that which is taken to be true. Not all assumptions are extraordinary. An EXTRAORDINARY ASSUMPTION is an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. They must be clearly disclosed and the intended users must be informed if they have affected the valuation results. LIMITING CONDITIONS refer to conditions that limit the appraiser's liability and limit the scope of the appraiser's responsibilities in an appraisal assignment.

**HYPOTHETICAL CONDITIONS** are those which are contrary to what exists but are supposed for the purpose of analysis. According to USPAP, all assumptions and conditions must be listed and qualified in every appraisal. (See also HYPOTHETICAL CONDITIONS)

**AUCTION REPLACEMENT VALUE (ARV):** This term, usually for insurance purposes, is defined as a reasonable amount in terms of US dollars which would be required to replace a property with another of similar age, quality, origin, appearance, provenance and condition within a reasonable length of time in an appropriate and relevant auction market. Since the client regularly and routinely buys at auctions, the appraiser rarely examines the retail market for this valuation. When applicable, sales and or import tax, commissions and or premiums are included in this amount.

**AUTHENTIC:** This term is used to describe pieces of furniture, decorative arts or fine arts which are of the period, right and have no restorations or alterations.

**BLANKET POLICY:** This term is used by insurance companies when articles of personal property are grouped together and given a total value. A blanket policy may be based upon an appraisal or it may be a value the insured requested. Typically a blanket policy is subject to limitations in values and carries a higher premium than one where items are scheduled individually.

000569

# GURR JOHNS

est.1914

BLOCKAGE DISCOUNT: This principle is applied to the valuation of large groups of similar and like items which, if sold during a limited period of time, would result in a depression of the prices one might expect if the items were sold separately in an ordinary market cycle. Consequently, blockage discount is narrowly defined as the percentage the appraiser would apply to reduce the total valuation to compensate for this situation. Blockage discounts are normally applied to estate valuations, especially in the case of artists' estates where large inventories of the art works of single artists must be valued. However, all appraisers should consider the applicability of blockage discounts when valuing large groups of similar and like items. Blockage is a discount or reduction in value necessary to allow a large group of similar objects to be absorbed by the market or sold at a specific date of valuation. Sometimes it may be necessary to offer an economic inducement in the form of a reduced price to stimulate the potential buyers in a given marketplace to purchase all the objects being offered for sale at one time. For example, one may have to offer two for the price of one, four for the price of one, one hundred for the price of one or whatever it may take to sell all the works. The term blockage discount comes from the world of finance where shares in publicly traded companies are frequently offered at discounted prices when the volume of the offering is too large for the market to absorb it at the full, undiscounted, price.

BURNT: When an item is presented at auction and fails to sell, it is said to be burnt.

BUYER'S PREMIUM: This is the percentage of the bid or "hammer" price paid by the buyer to the auction when purchasing an item. The fee ranges between 5 and 25%. See also Seller's Premium and Hammer Price. According to Frank Herrman, 10% buyer's premiums were instituted by Christie's and Sotheby's in London in 1975, influenced by European auction houses such as Mak Van Waay in Amsterdam. This was done to raise profits in a time of rising expenses and inflation. Hermann also notes "the general consensus was that to increase [sellers] commission rates beyond the average of fourteen percent would be punitive for sellers and would frighten them away from the auction room". (Herrman, "Sotheby's, Portrait of an Auction house," London, 1980, p. 423). According to Robert Lacey, buyer's premiums were instituted in the United States with Christie's opening of salesrooms in New York in 1977, bringing the 10% buyer's premium concept with them. Sotheby Parke Bernet (New York) followed suit in 1978, to keep up with the competitive vendor's commissions which Christie's was able to offer (Lacey, "Sotheby's, Bidding for Class," Boston, etc., 1998, p. 194). Over time, the buyer's premium has increased. The following illustration of this increase is based on buyer's premiums recorded in Sotheby's New York sales catalogues from 2003-2014. By March 26, 2003, buyer's premium was 20% of the hammer price up to and including $100,000, 12% on any excess of $100,000. By March 23, 2007, buyer's premium was 20% of the hammer price up to and including $500,000, and 12% on any amount in excess of $500,000. By March 18, 2014, buyer's premium was 25% of the hammer price up to and including $100,000, 20% in excess of $100,000 up to and including $2,000,000, and 12% of any amount in excess of $2,000,000.

BUY IN (BI): This occurs at auction when an object does not meet its reserve price and fails to sell.

CAPITAL GAINS TAX: This tax is assessed on profits realized from the sale of a capital asset such as stock, bonds or personal property.

CATALOGUE RAISONNE: This is a scholarly catalogue which should include all the known works or all the known works in a specific medium by the artist at the time of compilation of the book. Essential information identifying the works are included making this the definitive reference book.

CAVEAT EMPTOR: "Let the buyer beware." This term means that the seller is not held responsible for the quality or authenticity of the goods being sold.

CERTIFICATE OF AUTHENTICATION/AUTHENTICITY: This is an official document which certifies that the piece in question is right and of the period and by the artist designated. Some states including New York require specific information be included on a Certificate of Authentication.

CIRCA: "About" in reference to age; e.g. circa 1920 when describing the age of an object means that it was made around that time period give or take ten years.

CLEAR TITLE: Good ownership one free from encumbrance, obstruction, burden or limitation.

Appraisal Report no. 29498
Value Date: April 11, 2023

# GURR JOHNS

est.1914

COLLECTIBLE: This term usually describes any item that has been mass produced and usually machine manufactured. Today collectibles are typically manufactured items designed specifically for people to collect such as sports' cards and beanie babies.

