UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **IN RE:**<br>COPPER TREE, INC.,<br>EIN # xx-xxx6608<br><br>GREEN COPPER HOLDINGS, LLC,<br>EIN # xx-xxx9708;<br>Debtors.<br>Case No.: 24-10021-M<br>Chapter: 7 | CASE NO. 25-10088-T Chapter 7<br><br>Substantively Consolidated |

### TAKITIK ENTERPRISES AND DALE TAKIO'S AMENDED[1] RESPONSE TO DEBTORS' OBJECTION [Doc. 132]

COMES NOW, **Dale Takio a/k/a Dale Douglas Takio, and, Takitik Enterprises, Inc.,** ("Claimant"), and files this Response to the Trustee's Objection [Doc. 132], and states as follows:

### I. TRUSTEE'S OBJECTION [DOC. 132] IS KNOWINGLY FRIVILOUS.

A.  Trustee on June 25, 2025, filed an Objection to Claimant's claim knowing from the filings and the documents the Trustee should be in possession of, that the recitation of alleged facts or claims within Trustee's Objections are false and groundless.  See, Exhibits filed herein.  Trustee is keenly aware that but for the hard and tiring work of Claimants there would be no asset of the Debtor and therefore no monies from which to Trustee is attempting to take a fee off of the backs of those who actually put in the work, effort and spent the resources. An evidentiary hearing, with the Trustee taking the stand, will evidence that there is no possible, equitable, justifiable way that the Trustee would be able to substantiate a fee over that of the Claimants; Claimants who rightfully

---

[1] Amended so as to now reflect attorney Representation for the Claimants

1

deserve everything left on the table and then some as Claimants believe that there is and was underlying known fraud and theft on debtor's part which debtor wrongfully believes that the evidence disappeared with the sale of the Price Tower. See, Exhibits filed herein.

B. As to examples of Trustee's demonstration of favoritism or failing to properly do his job, Trustee has not filed objections to the following who upon information and belief, have no valid claim:

1. **Claim No: 5 Archway Properties, LLC – $9,700**
   a. Upon information and belief, Archway Properties, LLC was the company that purchased the offices of Cynthia Blanchard's husband's company. Offices owned by a company owned and controlled by both Blanchards' as husband and wife. Archway Properties states that they made debtor a $9700 loan;
   b. As a shareholder in the debtor entity, claimants are not privy nor have knowledge of any such loan to debtor nor would they know why nor have been told that Archway Properties, LLC had any legitimate dealings or lending grounds with Debtor. Claimants have no documentation nor any notice of any legal connection between that of Archway Properties and the Debtor herein and any such loan would appear suspect or at least worthy of detailed discovery in order to justify any loan, prove legally able to provide such a loan and that debtor was legally authorized to accept any such loan and that true legal consideration was provided.
2. **Claim No: 10 Joshua Gunter – $4,500**
   a. Josh Gunter (Cynthia Blanchard's newphew/cousin/family member) while he did indeed perform various IT related services for Copper computerized systems and networks, he was paid in the form of equity at a rate of 0.5% and confirmed on the CAP table signed by Cynthia. The IT work he performed with minimum as Pictoria Studios did most of it, and Josh was already on HeraSoft's payroll. Wherefore, it would appear on the surface that in the filing of this claim, Josh Gunter is asking to be paid twice. Thus, while the Trustee has challenged the equity of Claimants' Brand, Takio and Moran, et.al., he has not done so here apparently accepting by course of action that equity interests in Debtor arising from the Blanchards' companies are acceptable.
   b. During my tenure, Josh, Renee and Paul, had agreed that for any more permanent salaries or retainers for work it would only come when the debtor was fully funded. This never happened or not that the Claimants are aware of. Lack of funding is also blamed on Cynthia Blanchard and Paul Aubert, Esq.
3. **Claim No: 13 Enterprise Global Logistics – $65,100**
   a. Enterprise Global Logistics was never to have done any work. They claim to have moved, transported and secured debtor's assets that Claimant Brand and this Claimant(s) properly put the company on Notice pursuant to the proper statutes and law not to move, touch, abscond with evidence which included these very assets. Therefore if Enterprise Global Logistics as well as another company 20C Designs,

2

submitted invoices for payment and the Debtor paid for these services, such payments should be clawed back as they were done in violation of lawful Cease and Desist Letters and Statutory Letters prohibiting the tampering and removal of evidence. <u>See</u>, Exhibits filed herein.

