UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| IN RE: | ) | |
| **GREEN COPPER HOLDINGS, LLC** | ) | CASE NO. 25-10088-T |
| EIN # xx-xxx9708 | ) | Chapter 7 |
| | ) | |
| **COPPER TREE, INC.** | ) | Substantively Consolidated |
| EIN # xx-xxx6608 | ) | |
| | ) | |
| **THE INN AT PRICE TOWER INC.** | ) | |
| Debtors. | ) | |
| | / | |

**CLAIMANT PICTORIA STUDIOS USA, INC., (Claim No. 14), AND CLAIMANT TAKTIK ENTERPRISES, INC. (Claim No. 4) OBJECTION TO CLAIM NO. 23, CLAIMANT MARK HASKELL, AND NOTICE OF OPPORTUNITY TO BE HEARD**

COMES NOW **PICTORIA STUDIOS USA, INC., (CLAIM NO. 14)**, and, Claimant **TAKTIK ENTERPRISES, INC. (Claim No. 4)** by and through their undersigned counsel and hereby files this Objection to Claim No. 23, filed on August 11, 2025, and Notice of Opportunity to be heard, and as grounds thereof states as follows:

1. On August 11, 2025, Claimant Mark Haskell filed Claim No. 23 in the amount of $576,489.28.

2. Claimant attached several documents allegedly supportive of this claim. (See, ECF 23 "Case 25-10088-T   Claim 23   Filed 08/11/25   Attachment 1   Pg 1 of 4"; and, "Case 25-10088-T   Claim 23   Filed 08/11/25   Attachment 2   Pg 1 of 43".

3. Attachment 1, is a January 2025, Truity Credit Union Statement, only identifying as the Claimant as the debtor to the note. No mention at all of Green Copper Holdings or Copper Tree, Debtors herein, as being any legitimate debtor or having any obligation to Truity Credit Union.

4. Important about Attachment 1, is that this Truity Bank statement demonstrates the Claimant had made no payments towards this loan and thus did not advance any out of pocket money or at least none being shown.

5. Nowhere on this Attachment 1 statement does it reflect an agreed assumption from Truity that the Debtor had assumed this loan, was in privy with Truity, that Truity was even aware of the Debtor or that the Debtor had somehow become liable to Truity for the loan payments.

6. More importantly, this Truity Credit Union loan was for the benefit of the Claimant, an in-sider, as well as for Price Tower Arts Center ("PTAC"). Upon information and belief, the Claimant was the Treasurer of PTAC and PTAC was the entity that sold the Price Tower to the Debtor and is in issue within this case as the Price Tower and its art work are the largest assets of the Debor.

7. Upon information and belief, Claimant on behalf of PTAC has between 5-7, pre-existing, personal loans taken out with Arvest Bank. Claimant took out these loans to help support PTAC.

8. Claimant, through the help of Dale Takio, not for the benefit of the Debtor, herein, but for the benefit of Haskell, who was making alleged bad personal business such as endorsing 5-7 personal loans for PTAC with no collateral, high interest, no personal upside and paying off 5-7 separate loans for which PTAC benefited and it can be presumed that Claimant Haskell was helping himself as an owner and/or officer of PTAC.

9. Haskell, as an owner and/or officer of PTAC, needed to sell the Price Tower and needed a buyer, in the hopes of acquiring sufficient monies from any sale to pay off the loans taken or stop the bleeding as the Price Tower was not bringing in sufficient monies to keep PTAC afloat.

10. With Takio's help, Haskell was able to consolidate these pre-existing Arvest Bank loans at Truity Credit Union, where Takio had resources. Haskell by consolidating these pre-existing loans with Truity lowered the interest rate he was paying at Arvest, obtained additional benefits and was able to establish a new banking relationship which proved highly valuable to both Truity and Mr. Haskell.

11. As an insider with the Debtors herein, as well as being an insider at PTAC along with Claimant Donna Keffer (Claimant 20), Mr. Haskell positioned himself to sell to the Debtor herein the Price Tower and thus help himself as well as Mrs. Keffer.

