# EXHIBIT 1

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF OKLAHOMA

In re:
GREEN COPPER HOLDINGS, LLC, et al., Debtors.

Case No. 25-10088-T
Chapter 7 (Substantively Consolidated)

## CLAIMANT CYNTHIA DIANE BLANCHARD'S RESPONSES TO TRUSTEE-OBJECTOR'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

Claimant, Cynthia Diane Blanchard ("Claimant"), hereby responds to the Trustee-Objector's first Set of Interrogatories and Requests for Production of Documents as follows:

## INTERROGATORIES

**Interrogatory No. 1:**

State whether you own, hold or control equity securities in the Debtor; and if so, please state (i) the amount of such equity securities (stated as a percentage of the total amount of such securities); (ii) the date(s) on which you acquired such equity securities, and (iii) the consideration given by you for such equity securities.

**Response to Interrogatory No. 1**

Yes. I own equity securities in the Debtor, (held in Peaceful Journey, LLC, an LLC I own and manage). I founded Copper Tree, Inc. and initially held 100% of its equity. Over time, I granted very small minority equity interests to six individuals, none of whom contributed capital. After

those issuances, my ownership percentage is approximately 90.48% of the total issued and outstanding equity. To recap:

(i) The amount of such equity securities is approximately 90.48%.

(ii) The initial acquisition of equity securities occurred at the company's formation when I owned 100%, with small issuances to six individuals occurring thereafter.

(iii) No monetary consideration was exchanged for these issuances. My ownership was based on founding the company, and financing of the company's operations was provided in part by me personally in the form of loans, not equity contributions. My equity contribution consisted of my uncompensated time and leadership.

The Trustee already possesses the company's capitalization table and related records reflecting these percentages.

**Interrogatory No. 2:**

If you are now, or ever have been, an officer of the Debtor, identify the office(s) and the inclusive dates of your tenure in such office(s).

**Response to Interrogatory No. 2**

Yes. I served as:

- Chief Executive Officer of Copper Tree, Inc. from its formation in 2022 through the filing of its Chapter 7 bankruptcy in 2025;

- Managing Member of Green Copper Holdings, LLC from its formation in 2022 through the filing of its Chapter 7 bankruptcy in 2025; and

- President/Corporate Officer of The Inn at Price Tower, Inc. from its formation in 2022 through the filing of its Chapter 7 bankruptcy in 2025.

I did not take salary or other compensation for these roles.

**Interrogatory No. 3:**

If you are now, or ever have been, a director of the Debtor, identify the inclusive dates of your tenure in such role.

**Response to Interrogatory No. 3:**

Yes. I served as a Board Director of Copper Tree, Inc. from its formation in 2022 through the filing of its Chapter 7 bankruptcy in 2025.

**Interrogatory No. 4:**

State the date on which you allege to have first loaned funds to the Debtor.

**Response to Interrogatory No. 4**

The first loan I made to the Debtor was in 2022.

**Interrogatory No. 5:**

State whether the Debtor requested that you loan funds to it; and if so, identify: (i) how and by whom that request was authorized; (ii) the date of such authorization; and any Document(s) that memorialize that authorization.

**Response to Interrogatory No. 5**

The Debtor did not make formal requests for me to loan funds. As founder, CEO, and majority equity holder, I exercised authority to provide funding as needed to cover operations and

obligations. These advances were based on the guidance of Renee Nichols, who oversaw the company's accounting and advised what amounts were required and when. Before the company implemented internal controls in April 2024, Donna Keffer also assisted with bill payments and would notify Renee and me when advances were necessary to cover costs. Corporate counsel and board member Paul Aubert was also aware of these transactions. No separate board resolution or written authorization was required or created. Documents evidencing these loans consist of QuickBooks Online records, corresponding bank statements, and the Loan Agreement attached to my Proof of Claim, all of which have already been provided to the Trustee.

**Interrogatory No. 6:**

Identify all forms of loans or loan advances made by you to the Debtor, e.g., personal check, etc.

**Response to Interrogatory No. 6**

The loans and loan advances I made to the Debtor were made primarily by direct bank transfers from my personal accounts at Truity Credit Union into the Debtor's corporate accounts, which were also maintained at Truity Credit Union.

On rare occasions, a loan advance may have been made by a physical check, but if so, it is reflected in the corresponding Truity bank statements.