COMPARABLES: Finding similar and like objects to the one being appraised is the most commonly applied approach to evaluation. An examination and analysis of the sales figures for similar works or comparable objects allows the appraiser to arrive at the appropriate appraised value for the one under consideration. These figures are mandatory for most donation appraisals and may be provided by the appraiser in other situations when the appraiser judges them to be necessary.

COMPARABLE MARKET DATA APPROACH: See VALUATION APPROACHES (Below)

COMPARATIVE MARKET DATA APPROACH: See VALUATION APPROACHES (Below)

CONSERVATION: This is the treatment and preventative care of an object so that its condition does not deteriorate and the object can remain stable. This is the preservation of a work of art involving careful maintenance and protection of the item using materials and procedures which will have no adverse effects on the piece. See PRESERVATION and RESTORATION also.

CONSULTING EXPERT: This person is an appraiser who provides technical expertise and background knowledge to the attorney and client in a litigious situation. Such expertise may be related to the quality of the object, the value of the object or the methodology of the opposing appraiser. The work of the consulting expert is considered privileged and is not discoverable in court because it falls under the Attorney Work Product Privilege.

COST APPROACH: See VALUATION APPROACHES (Below)

COURT CASES: When the taxpayer has been unable to negotiate a compromise with the IRS the taxpayer may pursue to litigate. Taxpayer suits against the IRS have the right to be pursued in all parts of the judiciary system. They can be appealed up to the Supreme Court. While the decisions reached in these cases are specific to the individual cases, they may cause the IRS to modify its procedures and requirements. All appraisers would be well advised to study the relevant cases carefully since the decisions reached may cause the appraiser to modify the way IRS appraisals are formulated and appraisal reports are written. Court cases are also sometimes involved with divorce, insurance or damage and loss of value appraisals when the parties cannot agree on valuation or any other matters under discussion.

COVER LETTER: A cover letter is a letter accompanying the appraisal which does NOT include the value of the appraised items.

CRAQUELURE: This is the result of the uneven movements of canvas caused by the natural shrinking of the medium during the aging process. Craquelure usually appears on the surface in a spider web like series of cracks. The surface can be stabilized by relining the canvas and restoring the cracks.

CRAZING: This is the fine and random cracking extending only through the surface of pottery, porcelain, stone or concrete. The cracking can appear along or perpendicular to the length in polygonal shapes or as random spider webs. Crazing is due to differential contraction between the surface and interior sections often due to changes in temperature. Crazing has no structural or durability significance and does not by itself constitute a cause for rejections. It can, however, mark the beginnings of disintegration. All ceramic and concrete products and many natural stones under varying conditions of moisture and temperature are frequently subject to crazing. In some Asian potteries and porcelains crazing is produced in a foreseen, admired and regulated manner.

CULTURAL PATRIMONY: These are objects involved in the Holocaust, items from past and present wars which were pillaged or removed from their homeland or owners and those objects taken and robbed from underdeveloped and poor countries. Today there is an effort to prevent the continuous exploitation and exporting of these treasures.

# GURR JOHNS

est.1914

**DEPRECIATION IN VALUE:** This is a decrease in value over time.

**DIMS:** This is an abbreviation for dimensions.

**DISCLAIMER:** The disclaimer is an explanation of facts either contained in the appraisal for which the appraiser does or does not "disclaim" or deny responsibility. This is a listing of elements for which the appraiser does not accept responsibility.

**DISCLOSURE/FULL DISCLOSURE:** Disclosure is the passing of information that is secret, not previously known (i.e., revelation) or which is believed not to have been known previously. In an appraisal situation, this would include disclosing confidential information shared by the client with the appraiser. Full Disclosure, on the other hand, refers to the appraiser's obligation to state all the work that was done or not done in generating the appraisal report or any other factors which may, at a later date, alter the valuation conclusion in the report.

**DROIT MORAL:** French term for giving the authority to authenticate works of art, literally "moral right."

**DUE DILIGENCE:** A measure of prudence or activity that is properly expected from and ordinarily exercised by a reasonable and prudent person under the particular circumstances; not an absolute standard but dependent on the relative facts of the particular situation. In an appraisal situation, this refers to the amount of work one would expect an appraiser to perform in order to arrive at a credible conclusion.

**ESCHEAT:** This is the common law doctrine that operates to ensure that property is not left in limbo and ownerless upon the death of the owner. It can be the forfeiture of all property including bank accounts to the state treasury if it appears certain that there are no heirs, descendants or named beneficiaries to take the property upon the death of the last known owner.

**EQUITABLE DISTRIBUTION:** This term is generally used in a divorce situation or in the dissolution of a domestic partnership and is a fair division of assets between two or more people. It is the process through which the assets of the partners or family members are divided in a manner which is equitable based on several factors including the appraised values of the objects in question.

**EXECUTOR OR EXECUTRIX:** This is the person named in a decedent's will to administer the estate and distribute the properties as the decedent directed and in an equitable manner.

**EXTRAORDINARY ASSUMPTION:** See ASSUMPTIONS AND LIMITING CONDITIONS (Above)

**FA (FINE ARTS):** This is the acronym for Fine Arts and may be required by insurance companies to designate those objects on an insurance appraisal which include decorative art and antique objects such as furniture, metals, textiles, drawings, paintings, prints and sculpture as opposed to Fine Arts Breakable (FAB) or Sterling Silver (SS).

**FAB (FINE ARTS BREAKABLE):** This is the acronym for Fine Arts Breakable objects and may be required by insurance companies to designate those objects on an insurance appraisal such as glass, porcelain, marble and mirrors as opposed to Fine Arts (FA) or Sterling Silver (SS) objects which may be subject to a higher insurance premium.