4. **Claim No: 16 Frank Lloyd Wright Conservancy – $170,000**
    a. The Frank Lloyd Wright Conservancy (FLWC), by way of document provided to Claimants only had an easement right not a financial right nor did the Debtor produce a valid contract with the FLWC granting them the authority to issue any type of financial gain or benefit to the Conservancy.
5. **Claim No: 17 Price Tower Arts Center (PTAC) – $186,070**
    a. When PTAC sold the building to Debtor Copper, there were zero liabilities assumed and zero encumbrances.
    b. The only newly created liability would have been the "Service Agreement" where employees remained on PTAC payroll as well as another one of their entity's, The Inn at Price Tower, Inc. (ITP). <u>See</u>, Exhibits filed herein. If so, it would be assumed that Debtor would then reimburse for any extended payroll due to employees that transitioned from PTAC and/or IPT after the acquisition and until Copper could establish them under their own direct payroll systems. There is no known evidence of any such Contract allowing for this extension and debt service.
    c. The Trustee should have picked up on the fact that the signed document, (<u>See</u>, exhibit filed herein this case), by Cynthia Blanchard and Brad Doenges were subsequent to the original acquisition of the PT premises. PTAC later gave the ITP to Copper free and clear! Therefore, with nothing else presented, it is highly suspect how PTAC possibly incurred that much money, if any, owed by Debtor.
    d. The Trustee should have also picked up on the fact that Donna Keffer was one the employees that worked solely for PTAC. She worked for PTAC, both before and after the acquisition of the Price Tower, and was to be paid by PTAC. Donna Keffer is now claiming past due pay due by the Debor, however, she was only to have been paid by PTAC. How did the Trustee miss this, or did he? Ms. Keffer is also claiming an amount which would make her the highest paid employee of the Debtor while she continued as the Executive Director of PTAC. Adding to the sniff test factors is that Ms. Keffer was somehow acting as President and GM of Price Tower, without the knowledge and approval of the shareholders, all the while also being a Partner/Owner in Amler Architect (a tenant in the Price Tower who upon information and belief was not paying rent). <u>See</u>, Exhibits filed herein this case.
    e. Furthermore, upon information and belief, Claimants have only recently discovered but the Trustee should have been in possession of this information from the beginning, that the PTAC claim maybe some type of COVID loan that the Debor somehow may have assumed. If so, this was an unauthorized debt assumption and should be invalidated.
        i. Upon information and belief Mark Haskell paid off this loan but it was a wash as upon information and belief the PTAC owed the same amount or approximate to Mark Haskell; and,
        ii. Any PTAC loans or liabilities discovered before, during or after the Price Tower acquisition would be in contradiction to the

3

      bill of sale for the premises that clearly was sold to Copper without any liabilities or encumbrances. See, Exhibits filed herein. Taking this point one step further, any monies PTAC owed either to the SBA or to Mark Haskell would not be legal liabilities of the Debtor unless such liabilities were given without legal consideration and certainly were not shareholder approved.

**Claim No: 19** Linda Jones (bookkeeper for PTAC and then for Copper) – $97,161.30
  a. This dollar amount should have thrown off a huge red flag. Her part time book keeping services shouldn't have reached more than $18,000 per year, but to be fair a contrast and comparison with how much she was being paid by PTAC prior to the acquisition of the Price Tower can be made.

6. Again, against the Trustee, but how can Linda Jones and Renee both be claiming to be bookkeepers for a company that was doing no business. Adding insult to injury and for which the Trustee hasn't bothered to move against is their claims that between the two of them, Linda and Renee, are claiming nearly $400,000 in back fees!!!

  **Claim No: 20** Donna Keffer (Simultaneously the Exec Dir for PTAC, President of Copper Tree, Inc, GM of the Price Tower and Partner Owner in Ambler Architects (also a tenant of the Price Tower) – $$111,180.40 with $15,150 claimed as Priority
    a. Based upon the information the Debtor has provided to the claimants, Mrs. Keffer was a full time officer and employee of PTAC. She was close friends with Cynthia Blanchard and helped Mrs. Blanchard obtain the Price Tower using methods that should be discussed. As it is understood that Mrs. Keffer was actually a covered and paid employee of PTAC, any claim for fees and Oklahoma labor law violations should be stricken and further investigation into these claims under oath should be made.
    b. Mrs. Keffer also used her position and friendship with Mrs. Blanchard to violation Pictoria Studio's agreements as well as impermissibly using Debtor's funds to hire her husbands graphic design firm in violation of the executed Pictoria Studio's Contract.