12. Attachment 2, page 1 is the Bill of Sale for the Price Tower asset of the Debtor. This Bill of Sale, <u>dated March 7, 2025</u>, is by and between Price Tower Arts Center ("PTAC") as the Seller, and, Green Copper Holdings, LLC as the Buyer. Nothing within this Bill of Sale mentions, discusses or places any contingencies involving the Claimant and the Claimant's personal loan taken.

13. Attachment 2, page 2 – 7, is the Oklahoma standard Real Estate Agreement for the Purchase and Sale of the Price Tower. The second paragraph of this Agreement states in part, "**All prior verbal or written negotiations, representations and agreements are superseded by the Contract <u>and may only be modified or assigned by a further written Agreement of Buyer and Seller</u>**."

14. At no time has Buyer and Seller modified or assigned such agreement to include the Claimant, Mark Haskell, Claim 23, and release him of his sole banking liabilities. His banking commitments are his and his alone as his loan agreements hold him personally and singularly responsible. This is materially important as will be explained below.

15. Attachment 2, pages 9-11, is titled Loan Servicing Agreement and was entered into by and between Mark Haskell and Green Copper Holdings, LLC. This Servicing Agreement has no privy with Truity Credit Union nor is Truity Credit Union a third party to this Agreement. <u>This Servicing Agreement was entered into on March 6, 2025. At this time, the Debtor herein did not own the asset known as the Price Tower as the closing did not yet occur</u>. Therefore, Truity Credit Union nor Mr. Haskell would be able to have claimed a legal interest within the Debtor's assets at the time of Mr. Haskell's bank loans; all pre-existing.

16. The third Whereas Clause, page 9, of this Loan Serving Agreement states that Green Copper Holdings, LLC purchased from PTAC the Price Tower. This paragraph states that a loan was taken out in the amount of $591,009.18 for the benefit of PTAC paying off a balance owed to Arvest Bank. PTAC's benefit not the Debtors herein. PTAC, for which the Claimant was an in-sider and benefited from this sale as an in-sider.

17. Page 2 of Attachment 2, which is the Purchase and Sale Contract, paragraph 2, explicitly states that the real properties purchase price was $250. This is in direct contradiction to the above-mentioned, self-serving, Loan Service Agreement. This purchase and sale contract was by and between the Debtor and PTAC; whereas, the Serving Agreement is between the Debtor and Claimant, however, in this Servicing Agreement the Claimant is paying off a debt owed by a third party, for which he stood to benefit from as an owner and/or officer, to a third bank known as Arvest.

18. Furthermore, there is no properly performed Green Copper Holdings board approval specific to such a material and unusual business commitment, and certainly no shareholder approval for the allowance of Green Copper Holdings to bind the company to this Servicing Agreement for which the shareholders would have taken issue with. The Agreement

would be legally void or voidable as the conditions precedent to enter into and bind the company never occurred.

19. Attachment 2, page 9, paragraph 4, <u>expressly states</u>, **"All parties acknowledge that no loan identified herein shall be considered assumed by GCH unless otherwise done so under a separate agreement between Servicer and Truity."** [Emphasis added]. ("GCH" = Green Copper Holdings, LLC").

20. At no time did Truity enter into a separate agreement with Debtor and as such no legal basis exists to hold debtor to an assignment or assumption of the Haskell ("Claimant") personal loan.

21. Attachment 2, page 9, paragraph 4, continues and goes on to acknowledge that the loan holder, i.e., Mark Haskell, is the only one with liability for this loan until or unless privy of contract by and between Truity and the Debtor occurs.

22. Attachment 3, page 13, is the Disbursement Request Form from Truity Federal Credit Union evidencing that Mark Haskell used the loan proceeds to make payments to Arvest Bank. This document does not mention the Debtor nor confer any legal consideration onto the Debtor to somehow assume a loan in which the Claimant's own Service Agreement with the debtor expressly states that the loan cannot be assumed. <u>See</u>, No. 13, *supra*.