All such transactions are memorialized in QuickBooks Online records, the Ledger and the Truity bank statements, which have already been provided to the Trustee.

**Interrogatory No. 7:**

Identify all advances of loans made by you to the Debtor, including without limitation, the date,

amount and form of such advances. If you respond to this Interrogatory by reference to the Ledger or any other Document, state the date(s) of creation of such Document.

**Response to Interrogatory No. 7:**

All advances of loans that I made to the Debtor are fully documented in the QuickBooks Online records and corresponding Truity Credit Union bank statements, which reflect the date, amount, and form of each transaction.

For convenience, a consolidated version of these advances was compiled into the **Loan Ledger** attached to my Proof of Claim. This Ledger was created and maintained on an ongoing basis by Renee Nichols, who oversaw the company's accounting. It was updated contemporaneously with QBO entries from corporate creation in 2022 and through 2023–January 22, 2025 to track all advances and repayments.

In addition, the loan balance was consistently reflected in the company's monthly financial statements and debt schedule, which were prepared and reviewed throughout the Debtor's operations.

The Trustee is already in possession of:

- The complete QBO records,

- The corresponding Truity Credit Union bank statements,

- The Loan Ledger submitted with my Proof of Claim, and

- The company's monthly financials and debt schedules.

These collectively identify all advances of loans, with dates, amounts, and forms.

**Interrogatory No. 8:**

Identify any and all Documents that evidence or memorialize any loan and/or loan advances made by you to the Debtor, including, without limitation, credit/debit card receipts and/or statements, and checks or other drafts.

**Response to Interrogatory No. 8**

The loans and loan advances I made to the Debtor are evidenced and memorialized in the following documentation, all of which has been provided to the Trustee:

1. QuickBooks Online records reflecting each loan advance and repayment;

2. Truity Credit Union bank statements documenting the transfers between my personal accounts and the Debtor's accounts;

3. The Loan Ledger, created and maintained by Renee Nichols, which consolidates and itemizes each loan advance, repayment, and related entry, including dates, amounts, and accounts.

4. The Debtor's monthly financial statements and debt schedules, which consistently reflected the outstanding loan balance; and

These layers of documentation collectively and consistently evidence the loans I made to the Debtor.

**Interrogatory No. 9:**

Identify all repayments, by cash or non-cash property, made by the Debtor of any loans allegedly

made by you to the Debtor. If you respond to this Interrogatory by reference to the Ledger or any other Document, state the date(s) of creation of such Document.

**Response to Interrogatory No. 9**

There were two temporary repayments made by the Debtor on account of my loans. These repayments are documented in the materials already provided with my Proof of Claim. No other repayments, cash or non-cash, were made. See details in response to no. 14 below.

These repayments consisted of bank transfers from the Debtor's Truity Credit Union accounts back to my personal Truity account. All such repayments are reflected in the following documentation, already provided to the Trustee:

1. QuickBooks Online records,

2. Truity Credit Union bank statements, and

3. The Loan Ledger maintained by Renee Nichols, which consolidates and itemizes both loan advances and repayments

The Ledger was created contemporaneously with the QBO entries and updated through 2023–January 22, 2025 to include these repayments.

**Interrogatory No. 10:**

State whether you ever removed tangible property -- including, without limitation, furniture, furnishings, and art -- from the Debtor's owned or leased physical premises, and placed such property in premises owned, leased or controlled by you. For each item of property so moved, identify (i) the item; (ii) the date of the removal; (iii) the premises to which it was moved; (iv) the reason for its movement; and (v) its current location.

**Response to Interrogatory No. 10**

I did not remove any tangible property of the Debtor for my personal use.

In June 2023, at the recommendation of the company's curator, DeShane Atkins, eight Frank Lloyd Wright–related items stored in the annex were identified as potential candidates for deaccession for a possible auction with Christie's in NYC. These items were duplicates, had been in storage for years, and were similar in nature to those that PTAC had previously auctioned through Heritage in 2019.