**FAIR MARKET VALUE (FMV):** FMV is usually for IRS purposes and is defined by IRS Treasury Regulation Sections 1.170 and 20.2031 (b) as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." According to Technical Advisory Memorandum 9235005 (May 27, 1992), fair market value should include the buyer's premium. IRS Section 20.2031 (b) continues "the fair market value of an

# GURR JOHNS

est.1914

item of property includible in the decedent's gross estate is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the sale price of that item in a market other than that in which such item is commonly sold, taking into account the location of the item wherever appropriate. Thus, in the case of an item of property includible in the decedent's gross estate, which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail." (Treasury Regulation Section 1.170A-13 (3) (1988) It should be noted that the IRS has changed the definition slightly in various sections of the Revenue Code and other printed literature. In addition, Pamphlet 561 has also added the following to the definition for the purposes of Donation and Gift Tax: "If you put a restriction on the use of property you donate, the FMV must reflect that restriction."

FAKE: This is an object that has been made to deceive and is sold as something that it is not.

FEDERAL TAX REGULATIONS: These regulations are published by the Department of Treasury which has oversight authority over the Internal Revenue Service. The regulations are published from time to time to explain the tax law in the Internal Revenue Code. It offers explanation and examples illustrative of the principles stated in the revenue code.

FINE ARTS INSURANCE POLICY: An insurance policy which covers the fine arts contents of a home. Fine arts are generally defined broadly and can include not only two-dimensional art and sculpture but also decorative arts, furniture and collectibles. These policies may require individual scheduling of items or a blanket policy to cover all the items. Fine arts insurance policies generally vary from insurance carrier to carrier; one would be well advised to examine each policy closely.

FORCED LIQUIDATION VALUE (FLV): This is the lowest range "NET" value, usually for a quick and forced sale purpose. It is defined as "the most probable price in terms of cash, or other precisely revealed terms, for which the property would change hands if sold immediately, without regard to the relevant market place.

FORGERY: This is a copy executed by someone other than the original artist with the intent to present the object as the original. This is the generic term for both fakes and frauds.

FOXING: Brown spots caused by acid on paper or textiles.

FRAUD: This is a work of art which has been altered, misattributed or otherwise disguised or misrepresented to be what it is not.

FRENCH GRID SYSTEM: The name given to a system by which an object is divided into quadrants such as square inches or centimeters and a value is assigned to an individual quadrant. Presumably the value of the whole can then be determined by multiplying the number of quadrants by the value assigned to one unit. Appraisers of personal property are discouraged from using this methodology unless a clear and compelling rationale for its use can be established.

GOOD FAITH EXCLUSION: This is an IRS term. Under the law governing donation appraisals, an appraiser who writes an appraisal which is 150% above which the IRS determines as appropriate can be subject to sanctions. However, if the Director of Practice determines that the appraisal report in question was written in good faith, the Director has the right to exclude the appraiser from the specified sanctions.

HAMMER PRICE: This is the actual bid price at auction as the hammer falls and does not include the buyer's premium. (See also Buyer's Premium and Seller's Premium.)

HIGHEST AND BEST USE: The term is commonly used in real estate property appraising (See Sacramento Southern Railroad Company vs. Heilbron, 156 Cal 408) and has been carried over by some into the realm of personal property. Basically the term means that, when feasibly possible, one should evaluate personal property in the most appropriate marketplace where it will bring the highest price. The term typically is defined as the examination of the use of the property, which will result in its highest value. In an appraisal this cannot be merely theoretical but must be realistic in that the use must be legal, physically achievable and financially feasible. Oftentimes personal property appraisers refer to highest and best use as the highest attainable price for an object. Many personal property appraisers have trouble with this definition and object to the carry-over from real property. While the

000573

# GURR JOHNS
est.1914

concept of use may be appropriate for depreciable personal property such as machinery and equipment, it has questionable relevance in the world of appreciable personal property such as art, antiques and collectibles. While some appreciable personal property can be "used:' the motivation of the majority of collectors is not structured by the object's functional purpose but rather its aesthetic appeal. With this in mind, it has been argued that one does not begin to apply a term which is relevant to exceptions but rather terms applicable to the majority of situations are more appropriate. It has been suggested that the term "highest attainable price" may be the better term for appreciable personal property.

HYPOTHETICAL APPRAISALS: This is the type of appraisal done when the item is no longer in the possession of the owner because of a fire, flood or other loss. When the appraiser cannot examine the object or is only given photographs of the non-existent object that the appraiser states that the appraisal is hypothetical or written on the basis of the information supplied usually by the client. The appraiser's report is based upon a supposed situation or group of assumptions.

HYPOTHETICAL CONDITIONS: According to USPAP, the definition of a hypothetical condition is that which is contrary to what exists but is supposed for the purpose of analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal or economic characteristics of the subject property or about conditions external to the property such as market conditions or trends or about the integrity of data used in an analysis. Appraisals of damaged objects or appraisals done from a photograph used hypothetical conditions. A hypothetical condition may be used in an assignment only if I) the use of the hypothetical condition is clearly required for legal purposes, for purposes of reasonable analysis or for purposes of comparison; 2) the use of the hypothetical condition results in a credible analysis and 3) the appraiser complies with the disclosure requirements set forth in USPAP for hypothetical conditions. (See also ASSUMPTIONS AND LIMITING CONDITIONS)

IMPAIRED FAIR MARKET VALUE: Putting a restriction on the use of the property being donated implies that the fair market value is restricted and reduced.