7. **Claim No: 21, 22 and 23** Mark Haskell (Treasurer for PTAC and ITP)
a.  #21 - $163,000 – This appears to be tied to an EIDL loan from the SBA for COVID. The PTAC took out this loan during the COVID give aways and the Claimants were never provided any documentation demonstrating how the Debtor would legally fall in privy for the repayment of this loan, in whole or in part.
b.  Upon information and belief, this PTAC EIDL loan caused an encumbrance the Price Tower building. Mark Haskel agreed voluntarily to pay it off so as to clear the encumbrance. This encumbrance should have never existed as when the Price Tower was purchased by the Debtor it was done so with free and clear title, no encumbrances and no clouds on title. This despite the alleged payment by Mark Haskel. Thus, according to the Price Tower closing documents, if any clouds on title or encumbrances existed prior to closing, the legal liability and responsibility was that belonging to PTAC. Therefore, if Mark Haskel paid for a PTAC debt, it would be PTAC's responsibility to repay him not the debtor. But yet, the Trustee again appears to have missed this.
c.  #22 - $176,107 – Unless, Mark Haskell entered into a new loan agreement where he gave new cash to Copper Tree after the closing, then Copper Tree should not be liable for

4

<ul style="list-style: none;">
<li>anything other than simply making monthly payments to the refinanced amount with Truity as noted in #23 below.</li>
<li>d.    #23 - $576,489.28 – This is presumably for the original 6 or 7 notes that Mark Haskel personally guaranteed for PTAC!!!! Now he is claiming this debt belonging to debtor with no legal consideration and no approvals from the debtor. At time of acquistion Debtor expressly never assumed or acquired these notes, but rather agreed to help get Truity Credit Union to consolidate them in to a single note between Truity Credit Union and Mark Haskell and then pay off the original separate notes to Arvest Bank. <u>See</u>, Exhibits filed herein this case.</li>
<li>e.    The day before the acquisition, Mark Haskil and Truity effectuated this refinancing for a total of approximately $600,000. The claimants were directly involved in all aspects of these negotiations and strategies. Mr. Haskil's Servicing Agreement with Copper Tree indicates that Copper Tree would assume the debt if in default or after a set end date, however, this should be invalidated as neither Mark Haskil or Copper Tree ever had the authority to assume a debt between Haskell and Truity Credit Union absent the express contractual approval of Truity, the Debtor's shareholder approval, the Debtor's Board of Director's confirmation.</li>
</ul>

<u>NO RIGHT TO DISCHARGE OF DEBT</u>:

      C.    Had the Trustee bothered to review the Claimant's Exhibits prior to filing his frivolous Objections, he would have known that the Debtor adopted by resolution of their Board and with the blessing of their General Counsel, certain Promissory Notes that became part of the subsequent Agreements entered into and binding the Debtor. This incorporated language representing as follows:

> *Voluntary Proceeding. The Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing.* ***It is agreed that Company, as part of the inducement for the Investor to enter into this agreement, affirmatively represents that they shall not move to discharge the Investor with respect to this Note. Company further agrees to reaffirm the debt represented by this Note to the Investor, , in the event a bankruptcy is filed on their behalf. This provision is non-negotiable and a material inducement for the Investor to enter into this Note.***

5

> *; or*
>
> *Involuntary Proceeding. An involuntary petition is filed against the Company (unless such petition is dismissed or discharged within 60 days under any bankruptcy statute now or hereafter in effect), or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company. It is agreed that Company, as part of the inducement for the Investor to enter into this agreement, affirmatively represents that they shall not move to discharge the Investor with respect to this Note. Company further agrees to reaffirm the debt represented by this Note, , in the event a bankruptcy is filed on their behalf. This provision is non-negotiable and a material inducement for the Investor to enter into this Note.*
> ***[Emphasis Added].***

D. These same promissory notes acknowledge the legitimacy, authenticity and value of the debts owed and arising from the initial works of the Claimants; debts that voluntarily became owed by the Debtor.