23. Page 14-15, Attachment 2, is the Promissory Note between Haskell and Truity Federal Credit Union. While collateral of real property is discussed, we know that it could not legally encumber the Price Tower as the closing on the Price Tower had yet to occur given that the Promissory Note was entered into on a prior date. The Promissory Note cannot legally bind real property where no party to the Promissory Note owned or controlled this property, nor to the

Servicing Agreement as no party to that Agreement had legal interest in the Price Tower real-estate at such time.

24. Page 16-21, attachment 2, is the Business Loan Agreement between Claimant Haskell and Truity Federal Credit Union. No privy of contract nor legal consideration for any other claim exists regarding this Agreement between Truity and the Debtor herein. This Agreement is entered into before the Debtor has legal possession and control of the Price Tower real estate and thus, any use of the Price Tower as collateral as of the date of this Loan Agreement is void and unenforceable. If such agreement did attempt to bind real property not yet owned, such an agreement might be fraudulent.

25. This Business Loan Agreement provides that Mr. Haskell is the sole obligator to this loan. In fact, on page 5 of this Loan Agreement (Attachment 2, page 20), "Successors and Assigns: "… Borrower shall not however, have the right to assign Borrower's rights under this Agreement, or any interests therein…." Wherefore, regardless of any legal action the Claimant might take against the Debtor, for whatever claims he could conjure, the bank would still only have recourse against Mr. Haskell and Mr. Haskell will always be solely liable to the bank.

26. Attachment 2, page 26-28, is a document titled, "Assignment and Assumption of Leases". This document is for the leases within the Price Tower to third parties and entered into between PTAC and GCH. The claimant is not involved in this document nor in privy.

27. Attachment 2, page 40, is alleged minutes of an alleged Board Meeting, allegedly taken place, however, no Notice to Stockholders of the Debtor was provided making any such alleged board meeting improper and invalid. The alleged minutes demonstrate that Mark Haskell was an in-sider given that he was one of three alleged board members or Trustees present. "Alleged Board Members" as the Stockholders of the Debtor never had a chance nor did they vote on these

board members or Trustees. No waiver of conflict of interest for the benefit of Mr. Haskell exists either. No company meeting was ever held. This document couldn't be anymore ambiguous as to what occurred on March 7, 2023, but we do know that Mark Haskell undertook, himself, to secure a consolidating loan for the purposes of paying off Arvest Bank on behalf of PTAC, also benefiting himself, on March 6, 2023.

28. Pursuant to the Attachments submitted by Mr. Haskell (Claim 23) in support of his claim, the Agreements presented do not represent a legitimate or permitted assumption of debt by the Debtor. In fact, we know from the Servicing Agreement, Clause 4: "All parties acknowledge that **no loan identified herein shall be considered assumed** by the GCH unless otherwise done so under a separate agreement between Servicer and Truity." [**Emphasis added**]. No such separate agreement exists or has been provided. The clause further goes on to confirm that only Mr. Haskell shall have the liability of the bank loan unless or until a separate agreement between debtor and Truity occurs.

29. The Agreement establishes only a servicing role for the Debtor (as "Servicer"), requiring payments to Truity Credit Union on behalf of the Claimant (as "Borrower"), for some undefined legal consideration and lack of shareholder of GHC' approval. Mr. Haskell prior to any Price Tower closing by the Debtor, paid off the debt of a third party, i.e., Price Tower Arts Center, Inc. (PTAC) with Arvest Bank and unfortunately took this risk but did so unilaterally and as an insider. No disclosure to the Debtor's shareholders were made, no notice, no company meeting, no waiver of conflict, and no understanding by the Debtor's shareholders as to why Mr. Haskell would have made such a loan.

30. The Claimant remains primarily liable on the underlying promissory note and Business Loan Agreement to Truity, *supra*. In this instance, the Claimant is solely responsible to Truity for the loan he had taken out.