The curator advised that moving the items off-site would both (i) allow Christie's to evaluate them for a future auction and (ii) protect them from risk of inaccessibility if the company closed a bridge loan then being negotiated with Brock Pierce. Acting on that advice, the eight items were moved from the annex (which lacked adequate security) to my home, which has alarm, camera security, and climate control systems. The curator herself photographed the items at my home for Christie's, and we corresponded with Michael Jefferson of Christie's as well as other Christie's representatives for approximately two months (see Exhibit A). Ultimately, the company did not move forward with a Christie's auction. Dropbox of photos of the eight artifacts sent to Christies:

https://www.dropbox.com/scl/fo/tmggspxhq5cqnj2ll6av8/h?rlkey=fbf8ldiqvthutwzj5dgfww6kk&e=1&dl=0

The outcome was as follows:

- Seven of the eight items were later included in the group of artifacts purchased by 20C Design in April 2024, as documented in the sale records.

- One item (a fireplace hood) was returned to the annex.

Additionally, as the Trustee is aware, the Japanese Woodblock Print collection was relocated when the Tower was winterized and shut down prior to the bankruptcy. This was done to protect the collection from damage caused by extreme conditions. The collection was disclosed to the Trustee immediately after the bankruptcy filing and, at the Trustee's direction, delivered to Michelle Johnson, the Trustee's designated asset liquidation representative.

All actions regarding these items were undertaken transparently, with professional oversight.

**Interrogatory No. 11:**

State whether the Debtor ever sought financing from Entities other than you for the funds you allege to have loaned to it; and for each such financing effort, state: (i) the name of the potential financing Entity; (ii) the amount of financing requested; (iii) whether financing was obtained, and (iv) if financing was not obtained, the reason why not.

**Response to Interrogatory No. 11**

Yes. The Debtor sought financing from Entities other than myself; however, no such financing was ever obtained.

- **Brock Pierce (2023):** The Debtor pursued a proposed $1,000,000 bridge loan. The terms escalated over time of negotiations to include (i) a personal guarantee, (ii) a pledge of all of my (Peaceful Journey–held) personal equity, and (iii) 12% interest, among other extreme conditions. The loan was never closed because the terms were unreasonable, and additional factors on Mr. Pierce's side ultimately prevented its completion.

- **Family Office of AJ Rudhe (2023):** The company explored a proposed $1,000,000 bridge loan financing through Mr. Rudhe's family office, working with fiduciary Nathan Aldinger. This effort was abandoned for a number of reasons, including Mr. Aldinger's concern about consultant Dale Takio's extended three-month trip to Europe during the summer of 2023. Ultimately, the family office decided not to proceed, and no financing was obtained.

- **Broker Outreach (Greenberg & Castagna, 2023):** At the direction of consultants Mr. Takio and Mr. Moran, brokers Ken Greenberg and Patrick Castagna were brought in, initially demanding a 50% equity stake in exchange for securing $5 million in financing. The company rejected that demand, and after pushback, the brokers settled on a proposed 30% equity arrangement. Ultimately, they failed to secure financing (as reflected in company records), and no funds were obtained through their efforts.

- **UBAC Outreach (2023–Jan. 22, 2025):** In parallel, UBAC, LLC conducted extensive outreach efforts to family offices and professional networks, as documented in UBAC's Proof of Claim. These efforts did not result in institutional funding, and no outside capital was ultimately secured.

- **Dallas Hindman/Archway Properties (early 2024):** The company entered negotiations with Dallas Hindman/Archway Properties regarding a potential stock buyout through a short-form merger, resulting in a signed purchase agreement in March 2024. The transaction did not close due to several intervening events, including (i) the Keffer/Haskell/Jones self-payment incident, (ii) aggressive correspondence from Brand, Takio,

and Moran, and (iii) a series of negative articles published by reporter Andy Dossett in the Bartlesville Examiner-Enterprise (a Gannett publication).

- **McFarlin Group (2024–2025):** Following the collapse of the Hindman/Archway Properties deal, the company entered into negotiations with the McFarlin Building, LLC, resulting in a signed purchase agreement. The agreement did not close after McFarlin unilaterally and materially altered its terms without the company's knowledge, declined to adopt an amendment prepared by company counsel Paul Aubert to correct contradictions created by those changes, and issued last-minute demands outside the scope of the agreement. As a result, Mr. Aubert, terminated the agreement on June 9, 2025.