INCOME APPROACH: See VALUATION APPROACHES (Below)

IN THE STYLE OF: Means that an item is not of the period in which it was supposed to have been made but rather was made at a later time as a copy of the earlier piece.

INPAINTING: Similar to overpainting, this is a technique commonly used by conservators to unify a painting which has suffered paint loss. Inpainting is paint applied over paint losses on a canvas or other media.

GURR JOHNS
est.1914

INTERNAL REVENUE CODE: This is the tax law which has been structured and passed by Congress and signed by the President of the United States and remains the ultimate authority on tax matters until it is changed or amended by Congress, Internal Revenue Regulation 1.170A relates to Income Tax Charitable Deductions and allows as a deduction any charitable contribution which is made during the taxable year. Section I (e) (I) provides that if a charitable contribution is made in property other than money the amount of the contribution is generally the fair market value of the property at the time of the contribution. Section I (c)(2) provides that the fair market value is the price at which the property would change hands between the willing buyer and the willing seller with neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. Section 13 states information regarding the record keeping and return requirements for deductions for charitable contributions. For a deduction for a charitable contribution of property in excess of $5,000, Section 13(c) requires that a qualified appraisal be prepared. Internal Revenue Regulation 20.2031 relates to the Estate Tax. Section 2031 provides that the value of the gross estate of a decedent is determined by including the value at the time of death of all property wherever it is situated. Section 20.2031-1 (b) provides that the value of the property is includible in a decedent's gross estate is its fair market value at the time of the decedent's death. Section 2032(a) provides that the executor may elect to determine the value of all the property in the gross estate as of six months after the decedent's death. This is known as the Alternate Date of Valuation. Property distributed, sold, exchanged or otherwise disposed of within the six months after death must be valued as of the date of distribution, sale, exchange or other means. Section 20.2031-6(b) provides that if there are items among the personal effects or the household, articles with artistic or intrinsic value of a total in excess of $3,000, an appraisal, under oath, must be filed with the estate tax return. Section 20.2031-6(b) provides that if expert appraisers are employed, care must be taken to see that the appraisers are reputable and of recognized competency to appraise the particular class of property involved.

JOINT AND FRACTIONAL GIFTS: On occasion a number of people with equal or unequal ownership may donate an object or a group of objects to a non-profit institution. Separate appraisal with separate values must be made for each of the donors.

LAUNDRY LIST: This refers to a listing of object, similar to an inventory with no description and no information regarding the object other than exactly what it is without any measurements. Listing objects in this cursory and seemingly off hand manner is inappropriate for a professional appraiser to use when preparing an appraisal report.

LETTER OF TRANSMITTAL: This letter, addressed to the client accompanying the appraisal, is a summary of the appraisal. This letter must include all of the elements of USPAP including the name of the client, the purpose of the appraisal, the date of the appraisal and the effective date of the appraisal, for whom the appraisal is being executed, where and when the property was seen, value and the definition of value used, the valuation methods and market analyses, the number of items appraised, the total value of those items, the number of pages in the report, the statement of disinterest on the part of the appraiser, the statement of the fee structure, the credentials of the appraiser, the statement of compliance with a given code of ethics, a statement that the report can only be presented in its entirety, a statement that the appraisal can only be used by the party or parties for whom it was written and only for the stated purpose and the appraiser's tax identification number (the latter only for IRS donation appraisals).In the instance of a charitable donation appraisal, the appraiser may include the name of the donee institution in the letter. All assumptions, extraordinary assumptions, hypothetical and limiting conditions must also be included in a transmittal letter.

LIMITING CONDITION: See ASSUMPTIONS AND LIMITING CONDITIONS (Above)

LINED: This term usually refers to a painting on canvas that has been supported by another layer of canvas due to the deterioration of the original support.

LIQUIDATION VALUE: This value is based on the price realized in a sale situation under moderately forced or limiting conditions and under time constraints. This action may be initiated by the owner or a crediting institution. It is implicit in this definition that Liquidation Value will generally be lower than other types of valuation.

LKQ(LIKE, KIND, QUALITY): This abbreviation stands for the insurance terms LIKE, KIND, QUALITY and is the equivalent of an object with comparable attributes.

Appraisal Report no. 29498
Value Date: April 11, 2023

000575

# GURR JOHNS
est. 1914

LONG TERM CAPITAL GAINS PROPERTY: This is an IRS concept used in conjunction with donation appraisals. It refers to property that has been held for a designated period of time, after which the owner, upon donation, is entitled to a tax deduction based on the object's fair market value on the specified dates of valuation.

MARGINAL UTILITY: In economics, under the mainstream assumptions, the marginal utility of a good or service is the increase in usefulness obtained by consuming or using one more unit of that good or service. The concept is derived from attempts to explain the determination of price. The consumer's decision to buy is not all or nothing. Instead, it is a decision to buy or not to buy just one more unit. That means it is a mistake to look at the total utility of the two goods as the basis for demand. The total utility is irrelevant to the decision to buy or not to buy one more unit. What is relevant to any decision is what is gained or lost depending on how the decision is made and only a part of the total utility is gained or lost as a result of the decision to buy or not to buy one more unit of the good. Economists call the part of utility that is gained or lost in the decision to buy one more unit the marginal utility.

MARITAL DEDUCTION: This is a tax provision which allows one spouse to transfer upon death an unlimited amount of property to his/her spouse without incurring estate or gift taxes.