E. Trustee should know that Debtor has agreed by written Promissory Note and contract to ratify and reaffirm the debts owed and has failed or refused to do so.

F. Trustee prior to filing its frivolous Objections also knew or should have known that pursuant to the debtor's own Promissory Notes and/or contracts with the Claimants, debtor lawfully agreed not to move to discharge debts owed to claimants in the event bankruptcy is filed. Trustee is aware that the Debtor is in breach of these provisions but has failed to be genuine with the Court or his obligations.

G. The Trustee either reviewed these documents ahead of its Objections and thus knew his Objections to be false; or, the Trustee did not review the documents attributable to the debtor of which these exhibits vitiate the Trustee's representations to the Court. Either way, the Trustee's frivolous and malicious Objections should be denied.

H. Trustee falsely represents to this Court the following mis-statements which were either made intentionally or Trustee did not review the Creditor's exhibits or meet and confer with the Creditor to learn just how frivolous such false assertions are and should be sanctionable:

[3] … "*the alleged Agreement was a disguised attempt to pay Takio for sums allegedly owed by a non-Debtor entity. As a result, any obligations set forth in the Agreement were illusory and the Agreement was void ab initio.*". **RESPONSE**: As a sudden 180 turn, in the following paragraph No. 5, of Trustee's Objections, does the Trustee state: "In the alternative, the Agreement, if any, was terminated under its terms by the Debtor on or about September 25, 2023". The Trustee cannot possibly have it both ways. In one paragraph he states an Agreement does not exist and then in the following paragraph he admits that an Agreement does exist between the Parties and not only does it exist but the claimants were terminated by way of this very Agreement's terms; thus, the Trustee admits to the validity of the Agreement. As such the Trustee's objection should be denied with prejudice and sanctions awarded to the claimant.

[6] "*In the alternative, the Trustee additionally asserts that at all material times, Takio and Takitik were insiders of the Debtor, and the asserted claim exceeds the reasonable value of services provided to the Debtor. As a result, Claim No. 4 should be denied to the extent the amount exceeds the value of any services pursuant to 11 U.S.C. § 502(b)(4)*". **RESPONSE**: It appears that the Trustee failed to review the CAP table of the Debtor to recognize that neither Dale Takio, individually, nor Takitik Enterprises are stockholders in any of the Debtor's company(s), did not have board seats, in fact were paid and viewed as independent contractors, performed services at not only a discounted rate, but deferred payment time and again in a good-faith effort to help the

7

debtor remain solvent. As such the Trustee's objection should be denied with prejudice and sanctions awarded to the claimant. See, Exhibits filed herein this case.

[8] *"Claim No. 4 also purports to assert and recover, at least in part, the value of an equity interest in the Debtor. Such assertion does not constitute a "claim" against the Debtor's estate and thus should be denied. An equity security interest in the Debtor may ultimately be recognized and allowed only upon presentation of a timely Proof of Interest once all claims are allowed in this case".* **RESPONSE**: The Trustee fails to represent to the Court that equity was provided as part of Mr. Takio's compensation package as many of the Claimant's tasks could not be quantified by affixing a specific dollar figure. See, exhibits filed herein this case. Much of the value brought to the debtor by Mr. Takio could not be measured in terms of a billable hour and equity was given in return for services. These same services are what in fact allowed the Debtor to obtain the asset (i.e., the Price Tower and all of its ancillaries), as the Debtor and its officers were unable to alone secure the same.

G. Claimant's company is an alter ego and extension of himself personally.

## II. BACKGROUND

1. On or about October 13, 2022, Claimant entered into a series of three phased approached memorialized by multiple written Consulting Agreements with Debtors for branding, marketing, digital production, and related consulting services in connection with the Price Tower project. See Exhibits filed herein this case. This was the first of a series of continuing service agreements as well as Promissory Notes that the Debtor executed with Creditor. See, Exhibits filed herein this case and all should already be within the possession, control and knowledge of the Trustee as they are documents also belonging to the Debtor.

2. From October, 2022 through November 2023, Claimant properly performed services (Phases One, Two and Three) pursuant to the Agreements and issued monthly invoices totaling more than $400,000.00, all of which remain unpaid. A detailed Statement of Account was submitted with the Proof of Claim. See, Exhibits filed herein this case.