31. This structure contrasts with disallowed insider claims in this case, such as those of Cynthia Blanchard (alleged disguised equity contributions lacking repayment terms), and, Anthem Blanchard/UBAC LLC (alleged illusory for lack of performance records and adequate consideration). The Service Agreement does not transfer liability to the Debtor, rendering the claim unenforceable for many reasons including pursuant to 11 U.S.C. § 502(b)(1).

32. In the alternative, Pictoria Studios USA and Taktik Enterprises assert that at all material times, the Claimant had insider ties to the pre-acquisition entity, and the asserted claim exceeds the reasonable value of any services or benefits provided to the Debtor. As a result, Amended Claim No. 23 should be disallowed to the extent the amount exceeds such value pursuant to 11 U.S.C. § 502(b)(4). In fact, movants would argue that Mr. Haskell's actions, while benefiting himself, were adverse to other shareholders of the debtor such as the movants.

33. Amended Claim No. 23 fails to include adequate documentation under Bankruptcy Rule 3001(c), such as evidence of a separate assumption agreement, itemized interest/charges, or payment history establishing direct Debtor liability.

34. Amended Claim No. 23 may also purport to assert recovery based on equitable contributions tied to the acquisition's success, similar to disallowed equity-like claims. Such assertion does not constitute a "claim" against the Debtor's estate and should be denied on that basis.

35. Pictoria Studios USA and Taktik Enterprises intend to seek an order denying Amended Claim No. 23 in its entirety or allowing such Claim in a limited equitable sum under quantum meruit principles.

WHEREFORE, the Movants hereby pray that this Court grant the relief sought herein, including but not limited to:

a. A denial of claim 23 in full or in part;

b. Limiting any recovery to only those instances allowed pursuant to the Federal Bankruptcy Code and Federal Statute.

c. Values limited to value pursuant to 11 U.S.C. § 502(b)(4).

d. Any and all other relief the Court finds prudent, including in light of the above, the preemptive denial of ECF 156 and ECF 156-1.

RESPECTFULLY SUBMITTED ON THIS 16TH DAY OF AUGUST, 2025.

By: /s/ *Craig A. Brand, Esq.*
Craig Alan Brand, Esq.
FBN: 896111
Tel. (305) 878-1477
6462 S. Jamaica Circle
Englewood, Colorado 80111

**On behalf of and for:**
PICTORIA STUDIOS USA, INC. (Claim No. 14), and
TAKTIK ENTERPRISES, INC. (Claim No. 4).

**NOTICE OF OPPORTUNITY FOR HEARING**

Your rights may be affected. You should read this document carefully and consult your attorney about your rights and the effect of this document. If you do not want the Court to grant the requested relief, or you wish to have your views considered, you must file a written response objection to the requested relief with the Clerk of the United States Bankruptcy Court for the Northern District of Oklahoma, 224 South Boulder, Tulsa, Oklahoma 74103 no later than 33 days from the date of filing of this request for relief. You should also serve a file-stamped copy of your response or objection to the undersigned movant/movant's attorney [and others who are required to be served] and file a certificate of service with the Court. If no response or objection is timely filed, the Court may grant the requested relief without a hearing or further notice. The 33 day period includes the three (3) days allowed for mailing provided for in Fed. R. Bankr. P. 9006(f). *The moving party shall calculate the appropriate response time. If a response time is prescribed by applicable statute, rule, or order, the moving party shall add to the prescribed response time unless service is accomplished by hand delivery, the three (3) days required for mailing under Bankruptcy Rule 9006(f). If a response time is not prescribed by applicable statute, rule, or order, the response time shall be fourteen (33) days, which includes the three (3) days required for mailing under Bankruptcy Rule 9006(f).

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this foregoing Motion to Compel Trustee for a Proper Accounting was ECF filed with the Clerk of Court on this 16th day of August, 2025.

By: /s/ *Craig A. Brand, Esq.*
_____
Craig Alan Brand, Esq.
FBN: 896111
Tel. (305) 878-1477
6462 S. Jamaica Circle
Englewood, Colorado 80111

**On behalf of and for:**
PICTORIA STUDIOS USA, INC. (Claim No. 14), and
TAKTIK ENTERPRISES, INC. (Claim No. 4).