- **Ultimately, the company was funded during this time by:**

1. My personal loans (as documented in the Loan Ledger, QBO, and Truity bank records);

2. Loans from friends and family, which the Trustee is aware of and which are all documented in the company's debt schedule;

3. Revenues generated by the businesses; and

4. The artifact sale to 20C Design in April 2024.

**Interrogatory No. 12:**

State what property constituted the initial capitalization of the Debtor; and for the entire period of time in which you allegedly made loans to the Debtor, identify any Documents that (ii) constitute a balance sheet of the Debtor or (ii) present the assets and liabilities of the Debtor.

**Response to Interrogatory No. 12:**

The initial capitalization consisted of cash contributions at formation. The company's QuickBooks Online records and financial statements present the assets and liabilities of the Debtor. The trustee has all of this documentation in his possession.

**Interrogatory No. 13:**

State who created the Ledger.

**Response to Interrogatory No. 13**

The Loan Ledger was created and maintained by Renee Nichols, who was responsible for the company's accounting. The Ledger was created in QuickBooks Online beginning in early 2023 and was updated contemporaneously through January 22, 2025 to reflect all loan advances, repayments, and accrued interest.

**Interrogatory No. 14:**

Describe any demand(s) for payment that you made upon the Debtor prior to the commencement of this bankruptcy case.

**Response to Interrogatory No. 14**

I did not make any formal demand for repayment of my loans during the Debtor's operations. The loans were provided to sustain operations, preserve the Price Tower, and bridge the company until long-term financing, refinancing, or a sale could be achieved.

The only exceptions were two small, temporary repayment requests in 2024, which were made for short-term personal liquidity needs:

- March 28, 2024: $25,000 repayment (requested through Renee Nichols, with Paul Aubert informed).

- April 22, 2024: $10,000 repayment (requested through Renee Nichols, with Paul Aubert informed).

These amounts were promptly re-loaned back into the Debtor, along with additional funds, including:

- **April 17, 2024:** $7,500 and $1,600 loans advanced back into the company.

- **July–August 2024:** Multiple new loan advances totaling over $50,000.

- **October 2024:** $7,500 (10/01), $5,017 (10/09), and $15,000 (10/16) loan advances, exceeding the March/April temporary repayments.

- **January 15, 2025:** Regulatory fee paid personally by me, booked as a loan.

- **January 21, 2025:** $7,500 cash loan advance.

Accordingly, the net effect of these temporary withdrawals was not a reduction in my loans but rather a continuation and increase of my financing support through January 21, 2025.

As I stated in my response to the Trustee's objection to my Proof of Claim, I did not set a maturity date on my loans because once the unexpected McFarlin lawsuit was filed, I had no way of knowing how long the litigation would take or what the company's financial needs would be as we navigated it. The fact that my last loan was made on January 21, 2025 — the day before the bankruptcy filing — demonstrates clearly that these were loans and not equity contributions,

The only formal demand for repayment occurred in the context of this bankruptcy, through the filing of my Proof of Claim and supporting documentation.

## REQUESTS FOR PRODUCTION

**Request for Production No. 1:**

Produce copies of any and all documents referred to within, and/or that support or relate to, any of your responses to the Trustee's Interrogatories above.

**Response to Request for Production No. 1:**

Copies of and loan documentation, QBO transactions and ledger, and company bank statements and other supporting documentation have been provided to the Trustee.

**Request for Production No. 2:**

Produce any and all Documents that evidence or memorialize any loan and/or loan advances made by you to the Debtor, including, without limitation, credit/debit card receipts and/or statements, and checks or other drafts.

**Response to Request for Production No. 2:**

Responsive documents are included in the Proof of Claims already filed with the Court and provided to the Trustee.

**Request for Production No. 3:**

Produce copies of any documents, other than the Ledger, that evidence, illustrate and/or support your calculation of sums allegedly due by the Debtor to you for services rendered by you.

**Response to Request for Production No. 3:**

I did not seek compensation for services rendered; my Proof of Claims are based solely on loans advanced to the Debtor.

**Request for Production No. 4:**

Produce copies of any and all additional documents that support any loan allegedly made by you to the Debtor.

**Response to Request for Production No. 4:**

See Proof of Claims and supporting exhibits, which contain responsive documents.

Respectfully submitted,

*/s/ Cynthia Diane Blanchard/*
Cynthia Diane Blanchard, pro se
414 SE Washington Blvd. Ste. 205
Bartlesville, OK 74006
310-435-5707

Date: September 30, 2025