MARKET DATA APPROACH: See VALUATION APPROACHES (Below)

MARKET VALUE (MV): This value is the most probable price at which a property would sell in a competitive and open marketplace where the sale needs to be consummated within a specified time frame and neither the buyer nor the seller are under a compulsion to buy or sell. In addition, the object to be sold needs to have had sufficient market exposure for a reasonable amount of time and payment is made in terms of cash in American dollars or comparable financial arrangements are made. This term is essentially the same as fair market value except this term does not have the provision stating that there is no compulsion to buy or sell within a specified period of time. USPAP cautions appraisers to identify the exact definition of market value and its authority applicable in each appraisal completed for the purpose of market value.

MARKETABLE CASH VALUE (MCV): Defined as the net value a willing seller realized after disposing of property in a competitive and open market to a willing buyer.  Both the buyer and seller must be reasonably knowledgeable of all relevant facts, and neither being under constraint to buy or sell.  Marketable Cash Value takes into consideration insurance, dealer commissions, advertising, travel, and shipping expenses that may be involved in the sale (from Appraiser's Association of America Definitions of Value).

MARRIED, ASSEMBLED OR ASSOCIATED PIECES: See ASSEMBLED (Above)

MEDIATION: This is a way to settle a dispute and is a process by which parties to a dispute voluntarily select an impartial third party to facilitate a resolution of the issues by the parties themselves. The need for mutual agreement is deemed by some to be the major weakness in the mediation process. If one of the parties is unreasonably stubborn, it will be difficult to reach an agreement.

MEDIUM: There are at least four definitions of this term: 1.) The material the item is made from or the art is produced upon and may include white or black paper, canvas, board, ed (acetate), sculptures; 2.) The specific tool and material used by an artist, e.g., brush and oil paint, chisel and stone; 3.) The mode of expression used by the artist, e.g., painting, sculpture, the graphic arts; 4.) A liquid that may be added to a paint to increase its manipulability without decreasing its adhesive, binding or film forming properties.

METHOD OF CONSTRUCTION: This describes the way or ways in which an object has been made.

MICROSCOPY: This is the in-depth microscopic evaluation of an object to determine its age and/or authenticity.

# GURR JOHNS

est.1914

MINT CONDITION: This term describes artwork or objects which are in the same condition as when they were originally finished, printed, made. A term taken from coinage, this is the same condition as when it was minted.

MOST APPROPRIATE MARKET OR MARKETPLACE: This is the venue in which the appraiser determines an object can be sold most easily and at the highest price. Frequently in the case of personal property, where comparables are scarce, the most appropriate market can be a combination of auction and private gallery sales.

NO COMMERCIAL VALUE: This usually refers to an object, a group of objects for which it is not reasonable to assign a monetary value, usually in estate situations and this might include the mattress and box spring.

OBJECT ID™ : A generic classification methodology codified by the Getty Information Institute (Getty Museum) which lists nine fields for the minimum description of all works of art.

OF THE PERIOD, RIGHT or CORRECT: An object which has been made at or during the time ascribed to it.

OPPORTUNITY COST: The advantageous price one would pay for purchasing in bulk.

ORDERLY LIQUIDATION VALUE (OLV): This term, a low range net value usually for quick sales purposes, is defined as the most probable price in terms of cash or other precisely revealed terms for which the property would change hands under required and limiting conditions in an orderly manner and generally advertised and with knowledgeable buyers advised.

ORPHAN: This term refers to a single piece left from a set or a pair.

OVERPAINTING: This explains when paint is applied to a painting over already dry areas of paint. Sometimes used to include the original artist's glazes and sometimes especially used in conservation, this term means only later restorers' work. Overpainting is similar to inpainting (see above) except only inpainting fills in lost areas without covering the original paint.

OXIDATION: This is the binding of oxygen to a metal to form rust or the binding of oxygen to wood to darken it.

PARTIAL APPRAISALS: This type of appraisal is an estimate of the value of the object or objects as requested by the client wherein the client does not want a written professional, thoroughly researched appraisal document. The appraisal is usually presented in a verbal form or the written document does not follow the proscribed proof of valuation or the necessary boiler plate language to protect the appraiser. If the appraiser has an Errors and Omission insurance policy, he/she may be in violation of that policy by presenting a partial appraisal. Using a POV, discussed herein, is advisable. N.B. This is in strict opposition to USPAP.

PATINA: This is the buildup of a film produced by oxidation on the surface of an object. This term also refers to the final coating that is applied to a bronze by the artist or the foundry crafting the bronze.

GURR JOHNS

est.1914

PERSONAL PROPERTY: Defined by USPAP as "identifiable tangible objects that are considered by the general public as being "personal" for example, furnishings, artwork, antiques, gems and jewelry, collectibles, machinery and equipment; all tangible property that is not classified as real estate." USPAP does not mention that there are two general classifications of personal property; depreciable personal property or property that is expected to depreciate in value over time, and appreciable personal property or property that has the potential of increasing in value over time. Most machinery and equipment will depreciate in value once they are used, while art, antiques and collectibles have the potential of increasing in value as the demand in the collectors' marketplace increases as time goes by.

PREMIUM: See buyer's premium, seller's premium and hammer price.

PRESERVATION: Related to conservation and restoration, preservation actions are taken to prevent further changes or deterioration in objects, sites or structures. (See CONSERVATION and RESTORATION also.)

PRIMARY MARKET: The primary market is one created either by the maker or agent of the maker when an object is sold for the first time, usually in galleries or stores. The secondary market is the venue for the sale of an object between a seller and a buyer with neither of having participated in the creation or initial sale of the object. In the instance of multiples, a valid secondary market cannot exist while the maker or his agent retains a supply of the original offering.