3. On September 25, 2023, Debtors issued a Termination Letter acknowledging the Agreement and providing 45 days' notice, making the effective termination date November 9, 2023. Claimant continued to provide and properly perform its services through that period. See, Exhibits filed herein this case.

4. The Agreement states that termination requires payment of all outstanding invoices. These invoices remain unpaid. Claimant does not contest the termination date but maintains that services rendered during the term remain fully compensable with no defense available to the Creditor. See, Exhibits filed herein this case.

5. The contract explicitly applies to Copper Tree, Inc. and its wholly owned subsidiary, Green Copper Holdings, LLC.

**III. RESPONSE TO OBJECTION**

6. The Debtors' objection claims the contract was invalid or that no services were rendered. These claims are unsupported. In fact, the Claimant has dozens of emails and text messages from the Debtor and the Debtor's representatives raving about the Claimants, the Claimants' work and that but for the Claimants excellence, the Debtor would not have secured the assets in issue. See, Exhibits filed herein this case.

7. The contract was lawfully executed, reviewed and edited by Debtor's own corporate counsel, Mr. Paul Aubert, and fully approved by all board members including Mr. Anthem Blanchard. The contract contains a valid, time-stamped electronic signature from the

Debtors' authorized representative. For the Trustee to represent that this was not a legitimate contract is a false statement made a the Court. See, Exhibits filed herein this case.

8. For the Trustee to further falsely represent to the Court that "*The alleged Agreement was a disguised attempt to pay Claimants for sums allegedly owed by a non-Debtor entity*" is defamatory and a breach of the Trustee's ethics. Notice how the Trustee does not even attempt to substantiate his claim of "disguised attempt"; no specifics or examples included. Notice how the Trustee intentionally omits to the Court any showing that the Contract was … "*for sums allegedly owed by a non-Debtor entity*". See, Exhibits filed in this case in support of Claimants.

9. The Trustee's Objections are frivolous, false, defamatory and possibly a breach of legal ethics.

10. Claimants rendered substantial, reasonable and fair valued services during the contract period and has documentation and witnesses to support performance. Again, the Claimants have emails, text and testimony from the Debtor and the Debtor's agents, representatives, officers, shareholders, employees and/or those who the Debtor did business with, including those who were present for the securing of the Debtor's only asset, i.e., the Price Tower and its inclusions. See, Exhibits filed herein this case. The Trustee's assertions are categorically false.

11. Trustee also knows that the equity position received was also part of the consideration and payment for Claimants services. Trustee knows by review or should he have met and conferred that nothing comes for free and that a lot of the Claimant's good-will and work could not be billed by the hour and therefore paid with equity.

**IV. REQUEST FOR RELIEF**

WHEREFORE, Claimant respectfully requests that this Honorable Court:

    a.    DENY Debtors' Objections in its entirety;

    b.    Allow all of Claimant's claims including that of the hard and soft debt which would include the equity within the Debtor whose value is unknown but was paid by proper services and work provided;

    b.    Rule that the Trustee's Objections were/are baseless, frivolous and warrant sanctions in favor of the Claimant;

    c.    <u>Alternatively, set the matter for a hearing or evidentiary hearing and permit Claimant to first conduct timely and appropriate discovery, including the taking of depositions</u>; and

    d.    Grant such other and further relief as the Court deems just and proper.


Respectfully Submitted by:

/s/ Craig Alan Brand, Esq.
_____
Craig Alan Brand, Esq.
The Brand Law Firm, P.A.
Florida Bar No. (FBN): 896111
6462 S. Jamaica Circle
Englewood, CO 80111
Tel. (305) 878-1477
Craig@thebrandlawfirm.com

Attorney for: Dale Takio a/k/a Dale Douglas Takio,
and, Takitik Enterprises, Inc.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 24, 2025, a true and correct copy of the foregoing Response to Response to the Trustee's Objection [Doc. 132], was served electronically on participants in the CM/ECF system according to local procedures.

/s/ Craig Alan Brand, Esq.
_____
Craig Alan Brand, Esq.
Florida Bar No. (FBN): 896111

Attorney For: Dale Takio a/k/a Dale Douglas Takio, and, Takitik Enterprises, Inc.