PRIMARY SOURCE: This material, used in research and data comparisons, is from a firsthand witness and includes auctions attended, galleries, art fairs and stores visited and actual comparables witness by the appraiser.

PRIMARY WOOD: A piece of period furniture is usually made from two different types of woods, the first being the primary wood or the use of more of this wood which is seen on the outside as opposed to secondary wood, usually reserved for use in the interior of the case.

PRINCIPLE OF CHANGE: Change recognizes the shifting importance of other principles and explains the cycles of market development, stabilization, decline and renewal.

PRINCIPLE OF CONTRIBUTION: This term often relates to the "good, better, best" qualities of an item.

PRINCIPLE OF PROGRESSION: This term refers to the increase in interest/value that lower valued items may realize from their association with higher value items.

PRINCIPLE OF REGRESSION: This term states that higher valued items may suffer a decrease in value from association with lower-valued properties.

PRINCIPLE OF CONTRIBUTION: This term often relates to the "good, better, best" qualities of an item.

PRINCIPLE OF REVERSIBILITY: Whatever process is used to restore a painting or a piece of furniture, pottery or porcelain needs to be able to be reversed so that if, in time, what was done is shown not to be appropriate then that restoration can be removed and the object can be returned to the state in which it was prior to the restoration job.

PRISTINE/MINT/PROOF CONDITION: Excellent condition, as if new and usually in its original packaging or box.

PRIVATE LETTER RULINGS: From time to time the IRS sets forth specific rulings in response to requests from individual tax payers. These rulings are specific to the case by case situations presented by the taxpayer. While these rulings cannot be used as vehicles for precedent setting, they do reflect the reasoning of the IRS and give clear indications of how the IRS will react if a similar situation in another case is brought to their attention. All taxpayers and appraisers would be well advised to study these rulings closely.

000578

# GURR JOHNS
est.1914

PRIVATE TREATY SALE: This is a sale which occurs following an auction where the object being sold did not sell at the event and sells privately thereafter.

QUALIFIED APPRAISAL: A Qualified Appraisal is an appraisal conducted by a qualified appraiser in accordance with generally accepted appraisal standards. The IRS further states that an appraisal will be treated as having been conducted in accordance with generally accepted appraisal standards if it is consistent with the substance and principles of the Uniform Standards of Professional Appraisal Practice also known as USPAP. For donation purposes the appraisal report must be prepared by a qualified appraiser not more than sixty days before the date of the contribution of the appraised property. The appraisal must be signed and dated by a qualified appraiser who charges an appraisal fee that is not based on a percentage of value and that contains the following information: a detailed description of the property; the physical condition of the property; the date or expected date of the contribution; the terms of any agreement or understanding entered into or expected to be entered into by or on behalf of the donor that relates to the use, sale or other disposition of the property contributed; the name, address and taxpayer identification number of the appraiser; a detailed description of the appraiser's background and qualifications a statement that the appraisal was prepared for income tax purposes; the date on which the property was valued; the appraised fair market value of the property; the method of valuation used to determine the fair market value; the specific basis for the valuation including any comparable sales transactions and a description of the fee arrangement between the donor and the appraiser.

QUALIFIED APPRAISER: A Qualified Appraiser is an individual who has earned an appraisal designation from a recognized professional appraiser organization or has otherwise met minimum educational and experience requirements set forth in regulations prescribed by the IRS. The minimum education and requirements are met if the appraiser has successfully completed college or professional level course work that is relevant to the property being valued; obtained at least two years of experience in the trade or business of buying, selling or valuing the type of property being valued; regularly performs appraisals for which the individual receives compensation; and meets such other requirements as may be prescribed by the IRS in regulations or other guidance.

REAL PROPERTY: This refers to land and the buildings attached to the land. For a building to be part of real property, the land and the building must share the same title. If not, the building becomes part of personal property.

RECTO: This refers to the right hand page of a book or the front side of a leaf or picture, on the other side of VERSO.

REFINISHED CONDITION: This occurs when a piece has been stripped or skinned of its original patina and now sports a new finish.

REFRESHED CONDITION: This is a relatively new term which refers to the repainting of a piece of furniture.

RELATED USE RULE: This IRS rule is applied to charitable contributions and states that to receive the full allowable tax deduction a donor must donate property to an institution whose mission explicitly includes the acquisition and use of such property.

REPRODUCTION: This term refers to a piece made as an exact copy or in the mirror image of the original of a period piece but is not made to deceive.

RESALE VALUE: This is the price at which the item can be sold in the marketplace.

RESERVE: This term refers to the minimal amount for which a consignor agrees to sell a work for at auction. By law, the reserve must be at or below the low estimate. Typically a reserve is about 50 to 25% below the low estimate.

RESTORATION: This is the process whereby, if an object has lost a part and that missing part or piece is replaced or restored to simulate the original the object can be returned as closely as possible to its original condition. See CONSERVATION and PRESERVATION also.

Appraisal Report no. 29498
Value Date: April 11, 2023

# GURR JOHNS

est.1914

RESTRICTED USE APPRAISAL REPORT: See APPRAISAL REPORT OPTIONS /TYPES (above)

RETAIL REPLACEMENT VALUE (RRV): This term is defined as the highest amount in terms of US dollars that would be required to replace a property with another of similar age, quality, origin, appearance, provenance and condition within a reasonable length of time in an appropriate and relevant marketplace. When applicable, sales and/ or import tax, commissions and/ or premiums are included in this report. Usually used for insurance purposes.

RETAIL VALUE: Used to establish a price guideline for retail pricing, the appraised retail value is derived from retail replacement value. It is defined as a reasonable amount in terms of US dollars that would be required to purchase a property of similar age, quality, origin, appearance, provenance and condition with a reasonable length of time in an appropriate and relevant market. Unlike retail replacement value, retail values do not include any fees or additional costs such as taxes, framing, conservation, restoration and additional commissions.

REVENUE PROCEDURES (REV. PROC.): Revenue Procedures are termed "guidelines" by the IRS. They set forth a methodology for dealing with general situations. The taxpayer and the appraiser would be well advised to take these guidelines seriously and to view them as IRS requirements rather than elective procedures which the term "guideline" may indicate to the inexperienced appraiser. The IRS expects these guidelines to be followed and the courts have indicated that this expectation is reasonable. In addition the IRS has been known to apply these guidelines to appraisal situations which may not be specifically addressed in the guidelines themselves. For example, Rev. Proc. 6649 sets forth guidelines for donation appraisals; however, the IRS has been known to ask for the reporting elements stated in these guidelines to be followed for estate appraisals as well.

REVENUE RULINGS: These rulings complement the private letter rulings discussed above. While the private letter rulings are directed to specific cases brought to the attention of the IRS, the revenue rulings set forth the general principles addressed in specific private letter rulings. They also give tax consequences applicable to the general situations addressed in the rulings.

RIGHT, CORRECT or OF THE PERIOD: This term indicates that the object that is of the period, by the ascribed artist and is not a reproduction.

SALES COMPARISON APPROACH: See VALUATION APPROACHES (Below)

SALVAGE VALUE (SV): This is a valuation term implying abandonment by the rightful owner in which the person recovering the property may be entitled to a pre-agreed percentage of any net price realized in a future sale. Although there have been some exceptions, salvage is generally the lowest or rock bottom price realized in a sale situation. This is the net price in cash or other precisely revealed terms for which the property would change hands if sold immediately without regard to the relevant marketplace and appropriate use. In certain cases, this may be a negative value because labor and other costs may be required to disassemble and dispose of the property in a quick, forced and expedient manner.

SCHEDULED ARTICLES: This term is used by insurance companies when articles of personal property are individually listed, described and valued on an insurance policy. Although some insurance companies will accept a receipt of a recent purchase, the schedule is typically based on an appraisal. Typically scheduled items carry a lower insurance premium than items which are under a blanket insurance policy.

# GURR JOHNS

est 1914

SECONDARY MARKET: This term refers to the marketplace where a used object is bought and sold. Once an item is no longer available from the original source, it is considered a secondary market item and usually refers to the auction market and is in no way associated with the value or the condition of the object. The secondary market is the venue for the sale of an object between a seller and a buyer with neither of them having participated in the creation or initial sale of the object, usually through auction but can also be in galleries. In the instance of multiples, a valid secondary market cannot exist while the maker or his agent retains a supply of the original offering.

SECONDARY SOURCE: Examples of secondary sources utilizing exact primary sources in research and data comparison are ArtNet, ArtFact, P4a, Gordonsart, Art-Sales-Index, newel.com and other Internet research tools.

SELLER'S PREMIUM: This is the percentage of the bid or "hammer" price paid by the seller to the auction when selling an item. The fee ranges from nothing to 35% and may be more negotiable than the Buyer's Premium. See also BUYER'S PREMIUM and HAMMER PRICE.

SENTIMENTAL VALUE: This is never a monetary value but rather an emotional valuation not based on market factors or aesthetics.

SKINNED CONDITION: This term refers to a piece of furniture which has been stripped of its original patina and also describes a paper condition where skinned paper indicates the paper has lost a layer of fibers.

SS (STERLING SILVER): This is the acronym for sterling silver objects and is often required by insurance companies to designate the objects on a written report which may be subject to a higher insurance premium.

STEPPED UP BASIS: This is a tax term and refers to a value that is used to determine profit or loss when property is sold. If someone inherits property that has increased in value since the deceased person acquired it, the tax basis of the new owner is stepped up to the market value of the property at the time of death. The stepped up basis means that when the property is eventually sold there will be less taxable gain.

STYLE, IN THE STYLE OF: This refers to a piece made after the original would have been made and has the same features as the original just made years later.

SUMMARY APPRAISAL REPORT: See APPRAISAL REPORT OPTIONS /TYPES (above)

TAX IDENTIFICATION NUMBER (TAX I D): The tax ID number is an IRS term and requirement. In most cases, this is the social security number of the appraiser which the IRS requires the appraiser to list in certain types of appraisals with the appraiser's signature. In this way, the IRS can impose sanctions on the appraiser should they be warranted.

TERTIARY MARKET: This marketplace occurs in a forced sale situation such as liquidation or salvage sales.

TESTIFYING EXPERT: This is an appraiser who not only provides technical expertise and background knowledge to the attorney and the client in a litigious situation but is also used on the witness stand to explain complex valuation issues and to express expert opinions and conclusions as they relate to the object or objects in dispute. Such expertise may be related to the quality of the object, the value or object or the methodology of the opposing appraiser. The work of the testifying expert is discoverable in court.

# GURR JOHNS

est 1914

THERMOLUMINESCENCE TEST: This has been the definitive way to tell the true age of pottery, stoneware, porcelain, bronze and terra cotta. There are a handful of thermoluminescent labs worldwide which perform the thermoluminescent test. The most prominent lab is in Oxfordshire, England. To test an object's thermoluminescence, a small sample (about 100 milligrams) is heated to extreme temperatures. Most mineral materials store up increasing amounts of radioactive energy that is drawn from radioactive decay in and around the mineral. When heated (thermo), most minerals release the stored energy in the form of light (luminescence). By measuring the amount of light released from a material, one can calculate how many years have passed since the artifact was fired. Generally, the more light released the older the item is. More recently, concerns have been raised about results, based on suggestions that results could be skewed by irradiating objects to be tested.

ULTRAVIOLET LIGHT (UV): These are short, high energy invisible light waves beyond violet in the spectrum of light with a length of 250 to 400 nanometers.

UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE (USPAP): These are the appraisal procedures and guidelines for conducting and writing appraisals published by the Appraisal Standards Board of The Appraisal Foundation. First codified in 1987, these standards apply to all disciplines of appraising and are predicated on the concept that there is a common methodology which can be found in all aspects of appraisal practice including appraisal, appraisal review and appraisal consultancy.

VALUATION APPROACHES:

Comparative Market Data Approach: (alternately called: Market Data Approach, Comparable Market Data Approach and Sales Comparison Approach): This is the most commonly applied approach when appraising personal property in which appraised value is based upon past prices (close to the Effective Date) for similar works by the same artist/maker or of similar works by another artist/maker of equal standing and related reputation.

Cost Approach: This approach is used to determine the value of an object based upon the cost of duplicating or recreating the identical piece. This approach may be applied to the decorative arts when the methods of construction or materials used are replicable and of significant inherent value.

Income Approach: This approach is used to determine the value of a work of art or object which will be used to generate future income. This is most often done through leasing, rental or creating reproductions but not through a one-time only sale with transfer of title and/or copyright.

VALUE: This is a dollar amount dependent upon the type of appraisal report being written: insurance, IRS, equitable distribution for divorce proceedings or liquidation. The appraiser must state which value is being used and give a clear, concise definition of that value and cite the source for the definition.

VALUE IN EXCHANGE: This term refers to the ability to trade an item or asset, especially money, for other goods and services that can then be used to satisfy wants and needs. Value in exchange means that value that is satisfaction, is obtained indirectly through the acquisition of something else. For an item to have value in exchange, it need NOT have value in use, value obtained directly from the consumption of a good or service.

VALUE IN USE: This term refers to the satisfaction of wants and needs provided by the direct consumption of goods and services. Acquiring value from the use of goods and services is really the ultimate goal of economic activity. It is the final step in the production, allocation and consumption activities that are undertaken to address the fundamental problem of scarcity. Value in use should be contrasted with the similar phrase VALUE IN EXCHANGE.

VERSO: This term refers to the left hand page of a book or the back side of a leaf or a picture on the other side of RECTO.

VINTAGE: This is a widely used term referring to an object that was formerly in vogue but not more than 100 years old. This definition may vary by object, i.e., a vintage fountain pen is generally thought to be one manufactured pre-1965.

Appraisal Report no. 29498
Value Date: April 11, 2023

Page 35 of 37

000582

# GURR JOHNS

est.1914

WATERMARK: This is a design left in the paper by the paper manufacturer and is seen when the paper is held against the light. This mark is used to trace the origin of the paper. Special markings for an artist or publisher may incorporate a signature or a device and can be used to detect fakes although even watermarks can be faked. Watermarks on handmade papers are made by very low relief molds or designs of fine wire set on the screen on which the moist pulp collects.

WORK SIZE: This refers to the dimensions of works on panel or board. When the word "sight" is used in conjunction with work size, it refers to the dimensions of the visible image of the work.

Appraisal Report no. 29498
Value Date: April 11, 2023

# GURR JOHNS

est.1914

## TERMS AND CONDITIONS

This Appraisal is given subject to these Terms and Conditions, all of which are a part of this Appraisal, unless expressly set aside in writing.

1.   Unless otherwise stated herein, this Appraisal is based only on the readily apparent identity of the items appraised, and no further opinion or guarantee of authenticity, genuineness, attribution or authorship is made.

2.   Unless otherwise stated herein, the appraised values are based on the whole ownership and possessory interest undiminished by any liens, fractional interest or any other form of encumbrance or alienation.

3.   The Appraisal is made at the request of the parties for their sole use.  It is not an indication or certificate of title or ownership.  The identification of the interest of the requesting party is simply that represented to the Appraiser by such party and no inquiry or investigation has been made, nor is any opinion given as to the truth of such representation.

4.   The values expressed herein are based on the Appraiser's best judgment and opinion and are not a representation or warranty that the items will realize those values if offered for sale at auction or otherwise.  The values expressed are based on current information and no opinion is hereby expressed as to any future value, or unless otherwise expressly stated, to any past value.

5.   Unless expressly stated, the condition of the items is assumed to be good.  Functional obsolescence (damage as to render the item unusable for its essential purpose) or Economic obsolescence (lack of demand) of appraised items will only be noted if applicable.

6.   In conjunction with this Appraisal, should additional services of the Appraiser be requested by the client, his agent or attorney, or the Court (such as added time researching for other value purposes, pretrial conferences, Court appearances, Court preparations, etc.) compensation for same shall be at the customary hourly rate charged by the Appraiser at that time; and the availability of the Appraiser shall be subject to the Appraiser's schedule and reasonable notice by the client.  The client shall pay all such fees upon receipt of a statement.

7.   This Appraisal is prepared for the persons named on Page One herein and any use of or reliance on by third parties is prohibited unless authorized in writing by the Appraiser.

8.   Sales tax, excise tax, delivery costs, commissions, advertising, storage costs, marketing costs and costs or repairs have not been included in this Appraisal unless otherwise stated and should be added when applicable.

9.   Compensation for this appraisal is not contingent upon values found.

The Appraiser has no present or contemplated future interest in the appraised property, unless otherwise stated.